1   Reed R. Kathrein (139304)
    Peter E. Borkon (212596)
2   HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 202
3   Berkeley, CA 94710
    Telephone:  (510) 725-3000
4   Facsimile:  (510) 725-3001
    reed@hbsslaw.com
5   peterb@hbsslaw.com

6   Steve W. Berman (*pro hac vice*)
    Sean R. Matt (*pro hac vice*)
7   Erin K. Flory (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO LLP
8   1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
9   Telephone:  (206) 623-7292
    Facsimile:  (206) 623-0594
10  steve@hbsslaw.com
    sean@hbsslaw.com
11  erin@hbsslaw.com

12  Attorneys for Lead Plaintiffs, the YieldPlus Investor Group

13

14

15                UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                 SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | FIRST CONSOLIDATED AMENDED COMPLAINT <br><br> Date Action Filed:  March 18, 2008 |

28

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ...................................................................................................1

    A.   Claims of the Securities Class ....................................................................1

    B.   The Claims of the State Law Class..............................................................4

        1.   The unapproved change in investment policy claim ........................4

        2.   The insider trading claim.................................................................5

    C.   The Staggering Losses.................................................................................5

    D.   Plaintiffs' Claims........................................................................................8

II.  JURISDICTION AND VENUE ...........................................................................8

III. PARTIES................................................................................................................9

    A.   Plaintiffs .....................................................................................................9

    B.   Defendants ..................................................................................................9

IV.  FACTUAL ALLEGATIONS ..............................................................................14

    A.   Introduction to the Fund ...........................................................................14

    B.   The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund ..............................................................................14

    C.   The Misstatements of Material Fact and Material Omissions....................17

        1.   The misstatements of material fact and material omissions contained in the Fund's Registration Statements and SEC-filed Prospectus materials. .......................................................17

        2.   The material misstatements and omissions in Defendants' other written selling and offering notices, circulars, advertisements, letters and communications .....................................................28

        3.   The material misstatements and omissions in Defendants' oral offer and selling communications. ..............................................38

    D.   The Core Misrepresentations in All Written and Oral Materials. ..............41

    E.   Accounting Violations by the Fund, the Schwab Defendants and PriceWaterhouseCoopers. ..........................................................................47

    F.   Defendants Failed to Treat All Shareholders Equally ...............................54

    G.   The Fund's Management Profited Greatly from Running the Fund ...........54

        H.      Defendants' Misconduct Causes Huge Losses ........................................... 55

        I.      Schwab Continues to Deny the Truth ...................................................... 62

V.      CLASS ACTION ALLEGATIONS ......................................................... 62

COUNT I  VIOLATIONS OF SECTION 11 OF THE 1933 ACT AGAINST
         ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ................................. 64

COUNT II  VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT AGAINST
          ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ................................. 65

COUNT III  VIOLATIONS OF SECTION 15 OF THE 1933 ACT AGAINST
           THE CONTROL GROUP DEFENDANTS ON BEHALF OF THE
           SECURITIES CLASS ............................................................................................ 67

COUNT IV  INTENTIONAL INTERFERENCE WITH CONTRACTUAL
          RELATIONS ON BEHALF OF THE STATE LAW PRE-BREACH CLASS ..................... 67

COUNT V  VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE
         §§ 17200 *ET SEQ.* ON BEHALF OF THE STATE LAW PRE-BREACH CLASS .............. 74

COUNT VI  INTENTIONAL INTERFERENCE WITH CONTRACTUAL
          RELATIONS ON BEHALF OF THE STATE LAW POST-BREACH CLASS ................... 75

COUNT VII  VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE
           §§ 17200 *ET SEQ.* ON BEHALF OF THE STATE LAW POST-BREACH CLASS ........... 76

COUNT VIII  BREACH OF FIDUCIARY DUTY ON BEHALF OF THE STATE
            LAW POST-BREACH CLASS ............................................................................ 77

PRAYER FOR RELIEF .................................................................................................. 77

JURY DEMAND .......................................................................................................... 78

Plaintiffs, for their First Consolidated Amended Complaint, allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by and through their attorneys, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles, accounting and valuation experts, and other publicly available materials.

## I.   INTRODUCTION

1.     Plaintiffs bring this action against members of the Charles Schwab financial services family, on behalf of persons who bought shares in the Schwab YieldPlus Fund (the "Fund").  The Fund sold two classes of shares:  Investor Shares (ticker SWYPX) and Select Shares (ticker SWYSX).

2.     Plaintiffs allege that Defendants violated federal and state law in registering, marketing and selling the Fund as a stable, "ultrashort" bond fund that was a safe alternative to cash and which had "minimal" risk of a fluctuating share price.  Schwab marketed the Fund as "very very safe."  In fact the Fund was not an ultrashort bond fund, let alone one that was "stable" and "safe," because it was comprised of assets that were not truly short term in nature and otherwise riskier than represented.  In addition, the Fund's holdings were routinely mispriced and misleadingly described, obscuring their true value and the assets of the Fund.  Eventually the true risks presented by the assets held by the Fund were revealed, resulting in staggering losses to Fund investors.

3.     Plaintiffs seek to certify two distinct Classes, the "Securities Class" and the "State Law Class" as defined below.  (*See* ¶¶ 122-123 *infra*.)  Where pertinent, this complaint refers to both classes as the "Classes."  The claims of each class are summarized below.

## A.     Claims of the Securities Class

4.     The Registration Statement and Prospectus materials (including notes, circulars, and other written communications) made fundamental and core representations to investors that the Fund was subject to minimal risk.  By way of example, these representations included representations that:

1    •    The Fund is "an ultra short term bond fund designed to offer high current income

2        with minimal changes in share price."

3    •    "The Fund seeks to keep the average duration of its portfolio at one year or less."

4    •    The Fund's performance was benchmarked to the Lehman Brothers short 9-12

5        month U.S. Treasury Index.

6    •    The Fund is managed to "help maintain a high degree of share price stability and

7        preserve investors' capital."

8    •    "Looking for higher yields on your long-term cash with minimal exposure to

9        interest-rate risk?  The Schwab YieldPlus Fund® could be a smart alternative."

10   •    "CDs and ultrashort bond funds such as YieldPlus funds can be used as part of your

11       portfolio cash allocation…."

12   •    "Schwab YieldPlus ultrashort bond fund offers good returns with low principal risk."

13       5.    Defendants designed these core representations in order to portray the Fund as a

14   "smart solution[] for diversification and stability of capital" and a "smart alternative for your cash."

15       6.    The foregoing representations contained untrue statements of material facts, omitted

16   to state other facts necessary to make the statements not be misleading, and/or omitted to state

17   material facts required to be stated therein.  This was the case because:

18   •    The Fund had elements of credit and liquidity risk not consistent for a fund

19       represented to be an "ultrashort bond fund."  Given the asset composition of the

20       Fund, and its resulting exposure to interest rate risk, credit risk and liquidity risk, it

21       was not a "short term bond fund designed to offer high current income with minimal

22       changes in share price."

23   •    Schwab repeatedly represented that "the Fund seeks to keep the average duration of

24       its portfolio at one year or less."  This representation regarding duration was critical

25       to the ability of the Fund to maintain a level of risk that would in fact provide

26       "minimal exposure to interest rate risk."  Duration is the measure of a security's

27       price sensitivity to changes in interest rates; the lower the duration, the lower this

28       risk.  A representation that duration is one year reflects the risk of a 1-year Treasury.

1       The actual duration of the securities held by the Fund, as calculated for Plaintiffs by

2       a sophisticated industry expert, using only the holdings reports Schwab publicly

3       issued, exceeded two years, a fact that indicates that the risk associated with the

4       Fund was much greater than represented.  Once all of the details relating to the

5       illiquid securities held by the Fund are revealed in discovery and included in this

6       analysis, the actual average duration of the Fund is likely to be far greater.

7   •    The Fund's performance was not comparable to the Lehman Brothers short 9-12

8       U.S. Month Treasury Index, due to the fact that the average duration of Fund assets

9       exceeded two years and its holdings had far greater credit and liquidity risk due to a

10      heavy concentration in mortgage-backed securities.

11  •    Schwab misrepresented maturity dates for securities listed in the holding reports.

12      Instead of providing the true maturity date, Schwab represented that the coupon

13      payment date was the maturity date.  This is misleading because coupon payment

14      dates are always sooner than maturity for securities that pay interim interest.  This

15      misrepresentation helped conceal the fact that the duration was not as represented.

16  •    Schwab misrepresented the description of the securities listed in the holding reports

17      sent to investors.  For example, basic descriptions of the holdings change, but basic

18      descriptions should not change over time if they were accurate in the first instance.

19  •    Schwab misrepresented the pricing of securities listed in the holding reports, thereby

20      overstating the value of securities held by the Fund and rendering the Fund's

21      financial statements false and misleading.

22  •    The asset allocation of the Fund was inconsistent with Schwab representations that

23      the Fund was managed for price stability.  For example, by May 31, 2007, 46.50%

24      of Fund assets were invested in mortgage-backed securities, and this figure grew to

25      50.10% by February, 28 2008.  Such a high concentration of securities in a single

26      asset class is completely inconsistent with the represented classification of the Fund

27      as an "ultra short bond fund" designed to have "minimal changes in share price."

28

**B.      The Claims of the State Law Class**

      **1.      The unapproved change in investment policy claim.**

      7.      In Registration Statements and Prospectuses, Defendants agreed that the Fund's investment policy may be changed "only by vote of a majority of a fund's outstanding shares." *See*, *e.g.*, Nov. 15, 2004, Statement of Additional Information at 37.

      8.      As part of that policy, Schwab indicated that the Fund may not "concentrate" in a particular industry and adopted the Securities and Exchange Commission ("SEC") definition of "concentration" as investing 25% or more of Fund assets "in an industry or group of industries." The Fund also annually declared that it would remain fully diversified and would not concentrate holdings in any particular industry <u>unless a majority of the Fund's shareholders first voted to allow such concentration</u>.

      9.      The Fund adhered to this provision for many years.  But beginning in 2006, in an attempt to boost the Fund's competitive rate of return and to attract more shareholders, the Fund made a deliberate decision to modify and exceed the fundamental policy's 25% limitation on investing in a single industry or group of industries:  the Fund invested 28.9% of holdings in mortgage-backed securities.  Although required to do so, at no time did the Fund solicit or receive shareholder approval to exceed the 25% ceiling.

      10.      Moreover, in subsequent filings, Schwab sought to hide the change.  Buried deep in the September 1, 2006, Statement of Additional Information, Defendant Schwab Investments amended the November 15, 2005, Prospectus to redefine "single industry" so that there was no limit on the amount of mortgage-backed securities the Fund could hold.  In violation of the Investment Company Act ("ICA"), this amendment, which was made retroactive, was done without a shareholder vote.  Further, this fundamental change was not noted by any highlight, reference or separate filing, such as a customary and short "supplement" to the Prospectus.

      11.      In 2007 and 2008, again without shareholder approval, Defendants invested over 45% of Fund assets in mortgage-backed securities, with the effect of dramatically transforming the Fund into a higher risk investment.  The volatility that comes with that higher risk resulted in the

loss of billions of dollars.  The State Law Class asserts claims arising from the failure of Defendants to seek and obtain a vote prior to this change in investment policy.

### 2. The insider trading claim.

12.     Other Schwab funds that were managed by the same persons who managed the YieldPlus Fund also invested in the Fund.  Adding insult to Class members' injuries here, before the public investors became aware of the losses that would occur in the Fund, these other Schwab funds redeemed their shares before the Fund's net asset value ("NAV") dropped.  Thus, the State Law Class also asserts claims for breach of fiduciary duty arising from the fact that other Schwab investment funds that were managed by the same entities and persons as the Fund, with inside knowledge of the truth about the Fund, liquidated their holdings in the Fund at the expense of the other Fund investors.

## C.     The Staggering Losses

13.     By extending average duration of the portfolio in excess of two years, and by investing in 46% to 50% of portfolio assets in mortgage-backed securities, Defendants caused the Fund and its shareholders to incur billions of dollars in losses.  Shareholders have thus watched their supposedly safe, secure and good-as-cash YieldPlus shares decline from a long-standing NAV of approximately $9.70 per share to $6.19 per share as of August 29, 2008 – a drop of more than one-third, as depicted in the following chart:

1

2

3

4

5

6

7

8

9

10

11



12    14.    Morningstar dropped this fund from a five-star rating with low risk in August of

13    2007 to a one-star rating with high risk in 2008 and noted that the Fund "has been very volatile

14    compared with its peers."  As of August 31, 2008, Morningstar reported that the Fund was "more

15    risky" than most funds considered "ultrashort" and that the Fund did not "stick to higher quality

16    issues" and took on credit risk not associated with "ultrashort" funds.  The following graph

17    published by Morningstar shows the Fund's falling returns as it deviated from its fundamental and

18    core representations of safety and the manner in which other bond funds in the "ultrashort"

19    category were managed.[1]

20

21

22

23

24

25

26

27

28
_____
[1] In the graph, "+/- Cat" refers to the ultrashort bond fund category.

**Performance** _more ▶▶

**Growth of $10,000**                                    08-31-08

| | 2.2 | 3.4 | 5.5 | -1.2 | -29.4 |
|---|---|---|---|---|---|
| ● Fund | 2.2 | 3.4 | 5.5 | -1.2 | -29.4 |
| ● +/- Cat | 1.0 | 0.8 | 0.8 | -3.7 | -26.4 |
| ● +/- LB Aggregate Bond TR | -2.1 | 0.9 | 1.1 | -8.2 | -31.4 |

| **Trailing Returns %** | | | 08-29-08 |
|---|---|---|---|
| | YTD | 3 year | 5 year |
| Fund | -29.37 | -9.37 | -4.72 |
| % Rank in Cat | 99 | 100 | 100 |

15.     On August 20, 2008, Morningstar analyst Miriam Sjobom referred to the Fund as "an unmitigated disaster," noting "[a]lthough it's designed to be one of the more reliable holdings in a portfolio, its sizable stakes in nonagency mortgage- and asset-backed bonds, including some backed by subprime loans, have proved treacherous."  Ms. Sjobom suggested that the remaining shareholders flee the Fund because they "won't be able to recoup the majority of the damage":

> Since our last analysis of the fund in March, it has suffered additional losses and a management shakeup.  The fund is now down 31% for the 12 months ended Aug. 19, 2008, the worst showing in the ultrashort-bond category by far.  In mid-June, Schwab replaced manager Kim Daifotis, who had led the shop's fixed-income group . . . .
>
> Still, with its performance record in the dustbin and Schwab's credibility severely dented, where can the fund go from here?  The prognosis doesn't look good.  Because many of the bonds have been sold, shareholders won't be able to recoup the majority of the damage.  We also wouldn't be surprised to see the fund share the fate of troubled rivals SSgA Yield Plus and Evergreen Ultra Short Opportunities, both of which were liquidated in recent months.  Shareholders have been effectively liquidating the fund already:  It has experienced the greatest amount of net outflows of any mutual fund this year, with net assets dropping to $524 million at the end of

July from $6.5 billion at the start of 2008.  Remaining shareholders would be better off following suit.  [Emphasis added.]

16.     The shareholders of the Fund have now lost up to 36% of their supposedly safe cash investment.  Many are retirees, and many had put the money aside as emergency cash.  Now, much of it is gone.  The impact of the losses is revealed in a letter sent by a long-time Schwab client who had been told the Fund was "very stable," held "short term securities" and would experience only "minimal fluctuations":  "I am 79 years old and would had never switched had I not been assured … that my principal was secure."  On the other hand, Schwab made millions in fees it collected to manage the Fund, as did Schwab's representatives who received higher commissions by steering investors "cash allocations" into the highly risky Fund.

**D.     Plaintiffs' Claims**

17.     Plaintiffs bring claims under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. §§ 77k, 77i and 77o), intentional interference with contractual relations, violations of California Business & Professions Code § 17203 (unfair competition) and breach of fiduciary duty.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under § 22 of the Securities Act, 15 U.S.C. § 77v, 28 U.S.C. §§ 1331, 1332(d)(2) and 1367, and the principles of pendent and supplemental jurisdiction.

19.     Venue is proper in this District pursuant to 15 U.S.C. § 80a-43, 28 U.S.C. § 139l(b).  Many of the acts giving rise to the violations of law complained of herein, including the board-of-directors meetings, the preparation and dissemination to shareholders of the Registration Statements and Prospectuses, and the decision to deviate from the Fund's fundamental policy without first obtaining shareholder approval, occurred in this District.  The Fund, Schwab, Schwab Corp., the Trust and the Investment Advisor, as described below in paragraphs 25-28, have offices in this District.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

1    to, the mails, interstate telephone communications and the facilities of the national securities

2    markets.

3                                    **III.     PARTIES**

4    **A.     Plaintiffs**

5           21.     By order entered July 2, 2008, the Court appointed the following members of the

6    YieldPlus Investor Group as the Lead Plaintiffs for the above-named action:  Kevin O'Donnell,

7    James Coffin, John Hill, David and Gretchen Mikelonis, and Robert Dickson (the "Lead

8    Plaintiffs").  Lead Plaintiffs purchased Investor or Select shares of the Fund during the relevant

9    time period[2] pursuant to or traceable to a registration statement and prospectus at issue in this

10   complaint and have been damaged thereby.

11          22.     Plaintiff Robert Levin purchased Investor and (ticker SWYPX) or SelectFund

12   (ticker SWYSX) shares of the Fund before the Fund's investments in mortgage-backed securities

13   exceeded 25% of assets and has been damaged thereby.

14          23.     Plaintiff Karl Kyzer purchased Investor and (ticker SWYPX) or SelectFund (ticker

15   SWYSX) shares of the Fund after the Fund's investments in mortgage-backed securities exceeded

16   25% of assets and has been damaged thereby.

17   **B.     Defendants**

18          24.     The Defendants are all affiliated with each other and conduct business under the

19   umbrella of the "Charles Schwab" name, which is one of the largest financial services

20   organizations in the world.

21          25.     Defendant The Charles Schwab Corporation ("Schwab Corp.") is the parent

22   company of the Charles Schwab financial services complex.  It is a holding company which

23   engages in securities brokerage, banking services and related financial services through its

24   subsidiaries.  Schwab Corp. is the parent company of Schwab and Schwab Investment

25   Management, Inc.  It is headquartered at 101 Montgomery Street, San Francisco, CA 94104.

26
     _____

27          [2] This complaint uses "relevant time period" to refer to the time period March 17, 2005, to
     March 17, 2008 for the Securities Class.  The State Law Class encompasses the period from
28   initiation of the Fund to March 17, 2008.

1    26.    Defendant Charles Schwab & Co., Inc. ("Schwab" or "Underwriter") is also

2    headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab is the parent

3    company of Schwab Investments.  Pursuant to a Distribution Agreement, Schwab was, during the

4    relevant time period, the principal underwriter and distributor for shares of the Fund and was the

5    Trust's agent for the purpose of the continuous offering of the Fund's shares.

6    27.    Defendant Charles Schwab Investment Management, Inc., also known as Charles

7    Schwab Investment Management Services ("Schwab Management" or the "Investment Advisor"),

8    is also headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Management

9    is the asset management arm of The Charles Schwab Corporation, with over $200 billion in assets

10   under management.  Schwab Management oversees the asset management and administration of

11   the YieldPlus Fund.  As compensation for these services, Schwab Management receives a

12   management fee from the Fund.

13   28.    Defendant Schwab Investments ("Issuer," "Trust" or "Registrant") also has its

14   headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments was

15   organized under Massachusetts law on October 26, 1990, and is a Massachusetts Business Trust.  It

16   is the Registrant for the YieldPlus Fund, the issuer of Fund shares, and performed trust services for

17   the Fund.  The YieldPlus Fund is a series of the Trust.

18   29.    The relationship between the foregoing entities and the Fund is depicted in the

19   following diagram:

20

21

22

23

24

25

26

27

28

FIRST CONSOLIDATED AMENDED COMPLAINT
No. 08-cv-01510 WHA
010036-11  263556 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15      30.     Defendant Charles R. Schwab ("Charles Schwab") is the founder, Chairman, Chief

16  Executive Officer and Director of The Charles Schwab Corporation.  He is also the Chairman and

17  Trustee of Schwab Investments and the Fund.  As a result of his ownership of and interests in The

18  Charles Schwab Corporation, Mr. Schwab is deemed by Schwab's filings with the SEC to be a

19  controlling person of the Investment Adviser and Schwab.  Charles Schwab signed or authorized

20  the signing of the Registration Statements and served as a trustee of Schwab Investments.

21      31.     Defendant Evelyn Dilsaver was President and Chief Executive Officer ("CEO") of

22  the Fund and signed each Registration Statement effective during the relevant time period through

23  November 15, 2006.  Dilsaver also signed each Shareholder Report and the separate certifications

24  as Registrant's principal executive officer and principal financial officer (containing the Sarbanes

25  Oxley certifications), as required by Rule 30a-2(a) under the ICA, attached to each certified

26  Shareholder Report through April 7, 2007, and was a trustee of Schwab Investments.

27

28

32.     Defendant Randall W. Merk was a Trustee and then President and Chief Executive Officer of the Fund after Defendant Dilsaver left.  He was also President and Chief Officer of Schwab Management.  Defendant Merk signed each Registration Statement beginning with the November 15, 2005, Registration Statement.

33.     Defendant George Pereira has been Chief Financial Officer and Treasurer of the Fund and signed each Registration Statement beginning with the November 15, 2005, Registration Statement.  Pereira also signed each Shareholder Report and the separate certifications for Registrant's principal executive officer and principal financial officer (containing the Sarbanes Oxley certifications), as required by Rule 30a-2(a) under the ICA, attached to each certified Shareholder Report through June 12, 2007.

34.     Defendant Mariann Byerwalter ("Byerwalter") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

35.     Defendant Donald F. Doward ("Doward") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

36.     Defendant William A. Hasler ("Hasler") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

37.     Defendant Robert G. Holmes ("Holmes") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

38.     Defendant Gerald B. Smith ("Smith") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

39.     Defendant Donald R. Stephens ("Stephens") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

40.     Defendant Michael W. Wilsey ("Wilsey") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 49, *infra*.

41.     Defendant Kimon Daifotis ("Daifotis") was a senior vice president, the Chief Investment Officer of fixed income of Schwab Investments, and the Manager of the Fund since its inception in October 1999 until approximately June 13, 2008, when Schwab's SEC filings noted that he had been replaced.  He was also Senior Vice President and Head of Fixed Income Portfolio

1   Management at Schwab Management.  On information and belief due to his position as the person

2   with "overall responsibility for the management of the funds," he participated in the written or oral

3   communications used to market the Fund.

4         42.      Defendant Matthew Hastings joined Daifotis in 2004 and was primarily responsible

5   for the Fund's day-to-day management during the relevant time period and participated in the

6   marketing of the Fund.

7         43.      The persons identified above in ¶¶ 30-42 sometimes are referred to as the

8   "Individual Defendants."

9         44.      The roles of the Individual Defendants are summarized as follows:

| Registration Statement Signers |
| --- |
| Charles Schwab |
| Evelyn Dilsaver (through Nov. 15, 2006) |
| Randall Merk (beginning Nov. 15, 2005) |
| George Pereira (beginning Nov. 15, 2005) |
| Mariann Byerwalter |
| Donald Doward |
| William Hasler |
| Robert Holmes |
| Gerald Smith |
| Donald Stephens |
| Michael Wilsey |

| Fund Officer Defendants |
| --- |
| Charles Schwab, *Chairman* |
| Evelyn Dilsaver, *President and CEO* (through Nov. 15, 2006) |
| Randall Merk, *President and CEO* (after Nov. 15, 2006) |
| George Pereira, *Chief Financial Officer and Treasurer* (beginning at least Nov. 15, 2005) |
| Kimon Daifotis, *Manager* (October 1999 to June 13, 2008) |
| Matthew Hastings, *Manager* (2004 to present) |

FIRST CONSOLIDATED AMENDED COMPLAINT                    - 13 -
No. 08-cv-01510 WHA
010036-11 263556 V1

45.     Schwab Corp., Schwab, Schwab Management, Schwab Investments, and the Individual Defendants, directly or indirectly, control the Fund, both individually and collectively.

46.     Defendant PricewaterhouseCoopers LLP ("PWC") was the auditor for the Fund and consented to the incorporation by reference of their audit reports into the Registration Statements during the relevant time period.

## IV.     FACTUAL ALLEGATIONS

### A.     Introduction to the Fund

47.     The Schwab YieldPlus Fund (the "Fund") is an open-ended mutual fund organized as a Massachusetts business trust registered under the Investment Company Act.  It has issued two series of securities:  Investor Shares (ticker SWYPX) and Select Shares (ticker SWYSX).  Select Shares have a much higher minimum purchase requirement – $50,000 as compared to $2,500 for Investor Shares.  Select Shares have lower expenses than the Investor Shares.

48.     The Schwab entities positioned the Fund as a purportedly safe alternative to money market funds but with a higher yield.  Throughout the relevant time period, Defendants marketed the Fund as an "ultrashort bond fund" designed to invest primarily in investment grade bonds with a duration of one year or less.  As described by the Prospectuses, the Fund's basic strategy was to achieve high income returns while avoiding the risks of interest rate fluctuations, illiquidity or share price fluctuations by focusing the Fund's portfolio in very short-term, highly rated, fixed-income securities.  The Prospectuses touted the Fund's short duration strategy as "maintain[ing] an average portfolio duration of one year or less" in order to "maintain price share stability and preserve investor capital."

### B.     The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund

49.     Defendants annually filed nearly identical Registration Statements and Prospectuses throughout the relevant time period in connection with the continuous offerings of the Fund's shares.  Each annual Registration Statement and Prospectus would be filed with the SEC and become effective on or about November 15.  The Fund's shares were issued to investors pursuant

to the following series of Registration Statements filed with the SEC and made effective during the

relevant time period, which are referred to collectively as the "Registration Statements":

- Registration Statement filed pursuant to Form N-1A on September 1, 2004, and made effective as of November 15, 2004;

- Registration Statement filed pursuant to Form N-1A on November 12, 2004, and made effective as of November 15, 2004 (the "2004 Registration Statement");

- Registration Statement filed pursuant to Form N-1A on September 2, 2005, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 14, 2005, and made effective as of November 15, 2005 (the "2005 Registration Statement");

- Registration Statement filed pursuant to Form N-1A on September 5, 2006, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 15, 2006, and made effective as of November 15, 2006 (the "2006 Registration Statement");

- Registration Statement filed  pursuant to Form N-1A on August 31, 2007, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 14, 2007, and made effective as of November 15, 2007 (the "2007 Registration Statement");

50.     The Fund was marketed and sold to investors pursuant to the following series of

Prospectuses, which were supplemented periodically and which are referred to collectively herein

as the "Prospectuses," including:

- Prospectus dated November 15, 2004 (the "2004 Prospectus");

- Prospectus dated November 15, 2004, as amended September 15, 2005;

- Prospectus dated November 15, 2005 (the "2005 Prospectus");

- Prospectus dated November 15, 2005, as amended August 17, 2005;

- Prospectus dated November 15, 2006 (the "2006 Prospectus");

- Prospectus dated November 15, 2006, as amended July 13, 2007;

- Prospectus dated November 15, 2007 (the "2007 Prospectus"); and

- Prospectus dated November 15, 2007, as amended June 13, 2008.

51.     Most of the Prospectuses, with the exception of the 2004 Prospectus, also explicitly

incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual

Report for that year, each of which provided investors with additional guidance about, *inter alia*,

the Fund's investment strategies and limitations.  These Prospectuses referred investors seeking

more information to the SAI, which "includes a more detailed discussion of investment policies

and the risks associated with various investments" and which "is incorporated by reference into the

prospectus, making it legally part of the prospectus."  Schwab Investments reissued and updated

the SAIs throughout the relevant time period.  Thus, the SAIs and Certified Shareholder Reports

incorporated into the Prospectuses were part of the Prospectuses.  They include the following:

<u>Statements of Additional Information</u>

- Statement of Additional Information dated November 15, 2004;

- Statement of Additional Information dated November 15, 2004, as amended December 10, 2004;

- Statement of Additional Information dated November 15, 2004, as amended December 15, 2004;

- Statement of Additional Information dated November 15, 2004, as amended February 28, 2005;

- Statement of Additional Information dated November 15, 2004, as amended April 18, 2005;

- Statement of Additional Information dated November 15, 2004, as amended September 16, 2005;

- Statement of Additional Information dated November 15, 2005;

- Statement of Additional Information dated November 15, 2005, as amended December 9, 2005

- Statement of Additional Information dated November 15, 2005, as amended February 1, 2006;

- Statement of Additional Information dated November 15, 2005, as amended September 1, 2006;

- Statement of Additional Information dated November 15, 2006;

- Statement of Additional Information dated November 15, 2006, as amended February 1, 2007;

- Statement of Additional Information dated November 15, 2006, as amended May 7, 2007;

- Statement of Additional Information dated November 15, 2006, as amended July 25, 2007;

- Statement of Additional Information dated November 15, 2006, as amended August 16, 2007;

- Statement of Additional Information dated November 15, 2006, as amended October 17, 2007; and

- Statement of Additional Information dated November 15, 2007.

Semi-Annual and Annual Certified Shareholder Reports

- Semi-annual Certified Shareholder Report dated February 29, 2004;

- Annual Certified Shareholder Report dated August 31, 2004;

- Semi-annual Certified Shareholder Report dated February 28, 2005;

- Annual Certified Shareholder Report dated August 31, 2005;

- Semi-annual Certified Shareholder Report dated February 28, 2006;

- Annual Certified Shareholder Report dated August 31, 2006;

- Semi-annual Certified Shareholder Report dated February 28, 2007;

- Annual Certified Shareholder Report dated August 31, 2007; and

- Semi-annual Certified Shareholder Report dated February 29, 2008.

52.     Each of the foregoing documents that were issued during the period March 17, 2005, through March 17, 2008, were false and misleading as described below.

**C.     The Misstatements of Material Fact and Material Omissions**

    **1.     The misstatements of material fact and material omissions contained in the Fund's Registration Statements and SEC-filed Prospectus materials.**

53.     From the November 15, 2004, Registration Statement and Prospectus onward throughout the entire relevant time period, Defendants issued and offered for sale shares of the Fund, along with associated sales materials and advertisements, including web pages which also constitute a prospectus under the securities laws.  Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the relevant time period and continued to offer and sell the Fund's newly issued securities through notices, circulars, advertisements, letters, by radio and television, and over the Internet.

54.     The Registration Statements, Prospectuses, SAI's and Certified Shareholder Reports used throughout the relevant time period to register and offer Select and Investor Shares of the Fund to Plaintiffs and the Class contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.  While the Prospectuses issued

during the relevant time period were not perfectly identical, they did contain many of the same untrue statements and were rendered misleading by the same omissions.  These include the following statements.

55.    November 15, 2004, Prospectus:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN US SHORT TREASURY:  9-12 months" index.

56.    Each of these representations in the November 14, 2005, prospectus is false for the reasons stated in ¶¶ 86-87.

57.    November 15, 2004, Prospectus, as amended September 15, 2005:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for

higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN US SHORT TREASURY:  9-12 months" index.

58. Each of these representations in the November 14, 2005, prospectus is false for the reasons stated in ¶¶ 86-87.

59. November 14, 2005, Prospectus:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO

BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies. To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less. Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate. In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- "INVESTMENT STYLE RISK. In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS" index.

- "TRADE ACTIVITY MONITORING. The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability. Because of its historical ability to minimize its share price fluctuations, the Fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

60.     Each of these representations in the November 14, 2005, prospectus is false for the reasons stated in ¶¶ 86-87.

61.     November 15, 2005, Prospectus, as amended August 17, 2006:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price. The fund invests primarily in investment-grade bonds. The fund offers the potential for higher yields than a money market fund. However, unlike a money market fund, its share price will fluctuate. The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the Fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

62.    Each of the foregoing representations is false for the reasons stated in ¶¶ 86-87.

63.    November 15, 2006, Prospectus:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- • "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- • "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- • "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- • "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- • "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- • The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS*" index.

- • "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

64.     Each of the foregoing representations is false for the reasons stated in ¶¶ 86-87.

65.     November 15, 2006, Prospectus, as amended July 13, 2007:

- • "THE SCHWAB YIELDPLUS FUND (R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund seeks to keep the average duration of its portfolio at one year or less."

- • "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- • "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- • "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- • "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- "INVESTMENT STYLE RISK. In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY: 9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING. The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability. Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

66. Each of these representations is false for the reasons stated in ¶¶ 86-87.

67. November 14, 2007, Prospectus:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price. The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- "INVESTMENT STYLE RISK. In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN SHORT U.S. TREASURY: 9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING. The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability. Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

68. Each of the foregoing representations is false for the reasons stated in ¶¶ 86-87.

69. November 15, 2007, Prospectus, as amended June 13, 2008:

- "THE SCHWAB YIELDPLUS FUND(R) is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price. The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund . . . ."

- "INVESTMENT STYLE RISK. In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN SHORT U.S. TREASURY: 9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING. The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability. Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

70. Each of these representations is false for the reasons stated in ¶¶ 86-87.

71.     While the SAIs issued during the relevant time period were not identical, they did contain many of the same untrue statements and were rendered misleading by the same omissions for the reasons stated in ¶¶ 86-87.  These include the following statements:

November 15, 2004, SAI:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 3.

November 15, 2004, SAI, as amended December 10, 2004:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2004, SAI, as amended December 15, 2004:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2004, SAI, as amended February 28, 2005:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2004, SAI, as amended April 18, 2005:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2004, SAI, as amended September 16, 2005:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2005, SAI:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2005, SAI, as amended December 9, 2005:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2005, SAI, as amended February 1, 2006:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2005, SAI, as amended September 1, 2006:

- "The fund's investment objective is to seek high current income with minimal changes in share price."  Page 2.

November 15, 2006, SAI:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 2.

November 15, 2006, SAI, as amended February 1, 2007:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 2.

November 15, 2006, SAI, as amended May 7, 2007:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 2.

November 15, 2006, SAI, as amended July 25, 2007:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 2.

November 15, 2006, SAI, as amended August 16, 2007:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 1.

November 15, 2006, SAI, as amended October 17, 2007:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 1.

November 15, 2007, SAI:

- "The fund's investment objective is to seek high current income with minimal changes in share price." Page 1.

72.     Each of the foregoing representations in the SAIs were misleading for the reasons stated in ¶¶ 86-87.

73.     Semi-annually, throughout the relevant time period, Schwab Investments also issued Certified Reports to Shareholders of the Fund.  Each report discussed the performance of the Fund, its holdings and its duration.

74.     Also attached to each report was a certification by the Chief Executive Officer and Chief Financial Officer of the Fund, certifying:

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, <u>fairly present in all material respects the financial condition, results of operations, changes in net assets,</u> and cash flows (if the financial statements are required to include a statement of cash flows) of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosures and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of a date within 90 days prior to the filing date of this report based on such evaluation; and

d)     <u>Disclosed in this report any change in the registrant's internal control over financial reporting</u> that occurred during the registrant's most recent fiscal half-year (the registrant's second fiscal half-year in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer(s) and I <u>have disclosed</u> to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     <u>All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting</u> which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.  [Emphasis added.]

75.     Each report also contained the Report of Independent Registered Public Accounting Firm, signed by PricewaterhouseCoopers LLP, attesting to the shareholders that the "accompanying statements of assets and liabilities, including the portfolio holdings, and the related statements of operations and of changes in net assets and the financial highlights present fairly, in all material respects, the financial position of the Funds."

76.     The PWC Report was false and misleading for the reasons stated in Section E below.

**2.     The material misstatements and omissions in Defendants' other written selling and offering notices, circulars, advertisements, letters and communications.**

77.     Throughout the relevant time period, Defendants were also offering and selling shares of the Fund pursuant to a barrage of glossy brochures, letters and advertisements, including web pages.  These notices, circulars, advertisements, letters and communications also constitute a prospectus under the securities laws.  Defendants created and distributed these materials as part of a consistent and coordinated marketing scheme to market the Fund to investors as a higher-yielding "smart" alternative to cash, CDs and money-market funds, which offer a combination of safety and liquidity, or the ability to quickly access cash.

78.     Defendants' website was a key part of Defendants' selling efforts and a tool used by Defendants to convince investors to pour their cash portfolio allocations into the risky Fund. Representations on the website during the relevant time period made materially inaccurate for the reasons stated in ¶ 86-87, and by the omission of material facts, included:

a.      "If you are looking for higher yields on your cash with only marginally higher risk, the Schwab YieldPlus Fund could be a smart alternative."

b.      Defendants advertised the Fund as fitting into a peer group of Morningstar "ultrashort bond funds" which has only slightly more risk than a money market fund.  The following chart was and is used by Schwab on its website to emphasize the low risk of the Fund in comparison to a money market fund:

c.      Defendants advertised the Fund as having a goal to preserve principal while being "designed with your income needs in mind."

d.      Schwab advertised the Fund as a "cash equivalent" on its website.  This language was removed recently.  Notably, Schwab's website, http://www.schwab.com, has multiple menus for investments on its home page.  Under each of these menus is a selection of investments including "CDs & Money Markets."  The "Investments Products" web page also has a link entitled "CDs & Money Markets."  Above that link, Schwab stated, "Find smart solutions for diversification and stability of capital."  Once the investor clicked to the "CD & Money Markets" web page, the investor is presented with three options, including "Explore Cash Solutions" (as well as a box for the Fund stating "Earn higher yields on your long-term cash with minimal exposure to interest rate risk.  Learn more.").  On the "Explore Cash Solutions" link page Schwab promises "Great rates on a wide variety of cash solutions; Earn high returns and meet both your everyday and long-term cash management needs."  Schwab included the Fund as a choice along with two money market funds and three CD choices, stating "Earn higher yields on your long-term cash with minimal exposure to interest rate risk."

e.      The "Discover a smart alternative for your cash" web page.  The link to the Fund in the "CD & Money Market" web page, above, led to a new page for the Fund entitled as of February 2007 "Discover a smart alternative for your cash":

**Discover a smart alternative for your cash**

Looking for higher yields on your long-term cash with minimal exposure to interest-rate risk?  The Schwab YieldPlus Fund® could be a smart alternative.

The YieldPlus Fund offer

**High yields**—As you consider alternatives for your cash, this actively managed ultrashort bond fund offers a history of solid returns (see chart below) and attractive 30-day SEC yields.

**Minimal interest-rate risk**—YieldPlus is managed to help minimize exposure to interest rate risk.  Its share price (NAV) has fluctuated by no more than $0.04 (between $9.65 and $9.69) over the year ending 1/31/2007, giving it the relative stability necessary in today's market.  What is NAV?

**Best-in-class performance**—Morningstar has given YieldPlus Fund Select Shares a five-star overall rating.  And Lipper ranked the fund in the top 10% for the one, three and five year periods ending 1/31/2007.

     f.     The "Discover a smart alternative for your cash" page also touted the Fund's

Morningstar ratings and Comparison to its peers and the Lipper Ultrashort Bond Category:

**Overall Morningstar Rating™**

★ ★ ★ ★ ★

**Select Shares**

★ ★ ★ ★ ★

**Investor Shares**

The Overall Morningstar Rating out of 113 funds in the Ultrashort Bond Category as of 1/31/2007 is derived from the weighted average of the risk-adjusted performance figures associated with a fund's three-year, five-year and 10-year (if applicable) Morningstar-rated metrics.

**Fund performance vs. category** as of 12/31/2006



◼ Schwab YieldPlus Fund–Select Shares®[1] ([SWYSX](SWYSX))

◼ Schwab YieldPlus Fund Investor Shares[2] ([SWYPX](SWYPX))

◼ Lipper Ultrashort Bond Category Average[3]

     g.     The "Let us help you make the most of your cash" Web page.  As late as September 16, 2007, the "CDs & Money Markets" web page also had a link entitled: "Explore Cash Solutions."  This link leads to a page entitled "Let us help you make the most of your cash."  In turn, that page displays the Fund along with CDs as a proper place to put an investor's cash.  The page states that the Fund belongs in the Cash portfolio: "This is cash that is part of your long-term strategic asset allocation to generate income and reduce risk for a time horizon of more than one year.  Every portfolio should contain cash to reduce overall risk.  We recommend holding 5%-30% in cash, depending on your goals."

> Whether used for diversification, a major purchase or daily expenses, we want to make sure your cash – like all your investments – reaches its full potential.

> **How to manage your cash based on your needs**

> Optimizing your returns begins with allocating your cash among three cash types according to your need for liquidity and yield.  In general, the longer you can invest your money, the higher the return you can earn.

| Portfolio Cash | Short-term Savings | Daily Cash |
|---|---|---|

This is cash that is part of your long-term strategic asset allocation to generate income and reduce risk for a time horizon of more than one year. Every portfolio should contain cash to reduce overall risk. We recommend holding 5%-30% in cash, depending on your goals.

| CDs from Schwab CD OneSource™ | Time Horizon | Investment Minimum | Rate as of 09/01/2008 |
|---|---|---|---|
| 1-year CD | 12 months | $1,000 | 3.90% APY BUY |
| 2-year CD | 2 years | $1,000 | 4.35% APY BUY |

Pay no fees when you purchase CDs through Schwab.

| Other Longer-Term Investments | Time Horizon | Investment Minimum | Rate Information |
|---|---|---|---|
| Schwab YieldPlus Fund® | 12 months+ | $2,500 ($1,000 IRA) | View yields |
| Other fixed income products | Varies | From $1,000 | Varies |

Smart cash-investing ideas:

- Manage tax impact and your exposure to the alternative minimum tax (AMT) with a choice of two tax-free YieldPlus funds.
- Visit for our market outlook and weekly cash allocation recommendation.

     h.     The "Let us help you make the most of your cash" page continues to identify the Fund as an appropriate place to park cash. On the left side of the page, in a blue prominent box, along with phone numbers to call, or email addresses to send email to a Schwab representative, are the following links:



**What About Cash?**
By Rande Spiegelman

"…money market funds are more attractive than they've been in a long, long time… "
Read full article.
View additional cash related articles.

**Frequently asked questions**

What is the right amount of cash to hold?
How can I get higher yields without increasing risk? What is the difference between bank and brokered CDs?
What is the difference between the two types of money funds?

**Let us help you make most of your cash.**

Call **800-880-9217** for a personalized recommendation.

j.       The "Cash FAQs" web page.  The links to the "Frequently asked questions"

on the "Let us help you make the most of your cash" Web page lead to the "Cash FAQs"

Webpage.  This page identifies the Fund as an appropriate place for cash with "low

principal risk":

**What is the right amount of cash to hold?**

It all depends on what you need your money for.  Optimize your cash holdings based on your needs:

**Daily cash** is the cash flow you keep on hand for trading and other day-to-day expenses.  Typically this money is held in checking accounts and/or sweep services.  We suggest keeping it to a minimum, as you may be able to earn higher yields by investing in smart cash alternatives.

**Short-term savings** are for known obligations, such as property taxes, your child's wedding or college tuition.  You might cover these with cash reserves (rather than monthly income).  Emergency funds are your buffer for the unexpected.  We recommend setting aside three to six months of after-tax income.  The key here is safety and liquidity.  Purchased money funds are a convenient investment choice, providing next-day liquidity and better interest rates than sweep money funds.  Short-term CDs are a good solution for expenses coming due in the next three to 12 months, and can also be used as part of your portfolio cash allocation.

**Portfolio cash** is the "cash" slice of the investment pie.  Most asset allocation guidelines suggest anywhere from 5% to 30% of your portfolio be kept in cash products, depending on your investing style. <u>CDs and ultrashort bond funds such as YieldPlus funds can be used as part of your portfolio cash allocation, as can the products mentioned above</u>.

**How can I get higher yields without increased risk?**

In general, the longer you invest your money, the higher the yield you can earn.  It's important to understand which risk you want to minimize to make the appropriate risk/reward trade-off.

**Principal risk** occurs when the principal fluctuates in value.  In general, as principal risk increases, yield increases.  Principal risk will be zero in CDs, checking or savings accounts which are FDIC-insured (up to $100,000 per institution).  In other words, if you invest $1,000 in a CD, you can be sure that you will receive at least $1,000 at maturity.  <u>The Schwab YieldPlus ultrashort bond fund offers good returns with low principal risk</u>.

**Liquidity risk** occurs if you need the money before the term of the investment is over.  For instance, many bank CDs have an early withdrawal penalty.  If liquidity is a concern, a purchased money fund may be a good investment since you can access the funds in one business day.

**Interest rate risk** occurs when you are invested at today's rate in a rising interest rate environment.  For instance, by locking in a CD at 3% for five years, you do not have the option of investing that same money if interest rates climb next year to 5%.  To avoid interest-rate risk, consider investing in shorter time horizon instruments like short-term CDs.  [Emphasis added.]

k.      The link to the  **"What About Cash?"** article, on the "Let us help you make the most of your cash" Web page led to the Rande Spiegleman article dated August 3, 2006, and contains a quote that indicates that the article is about "… money funds are more attractive than they've been in a long, long, time…".  The article itself defines cash to include the Fund:

**What is cash?**

In an investment context, cash usually means cash equivalents such as money market funds, Treasury bills (T-bills), short-term corporate commercial paper, and overnight government repurchase agreements. There are also near-cash investments such as short-term certificates of deposit (CDs), <u>ultrashort bond funds</u> and stable value funds.

The article then states the principal reasons to maintain a cash position are as follows:

**Why hold cash?**

Let's look at three broad reasons for maintaining a cash position as part of your financial plan.

**Reason No. 1:  liquidity**

Apart from day-to-day expenses, which you typically pay from current cash flow, the need for liquidity generally falls into two categories:

Emergencies (health problems, you lose your job, etc.).

Known obligations coming due in the next one to three years.

For emergency funds, we recommend setting aside cash equal to three to six months of after-tax income.  The amount that's right for you depends on your job outlook and other sources of income and credit.

Once you decide how much to set aside for emergencies, including that cash in your portfolio allocation is up to you.  Your emergency cash reserve may be larger than your portfolio's targeted cash allocation, in which case you'll need to keep at least some cash outside your investment portfolio.  On the other hand, if your portfolio is big enough, you could choose to include your emergency reserve within your targeted cash allocation.  Either way, the key is safety and liquidity in case of emergency.

Unlike your emergency reserve, which you maintain "just in case," think about cash set aside to cover known obligations as money that's already spent.  Known obligations that you might pay from cash reserves (instead of current salary or other monthly income) can include quarterly estimated income taxes, property taxes, a down payment on a home, your child's wedding, college bills, a vacation, and so on.

Liquidity is extremely important here—don't invest money reserved for short-term obligations in the market.  Instead, keep it in cash or near-cash investments.

**Liquidity for retirees**

Retirees typically have special liquidity needs.  For example, the need for emergency funds may go away – if you're no longer working, there's no need to plan for the possibility of losing your job.  However, you may want to set aside enough cash to cover at least 12 months' living expenses.  Think of it as a "known obligation."

Beyond that, it's not a bad idea to keep another two to four years' worth of expenses in near-cash investments (short-term bonds, ultrashort bond funds, CDs, etc.) as part of the fixed income portion of your retirement portfolio.  That way, when a bear market comes

along, you could avoid having to liquidate other assets during the worst possible time, assuming the bear market doesn't last more than a few years.

**Reason No. 2: flexibility**

By holding a percentage of your portfolio in cash, you can take advantage of investment opportunities as they arise.  For example, a cash allocation may come in handy if you wish to slightly overweight or underweight certain asset classes in your portfolio based on your outlook for the markets.

We're not talking about market timing or even large, tactical shifts between stocks, bonds and cash.  The odds against being consistently right are too great to make such a huge bet.  However, by shifting your asset allocation 5% to 10% one way or the other, you may be able to add value when you're right – without derailing your long-term goals if you're wrong.

In addition, a cash allocation can provide flexibility when it's time to rebalance your portfolio and/or pay investment fees.

**Reason No. 3: stability**

Bonds have been the traditional choice for reducing a portfolio's overall risk.  Bonds tend to perform differently than stocks in the same market conditions – sometimes moving in the opposite direction.

Historically, however, cash is even less correlated with stocks.  What's more, cash is far less volatile than bonds on average.  The big advantage of bonds, of course, is the potential for higher income.  That said, in the appropriate proportion, cash can stabilize your portfolio over time.

**Where should you keep your cash?**

Whatever your reasons for holding cash, you need a good place to park it.  That does NOT include under the mattress or in a big safe.  Physical cash earns no interest and can be stolen or destroyed.

The table below summarizes various ways to invest your cash, from lowest to highest generally expected yield.

**Smart ways to invest your cash**

| Investment | Liquidity | Value | Credit quality |
|---|---|---|---|
| Checking and savings accounts | Immediate | Stable | FDIC insured |
| Money market funds | Immediate (may be limits on writing checks) | Stable | Not FDIC insured |
| Position-traded money market funds | Generally available day after sale | Stable | Not FDIC insured |
| T-bills | Available at maturity | Fluctuates prior to maturity | Backed by U.S. Treasury |
| Certificates of Deposit (CDs) | Penalties for early withdrawal | Stable | FDIC insured |
| Ultra-short bond funds | Generally available day after sale | Fluctuates | Subject to bonds in portfolio (look for overall credit rating of A or better) |
| Stable value funds* | Generally available day after sale, may have short-term redemption fees | Stable | Subject to bonds in portfolio and insurance provider (look for companies rated A or better) |

**The bottom line**

Checking, savings and money market accounts are good for day-to-day expenses as well as your emergency reserve.

Shorter-term CDs and T-bills can be used as part of your strategic cash allocation and are also good for known obligations coming due in the next three to 12 months.

Longer-term CDs, ultrashort bond funds and stable value funds can be used as part of your strategic cash allocation and are good for known obligations coming due within one to three years. . . . [Emphasis added.]

l.        On a separate page, a link to the Speigelman article, Speigelman is identified as CPA, CFP®, Vice President of Financial Planning, Schwab Center for Investment Research®, and describes the article, which recommends the Fund, as identifying, "three reasons to maintain a cash position as part of your financial plan – *and smart cash investments.*"

m.        Schwab has taken down these web pages or has altered any suggestion that their ultrashort bond fund is an appropriate place for the cash portion of an investor's portfolio.  For instance, since March of 2008, the "Discover a smart alternative for your cash" webpage no longer contains this name, and has been changed as follows:

The Schwab YieldPlus Fund® is designed with your income needs in mind.  The fund's objective is to seek high current income with minimal changes in share price....  The YieldPlus Fund offers:

• Monthly Income – The fund invests in a large, well-diversified portfolio of taxable bonds and distributes its income on the last day of each month.

• Low Duration – To minimize changes in share price or NAV, the fund seeks to maintain an average portfolio duration of one-year or less.  However, in volatile markets, the fund may experience a higher degree of NAV fluctuation.

• Active Portfolio Management – The fund is actively managed by a seasoned team of taxable bond portfolio managers who are supported by a team of credit and market analysts.  The team use[s] a disciplined approach designed to deliver competitive total returns, which has become the foundation of managing Schwab's other fixed income funds.

3.      **The material misstatements and omissions in Defendants' oral offer and selling communications.**

79.      Defendants also undertook to market, offer and sell the Fund to investors through oral communications and representations as a safe alternative to cash or preservation of capital.  As admitted in a May 2007 interview with Bloomberg TV, Defendant Matt Hastings, co-manager of YieldPlus, stated:  "The investors that we are trying to capture are money fund investors or investors that are defensive on the bond market."

80.      Schwab brokers (or customer representatives) were trained and specifically taught to sell the Fund as a "cash alternative" on par with money market investments and CDs.  The misstatements above were broadly disseminated by Defendants to the Schwab brokers and customer representatives or financial consultants, and to asset managers and advisors who either sold the Fund, or invested customer assets in the Fund.  Defendants did not reveal the truth about the Fund to the Schwab brokers, customer representative and asset managers, who repeated or passed on the misrepresentations, or invested their clients assets in the Fund based on the misstatements and omissions identified in ¶¶ 86-87.

81.      Schwab presented the Fund to brokers as a money market alternative and encouraged brokers to comb through client lists and recommend to clients that the client shift assets from money markets to the Fund.  Schwab told brokers who, in turn, told clients that the

1   Fund was a safe alternative to a money market account because the Fund had insignificantly

2   greater risk and higher yields.  Brokers were told that the Fund had no sub-prime exposure.

3   Brokers were told that this was essentially a cash equivalent.  Schwab also encouraged investments

4   in the Fund because investors could not write checks against Fund accounts.  This meant Schwab

5   had use of the cash without the additional cost to Schwab of administering a money market fund.

6   The Fund managers at Schwab issued guidelines for brokers to target a certain type of investor.

7   Specifically, anyone who had a 12-month time frame for a money market investment or a CD was

8   a target for the Fund.  Brokers were instructed to sell this as a safe harbor for investor cash when it

9   was not.  *See infra* ¶¶ 86-87.

10          82.      Schwab incentivized its customer representatives to switch Schwab customers from

11  CDs and money market accounts to the Fund by changing its compensation structure.  Schwab had

12  followed the practice of compensating its representatives or consultants on the basis of assets

13  brought into the firm.  Schwab changed the structure of the compensation plan to focus on revenue

14  produced for Schwab by each client.  Schwab created several compensation "buckets" based on

15  revenue derived from the type of asset sold.  For example, the lowest paying bucket contained

16  individual stocks and bonds.  The next bucket, which paid more revenue to the consultant than the

17  first bucket, contained so-called expense ratio-based funds like money market, YieldPlus and

18  certain other mutual funds.  The next bucket contained fee-generating investments, and the one

19  after that contained certain Schwab proprietary managed products.  This bucket-styled

20  compensation system shifted the focus from what was best for the client to what was best for the

21  financial consultant and Schwab's bottom line.  The consultants immediately had an incentive to

22  move people "up the buckets" to earn more compensation.  Loyalty and duty to clients were

23  sacrificed as Schwab representatives sought to earn more (and sale managers were constantly

24  pushing them to produce more revenue for Schwab).  Sometime in early 2007, Schwab removed

25  CDs from the expense-ratio based compensation bucket and into the individual stock bucket.  This

26  move meant that CDs would pay a consultant only 4 basis points, whereas the Fund and other

27  mutual funds would pay out 40 basis points.  Thus, at the same time that Schwab was offering the

28

FIRST CONSOLIDATED AMENDED COMPLAINT                    - 39 -
No. 08-cv-01510 WHA
010036-11  263556 V1

1   Fund as a cash alternative investment, it provided its consultants with a greater financial incentive

2   to promote YieldPlus over CDs.

3         83.    Schwab brokers were provided a common script or theme to entice investors into

4   the Fund.  A typical sales pitch was to inform investors that the Fund was "virtually as safe as a

5   money market account, paid a higher rate of return due to the high grade short term debt."[3]  "Yield

6   Plus was very similar to a money market fund, conservative, safe and a good place for money not

7   invested in equities."[4]  Investors were told the Fund was "safe" and better than a CD.  The upside

8   for brokers was a commission that was 5 to 10 times higher than the commissions for selling a

9   money market.

10         84.    The following is an example of the common misrepresentations repeated to

11   investors:

12         Dear Mr. Schwab:

13         I and my family have been clients of your firm for many years, and
      have gone through the ups and downs of the financial markets,
14         always with proper service from Charles Schwab Inc., which was as
      good as the service from my other investments with Fidelity,
15         Vanguard and T. Rowe Price.

16         Between April and May 2007 I spoke with your representatives at
      your San Mateo office about how I could obtain a slightly better
17         yield on my Money Market holdings (SWVXX), without
      jeopardizing my principal in the account.  I was advised to transfer
18         funds to your Schwab Yield Plus Select Shares (SWYSX), and was
      told that it was a fund with short term securities, very stable, with
19         minimum fluctuations, and the same advantages as your Money
      Market Fund, but paying a slightly better yield than your regular
20         Money Market Fund.

21         I did as advised, but over the last seven months I saw a continuous
      drop in the value of my investment.  My several inquiries with your
22         representative were answered with encouragement to continue to
      hold because the fund was bound to recover.  Finally, seeing no
23         recovery of any kind, on Friday, January 25, 2008, I sold my
      SWYSX holdings, which cost me $114,018, for $105,533, at a loss
24         of $8,485 in principal.

25         I am 79 years old, and would have never switched to the SWYSX
      Fund had I not been assured by your staff that my principal was
26         secure.  Therefore, I hereby solicit your assistance in recovering my

27        [3] Brent S.

28        [4] Randy S.

above losses, and trust that you will give this matter prompt consideration.  [Emphasis added.]

This selling theme is reflecting in another communication:

I am one of those who invested in the Schwab Yield Plus Select Fund, SWYSX, for my IRA.  This Fund was sold to me as "similar to a money market", not exactly a money market, but a short term bond fund that fluctuated by "only pennies".  I invested in it because I was looking for a cash-type investment that had a higher return than their money market.  The low yield of 5.66% helped confirm that this was a very conservative type of fund.

This fund has since lost over 30% of its value.

85.   Again, the common core sales theme is evidenced by the following reports from investors:

1.   What you were told?

I was a Schwab Private Client, and the SWYSX fund was one of several that were recommended and suggested as a fit for my portfolio.  I was a risk adverse investor, as this was my IRA account and for retirement purposes only.  I was told this was a bond fund, made up of corporate obligations of high quality.  My advisor told me that he himself had money in this fund.  Along the way he liquidated his position, said he needed the money to buy a home.[5]

* * *

Both my mother and myself were told by a Schwab broker in Medford, Or. that this was a fund with good returns and that it was very much like a money market fund and that we could withdraw from it without holding for any length of time.  We were also told the fund held only the safest of investments and was overseen by a very experienced team of fund managers.[6]

**D.   The Core Misrepresentations in All Written and Oral Materials**

86.   The true material facts, or material facts omitted necessary to make the statements made not misleading and/or omitted material facts required to be stated therein, were:

a.   The Fund was not an "ultra short term bond fund" designed to offer higher current income "with minimal changes in share price."  Rather the average duration of investments exceeded two years – the opposite of a "short term" fund.  In fact, Defendants had abandoned the objectives and investment policies of the Fund in pursuit of higher

---

[5] Robert J.

[6] Debra B.

yields, including the objective to maintain share price stability and preserve investor capital and seek minimal fluctuation in share price.

b.      The Fund abandoned the stated duration objective without disclosing such. The duration of the securities held by the Fund had average durations greater than one year. Even then, those durations were susceptible to substantial and sudden change along with changes in default rates, interest and prepaid option rates.  Defendants tied the short-term nature of the Fund to a core representation that the average duration was one year or less. This was blatantly false as an analysis of just some of the available data indicates a duration of two years or greater, as calculated by an industry expert:[7]

|  | 5/30/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 | 5/31/2008 |
|---|---|---|---|---|---|
| % Net Asset Holdings Coverage | 50.92% | 56.16% | 62.55% | 61.83% | 80.56% |
| Estimated Duration | 2.35 | 1.95 | 2.25 | 1.98 | 2.02 |
| Total net asset (x1000) | 13,277,983 | 10,696,509 | 8,026,701 | 4,891,733 | 679,459 |

The average duration was probably even longer than indicated in the table above because data on illiquid securities was not publically available, and these securities typically have longer durations.

c.      The holding reports sent to investors list coupon payment dates instead of maturity dates.  Notwithstanding any disclosure argument that Defendants may make, this switch was misleading because (i) it suggested that the investments are short term, (ii) it served to mask the fact that portfolio duration was longer than represented, and (iii) investors could not determine the true maturity dates from the report.  The following example from just a small sample of a holding report demonstrates this:

| Description from 5/31/08 Holding Report | Stated Maturity | True Maturity |
|---|---|---|
| WAMU COMMERCIAL MORTGAGE SECURITY Series 2007-SL2 Class A | 06/01/08 | 12/27/2049 |
| WAMU COMMERCIAL MORTGAGE SECURITY Series 2007-SL3 Class A | 06/01/08 | 3/23/2045 |
| LEHMAN XS TRUST Series 2007-5H Class 3A4 | 11/30/09 | 5/25/2037 |
| HARBORVIEW MORTGAGE LOAN TRUST Series 2006-6 Class X1 | 06/01/08 | 8/19/2036 |
| BEAR STEARNS ALT-A TRUST Series 2006-1 Class 23A1 | 06/01/08 | 2/25/2036 |

---

[7] Determining average duration of the Fund's holdings is a complex endeavor that only sophisticated industry experts can undertake.

| | | |
|---|---|---|
| COUNTRYWIDE ALTERNATIVE LOAN TRUST Series 2005-51 Class 3AB1 | 06/20/08 | 11/20/2035 |
| LEHMAN XS TRUST Series 2005-4 Class 2A1B | 06/25/08 | 10/25/2035 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. Series 2004-HE6 Class M1 | 06/25/08 | 8/25/2034 |

       d.     The Fund's asset allocation was not well-diversified and was overly concentrated in a single risky industry or market sector, thereby increasing risk exposure on a systematic basis, as Defendants began to concentrate investments in asset-backed securities and mortgage-backed securities. The Fund was quickly concentrating its investments into the housing market and risky housing market-exposed debt instruments – by May 2007 the Fund was concentrated in a single risky industry or market segment, with over 46.5 % of Fund assets invested in the mortgage industry. As recently as August 2006, it was only 28.9%. Two years before that it was 11.1%. This change in asset concentration is inconsistent with the representations regarding share price stability and safety. The following is just an illustration of the increased and undisclosed risk to the Fund by the change in asset concentration:

| | % Net Assets | | | | |
|---|---|---|---|---|---|
| | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 | 5/31/2008 |
| CORPORATE BONDS | 45.10% | 40.30% | 34.90% | 34.00% | 24.60% |
| ASSET-BACKED OBLIGATIONS | 10.90% | 7.00% | 7.90% | 10.00% | 23.20% |
| MORTGAGE-BACKED SECURITIES | 46.50% | 45.90% | 46.20% | 50.10% | 18.40% |
| Total ABS+MBS | 57.40% | 52.90% | 54.10% | 60.10% | 41.60% |

This level of concentration in mortgage-backed securities is inconsistent with the represented core purpose of this Fund and with the stated representation that the Fund presented a risk of "minimal change in share price" or was "similar to" a money market fund.

       e.     The ever-growing mortgage-backed security and asset-backed portion of the portfolio assumed actual and not theoretical "maturity extension risk."

       f.     As a result of these extended durations, as well as its aggressive venture into mortgage-backed securities, the Fund was not an ultrashort term bond fund as that term is commonly understood, and the Fund was not properly categorized in the ultrashort bond category. The Fund took a very aggressive approach of investing in mortgage-backed

securities and lower rated bonds.  While an ultrashort fund typically focuses on duration and assumes an interest rate risk greater than a 90-day treasury bond, such funds do not typically take on credit or liquidity risk which could substantially impact principal.  The other 111 ultrashort bond funds followed by Morningstar did not take on such risk. Comparing the Fund to other top-performing ultrashort bond funds (*e.g.*, Franklin Adjustable U.S. Government Securities Fund - source: morningstar.com), the Fund invested a significantly larger proportion of the portfolio in mortgage securities backed by non-agencies.  Also, other funds have significantly lower or no allocation to asset-backed and corporate sectors.  As a result, the average asset credit quality of the top-performing ultrashort bond funds has been stable (AAA) through the credit crunch, while the average credit quality of the Fund's assets has been lower (A – AA) during this period.  As such, the Fund has had a greater exposure to credit and also illiquidity risk than other top-performing ultra short bond funds.  This risk was not adequately disclosed.

g.      Defendants compared the Fund to the wrong comparative index in an effort to attract investment:  the Lehman Brothers U.S. Short Treasury:  9-12 months.  This comparison sought to assure investors that the Fund had a comparable profile equivalent to a 9-12 month Treasury.  In fact, this is not the case for the reasons stated above.  The falsity of the comparison to the Lehman short term fund index is further evidenced by the fact that of the dozens of funds that are "ultra short," the Fund's decline is dramatically different than the reaction of other ultra short funds to changes in the market.  *See* ¶ 120.

h.      The Fund mispriced a material potion of its assets as the assets deteriorated in value and liquidity.  Furthermore, the holding reports sent to investors falsely and materially misrepresented the value of securities in the Fund.  For example, here is a comparison of value using a well accepted valuation technique employed by Plaintiffs' expert for just a few of the assets publicly reported in the Fund's holding reports for the time periods indicated, which demonstrates that Defendants mispriced and overstated the value of these Fund assets as evidenced by just a slice of the holding reports:

**Schwab Holding Report Valuation**

| Description | Rating | 5/31/2007 | 8/31/2007 | 11/30/2007 | Chg% |
|---|---|---|---|---|---|
| FREMONT HOME LOAN TRUST Series 2003-B Class M1 | AA | 100.15 | 98.75 | 96.75 | -3.4% |
| MORGAN STANLEY ABS CAPITAL I Series 2004-HE8 Class M1 | AA+ | 100.61 | #N/A | 97.95 | -2.6% |
| NOVASTAR HOME EQUITY LOAN Series 2003-4 Class M1 | AA | 100.05 | #N/A | 96.64 | -3.4% |
| NOVASTAR HOME EQUITY LOAN Series 2003-3 Class M1 | AA+ | 100.41 | 95.95 | 94.61 | -5.8% |

**Proper Valuation by Plaintiffs' Expert**

| Description | Rating | 5/31/2007 | 8/31/2007 | 11/30/2007 | Chg% |
|---|---|---|---|---|---|
| FREMONT HOME LOAN TRUST Series 2003-B Class M1 | AA | 100.76 | 93.20 | 81.52 | -19.1% |
| MORGAN STANLEY ABS CAPITAL I Series 2004-HE8 Class M1 | AA+ | 100.50 | 95.76 | 87.63 | -12.8% |
| NOVASTAR HOME EQUITY LOAN Series 2003-4 Class M1 | AA | 100.30 | 91.46 | 78.15 | -22.1% |
| NOVASTAR HOME EQUITY LOAN Series 2003-3 Class M1 | AA+ | 100.83 | 97.01 | 82.41 | -18.3% |

Here are other examples were the Fund holding reports sent to investors falsely and materially misrepresented the value of securities in the Fund:

**Schwab Holding Report Valuation**:

| Description | Collateral Type | Curr Rating | Orig Rating | May-07 | Aug-07 | Nov-07 | Feb-08 | Chg% |
|---|---|---|---|---|---|---|---|---|
| AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2007-A Class 13A1 | WH30 6.4 | AAA | AAA | 101.65 | 96.20 | 96.04 | 98.51 | 2.6% |
| CITIMORTGAGE ALTERNATIVE LOAN TRUST Series 2006-A7 Class 1A12 | AltA36.4 | AAA/*- | AAA | 100.26 | 100.24 | 99.33 | 101.31 | 2.0% |
| DEUTSCHE ALTERNATIVE ASSET SECURITIES, INC. Series 2005-6 Class 1A3 | AltA36.2 | AAA | AAA | 99.54 | 99.58 | 99.79 | 101.55 | 1.8% |
| JP MORGAN ALTERNATIVE LOAN TRUST Series 2006-A4 Class A13 | AltAA6.5 | AAA | AAA | 100.36 | 100.40 | 97.92 | 98.45 | 0.5% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-3XS Class 1A2 | HOMEE6.7 | AAA | AAA | 99.70 | 99.65 | 100.23 | 103.07 | 2.8% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-8XS Class A1 | HOMEE6.7 | B- | AAA | 99.66 | 99.84 | 101.05 | 102.69 | 1.6% |
| RESIDENTIAL ACCREDIT LOANS, INC. Series 2006-QS8 Class A1 | AltA36.8 | A/*- | AAA | 100.25 | 100.45 | 98.79 | 102.15 | 3.4% |
| WASHINGTON MUTUAL ALTERNATIVE MORTGAGE PASS- THROUGH CERTIFICATES Series 2007-1 Class 2A1 | AltA15 6 | AAA | AAA | 100.16 | #N/A | 100.29 | 102.88 | 2.6% |
| Citimortgage Alternative Loan Trust Series 2007-A2 Class 1A13 | AltA36.4 | AA/*- | AAA | #N/A | 99.65 | 98.67 | 100.73 | 2.1% |
| Morgan Stanley Mortgage Loan Trust Series 2007-6XS Class 1A2S | WH30 6.7 | AAA | AAA | #N/A | 99.19 | 100.10 | 101.77 | 1.7% |

1

_____

2    **Proper Valuation by Plaintiffs' Expert:**

3

| Description | Collateral Type | Curr Rating | Orig Rating | May-07 | Aug-07 | Nov-07 | Feb-08 | Chg% |
|---|---|---|---|---|---|---|---|---|
| AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2007-A Class 13A1 | WH30 6.4 | AAA | AAA | 100.72 | 99.47 | 96.13 | 90.85 | -5.5% |
| CITIMORTGAGE ALTERNATIVE LOAN TRUST Series 2006-A7 Class 1A12 | AltA36.4 | AAA/*- | AAA | 100.03 | 95.82 | 91.54 | 88.12 | -3.7% |
| DEUTSCHE ALTERNATIVE ASSET SECURITIES, INC. Series 2005-6 Class 1A3 | AltA36.2 | AAA | AAA | 98.02 | 94.46 | 90.90 | 88.42 | -2.7% |
| JP MORGAN ALTERNATIVE LOAN TRUST Series 2006-A4 Class A1 | AltAA6.5 | AAA | AAA | 98.48 | 95.84 | 93.17 | 91.48 | -1.8% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-3XS Class 1A2 | HOMEE6.7 | AAA | AAA | 100.77 | 96.56 | 92.86 | 83.11 | -10.5% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-8XS Class A1 | HOMEE6.7 | B- | AAA | 101.31 | 96.55 | 92.24 | 82.44 | -10.6% |
| RESIDENTIAL ACCREDIT LOANS, INC. Series 2006-QS8 Class A1 | AltA36.8 | A/*- | AAA | 99.99 | 95.54 | 91.03 | 87.36 | -4.0% |
| WASHINGTON MUTUAL ALTERNATIVE MORTGAGE PASS- THROUGH CERTIFICATES Series 2007-1 Class 2A1 | AltA15 6 | AAA | AAA | 99.87 | 95.08 | 90.15 | 85.83 | -4.8% |
| Citimortgage Alternative Loan Trust Series 2007-A2 Class 1A13 | AltA36.4 | AA/*- | AAA | 98.94 | 94.92 | 90.88 | 87.75 | -3.4% |
| Morgan Stanley Mortgage Loan Trust Series 2007-6XS Class 1A2S | WH30 6.7 | AAA | AAA | 99.08 | 98.69 | 97.05 | 94.85 | -2.3% |

13    The foregoing tables demonstrate that the holding reports overstated the value of the Fund's

14    holdings,[8] and, on information and belief, there are many more examples.  As a direct result, the

15    Fund's NAV was overstated, and its financial statements were false.

16        87.    Defendants obfuscated the truth about the price of the assets but also falsified or

17    obscured the true nature of the securities in the Fund's portfolio by using inconsistent asset

18    descriptions.  For instance, the following examples from the August 31, 2007, holdings report

19    indicated that the specified securities were variable-rate, while the November 30, 2007, holdings

20    report indicated they were not.  Yet, the same exact security was held in the Fund on both dates:

21

22

23

24

25

26

27    _____

      [8] Determining these true valuations of the Fund's holdings is a complex endeavor that only
28    sophisticated industry experts can undertake.

Examples of Inconsistent Asset Description

| Asset Category | Asset Description | Rate / Date / Footnotes / Face Amount / Value 8/31/2007 holding report | | Rate / Date / Footnotes / Face Amount / Value 11/30/2007 holding report | |
|---|---|---|---|---|---|
| Corporate | AGFIRST FARM CREDIT BANK | 6.59%, 12/15/07 (a)(b)(c)(d) | 25,000   25,253 | 6.59%, 06/29/49 (b)(c)(d) | 25,000   24,802 |
| Corporate | DANSKE BANK A/S | 5.91%, 06/16/14 (a)(b)(c)(d) | 24,100   23,487 | 5.91%, 12/29/49 (b)(c)(d) | 24,100   22,777 |
| Corporate | DBS CAPITAL FUNDING CORP. | 7.66%, 03/15/11 (a)(b)(c)(d) | 24,500   26,432 | 7.66%, 03/31/49 (b)(c)(d) | 24,500   26,842 |
| Corporate | NATEXIS AMBS CO., LLC | 8.44%, 06/30/08 (a)(b)(c)(d) | 53,370   54,589 | 8.44%, 12/29/49 (b)(c)(d) | 53,370   54,643 |
| Corporate | UNICREDITO ITALIANO CAPITAL TRUST II | 9.20%, 10/05/10 (a)(b)(c)(d) | 68,986   76,589 | 9.20%, 10/05/49 (b)(c)(d) | 68,986   75,421 |
| Corporate | ILFC E-CAPITAL TRUST I | 5.90%, 12/21/10 (a)(b)(c)(d) | 73,495   72,339 | 5.90%, 12/21/65 (b)(c)(d) | 73,495   73,313 |
| Corporate | OIL INSURANCE LTD. | 7.56%, 06/30/11 (a)(b)(c)(d) | 71,375   74,443 | 7.56%, 12/29/49 (b)(c)(d) | 71,375   73,500 |
| Corporate | STONEHEATH RE | 6.87%, 10/15/11 | 34,380   34,745 | 6.87%, 12/29/49 | 34,380   32,930 |
| Corporate | ZFS FINANCE USA TRUST III | 6.51%, 09/17/07 (a)(b)(c)(d) | 78,050   74,345 | 6.84%, 12/15/65 (b)(c)(d) | 78,050   75,988 |
| Corporate | CVS CAREMARK CORP. | 6.30%, 12/01/07 (a)(b)(d) | 90,000   87,022 | 6.30%, 06/01/37 (b)(d) | 90,000   88,256 |
| MBS | AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2005-3 Class 2A3 | 4.99%, 08/25/10 (a)(b)(d) | 25,000   24,418 | 4.99%, 09/25/35 (b)(d) | 25,000   23,948 |
| MBS | GSR MORTGAGE LOAN TRUST Series 2004-5 Class 3A2 | 4.70%, 09/01/07 (a)(b)(d) | 21,888   21,836 | 4.70%, 05/25/34 (b)(d) | 21,888   21,660 |

Footnotes:

(a) Variable-rate security.

(b) Callable security.

(c) Securities exempt from registration under Rule 144A of the Securities

   Act of 1933. These securities may be resold in transactions exempt from

   registrations, normally to qualified institutional buyers. At the period end, the value of these amounted to $1,344,330 or 16.7% of net

   assets.

(d) All or a portion of this security is held as collateral for futures

   contracts and short sales.

(e) Credit-enhanced security.

Footnotes:

(a) Variable-rate security.

(b) Callable security.

(c) Securities exempt from registration under Rule 144A of the Securities

   Act of 1933. These securities may be resold in transactions exempt from

   registrations, normally to qualified institutional buyers. At the period end, the value of these amounted to $1,812,603 or 16.9% of net

   assets.

(d) All or a portion of this security is held as collateral for futures

   contracts and short sales.

(e) Credit-enhanced security.

88.     A reasonable investor would have viewed these undisclosed facts, severally and jointly, as having materially altered the total mix of information available to him or her. Such an investor would reasonably think that the facts described herein but never disclosed would cause him or her to undertake a materially increased investment risk in connection with the Fund shares they purchased during the relevant time period because the Fund was investing in securities that were materially more risky than disclosed. Nevertheless, Defendants did not disclose the facts highlighted in this section of the Complaint immediately above in any of the Fund Prospectus Materials which were in effect during the relevant time period.

E.     **Accounting Violations by the Fund, the Schwab Defendants and PricewaterhouseCoopers**

89.     The Fund's Prospectuses and Registration Statements during the relevant time period, the Sarbanes-Oxley certification by the Chief Executive Officer and Chief Financial

Officer, and the signed PricewaterhouseCoopers audit report for the Fund and consented to and incorporated by reference into the Registration Statements during the relevant time period[9] violated Generally Accepted Accounting Principles (GAAP) because they misrepresented or omitted material information as follows.

90.     Every six months throughout  the Securities Class Period, on SEC Forms N-CSRS (semi-annual) and N-CSR (annual), Schwab Investments issued and filed with the SEC, Certified Reports to Shareholders ("CRS") which were incorporated by reference into the Registration Statements and Prospectuses ("Semi-annual Shareholder Reports").  Each CRS discussed the performance of the Fund, its holdings and its duration. The first semi-annual Form N-CSRS for the first half of each fiscal year, covering the period of September 1 to the end of February, was unaudited.  The second annual report on Form N-CRS was audited and covered the entire year ending August 31.

91.     Each was signed by the Registrant, Schwab Investments, and by its Chief Executive Officer.  Each was also signed by the CEO and CFO in their personal capacities.  For the Certified Shareholder Reports up and through Form N-CSRS for the period ending February 28, 2007, the CEO was Ellen Dilsaver and the CFO was George Pereira.  For the Certified Shareholder Reports beginning with the Form N-CSR for the fiscal year ending August 31, 2007, the CEO was Randall Merk and the CFO was George Pereira.  Each contained the following representation in the notes to the financial statements contained therein:

> Item 11: Controls and Procedures.
>
> (a)   Based on their evaluation of Registrant's disclosure controls and procedures, as of a date within 90 days of the filing date, Registrant's Chief Executive Officer, [Evelyn Dilsaver or Randall Merk] and Registrant's Principal Financial Officer, George Pereira, have concluded that <u>Registrant's disclosure controls and procedures are: (i) reasonably designed to ensure that information required to be disclosed in this report is appropriately communicated to Registrant's officers to allow timely decisions regarding disclosures required in</u>

---

[9] The Report of Independent Registered Public Accounting Firm, signed by PricewaterhouseCoopers LLP, attested to the shareholders that the "accompanying statements of assets and liabilities, including the portfolio holdings, and the related statements of operations and of changes in net assets and the financial highlights present fairly, in all material respects, the financial position of the Funds."

1

2

> this report; (ii) reasonably designed to ensure that information required to be disclosed in this report is recorded, processed, summarized and reported in a timely manner; and (iii) are effective in achieving the goals described in (i) and (ii) above.

3

4

5

6

> (b)   During the [latest] fiscal quarter of the period covered by this report, there have been no changes in Registrant's internal control over financial reporting that the above officers believe to have materially affected, or to be reasonably likely to materially affect, Registrant's internal control over financial reporting.  [Emphasis added.]

7       92.   Throughout the relevant time period, attached to each semi-annual and annual

8   Certified Shareholder Report on both Forms N-CSRS and N-CRS, was a certification by the Chief

9   Executive Officer and Chief Financial Officer of the Schwab Investments (identified above for the

10   appropriate filing) certifying as required by Rule 30a-2(b) under the 1940 Act, that:

11

12

> 4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Rule 30a-3(c) under the Investment Company Act of 1940) for the registrant and have...:

13

14

15

16

> b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…. [Emphasis added.]

17       93.   Throughout the relevant time period, each annual Certified Shareholder Report on

18   SEC Form N-CSR contained the Report of Independent Registered Public Accounting Firm, signed

19   by Defendant PricewaterhouseCoopers LLP.  Each annual Report by PriceWaterhouseCoopers

20   attested to the shareholders that the "accompanying statements of assets and liabilities, including

21   the portfolio holdings, and the related statements of operations and of changes in net assets and the

22   financial highlights present fairly, in all material respects, the financial position of the" Fund "at

23   [August 31, 2005, 2006 and 2007], the results of each of their operations for the period then ended,

24   and the changes in each of their net assets and the financial highlights for each of the periods

25   presented, in conformity with accounting principles generally accepted in the United States of

26   America." Emphasis added.  In so attesting, pursuant to the Accounting and Auditing Guide –

27

28

Investment Companies [Recognized as GAAP],[10] PricewaterhouseCoopers, as the Fund's auditor, was required to assure the Fund's compliance with GAAP, including to:

      a.      Review and consider fraud risk factors including potentially <u>deficient internal controls</u> at the Fund;

      b.      Review and consider risks caused by the <u>Fund management's override of internal controls</u>;

      c.      Review and consider the typical internal controls maintained by investment advisors; and

      d.      Comply with SEC Rule 38a-1, adopted because it was "critically important for funds and advisers to have strong systems of controls in place to prevent violations of the federal securities laws and to protect the interests of shareholders and clients.  GAAP mandated compliance with SEC Rule 38a-1 of the ICA and Section 206(4)-7, required the Fund <u>to adopt and implement compliance programs to prevent violations of the Securities Laws</u> from occurring, detect violations that have occurred and promptly correct any violations that have occurred.  The SEC had explained in its Final Rule:  Compliance Programs of Investment Companies and Investment Advisers [http://www.sec.gov/rules/final/ia-2204.htm#P131_36812 ] that at a minimum these policies and procedures should address, *inter alia*:

      •      "Portfolio management processes, including allocation of investment opportunities among clients and consistency of portfolios with clients' investment objectives, disclosures by the adviser, and applicable regulatory restrictions";

      •      "The accuracy of disclosures made to investors, clients, and regulators, including account statements and advertisements";

      •      "Processes to value client holdings and assess fees based on those valuations";

      •      "Pricing of portfolio securities and fund shares"; and

---

[10] See AICPA Audit and Accounting Guide – Investment Companies (Sect. 2.35-2.39), which incorporates Accounting Series Release No. 118 ("ASR 118").

1          •     "Protection of Non-public information."

2          94.     Notwithstanding these certifications, representations and GAAP/ SEC requirements,

3     Defendants' internal controls were grossly inadequate and Defendants failed to adopt, implement

4     or follow such programs and perform their touted function of the credit research department.

5     Rather, compliance with shareholder investment objectives, processes to value holdings, and the

6     pricing of fund shares was deficient at Schwab for the following reasons:

7          a.     Defendant Schwab Management's Credit Research Group, whose function

8     was to assure that assets purchased by the trading desk met the risk profile of the fund, had

9     no power and, therefore, was nothing more than window dressing.  For example, the trading

10    desk ignored the group, and purchased securities before the group analyzed the securities

11    for credit risk.  The Credit Research Group was then relegated the task of "rubber

12    stamping" credit/risk approval of the trades after the fact.

13         b.     Defendant Schwab Management and the Credit Research Group had no

14    internal system for asset valuation.  Schwab was in the process of developing such a

15    system, but it was never put in place.

16         c.     Defendant Schwab Management's Credit Research Group was unable to

17    analyze the credit worthiness of mortgage-backed securities because it had neither the

18    personnel, tools nor the data available to it to conduct such an analysis.  In most instances,

19    the prospectus or supplemental prospectus for the assets being purchased were unavailable,

20    yet the trading desk purchased the securities.  Defendant Schwab Management's Credit

21    Policies and Procedures were old and did not properly address the types of securities being

22    purchased by the trading desk.  The Policies and Procedures covered only corporate bonds,

23    and did not cover the vast bulk of the securities being purchased for the Fund.

24         d.     Defendant Schwab Management's Credit Research Group had no means of

25    identifying securities that were subprime.  There was no information in the data base of

26    investments that would allow independent verification of such securities, and the Credit

27    Research Group was not aware of a common definition of subprime.

28

FIRST CONSOLIDATED AMENDED COMPLAINT          - 51 -
No. 08-cv-01510 WHA
010036-11  263556 V1

1

2

3

4

   e.    If the Fund's trustees had any policies in place for "fair pricing" as required by the SEC, they were ignored.  Throughout 2007, Defendant Schwab Management argued with its outside valuation vendor when it did not like the pricing, would insist on re-pricing and would get the re-pricing.

5

6

7

8

9

10

11

12

13

14

15

16

   f.    To the extent that the Fund adopted any policies to assure that the securities laws were not violated, they were hindered by management override, indifference, or lack of personnel to implement and follow.  When Defendant Schwab Management's Credit Research Group objected to the trading desk that an investment was too large to be considered diversified and was unduly concentrated, the trading desk ignored the protests, responding, in essence, "tough luck."  When internal auditors tried to audit the Schwab Management's Credit Research Group, they were told to skip those who reviewed mortgaged-backed assets.  In 2006-2007, there was so much money flowing into the Fund that the trading desk would just buy what was available.  When the credit research group warned that the trading desk's purchases of mortgage-backed securities were an unduly concentrated "real estate play," the trading desk responded that there was nothing else to buy, and continued purchasing mortgage-backed securities.

17

18

19

20

21

   g.    In 2006, the internal auditors were fired, possibly for cost-cutting reasons.  In 2006, Sheldon D. Engler Ph.D., Vice President and Head of Fixed Income Research, of Defendant Schwab Management, Inc., who managed the team responsible for credit analysis and investment selection for Schwab's money market and bond funds, walked out and was not replaced.

22

23

24

25

26

27

   h.    The Fund and Schwab Management had no policy or failed to implement an adequate policy that assured the fair allocation of investment opportunities among clients and that prohibited Schwab Management from using inside information on behalf of other series of The Charles Schwab Family of Funds.  Schwab Management pulled its other funds' investments out of the Fund ahead of other investors in the Fund, and the Schwab Defendants failed to stop selective redemptions of the Fund when it became apparent that

28

1    Schwab Management would be required to sell the most liquid assets first to meet such

2    redemptions at the disadvantage of the remaining shareholders.

3        95.    As a result of the foregoing, representations as to the Fund's financial statements

4    were misleading.

5        96.    In addition, notwithstanding the above representations and obligations, the Fund's

6    Prospectuses and Registration Statements during the relevant time period, certifications by the

7    Chief Executive Officer and Chief Financial Officer, and the PricewaterhouseCoopers Audit

8    Reports, incorporated by reference into the Registration Statements and Prospectuses during the

9    relevant time period, violated GAAP as follows:

10          a.    GAAP required the Fund's valuation methods to be
                  appropriate under the circumstance and be applied
11                consistently.  In truth, the Fund's securities were mispriced
                  (*see supra* at ¶ 86(h)), the Fund had no ability to internally
12                price the assets, and valuation methods were deviated from
                  where disagreement arose with the outside valuation service
13                so that the Fund could retain a stable NAV(*see supra* at ¶ 94).

14          b.    GAAP required, pursuant to the Investment Company Act of
                  1940, that securities for which market quotations were
15                "readily available" must be valued at market value, and all
                  other securities and other assets must be valued at "fair
16                value."  In truth, securities were mispriced, (*see supra* at
                  ¶ 86(h)), and prices were changed to meet with Defendants'
17                objections, *see supra* at ¶ 94.

18          c.    GAAP required that the Fund comply with the FASB
                  Statements of Financial Accounting Concepts No.'s 1 and 2
19                requirement that the statements of assets and liabilities,
                  including the portfolio holdings, and the related statements of
20                operations and of changes in net assets and the financial
                  highlights:
21
22              i.    Provide information that was useful to present to
                      future investors in making rational investment, credit,
23                    and similar decisions (FASB Statement of Financial
                      Accounting Concepts No. 1, Paragraph 34).  In truth,
24                    the statements misrepresented the nature of the Fund
                      as an ultra-short bond fund (*see supra* at ¶ 86) and
25                    misrepresented the NAV of the funds assets (*see
                      supra* at ¶ 86(h)).

26              ii.   Were reliable in that they represented what they
                      purported to represent (FASB Statement of Financial
27                    Accounting Concepts No. 2, Paragraphs 58 – 59). In
                      truth, the statements misrepresented the NAV of the
28                    funds assets (*see supra* at ¶ 86(h)).

iii.     Were complete, which means that nothing was left out of the information that may be necessary to insure that they validly represented underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2, Paragraph 79). In truth, the statements were incomplete in that they failed to disclose that the Fund had lacked internal controls (¶ 94) and consistent applications to determine an accurate NAV of the Fund's assets (*see supra* at ¶ 86(h)).

## F.     Defendants Failed to Treat All Shareholders Equally

97.     As soon as the mortgage crisis began to impact the Fund, rather than treating all shareholders equally, Defendants liquidated the Fund's most liquid and high quality assets, leaving the remaining shareholders, who were oblivious to the Fund's troubles or the causes of the trouble, with the lower quality illiquid bonds.

98.     In March 2007, one of the Fund's top investors and a related Schwab entity, the Schwab Charitable Funds, pulled all of its investments out of the Fund.

99.     Even as Schwab Management deflected responsibility for the Fund's losses and tried to reassure investors, other Schwab mutual funds were pulling their investments from the Fund. A Management Letter posted on Defendants' website on April 1, 2008, stated that, as of that day, other Schwab funds had liquidated all of their holdings in the Fund, and Schwab entities no longer held any of its shares.

## G.     The Fund's Management Profited Greatly from Running the Fund

100.     The Registration Statement disclosed that defendant Schwab Management would receive an annual fee of .64% of the YieldPlus Investor Share's average net assets, and .49% of the YieldPlus Select Share's average net assets.

101.     Defendants' unlawful conduct allowed them to gain more than $75 million in investment advisory fees during the relevant time period. For the fiscal years ended August 31, 2004, 2005, 2006 and 2007, the Fund paid net investment advisory fees, respectively, of $7,584,000 (gross fees were reduced by $0); $14,676,000 (gross fees were reduced by $0); $19,899,000 (gross fees were reduced by $0); and $33,797,000 (gross fees were reduced by $2,000).

1

## H.      Defendants' Misconduct Causes Huge Losses

2      102.    Due to Defendants' positive, but misleading or untrue statements, and the omissions

3  described above, billions of dollars poured into the Fund at prices set by Defendants, averaging a

4  NAV of approximately $9.70 per share throughout the relevant time period.

5      103.    On March 22, 2007, Charles Schwab announced that the Fund was awarded a

6  Lipper Performance Achievement Certificate for 2006.  Schwab Management attributed the Fund's

7  success to its research acumen, rather than increased – and undisclosed – risks that the Fund had

8  assumed:

9          To be No. 1, you have to do everything well and capitalize in all
          areas – trading, credit analysis and portfolio management – not just
10         outperform in one aspect.  Our overall performance might receive the
          attention, but we're especially pleased with our risk-adjusted
11         performance.  That is what's important to our investors.  We don't
          seek to hit homeruns, but we aim for a lot of singles and the
12         occasional double.  These funds have great long-term records
          because of consistent out performance, little by little, every month.

13     104.    By May 1, 2007, the Fund's assets reached over $13 billion.  The following chart

14  depicts the Fund's massive growth in assets throughout 2006 and 2007:

15

16

17

18

19

20

21



22     105.    But Defendants' investments ultimately triggered staggering losses.

23     106.    The Fund's dependence for success on heavy investments in mortgage-backed

24  securities, including those backed by subprime mortgages, tied the Fund's fate to that of the

25  mortgage market.  The collapse of pricing within that market and the devastating impact that

26  collapse had on the Fund illustrate the extent to which the Fund had deviated from its investment

27  guidelines and exposed investors to high-risk instruments that proved illiquid.

28

107.     Specifically, in the last half or 2006 and the first quarter of 2007, industry analysts watched the housing market slow down and predicted trouble for the mortgage loans.  Even Defendants recognized the risk in the housing market.  Defendant Daifotis admitted the housing and subprime crisis threat in the April 2007 Certified Report to Shareholders:

> The housing market remains a significant headwind for the economy and recently has provided some mixed messages.  Existing home sales were up 3.0% in January as a result of mild weather during the November-December period, supporting the sentiment that the worst of the housing crisis may have passed.  However, new home sales declined in January as cold weather hit the East Coast, and housing starts and new home sales declined 14.3% and 16.6%, respectively. In addition, the recent collapse of the sub-prime mortgage market has caused many lenders to tighten their standards, which could potentially push more sub-prime borrowers into foreclosure, thereby increasing the supply of homes on the market.  In a broader perspective, increases in foreclosure and vacancy rates in the near future have the potential to weigh down on the labor market, one of the reasons the housing market has been closely followed.

108.     Jeff Mortimer, the Senior Vice President and Chief Financial Officer of Schwab Management, admitted in a June, 2007 Certified Report to Shareholders of Schwab's equity funds:

> In its March 2007 statement, the Fed noted that although adjustments to the housing sector are ongoing, the economy will likely maintain its path towards a moderate pace. . . .
>
> The housing market continues to pose a significant headwind for the economy and recently has shown signs that the bottom may not have yet been reached.  Existing home sales, which account for roughly 85% of the market, fell 8.4% in March to a seasonally adjusted annual rate of 6.12 million units, while new home sales were at a seasonally adjusted annual rate of 858,000 units, 23.5% below March 2006.  In general, the market seems to be quite pessimistic with regards to a recovery, with even the National Association of Realtors predicting a decline in new home sales of 14.2% in 2007.  In addition, the recent sub-prime debacle has caused many lenders to tighten standards, which could pose a further drag on homes sales.

109.     In June 2007, two Bear Stearns hedge funds that had been heavily invested in mortgage instruments collapsed.

110.     On July 5, 2007, the *New York Times* published an article noting that Countrywide, the nation's largest mortgage lender, stated the day before "that more borrowers with good credit were falling behind on their loans and that the housing market might not begin recovering until

2009 because of a decline in house prices that goes beyond anything experienced in decades." The article further explained that:

> Countrywide's stark assessment signaled a critical change in the substance and tenor of how housing executives are publicly describing the market. Just a couple of months ago, some executives were predicting a relatively quick recovery and saying that most home loans would be fine with the exception of those made to borrowers with weak credit who stretched too far financially.

111.    Beginning in late 2007 and accelerating through the first quarter of 2008, the Fund took massive write-downs as it marked the value of mortgage-backed investments down to their reduced market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in turn caused investors to abandon the Fund.

112.    The NAV plummeted $3.47 to as low as $6.18 per share on August 1, 2008, or a loss of over 35% since late July.  As seen in the Morningstar charts below, the Fund performed 30.1% worse than the average "ultrashort" bond fund that Defendants misrepresented the Fund to be.  The Fund ranked in the lowest 99% of all funds in this category.

113.    By comparison, the Lehman Brothers Aggregate Bond Treasury Index – another benchmark to which Defendants compared the Fund – rose significantly over the last year-and-a-half.  According to a letter posted on Schwab's website on March 20, 2008, the Fund's assets had declined to approximately $2.5 billion as of March 20, 2008, from a high of over $13.0 billion as of May 30, 2007.

114.    The following Morningstar total return chart shows the precipitous drop in NAV of the Fund's shares compared to that of its peers and the Lehman Brothers Aggregate Treasury Bond Index:



### Growth of $10,000 — 08-31-08

Fund: Schwab YieldPlus Investor • Category: Ultrashort Bond • Index: LB Aggregate Bond TR

### Performance History — 08-31-08

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 08-08 |
|---|---|---|---|---|---|---|---|---|
| Total Return % | 5.9 | 2.7 | 2.9 | 2.2 | 3.4 | 5.5 | -1.2 | -29.4 |
| +/- Index | -2.6 | -7.6 | -1.2 | -2.1 | 0.9 | 1.1 | -8.2 | -31.4 |
| +/- Category | 0.4 | -0.2 | 1.2 | 1.0 | 0.8 | 0.8 | -3.7 | -26.4 |
| % Rank in Category | 39 | 53 | 6 | 7 | 10 | 6 | 86 | 99 |
| Fund Category | UB | UB | UB | UB | UB | UB | UB | UB |

See fund category codes

### Trailing Total Returns — through 08-29-08

| | Total Return % | +/- LB Aggregate Bond TR | +/- USTREAS CD Sec Mkt 6M | % Rank in Cat |
|---|---|---|---|---|
| 1-Day | 0.04 | 0.06 | --- | 25 |
| 1-Week | 0.09 | -0.43 | --- | 36 |
| 1-Month | 0.50 | -0.45 | --- | 1 |
| 3-Month | -0.88 | -1.67 | --- | 54 |
| Year-to-date | -29.37 | -31.37 | --- | 99 |
| 1-Year | -30.69 | -36.55 | --- | 98 |
| 3-Year Annualized | -9.37 | -13.63 | --- | 100 |
| 5-Year Annualized | -4.72 | -9.33 | --- | 100 |
| 10-Yr Annualized* | --- | --- | --- | --- |

*Data through 08-31-08

| Historical Quarterly Returns | | | | |
|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 |
| 2008 | -19.87 | -11.63 | --- | --- |
| 2007 | 1.31 | 1.11 | -1.04 | -2.57 |
| 2006 | 1.14 | 1.24 | 1.42 | 1.54 |
| 2005 | 0.71 | 0.76 | 0.90 | 0.93 |
| 2004 | 0.69 | 0.17 | 0.86 | 0.48 |
| 2003 | 0.87 | 0.76 | 0.29 | 0.95 |
| 2002 | 0.65 | 0.76 | 0.12 | 1.11 |

S&P 500 index data: S&P 500 Copyright © 2008



115.   Defendants did not disclose that the Fund's rapid decline was the result of risky investments made in violation of the Fund's investment guidelines.  Instead, in conjunction with this revaluation, Defendants have blamed the mortgage crisis.  In November 2007, Schwab, in an e-mail response to investors' queries as to the reason for the decline of the Funds' NAV, stated that the decline was due to a "wholesale downward repricing of the mortgage and asset backed sectors by Interactive Data Corp., the independent pricing agency."

116.   On March 10, 2008, Defendants issued a letter stating:  "Even though YieldPlus is a highly diversified fund, it reflects the declines we have seen in non-Treasury securities, including mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations."

117.   On March 20, 2008, Schwab Management released a statement blaming "market pessimism and forced selling of bonds by institutional leveraged investors" as "two of the reasons why the fixed income market continues to suffer."  That statement also reported that between "June 29, 2007, and March 20, 2008, approximately $0.60 of the $1.91-per share decline in NAV" of the Fund represented "unrealized losses."  Schwab Management did not disclose that the Fund's precipitous decline resulted from its abandonment of the investment strategy touted in the Prospectuses.

118.   In fact, the harm to Plaintiffs and the Classes did not result from market conditions endemic to bond mutual funds in general, or to short-duration bond funds in particular.  The devastation wrought by the Fund's venture into high-risk investments did not impact the Fund's peers, which, having avoided risky mortgage-backed securities in accordance with their profile as ultrashort bond funds, continued to generate positive returns even as the market for mortgage-backed securities collapsed.  For example, whereas the Fund was ranked by Morningstar in the top 25% within the ultrashort bond fund category for 2006, for 2007, the Fund's ranking fell to the bottom 25% based on the returns of -1.04% and -1.24% for the Select and Investor Shares, respectively.

119.   Meanwhile, the Fund's peers within the Morningstar ultra short bond funds category faired much better achieving average returns of 2.57% for 2007 and -1.47% for 2008 as of March 31.

120.   A comparison of the performance the Fund with the returns of other funds in the ultrashort bond category reveals the vastly different but undisclosed risk of the Fund due to the duration and risk of its underlying assets:

| Category Name[11] | 1 Year Return |
| --- | --- |
| Allegiant Ultra Short Bond A LW | 4.93 |
| Allegiant Ultra Short Bond A | 4.93 |
| Allegiant Ultra Short Bond I | 4.88 |
| Calvert Ultra-Short Floating Income A LW | 5.67 |

---

[11] As of August 2008.

| Category Name[11] | 1 Year Return |
|---|---|
| Calvert Ultra-Short Floating Income A | 5.67 |
| Franklin Adjustable U.S. Govt Secs A LW | 4.55 |
| Franklin Adjustable U.S. Govt Secs A | 4.55 |
| Ridge Worth US Gov Sec Ultra-Short Bd I | 4.42 |
| PIA Short Term Securities | 4.55 |
| Franklin Adjustable U.S. Govt Secs C | 4.13 |
| Trust For Credit Unions Ultr-Sht Dur Gov | 3.92 |
| DFA One-Year Fixed-Income I | 3.71 |
| Goldman Sachs Enhanced Income Instl | 3.06 |
| Federated Gov Ultrashort Duration Instl | 3.78 |
| SM&R Primary | 3.78 |
| Evergreen Adjustable Rate Instl | 3.54 |
| Federated Gov Ultrashort Duration InSv | 3.68 |
| Goldman Sachs Enhanced Income Admin | 3.01 |
| PIMCO Short-Term Instl | 3.15 |
| Goldman Sachs Enhanced Income A LW | 2.70 |
| Goldman Sachs Enhanced Income A | 2.70 |
| Evergreen Adjustable Rate Instl Svc | 3.28 |
| Evergreen Adjustable Rate A Load Waived | 3.27 |
| Evergreen Adjustable Rate A | 3.27 |
| Federated Gov Ultrashort Duration A LW | 3.31 |
| Federated Gov Ultrashort Duration A | 3.31 |
| PIMCO Short-Term Admin | 2.90 |
| CMG Ultra Short Term Bond | 2.23 |
| RidgeWorth Ultra-Short Bond I | 3.20 |
| PIMCO Short-Term D | 2.84 |
| PIMCO Short-Term A Load Waived | 2.79 |
| PIMCO Short-Term A | 2.79 |
| PIMCO Short-Term R | 2.53 |
| Touchstone Ultra Short Dur Fixed Inc Z | 2.79 |
| PIMCO Short-Term C | 2.48 |
| Goldman Sachs Enhanced Income B | 2.04 |
| Evergreen Adjustable Rate C | 2.50 |
| Evergreen Adjustable Rate B | 2.50 |
| Permanent Portfolio Treasury Bill | 1.99 |

| Category Name[11] | 1 Year Return |
|---|---|
| Managers Short Duration Government | 3.02 |
| PIMCO Short-Term B | 2.03 |
| Payden Limited Maturity | 0.95 |
| Goldman Sachs Ultra-Short Dur Gov Ins | 1.98 |
| RidgeWorth Limited Duration I | 2.02 |
| Goldman Sachs Ultra-Short Gov A LW | 1.52 |
| Goldman Sachs Ultra-Short Dur Gov A | 1.51 |
| Goldman Sachs Ultra-Short Gov Svc | 1.46 |
| Schwab YieldPlus Investor | -30.93 |
| Schwab YieldPlus Select | -30.94 |

**I.      Schwab Continues to Deny the Truth**

121.    Schwab Management has yet to acknowledge its responsibility for directing the Fund's investments into risky, long-duration mortgage-backed instruments that caused the losses incurred by Plaintiffs and the Classes, and instead have sought to place the blame elsewhere.  For example, on March 10, 2008, Defendants stated "Even though YieldPlus is a highly diversified fund, it reflects the declines we have seen in non-treasury securities, including mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations."  That letter continued to tout the Fund to investors by stating "YieldPlus invests in a diversified group of securities across a broad range of sectors and industries."  Furthermore, a subsequent letter sent to investors in a March 20, 2008, letter to investors, Schwab Management stated "market pessimism and forced selling of bonds by institutional leveraged investors are two of the reasons that the fixed income market continues to suffer."  A letter posted on Schwab's website dated April 1, 2008, continued to deflect responsibility for the Fund's losses, stating "In recent weeks, market pessimism and forced selling of bonds by institutional leveraged investors are two of the reasons that the fixed income market continues to suffer."

**V.      CLASS ACTION ALLEGATIONS**

122.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of two classes as follows:

1                a.     The "Securities Class" consisting of all persons or entities who acquired

2   shares of the Fund traceable to a false and misleading Registration Statement and

3   Prospectus for the Fund and who were damaged thereby.  The time period for this class is

4   three years prior to the filing of this lawsuit or from March 17, 2005, to March 17, 2008.

5                b.     The "State Law Class" consisting of two subclasses as follow:

6                    i.     All persons or entities who owned shares of the Fund at any time

7   before the Fund's investments in mortgage-backed securities exceeded 25% of its

8   assets, and, by continuing to own those shares suffered damages as a result thereof.

9   These shareholders will be referred to as the "Pre-Breach Class."

10                    ii.     All persons or entities who acquired shares of the Fund at any time

11   after the Fund's investments in mortgage-backed securities began to exceed 25% of

12   its assets, and, by continuing to own those shares suffered damages as a result

13   thereof.  These shareholders will be referred to as the "Post-Breach Class."

14       123.    Excluded from the Classes are Defendants, the Officers and Directors of the

15  Company, at all relevant times, members of their immediate families and their legal

16  representatives, heirs, successors or assigns and any entity in which Defendants have or had a

17  controlling interest.

18       124.    The members of the Classes are so numerous that joinder of all members is

19  impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and

20  can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if

21  not tens-of-thousands of members in the proposed Classes.  Record owners and other members of

22  the Classes may be identified from records maintained by Registrant or its transfer agent and may

23  be notified of the pendency of this action by mail, using the form of notice similar to that

24  customarily used in securities class actions.

25       125.    Plaintiffs' claims are typical of the claims of the members of the Classes as all

26  members of the Classes are similarly affected by Defendants' wrongful conduct in violation of

27  federal law that is complained of herein.

28

1    126.    Plaintiffs will fairly and adequately protect the interests of the members of the

2   Classes and have retained counsel competent and experienced in class and securities litigation.

3    127.    Common questions of law and fact exist as to all members of the Classes and

4   predominate over any questions solely affecting individual members of the Classes.  Among the

5   questions of law and fact common to the Classes are:

6         a.    whether the 1933 Act was violated by Defendants' acts as alleged;

7         b.    whether statements made by Defendants to the investing public in the

8   Registration Statement and Prospectus misrepresented or omitted material facts;

9         c.    whether the non-Fund defendants intentionally interfered with the contract

10   between the Fund and member of the Classes;

11         d.    whether the law of Massachusetts or California governs any or all state-law

12   claims; and

13         e.    whether the members of the Classes have sustained damages and, if so, what

14   is the proper measure thereof.

15    128.    A class action is superior to all other available methods for the fair and efficient

16   adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as

17   the damages suffered by individual Class members may be relatively small, the expense and

18   burden of individual litigation make it impossible for members of the Classes to redress

19   individually the wrongs done to them.  There will be no difficulty in the management of this action

20   as a class action.

### COUNT I

### VIOLATIONS OF SECTION 11 OF THE 1933 ACT
### AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS

23    129.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs

24   as if set forth fully herein.  This Count is brought pursuant to § 11 of the 1933 Act, 15 U.S.C.

25   § 77k, on behalf of the Securities Class.  It is asserted against the following defendants:  Schwab

26   Investments; Charles R. Schwab; Dilsaver; Merk; Pereira; Byerwalter; Doward; Hasler; Holmes;

27   Smith; Stephens; Wilsey; and PWC.

130.   The Registration Statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

131.   The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

132.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

133.   By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated § 11 of the 1933 Act.

134.   Plaintiffs acquired Fund shares pursuant to the Registration Statements.

135.   Plaintiffs and the Class have sustained damages.  The value of the Fund shares has declined substantially subsequent to and due to Defendants' violations.

136.   At the time of their purchases of the Fund shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to July 2007.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

### COUNT II

**VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT
AGAINST ALL DEFENDANTS ON BEHALF OF THE SECURITIES CLASS**

137.   Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein.

138.   This Count II is asserted against those defendants who were participants in the distribution of the Fund's shares through subsidiaries and trust departments of subsidiaries owned or controlled by Schwab Corp. and Charles Schwab (hereinafter the "§ 12 Defendants") to the

1   Securities Class.  More specifically, this Count is asserted against all the Defendants in Count I,

2   plus Charles Schwab & Co., Schwab Investment Management, Daifotis and Hastings.

3      139. Plaintiffs repeat and incorporate each and every allegation contained above as if

4   fully set forth herein, except to the extent any allegations above contain facts which are

5   unnecessary or irrelevant for purposes of stating a claim under Section 12, including allegations

6   that might be interpreted to sound in fraud or relating to any state of mind on the part of the § 12

7   Defendants, other than strict liability or negligence.

8      140. The § 12 Defendants offered and sold a security, namely shares of the Fund's

9   common stock, by means of a prospectus or were controlling persons of the Fund or of those who

10  offered and sold the Fund's shares.  This prospectus contained untrue statements of material facts

11  and omitted to state material facts necessary in order to make the statements, in light of the

12  circumstances under which they were made, not misleading, which statements and omissions the

13  § 12 Defendants knew, or in the exercise of reasonable care the § 12 Defendants would have

14  known, were false or were material facts which were required to be disclosed to avoid the

15  representations which were made from being misleading.

16     141. The § 12 Defendants actively solicited the sale of the Fund's shares to serve their

17  own financial interests.

18     142. Plaintiffs did not know that the representations made in connection with the

19  distribution to them by the § 12 Defendants regarding the matters described above were untrue and

20  did not know the above described material facts that were not disclosed.

21     143. As a result of the matters set forth herein, pursuant to § 12(a)(2) of the Securities

22  Act, Plaintiffs and Class members are entitled to recover the consideration paid for such security

23  with interest thereon, less the amount of any income received thereon, upon the tender of such

24  security, or for damages if they no longer own such shares.

25     144. Plaintiffs and putative Class members who do not opt out, hereby tender their shares

26  in the Fund.

27     145. The § 12 Defendants are liable to Plaintiffs and Class members pursuant to

28  § 12(a)(2) of the Securities Act, as sellers of the Fund's shares.

**COUNT III**

**VIOLATIONS OF SECTION 15 OF THE 1933 ACT
AGAINST THE CONTROL GROUP DEFENDANTS ON
BEHALF OF THE SECURITIES CLASS**

146.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein on behalf of the Securities Class.

147.     This Count is brought pursuant to § 15 of the 1933 Act against Defendants Schwab Corp., Charles Schwab & Co., Schwab Investment Management, Schwab Investments and Dilsaver, Merk, Pereira, Byerwalter, Doward, Halser, Holmes, Smith, Stephens, and Wilsey.

148.     Each of these Defendants was a control person of the Fund or the Defendant Schwab entities by virtue of his or her position as a trustee and/or senior officer of the Fund or the Defendant Schwab entities.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other trustees and/or officers and/or major shareholders of the Defendant Schwab entities and the Fund.

149.     Each of the Individual Defendants was a culpable participant in the violations of §§ 11 and 12 of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Fund.

**COUNT IV**

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL
RELATIONS ON BEHALF OF THE STATE LAW PRE-BREACH CLASS**

150.     Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs as if fully set forth in this paragraph.  This count is asserted by Plaintiffs against defendants Schwab, Schwab Corp., Schwab Management, Schwab Investments, Dilsaver, Merk, Pereira, Byerwalter, Hasler, Holmes, Smith, Stephens, Wilsey, Daifotis and Hastings on behalf of the Pre-Breach Class only and encompasses only acquisitions of shares of the Fund that took place before the Fund violated its no-concentration fundamental investment policy.

151.   The Registration Statement, Prospectus and SAI's constituted a contract between each investor and Schwab.

152.   The SAIs listed numerous limitations on the Fund, including limitations on the Fund's ability to invest in a given industry and ability to invest in illiquid instruments. Specifically, the SAIs stated that the Fund could not:

> Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.

The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005; November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15, 2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7, 2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16, 2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

153.   As had prior SAIs, the SAI issued November 15, 2004, set forth the Fund's existing fundamental investment policies, which could not be changed or diverged from without prior approval from a majority of the Fund's shareholders:

### INVESTMENT LIMITATIONS

> The following investment limitations are fundamental investment polices and restrictions and may be changed only by vote of a majority of a fund's outstanding voting shares.…
>
> THE SCHWAB YIELDPLUS FUND[(R)] … MAY NOT:…
>
> 2)   Concentrate investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or the rules or regulations there under, as such statute, rules and regulations may be amended from time to time….

The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as

1   amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15,

2   2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005;

3   November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as

4   amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15,

5   2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7,

6   2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16,

7   2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

8        154.    Following this paragraph and within the same section establishing the Fund's

9   fundamental investment policies, the SAI also defined the term "concentration":

10      THE FOLLOWING DESCRIPTIONS OF THE 1940 ACT MAY
        ASSIST INVESTORS IN UNDERSTANDING THE ABOVE
11      POLICIES AND RESTRICTIONS….

12      Concentration.  The SEC has presently defined concentration as
        investing 25% or more of an investment company's net assets in an
13      industry or group of industries, with certain exceptions.

14  The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004;

15  November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as

16  amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15,

17  2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005;

18  November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as

19  amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15,

20  2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7,

21  2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16,

22  2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

23       155.    This fundamental investment policy thus assured shareholders that the Fund would

24  remain well diversified.  Because this policy was "fundamental," the Board of Trustees could not

25  legitimately change the policy without first obtaining approval by a majority of the Fund's

26  shareholders.

27       156.    In a separate section entitled "Investments, Risks and Limitations," this

28  November 15, 2004, Statement of Additional Information also purported to describe in greater

detail certain terms used elsewhere in the document, including the word, "concentration." This description specifically advised investors that mortgage-backed securities constituted "a particular industry" and thus were subject to the Fund's no-concentration fundamental policy:

> CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities <u>as a separate industry for purposes of a fund's concentration policy</u>…. [Emphasis added.]

The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005.

157.    The SAIs also stated that the Fund could not "Invest more than 15% of its net assets in illiquid securities."  The foregoing quote appeared verbatim in SAIs issued as followed: November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005; November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15, 2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7, 2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16, 2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

158.    By summer 2006, the Fund was violating its no-concentration fundamental policy. And the Fund had not sought shareholder approval before doing so.

159.    Contrary to the Fund's investment guidelines, Schwab Management had begun shifting the Fund's assets into longer-duration bonds, including extensive investments in high-risk mortgage-backed securities and similar investments.  Mortgage-backed securities posed a

particular risk to the Fund by drastically increasing exposure to the very interest rate risk that the Fund's investment strategy purported to minimize.  While rising interest rates may cause the value of highly-rated corporate or government bonds to decrease, such rate changes generally do not increase the risk that the bonds would default.  In contrast, instruments backed by residential mortgages – and by subprime mortgages in particular – face a significantly heightened risk of default from interest rate spikes.  Focusing on mortgage-backed securities also heightened the Fund's concentration risk by eroding the diversity of its investments, in violation of its investing guidelines.

160.    By deviating from the Fund's investment guidelines into higher-risk investments, the Fund's performance initially improved markedly.  In 2005, the Fund achieved returns of 3.4%, significantly surpassing the Lehman Brothers Aggregate Bond Index, which achieved a return of 2.4%.  Furthermore, the Fund's 2005 returns outpaced the average approximate 2.5% return of the 115 other ultrashort bond funds within the Morningstar ultrashort bond fund category.  In 2006, the Fund achieved returns of 5.6% and 5.5% for the Select and Investor Shares, respectively, while the Lehman Brothers Aggregate Bond Index achieved a return of 4.3%.  Meanwhile, the Fund's 2006 returns beat the average approximate 4.7% return of the 115 other ultrashort bond funds within the Morningstar ultrashort bond fund category.

161.    The strikingly improved performance achieved by abandoning the Fund's conservative investment guidelines succeeded in attracting new investors to the Fund.  This growth began to occur in mid-to late 2005 when investors, attracted to a fund proclaiming itself to limiting fluctuations in share price but able to generate higher returns, poured investments into the Fund.  By April 30, 2005, the Fund surpassed $5.5 billion in assets to become one of the largest ultrashort term bond funds.  In May 2005, Lipper and Morningstar mutual fund industry analysts named the Fund as the best performer in its class.

162.    By the fall of 2006, the Fund's annual report dated August 31, 2006, disclosed that the Fund had 28.9% of its holdings in mortgage-backed securities, exceeding the fundamental policy's 25% limit.

163.   Even then, the SAI's description of the Fund's fundamental policy remained unchanged.  The SAI dated November 15, 2006, contained the same description of the Fund's no-concentration policy, as did every SAI thereafter as set forth in ¶¶ 152-54:

### INVESTMENT LIMITATIONS

The following investment limitations are fundamental investment polices and restrictions and may be changed only by vote of a majority of a fund's outstanding voting shares.…

THE SCHWAB YIELDPLUS FUND[(R)] … <u>MAY NOT</u>:…

2)   <u>Concentrate investments in a particular industry or group of industries</u>, as concentration is defined under the 1940 Act, or the rules or regulations there under, as such statute, rules and regulations may be amended from time to time;.…

THE FOLLOWING DESCRIPTIONS OF THE 1940 ACT MAY ASSIST INVESTORS IN UNDERSTANDING THE ABOVE POLICIES AND RESTRICTIONS.…

Concentration.  The SEC has presently <u>defined concentration as investing 25% or more</u> of an investment company's net assets in an industry or group of industries, with certain exceptions.  [Emphasis added.]

164.   Then, by fiat and without holding a shareholder vote, the SAI amended September 1, 2006, indicated that the Fund <u>reversed</u> its conclusion that mortgage-backed securities comprised "a particular industry."  Purporting to excuse the Fund's over-concentration in mortgage-based securities in violation of its fundamental investment policies, Defendants revised the prior SAI's description of "concentration":

"CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures.  A fund will limit its investments in each identified industry to less than 25% of its total assets. . . .  <u>The funds have determined that mortgage-backed securities issued by private lenders do not have risk</u>

1    characteristics that are correlated to any industry and, therefore, the
     funds have determined that mortgage-backed securities issued by
2    private lenders are not part of any industry for purposes of the funds'
     concentration policies.  This means that a fund may invest more than
3    25% of its total assets in privately-issued mortgage-backed securities,
     which may cause the fund to be more sensitive to adverse economic,
4    business or political developments that affect privately-issued
     mortgage-backed securities.  Such developments may include
5    changes in interest rates, state or federal legislation affecting
     residential mortgages and their issuers, and changes in the overall
6    economy."  [Emphasis added.]

7        165.    Over time, the Fund shifted asset allocation to become highly concentrated in

8    mortgage-backed securities.  This change in asset concentration is inconsistent with the

9    representations regarding share price stability and safety.  The August 31, 2004 Annual Report

10   disclosed that the Fund's holdings in mortgage-backed securities comprised 11.1% of the Fund's

11   portfolio.  This had grown to 28.9% by August 31, 2006, exceeding the fundamental policy's 25%

12   limit.  From there, it would grow to a high of 50.1% by the end of February 2008, as demonstrated

13   in the following chart produced by an industry expert using a sophisticated, industry-accepted

14   valuation methodology not available to the average investor:

|  | % Net Assets | | | | |
| --- | --- | --- | --- | --- | --- |
|  | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 | 5/31/2008 |
| CORPORATE BONDS | 45.10% | 40.30% | 34.90% | 34.00% | 24.60% |
| ASSET-BACKED OBLIGATIONS | 10.90% | 7.00% | 7.90% | 10.00% | 23.20% |
| MORTGAGE-BACKED SECURITIES | 46.50% | 45.90% | 46.20% | 50.10% | 18.40% |
| Total ABS+MBS | 57.40% | 52.90% | 54.10% | 60.10% | 41.60% |

19       166.    At no time did Defendants seek or obtain approval from a majority of the Fund's

20   shareholders to deviate from the Fund's no-concentration fundamental policy.

21       167.    The Fund's conduct, as described above, deviated from the Fund's investment

22   policy that was changeable only by a shareholder vote, and a deviation from a policy recited in the

23   Fund's Registration Statement as a "fundamental investment policy."

24       168.    The above-noted investments made in violation of the stated fundamental

25   investment policy caused significant losses to the Fund's shareholders, as alleged above.

26       169.    As described above, Plaintiffs and other members of the Classes have suffered

27   substantial damages in connection with losses in the Fund's value that resulted from the Fund's

28   deviation from its stated fundament investment policy and its resulting breach of contract.

170.    Defendants, by means of their control of defendant Fund, induced the Fund to breach the contracts entered into by the Fund with Plaintiffs and members of the Pre-Breach Class, and interfered with the contractual relationships between the Fund and members of the Pre-Breach Class for the purpose of promoting their own financial interests by inducing the Fund to concentrate assets in a particular industry or group of industries without first obtaining shareholder approval in violation of the contracts.  Those defendants knew of the Fund's contracts with Plaintiffs and members of the Pre-Breach Class, intended to induce the Fund to breach its contracts and, as a result, did injure Plaintiffs and members of the Pre-Breach Class through these actions.

## COUNT V

### VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE §§ 17200 *ET SEQ.* ON BEHALF OF THE STATE LAW PRE-BREACH CLASS

171.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs as if fully set forth in this paragraph.  This count is asserted by Plaintiffs against Schwab Management, Schwab Investments, Dilsaver, Merk, Pereira, Byerwalter, Hasler, Holmes, Smith, Stephens, Wilsey, Daifotis and Hastings on behalf of the Pre-Breach Class only and encompasses only acquisitions of shares of the Fund that took place before the Fund violated its no-concentration fundamental investment policy.

172.    The Fund engaged in "unlawful" business acts and practices in violation of the California Unfair Competition Law ("UCL") by violating federal law as described above, including but not limited to § 48(a) of the ICA (15 U.S.C. 80(a)-47(a)), and § 13(a) of the ICA, 15 U.S.C. § 80a-13(a).  Plaintiffs reserves the right to identify additional violations of California and/or federal law committed by the Fund as further investigation and discovery warrants.

173.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of the Fund's business.  The wrongful conduct is part of a pattern or generalized course of conduct that has been repeated in the State of California on hundreds of occasions.  The conduct thus impacts the public interest.

174.     As a proximate result of the wrongful conduct, Plaintiffs and the members of the Pre-Breach Class have sustained substantial damages in connection with losses in the Fund's value that resulted from the Fund's deviation from its stated fundamental investment policy.

175.     Plaintiffs requests that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unlawful conduct, as provided in California Business & Professions Code § 17203 and Civil Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT VI

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS ON BEHALF OF THE STATE LAW POST-BREACH CLASS

176.     Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs as if fully set forth in this paragraph.  This count is asserted by Plaintiffs against Schwab Management, Schwab Investments, Dilsaver, Merk, Pereira, Byerwalter, Hasler, Holmes, Smith, Stephens, Wilsey, Daifotis and Hastings, on behalf of the Post-Breach Class only and encompasses only acquisitions of shares of the Fund that took place after the Fund violated its no-concentration fundamental investment policy.

177.     Defendants, by means of their control of defendant Fund, induced the Fund to breach the contracts entered into by the Fund with Plaintiffs and members of the Post-Breach Class, and interfered with the contractual relationships between the Fund and members of the Post-Breach Class for the purpose of promoting their own financial interests by inducing the Fund to concentrate assets in a particular industry or group of industries without first obtaining shareholder approval in violation of the contracts.  These defendants knew of the Fund's contracts with Plaintiffs and members of the Post-Breach Class, intended to induce the Fund to breach its contracts and, as a result, did injure Plaintiffs and members of the Post-Breach Class through these actions.

**COUNT VII**

**VIOLATIONS OF THE CALIFORNIA BUS. & PROF.**
**CODE §§ 17200 *ET SEQ.* ON BEHALF OF THE STATE LAW POST-BREACH CLASS**

178.   Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs as if fully set forth in this paragraph.  This count is asserted by Plaintiffs against Schwab Management, Schwab Investments, Dilsaver, Merk, Pereira, Byerwalter, Hasler, Holmes, Smith, Stephens, Wilsey, Daifotis and Hastings, on behalf of the Post-Breach Class only and encompasses only shares of the Fund acquired after the Fund violated its no-concentration fundamental investment policy.

179.   These Defendants engaged in "unlawful" business acts and practices in violation of the UCL by violating federal law, including but not limited to § 48(a) of the ICA (15 U.S.C. § 80a-47(a)), for causing the Fund to violate § 13(a) of the ICA.  Plaintiffs reserve the right to identify additional violations of California and/or federal law by the Fund caused by these Defendants as further investigation and discovery warrants.

180.   The Fund's conduct, as described above, violated § 13(a) of the ICA in that the Fund deviated from its investment policy that was changeable only by a shareholder vote and from a policy recited in the Fund's Prospectus as a "fundamental investment policy" as detailed above.

181.   All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of these Defendants' businesses.  These Defendants' wrongful conduct is part of a pattern or generalized course of conduct that has been repeated in the State of California on a continuing basis.  The Defendants' conduct thus impacts the public interest.

182.   As a proximate result of the Defendants' wrongful conduct, Plaintiffs and the members of the Post-Breach Class have sustained substantial damages in connection with losses in the Fund's value that resulted from the Fund's deviation from its stated fundamental investment policies.

183.   Plaintiffs' requests that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of

such unfair competition, as provided in California Business & Professions Code § 17203 and Civil Code § 3345, and for such other relief as set forth in the Prayer for Relief.

## COUNT VIII

### BREACH OF FIDUCIARY DUTY ON BEHALF OF THE STATE LAW POST-BREACH CLASS

184.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs as if fully set forth in this paragraph.  This count is asserted against all defendants except PWC.

185.    Schwab Investments, Schwab Investment Management, Charles S. Schwab, Dilsaver, Merk, Pereira and Daifotis were each controlling persons of the Fund as well as other funds in the Schwab family of Funds.  Each was a fiduciary to the Fund and to Class members.

186.    Each of these defendants had inside information as to the true nature of the Fund as explained in ¶¶ 86-87.

187.    Other Schwab funds in the Schwab family of funds had investments in the Fund. Aware that the Fund's value would decline due to the risky nature of much of its holdings these defendants caused the Schwab funds to withdraw from the Fund at the expense of members of the class.  This act of withdrawal was a breach of fiduciary duty to the state law class and caused damage to members of the class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

E.      Awarding rescissionary damages; and

F.      Such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated:  October 2, 2008                   HAGENS BERMAN SOBOL SHAPIRO LLP
                                          Reed R. Kathrein
                                          Peter E. Borkon
                                          715 Hearst Avenue, Suite 202
                                          Berkeley, CA 94710
                                          Telephone: (510) 725-3000
                                          Facsimile: (510) 725-3001
                                          reed@hbsslaw.com
                                          peterb@hbsslaw.com


                                          By:  ___/s/ Steve W. Berman_____
                                                  Steve W. Berman
                                                  Sean R. Matt
                                                  Erin K. Flory
                                          HAGENS BERMAN SOBOL SHAPIRO, LLP
                                          1301 Fifth Avenue, Suite 2900
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594
                                          steve@hbsslaw.com
                                          sean@hbsslaw.com
                                          erin@hbsslaw.com

                                          *Attorneys for Lead Plaintiff theYieldPlus Investor Group*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the following Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the following Manual Notice List.

                  /s/ Steve W. Berman
                  STEVE W. BERMAN

**Electronic Mail Notice List**

- **Vahn Alexander**
  valexander@faruqilaw.com
- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com
- **Peter E. Borkon**
  peterb@hbsslaw.com
- **Timothy J. Burke**
  service@ssbla.com
- **Erin K. Flory**
  erin@hbsslaw.com
- **J. Thomas Hannan**
  hannan@lh-sf.com
- **Reed R. Kathrein**
  reed@hbsslaw.com,steve@hbsslaw.com,nancyq@hbsslaw.com,sf_filings@hbsslaw.com
- **Sean R. Matt**
  sean@hbsslaw.com
- **Azra Z. Mehdi**
  azram@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com
- **Stuart Christopher Plunkett**
  rpelletier@mofo.com,ggerrish@mofo.com,splunkett@mofo.com
- **Alan R Plutzik**
  aplutzik@bramsonplutzik.com
- **Darryl Paul Rains**
  drains@mofo.com,dgillis@mofo.com

**Manual Notice List**

Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

FIRST CONSOLIDATED AMENDED COMPLAINT
No. 08-cv-01510 WHA
010036-11 263556 V1

- 79 -