1   DARRYL P. RAINS (CA SBN 104802)
    MORRISON & FOERSTER LLP
2   755 Page Mill Road
    Palo Alto, California 94304-1018
3   Telephone: 650.813.5600
    Facsimile: 650.494.0792
4   Email: DRains@mofo.com

5   STUART C. PLUNKETT (CA SBN 187971)
    KIMBERLY L. TAYLOR (CA SBN 240483)
6   MORRISON & FOERSTER LLP
    425 Market Street
7   San Francisco, California 94105-2482
    Telephone: 415.268.7000
8   Facsimile: 415.268.7522

9   Attorneys for Defendants The Charles Schwab Corporation,
    Charles Schwab & Co., Inc., Charles Schwab Investment
10  Management, Inc., Schwab Investments, Charles R. Schwab,
    Evelyn Dilsaver, Randall W. Merk, George Pereira, Kimon
11  Daifotis, and Matthew Hastings

12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

17  IN RE CHARLES SCHWAB CORP.              Master File No. C-08-01510-WHA
    SECURITIES LITIGATION
18                                          CLASS ACTION

19                                          MOTION TO DISMISS FIRST
                                            CONSOLIDATED AMENDED
20                                          COMPLAINT

21                                          Date:        December 11, 2008
                                            Time:        8:00 a.m.
22                                          Judge:       Hon. William H. Alsup
                                            Courtroom:   9
23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION TO DISMISS
FIRST CONSOLIDATED AMENDED COMPLAINT**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on December 11, 2008, at 8:00 a.m. or as soon thereafter as the matter may be heard, in Courtroom 9 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, defendants The Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Investment Management, Inc., Schwab Investments, Charles R. Schwab, Evelyn Dilsaver, Randall W. Merk, George Pereira, Kimon Daifotis, and Matthew Hastings will, and hereby do, move for dismissal of the First Consolidated Amended Complaint pursuant to Rules 8, 9(b) and 12 of the Federal Rules of Civil Procedure.

The motion is based on this notice of motion and motion, the memorandum set forth below, the accompanying declaration of Kimberly L. Taylor, the accompanying request for judicial notice, the reply memorandum, the pleadings and papers on file in this action, and such other written or oral argument as may be presented before the motion is taken under submission by the Court.

# STATEMENT OF ISSUES
(Local Rule 7-4)

1.      Do plaintiffs adequately plead that any statement in the YieldPlus fund's registration statement or prospectuses was materially false or misleading?

2.      Do plaintiffs adequately plead that their alleged loss is causally connected to the purported misstatements?

3.      Are the defendants (other than Schwab Investments and Charles Schwab & Co., Inc.) "sellers" of the fund's shares for purposes of section 12(a)(2)?

4.      Do plaintiffs adequately allege control person liability against The Charles Schwab Corporation or any of its subsidiaries and officers?

5.      Are plaintiffs' state law claims preempted by the Securities Litigation Uniform Standards Act because they are based on alleged misrepresentations or omissions in connection with the sale of securities?

6.      Do plaintiffs adequately plead a claim for intentional interference with contractual relations?

7.      Do plaintiffs adequately plead a claim for violation of California Business & Professions Code section 17200?

8.      Are plaintiffs required to assert their claim for breach of fiduciary duty derivatively, and if not, do they adequately plead such a breach of fiduciary duty?

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS FIRST CONSOLIDATED
    AMENDED COMPLAINT ................................................................................................ i

STATEMENT OF ISSUES ..................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................... v

INTRODUCTION ................................................................................................................... 1

BACKGROUND FACTS ........................................................................................................ 2

ARGUMENT ........................................................................................................................... 5

I.      PLAINTIFFS' SECTION 11 CLAIM MUST BE DISMISSED. .................................... 7

      A.      The YieldPlus Fund's Registration Statement Is Not Misleading. ......................... 7

              1.      Duration. ..................................................................................................... 8

              2.      Coupon Dates and Maturity Dates. ............................................................. 9

              3.      Concentration and Diversification. ........................................................... 10

              4.      Benchmark Index. ..................................................................................... 12

              5.      Asset Valuations. ...................................................................................... 13

              6.      Asset Classifications. ................................................................................ 14

      B.      Plaintiffs Do Not Plead Loss Causation. ............................................................. 14

II.     PLAINTIFFS' SECTION 12 CLAIM MUST BE DISMISSED. .................................. 16

      A.      The YieldPlus Fund's Prospectuses Were Not Materially Misleading. ................. 16

      B.      Schwab Investments and Charles Schwab & Co., Inc. Are the Only
              "Sellers" of the Fund. ............................................................................................ 16

      C.      Plaintiffs Do Not Plead Loss Causation. ............................................................. 17

III.    PLAINTIFFS' "CONTROL PERSON" CLAIM MUST BE DISMISSED. .................... 17

IV.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY SLUSA. ..................... 18

V.     COUNTS IV AND VI — FOR INTERFERENCE WITH CONTRACTUAL
      RELATIONS — MUST BE DISMISSED. ...................................................................... 19

      A.      The Fund's SEC Filings Do Not Constitute a Contract. ...................................... 19

      B.      The Fund Did Not Breach Its Concentration Policy. ............................................ 20

      C.      Defendants Cannot Be Liable for Inducing a Breach of the Fund's
              Contracts. .............................................................................................................. 21

      D.      Plaintiffs Do Not Properly Plead Intentional Interference. .................................. 22

VI.    COUNTS V AND VII — FOR VIOLATIONS OF SECTION 17200 — MUST
      BE DISMISSED. ............................................................................................................. 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VII.      THE BREACH OF FIDUCIARY DUTY COUNT MUST BE DISMISSED ................. 24

     A.      Plaintiffs' Claim Must Be Asserted Derivatively. .................................................. 24

     B.      Plaintiffs Fail To State a Claim for Breach of Fiduciary Duty. ............................ 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

Page(s)

*Acri v. Varian Assocs.*,
114 F.3d 999 (9th Cir. 1997) ............................................................................................ 19

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) ................................................................................................. 21, 22

*Ashker v. Horel*,
2007 WL 2348732 (N.D. Cal. Aug. 14, 2007) .................................................................. 21

*Batchelder v. Kawamoto*,
147 F.3d 915 (9th Cir. 1998) ............................................................................................ 24

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ........................................................................................................ 6

*Belodoff v. Netlist, Inc.*,
2008 WL 2356699 (C.D. Cal. May 30, 2008) ............................................................... 6, 12

*Bessette v. Bessette*,
434 N.E.2d 206 (Mass. 1982) ........................................................................................... 24

*Blank v. Kirwan*,
39 Cal. 3d 311 (1985) ....................................................................................................... 23

*Blasberg v. Oxbow Power Corp.*,
934 F. Supp. 21 (D. Mass. 1996) ...................................................................................... 24

*Borsellino v. Goldman Sachs Group, Inc.*,
477 F.3d 502 (7th Cir. 2007) ............................................................................................ 22

*Bowen v. Ziasun Techs., Inc.*,
116 Cal. App. 4th 777 (2004) ........................................................................................... 23

*Brazier v. Sec. Pac. Mortgage Inc.*,
245 F. Supp. 2d 1136 (W.D. Wash. 2003) ........................................................................ 14

*Brodsky v. Yahoo!, Inc.*,
2008 WL 4531815 (N.D. Cal. Oct. 7, 2008) ................................................................. 7, 17

*Buster v. George W. Moore, Inc.*,
783 N.E.2d 399 (Mass. 2003) ........................................................................................... 20

*Charles O. Bradley Trust v. Zenith Capital LLC*,
2008 WL 3400340 (N.D. Cal. Aug. 11, 2008) .................................................................. 23

*Clark v. Nevis Capital Mgmt., LLC*,
  2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ........................................................ 15

*Cohen v. Stratosphere Corp.*,
  115 F.3d 695 (9th Cir. 1997) ............................................................................ 20

*Davis & Cox v. Summa Corp.*,
  751 F.2d 1507 (9th Cir. 1985) .......................................................................... 24

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................... 14

*Estate of Bray*,
  230 Cal. App. 2d 136 (1964) ............................................................................ 20

*Forsythe v. Sun Life Fin., Inc.*,
  417 F. Supp. 2d 100 (D. Mass. 2006) ............................................................... 24

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .......................................................................... 18

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998) ....................................................................... 12, 13

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................................. 15

*In re Anchor Gaming Sec. Litig.*,
  33 F. Supp. 2d 889 (D. Nev. 1999) ................................................................... 14

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ............................................................................ 5

*In re DNAP Sec. Litig.*,
  2000 WL 1358619 (N.D. Cal. Sept. 14, 2000) ................................................. 15

*In re Gemstar-TV Guide, Int'l Inc. Sec. Litig.*,
  2003 U.S. Dist. LEXIS 25884 (C.D. Cal. Aug. 15, 2003) ................................... 6

*In re GlenFed Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994) .......................................................................... 6, 9

*In re Infonet Serv. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) ............................................................ 17

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......................................................... 13, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................ 6, 15

*In re Merrill Lynch & Co.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003) ............................................................ 15, 17

*In re Merrill Lynch Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................. 15

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...................................................... 15

*In re Silicon Storage Tech. Inc., Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ................................................. 7, 8, 13

*In re Splash Tech. Holdings, Inc., Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................................... 18

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) ................................................................................. 5

*In re Textainer Partnership Sec. Litig.*,
   2006 WL 3247425 (N.D. Cal. Aug. 10, 2006) .................................................... 8, 9

*In re Valence Tech. Sec. Litig.*,
   1995 WL 274343 (N.D. Cal. May 8, 1995) ........................................................... 8

*In re Verifone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) .................................................................................. 8

*In re Viropharma, Inc., Sec. Litig.*,
   2003 WL 1824914 (E.D. Pa. Apr. 7, 2003) .......................................................... 8

*In re Worldcom, Inc. Sec. Litig.*,
   2004 WL 1097786 (S.D.N.Y. May 18, 2004) ...................................................... 18

*Kainos Labs., Inc. v. Beacon Diagnostics, Inc.*,
   1998 WL 2016634 (N.D. Cal. Sept. 14, 1998) .................................................... 24

*Khoury v. Maly's of Cal., Inc.*,
   14 Cal. App. 4th 612 (1993) ................................................................................ 23

*Lipson v. Anesthesia Servs., P.A.*,
   790 A.2d 1261 (Del. Super. Ct. 2001) ................................................................ 20

*Marin Tug & Barge, Inc. v. Westport Petr.*,
   271 F.3d 825 (9th Cir. 2001) ............................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
   339 F.3d 1087 (9th Cir. 2003) ................................................................. 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
   547 U.S. 71 (2006) ........................................................................ 18, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................. 14

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .............................................................. 9, 14

*Paralyzed Veterans of Am. v. McPherson*,
   2008 WL 4183981 (N.D. Cal. Sept. 9, 2008) ................................................. 3

*Perera v. Chiron Corp.*,
   1996 WL 251936 (N.D. Cal. May 8, 1996) ................................................... 23

*Pinter v. Dahl*,
   486 U.S. 622 (1988) ........................................................................... 16

*Quelimane Co. v. Stewart Title Guar. Co.*,
   19 Cal. 4th 26 (Cal. 1998) ................................................................ 19, 20

*Rennick v. O.P.T.I.O.N. Care*,
   77 F.3d 309 (9th Cir. 1996) .................................................................. 20

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................ 5, 6

*Scognamillo v. Credit Suisse First Boston LLC*,
   2005 WL 2045807 (N.D. Cal. Aug. 25, 2005) ................................................ 23

*Shapiro v. Miami Oil Producers, Inc.*,
   84 F.R.D. 234 (D. Mass. 1979) ............................................................... 25

*Shaw v. Digital Equip. Corp.*,
   82 F.3d 1194 (1st Cir. 1996) ................................................................. 17

*Shoemaker v. Myers*,
   52 Cal. 3d 1 (1990) .......................................................................... 21

*Start v. Apple Computer, Inc.*,
   1996 WL 161630 (N.D. Cal. Mar. 22, 1996) ................................................. 20

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005) ........................................................ 24

*Synapsis LLC v. Evergreen Data Sys., Inc.*,
  2005 WL 1656901 (N.D. Cal. July 13, 2005) ........................................................................ 22

*U.S. Mortgage, Inc. v. Jensen*,
  494 F.3d 833 (9th Cir. 2007) .................................................................................... 18, 19

*Van Ness v. Blue Cross*,
  87 Cal. App. 4th 364 (2001) ........................................................................................ 23

*Verona Partners, LLC v. Tenant Capital Partners Convertible Opportunities Fund LP*,
  2006 WL 2669035 (N.D. Cal. Sept. 18, 2006) ........................................................ 15

*Vess v. Ciba-Geiby Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................. 5, 22

*Westlye v. Look Sports, Inc.*,
  17 Cal. App. 4th 1715 (1993) ..................................................................................... 20

*Williams v. Gerber Prods. Co.*,
  523 F.3d 934 (9th Cir. 2008) ........................................................................................ 7

*Williston Basin Interstate Pipeline Co. v. Exclusive Gas Storage Leasehold*,
  524 F.3d 1090 (9th Cir. 2008) ....................................................................................... 6

*Woods v. Fox Broad. Sub., Inc.*,
  129 Cal. App. 4th 344 (2005) ..................................................................................... 22

## STATUTES AND RULES

15 U.S.C.
  § 77k .................................................................................................................... 7, 15
  § 77l ........................................................................................................................ 16
  § 77o ....................................................................................................................... 17
  §77p ................................................................................................................... 18, 19
  §77r ......................................................................................................................... 19
  § 78bb ..................................................................................................................... 19
  §§ 80a-8 ................................................................................................................... 23

28 U.S.C.
  § 1367(c) ................................................................................................................. 19

Federal Rules of Civil Procedure
  8 ................................................................................................................................ 7
  9 ..................................................................................................................... *passim*

Cal. Civ. Code
    § 1550 ................................................................................................................. 20

Cal. Bus. & Prof. Code
    § 17200 ........................................................................................................... 18, 23

**OTHER AUTHORITIES**

SEC Release No. IC-13436 (Aug. 12, 1983) ................................................... 10, 11, 21

*Ultra-Short Bond Funds: Know Where You're Parking Your Money*
    Published by the United States Securities and Exchange Commission
    *available at* http://www.sec.gov/investor/pubs/ultra-short_bond_funds.htm .......................... 3

William L. Stern, *Bus. & Prof. C. § 17200 Practice*
    ¶¶ 3:26–28 (The Rutter Group 2008) ................................................................. 23

*George Soros: Credit Crisis Is the Worst Since the Great Depression,*
    Telegraph, May 24, 2008 .............................................................................. 2

**INTRODUCTION**

Plaintiffs — investors in the Schwab YieldPlus mutual fund — say they thought the fund was "safe, secure and good as cash" — so safe it would be immune to the credit crisis now engulfing the world's financial markets.  (Compl. ¶ 13.)

That is not what the fund's prospectuses say.  What the prospectuses actually say is:

> [T]he values of the securities owned by the fund rise and fall daily.  As with any investment whose performance is tied to these [bond] markets, the value of your investment in the fund will fluctuate, which means that you could lose money.

(Nov. 15, 2007 Prospectus at 4, attached as Taylor Decl. Ex. A.)  No investor who read this language could have thought the fund was as "good as cash" or would not be affected by a worldwide financial crisis.

Plaintiffs' complaint pleads eight counts.  The first three arise under the Securities Act of 1933, and focus on the statements in the fund's registration statement and prospectuses regarding the fund's investment objectives and risks.  These claims do not adequately allege any material misstatement.  They also improperly incorporate statements from outside the fund's registration statement and prospectuses, and improperly name defendants who fall outside the '33 Act's reach.

The five remaining claims arise under state law.  All five are preempted by the Securities Litigation Uniform Standards Act, and four of the five proceed from an erroneous reading of the fund's diversification and concentration policies.  The final claim — for breach of fiduciary duty — alleges insider trading but does not plead any facts to support that charge.

The credit crisis has hurt millions of investors, including investors in the YieldPlus fund.  But that does not mean defendants violated the securities laws.  The fund's registration statement and prospectuses accurately disclosed the nature of the fund, the fund's policies regarding diversification and concentration, and the risks associated with investing in the fund.  Because plaintiffs do not properly plead any violation of the securities laws, or state law, their complaint should be dismissed.

**BACKGROUND FACTS**

*The Credit Crisis*.  The current market collapse is the worst financial crisis to hit the world since the Great Depression.  *See*, *e.g.*, *George Soros: Credit Crisis Is the Worst Since the Great Depression*, Telegraph, May 24, 2008 ("[w]e are in the midst of the worst financial crisis since the 1930s").

The essence of the crisis is a devaluation of assets.  Housing prices, fixed-income securities, and stocks of all kinds have declined in value as investors have lost confidence in the markets.

In the housing sector, U.S. home prices declined 17 percent between July 2007 and July 2008, with losses to homeowners exceeding $5 trillion.  The collapse in home prices bankrupted mortgage companies like Ameriquest, New Century Financial, Option One, and Countrywide Financial.  (*See* Compl. ¶ 110.)  And it led to the government takeovers of Fannie Mae and Freddie Mac.

In the equities market, stocks have lost a mind-boggling $8 trillion, with stock indices showing declines of 30 to 40 percent worldwide over the past year.  More than a dozen commercial banks have failed or been sold for pennies on the dollar, including IndyMac Bank, Washington Mutual, and Wachovia.  Among the investment banks, Bear Stearns and Lehman Brothers both collapsed, while Merrill Lynch sold itself, to avoid the same fate, to Bank of America.  The world's largest insurer — American International Group, or "AIG" — survived, but only because of government loan guarantees totaling over $115 billion.  Just about every investor who owns stocks or equity mutual funds has lost money as a result of this crisis.

And, in the fixed-income markets, asset write-downs have exceeded $1 trillion, with commercial banks, investment banks, and other large holders recording charges of $20 billion, $40 billion, and more.  Just about every investor who owns fixed-income securities (apart from U.S. treasury securities) has been hurt.

*The Impact of the Credit Crisis on Ultra-Short Bond Funds*.  The credit crisis, not surprisingly, hurt mutual funds in the ultra-short bond fund category.  Ultra-short bond funds are

1  "bond funds" because they invest in fixed-income securities.  They are "ultra-short" because they

2  typically seek to maintain an average portfolio duration of one year or less.

3      Ultra-short bond funds thus fall between money market funds and long-term bond funds.

4  Unlike a money market fund, an ultra-short bond fund "may invest in [a] wide range of securities,

5  including corporate debt, government securities, mortgage-backed securities, and other asset-

6  backed securities."  (http://www.sec.gov/investor/pubs/ultra-short_bond_funds.htm, attached as

7  Taylor Decl. Ex. G; *see also* Nov. 15, 2007 Prospectus at 2.)[1]  Ultra-short bond funds "typically

8  pursue strategies aimed at producing higher yields by investing in securities with higher risks."

9  (http://www.sec.gov/ investor/pubs/ultra-short_bond_funds.htm.)  As a result, ultra-short bond

10  funds will have "a higher risk profile than a money market fund" and "higher risks than . . .

11  certificates of deposits (CDs)."  (http://www.sec.gov/investor/pubs/ultra-short_bond_funds.htm;

12  Nov. 15, 2007 Prospectus at 2.)  In addition, unlike a money market fund, "the net asset value

13  (NAV) of an ultra-short bond fund will fluctuate."  (http://www.sec.gov/investor/pubs/ultra-

14  short_bond_funds.htm; *see* Nov. 15, 2007 Prospectus at 2.)  But, unlike a long-term bond fund,

15  ultra-short bond funds keep their duration low, resulting in less exposure to interest rate and credit

16  risks.  Ultra-short bond funds thus offer investors the opportunity to earn a higher yield than a

17  money market fund with less risk than a long-term bond fund.

18      The credit crisis hit many ultra-short bond funds hard.  Some of them — like Wachovia

19  Bank's Evergreen Ultra Short Opportunities Fund and State Street's SSgA Yield Plus Fund —

20  lost over 25 percent of their value before they were closed and their assets liquidated.  One of the

21  YieldPlus fund's largest competitors — the Fidelity Ultra-Short Bond Fund — lost almost 20

22  percent of its value.[2]  But, as the largest ultra-short fund, the YieldPlus fund had the most to lose.

_____

23      [1] The Court may take judicial notice of factual information found on a government

24  website.  *See Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *5 (N.D. Cal.
Sept. 9, 2008).

25      [2] While money market funds are less risky than ultra-short bond funds, the credit crisis

26  even hurt some money market funds.  For the first time in decades, a money market fund — the
$60 billion Reserve Primary Fund — "broke the buck" by failing to preserve its constant share

27  value.  That fund is now in liquidation.  Managers of nearly twenty other money market funds,
including Wachovia, SunTrust, Credit Suisse, and Lehman Brothers, pumped money into their

28  funds in order to avoid the same fate.  Finally, to avoid further failures, the U.S. Treasury

(Footnote continues on next page.)

*The Charles Schwab Ultra-Short Bond Fund*.  The YieldPlus fund opened for investment in October 1999.  Over the next eight years, the fund generated an average annual total return of around 4.1 percent through July 31, 2007, or about 1.5 percent higher than the comparable return on money market funds.  Its NAV fluctuated less than 1 percent annually, on average, during this period.  The combination of high yields and low volatility caused the Lipper rating organization to rank the YieldPlus fund as the top mutual fund in its category for the period from 2002 to 2005.  (Compl. ¶ 161.)  Morningstar, another prominent mutual fund research firm, gave the YieldPlus fund "five stars"— its highest rating.  (*Id*.)

The fund's success generated great interest among investors.  Over the eight-year stretch from its inception to July 2007, the YieldPlus fund grew to have more than $13.5 billion in assets.

*The Run on the Fund*.  As the largest ultra-short bond fund, the YieldPlus fund bore the brunt of the sell-off.  As the credit crisis worsened in August 2007, the fund experienced, for the first time, a significant decline in its net asset value (or "NAV").[3]  The decline was modest at first:  the fund's NAV dropped from approximately $9.70 per share in July 2007 to $9.40 at the end of August.  The decline did not mean the bonds in the fund's portfolio had stopped performing; in fact, even today, the fund has not experienced significant defaults.  But the fund, like all mutual funds, must "mark to market" its portfolio each day.  The wholesale devaluation of fixed-income securities forced daily write-downs of the value of the YieldPlus fund's portfolio.

The NAV decline was modest, but it was enough to prompt a rush to the exits.  Investors in the fund withdrew a staggering $2.7 billion of assets during August 2007.  After a pause, redemptions surged again in November and December 2007.  By the end of the year, investors had withdrawn $6.9 billion, or one-half of the fund's assets.

---

(Footnote continued from previous page.)

announced on September 19, 2008, a new government-sponsored investor insurance program for money market funds.

[3] While the fund told investors it seeks only "minimal changes in share price," it warned them the fund "is not a money market fund," it "has a higher risk profile than a money market fund," and "unlike a money market fund, its share price will fluctuate."  (Nov. 15, 2007 Prospectus at 2.)

1    These customer redemption requests forced the fund to liquidate billions of dollars of

2    fixed-income securities at precisely the time when market conditions were at their worst.  The

3    forced sales at distressed prices contributed to further NAV declines.  It was a vicious cycle:

4    withdrawals forced more distressed sales, which forced down NAV, which incited more

5    withdrawals.  It was a classic run on the fund.  By the time this lawsuit was filed, on March 18,

6    2008, the fund had shrunk to just $2.9 billion, and its NAV had declined to $7.88 per share.  (*See*

7    Compl. ¶ 105.)

8                                          **ARGUMENT**

9    Plaintiffs' complaint asserts three federal claims under the Securities Act of 1933.  The

10   claims all assert that the fund's registration statement and prospectuses misstated material facts

11   and omitted to disclose material facts.

12   These claims must meet Rule 9(b)'s heightened pleading standard.  Rule 9(b) applies to

13   claims that "sound in fraud" or are "grounded in fraud."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d

14   1399, 1405 (9th Cir. 1996) ("the particularity requirements of Rule 9(b) apply to claims brought

15   under Section 11 when, as here, they are grounded in fraud"); *In re Daou Sys., Inc. Sec. Litig.*,

16   411 F.3d 1006, 1027 (9th Cir. 2005) (section 11 claim "subject to Rule 9(b)'s particularity

17   mandate if [it] 'sounds in fraud'").

18   Rule 9(b) is not limited to claims where scienter is an element, or to claims where the

19   word "fraud" is used.  The key Ninth Circuit case on this point is *Vess v. Ciba-Geiby Corp. USA*,

20   317 F.3d 1097, 1103–04 (9th Cir. 2003).  *Vess* held that a proper Rule 9(b) inquiry must focus on

21   the nature of the factual allegations.  Thus, a complaint "sounds in fraud," according to *Vess*, if its

22   factual allegations "necessarily constitute fraud," even if fraud is not "an essential element" of the

23   claim and even if the complaint never "mentions the word 'fraud'."  *Id.* at 1105.  *Accord*

24   *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b)'s "wording is cast in terms of

25   the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed

26   in terms of the constituent elements of a fraud cause of action").

27   Plaintiffs' allegations here necessarily constitute fraud.  Plaintiffs allege Schwab

28   routinely:  "misrepresented the description of the securities," "misrepresented the pricing of

1    securities," "misrepresented maturity dates" to help "conceal the fact that the duration was not as

2    represented," and "made a deliberate decision to modify and exceed" the fund's stated

3    concentration limits.  (Compl. ¶¶ 2, 6.)  The effect of these alleged misrepresentations was to

4    make the fund "riskier than represented," "obscuring the[] true value and the assets of the Fund"

5    until "the true risks" were revealed.  (*Id.* ¶ 2.)

6            Plaintiffs do not plead explicitly that these misrepresentations were intentional, but, of

7    course, the facts as alleged compel that conclusion.  Indeed, it is hard to comprehend how Schwab

8    allegedly could have systematically misstated the maturity dates, prices, and descriptions of the

9    securities in the fund, and exceeded a known concentration limit for over a year, without doing so

10   intentionally.  When the facts, as alleged, necessarily imply the intent to deceive, then they

11   "necessarily constitute fraud," and Rule 9(b) must be applied.  As a court held recently in

12   applying Rule 9(b) to a section 11 claim alleging channel-stuffing:  "No reasonable jury could

13   conclude that Defendant carried out [these practices] and yet failed to disclose [them] through

14   anything other than the intent to deceive."  *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *6

15   (C.D. Cal. May 30, 2008); *see also Rombach*, 355 F.3d at 172 (words like "inaccurate,"

16   "misleading," "untrue," and "false" "are classically associated with fraud"); *In re Gemstar-TV

17   Guide, Int'l Inc. Sec. Litig*., 2003 U.S. Dist. LEXIS 25884, at *28 (C.D. Cal. Aug. 15, 2003)

18   (Rule 9(b) applies to section 11 claim that sounds in fraud "no matter how carefully Plaintiffs

19   walk around the issue").

20           Rule 9(b) says a complaint must state "with particularity the circumstances constituting"

21   the mistake or fraud.  This means plaintiffs must allege the time, date, place, and content of each

22   fraudulent statement, and explain, in detail, why each statement was false at the time it was made.

23   *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547–49 (9th Cir. 1994); *In re McKesson HBOC, Inc.

24   Sec. Litig.*, 126 F. Supp. 2d 1248, 1257 (N.D. Cal. 2000) (complaint must plead "two types of

25   information:  (1) the 'time, place, and content of alleged misrepresentations' . . . and (2) 'an

26

27

28

1    explanation as to why the statement or omission complained of was false or misleading'").[4]  And

2    they must do so in a manner that is easy to understand.[5]

3        Plaintiffs' three federal claims — under section 11, section 12(a)(2), and section 15 of the

4    '33 Act — do not meet these standards.

## I.    PLAINTIFFS' SECTION 11 CLAIM MUST BE DISMISSED

6        Count I is a section 11 claim.  Section 11 permits the purchaser of a security to sue if the

7    security's registration statement contained "an untrue statement of material fact" or "omitted to

8    state a material fact required to be stated" in the registration statement.  15 U.S.C. § 77k(a).

9        Plaintiffs' section 11 claim does not allege any untrue statement with the specificity

10   required by Rule 9(b), and it does not allege loss causation — that is, it does not connect any

11   alleged misstatement to the decline in the YieldPlus fund's NAV.

### A.    The YieldPlus Fund's Registration Statement Is Not Misleading.

13       As best we can tell, paragraphs 55 to 72 of the complaint refer to statements allegedly

14   contained in the fund's registration statement (or documents incorporated in it by reference).  And

15   paragraphs 86 and 87 are the only places those statements are alleged to be false.

16       Paragraphs 86 and 87 appear to identify six separate "untrue facts."  We address each

17   separately to show that no false statement is properly pleaded under Rule 9(b).

18

19

20       [4] Plaintiffs' complaint would need to be dismissed even under Rule 8's more lenient
standard, because plaintiffs have not pleaded enough specific facts to push the complaint over
21   "the line between possibility and plausibility."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1966
(2007).  *Accord Williston Basin Interstate Pipeline Co. v. Exclusive Gas Storage Leasehold*, 524
22   F.3d 1090, 1096 (9th Cir. 2008); *Williams v. Gerber Prods. Co.*, 523 F.3d 934, 938 (9th Cir.
2008).

23
         [5] Plaintiffs' "puzzle-style" pleading involves several pages of allegedly false statements
24   followed by just two paragraphs of supposedly "true" facts.  (Compl. ¶¶ 86–87.)  There is little
effort to connect the two.  "[C]ourts have repeatedly lamented plaintiffs' counsel's tendency [in
25   securities class actions] to place the burden on the reader to sort out the statements and match
them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiffs' claims."
26   *Brodsky v. Yahoo!, Inc.*, 2008 WL 4531815, at *4 (N.D. Cal. Oct. 7, 2008) (*citing Wenger v.
Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998)); *In re Silicon Storage Tech. Inc., Sec.
27   Litig.*, 2007 WL 760535, at *10 n.5 (N.D. Cal. Mar. 9, 2007) (courts "have repeatedly chastised
plaintiffs in securities fraud cases for this kind of 'puzzle-style' pleading").

28

1

### 1.    **Duration**

Duration is a measure of a bond's sensitivity to interest rate changes.  (Compl. ¶ 6.)  The fund's Statements of Additional Information ("SAI") explain that duration "is the magnitude of the change in the price of a bond relative to a given change in market interest rates."  (Nov. 15, 2007 SAI at 11, attached as Taylor Decl. Ex. B.)  The duration calculation weights the "bond's yield, coupon interest payments, final maturity, call and put features and prepayment exposure into one measure."  (*Id.*)

The YieldPlus fund's registration statement says the fund "seeks to keep the average duration of its portfolio at one year or less."  (Compl. ¶¶ 4, 55.)  Citing an unnamed "sophisticated industry expert," plaintiffs allege the fund's "actual duration" "exceeded two years."  (*Id.* ¶ 6.)

An opinion — even the opinion of a "sophisticated industry expert" — is still just an opinion.  Opinions don't meet Rule 9(b)'s requirement that the "circumstances of fraud" be pleaded with particularity.  *In re Viropharma, Inc., Sec. Litig.*, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) (expert opinion "entirely improper" to defeat motion to dismiss); *see In re Verifone Sec. Litig.*, 11 F.3d 865, 868 (9th Cir. 1993) ("conclusory allegations" and "unwarranted inferences" cannot defeat motion to dismiss).

Moreover, Rule 9(b) requires that allegations about an expert's conclusions be accompanied by specific factual support.  *In re Silicon Storage Tech. Inc., Sec. Litig.*, 2007 WL 760535, at *32 (complaint must include "sufficient facts" about expert to show he "was likely to possess the information alleged"); *In re Valence Tech. Sec. Litig.*, 1995 WL 274343, at *4 (N.D. Cal. May 8, 1995) (Rule 9(b) requires "specific factual support").

Here, plaintiffs have refused to identify their expert and have declined to state any of his qualifications.  They have not provided any explanation of his calculations or methodology, telling us that "[d]etermining average duration of the Fund's holdings is a complex endeavor that only sophisticated industry experts can undertake."  (Compl. ¶ 86(b) n.7.)  We are, in short, asked to take it all on faith.

1      Under the similar pleading standard imposed by the Reform Act, courts have required a

2   plaintiff to identify its expert, state his qualifications, describe his methodology, and set out the

3   data upon which he relied in forming his conclusions.  In *In re Textainer Partnership Securities.*

4   *Litigation*, 2006 WL 3247425 (N.D. Cal. Aug. 10, 2006), Judge Chesney dismissed a securities

5   claim based upon the opinion of an expert whose identity and qualifications were disclosed,

6   because the complaint "contain[ed] no summary or estimate [prepared by the expert]," "no

7   calculation," no "corroborating information supporting" the expert's claim, and no data

8   underlying the expert's conclusion.  *Id.* at *6.  By contrast, in *Nursing Home Pension Fund, Local*

9   *144 v. Oracle Corp*., 380 F.3d 1226, 1233 (9th Cir. 2004), the Ninth Circuit held that expert

10  conclusions were adequately pleaded when they disclosed an expert's identity, qualifications,

11  calculations, and supporting data.

12      Plaintiffs do not satisfy Rule 9(b) simply by pleading that the fund's duration was two

13  years, not one.  *In re GlenFed*, 42 F.3d at 1548 (complaint must set forth "circumstances

14  indicating falseness").

15              **2.      Coupon Dates and Maturity Dates**

16      The fund's registration statement incorporates by reference the annual portfolio schedules

17  included in the fund's audited financial statements.  These schedules list every security owned by

18  the fund.  They also state each security's yield and maturity date.

19      Plaintiffs allege these holding schedules falsely substituted "coupon payment dates instead

20  of maturity dates."  (Compl. ¶ 86(c).)  This had the effect, plaintiffs say, of suggesting "the

21  investments are short term."  (*Id.*)

22      Plaintiffs' complaint ignores the explanation provided in the holding schedules and SAIs.

23  Most of the securities listed in the holding schedules are fixed rate securities.  For these securities,

24  the final maturity date is reported.  But some of the securities are "variable rate" securities,

25  meaning their interest rate "is adjusted either periodically or at specific intervals."  (Nov. 15,

26  2007 SAI at *35.)  Because, for variable rate securities, "the[] interest rate exposure corresponds

27  to the frequency of the coupon reset" (*id.* at 11), the holding schedules list the reset date, not the

28  maturity date, for these securities.  (*Id.* at 21.)  As the SAIs explain:

> If it is a variable-rate security, its effective maturity date is the earlier of its demand date or next interest rate change date.  For variable-rate securities not subject to a put or demand feature and floating-rate securities, the effective maturity date is the next interest rate change date.

(*Id.*)

Plaintiffs' complaint alleges eight examples of misstated maturity dates.  (Compl. ¶ 86(c).)  All eight are variable-rate securities and, in each case, the reported date is the interest rate change date — just as explained in the holding reports and SAIs.  (Form N-Q for period ending May 31, 2008 at *37–43, attached as Taylor Decl. Ex. D.)  No reader could have thought the schedules suggested that all portfolio investments were "short term."

### 3.    Concentration and Diversification

The YieldPlus fund is a diversified fixed-income fund.  As a result, the fund limits its investments in any one industry to less than 25 percent of the fund's assets.  (Compl. ¶¶ 8, 152.)  Plaintiffs allege the fund violated this representation by investing around 45 percent of its assets in mortgage-backed securities.  (*Id.* ¶¶ 11, 86(d).)  Although they do not say it expressly, plaintiffs necessarily have to be arguing that mortgage-backed securities are a single "industry" for purposes of the fund's concentration limit.[6]

Neither the '40 Act nor any SEC regulation defines "industry."  But the SEC's staff has published guidelines relating to registration statements for mutual funds.  SEC Release No. IC-13436 (Aug. 12, 1983).  Guide 19, entitled "Concentration of Investments in Particular Industries," sets out the SEC staff's views on the meaning of "industry" for purposes of a concentration policy.  It states:

> In determining industry classifications . . . [a] registrant . . . may select its own industry classifications, but such classifications must be reasonable and should not be so broad that the primary economic characteristics of the companies in a single class are materially different.  Registrants selecting their own industry classifications must be reasonable and should disclose them (a) in the prospectus in the case of policy to concentrate, or (b) in the Statement of Additional Information in the case of a policy not to concentrate.

---

[6] Plaintiffs variously call mortgage-backed securities an "industry" and a "market sector." (Compl. ¶ 86(d).)  The concentration limit applies, of course, to industries, not market sectors.

1    SEC Release No. IC-13436 at *74.

2           As permitted by this guidance, the YieldPlus fund typically has relied on the industry

3    classifications provided in the Global Industry Classification Standard classification system

4    developed by Morgan Stanley and Standard & Poors.  And, as permitted by Guide 19, the fund

5    also periodically has "select[ed] its own classifications" and disclosed them in its SAIs.  Starting

6    in 2006, the fund classified non-agency mortgage-backed securities as not part of any industry —

7    just as it was permitted to do under Guide 19.

8           In so doing, the YieldPlus fund conformed to common industry practice.  For example, the

9    Pacific Investment Management Company ("PIMCO"), the largest investment company manager

10   of fixed income funds, has for years taken the very same position.  PIMCO's SAIs state that, "[i]n

11   the case of privately issued mortgage-related securities, the Funds take the position that

12   mortgage-related securities do not represent interests in any particular 'industry' or group of

13   industries."  (Feb. 27, 2008 SAI for PIMCO at 15, attached as Taylor Decl. Ex. E.)  Moreover, no

14   standard industry classification system of which we are aware defines "mortgage-backed

15   securities" as an industry — for the obvious reason that securities backed by mortgages are not an

16   "industry" any more than the homeowners who took out those mortgages are an "industry."

17          The YieldPlus fund also fully disclosed its decision on mortgage-backed securities.  The

18   fund's SAI, as amended on September 1, 2006, disclosed:

19              [T]he funds have determined that mortgage-backed securities issued by
                private lenders do not have the risk characteristics that are correlated to
20              any industry and, therefore, the funds have determined that mortgage-
                backed securities issued by private lenders are not part of any industry for
21              purposes of the funds' concentration policies.  This means that a fund may
                invest more than 25% of its total assets in privately-issued mortgage-
22              backed securities, which may cause the fund to be more sensitive to
                adverse economic, business or political developments that affect privately-
23              issued mortgage-backed securities.

24   (Sept. 1, 2006 SAI at *8, attached as Taylor Decl. Ex. C.)  The fund thus disclosed precisely how

25   it uses the word "industry."  And the fund clearly disclosed that it does not treat mortgage-backed

26   securities as an industry for purposes of its concentration policy.  No investor could have been

27

28

MASTER FILE NO. C-08-01510-WHA
MOTION TO DISMISS FIRST CONSOLIDATED AMENDED COMPLAINT
pa-1290324

11

misled into thinking the fund would limit its mortgage-backed securities to less than 25 percent of the fund's assets.[7]

Plaintiffs cannot state a section 11 claim based on information the fund fully disclosed in its registration statement. This exact point was made — about mortgage-backed securities, no less — in *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir. 1998). There, the court dismissed a section 11 claim based on an alleged failure to disclose investments in mortgage-backed securities. The court found that the fund had disclosed it would invest in mortgage-related securities and even had provided "extensive descriptions of the mortgage-related instruments purchased" for the fund. *See also Belodoff*, 2008 WL 2356699, at *9 (where information allegedly omitted was in fact disclosed, the alleged misstatement "cannot be a basis for a Section 11 claim as a matter of law").

### 4.   Benchmark Index

Plaintiffs allege the fund misled investors by comparing itself to the "Lehman Brothers U.S. Short Treasury: 9-12 months." (Compl. ¶ 86(g).) Plaintiffs say this comparison was misleading because it "sought to assure investors that the Fund had a comparable profile to a 9-12 month Treasury." (*Id.*)

The fund sought no such thing. The SEC requires each mutual fund to compare itself to a "broad-based securities market index." The Lehman index has the same average duration as the YieldPlus fund, and, as a result, provides the most suitable available benchmark. Plaintiffs have not pleaded that any index was better suited for this purpose.

But the comparison to the Lehman index does not imply that the fund's assets had the same credit quality as treasury securities. The registration statement's reference to the Lehman U.S. Short Treasury Index is accompanied by a specific explanation about the

---

[7] Of course, the fund also disclosed its entire holdings. Those disclosures list the securities in the fund's portfolio by category and state each category's percentage of total assets. One of the categories is "mortgage-backed securities." Plaintiffs thus knew precisely how much of the portfolio was invested in mortgage-backed securities. They concede as much, for they allege these percentages (which they copied from the fund's holdings schedules) in their complaint. (Compl. ¶ 86(d).)

1   differences in credit quality between the securities in the fund and those comprising the index.

2   The explanation is found directly under the reference to the index.  It says:

3
>      The Lehman Brothers Short 9-12 Month U.S. Treasury Index is composed
4      of only U.S. Treasury securities, which are direct obligations of the U.S.
       government and are backed by the full faith and credit of the United States
5      and are, therefore, considered free of credit risk.  The fund may invest in
       debt instruments that are subject to credit risk (please see the discussion of
6      credit risk in the Principal risks section).

7   (Nov. 15, 2007 Prospectus at 7.)  The Principal Risks section, in turn, advises that "[t]he fund is

8   subject to the risk that a decline in the credit quality of a portfolio investment could cause the

9   fund's share price to fall."  (*Id.* at 4.)  It also warns that "the fund is not subject to the maturity,

10  credit or diversification limitations of a money market fund" and "may invest up to 25% of its

11  assets in below investment grade bonds (sometimes called junk bonds)."  (*Id.*)

12      No reasonable investor could have been misled into thinking the fund invested only

13  in U.S. Treasury securities or had the same risk "profile" as a "9-12 month Treasury."  (Compl.

14  ¶ 86(g).)  *See Hunt*, 159 F.3d at 730 (fund's comparison to Lehman index allegedly composed of

15  less risky securities did not state section 11 claim where fund disclosed credit risks).

16                  **5.      Asset Valuations**

17      Plaintiffs say the fund's holding schedules "mispriced a material portion of its assets."

18  (Compl. ¶ 86(h).)  Like plaintiffs' duration allegations, this claim is based on the opinion of an

19  unnamed expert "using a well accepted" — but undisclosed — "valuation technique."  (*Id.*

20  ¶ 86(h).)

21      While plaintiffs do not describe their expert's "technique," they admit it was applied to

22  "just a few of the assets" listed in "just a slice of the [fund's] holding reports."  (*Id.*)  The

23  "technique," then, cannot possibly support plaintiffs' charge that "a material portion" of the

24  fund's securities were mispriced — for the simple reason that plaintiffs' expert did not even look

25  at a material portion of the portfolio.  After all, during the class period, the fund had well over

26  five hundred securities in its portfolio.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d

27  595, 630–31 (S.D.N.Y. 2005) (mislabeled assets not materially misleading because they

28  represented "comparatively small volume of assets" of portfolio).

1    In any event, allegations based on the opinions of an undisclosed expert do not comply

2    with Rule 9(b) unless they are accompanied by allegations that "corroborate" the expert's claim.

3    *In re Silicon Storage*, 2007 WL 760535, at \*32.  This means plaintiffs must disclose their expert's

4    qualifications, describe his methodology and sources of data, and plead other specific facts setting

5    forth the basis for his opinion.  *Cf. Oracle*, 380 F.3d at 1233 (expert conclusions adequately

6    pleaded when expert's identity, qualifications, calculations, and supporting data are disclosed).

7    Plaintiffs' complaint does none of these things.

8    ### 6.    Asset Classifications

9    Plaintiffs allege the fund "falsified or obscured the true nature of the securities in the

10   Fund's portfolio by using inconsistent asset descriptions."  (Compl. ¶ 87.)  They base this charge

11   on a sample of eleven securities which, they claim, are identified as variable-rate securities in

12   some reports and not in others.  (*Id.*)  Plaintiffs do not adequately explain why this supposed

13   discrepancy amounts to a misrepresentation.  Just as a mortgage may start at a fixed rate and then

14   convert to an adjustable rate, many securities can, at different times, be either fixed- or variable-

15   rate.  *See Brazier v. Sec. Pac. Mortgage Inc.*, 245 F. Supp. 2d 1136, 1140 n.2 (W.D. Wash. 2003)

16   (describing mortgage with fixed rate for three years switching to adjustable rate).  Plaintiffs must

17   allege more than this to make out a violation of the securities laws.

18   In any event, the distinction between variable-rate and fixed-rate securities — for just

19   eleven securities out of more than five hundred in the portfolio — would not be material to any

20   reasonable investor.  *See In re JP Morgan*, 363 F. Supp. 2d at 630–31 (misclassification affecting

21   small percentage of portfolio not misleading); *In re Anchor Gaming Sec. Litig.*, 33 F. Supp. 2d

22   889, 895 (D. Nev. 1999) (misstatements affecting "certain small amounts [of earnings] are

23   immaterial, as a matter of law").

24   ### B.    Plaintiffs Do Not Plead Loss Causation.

25   Loss causation is the required link between an alleged misstatement and the plaintiff's

26   alleged loss.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *Metzler Inv. GMBH v.*

27   *Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (complaint "fails to allege loss

28

1     causation" if it does not provide "the causal connection between th[e] loss and the

2     misrepresentation").

3        Lack of loss causation ordinarily is an affirmative defense under section 11.  15 U.S.C.

4     § 77k(e).  But a section 11 claim may be dismissed on the pleadings if it is apparent, from the

5     face of the complaint, that the alleged loss is not causally connected to the purported

6     misstatement.  *In re DNAP Sec. Litig.*, 2000 WL 1358619, at *3 (N.D. Cal. Sept. 14, 2000) (claim

7     dismissed based on "complete disconnect between plaintiffs' claims of loss and the alleged

8     omissions"); *In re McKesson*, 126 F. Supp. 2d at 1262; *In re Merrill Lynch Research Reports Sec.*

9     *Litig.,* 272 F. Supp. 2d 243, 253–54 (S.D.N.Y. 2003).  This makes sense, since it would be a

10    waste to allow plaintiffs to proceed if their complaint "demonstrate[s] that any loss experienced

11    by Plaintiffs could not be attributable to an alleged misrepresentation or omission."  *In re*

12    *Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005); *see also In re*

13    *Merrill Lynch & Co.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

14        Here, the fund's NAV was not affected by anything the fund said in its registration

15    statement for the simple reason that

16
17          the value of a mutual fund share is calculated according to a statutory
         formula.  Share price is a function of "Net Asset Value," the pro-rata share
         of assets under management, minus liabilities such as fees.

18   *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *9 (S.D.N.Y.

19   Apr. 18, 2006); *accord Clark v. Nevis Capital Mgmt., LLC*, 2005 WL 488641, at *18 (S.D.N.Y.

20   Mar. 2, 2005) ("[t]he share price of a mutual fund is determined by the value of all the underlying

21   securities it holds at a given time, and the fund price fluctuates with the price of those underlying

22   securities").  Thus, while plaintiffs may have experienced a loss due to the decline in the value of

23   the underlying assets of the fund, plaintiffs cannot allege any facts "showing a connection

24   between the decline in value of the Fund and the claimed omission[s]" or misstatements.  *Verona*

25   *Partners, LLC v. Tenant Capital Partners Convertible Opportunities Fund LP*, 2006 WL

26   2669035, at *14 (N.D. Cal. Sept. 18, 2006).

27        Indeed, plaintiffs do not even attempt to link their complaint's allegations — about

28   coupon dates, benchmarks, asset classifications, internal controls, and the like — to any decline in

1  the fund's NAV.  Instead, plaintiffs say the fund's NAV declined because of "massive write-

2  downs as [the fund] marked the value of mortgage-backed investments down to their reduced

3  market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in

4  turn caused investors to abandon the Fund."  (Compl. ¶ 111.)

5        Plaintiffs are correct, of course, that the fund each day had to mark-to-market the value of

6  each security in its portfolio, and that the fund had to write down securities whose market value

7  had declined.  But that process has no link to any statements in the fund's registration statement.

8  Plaintiffs' complaint thus does not connect any alleged misstatement to the decline in the fund's

9  NAV.  Since this defect is apparent on the pleading's face, the complaint should be dismissed.

10  **II.    PLAINTIFFS' SECTION 12 CLAIM MUST BE DISMISSED**

11        Count II is a section 12(a)(2) claim.  Section 12(a)(2) permits the purchaser of a security

12  to sue the person from whom he purchased it if the sale was made "by means of a prospectus or

13  oral statement" that contained "an untrue statement of a material fact" or "omit[ted] to state a

14  material fact."  15 U.S.C. § 77l(a)(2).

15        Plaintiffs' section 12(a)(2) claim has three flaws:  (1) it fails to allege any untrue statement

16  with the specificity required by Rule 9(b); (2) it is asserted against persons who did not "sell" the

17  security to plaintiffs; and (3) it does not properly allege loss causation.

18        **A.    The YieldPlus Fund's Prospectuses Were Not Materially Misleading.**

19        Plaintiffs' section 12(a)(2) claim involves the same alleged misstatements as their section

20  11 claim.  The claim should be dismissed for the reasons set out in Section I.A., above.

21        **B.    Schwab Investments and Charles Schwab & Co., Inc., Are the Only
                 "Sellers" of the Fund.**

22

23        A section 12(a)(2) claim may only be asserted against the "seller" of the security.

24  15 U.S.C. § 77l(a)(2).  The United States Supreme Court has interpreted "seller" to mean the

25  "owner who passed title" and any "person who successfully solicits the purchase, motivated at

26  least in part by a desire to serve his own financial interests or those of the security owner."

27  *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).  Only Schwab Investments and Charles Schwab & Co.,

28  Inc., meet these tests.

1   Plaintiffs do not say from whom they purchased their shares.  But, among the defendants,

2   only Schwab Investments and Charles Schwab & Co., Inc., could have passed title to plaintiffs.

3   (Nov. 15, 2007 Prospectus at 30, 31–37.)  *See*, *e.g.*, *In re Infonet Serv. Corp. Sec. Litig.*,

4   310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003) (section 12(a)(2) claim dismissed where defendants

5   did not pass title to the security).

6   And only Charles Schwab & Co., Inc. — the broker-dealer who was one of the fund's

7   authorized distributors — can fairly be said to have solicited investments in the fund.  The

8   remaining defendants — fund officers, portfolio managers, and another Schwab subsidiary — are

9   not alleged to have played any direct role in the solicitation of purchases of fund shares.  All

10   plaintiffs say about these remaining defendants is that they "offered and sold a security" or

11   "actively solicited the sale of the Fund's shares."  (Compl. ¶¶ 140, 141.)  The Court need not

12   accept these legal conclusions.  *See*, *e.g.*, *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st

13   Cir. 1996) (rejecting use of conclusory "solicitation" label as a "legal term of art").

14   **C.**   **Plaintiffs Do Not Plead Loss Causation.**

15   Plaintiffs' section 12(a)(2) claim shows, on its face, that any losses suffered by investors

16   were not linked to statements in the fund's prospectuses.  It should therefore be dismissed for the

17   reasons set out in Section I.B., above.  *See*, *e.g.*, *In re Merrill Lynch*, 289 F. Supp. 2d at 437

18   (motion to dismiss section 12 claim granted where lack of loss causation apparent on face of

19   complaint).

20   **III.**   **PLAINTIFFS' "CONTROL PERSON" CLAIM MUST BE DISMISSED**

21   Plaintiffs' third claim is a section 15 "control person" claim against The Charles Schwab

22   Corporation and some of its subsidiaries and officers.  They are alleged to have "controlled"

23   either the fund or other "Schwab entities."  (Compl. ¶ 148.)

24   Section 15 imposes liability on a person who "controls" another person who committed an

25   underlying violation of section 11 or 12.  15 U.S.C. § 77o.  No section 15 claim can survive

26   without a viable underlying section 11 or 12 claim.  So this claim should be dismissed if the

27   section 11 and 12 claims are dismissed.  *See*, *e.g.*, *Brodsky*, 2008 WL 4531815, at *13 (control

28   person claim dismissed where plaintiffs failed to allege underlying primary violation).

1    A section 15 claim must also plead facts showing how each purported "control person"

2    was able to exercise "actual power or control over" the controlled entity. *Howard v. Everex Sys.,*

3    *Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also In re Splash Tech. Holdings, Inc., Sec. Litig.*,

4    2000 WL 1727377, at *25 (N.D. Cal. Sept. 29, 2000) (complaint must plead facts showing each

5    defendant "exercised 'a significant degree of day-to-day operational control, amounting to the

6    power to dictate another party's conduct or operations'").

7    That is where plaintiffs' complaint falls short. Plaintiffs never explain how the control

8    persons — like The Charles Schwab Corporation or Charles Schwab & Co., Inc. — exercise

9    actual power or control over the fund. The fund is completely separate from Schwab and its

10   subsidiaries. Nor do they explain how the fund's officers — such as Mr. Merk, Mr. Pereira, or

11   Ms. Dilsaver — exercised actual control over any of the Schwab corporate entities. All plaintiffs

12   say is that each defendant exercised control "by virtue of . . . [his] position[s] as [a] . . . senior

13   officer" and his "direct and/or indirect business and/or personal relationships with other trustees

14   and/or officers and/or major shareholders." (Compl. ¶ 148.) These sorts of conclusions do not

15   satisfy Rule 8. *In re Worldcom, Inc. Sec. Litig.*, 2004 WL 1097786, at *2–3 (S.D.N.Y. May 18,

16   2004) (conclusory allegations of control fail to provide "fair notice" under Rule 8).

17   **IV.   PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY SLUSA**

18   Plaintiffs' other five counts assert claims under state law — two for intentional

19   interference with contract, two under California Business & Professions Code section 17200, and

20   a final one for breach of fiduciary duty.

21   All five state law claims are preempted by the Securities Litigation Uniform Standards

22   Act, or "SLUSA." SLUSA preempts any "covered class action" asserting state law claims for a

23   misrepresentation or omission of material fact in connection with the purchase or sale of a

24   "covered security." 15 U.S.C. §§ 77p, 78bb; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*

25   *Dabit*, 547 U.S. 71, 85 (2006); *U.S. Mortgage, Inc. v. Jensen*, 494 F.3d 833 (9th Cir. 2007). All

26   of these elements are met here.

27

28

Plaintiffs' lawsuit is a "covered class action" because it asserts state law claims and seeks damages on behalf of more than fifty prospective class members.  15 U.S.C. §§ 77p(f)(2)(A)(i)(I), 78bb(f)(5)(A)(i)(I).  The state law claims all expressly incorporate by reference the complaint's allegations of misrepresentations and omissions.  (Compl. ¶¶ 2, 6, 150, 171, 178, 184.)  Plaintiffs allege these misstatements were made "in connection with" the purchase of securities.  *Merrill Lynch*, 547 U.S. at 85 ("in connection with" requirement extends to both purchasers and holders, including purchases "by someone else"); *U.S. Mortgage*, 494 F.3d at 844–45.  And the fund's shares are "covered securities" because they were "issued by an investment company . . . that has filed a registration statement under the Investment Company Act of 1940."  15 U.S.C. § 77r(b)(2). (*See* Compl. ¶ 28.

All five of plaintiffs' state law claims are preempted by SLUSA and must be dismissed. *U.S. Mortgage*, 494 F.3d at 846.[8]

## V.   COUNTS IV AND VI — FOR INTERFERENCE WITH  CONTRACTUAL RELATIONS — MUST BE DISMISSED

Plaintiffs' fourth and sixth counts allege nearly identical claims for intentional interference with contract.  These claims concern the fund's concentration policy, which limits investments in "any industry or group of industries" to under 25 percent of the fund's assets. (Compl. ¶ 152.)  Plaintiffs say the fund breached its "contract" with its investors by changing this policy "without first obtaining approval by a majority of the Fund's shareholders."  (*Id.* ¶ 155.)

### A.   The Fund's SEC Filings Do Not Constitute a Contract.

Before plaintiffs can plead interference with a contract, they must plead a contract. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (Cal. 1998) (actual contract, and breach of that contract, are essential elements of intentional interference claim).[9]  Here, plaintiffs

---

[8] The state law claims should also be dismissed for another reason.  If plaintiffs' federal claims are dismissed, the Court may, and should, decline to exercise supplemental jurisdiction over them.  28 U.S.C. § 1367(c); *Acri v. Varian Assocs.*, 114 F.3d 999, 1001 (9th Cir. 1997) (courts should decline to exercise supplemental jurisdiction when federal claims are dismissed).

[9] California law governs Counts IV and VI.  Under California's governmental interest conflicts analysis, the state will apply its own laws if there is no "true conflict" with the laws of other states.  Here, California, Delaware, and Massachusetts all have similar laws relating to

(Footnote continues on next page.)

1  say the contract consists of the fund's "Registration Statement, Prospectus and SAIs."  (Compl.

2  ¶ 151.)

3         But these SEC disclosure documents lack the essential characteristics of any valid

4  contract.  To be valid, a contract must identify the parties to the agreement, reflect their mutual

5  assent, have a lawful object, and show consideration.  Cal. Civ. Code § 1550.  The fund's SEC

6  filings do not meet any of these requirements.  They do not identify any contracting parties.  *See*

7  *Westlye v. Look Sports, Inc.*, 17 Cal. App. 4th 1715, 1728 (1993) (ability to identify parties

8  "essential to the validity of a contract").  They do not reflect mutual assent.  *See Rennick v.*

9  *O.P.T.I.O.N. Care*, 77 F.3d 309, 315 (9th Cir. 1996) (required mutual consent a "basic tenet of

10  contract law").  And they do not show consideration, because the concentration policy disclosed

11  in the fund's prospectuses and SAIs is required by the Investment Company Act of 1940.

12  (Compl. ¶¶ 15, 154.)  Promising to do "what one is already legally bound to do cannot be

13  consideration."  *Estate of Bray*, 230 Cal. App. 2d 136, 142 (1964) (quotation omitted); *Start v.*

14  *Apple Computer, Inc.*, 1996 WL 161630, at *2 (N.D. Cal. Mar. 22, 1996).[10]

15         The fund's registration statement and prospectuses are not contracts and cannot form the

16  object of an intentional interference claim.

17         **B.       The Fund Did Not Breach Its Concentration Policy.**

18         Even if the fund's SEC filings were a "contract," plaintiffs have not adequately pleaded

19  that any provision of those filings was "breached."  Plaintiffs allege they were deprived of a

20  contractual right to vote on a "fundamental" change to the fund's concentration policy.  (Compl.

21  ─────────────────────────

   (Footnote continued from previous page.)

22  interference with contract.  *Compare Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 414
   (Mass. 2003) *and Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1284 (Del. Super. Ct. 2001)

23  *with Quelimane*, 19 Cal. 4th at 55.

24         [10] For these reasons, the Ninth Circuit has rejected breach of contract claims based on
   prospectuses.  In *Cohen v. Stratosphere Corp.*, 115 F.3d 695, 701 (9th Cir. 1997), the court

25  concluded that a prospectus did not constitute a "binding contract," and that even submitting
   subscription agreements and payment did not form a "contract of purchase" in a "best efforts"

26  stock offering.  And, in *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*,
   339 F.3d 1087, 1092 (9th Cir. 2003), the court held that a prospectus is a "disclosure document,"

27  and refused to "convert [defendant's] solicitation of the shareholders' vote into a contractual
   offer."

28

¶ 155.)  But, as noted above in Section I.A.3, the fund never changed its concentration policy — it has consistently limited concentration in any industry to 25 percent of the fund's assets.  All the fund did, consistent with the discretion afforded it by the SEC, was implement its concentration policy by determining that mortgage-backed securities did not fall within its industry classifications.

The SEC's Guide 19 affords the fund discretion to adopt, or change, "reasonable" industry classifications, and the fund's decision not to classify mortgage-backed securities as a single "industry" was clearly reasonable.  *See* SEC Release No. IC-13436, at *74.  The commonly accepted understanding of "industry" aggregates companies which produce similar products (such as the automobile industry or the steel industry).  Mortgage-backed securities, by contrast, are a form of security, not a product.  Mortgage-backed securities are no more an industry than "preferred stock" and "convertible debentures" are industries.  For this obvious reason, no standard industry classification system of which we are aware defines "mortgage-backed securities" as an industry.

Plaintiffs' right to vote on changes to the fund's "fundamental" investment policies does not extend to the implementation of those policies.  The SEC's guidance recognizes that.  Not giving shareholders a vote on the implementation of the fund's concentration policy did not breach any term of any agreement with investors.

## C.    Defendants Cannot Be Liable for Inducing a Breach of the Fund's Contracts.

A claim for interference with contract cannot be asserted against just anyone.  For example, it cannot be pleaded against a party to the contract.  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994) ("the tort cause of action for interference with contract does not lie against a party to the contract").  And it cannot be pleaded against someone who acts on behalf of a party to the contract.  *Shoemaker v. Myers*, 52 Cal. 3d 1, 25 (1990) ("defendants stand in the place of the employer, because the employer — the other party to the supposed contract — cannot act except through such agents"); *Ashker v. Horel*, 2007 WL

1    2348732, at *2 (N.D. Cal. Aug. 14, 2007); *Synapsis LLC v. Evergreen Data Sys., Inc.*, 2005 WL

2    1656901, at *3 (N.D. Cal. July 13, 2005).

3            Indeed, an interference with contract claim can only be asserted against a stranger to the

4    contract. *Applied Equip.*, 7 Cal. 4th at 514 ("[t]he tort duty not to interfere with the contract falls

5    only on strangers — interlopers who have no legitimate interest in the scope or course of the

6    contract's performance"); *Marin Tug & Barge, Inc. v. Westport Petr.*, 271 F.3d 825, 832 (9th Cir.

7    2001) ("the core of intentional interference business torts is interference with an economic

8    relationship by a third-party *stranger* to that relationship") (emphasis in original). *But see*

9    *Woods v. Fox Broad. Sub., Inc.*, 129 Cal. App. 4th 344 (2005) (*Applied Equipment* should be

10   limited to parties to contract and their agents).

11           None of the defendants in this case is a stranger to the contract alleged in plaintiffs'

12   complaint. Plaintiffs thus have not named any proper defendant to an intentional interference

13   claim. (Compl. ¶¶ 27, 30–40, 148, 151, 170.)

14           **D.      Plaintiffs Do Not Properly Plead Intentional Interference.**

15           "It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity

16   requirement applies to state-law causes of action." *Vess*, 317 F.3d at 1103; *accord Borsellino v.*

17   *Goldman Sachs Group, Inc.*, 477 F.3d 502, 507–08 (7th Cir. 2007) (Rule 9(b) applies to claims

18   for interference with economic advantage). "Averments of fraud must be accompanied by the

19   who, what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (quotation

20   omitted).

21           Plaintiffs' intentional interference claim asserts that defendants engaged in "intentional

22   acts designed to induce a breach or disruption of [a] contractual relationship." *Applied Equip.*,

23   7 Cal. 4th at 513. But plaintiffs do not allege any details about these alleged acts or the intent

24   behind them. (*See* Compl. ¶¶ 170, 177.) Counts IV and VI should be dismissed for this reason as

25   well.

26

27

28

1

## VI.    COUNTS V AND VII — FOR VIOLATIONS OF  SECTION 17200 — MUST BE DISMISSED

2

3    Section 17200 of California's Business & Professions Code prohibits "unlawful, unfair or

4    fraudulent" business practices.  Counts V and VII of plaintiffs' complaint allege it was

5    "unlawful" for the fund not to classify mortgage-backed securities as an "industry" without first

6    submitting the matter to a shareholder vote.  (Compl. ¶ 172.)[11]

7    For this proposition, plaintiffs cite section 13(a) of the Investment Company Act of 1940,

8    which prohibits a fund from "deviat[ing] from its policy in respect of concentration of

9    investments in any particular industry or group of industries" "unless authorized by the vote of a

10   majority of its outstanding voting securities."  15 U.S.C. §§ 80a-8(b), 13(a).

11   As we showed previously in Section V.B., there was nothing "unlawful" in the way the

12   fund classified mortgage-backed securities.  The fund never changed, or deviated from, its

13   concentration policy — the fund has always avoided purchasing a security "if, as result of such

14   purchase, 25% or more of the value of its total assets would be invested in any industry or group

15   of industries."  (Compl. ¶ 152.)

16   In any event, section 17200 does not apply to securities transactions like the ones alleged

17   in plaintiffs' complaint.  *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 786 (2004);

18   William L. Stern, *Bus. & Prof. C. § 17200 Practice* ¶¶ 3:26–28 (The Rutter Group 2008);

19   *Perera v. Chiron Corp.*, 1996 WL 251936, at *5 (N.D. Cal. May 8, 1996) (decision that section

20   17200 does not apply to securities claims is in line with "numerous cases from other

21   jurisdictions").  Thus, a majority of federal courts have concluded that section 17200 does not

22   apply to securities transactions.  *See, e.g., Charles O. Bradley Trust v. Zenith Capital LLC*, 2008

23   WL 3400340, at *4 (N.D. Cal. Aug. 11, 2008); *Scognamillo v. Credit Suisse First Boston LLC*,

24

25   _____

[11] Section 17200 applies only where conduct is alleged to have violated some other law.
*Van Ness v. Blue Cross*, 87 Cal. App. 4th 364, 376 (2001) (dismissal of underlying claim disposes
26   of section 17200 claim); *Khoury v. Maly's of Cal., Inc*., 14 Cal. App. 4th 612, 619 (1993)
(demurrer to section 17200 claim sustained where underlying violation not stated); *Blank v.
27   Kirwan*, 39 Cal. 3d 311, 329 (1985) (compliance with underlying law is complete defense to
section 17200 claim).

28

1    2005 WL 2045807, at *12 (N.D. Cal. Aug. 25, 2005); *Kainos Labs., Inc. v. Beacon Diagnostics,*

2    *Inc.*, 1998 WL 2016634, at *17–18 (N.D. Cal. Sept. 14, 1998).

3    **VII.    THE BREACH OF FIDUCIARY DUTY COUNT MUST BE DISMISSED**

4         Plaintiffs' final claim is for breach of fiduciary duty.  Plaintiffs allege that certain

5    defendants were "[a]ware that the Fund's value would decline," and, knowing that, "caused

6    [other] Schwab funds to withdraw from the Fund at the expense of members of the class."

7    (Compl. ¶ 187.)  This claim is derivative in nature; it has no place in a class action.  And, in any

8    event, it does not adequately plead any breach of fiduciary duty.

9         **A.    Plaintiffs' Claim Must Be Asserted Derivatively.**

10        Plaintiffs' claim is derivative under Massachusetts law.[12]  To bring a direct claim, a

11   plaintiff must allege an injury "distinct from the injury suffered generally by the shareholders as

12   owners of the corporate stock."  *Stegall v. Ladner*, 394 F. Supp. 2d 358, 364 (D. Mass. 2005)

13   (citation and quotations omitted); *see also Bessette v. Bessette*, 434 N.E.2d 206, 208 (Mass.

14   1982).  If the plaintiff's injury is not separate and distinct from the injuries suffered by

15   shareholders generally, the claim must be asserted derivatively.  *Forsythe v. Sun Life Fin., Inc.*,

16   417 F. Supp. 2d 100, 113 (D. Mass. 2006).

17        Plaintiffs' complaint does not explain how withdrawals allegedly made by other Schwab

18   funds came "at the expense of members of the class," but plaintiffs must be alleging some

19   diminution in the value of their fund shares.  (*See* Compl. ¶ 187.)  That is a classic derivative

20   claim — the injury derives from a decline in the value of the fund generally, not from any distinct

21   injury to plaintiffs personally.  *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass.

22   1996) (claims of "mismanagement of funds [and] embezzlement or breach of fiduciary duty

23   resulting in a diminution of the value of the corporate stock or assets" is "held by the corporation

24   itself, and is thus derivative if brought by an investor"); *Stegall*, 394 F. Supp. 2d. at 367 (breach

25

26        [12] Massachusetts law applies because the trust was organized under the laws of
     Massachusetts.  *See, e.g., Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) (noting that
27   rights of shareholders are determined by law of state of incorporation under "internal affairs"
     doctrine); *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1527 (9th Cir. 1985) (same).

28

1  of fiduciary duty claim is derivative).  Plaintiffs cannot pursue their breach of fiduciary duty

2  theory as a class claim.

3  **B.      Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty.**

4  Plaintiffs' fiduciary duty claim also does not plead any breach with particularity.

5  *Shapiro v. Miami Oil Producers, Inc.*, 84 F.R.D. 234, 236 (D. Mass. 1979) (Rule 9(b) extends to

6  fiduciary duty claim that sounds in fraud).  All plaintiffs say is that some defendants misused

7  "inside information as to the true nature of the fund" to avoid losses in other Schwab funds.

8  (Compl. ¶¶ 98, 186, 187.)  Plaintiffs do not say what the information was, who had it, or when it

9  was obtained.  They do not say which other funds redeemed their YieldPlus shares, when they did

10  so, how any defendant "caused" them to do so, or how any redemptions came "at the expense" of

11  the class.  Plaintiffs' fiduciary duty claim fails for this reason as well.

12  **CONCLUSION**

13  The credit crisis has hurt millions of investors, including investors in the YieldPlus fund.

14  But, to state federal securities claims, plaintiffs must plead more than just losses.  That is all they

15  have pleaded here.  While plaintiffs' losses are regrettable, their attempt to recoup those losses

16  without any valid legal basis is more so.  Because their complaint does not state a valid claim for

17  relief, it should be dismissed.

18  Dated:  November 6, 2008                    DARRYL P. RAINS
                                                STUART C. PLUNKETT
19                                              KIMBERLY L. TAYLOR
                                                MORRISON & FOERSTER LLP
20
                                                By:  /s/ Darryl P. Rains
21                                                        Darryl P. Rains

22                                              Attorneys for Defendants The Charles Schwab
                                                Corporation, Charles Schwab & Co., Inc.,
23                                              Charles Schwab Investment Management, Inc.,
                                                Schwab Investments, Charles R. Schwab,
24                                              Evelyn Dilsaver, Randall W. Merk, George
                                                Pereira, Kimon Daifotis, and Matthew
25                                              Hastings

26

27

28