1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:                                           No. C 08-01510 WHA

CHARLES SCHWAB CORPORATION
SECURITIES LITIGATION.

     This Document Relates              **ORDER RE MOTIONS TO**
        To All Cases.                   **DISMISS OF SCHWAB**
_____/            **DEFENDANTS, INDEPENDENT**
                                              **TRUSTEES, AND**
                                              **PRICEWATERHOUSECOOPERS;**
                                              **ORDER RE MOTION TO STRIKE**

**INTRODUCTION**

     In this putative class action, plaintiffs allege that defendants Charles Schwab

Corporation and several affiliated entities and individuals violated federal securities laws and

various state laws by misrepresenting the risk profile and assets of Schwab's YieldPlus Fund

and by improperly changing the fund's investment policies.  Defendants include the Schwab

Corporation, certain subsidiaries and officers, the YieldPlus Fund's trustees and portfolio

managers, and the fund's auditor, PricewaterhouseCoopers, LLP.  The Schwab defendants, the

fund's independent trustees, and PricewaterhouseCoopers have filed separate motions to

dismiss.  The Schwab defendants also move to strike portions of the operative complaint.  For

the reasons stated below, the motions to dismiss filed by the Schwab defendants and the

independent trustees are **GRANTED IN PART** and **DENIED IN PART**.  PricewaterhouseCoopers'

motion to dismiss is **GRANTED**.  Finally, the motion to strike is **DENIED**.

**STATEMENT**

This action originated as multiple independent class actions filed by investors in Schwab's YieldPlus Fund ("fund"), a short-term fixed-income mutual fund. These actions were consolidated into the present class action, and an order dated July 2, 2008, appointed the following plaintiffs as lead plaintiffs: Kevin O'Donnell, James Coffin, John Hill, David and Gretchen Mikelonis, and Robert Dickson. Plaintiffs bring this action against (1) several Schwab corporate entities, and officers and employees of those entities; (2) the trustees of Schwab Investments who signed the registration statements at issue; and (3) PricewaterhouseCoopers LLP, the fund's auditor.

Plaintiffs allege that defendants positioned the fund, via registration statements and other related documents, as an "ultra short term bond fund" which sought to keep its average portfolio duration below one year and to limit "principal risk" exposure, to preserve capital. Instead, plaintiffs allege, the fund took on significantly greater risk by extending its average portfolio duration beyond two years and by concentrating a significant portion of its portfolio in riskier assets such as mortgage-backed securities. Therefore, plaintiffs allege, investors were unwittingly exposed to significant risks, and as the nation's credit crisis unfolded, those risks lead to substantial losses. For the purposes of the motions to dismiss, the following well-pled allegations will be taken as true.

Defendant The Charles Schwab Corporation was the parent corporation of the Charles Schwab financial services complex. Charles Schwab & Co., Inc., was the parent company of Schwab Investments and was the principal underwriter and distributor for shares of the fund. Charles Schwab Investment Management, Inc., was the asset management arm of the Charles Schwab Corporation; it oversaw the asset management and administration of the fund. Schwab Investments, a business trust organized under the laws of Massachusetts, was the registrant for the fund, the issuer of fund shares and performed trust services for the fund. Charles R. Schwab was the founder, Chairman, CEO and director of the Charles Schwab Corporation. Defendants Evelyn Dilsaver, Randall W. Merk and George Pereira were officers of the fund; each signed some or all of the registration statements at issue in this case. Kimon Daifotis was the head of

United States District Court

For the Northern District of California

1    fixed income portfolio management at Schwab Management, and Matthew Hastings worked

2    with Mr. Daifotis and was primarily responsible for the fund's day-to-day management during

3    the relevant period. (All of these defendants will be referred to collectively as the "*Schwab*

4    *Defendants*.") The complaint also names as defendants seven trustees of Schwab Investments,

5    each of whom also allegedly signed the registration statements at issue (collectively,

6    "*Independent Trustees*"). Finally, defendant PricewatersCoopers LLP ("*PwC*") was the fund's

7    auditor (Compl. ¶¶ 24–46).[1]

8          The Schwab YieldPlus Fund is an open-ended mutual fund organized as a

9    Massachusetts business trust registered under the Investment Company Act. It offered two

10   classes of shares: Investor Shares and Select shares. The latter had a higher minimum

11   investment requirement but lower fees compared to the former (Compl. ¶ 47).

12         Defendants annually filed similar registration statements with the SEC, on or about

13   November 15 of each year. They marketed and sold fund shares to investors with annual

14   prospectuses. These were also published on or about November 15 of each year. The

15   prospectuses referred investors to various Statements of Additional Information ("SAIs").

16   These contained more detailed discussions of the fund's investment policies and risks.

17   Investors were also referred to the fund's Certified Shareholder Reports (*i.e.*, Annual Reports).

18   Both were incorporated by reference into the prospectuses. Defendants also marketed the fund

19   through various other written offering notices, circulars, advertisements, letters; they provided

20   information about the fund on the Schwab website; and they marketed the fund with oral

21   communications, including by investment managers, brokers and customer representatives

22   (Compl. ¶¶ 48–52, 77–85).

23         Plaintiffs aver that, through these documents and communications, defendants made

24   several misrepresentations regarding the investment policies and risk profile of the fund.

25   Defendant represented that the fund was an "ultra short term bond fund" and that defendants

26   sought to keep the fund's average portfolio duration at one year or less. In fact, defendants

27

28         [1] All references to the "complaint" and citations to "Compl." refer to the First Consolidated Amended
     Complaint (Dkt. No. 104).

abandoned that duration objective and extended the average duration of the fund's investments beyond two years (Compl. ¶ 86a–c).

Defendants also represented that the fund was similar to a money market fund with minimal changes in share price. Plaintiffs claim that these representations were false because the fund concentrated an increasing portion of its assets — eventually more than 45 percent — in risky mortgaged-backed and asset-backed securities (Compl. ¶ 86d).

As a result of these misrepresentations, plaintiffs contend, that the fund was improperly categorized in the "ultrashort bond fund" category because it had too much credit and illiquidity risk. Similarly, plaintiffs contend that the fund utilized the wrong comparative index, the "Lehman Brothers U.S. Short Treasury: 9–12 months," when in fact the fund's profile was not comparable to that index (Compl. ¶¶ 86f–g).

The complaint further claims that the fund mis-priced a material portion of its assets as those assets deteriorated in value and liquidity, thus overstating the value of the fund's holdings. And, the fund "obscured the true nature of the securities in the fund's portfolio by using inconsistent asset descriptions," for example, by classifying the exact same security in some reports as variable-rate and in other reports as not variable-rate (Compl. ¶¶ 86h, 87).

Plaintiffs intend to seek the certification, under Rules 23(a) and Rule 23(b)(3), of two classes, the second of which contains two sub-classes:  (1) a "securities" class consisting of all persons or entities who acquired shares of the fund traceable to a false and misleading registration statement and prospectus and who were damaged thereby between March 17, 2005 to March 17, 2008 (the date of filing of this lawsuit); and (2) a "state law class." The latter consists of two sub-classes:  (2a) a "pre-breach class" consisting of persons or entities who owned shares of the fund at any time before the fund's investments in mortgage-backed securities exceeded 25% of its assets and by continuing to own shares suffered damages; and (2b) a "post-breach class" consisting of all persons or entities who acquired shares of the fund at any time after the fund's investments in mortgage-backed securities exceeded 25% of its assets and by continuing to own those shares suffered damages (Compl. ¶¶ 3, 122–28).

4

The complaint asserts eight counts. Count One alleges violations of Section 11 of the 1933 Act, 15 U.S.C. 77k, on behalf of the securities class. Count Two alleges violations of Section 12(a)(2) of the 1933 Act, 15 U.S.C. 77l, on behalf of the securities class. Count Three asserts control person liability under Section 15 of the 1933 Act predicated on the violations claimed in counts one and two. Count Four alleges intentional interference with contractual relations on behalf of the state pre-breach class. Count Five alleges violations of California's unfair competition laws on behalf of the state pre-breach class. Cal. Bus. & Prof. Code 17200 *et seq*. Count Six alleges intentional interference with contractual relations on behalf of the state post-breach class. Count Seven alleges violations of California's unfair competition laws on behalf of the state post-breach class. Count Eight alleges breach of fiduciary duty against all defendants except PwC (Compl. ¶¶ 129–187).

**ANALYSIS**

This order addresses four motions. Three groups of defendants have separately moved to dismiss: (1) the Schwab defendants, (2) the independent trustees, and (3) PwC. The Schwab defendants also move to strike portions of the First Consolidated Amended Complaint.

**1.    SCHWAB DEFENDANTS' MOTION TO DISMISS.**

**A.    The Section 11 Claim.**

Section 11 focuses specifically on misstatements or omissions in registration statements. It creates a private right of action for purchasers of securities, against certain enumerated defendants, where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. 77k(a). The Ninth Circuit has described the elements of a Section 11 claim as follows:

> The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions.

*United States District Court*
For the Northern District of California

*In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (internal quotations and citations omitted).  Although loss causation is not an element of the *prima facie* case under Section 11, that provision allows defendants to assert a lack of loss causation as an affirmative defense.  *See* 15 U.S.C. 77k(e).

Defendants contend that the complaint fails to state a claim under Section 11 because (1) it fails adequately to plead any misrepresentation with the specificity required by Rule 9(b), and (2) loss causation could not be proven under the facts alleged.  Plaintiffs respond that the complaint need not satisfy Rule 9(b)'s pleading standards but rather only the more lenient standards of Rule 8 and that they will be able to establish loss causation under the circumstances alleged.

### (i)        *Misrepresentations and the Pleading Standard.*

The parties dispute whether plaintiffs' Section 11 claim should be analyzed under the notice pleading standards of Rule 8 or instead under Rule 9(b).  The latter requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

The applicability of Rule 9(b) hinges not on the elements of the claim but rather on the nature of the allegations themselves:  "Rule 9(b) applies to 'averments of fraud' in all civil cases in federal district court . . . in cases in which fraud is not an essential element of the claim, Rule 9(b) applies, but only to particular averments of fraud."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  For example, "the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."  *Id*. at 1103–04.  A typical example of that situation is where a plaintiff alleges that the same course of conduct constitutes both securities fraud under Section 10 as well as a violation of Section 11.  In other cases, "a plaintiff may choose . . . to allege some fraudulent and some non-fraudulent conduct.  In such cases, only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements."  *Id*. at 1104.

Where, as here, the plaintiff has *not* alleged that the same course of conduct constitutes both a Section 11 violation and a violation of other laws necessarily sounding in fraud such as Rule 10b-5, the "unified course of fraudulent conduct" test is essentially circular and is therefore uninstructive. Instead, courts examine the nature of the allegations themselves: "[f]raud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word "fraud" is not used). Under California law, the 'indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages.'" *Vess*, 317 F.3d at 1105 (citations omitted). In such situations, *only* the allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). *In re Daou Systems, Inc.*, 411 F.3d at 1027. Moreover, "[t]he only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive." *Ibid.* (quoting *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)).

Although Section 11 claims require a misrepresentation, they are not inherently fraud-based, unlike claims under Rule 10b-5. As stated, scienter is not required for claims under Section 11; defendants may be liable under Section 11 for negligent or even innocent misrepresentations. *In re Daou Systems, Inc.*, 411 F.3d at 1027. Although Rule 9(b) does not ordinarily apply to Section 11 claims, "the particularity requirements of Rule 9(b) appl[ies] to claims brought under Section 11 when . . . they are grounded in fraud." *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1404–05 (9th Cir. 1996).

The complaint does not specifically allege fraud; indeed, it assiduously avoids use of the word. Moreover, it also generally avoids averments inherently suggestive of fraud such as that defendants "knowingly" or "intentionally" made the misrepresentations alleged. In their opposition brief, plaintiffs disclaim any allegation of fraud and contend that the complaint asserts merely negligent misrepresentations (Opp. at 3). The substance of the allegations themselves, however, must be examined.

United States District Court

For the Northern District of California

1        Defendants claim that, while fraud is not specifically pled, the allegations necessarily

2    constitute fraud.  Defendants first cite several allegations that defendants "misrepresented"

3    various facts or circumstances.  Those allegations alone are uninstructive on the issue because

4    Section 11 *requires* a misrepresentation, but as stated Section 11 is concerned as much with

5    negligent or innocent conduct as with fraud.  The gist of defendants' argument is that "it is hard

6    to comprehend how Schwab allegedly could have systematically misstated the maturity dates,

7    prices, and descriptions of the securities in the fund, and exceeded a known concentration limit

8    for over a year, without doing so intentionally" (Br. at 6).

9        This order is unable to hold that the conduct alleged necessarily sounds in fraud.  Other

10   explanations are certainly possible.  Indeed, although the complaint does not specifically plead

11   negligence (plaintiffs make that argument only in their opposition brief), it alleges a potentially

12   non-fraudulent cause of the misrepresentations — that the misstatements arose from

13   breakdowns in internal controls (Compl. ¶¶ 92, 94).  Assuming that material misstatements

14   occurred, is possible that many of the defendants were unaware of the fund's increasing risk and

15   deviations from stated investment policies, and/or were merely negligent in failing to recognize

16   and prevent them.

17       The Ninth Circuit has applied Rule 9(b) to Section 11 claims where the plaintiff pled

18   both fraud and non-fraud bases for liability based on the same course of conduct.  *In re Daou*

19   *Systems, Inc.*, 411 F.3d at 1027.  *See also In re Stac Electronics Securities Litigation*, 89 F.3d at

20   1404–05 & n.2 (in that situation, "nominal" efforts to disclaim fraud were "unconvincing").  No

21   published Ninth Circuit decision has been found, however, applying Rule 9(b)'s particularity

22   requirement to a Section 11 claim where, as here, the underlying conduct was not also alleged

23   to have constituted fraud.  Courts generally apply Rule 8 to Section 11 claims where *only* non-

24   fraud bases for liability are pled or where such claims are adequately distinguished from fraud

25   claims.  *See, e.g.*, *In re Suprema Specialties, Inc. Securities Litigation*, 438 F.3d 256, 270–73

26   (3d Cir. 2006); *Romine v. Acxiom Corp.*, 296 F.3d 701 (8th Cir. 2002); *In re Exodus*

27   *Communications, Inc. Securities Litigation*, 2005 WL 2206693 (N.D. Cal. 2005) (unpublished)

28   (Chesney, J.).  The Ninth Circuit has reached the same result in unpublished opinions.  *Safron*

*Capital Corp. v. Leadis Technology, Inc.*, 274 Fed.Appx. 540 (9th Cir. 2008); *Knollenberg v. Harmonic, Inc.*, 152 Fed.Appx. 674 (9th Cir. 2005).  This order declines to characterize the claims as *necessarily* sounding in fraud where plaintiffs have not expressly pled fraud and have pled non-fraud bases for liability.  For these reasons, Rule 8 governs the claim; defendants motion to dismiss the Section 11 claim for failure to satisfy Rule 9(b) is denied.

**(ii)**     *Loss Causation.*

As stated, loss causation is not an element of the *prima facie* case under Section 11, but defendants may assert a *lack* of loss causation as an affirmative defense.  *See* 15 U.S.C. 77k(e).  District courts have dismissed Section 11 claims on the pleadings where it was apparent on the face of the complaint that the plaintiffs would be unable to establish loss causation.  *See, e.g.*, *In re DNAP Securities Litigation*, 2000 WL 1358619, *3 (N.D. Cal. 2000) (unpublished) (Alsup, J.); *In re Countrywide Financial Corp. Securities Litigation*, 2008 WL 5100124, at *25 (C.D. Cal. 2008) (Pfaelzer, J.).  Defendants contend that this is such a case.

Defendants reasoning is as follows.  Plaintiffs are investors in a mutual fund rather than in an individual security.  The price of shares in a mutual fund — the fund's net asset value — is determined entirely by the value of the assets in the fund's portfolio:  "the value of a mutual fund share is calculated according to a statutory formula.  Share price is a function of 'Net Asset Value,' the pro-rata share of assets under management, minus liabilities such as fees."  *In re Morgan Stanley and Van Kampen Mut. Fund Securities Litigation*, 2006 WL 1008138, at *9 (S.D. N.Y. 2006).  Thus, even if the fund misrepresented its investment policies and/or risk profile, those misrepresentations could not have caused plaintiffs' losses because the misrepresentations did not cause the decline in the value of the portfolio's asset holdings.

Surface appeal aside, defendants restrict the concept of loss causation is too narrowly.  Loss causation is "a causal connection between the material misrepresentation and the loss."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  The concept of loss causation is analogous to the common-law doctrine of proximate cause:  "*Dura* culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting."  *Merrill Lynch & Co. Inc. v.*

United States District Court

For the Northern District of California

9

1    *Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (citation omitted).  Although the loss

2    causation inquiry often hinges on the timing of purchases and sales in relation to the typical

3    inflation-disclosure-deflation cycle, loss causation is not limited to that scenario.  *See In re*

4    *Mutual Funds Inv. Litigation*, 2008 WL 5412407, at *4 (D. Md. 2008).  Indeed, although *Dura*

5    addressed that scenario, the decision explained that it "need not, and d[id] not, consider other

6    proximate cause or loss-related questions."  *Dura Pharmaceuticals*, 544 U.S. at 346.  Moreover,

7    the Ninth Circuit has explained that "[a] plaintiff is not required to show that a

8    misrepresentation was the sole reason for the investment's decline in value' in order to establish

9    loss causation."  *In re Daou Systems*, 411 F.3d at 1025 (citations omitted).

10           Defendants' narrow formulation of loss causation would effectively insulate mutual fund

11    companies from claims for a wide range of material misrepresentations regarding fund policies,

12    risks and investment decisions.  Defendants would immunize a scheme that purported to invest

13    in low-risk government bonds but in fact invested in legitimate but high-risk treasure-hunting

14    expeditions.  Loss causation, however, is not limited to the common "corrective disclosure-price

15    drop" scenario.

16           As courts in other circuits have explained, a plaintiff may establish loss causation by

17    alleging "that the *subject* of the fraudulent statement or omission was the cause of the actual

18    loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk

19    (or some other risk) that materialized and played some part in diminishing the market value of"

20    the security.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005) (citation

21    omitted; emphasis in original).  That is:

22                  the loss must be caused by the "materialization of the concealed
                    risk."  [citing *Lentell*, 396 F.3d at 173.]
23
                    Thus, "the Second Circuit has made clear that in order '[t]o plead
24                  loss causation, the complaint must allege facts that support an
                    inference that [defendants'] misstatements and omissions
25                  concealed the circumstances that bear upon the loss suffered such
                    that plaintiffs would have been spared all or an ascertainable
26                  portion of that loss absent the fraud.'"

27    *In re Mutual Funds Inv. Litigation*, 568 F. Supp. 2d 349, 359 (D. Md. 2008) (citations omitted).

28

United States District Court

For the Northern District of California

It is insufficient, of course, "for an investor to allege only that it would not have invested but for the fraud. Such an assertion alleges transaction causation, but it does not allege loss causation." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). Loss causation, however, can be established where a plaintiff proves that "it was the very facts about which the defendant lied which caused its injuries." *Ibid.* (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997)). In that instance, the loss is caused because "the failure to disclose th[e] fact caused [the] injury through [the plaintiff's] undervaluation of the risk it was undertaking in accepting the [investment]." *Caremark*, 113 F.3d at 648. Here, plaintiffs certainly alleged that the *subject* of the fraudulent statements caused their losses — that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses. Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses.

Other causation theories also conceivable. For example, defendants explain that the fund investors' losses were exacerbated through a "run on the fund" scenario: as losses mounted, more an more investors sought to withdraw their investments, forcing the fund to liquidate assets at low prices, which in turn contributed to the share-price decline (Br. at 5). If investors' realization that they had assumed more risk than had been previously disclosed contributed to the investor redemptions, then the fraud caused at least a portion of plaintiffs' losses. In any event, it is not apparent on the face of the complaint that plaintiffs could not establish loss causation.

**B.     Section 12(a)(2) Claim.**

Section 12 allows purchasers of securities to sue "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication," containing a material misstatement or misleading omission. 15 U.S.C. 77l(a)(2). Defendants move to dismiss the Section 12(a)(2) claim on the grounds that (1) the complaint fails adequately to allege any

material misrepresentations or omissions; (2) plaintiffs would be unable to establish loss

causation; and (3) defendants are not statutory "sellers" within the meaning of Section 12(a)(2).

### (i)    *Misrepresentations & Loss Causation.*

Defendants do not allege that the misrepresentation and loss causation inquiries are in

any way different for the Section 12 claim than they were for the Section 11 claim; defendants

simply incorporate their Section 11 arguments by reference.

As with Section 11, fraud is not an element of a Section 12(a)(2) claim. *See Miller v.

Thane Intern., Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Therefore, as explained, the Section

12(a)(2) claim must satisfy Rule 9(b) only to the extent that the factual allegations sound in

fraud. The allegations underlying the Section 12 claim are the same as those underlying the

Section 11 claim. Therefore, plaintiffs Section 12 claims, like the Section 11 claims, do not

sound in fraud and Rule 8 rather than Rule 9(b) applies.

Similarly, a lack of loss causation is an affirmative defense rather than an element of the

claim under Rule 12(a)(2). 15 U.S.C. 77l(b). A Section 12 claim will be dismissed where it is

evident on the face of the complaint that loss causation could not be established. *In re Merrill

Lynch & Co., Inc. Research Reports Securities*, 289 F. Supp. 2d 429, 437 (S.D. N.Y. 2003). For

the reasons stated above, it is not evident on the face of the complaint that plaintiffs would be

unable to establish loss causation.

### (ii)    *Were Defendants Statutory "Sellers"?*

As stated, Section 12(a)(2) claims may be asserted only against a defendant who "offers

or sells a security." The Supreme Court has ruled that the phrase "offers or sells" includes not

only traditional sellers — individuals who pass title to another — but also certain individuals

who engage in the solicitation of sales:

> The person who gratuitously urges another to make a particular
> investment decision is not, in any meaningful sense, requesting
> value in exchange for his suggestion or seeking the value the
> titleholder will obtain in exchange for the ultimate sale . . . .
> [L]iability extends only to the person who successfully solicits the
> purchase, motivated at least in part by a desire to serve his own
> financial interests or those of the securities owner.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).  As the Ninth Circuit has explained, "plaintiff must

2    allege that the defendants did more than simply urge another to purchase a security; rather, the

3    plaintiff must show that the defendants solicited purchase of the securities for their own

4    financial gain."  *In re Daou Systems, Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005).[2]

5            Defendant Schwab Investments is alleged to have been the issuer of the funds (Compl. ¶

6    28).  Defendant Charles Schwab & Co. is alleged to have been the distributor and principal

7    underwriter (Compl. ¶ 26).  Defendants virtually concede that those two defendants are proper

8    parties.  Defendants argue, however, that *only* those two defendants could have passed title to

9    plaintiffs, and *only* Charles Schwab & Co., the broker-dealer, could be deemed to have solicited

10   investments in the fund.  Defendants claim that the allegations against all other defendants are

11   insufficient.

12           In opposition, plaintiffs rely predominantly on their allegation that defendants Charles

13   A. Schwab, Dilsaver, Merk and Pereira (as well as the independent trustees, as discussed *infra*),

14   signed offering documents such as registration statements.  Plaintiffs supplement that allegation

15   with other general averments, for example, that defendants were "participants" in the

16   distribution of the fund's shares; that defendants "offered and sold" the funds shares; and that

17   defendants "actively solicited the sale of the fund's shares" (Compl. ¶¶ 138, 140–141).  The

18   complaint adds that defendant Daifotis "participated in the written or oral communications used

19   to market the fund" and that defendant Hastings similarly "participated in the marketing of the

20   fund" (Compl. ¶¶ 40–41).

21           The Ninth Circuit has not addressed whether simply alleging that a defendant signed a

22   registration statement — possibly combined with other generalized allegations of solicitation

23

24

25

26

27

28           [2] *Pinter* addressed a claim under Section 12(a)(1), but the Ninth Circuit has clarified that the same
     inquiry governs claims under Section 12(a)(2).  *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 535–36
     (9th Cir. 1989).

activity — will suffice to state a Section 12 claim.  Other courts faced with such claims have reached varying results.[3]

In *Pinter*, the Supreme Court left little doubt that mere *participation* in a solicitation or sale will not suffice:  "[Section] 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants' collateral to the offer or sale.  When Congress wished to create such liability, it had little trouble doing so."  *Pinter*, 486 U.S. at 650 & n.27.  The decision further explained that "[t]he 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser."  *Id*. at 651.  Courts have extrapolated from these statements a requirement that the defendant be alleged to have had some "direct" role in the solicitation of the plaintiff, although the Ninth Circuit has not explained precisely what that direct role may entail.  *See In re Daou Systems*, 411 F.3d at 1029 (asking whether "defendants were 'directly involved' in the actual solicitation of a securities purchase").  *See also In re Westinghouse Securities Litigation*, 90 F.3d 696, n.19 (3d Cir. 1996) (Alito, J.) (direct and active participation in solicitation is necessary for solicitation liability); *In re Alliance Equipment Lease Program Securities Litigation*, 2002 WL 34451621, at *7–8 (S.D. Cal. 2002) (collecting cases).

---

[3] *Compare Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) ("Although signing the registration statement need not constitute active solicitation . . . it is, at this stage of the proceedings, a sufficient allegation to permit Plaintiffs to present evidence that, alone or in tandem with other acts, the signatures constituted active solicitation"); *In re Sirrom Capital Corp. Securities Litigation*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) ("A Prospectus itself is considered a solicitation document.  Thus, the Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock") (citations omitted); *In re National Golf Properties, Inc.*, 2003 WL 23018761 (C.D. Cal. 2003) (same); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 308 (S.D.N.Y. 2001) (similar); *In re Portal Software, Inc. Securities Litigation*, 2006 WL 2385250, at *4 (N.D. Cal. 2006) (allegations of signing registration statement combined with other averments of solicitation sufficed); *In re Deutshce Telekom AG Securities Litigation*, 2002 WL 244597, at *5 (S.D.N.Y. 2002) (those who sign registration statement, but not prospectus, are considered solicitors); *with In re Harmonic, Inc., Securities Litigation*, 2006 WL 3591148, at *13 (N.D. Cal. 2006) ("Nor is the addition of the claim against Ley that he signed the prospectus sufficient to qualify him as a 'seller' . . . . While district courts are split on this issue, as demonstrated by the cases cited by the parties herein, the circuits that have addressed the issue have determined that simply signing a registration statement or prospectus provides an insufficient legal basis for relief"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (similar); *In re Infonet Services Corp. Securities Litigation*, 310 F. Supp. 2d 1080, 1101 (C.D. Cal. 2003) (similar; applying Rule 9(b)).

United States District Court

For the Northern District of California

1    This order finds that plaintiffs adequately pled solicitation.  Plaintiffs alleged more than

2    mere participation.  As many courts have found, the registration statement is itself a solicitation

3    document.  Although the act of signing a registration statement, alone, may not always suffice,

4    it is at least suggestive of solicitation activity.  As stated, the complaint also alleges that

5    defendants "actively solicited the sale of the fund's shares" and that certain defendants were

6    involved in marketing the fund.  Whether or not defendants actually solicited plaintiffs' sales is

7    a factual question which should generally be left to the jury; at this stage plaintiffs' need only

8    satisfy Rule 8(a)'s lenient pleading standards.  *In re Westinghouse Securities Litigation*, 90 F.3d

9    at 717.  For these reasons, the complaint adequately pleads that defendants were statutory

10   "sellers" under Section 12(a)(2).

11              **C.    Section 15 Claim.**

12              Section 15 of the Securities Act of 1933 imposes joint and several liability upon every

13   person who controls any person liable under Sections 11 or 12 of the Act.  15 U.S.C. 77o; *In re*

14   *Daou Systems, Inc.*, 411 F.3d 1006, 1029–30 (9th Cir. 2005).  To state a control person claim,

15   plaintiff must establish (1) a primary violation of the pertinent federal securities laws, and (2)

16   that defendants exercised actual power or control over the primary violator.  *See Howard v.*

17   *Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  *See also* 17 C.F.R. 230.405

18   (defining "control").  "Whether [the defendant] is a controlling person is an intensely factual

19   question, involving scrutiny of the defendant's participation in the day-to-day affairs of the

20   corporation and the defendant's power to control corporate actions."  *Howard*, 228 F.3d at

21   1065.[4]

22              The complaint asserts control-person claims against several defendants:  The Charles

23   Schwab Corporation, Charles Schwab & Co., Inc., Schwab Investment Management, Schwab

24   Investments, Charles R. Schwab, Dilsaver, Merk and Pereira.[5]  As explained, the corporate

25

26              [4] Although *Howard* addressed control-person liability under Section 20 of the Exchange Act rather
27   than Section 15 of the Securities Act, and Section 15 and Section 20(a) are separate bases of liability, the Ninth
     Circuit has held that the analysis is identical.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1578 (9th Cir.
     1990).

28              [5] Control-person claims are also asserted against the independent trustees, as discussed *infra*.

United States District Court

For the Northern District of California

1    defendants are alleged to have been the issuer of the fund's shares, the underwriter and

2    distributer of those shares, and parent companies of those two entities, respectively.  The

3    individual defendants are alleged to have been officers of the fund.  Each of the individual

4    defendants is alleged to have signed the registration statements at issue.

5         Defendants argue that the complaint fails to convey how the alleged control persons

6    exercised actual power and control over the fund, asserting that the fund is "completely

7    separate" from Schwab and its subsidiaries.  This assertion is a factual rebuttal inappropriate for

8    a motion to dismiss.  Defendants may ultimately establish that the fund is "completely separate"

9    from Schwab and its subsidiaries, but that is not the only, or indeed the most natural, inference

10   drawn from the allegations in the complaint.  Defendants are on fair notice of the claims;

11   plaintiffs are at least entitled to seek to prove that the alleged "parent company of the Charles

12   Schwab financial services complex," the "parent company of [the asset management company]

13   and the principal underwriter and distributor for [the] shares," the entity that "over[saw] the

14   asset management and administration of the [fund]," and the registrant and issuer of the shares,

15   were each in a position to exercise actual power and control over the contents of the registration

16   statements and reports at issue (Compl. ¶¶ 25–28).

17        Defendants also take issue with the complaint for failing to explain how the individual

18   defendants — officers of the fund — exercised control over the corporate entities, which are

19   parents of the fund.  Defendants, evidently, would require plaintiffs to establish that the control

20   persons exercised power and control over *all* primary violators.  No authority suggesting such a

21   burden has been cited.  At this stage, as explained above, Section 11 and Section 12 claims

22   remain against all of the Schwab defendants.  It is a plausible inference, for example, that

23   individuals who were officers of the fund (and other Schwab entities, in some cases) and who

24   signed the registration statements were in a position to exercise power and control over Schwab

25   Investments and/or the fund's portfolio managers, Daifotis and Hastings.  Defendants' motion

26   to dismiss the Section 15 claims is therefore denied.

27

28

16

**United States District Court**
For the Northern District of California

D.      **Are the State Claims Preempted?**

Defendants contend that all of the complaint's state-law claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA").  The preemption provision states:

> No *covered class action* based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
> (1) an *untrue statement or omission* of a material fact *in connection with the purchase or sale* of a *covered security*; or
>
> (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. 77p, 78bb (emphasis added).[6]  Plaintiff does not dispute that this action is a "covered class action" regarding a "covered security."  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 n.6 (2006) (defining the terms).  Plaintiff argues, however, that the state claims do not allege "untrue statements or omissions" and are not related to the purchase or sale of the covered securities, *i.e.*, a securities transaction.

This order agrees.  The state claims are not, in substance, predicated on misrepresentations or omissions.  Rather, each of those claims asserts a violation arising from an allegedly unauthorized change of the fund's concentration policy, which expressly limited concentration to 25 percent of assets in any single "industry."  Plaintiff alleges that the violations occurred when the fund changed its concentration policy by ceasing to define mortgage-backed securities as an "industry," *without a shareholder vote*, thereby permitting the fund to invest far more than 25 percent of its assets in mortgage-backed securities and other such assets.  Plaintiff alleges that both a contract between Schwab and its investors, as well as the Investment Company Act, required the shareholder vote.  Plaintiff also asserts a fiduciary-duty claim predicated on self-dealing and requests leave to amend in order to assert a fiduciary claim based on voting rights.  None of these claims are predicated on a misrepresentation — plaintiffs readily agree that Schwab properly disclosed the change in its concentration policy but argue that the change was nevertheless improper.

---

[6] SLUSA amended the 1933 Act and the 1934 Act in nearly identical ways.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 n.6 (2006).

United States District Court

For the Northern District of California

1    Defendants argue to the contrary by citing allegations of misrepresentations in the

2  complaint which underpin the federal securities claims.  For example, defendants cite the

3  allegations that Schwab misrepresented the nature of the fund as an "ultra-short bond fund" and

4  misrepresented the fund's portfolio duration.  True, those allegations are incorporated by

5  reference into the state claims but are really irrelevant thereto.  When applying SLUSA, courts

6  ignore extraneous allegations and focus on the gravamen of the complaint:  "when an allegation

7  of misrepresentation in connection with a securities trade, implicit or explicit, operates as a

8  factual predicate to a legal claim, that ingredient is met.  To be a factual predicate, the fact of a

9  misrepresentation must be one that gives rise to liability, not merely an extraneous detail."

10  *LaSala v. Bordier et Cie*, 519 F.3d 121, 141 (3d Cir. 2008).  Because the state claims are not

11  predicated upon a misrepresentation in connection with a securities transaction, those claims are

12  not preempted.

13             **E.      Intentional Interference with Contractual Relations Claims.**

14    Counts Four and Six of the complaint assert claims for intentional interference with

15  contractual relations on behalf of the state pre-breach and post-breach classes, respectively,

16  against all corporate defendants and several individual defendants.  Plaintiffs' theory is as

17  follows:  the registration statement, prospectus and SAIs constituted a contract; the fund's

18  investment policies, including the above-discussed 25 percent concentration policy, were a term

19  of that contract; the SAI's also provided that those investment policies could not be changed

20  without a shareholder vote; the fund, therefore, violated one or both of those contract terms

21  when it began concentrating assets in mortgage-backed securities (Compl. ¶¶ 151–170).

22    In order to state a claim for intentional interference with contractual relations under

23  California law, a plaintiff must plead:  (1) a valid contract between plaintiff and a third party;

24  (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a

25  breach or disruption of the contractual relationship; (4) actual breach or disruption of the

26  contractual relationship; and (5) resulting damage.  *Quelimane Co. v. Stewart Title Guaranty*

27

28

18

*Co.*, 19 Cal. 4th 26, 55 (1998).[7]  Moreover, as the third-party requirement suggests, the claim

may not be asserted against parties to the contract:  "a *stranger* to a contract may be liable in

tort for intentionally interfering with the performance of the contract . . . .  However, the tort

cause of action for interference with a contract does not lie against a party to the contract."

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 513–14 (1994) (emphasis

added).

        Defendants move to dismiss the claims on the grounds that (1) plaintiffs failed to plead

the existence of a contract; (2) defendants are not proper parties; (3) the fund did not breach the

alleged contract in the manner claimed; and (4) the complaint fails adequately to plead

intentional interference.

        This order finds that the complaint fails adequately to plead the existence of a contract.

Under California law, a valid contract requires (1) [p]arties capable of contracting; (2) [t]heir

consent; (3) [a] lawful object; and (4) [a] sufficient cause or consideration.  Cal. Civ. Code §

1550.  The complaint fails to plead facts from which the existence of a contract could plausibly

be inferred.  For example, the complaint never identifies the parties to the alleged contract; in

fact, it offers contradictory averments on the subject.  The complaint first avers that "the

Registration Statement, Prospectus and SAIs constituted a contract between each investor and

Schwab" (Compl. ¶ 151).  The complaint identifies "Schwab" as defendant Charles Schwab &

Co. (Compl. ¶ 26).  The complaint, however, later claims that it was the "defendant Fund" who

was the party to, and breached, the contract.  In their briefing, plaintiffs do little to clarify the

matter, variously asserting that the "Fund," or Schwab Investments, or all who signed the

prospectus (including most or all of the individual defendants), are parties to the contract (Opp.

at 20–22).  For similar reasons, the defendants deemed strangers to the contract, and therefore

proper parties for this claim, are a moving target.  The claim is asserted against Schwab

Investments and most of the individual defendants, but in opposition plaintiffs admit that most

of them are parties to the contract (Opp. at 22).  The complaint also fails to provide notice of

other basic characteristics of the alleged contract, such as the contract's lawful object and the

---

[7] The parties agree that California law governs the claim.

1 nature of the consideration provided by the parties.  The complaint fails to afford defendants

2 notice of the nature claims asserted against it.  The complaint, therefore, fails to state a claim for

3 intentional interference with contractual relations.

4       Without having the circumstances of a contract properly pled, this order need not and

5 cannot address whether, in other circumstances, the registration statements and other documents

6 might form the basis for a contract, an issue which the parties dispute.  Plaintiffs request leave

7 to amend in order to assert breach-of-contract claims against certain defendants.  The

8 intentional interference claim is dismissed without prejudice, and plaintiffs will be permitted to

9 move for leave to amend in the manner described below.

10 **F.     Section 17200 Claims.**

11       Counts Five and Seven assert violations of California's unfair competition laws on

12 behalf of the state pre-breach and post-breach classes, respectively.  The complaint asserts that

13 defendants engaged in "unlawful" business acts and practices by violating federal law,

14 including Sections 13(a) and 48(a) of the Investment Company Act.  15 U.S.C. 80a-13, 80a-

15 47(a).[8]

16       Section 13(a) proscribes various conduct, including the following:

17         (a) No registered investment company shall, unless authorized by
the vote of a majority of its outstanding voting securities-- . . . (3)
18 *deviate from its policy in respect of concentration of investments*
in any particular industry or group of industries as recited in its
19 registration statement, deviate from any investment policy which
is changeable only if authorized by shareholder vote, or deviate
20 from any policy recited in its registration statement pursuant to
section 80a-8(b)(3) of this title.

21 15 U.S.C. 80a-13(a)(3) (emphasis added).  Section 48(a), in turn, provides, "[i]t shall be

22 unlawful for any person, directly or indirectly, to cause to be done any act or thing through or

23 by means of any other person which it would be unlawful for such person to do under the

24 provisions of this subchapter or any rule, regulation, or order thereunder."  15 U.S.C. 80a-47(a).

25

26

27 _____

28    [8] Private rights of action the ICA itself are limited.  *See, e.g., Bellikoff v. Eaton Vance Corp.*, 481 F.3d
110 (2d Cir. 2007); *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002); *Potomac Capital
Markets Corp. v. Prudential-Bache Corporate Dividend*, 726 F.Supp. 87 (S.D.N.Y. 1989).

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendants move to dismiss the claim on the grounds that (1) they did not in fact violate

2    their concentration policy, and (2) California's unfair competition laws do not apply to

3    violations of these provisions.  Regarding the former, defendants emphasize that the fund's

4    change in investment policy — the decision to no longer deem mortgage-backed securities an

5    "industry" in order to allow concentration in those assets — was properly disclosed.  This

6    argument misses the crux of plaintiffs' claim.  The problem, plaintiffs assert, is not a

7    misrepresentation but rather that defendants changed the policy without a majority vote of the

8    shareholders, as (they allege) was legally required.  Defendants have provided no authority

9    addressing whether the fund's amended definition constituted a "deviat[ion] from its policy in

10   respect of concentration of investments in any particular industry or group of industries."  This

11   order, therefore, is unable to conclude on the pleadings that defendants did not violate or

12   improperly amend the investment policy.

13   Defendants' second claim relies on a decision of the California Court of Appeals.

14   *Bowen v. Ziasun Technologies, Inc.*, 116 Cal. App. 4th 777 (2004).  *Bowen* analyzed the

15   purpose of California's unfair business practices provision and ruled, for the first time, that

16   "[S]ection 17200 does not apply to securities transactions."  *Id.* at 788.  Relying on *Bowen*,

17   defendants argue that plaintiffs cannot predicate a Section 17200 claim on securities violations.

18   The reach of the ruling, however, is far from certain.  As a recent decision in this district

19   explained,

20       "[t]he California courts have expressly held that federal securities
         laws do not preempt Section 17200 generally . . . .  In addition,
21       *Bowen* and the cases on which it rests all dealt with fraud in the
         sale of securities . . . .  Moreover, even the broad language of the
22       *Bowen* case is limited to "securities transactions," and does not
         encompass all situations where securities are somehow implicated
23       but not purchased or sold.

24   *Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529 (N.D. Cal. 2005) (Illston, J.)

25   (citations omitted).  California decisions have since interpreted *Bowen* narrowly.

26   *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715 & n.20 (2007) (also

27   noting that the Attorney General has filed an *amicus* brief arguing that *Bowen* was wrongly

28   decided); *Adams v. Fiserv*, 2008 WL 3890036, *8 (Cal. App. 4th 2008).  Plaintiffs' Section

United States District Court

For the Northern District of California

1    17200 claims do not concern fraud in the sale of securities and, indeed, are not predicated upon

2    violations of the 1933 or 1934 Acts.  This order is unwilling to dismiss the claims on the

3    pleadings based on *Bowen*.

4                 **G.**        **Breach of Fiduciary Duty Claim.**

5           Count Eight of the complaint alleges breach of fiduciary duty against all defendants

6    except PwC.  It avers that each defendant was a fiduciary of the fund, and that each had inside

7    information regarding the alleged misrepresentations and were therefore aware that the fund's

8    value would decline due to the risky nature of its holdings.  The claim avers that other funds

9    within the Schwab family had invested in the YieldPlus Fund, and that defendants caused those

10   other funds to withdraw, at the expense of members of the class.

11          Defendants assert two challenges to the claim:  (1) that the claim must be asserted

12   derivatively, not directly; and (2) that the complaint fails to state a claim under Rule 9(b).

13          As both sides recognize, because the fund is a Massachusetts trust, plaintiffs' fiduciary-

14   duty claim should be analyzed under Massachusetts law.  *See Batchelder v. Kawamoto*, 147

15   F.3d 915, 920 (9th Cir. 1998) (discussing the "internal affairs" doctrine).  Under Massachusetts

16   law, "if the wrong underlying claim results in harm to a plaintiff shareholder only because the

17   corporate entity has been injured, with the plaintiff's injury simply being his proportionate share

18   of the entity's injury, the harm to the shareholder is indirect and his cause of action is

19   derivative." *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 113 (D. M.A. 2006).

20   Defendants contend that the claim must be asserted derivatively because plaintiffs have

21   identified no injury distinct from other shareholders; rather, defendants contend, the alleged

22   injury arises from the decline in value of the fund generally.

23          Courts have on occasion permitted claims to be brought directly (as a shareholder)

24   rather than derivatively (on behalf of the corporation) where unequal treatment is asserted.  *See,*

25   *e.g.*, *Frank v. LoVetere*, 363 F. Supp. 2d 327 (D. Conn. 2005) (direct fiduciary claim stated for

26   unequal shareholder treatment).  Where such claims have been permitted, however, the

27   plaintiffs were able to identify some unique injury not common to all shareholders.  For

28   example, share buy-backs on preferential terms may improperly divert funds from the company

United States District Court

For the Northern District of California

1    to certain shareholders but not to others.  Plaintiffs here, however, identify no theory of

2    individual injury and therefore fail to establish that their claim may be directly asserted.  The

3    fiduciary-duty claim is dismissed without prejudice, but plaintiff will be permitted to move for

4    leave to amend including, as requested, to propose a fiduciary claim based on a violation of

5    voting rights.[9]

6         For all of the above-stated reasons, the Schwab defendants' motion to dismiss is granted

7    in part and denied in part.

8         **2.    INDEPENDENT TRUSTEES' MOTION TO DISMISS.**

9         The independent trustees of the YieldPlus Fund have also moved to dismiss the

10   complaint.  As stated, defendant Schwab Investments is a Massachusetts business trust.  The

11   YieldPlus fund, defendants explain, is a series of that trust.  Schwab Investments is the issuer

12   and registrant of the fund's shares.  The trust is governed by nine trustees.  Two of those,

13   including defendant Charles R. Schwab, are affiliated with Schwab entities; the remaining

14   trustees are not alleged to have been otherwise-affiliated with Schwab (*see* Compl. ¶¶ 28–31;

15   34–40).  Those seven trustees were represented by the fund to be independent of Schwab and to

16   qualify as "disinterested" under the Investment Company Act of 1940 (Taylor Exh. B at

17   43–46).[10]

18        The seven "independent trustees" move to dismiss.  They challenge five instances

19   where, they allege, the complaint improperly "lumped" them into claims along with the other

20   defendants.  Specifically, they challenge the following claims:  (1) that they were statutory

21   "sellers" under Section 12(a)(2); (2) that they were "control persons" under section 15; (3) that

22   they intentionally interfered with a contract between plaintiffs and Schwab; (4) that they

23   committed an "unlawful act" under Section 17200; and (5) that they breached their fiduciary

24   duties.

25

26

27        [9] It is therefore unnecessary to determine whether Rule 9(b) would apply to the claim or whether the
     claim would satisfy the pleading standards of Rule 9(b).

28        [10] The Court takes judicial notice of the November 2007 SAI.

The third and fifth grounds for the independent trustees' motion to dismiss are granted, for the same reasons that the Schwab defendants' motion was granted on those claims. The remaining grounds for the motion will be discussed in turn.

### A.    "Sellers" under Section 12(a)(2).

As explained, Section 12(a)(2) claims may be asserted only against those who "offer[ed] or s[old] a security." The independent trustees contend that the complaint failed adequately to plead that they sold or solicited the sale of a security under this provision.

The motion must be denied. Although not all of the complaints' solicitation averments apply to the independent trustees, the most material of those allegations equally apply. The Schwab defendants' motion was denied because the complaint averred that they had signed the registration statements, documents inherently utilized for the solicitation of securities sales, and more generally that defendants "actively solicited the sale of the fund's shares." Those allegations also apply to the independent trustees. Although plaintiffs eventually must point to facts establishing that defendants were actually and directly involved in solicitation or sales, at this stage they need only satisfy Rule 8(a)'s lenient pleading standards. *In re Daou Systems*, 411 F.3d at 1029; *In re Westinghouse Securities Litigation*, 90 F.3d at 717. For these reasons, the motion is denied.

### B.    Control Person Liability.

Defendants contend that, as independent trustees, they are not alleged to have had day-to-day decisionmaking or control responsibilities in the company. They emphasize that their role as trustees was similar to that of outside directors, a role which has been held, in and of itself, insufficient to establish control-person liability.[11] *Howard v. Everex Sys.*, 228 F.3d 1057, 1067 (9th Cir. 2000) (board member held not a control person where the plaintiff alleged he "reviewed and approved" financial statements but made "no showing that [the defendant] . . . exercised any specific control over the preparation and release of the financial statements"). Where a board member is alleged to have signed the registration statements at issue, however,

---

[11] Defendants draw an analogy between their role as independent trustees and the role of board members in a corporation, and plaintiffs do not argue that the analogy is inapposite.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    courts have presumed that the director exercised actual authority and control, at least over the

2    contents of and/or release of those statements.  *See, e.g.*, *In re Alstom SA Secs. Litig.*, 406 F.

3    Supp. 2d 433, 487 (S.D.N.Y. 2005) ("courts have held that officer or director status alone does

4    not constitute control . . . .  In contrast, if that same officer or director has signed financial

5    statements containing materially false or misleading statements, courts have held that control as

6    to the financial statements is sufficiently pled") (collecting cases); *In re Philip Servs. Corp.*

7    *Secs. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (directors who also signed registration

8    statement controlled those who wrote the report); *In re Enron Corp. Sec., Derivative & ERISA*

9    *Litigation*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (same, for outside director and audit-

10   committee member).  It makes sense that the authority to sign and certify the contents of a

11   registration statement implies the authority to effectuate changes to that statement by

12   withholding certification — for example, where misrepresentations are known or suspected.

13   Otherwise, the certification authority is meaningless.  The motion, therefore, is denied.

14          **C.     Section 17200.**

15          The independent trustees challenge the Section 17200 claims on one ground not raised

16   by the Schwab defendants:  that the independent trustees are not alleged to have played any

17   specific role in the "unlawful acts" alleged — to reiterate, the allegedly improper alteration of

18   the investment concentration policy without shareholder approval.  Defendants first contend

19   that the claim should be analyzed under Rule 9(b) because it is grounded in fraud.  The claim,

20   however, is not grounded in fraud.  The claim does not rely on any misrepresentation, much less

21   fraud.  In fact, as stated, plaintiffs admit that the challenged change in investment policy *was*

22   disclosed; they assert that it was otherwise unlawful because not approved by the shareholders.

23   The claim, therefore, is governed by Rule 8.

24          Defendants are unable to prevail under the pleading standards of Rule 8.  At least one

25   potential theory of liability can plausibly be inferred from the allegations incorporated into the

26   claim by reference:  the independent trustees are alleged to have signed and approved the

27   registration statement which disclosed (by reference) the challenged change in the fund's

28   investment policy.  Moreover, as trustees of the fund, defendants may plausibly be inferred to

**United States District Court**
For the Northern District of California

1    have had a role overseeing the investment policies of the fund.  This order is unwilling to

2    conclude at this stage of the proceedings that the complaint fails to put defendants on notice of

3    their alleged role in the challenged conduct.  The motion, therefore, is denied.

4          For these reasons, the independent trustees' motion to dismiss is granted in part and

5    denied in part.

6          **3.      PRICEWATERHOUSECOOPERS' MOTION TO DISMISS.**

7          PricewaterhouseCoopers, the fund's auditor, independently moves to dismiss the Section

8    11 claim against it.  PwC attacks the Section 11 claim on two grounds:  (1) timeliness, and (2)

9    for failure adequately to plead a misrepresentation or omission against PwC.[12]

10         **A.      Timeliness.**

11         Claims under Section 11 of the 1933 Act must be "brought within one year after the

12   discovery of the untrue statement or the omission, or after such discovery should have been

13   made by the exercise of reasonable diligence."  15 U.S.C. 77m.  Under this provision, the

14   limitations period begins to run with either actual or inquiry notice.  *In re Stac Electronics*

15   *Securities Litigation*, 89 F.3d 1399, 1411 (9th Cir. 1996).

16         To assess inquiry notice, the Ninth Circuit applies an

17   "inquiry-plus-reasonable-diligence" test — that is, "inquiry notice triggers an investor's duty to

18   exercise reasonable diligence and [] the . . . statute of limitations period begins to run once the

19   investor, in the exercise of reasonable diligence, should have discovered the facts underlying

20   the alleged fraud."  *Betz v. Trainer Wortham & Co.*, 519 F.3d 863, 876 (9th Cir. 2008)

21   (quotation and citation omitted).  The first prong, "inquiry notice," is satisfied when:

22                 there exists sufficient suspicion of fraud to cause a reasonable
                   investor to investigate the matter further . . . .  The facts
23                 constituting inquiry notice must be sufficiently probative of
                   fraud-sufficiently advanced beyond the stage of a mere suspicion .
24                 . . to incite the victim to investigate.

25

26

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [12] The complaint also asserts a claim against PwC under Section 12(a)(2), and PwC moves to dismiss
     the claim.  Plaintiffs do not oppose dismissal of the Section 12(a)(2) claim (Opp. at 21 n.10).  PwC's motion to
     dismiss the Section 12 claim is therefore granted.

1    *Ibid.* (quotation and citation omitted).  If the plaintiff had inquiry notice, courts ask whether the

2    investor, in the exercise of reasonable diligence, should have discovered the facts constituting

3    the alleged fraud, an objective standard.  *Ibid.*

4        Plaintiffs added PwC as a defendant for the first time in the First Consolidated Amended

5    Complaint, filed October 2, 2008.  PwC argues that plaintiffs' own pleading admits inquiry

6    notice of the misrepresentations as of July 2007.  PwC relies predominantly on the following

7    passage of the complaint (Compl. ¶ 136; emphasis added):

8            At the time of their purchases of the Fund shares, Plaintiffs and
             other members of the Class were without knowledge of the facts
9            concerning the untrue statements or omissions herein and *could
             not have reasonably discovered those facts prior to July 2007.*
10           Less than one year has elapsed from the time that Plaintiffs
             discovered or reasonably could have discovered the facts upon
11           which this complaint is based to the time that Plaintiffs filed this
             complaint.
12

13       As PwC emphasizes, courts have dismissed claims where the complaint itself pled facts

14   admitting or necessarily implying that the plaintiff reasonably could have discovered the

15   pertinent facts at an early date.  *AIG Retirement Services, Inc. v. Altus Finance S.A.*, 2006 WL

16   5971775, at *7–8 (C.D. Cal. 2006) (finding that the clock started no later than February 1999,

17   the date on which a prior action had been filed, because the plaintiff pled that he "did not learn,

18   nor, in the exercise of reasonable diligence, could have learned, of the existence of the claims

19   asserted herein before the period on or around late 1998 or early 1999, shortly before [the prior

20   action] was filed"); *Hughes v. Vanderbilt University*, 215 F.3d 543 (6th Cir. 2000) (plaintiff had

21   pled that "plaintiff and class members did not know or have reason to know of their claims for

22   relief against the defendants . . . until about January 14, 1994, and later").

23       The Ninth Circuit has instructed, however, that "[t]he question of what a reasonably

24   prudent investor should have known is particularly suited to a jury determination" and that "the

25   defendant bears a considerable burden in demonstrating, at the *summary judgment stage*, that

26   the plaintiff's claim is time barred."  *Betz*, 519 F.3d at 877 (citations omitted).  The burden must

27   be at least as high on the pleadings.

28       The inference defendant urges is certainly one which could fairly be derived from the
     pleadings and may well be the inference most naturally derived therefrom.  It is not, however,

                                                    27

1   the only inference which could be drawn from the pleadings.  Plaintiffs argue, for example, that

2   the reference to July 2007 was merely a reference to the time when the fund's NAV began to

3   fall.  The Ninth Circuit declines to find inquiry notice from a mere declining account balance.

4   *Betz*, 519 F.3d at 878 n.4.  Moreover, the Ninth Circuit is particularly hesitant to find inquiry

5   notice as a matter of law where "the plaintiff alleges that the defendants' reassurances

6   convinced the plaintiff to postpone his or her legal action."  *Id*. at 877–78.  As plaintiff

7   emphasizes, Schwab continued to represent to investors after July 2007 that it was an ultra-short

8   bond fund which sought minimal risk and high share-price stability (*see, e.g.*, Compl. ¶¶

9   67–69).  Based on the reluctance in this circuit to deciding inquiry notice as a matter of law, this

10  order is unable to conclude that the reference to July 2007 constituted an admission of inquiry

11  notice.  PwC's remaining arguments — for example, that Schwab had publicly disclosed its

12  exposure to mortgage-backed securities or had discussed the difficult market conditions — are

13  unavailing because those factors did not clearly put plaintiffs on inquiry notice of

14  *misrepresentations*.  This order declines to rule, based on the pleadings alone, that the claims

15  against PwC were untimely as a matter of law.

16              **B.       Sufficiency of the Pleadings.**

17          PwC claims that defendant failed adequately to plead any material misstatements or

18  omissions.  In *Monroe*, the Ninth Circuit addressed the scope of accountants' liability under

19  Section 11.  *Monroe v. Hughes*, 31 F.3d 772 (9th Cir. 1994).  It ruled that:

20              Section 11 of the 1933 Act permits an action against an
                accountant based on material misstatements or omissions in a
21              registration statement, *but only as to those portions of the
                statement that purport to have been prepared or certified by the*
22              *accountant*.

23  *Id*. at 774 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 n.22 (1983)) (emphasis

24  added).  Section 11 itself permits accounts to be sued only "with respect to the statement in such

25  registration statement, report, or valuation, which purports to have been prepared or certified by

26  him."  15 U.S.C.A. § 77k(a)(4).

27

28

United States District Court

For the Northern District of California

1    PwC issued unqualified audit opinions for the registration statements at issue which

2    were incorporated into the registration statements themselves, stating the following (Compl. ¶

3    93; emphasis added; quotations in original):

> "[the] accompanying statements of assets and liabilities, including
> the portfolio holdings, and the related statements of operations
> and of changes in net assets and the financial highlights *present
> fairly*, in all material respects, the financial position of the" Fund
> "at [August 31, 2005, 2006 and 2007], the results of each of their
> operations for the period then ended, and the changes in each of
> their net assets and the financial highlights for each of the periods
> presented, *in conformity with accounting principles generally
> accepted in the United States of America*."

9    Because the only representation PwC is alleged to have made is that the fund's financial

10   statements "fairly present" the financial position of the fund in conformity with GAAP, the

11   complaint states a claim for accounting fraud only if it adequately pleads a material violation of

12   GAAP in the statements PwC certified.

13   Plaintiffs allege that PwC's unqualified audit opinion was rendered misleading as a

14   violation of GAAP because Schwab's internal controls were deficient.  Plaintiff claims that the

15   opinion's failure to identify internal-control problems (or its unqualified opinion despite those

16   problems), rendered the opinion misleading by inference or omission, because GAAP, plaintiff

17   alleges, imposes certain obligations on accountants with respect to internal controls:  (1) to

18   review and consider fraud risk factors including potentially deficient internal controls; (2) to

19   review and consider risks caused by the Fund management's override of internal controls; (3) to

20   review and consider the typical internal controls maintained by investment advisors; and (4) to

21   comply with SEC Rule 38a-1 (Compl. ¶ 93).  The complaint does not explain how precisely

22   GAAP gives rise to these obligations, and plaintiffs' briefing sheds no further light on the

23   issue.[13]

---

[13] Rule 38a-1, codified at 17 C.F.R. 270.38a-1, is targeted at investment companies themselves, not accountants, and it does not purport to define obligations under GAAP.  The complaint cites an AICPA standard or guide:  "*See* AICPA Audit and Accounting Guide – Investment Companies (Sect. 2.35-2.39), which incorporates Accounting Series Release No. 118 ("ASR 118")" (Compl. ¶ 93 n.10).  The complaint does not explain what the cited standards say or how they give rise to the alleged GAAP duties.  Plaintiffs have neither provided nor asked the Court to take judicial notice of those standards.  Plaintiffs do not rely on the standard in their briefing; in fact, their opposition brief does not mention the standard or otherwise explained how the alleged omission contravenes GAAP.

United States District Court

For the Northern District of California

Section 11 creates liability only for misstatements or omissions in registration statements; it does not reach all alleged accounting and audit problems. Plaintiffs have not alleged that PwC made any affirmative representations regarding internal controls in the registration statements. In fact, PwC specifically disclaimed the notion that, in issuing its audit opinion, it made any representation whatsoever with respect to the quality or adequacy of Schwab's or the fund's internal controls (West Exh. D, E; emphasis added):[14]

> we considered the Funds' internal control over financial reporting, including control activities for safeguarding securities, as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements . . . *but not for the purpose of expressing an opinion on the effectiveness of the Funds' internal control over financial reporting*.

Moreover, insofar as plaintiffs allege that PwC's failure to identify internal-control problems in its audit opinion constituted a material omission (or an unstated but implied representation) due to a GAAP violation, the allegation founders on binding Ninth Circuit precedent. In *Monroe*, the Ninth Circuit specifically rejected a claim (albeit at summary judgment) that GAAP obligated accountants to publicly identify internal-control deficiencies to investors. There, as here, "[t]he principal issues . . . [were] whether [the accountant] should have stated in its . . . audit report that it had found deficiencies in internal controls, and whether its failure to do so was a material omission actionable under § 11." *Monroe*, 31 F.3d at 774. After reviewing the duties of accountants under GAAP, the Generally Accepted Auditing Standards ("GAAS") and the standards of the American Institute of Certified Public Accountants ("AICPA"), the decision concluded as follows:

> Neither applicable professional standards, nor any legal authority of which we are aware, however, treat deficiencies in internal controls of a company as material to the audit report itself. *Such deficiencies are reported to management* because they represent matters of which management should be cognizant. *Adams*, 623 F.2d at 431 (primary function of internal controls is to signal to auditor the extent to which the auditor must test a client's records) . . . . We see no basis for holding that they should be regarded as material for purposes of § 11, which concerns matters that would have significance to the purchaser of securities in understanding what is being purchased.

---

[14] This order hereby takes judicial notice of PwC's (publicly filed) 2006 and 2007 annual reports to the board and shareholders of Schwab Investments (West Exh. D, E).

1     *Id.* at 775 (emphasis added; citations omitted).  The decision therefore specifically rejected the

2     claim here asserted — that a failure to disclose alleged internal control deficiencies to investors

3     constituted a material omission under Section 11.[15]

4             Finally, as stated, plaintiffs have not even *pled* that GAAP creates an obligation to

5     disclose internal-control problems *to investors*; rather it avers only that accountants must

6     "review and consider" such problems.  The distinction is important because, as explained,

7     courts have held that auditors must only report internal-control problems they encounter *to*

8     *management*, but not to investors.  *Monroe*, 31 F.3d at 775; *In re Van Wagoner Funds, Inc.*

9     *Securities Litigation*, 382 F. Supp. 2d 1173, 1182 (N.D. Cal. 2004).  Section 11, however, does

10    not reach misstatements or omissions other than those in registration statements.  For all of

11    these reasons, this order finds that the complaint fails to state a claim with respect to the failure

12    to disclose internal-control problems in the public audit opinions or the issuance of an

13    unqualified opinions despite the alleged internal-control problems.

14            Plaintiffs argument for a contrary result relies predominantly on *In re Metropolitan*

15    *Securities Litigation*, 532 F. Supp. 2d 1260, 1294 (E.D. Wash. 2007).  That decision

16    distinguished *Monroe* and concluded that the plaintiff *had* stated a Section 11 claim against an

17    accountant for failure to identify internal control problems in an audit opinion.  It found *Monroe*

18    "distinguishable . . . [in] two respects that may render the internal control deficiencies material."

19    *In re Metropolitan*, 532 F. Supp. 2d at 1294.

20            *First*, *Metropolitan* explained, *Monroe* "premised its ruling on the fact that the auditor

21    took additional steps to ensure the reliability of the audit report despite the alleged failures in

22    internal controls."  *Ibid*.  This basis, however, is unpersuasive.  Although as background

23    *Monroe* explained that the auditor had taken account of the weakness in internal controls by

24    performing some independent testing to verify the accuracy of the company's financial records,

25    the decision gave no indication that its holding regarding disclosure of the internal control

26    _____

27            [15] This order is cognizant that *Monroe* was decided some fifteen years ago.  This order should not be
      interpreted as rejecting the possibility that the currently applicable accounting standards or duties are different
      than those reviewed in *Monroe*.  The pleadings and briefing, however, present no reasoned basis upon which to
28    distinguish this case from *Monroe*, and therefore this order is unable ignore or revisit binding Ninth Circuit
      precedent.

United States District Court

For the Northern District of California

problems themselves hinged on the scope of the audit. *Monroe* was squarely presented with a claim that the auditor's omission of the internal-control problems was, in and of itself, a material omission under Section 11. It rejected the claim because it found no such disclosure obligation imposed on accountants by the "applicable professional standards . . . [or] legal authority," without mention of the scope, quality or accuracy of the audit.

*Second*, *Metropolitan* explained, "the Plaintiffs [had] give[n] two reasons that the alleged deficiencies were material . . . [*i.e.*, that] the deficiencies were 'serious enough to preclude an unqualified audit report for FY 2001' . . . [and that the accountant] approved and published 'untrue and misleading audited financial statements.'" *Id*. at 1294–95 (citations omitted). The former is precisely the claim rejected by *Monroe*: that GAAP somehow rendered an audit opinion misleading under Section 11 due to a failure to disclose material internal control problems to investors. The latter is an entirely distinct Section 11 claim: that the unqualified audit opinion was misleading not because it failed to disclose internal-control problems but rather because it approved faulty financial reports, *i.e.*, it erroneously stated that the certified financial reports "fairly present" the company's financial position when in actuality they did not.

Plaintiff argues that the complaint states a claim against PwC in two additional respects: (1) the complaint alleges that PwC's audit opinion was misleading because the fund mis-priced some portion of its investments and reported an inflated NAV; and (2) PwC's audit opinions contravened GAAP for failure to comply with FASB Statements of Financial Accounting Concepts Nos. 1 and 2.

The averments underpinning the former are pled in their entirety in two paragraphs of the complaint. The complaint first alleges the following (Compl. ¶ 86(h)):

> The Fund mispriced a material potion of its assets as the assets deteriorated in value and liquidity. Furthermore, the holding reports sent to investors falsely and materially misrepresented the value of securities in the Fund. For example, here is a comparison of value using a well accepted valuation technique employed by Plaintiffs' expert for just a few of the assets publicly reported in the Fund's holding reports for the time periods indicated, which demonstrates that Defendants mispriced and overstated the value of these Fund assets as evidenced by just a slice of the holding reports:

32

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

\*      \*      \*

[tables comparing valuations of fourteen assets in 2007, as reported in "Schwab Holding Reports," versus allegedly "proper" valuations of an unidentified expert]

\*      \*      \*

The foregoing tables demonstrate that the holding reports overstated the value of the Fund's holdings, and, on information and belief, there are many more examples. As a direct result, the Fund's NAV was overstated, and its financial statements were false.

The complaint proceeds to claim, with no further explanation, that the fund's registration statements and prospectuses, and PwC's certification of them, violated GAAP on account of this alleged mispricing of assets (Compl. ¶¶ 96a–b).

PwC is not alleged to have conducted the allegedly improper asset valuations itself — Schwab allegedly employed an "outside valuation vendor" for that purpose (see Compl. ¶ 94b, e). To reiterate, the only relevant statement attributed to PwC was its audit opinion, incorporated into the registration statements — that "[the] accompanying statements of assets and liabilities, including the portfolio holdings . . . present fairly, in all material respects, the financial position of the" Fund "at [August 31, 2005, 2006 and 2007]," in conformity with GAAP (Compl. ¶ 93; bracketed text in original). The allegations state a claim only if they plausibly allege that the registration statements themselves and PwC's certification of them violated GAAP.

The complaint's allegation that some unspecified financial statements were faulty for including a NAV overstated by an unspecified amount is largely conclusory and can be deemed to state an accounting claim against PwC only through a series of speculative and implausible inferences. The complaint contains no allegations whatsoever of mispriced assets prior to May 2007, and on that date the reported and "proper" prices substantially align. The listed figures indicate that the alleged price divergence between the reported and "proper" prices began only thereafter and became progressively worse. The pleadings, therefore, certainly do not support plaintiff's allegations of broad-based accounting fraud over a three-year period beginning in 2005. Furthermore, the complaint cites prices through February 2008, subsequent to the last of the PwC audit opinions at issue, and the divergence became most pronounced at that time.

33

United States District Court

For the Northern District of California

1    Even with respect to the August 2007 "Schwab holding report" — the only allegedly

2    offending report potentially aligning with the PwC opinions identified by the complaint — the

3    pleadings do not plausibly state a Section 11 claim against PwC.  As PwC emphasizes, an audit

4    opinion is not a guarantee that the financial statements are entirely without error nor an exact

5    science,[16] and the complaint offers no allegations whatsoever regarding what steps PwC did

6    take or should have taken with respect to the offending asset valuations.  It pleads no facts

7    whatsoever connecting the allegation that an outside vendor and/or management mispriced

8    fourteen assets to its sweeping, generalized allegation that *PwC's* audit opinion was faulty

9    because the "Fund's NAV was overstated, and its financial statements were false."

10    Moreover, the complaint identifies only fourteen assets alleged to have been mispriced

11    out of a portfolio of hundreds if not thousands of assets (allegedly valued at $6.5 billion at the

12    start of 2008), and even those allegations are based on an unidentified expert's unexplained

13    valuation technique.  Indeed, some of the fourteen identified assets were allegedly *undervalued*

14    while others allegedly overvalued.  Decisions have dismissed similarly sparse allegations for

15    failing plausibly to plead a *material* misrepresentation.  *See In re JP Morgan Chase Securities*

16    *Litigation*, 363 F. Supp. 2d 595, 631 (S.D.N.Y. 2005) ("Changing the accounting treatment of

17    approximately 0.3% of JPM Chase's total assets from trades to loans would not have been

18    material to investors"); *In re Countrywide Financial Corp. Securities Litigation*, 2008 WL

19    5100124 (C.D. Cal. 2008) (dismissing accounting claims for failure to plead sufficient

20    corroborating facts to permit inference of false financial statements).  The complaint fails to

21    state a plausible claim that any of PwC's audit opinions were materially misleading or violated

22    GAAP on account of the few allegedly mispriced assets listed.

23    Finally, as stated, the complaint avers an accounting violation predicated upon an

24    alleged failure to comply with FASB Statements of Financial Accounting Concepts Nos. 1 and

25

26

27

28
_____

[16] *See Monroe*, 31 F.3d at 774; *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 100–01 (1995).

34

United States District Court

For the Northern District of California

1   2 (Compl. ¶ 96c).[17]  The complaint alleges that this concept converts various alleged violations

2   discussed above — failure to disclose problems with internal controls; mispriced assets; the

3   representation that the fund was an "ultra-short bond fund" — into GAAP violations and thus

4   Section 11 violations arising from PwC unqualified audit opinion.

5         The FASB publishes Statements of Financial Accounting *Standards* as well as

6   Statements of Financial Accounting *Concepts*.  Plaintiff provides authority indicating that

7   compliance with the former is mandated by GAAP, and defendant does not argue to the

8   contrary.  Plaintiffs, however, provide no authority suggesting that the same is true of the latter.

9   In fact, FASB Concept No. 1 states the following:[18]

> Statements of Financial Accounting Concepts are intended to
> establish the objectives and concepts that the Financial
> Accounting Standards Board will use in developing standards of
> financial accounting and reporting.
>      The Board itself is likely to be the major user and thus the
> most direct beneficiary of the guidance provided by the new
> series.
>
>      *       *       *
>
> Unlike a Statement of Financial Accounting Standards, a
> Statement of Financial Accounting Concepts *does not establish*
> *generally accepted accounting principles.*

16   This order concludes, therefore, that the complaint fails to state a claim based on its allegation

17   that FASB Statements of Financial Accounting Concepts Nos. 1 and 2 convert the above-

18   described allegations — which, as stated, do not otherwise state a claim for accounting fraud —

19   into accounting-fraud claims.

20         The crux of the allegations in the complaint concern not accounting fraud but rather that

21   Schwab misrepresented to investors the fund's investment strategy and overall risk profile.

22   These matters are not intuitively deemed the accountant's responsibility, and the complaint

23

24       [17] The complaint avers that these two FASB concepts require that financial reports:  (1) "[p]rovide
25   information that was useful to present to future investors in making rational investment, credit, and similar
     decisions;" (2) "[w]ere reliable in that they represented what they purported to represent;" and (3) "[w]ere
26   complete, which means that nothing was left out of the information that may be necessary to insure that they
     validly represented underlying events and conditions" (Compl. ¶ 96c).

27       [18] Concept No. 1 at 3 (emphasis added) (*available at* http://www.fasb.org/st/#cons).  Surprisingly,
     neither side offered the FASB concepts at issue for judicial notice, but because the concepts are publicly
28   available from the FASB's website, this order nevertheless takes judicial notice of FASB Statement of Financial
     Accounting Concept No. 1 pursuant to FRE 201.

United States District Court
For the Northern District of California

pleads no facts rendering them PwC's responsibility.  Plaintiffs seek to put in play all of PwC's

accounting for the fund over a period of three years or more, based on allegations that just

fourteen assets were mispriced (by someone other than PwC) in just one of those years, without

offering any coherent allegations as to how those figures were utilized or addressed in PwC's

audits or fed into Schwab's reported financial statements.  Such allegations fail plausibly to

state an accounting-fraud claim.  PwC's motion to dismiss is therefore granted.

### 4.   SCHWAB DEFENDANTS' MOTION TO STRIKE.

The Schwab defendants move to strike portions of the complaint concerning events that

occurred after the end of the class period, and allegations regarding statements not contained in

registration statements or prospectuses.  Rule 12(f) instructs that courts "may strike from a

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous

matter."  Motions to strike generally are disfavored, however, and "should not be granted unless

the matter to be stricken clearly could have no possible bearing on the subject of the litigation . .

. .  If there is any doubt whether the portion to be stricken might bear on an issue in the

litigation, the court should deny the motion."  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp.

2d 1048, 1057 (N.D. Cal. 2004).

This order is unable to conclude that there is no doubt that the challenged allegations are

entirely irrelevant to the case.  Plaintiffs provide authority for the proposition that the post-class

allegations will be relevant to the calculation of damages for the state claims because those

claims permit damages for harm even after the lawsuit was filed.  Defendants argue to the

contrary.  The claim, at this stage, is not one regarding which there is no doubt.  Rule 12(f) is

not a vehicle by which to place contested legal issues prematurely before the court.  Similarly,

defendants contend that several of the alleged misrepresentations were not made in registration

statements or prospectuses and therefore are not actionable under Section 11 or Section 12.  The

parties dispute the breadth of the term "prospectus" as applied to plaintiff's claims, including

the effect of Rule 482.  17 C.F.R. 230.482.  This order declines to proceed statement-by-

statement at this early stage in the proceedings to settle whether numerous types of advertising

or offering materials fall within the securities laws.  At a minimum, once again, plaintiffs claim

that the alleged statements are actionable, or at least relevant, is not without doubt. For these

reasons, defendants' motion to strike is denied.

**CONCLUSION**

For all of the above-stated reasons, the Schwab defendants' motion to dismiss is

**GRANTED IN PART AND DENIED IN PART**. The independent trustees' motion to dismiss is also

**GRANTED IN PART AND DENIED IN PART**. PricewaterhouseCoopers' motion to dismiss is

**GRANTED**. Finally, the motion to strike is **DENIED**.

Plaintiff may move for leave to amend the dismissed claims by **FEBRUARY 26, 2009**.

Any such motion should be accompanied by a proposed pleading and the motion should explain

why the foregoing problems are overcome by the proposed pleading. Plaintiff must plead its

best case. Failing such a motion, all inadequately pled claims will be dismissed with prejudice.

Because the motions to dismiss are denied in part as to all defendants other than

PricewaterhouseCoopers, the discovery stay is hereby lifted with respect to all such defendants.

As stated in the Case Management Order, initial **DISCLOSURES** must be made within 21

calendar days of the date of entry of this order, *i.e.*, February 25, 2009 (Dkt. No. 161 ¶ 1).

**IT IS SO ORDERED.**

Dated: February 4, 2009.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE