United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: <br><br> CHARLES SCHWAB CORPORATION <br> SECURITIES LITIGATION. <br><br> This Document Relates <br> To All Cases. <br> _____/ | No. C 08-01510 WHA <br><br> **ORDER DENYING MOTION** <br> **FOR LEAVE TO AMEND** |

**INTRODUCTION**

In this putative securities class action, plaintiffs allege that defendants Charles Schwab Corporation and several affiliated entities and individuals misrepresented the risk profile of Schwab's YieldPlus Fund and improperly changed the fund's investment policies. Motions to dismiss filed by the Schwab defendants and the fund's independent trustees were granted in part and denied in part, and a motion to dismiss filed by PricewaterhouseCoopers, the fund's auditor, was granted. All of plaintiffs federal claims were allowed to proceed against the Schwab defendants and the independent trustees, as was one state claim: a Section 17200 claim asserting violations of shareholder voting rights afforded by the federal Investment Company Act. Plaintiffs now move for leave to amend the complaint seeking to salvage dismissed state claims. The hearing on the motion was waived. For the reasons stated below, the motion will be **DENIED**.

**STATEMENT**

Investors in Schwab's YieldPlus Fund ("fund"), a short-term fixed-income mutual fund, brought this action against (1) several Schwab corporate entities, and officers and employees thereof, (2) trustees of the fund who signed the registration statements at issue, and (3) PricewaterhouseCoopers LLP, the fund's auditor. The circumstances of the alleged violations were set forth in an earlier order and remain substantially unchanged in the proposed amended pleading (*see* Dkt. No. 164).

In brief, defendants annually filed registration statements with the SEC. They marketed and sold fund shares to investors with annual prospectuses. The prospectuses referred investors to various statements of additional information. These contained more detailed discussions of the fund's investment policies and risks. Investors were also referred to the fund's certified shareholder reports (*i.e.*, annual reports). Both were incorporated by reference into the prospectuses.

Plaintiffs allege that these documents as well as other Schwab advertisements and communications misrepresented the investment policies and risk profile of the fund. Defendants allegedly positioned the fund as an "ultra short term bond fund" which sought to keep its average portfolio duration below one year and to limit "principal risk" exposure in order to preserve capital. Instead, plaintiffs allege, the fund took on significantly greater risk by extending its average portfolio duration beyond two years.

Defendants also represented that the fund was similar to a money market fund and sought to maintain minimal changes in share price. Such representations were false, plaintiffs allege, because the fund concentrated an increasing portion of its assets — eventually more than 45 percent — in riskier mortgaged-backed and asset-backed securities. Due to such misrepresentations, plaintiffs allege, investors were unwittingly exposed to significant risks, and as the nation's mortgage crisis unfolded those risks lead to substantial losses.

A first amended complaint asserted federal claims under Sections 11, 12 and 15 of the 1933 Act. It also asserted multiple state claims: two claims for intentional interference with contractual relations (on behalf of different would-be classes); two claims for violations of

2

1  California's unfair competition laws (again on behalf of different would-be classes); and one
2  claim for breach of fiduciary duty. Motions to dismiss filed by the Schwab defendants and the
3  independent trustees were granted in part and denied in part. Plaintiffs were permitted to
4  proceed with all of their federal securities claims. They were also permitted to proceed with
5  their state unfair-competition claim, which alleges that defendants deprived shareholders an
6  opportunity to vote on changes in fund's investment policies, as required by the Investment
7  Company Act. Plaintiffs' intentional interference and fiduciary-duty claims, however, were
8  dismissed without prejudice. The claims against PricewaterhouseCoopers were dismissed in
9  their entirety. Plaintiffs now move for leave to amend in an effort to cure the dismissed state
10 claims and add one new state claim.[1]

**ANALYSIS**

Under FRCP 15(a), leave to amend a complaint shall be freely given when justice so requires, but "[l]eave to amend need not be granted when an amendment would be futile." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002). In their proposed pleading, plaintiffs re-allege the dismissed intentional-interference claims and the fiduciary-duty claim. Plaintiffs also seek to add a new breach-of-contract claim.

**1.    CONTRACT-BASED CLAIMS.**

The crux of both the intentional-interference and the breach-of-contract claims is that plaintiffs were deprived the opportunity to vote on changes in the fund's investment policies. Normally, however, any such voting rights must arise from the federal Investment Company Act. As stated, plaintiffs have already been permitted to proceed with their ICA voting-rights theory via their Section 17200 claim (plaintiffs did not allege a claim directly under the ICA itself). Plaintiffs now allege additional contract theories for the same alleged voting rights violations. Specifically, certain fund disclosure documents mention the ICA voting requirement. Plaintiffs contend that those disclosure documents — which are required by regulation — also constituted contracts between shareholders and the fund, and that defendants

---

[1] Plaintiff does not move for leave to amend the claims against defendant PricewaterhouseCoopers. The claims against PwC, therefore, are now dismissed without further leave to amend.

3

breached those contracts when they failed to afford plaintiffs a vote. Both theories require the existence of a valid contract. This order finds that no such contract has been pled.

Plaintiffs allege that "[t]he Registration Statements, Prospectuses and SAIs are part of a contract that existed between each investor on the one hand, and the Fund and Trustee Defendants on the other" (Compl. ¶ 140). Plaintiffs further describe the alleged contract as follows (Compl. ¶ 142):[2]

> Plaintiffs provided consideration in return for certain promises of performance by the defendants, and the parties had a lawful object that was part of the Contract – *i.e.*, prudent investment as defined in the Registration Statement and SAIs. Another part of the contract is the documentation provided each Plaintiff and Class member that included a written confirmation from Schwab of the number of shares purchased in the Fund, the purchase price and transaction date. These documents taken together provide consideration and constitute the terms of the agreement.

In short, plaintiffs contend that when each investor purchased shares of the fund, the investor entered a contract with the fund and each of its trustees. The contract allegedly included not only the sale of fund shares but also each and every term of the registration statements and SAIs.

Plaintiffs' breach-of-contract theory is as follows. The prospectuses and SAIs specified certain "fundamental investment policies" that could be changed "only by vote of a majority of the fund's outstanding shares." Those included, *inter alia*, that the fund could not "[c]oncentrate investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or the rules or regulations thereunder . . . ." The Investment Company Act *required* the fund to disclose its concentration policy and *required* that the policy could be changed only via shareholder vote. 15 U.S.C. 80a-8, 80a-13(a)(3). The SAI further explained:

> **The following descriptions of the 1940 Act may assist investors in understanding the above policies and restrictions**.
> \*   \*   \*
> Concentration. The SEC has presently defined concentration as investing 25% or more of an investment company's net assets in an industry or group of industries.

---
[2] Unless otherwise noted, references to the complaint herein are to the proposed amended pleading.

4

1 The alleged breach occurred when defendants changed this no-concentration policy by re-
2 defining the term "industry" to permit greater investment in mortgage-backed securities,
3 *without a shareholder vote*. The alleged breach was the failure to provide a shareholder vote;
4 the change in investment policy itself (plaintiffs have admitted) was promptly disclosed and was
5 not otherwise improper.

6 The Ninth Circuit has never addressed whether mutual fund disclosure documents
7 constitute a contract under these precise circumstances. In slightly different circumstances,
8 however, it ruled that prospectuses were *not* contractual documents. In *McKesson HBOC v.*
9 *New York State Common Retirement Fund*, a statutory merger was executed pursuant to a
10 merger agreement and, because the transaction involved offering shares, SEC regulations
11 required that a prospectus accompany the transaction. 339 F.3d 1087 (9th Cir. 2003). The
12 prospectus specifically referenced the merger agreement and detailed the terms upon which the
13 merger would become effective — a shareholder vote by both companies. Although the
14 prospectus (which detailed the "offer" of securities to investors) specifically referenced the
15 merger agreement, the Ninth Circuit ruled that it did not constitute a contract with investors nor
16 an "offer" under contract law. It explained, "[a]lthough the Securities Act refers to a prospectus
17 as a communication 'which offers any security for sale' . . . 'the term 'offer' has a different and
18 far broader meaning in securities law than in contract law.'" *Id*. at 1092.

19 Similarly, the prospectuses and SAIs here at issue are not contracts but rather are
20 *mandatory* regulatory disclosure documents. In its guide for public investors, the SEC
21 describes mutual-fund prospectuses as follows (emphasis in original):[3]

> When you purchase shares of a mutual fund, the fund *must*
> provide you with a prospectus. But you can-and should-request
> and read a fund's prospectus *before* you invest. The prospectus is
> the fund's primary selling document and contains valuable

---

[3] *See* http://www.sec.gov/answers/mfprospectustips.htm (last visited May 11, 2009). Similarly, the SEC described SAIs as follows: "Mutual funds . . . also are required to have statements of additional information (SAIs). Although funds are not required to provide investors with the SAI, they must give investors the SAI upon request and without charge. The SAI conveys information about the fund that is not necessarily needed by investors to make an informed investment decision, but that some investors find useful . . . ." *See* http://www.sec.gov/answers/mfinfo.htm (last visited May 11, 2009). This order takes judicial notice of these descriptions on the SEC's public government website.

5

> information . . . . The prospectus also acts as an "owner's manual" after you've invested in a fund . . . .
>
> The SEC requires funds to include specific categories of information in their prospectuses and to present key data (such as fees and past performance) in a standard format so that investors can more easily compare different funds.

That is, the SEC *requires* Schwab to issue those documents on a periodic basis and defines what types of information must be included. It also requires that the documents be provided to prospective investors upon request before any investment takes place. *See* 17 C.F.R. 239.15, 239.15A.

Plaintiffs offer no coherent theory as to why such documents should be deemed incorporated into a contract with each investor. For a contract to incorporate another document by reference, "[t]he reference to the incorporated document must be clear and unequivocal." *Cariaga v. Local No. 1184 Laborers Intern. Union of North America*, 154 F.3d 1072 (9th Cir. 1998) (citation omitted).

The complaint alleges that investors received "written confirmation from Schwab of the number of shares purchased in the Fund, the purchase price and transaction date." Plaintiff contends that these "individual transaction documents" provide the essential terms of the contract such as price and quantity (Reply at 1). The individual transaction documents, however, did not expressly incorporate the prospectuses and SAIs nor refer to them in any way — at least, the pleading does not so allege. Plaintiffs simply allege in conclusory fashion the existence of an overarching contract consisting of a swath of evidently distinct documents. Merely pleading such an ill-defined contract in conclusory fashion does not suffice.

Indeed, confronted with this apparent lack of connection between the disclosure documents and the share-purchase transactions, plaintiffs shift gears and argue that express language of incorporation was not needed because the disclosure documents constituted *separate agreements* with investors. As plaintiffs explain (Reply at 5; emphasis added):

> "*Several contracts* relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together" [quoting California Civil Code § 1642]. It is well established under § 1642 that where, as here, several written instruments concerning the same subject matter [are] made as part of the same transaction [they] must be construed together.

6

In support of this proposition, plaintiffs cite decisions in which parties had executed multiple agreements that expressly detailed terms of a single transaction (*e.g.*, terms of employment or insurance coverage).[4]

This "several contracts" theory is beyond the pale. Simply put, there is no plausible allegation of multiple contracts. If the prospectuses and registration statements were not incorporated into the sales transaction, how could they possibly constitute separate contracts among the parties? Plaintiffs certainly were not bound by the disclosure documents until they purchased shares, and there was no transaction among the parties *other* than the share purchase — at least, none is alleged. As stated, Schwab is required to publish the prospectuses and SAIS in accordance with SEC guidance and to make them available to *any* actual or prospective investor, even before any transaction occurs. Given the lack of any plausible allegation as to why the disclosure documents constituted (or were incorporated into) a contract, this order finds that the proposed contract-based claims are futile.

Granted, in certain circumstances prospectuses can constitute a contract. In the tender offer situation, for example, "[a] binding contract is created when the shareholder tenders his or her securities in accordance with the terms of the offer."[5] In that situation, the prospectus has been found to constitute an "offer" under contract law. As *McKesson* explained, however, offering documents under the securities laws are generally different than contract "offers" (a far narrower concept), and bare allegations will not equate the two.

Plaintiffs also cite *Lapidus v. Hecht*, which stated:

> the plaintiffs allege violations of their contractual rights as shareholders to vote on proposed changes to the short sale and senior security restrictions spelled out in the registration statement filed with the SEC. These allegations are sufficient to satisfy the injury requirement for a direct action.

---

[4] *See, e.g.*, *Kliff v. Hewlett Packard Co.*, 2008 WL 4946278 (9th Cir. 2008) (unpublished) (the parties "executed" multiple written agreements that "set forth in express terms" an employment agreement); *American Cas. Co. of Reading, Pennsylvania v. Baker*, 22 F.3d 880 (9th Cir. 1994) (a "Claims Service Agreement . . . executed contemporaneously with the Rescission Agreement" together defined insurance coverage).

[5] 6A Fletcher Cyc. Corp. § 2841.10. *See also Caleb & Co. v. E.I. DuPont de Nemours & Co.*, 615 F. Supp. 96, 102–03 (S.D.N.Y. 1985).

7

1  232 F.3d 679, 683 (9th Cir. 2000). The decision, however, did not involve contract claims but
2  rather statutory claims under the Investment Company Act. It merely addressed whether the
3  plaintiffs could bring their claim as a direct rather than derivative action. Here, plaintiffs did
4  not assert claims directly under the ICA, and their Section 17200 claims predicated on alleged
5  ICA violations have already been permitted to proceed.[6]

### 2. FIDUCIARY-DUTY CLAIM.

Plaintiffs also propose two fiduciary-duty theories. Both sides agree that, because the fund is a Massachusetts trust, Massachusetts law applies. The first theory (which was previously dismissed) is based on alleged unequal shareholder treatment. Although the theory is not entirely clear, the claim is best understood as alleging insider trading and misuse of inside information. Various affiliated Schwab entities (*e.g.*, other Schwab funds) had invested in the fund, plaintiffs allege, and "with inside knowledge of the truth of the fund" defendants caused those other entities to sell shares before the public was aware of the problems. This claim was previously dismissed because plaintiffs identified no basis for asserting the claim directly (as individual shareholders) rather than derivatively (on behalf of the fund).

Insider-trading claims are frequently asserted under the federal securities laws, but no such federal claim has been pled. Insider-trading or inside-information theories are also cognizable under state fiduciary-duty law, but such claims are classic *derivative* claims. *See, e.g.*, *In re Polymedica Corp.*, 2002 WL 1809095 (Mass. Super. 2002) (claim asserted derivatively that defendants, *inter alia*, sold shares based on inside information); *Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008) (claim asserted derivatively that defendants used material inside information improperly to time option grants). Plaintiffs assert the claim only directly (as shareholders), not derivatively. No decision has been cited nor found where such a claim has been allowed to proceed as a direct claim.

---

[6] The authority cited by *Hecht* suggests that the decision's reference to "contractual rights as shareholders" was a reference to the fact that a contract to purchase equity shares ordinarily imbues the purchaser with the rights inherent in stock ownership, including the right to vote the stock and to a ratable share of dividends. *See, e.g.*, 17 Williston on Contracts §§ 51:75, 51:82 (4th ed.); *Kramer v. Western Pac. Indus.*, 546 A.2d 348, 351 (Del. 1988).

8

If, instead, plaintiffs' theory is one of mismanagement of the corporation somehow led to diminution in the fund's assets, that too must be a derivative claim under Massachusetts law. *Stegall v. Ladner*, 394 F. Supp. 2d 358, 364 (D. Mass. 2005) ("Plaintiff's allegations relate to a diminution in the total assets of the Funds and only derivatively did this injury harm each shareholder"); *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) ("if a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor").

As explained in the order dismissing this claim, this is not a case where money was improperly diverted from some shareholders to others — the type of "unequal treatment" which has been allowed to proceed as a direct action. The proposed amendment is therefore futile as to this theory.

Plaintiffs place predominant emphasis on a new fiduciary theory predicated on alleged violation of plaintiffs' shareholder voting rights. The proposed pleading asserts the theory in its entirety in the following paragraph (Compl. ¶ 199):

> Moreover, defendants . . . breached fiduciary duties by violating the voting rights of Plaintiffs and the Pre-Breach Class by unilaterally revising the Fund's no-concentration fundamental investment policy as more particularly described above in paragraphs 139-160. This caused Plaintiffs and the members of the Pre-Breach Class an individual injury distinct from injury to the Fund itself.

Paragraphs 139–60, in turn, set forth the breach-of-contract claim. As explained, however, the contract claim fails.

In their briefing, plaintiffs shift gears and explain: "[p]laintiffs' breach-of-fiduciary-duty claim arises from certain defendants' allowing the Fund to violate shareholders' *statutory* voting rights under § 13(a) of the ICA" (Reply at 7; emphasis in original). The proposed pleading, however, does not clearly assert this claim — as stated, it references the contract allegations.

In any event, plaintiffs entirely fail to explain how the alleged violation of the ICA would activate any non-ICA fiduciary duties. Although plaintiffs do not specify a fiduciary

9

theory, the cited authority suggests reliance on the duty of loyalty. Plaintiffs fail to explain why "unilaterally revising the fund's no-concentration fundamental investment policy" in violation of a *statutory* voting requirement is a non-statutory duty-of-loyalty issue. The claim does not identify clear divided loyalties. It simply alleges that fund management invested too aggressively — without shareholder approval.

Plaintiffs cite *Coggins v. New England Patriots Football Club*, 397 Mass. 525, 530–31 (1986). That decision, however, addressed an entirely different situation: a cash freeze-out merger in which a controlling shareholder allegedly crammed an unfair merger on minority shareholders, forcing them to sell against their will at disadvantageous terms. Such conduct poses clear duty-of-loyalty problems: an individual who is both a fiduciary and a shareholder allegedly benefits at the expense of fellow (minority) shareholders by displacing them on unfair terms. As *Coggins* explained,

> The dangers of self-dealing and abuse of fiduciary duty are greatest in freeze-out situations like this merger, where a controlling stockholder and corporate director chooses to eliminate public ownership. It is in these cases that a judge should examine with closest scrutiny the motives and behavior of the controlling stockholder . . . .
>
> A controlling stockholder who is also a director standing on both sides of the transaction bears the burden of showing that the transaction does not violate fiduciary obligations.

*Id*. at 532–33 (quotations and citations omitted). This case is completely different. Plaintiffs allege that defendants changed the fund's investment policies without a shareholder vote allegedly required by the ICA. That is not a non-ICA duty-of-loyalty issue — at least, plaintiffs offer no authority so suggesting. Conclusory allegations of a fiduciary duty and breach thereof do not suffice. *TalentBurst, Inc. v. Collabera*, 567 F. Supp. 2d 261, 265 (D. Mass. 2008).[7]

Plaintiffs also cite *Lapidus v. Hecht*, 232 F.3d 679 (9th Cir. 2000). As stated, however, that decision addressed claims brought under the ICA itself, not claims seeking to re-characterize statutory ICA obligations as non-ICA fiduciary violations. *Id*. at 681 & n.4. Here,

---

[7] Plaintiffs contend in a footnote that "[t]his duty is not unique to freeze-outs and other abuses of minority shareholders. A controlling shareholder's fiduciary to minority shareholders is 'the same sort of fiduciary character' that the law 'impresses upon the directors in their relation to all the stockholders.'" That does not mean, however, that violations of any and all statutory obligations necessarily contravene those duties.

as stated, plaintiffs' Section 17200 claim based on alleged ICA violations was previously allowed to proceed (and no direct ICA claim was alleged). *Hecht* offers no support for a separate fiduciary claim based on the same alleged misconduct. For all of these reasons, the proposed fiduciary claim is futile.[8]

## CONCLUSION

For all of the above-stated reasons, plaintiffs' motion for leave to amend is **DENIED**. Because plaintiff did not move to amend the claims against PwC, moreover, the claims against PwC are hereby **DISMISSED WITHOUT FURTHER LEAVE TO AMEND**.

**IT IS SO ORDERED.**

Dated: May 15, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[8] Defendants also attempt to raise entirely new challenges to the Section 17200 claims. Those claims, however, were not dismissed. Defendants cannot raise *new* challenges to those claims in their opposition to the instant motion.

11