Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Sean R. Matt (*pro hac vice*)
Erin K. Flory (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com

Attorneys for Lead Plaintiffs, the YieldPlus Investor Group

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | SECOND CONSOLIDATED AMENDED COMPLAINT<br><br>Date Action Filed:  March 18, 2008 |

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION .................................................................................................. 1

    A.    Claims of the Securities Class ................................................................... 1

    B.    The Claims of the State-Law Class ........................................................... 4

        1.    The unapproved change in investment policy claim. ...................... 4

        2.    The insider trading claim. ................................................................ 5

    C.    Claims of the Investment Company Act Claim .......................................... 5

    D.    The Staggering Losses ............................................................................... 5

    E.    Plaintiffs' Claims ....................................................................................... 8

II.   JURISDICTION AND VENUE ............................................................................ 8

III.  PARTIES .............................................................................................................. 9

    A.    Plaintiffs .................................................................................................... 9

    B.    Defendants ................................................................................................. 9

IV.   FACTUAL ALLEGATIONS .............................................................................. 14

    A.    Introduction to the Fund ........................................................................... 14

    B.    The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund ............................................................................... 15

    C.    The Misstatements of Material Fact and Material Omissions .................. 17

        1.    The misstatements of material fact and material omissions contained in the Fund's Registration Statements and SEC-filed Prospectus materials. ...... 17

        2.    Additional misrepresentations and/or omissions regarding liquidity. ............. 38

        3.    The material misstatements and omissions in Defendants' other written selling and offering notices, circulars, advertisements, letters and communications ...... 38

        4.    The material misstatements and omissions in Defendants' oral offer and selling communications. ............ 48

    D.    The Core Misrepresentations in All Written and Oral Materials ............. 51

    E.    Defendants Failed to Treat All Shareholders Equally .............................. 63

    F.    The Fund's Management Profited Greatly from Running the Fund .......... 64

G.      Defendants' Misconduct Causes Huge Losses ........................................ 64

H.      Schwab Continues to Deny the Truth .................................................... 71

V.      CLASS ACTION ALLEGATIONS ....................................................................... 72

COUNT I  VIOLATIONS OF SECTION 11 OF THE 1933 ACT ON BEHALF OF THE
SECURITIES CLASS ............................................................................................ 74

COUNT II  VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT ON BEHALF
OF THE SECURITIES CLASS ............................................................................. 75

COUNT III  VIOLATIONS OF SECTION 15 OF THE 1933 ACT  AGAINST THE
CONTROL GROUP DEFENDANTS ON BEHALF OF THE SECURITIES CLASS ........ 76

COUNT IV  VIOLATIONS OF THE CALIFORNIA BUS. & PROF.  CODE §§ 17200 et seq.
ON BEHALF OF THE STATE-LAW CLASS ................................................................. 76

COUNT V  VIOLATIONS OF SECTION 13(A) OF THE INVESTMENT COMPANY ACT
AGAINST DEFENDANT SCHWAB INVESTMENTS ON BEHALF OF THE
SECTION 13(A) CLASS ........................................................................................ 84

COUNT VI  BREACH OF CONTRACT ON BEHALF OF THE STATE-LAW PRE-BREACH
CLASS ................................................................................................................. 85

COUNT VII  INTENTIONAL INTERFERENCE WITH CONTRACTUAL  RELATIONS
ON BEHALF OF THE STATE LAW PRE-BREACH CLASS ............................................ 86

COUNT VI  VIOLATIONS OF THE CALIFORNIA BUS. & PROF.  CODE §§ 17200 et seq.
ON BEHALF OF THE STATE LAW POST-BREACH CLASS .......................................... 87

COUNT VII  BREACH OF CONTRACT ON BEHALF OF THE STATE LAW
POST-BREACH CLASS ........................................................................................ 88

COUNT VIII  INTENTIONAL INTERFERENCE WITH CONTRACTUAL  RELATIONS
ON BEHALF OF THE STATE LAW POST-BREACH CLASS .......................................... 89

COUNT X  BREACH OF FIDUCIARY DUTY ON BEHALF OF STATE LAW CLASSES ......... 90

VI.      OTHER COUNTS ........................................................................................ 92

PRAYER FOR RELIEF ............................................................................................. 92

JURY DEMAND ...................................................................................................... 92

1  Plaintiffs, for their Second Consolidated Amended Complaint, allege the following upon

2  personal knowledge as to themselves and their own acts, and as to all other matters upon

3  information and belief, based upon the investigation made by and through their attorneys, which

4  included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press

5  releases, analyst reports, news articles, accounting and valuation experts, and other publicly

6  available materials.  To the extent the Court has dismissed claims asserted herein or not allowed

7  the claim by amendment (Count V), they are asserted now to preserve them for appeal.

8  ## I.     INTRODUCTION

9  1.     Plaintiffs bring this action against members of the Charles Schwab financial

10  services family, on behalf of persons who bought shares in the Schwab YieldPlus Fund (the

11  "Fund").  The Fund sold two classes of shares:  Investor Shares (ticker SWYPX) and Select Shares

12  (ticker SWYSX).

13  2.     Plaintiffs allege that Defendants violated federal and state law in registering,

14  marketing and selling the Fund as a stable, "ultrashort" bond fund that was a safe alternative to cash

15  and which had "minimal" risk of a fluctuating share price.  Schwab marketed the Fund as "very

16  very safe."  In fact, the Fund was not an ultrashort bond fund, let alone one that was "stable" and

17  "safe," because it was comprised of assets that were not truly short term in nature and otherwise

18  riskier than represented.  In addition, the Fund's holdings were routinely mispriced and

19  misleadingly described, obscuring their true value and the assets of the Fund.  Eventually, the true

20  risks presented by the assets held by the Fund were revealed, resulting in staggering losses to Fund

21  investors.

22  **A.     Claims of the Securities Class**

23  3.     The Registration Statement and Prospectus materials (including notes, circulars, and

24  other written communications) made fundamental and core representations to investors that the Fund

25  was subject to minimal risk.  By way of example, these representations included representations that:

26  •     The Fund is "an ultra short term bond fund designed to offer high current income

27  with minimal changes in share price."

28  •     "The Fund seeks to keep the average duration of its portfolio at one year or less."

1        •       The Fund's performance was benchmarked to the Lehman Brothers short 9-12

2                month U.S. Treasury Index.

3        •       The Fund is managed to "help maintain a high degree of share price stability and

4                preserve investors' capital."

5        •       "Looking for higher yields on your long-term cash with minimal exposure to

6                interest-rate risk? The Schwab YieldPlus Fund® could be a smart alternative."

7        •       "CDs and ultrashort bond funds such as YieldPlus funds can be used as part of your

8                portfolio cash allocation…."

9        •       "Schwab YieldPlus ultrashort bond fund offers good returns with low principal risk."

10       4.      Defendants designed these core representations in order to portray the Fund as a

11   "smart solution[] for diversification and stability of capital" and a "smart alternative for your cash."

12       5.      The foregoing representations contained untrue statements of material facts, omitted

13   to state other facts necessary to make the statements not be misleading, and/or omitted to state

14   material facts required to be stated therein.  This was the case because:

15       •       The Fund had elements of credit and liquidity risk not consistent for a fund

16               represented to be an "ultrashort bond fund."  Given the asset composition of the

17               Fund, and its resulting exposure to interest rate risk, credit risk and liquidity risk, it

18               was not a "short term bond fund designed to offer high current income with minimal

19               changes in share price."

20       •       Schwab repeatedly represented that "the Fund seeks to keep the average duration of

21               its portfolio at one year or less."  This representation regarding duration was critical

22               to the ability of the Fund to maintain a level of risk that would in fact provide

23               "minimal exposure to interest rate risk."  Duration is the measure of a security's

24               price sensitivity to changes in interest rates; the lower the duration, the lower this

25               risk.  A representation that duration is one year reflects the risk of a 1-year Treasury.

26               The actual duration of the securities held by the Fund, as calculated for Plaintiffs by

27               a sophisticated industry expert, exceeded one year during much of the Class Period,

28               a fact that indicates that the risk associated with the Fund was much greater than

1    represented.  Once all of the details relating to the illiquid securities held by the

2    Fund are revealed in discovery and included in this analysis, the actual average

3    duration of the Fund is likely to be far greater.

4    •    The Fund's performance was not comparable to the Lehman Brothers short 9-12

5    U.S. Month Treasury Index, due to the fact that the average duration of Fund assets

6    exceeded two years and its holdings had far greater credit and liquidity risk due to a

7    heavy concentration in mortgage-backed securities.

8    •    Schwab misrepresented maturity dates for securities listed in the holding reports.

9    Instead of providing the true maturity date, Schwab represented that the coupon

10    payment date was the maturity date.  This is misleading because coupon payment

11    dates are always sooner than maturity for securities that pay interim interest.  This

12    misrepresentation helped conceal the fact that the duration was not as represented.

13    •    Schwab misrepresented the description of the securities listed in the holding reports

14    sent to investors.  For example, basic descriptions of the holdings change, but basic

15    descriptions should not change over time if they were accurate in the first instance.

16    •    Schwab misrepresented the pricing of securities listed in the holding reports, thereby

17    overstating the value of securities held by the Fund and rendering the Fund's

18    financial statements false and misleading.

19    •    The asset allocation of the Fund was inconsistent with Schwab representations that

20    the Fund was managed for price stability.  For example, by May 31, 2007, 46.50%

21    of Fund assets were invested in mortgage-backed securities, and this figure grew to

22    50.10% by February 28, 2008.  Such a high concentration of securities in a single

23    asset class is completely inconsistent with the represented classification of the Fund

24    as an "ultra short bond fund" designed to have "minimal changes in share price."

25    •    Schwab failed to disclose that it lacked the risk management tools that were

26    necessary to manage the Fund to meet its stated objectives.

27    •    Schwab represented that it would not invest more than 15% of its net assets in

28    illiquid securities, when in fact from February 20, 2007, forward it did so.

SECOND CONSOLIDATED AMENDED COMPLAINT          - 3 -
No. 08-cv-01510 WHA
010036-12  326326 V1

1

2

**B.      The Claims of the State-Law Class**

        **1.      The unapproved change in investment policy claim.**

        6.      In Registration Statements and Prospectuses, Defendants agreed that the Fund's investment policy may be changed "only by vote of a majority of a fund's outstanding shares." *See*, *e.g.*, Nov. 15, 2004, Statement of Additional Information at 37.

        7.      As part of that policy, Schwab indicated that the Fund may not "concentrate" in a particular industry and adopted the Securities and Exchange Commission ("SEC") definition of "concentration" as investing 25% or more of Fund assets "in an industry or group of industries." The Fund also annually declared that it would remain fully diversified and would not concentrate holdings in any particular industry *unless a majority of the Fund's shareholders first voted to allow such concentration.*

        8.      The Fund adhered to this provision for many years.  But beginning in 2006, in an attempt to boost the Fund's competitive rate of return and to attract more shareholders, the Fund made a deliberate decision to modify and exceed the fundamental policy's 25% limitation on investing in a single industry or group of industries:  the Fund invested 28.9% of holdings in mortgage-backed securities.  Although required to do so, at no time did the Fund solicit or receive shareholder approval to exceed the 25% ceiling.

        9.      Moreover, in subsequent filings, Schwab sought to hide the change.  Buried deep in the September 1, 2006, Statement of Additional Information, Defendant Schwab Investments amended the November 15, 2005, Prospectus to redefine "single industry" so that there was no limit on the amount of mortgage-backed securities the Fund could hold.  In violation of the Investment Company Act ("ICA"), this amendment, which was made retroactive, was done without a shareholder vote.  Further, this fundamental change was not noted by any highlight, reference or separate filing, such as a customary and short "supplement" to the Prospectus.

        10.      In 2007 and 2008, again without shareholder approval, Defendants invested over 45% of Fund assets in mortgage-backed securities, with the effect of dramatically transforming the Fund into a higher risk investment.  The volatility that comes with that higher risk resulted in the

loss of billions of dollars.  The State Law Class asserts claims arising from the failure of Defendants to seek and obtain a vote prior to this change in investment policy.

       **2.**      **The insider trading claim.**

       11.      Other Schwab funds that were managed by the same persons who managed the YieldPlus Fund also invested in the Fund.  Adding insult to Class members' injuries here, before the public investors became aware of the losses that would occur in the Fund, these other Schwab funds redeemed their shares before the Fund's net asset value ("NAV") dropped.  Thus, the State Law Class also asserts claims for breach of fiduciary duty arising from the fact that other Schwab investment funds that were managed by the same entities and persons as the Fund, with inside knowledge of the truth about the Fund, liquidated their holdings in the Fund at the expense of the other Fund investors.[1]

**C.**      **Claims of the Investment Company Act Claim**

       12.      Plaintiffs also bring a claim under the Investment Company Act arising from Schwab Investment's failure to obtain a shareholder vote before investing more than 25% of the Fund's total assets in mortgage-backed securities.

**D.**      **The Staggering Losses**

       13.      By extending average duration of the portfolio in excess of two years, and by investing in 46% to 50% of portfolio assets in mortgage-backed securities, Defendants caused the Fund and its shareholders to incur billions of dollars in losses.  Shareholders have thus watched their supposedly safe, secure and good-as-cash YieldPlus shares decline from a long-standing NAV of approximately $9.70 per share to $6.19 per share as of August 29, 2008 – a drop of more than one-third, as depicted in the following chart:

---

[1] As of August 2008.

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20

14.      Morningstar dropped this fund from a five-star rating with low risk in August 2007 to a one-star rating with high risk in 2008 and noted that the Fund "has been very volatile compared with its peers."  As of August 31, 2008, Morningstar reported that the Fund was "more risky" than most funds considered "ultrashort" and that the Fund did not "stick to higher quality issues" and took on credit risk not associated with "ultrashort" funds.  The following graph published by Morningstar shows the Fund's falling returns as it deviated from its fundamental and core representations of safety and the manner in which other bond funds in the "ultrashort" category were managed.[2]

21
22
23
24
25
26
27
28

[2] In the graph, "+/- Cat" refers to the ultrashort bond fund category.

1



2

3

4

5

6

7

8

9

10

11

12

13

14          15.    On August 20, 2008, Morningstar analyst Miriam Sjobom referred to the Fund as

15  "an unmitigated disaster," noting "[a]lthough it's designed to be one of the more reliable holdings

16  in a portfolio, its sizable stakes in nonagency mortgage- and asset-backed bonds, including some

17  backed by subprime loans, have proved treacherous."  Ms. Sjobom suggested that the remaining

18  shareholders flee the Fund because they "won't be able to recoup the majority of the damage":

19                     Since our last analysis of the fund in March, it has suffered additional
                   losses and a management shakeup.  The fund is now down 31% for
20                 the 12 months ended Aug. 19, 2008, *the worst showing in the
                   ultrashort-bond category by far.*  In mid-June, Schwab replaced
21                 manager Kim Daifotis, who had led the shop's fixed-income group....

22                     Still, with its performance record in the dustbin and Schwab's
                   credibility severely dented, where can the fund go from here?  The
23                 prognosis doesn't look good.  Because many of the bonds have been
                   sold, *shareholders won't be able to recoup the majority of the
24                 damage.*  We also wouldn't be surprised to see the fund share the fate
                   of troubled rivals SSgA Yield Plus and Evergreen Ultra Short
25                 Opportunities, both of which were liquidated in recent months.
                   Shareholders have been effectively liquidating the fund already:  It
26                 has experienced the greatest amount of net outflows of any mutual
                   fund this year, with net assets dropping to $524 million at the end of
27                 July from $6.5 billion at the start of 2008.  Remaining shareholders
                   would be better off following suit.  [Emphasis added.]

28

16.     The shareholders of the Fund have now lost up to 36% of their supposedly safe cash investment.  Many are retirees, and many had put the money aside as emergency cash.  Now, much of it is gone.  The impact of the losses is revealed in a letter sent by a long-time Schwab client who had been told the Fund was "very stable," held "short term securities" and would experience only "minimal fluctuations":  "I am 79 years old and would had never switched had I not been assured … that my principal was secure."  On the other hand, Schwab made millions in fees it collected to manage the Fund, as did Schwab's representatives who received higher commissions by steering investors "cash allocations" into the highly risky Fund.

**E.     Plaintiffs' Claims**

17.     Plaintiffs bring claims under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") (15 U.S.C. §§ 77k, 77i and 77o), Section 13(a) of the Investment Company Act ("ICA"), intentional interference with contractual relations, violations of California Business & Professions Code § 17203 (unfair competition) and breach of fiduciary duty.

**II.     JURISDICTION AND VENUE**

18.     This Court has jurisdiction over the subject matter of this action under § 22 of the Securities Act, 15 U.S.C. § 77v; § 44 of the ICA, 15 U.S.C. § 80a-43; 28 U.S.C. §§ 1331, 1332(d)(2) and 1367, and the principles of pendent and supplemental jurisdiction.

19.     Venue is proper in this District pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-43, 28 U.S.C. § 139l(b).  Many of the acts giving rise to the violations of law complained of herein, including the board-of-directors meetings, the preparation and dissemination to shareholders of the Registration Statements and Prospectuses, and the decision to deviate from the Fund's fundamental policy without first obtaining shareholder approval, occurred in this District.  The Fund, Schwab, Schwab Corp., the Trust and the Investment Advisor, as described below in paragraphs 25-28, have offices in this District.

20.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

III.   PARTIES

A.   **Plaintiffs**

21.   By order entered July 2, 2008, the Court appointed the following members of the YieldPlus Investor Group as the Lead Plaintiffs for the above-named action:  Kevin O'Donnell, James Coffin, John Hill, David and Gretchen Mikelonis, and Robert Dickson (the "Lead Plaintiffs").  Lead Plaintiffs purchased Investor or Select shares of the Fund during the relevant time period pursuant to or traceable to a registration statement and prospectus at issue in this complaint and have been damaged thereby.  Gretchen Mikelonis has since withdrawn as a named plaintiff.

22.   Plaintiff Robert Levin purchased Investor and (ticker SWYPX) or Select Fund (ticker SWYSX) shares of the Fund before the Fund's investments in mortgage-backed securities exceeded 25% of assets and has been damaged thereby.

23.   Plaintiff Karl Kyzer purchased Investor and (ticker SWYPX) or Select Fund (ticker SWYSX) shares of the Fund after the Fund's investments in mortgage-backed securities exceeded 25% of assets and has been damaged thereby.

B.   **Defendants**

24.   The Defendants are all affiliated with each other and conduct business under the umbrella of the "Charles Schwab" name, which is one of the largest financial services organizations in the world.

25.   Defendant The Charles Schwab Corporation ("Schwab Corp.") is the parent company of the Charles Schwab financial services complex.  It is a holding company which engages in securities brokerage, banking services and related financial services through its subsidiaries.  Schwab Corp. is the parent company of Schwab and Schwab Investment Management, Inc.  It is headquartered at 101 Montgomery Street, San Francisco, CA 94104.

26.   Defendant Charles Schwab & Co., Inc. ("Schwab" or "Underwriter") is also headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab is the parent company of Schwab Investments.  Pursuant to a Distribution Agreement, Schwab was, during the

1    relevant time period, the principal underwriter and distributor for shares of the Fund and was the

2    Trust's agent for the purpose of the continuous offering of the Fund's shares.

3         27.    Defendant Charles Schwab Investment Management, Inc., also known as Charles

4    Schwab Investment Management Services ("Schwab Management" or the "Investment Advisor"),

5    is also headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Management

6    is the asset management arm of The Charles Schwab Corporation, with over $200 billion in assets

7    under management.  Schwab Management oversees the asset management and administration of

8    the YieldPlus Fund.  As compensation for these services, Schwab Management receives a

9    management fee from the Fund.

10        28.    Defendant Schwab Investments ("Issuer," "Trust" or "Registrant") also has its

11   headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments was

12   organized under Massachusetts law on October 26, 1990, and is a Massachusetts Business Trust.  It

13   is the Registrant for the YieldPlus Fund, the issuer of Fund shares, and performed trust services for

14   the Fund.  The YieldPlus Fund is a series of the Trust.  Defendant Charles Schwab Investment

15   Management, Inc. was paid net advisory fees by the Fund of $19,899,000, $37,797,000 and

16   $13,293,000 during the years ended 2006, 2007 and 2008.

17        29.    The relationship between the foregoing entities and the Fund is depicted in the

18   following diagram:

19

20

21

22

23

24

25

26

27

28



30.     Defendant Charles R. Schwab ("Charles Schwab") is the founder, Chairman, Chief Executive Officer and Director of The Charles Schwab Corporation.  He is also the Chairman and Trustee of Schwab Investments and the Fund.  As a result of his ownership of and interests in The Charles Schwab Corporation, Mr. Schwab is deemed by Schwab's filings with the SEC to be a controlling person of the Investment Adviser and Schwab.  Charles Schwab signed or authorized the signing of the Registration Statements and served as a trustee of Schwab Investments.

31.     Defendant Evelyn Dilsaver was President and Chief Executive Officer ("CEO") of the Fund and signed each Registration Statement effective during the relevant time period through November 15, 2006.  Dilsaver also signed each Shareholder Report and the separate certifications as Registrant's principal executive officer and principal financial officer (containing the Sarbanes Oxley certifications), as required by Rule 30a-2(a) under the ICA, attached to each certified Shareholder Report through April 7, 2007, and was a trustee of Schwab Investments.

32.     Defendant Randall W. Merk was a Trustee and then President and Chief Executive Officer of the Fund after Defendant Dilsaver left.  He was also President and Chief Officer of Schwab Management.  Defendant Merk signed each Registration Statement beginning with the November 15, 2005, Registration Statement.

33.     Defendant George Pereira has been Chief Financial Officer and Treasurer of the Fund and signed each Registration Statement beginning with the November 15, 2005, Registration Statement.  Pereira also signed each Shareholder Report and the separate certifications for Registrant's principal executive officer and principal financial officer (containing the Sarbanes Oxley certifications), as required by Rule 30a-2(a) under the ICA, attached to each certified Shareholder Report through June 12, 2007.

34.     Defendant Mariann Byerwalter ("Byerwalter") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

35.     Defendant Donald F. Doward ("Doward") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

36.     Defendant William A. Hasler ("Hasler") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

37.     Defendant Robert G. Holmes ("Holmes") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

38.     Defendant Gerald B. Smith ("Smith") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

39.     Defendant Donald R. Stephens ("Stephens") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

40.     Defendant Michael W. Wilsey ("Wilsey") is a Trustee of Schwab Investments who signed each of the Registration Statements identified in ¶ 48, *infra*.

41.     Defendant Kimon Daifotis ("Daifotis") was a senior vice president, the Chief Investment Officer of fixed income of Schwab Investments, and the Manager of the Fund since its inception in October 1999 until approximately June 13, 2008, when Schwab's SEC filings noted that he had been replaced.  He was also Senior Vice President and Head of Fixed Income Portfolio Management at Schwab Management.  On information and belief, and by way of example, due to his position as the person with "overall responsibility for the management of the funds," he participated in the written or oral communications used to market the Fund.  In order to solicit new investors Daifotis created and approved solicitation materials that contained the core

misrepresentations described herein and which featured his picture and qualifications.  *See*, *e.g.*, DAIF014098.  On information and believe Daifotis helped author "white papers" that were provided to investors and/or their advisors for the purpose of convincing them that an "ultra short bond fund" was appropriate as a cash alternative.  Daifotis also made presentations to institutional investors or their investment consultants, the purpose of which was to solicit investment in Schwab Funds including Yield Plus.  *See*, *e.g.*, DAIF014802-14841.  Daifotis prepared Quarterly Performance Summary's, one purpose of which was to solicit new investors.  These reprints claimed that Yield Plus was "a smart cash alternative" and its "consistently strong performance" was due to its management team's "disciplined investment approach."  *See*, *e.g.*, DAIF014689. Daifotis helped draft these reports.  Daifotis regularly prepared quarterly reviews of the Schwab YieldPlus Fund.  The purpose of these reviews was to solicit new investors.  In "why this product," Daifotis authored or approved the representation that "low duration" ... "can help minimize exposure...."  The review contained a picture of Daifotis and a description of his qualifications.  In sum, Schwab employees used four types of documents to solicit investors:  Schwab YieldPlus Fund Fact Sheet, Yield Plus PowerPoint Presentation, CSMIM Perspectives and the Prospectus.

42.     Defendant Matthew Hastings joined Daifotis in 2004 and was primarily responsible for the Fund's day-to-day management during the relevant time period and participated in the marketing of the Fund.

43.     The persons identified above in ¶¶ 30-42 sometimes are referred to as the "Individual Defendants."

44.     The roles of the Individual Defendants are summarized as follows:

| Registration Statement Signers |
| :---: |
| Charles Schwab |
| Evelyn Dilsaver (through Nov. 15, 2006) |
| Randall Merk (beginning Nov. 15, 2005) |
| George Pereira (beginning Nov. 15, 2005) |
| Mariann Byerwalter |
| Donald Doward |
| William Hasler |

1

| |
|---|
| Robert Holmes |
| Gerald Smith |
| Donald Stephens |
| Michael Wilsey |

| **Fund Officer Defendants** |
|---|
| Charles Schwab, *Chairman* |
| Evelyn Dilsaver, *President and CEO* (through Nov. 15, 2006) |
| Randall Merk, *President and CEO* (after Nov. 15, 2006) |
| George Pereira, *Chief Financial Officer and Treasurer* (beginning at least Nov. 15, 2005) |
| Kimon Daifotis, *Manager* (October 1999 to June 13, 2008) |
| Matthew Hastings, *Manager* (2004 to present) |

45.     Schwab Corp., Schwab, Schwab Management, Schwab Investments, and the Individual Defendants, directly or indirectly, control the Fund, both individually and collectively.

## IV.     FACTUAL ALLEGATIONS

### A.     Introduction to the Fund

46.     The Schwab YieldPlus Fund (the "Fund") is an open-ended mutual fund organized as a Massachusetts business trust registered under the Investment Company Act.  It has issued two series of securities:  Investor Shares (ticker SWYPX) and Select Shares (ticker SWYSX).  Select Shares have a much higher minimum purchase requirement – $50,000 as compared to $2,500 for Investor Shares.  Select Shares have lower expenses than the Investor Shares.

47.     The Schwab entities positioned the Fund as a purportedly safe alternative to money market funds but with a higher yield.  Throughout the relevant time period, Defendants marketed the Fund as an "ultrashort bond fund" designed to invest primarily in investment grade bonds with a duration of one year or less.  As described by the Prospectuses, the Fund's basic strategy was to achieve high income returns while avoiding the risks of interest rate fluctuations, illiquidity or share price fluctuations by focusing the Fund's portfolio in very short-term, highly rated, fixed-income securities.  The Prospectuses touted the Fund's short duration strategy as "maintain[ing] an average portfolio duration of one year or less" in order to "maintain price share stability and preserve investor capital."

SECOND CONSOLIDATED AMENDED COMPLAINT                          - 14 -
No. 08-cv-01510 WHA
010036-12  326326 V1

**B.** **The Relevant Registration Statements and SEC-Filed Prospectus Materials for the Fund**

48.    Defendants annually filed nearly identical Registration Statements and Prospectuses throughout the relevant time period in connection with the continuous offerings of the Fund's shares.  Each annual Registration Statement and Prospectus would be filed with the SEC and become effective on or about November 15.  The Fund's shares were issued to investors pursuant to the following series of Registration Statements filed with the SEC and made effective during the relevant time period, which are referred to collectively as the "Registration Statements":

- Registration Statement filed pursuant to Form N-1A on September 1, 2004, and made effective as of November 15, 2004;

- Registration Statement filed pursuant to Form N-1A on November 12, 2004, and made effective as of November 15, 2004 (the "2004 Registration Statement");

- Registration Statement filed pursuant to Form N-1A on September 2, 2005, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 15, 2005, and made effective as of November 15, 2005 (the "2005 Registration Statement");

- Registration Statement filed pursuant to Form N-1A on September 5, 2006, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 15, 2006, and made effective as of November 15, 2006 (the "2006 Registration Statement");

- Registration Statement filed  pursuant to Form N-1A on August 31, 2007, and made effective 60 days after filing;

- Registration Statement filed pursuant to Form N-1A on November 14, 2007, and made effective as of November 15, 2007 (the "2007 Registration Statement");

49.    The Fund was marketed and sold to investors pursuant to the following series of Prospectuses, which were supplemented periodically and which are referred to collectively herein as the "Prospectuses," including:

- Prospectus dated November 15, 2004 (the "2004 Prospectus");

- Prospectus dated November 15, 2004, as amended September 15, 2005;

- Prospectus dated November 15, 2005 (the "2005 Prospectus");

- Prospectus dated November 15, 2005, as amended August 17, 2005;

- Prospectus dated November 15, 2006 (the "2006 Prospectus");

- Prospectus dated November 15, 2006, as amended July 13, 2007;

- Prospectus dated November 15, 2007 (the "2007 Prospectus"); and

- Prospectus dated November 15, 2007, as amended June 13, 2008.

50.    Most of the Prospectuses, with the exception of the 2004 Prospectus, also explicitly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations.  These Prospectuses referred investors seeking more information to the SAI, which "includes a more detailed discussion of investment policies and the risks associated with various investments" and which "is incorporated by reference into the prospectus, making it legally part of the prospectus."  Schwab Investments reissued and updated the SAIs throughout the relevant time period.  Thus, the SAIs and Certified Shareholder Reports incorporated into the Prospectuses were part of the Prospectuses.  They include the following:

Statements of Additional Information

- Statement of Additional Information dated November 15, 2004;

- Statement of Additional Information dated November 15, 2004, as amended December 10, 2004;

- Statement of Additional Information dated November 15, 2004, as amended December 15, 2004;

- Statement of Additional Information dated November 15, 2004, as amended February 28, 2005;

- Statement of Additional Information dated November 15, 2004, as amended April 18, 2005;

- Statement of Additional Information dated November 15, 2004, as amended September 16, 2005;

- Statement of Additional Information dated November 15, 2005;

- Statement of Additional Information dated November 15, 2005, as amended December 9, 2005;

- Statement of Additional Information dated November 15, 2005, as amended February 1, 2006;

- Statement of Additional Information dated November 15, 2005, as amended September 1, 2006;

- Statement of Additional Information dated November 15, 2006;

- Statement of Additional Information dated November 15, 2006, as amended February 1, 2007;

- Statement of Additional Information dated November 15, 2006, as amended May 7, 2007;

- Statement of Additional Information dated November 15, 2006, as amended July 25, 2007;

- Statement of Additional Information dated November 15, 2006, as amended August 16, 2007;

- Statement of Additional Information dated November 15, 2006, as amended October 17, 2007; and

- Statement of Additional Information dated November 15, 2007.

<u>Semi-Annual and Annual Certified Shareholder Reports</u>

- Semi-annual Certified Shareholder Report dated February 29, 2004;

- Annual Certified Shareholder Report dated August 31, 2004;

- Semi-annual Certified Shareholder Report dated February 28, 2005;

- Annual Certified Shareholder Report dated August 31, 2005;

- Semi-annual Certified Shareholder Report dated February 28, 2006;

- Annual Certified Shareholder Report dated August 31, 2006;

- Semi-annual Certified Shareholder Report dated February 28, 2007;

- Annual Certified Shareholder Report dated August 31, 2007; and

- Semi-annual Certified Shareholder Report dated February 29, 2008.

51.     Each of the foregoing documents that were issued during the period March 11, 2006, through March 17, 2008, were false and misleading as described below.

**C.     The Misstatements of Material Fact and Material Omissions**

    **1.     The misstatements of material fact and material omissions contained in the Fund's Registration Statements and SEC-filed Prospectus materials.**

52.     From the November 15, 2005, Registration Statement and Prospectus onward throughout the entire relevant time period, Defendants issued and offered for sale shares of the Fund, along with associated sales materials and advertisements, including web pages which also constitute a prospectus under the securities laws.  Defendants continuously filed nearly identical Registration Statements and Prospectuses throughout the relevant time period and continued to

offer and sell the Fund's newly issued securities through notices, circulars, advertisements, letters, by radio and television, and over the Internet.

53.     The Registration Statements, Prospectuses, SAIs and Certified Shareholder Reports used throughout the relevant time period to register and offer Select and Investor Shares of the Fund to Plaintiffs and the Class contained untrue statements of material facts and omitted material facts necessary to make the statements therein not misleading.  While the Prospectuses issued during the relevant time period were not perfectly identical, they did contain many of the same untrue statements and were rendered misleading by the same omissions.  These include the following statements.

54.     November 14, 2005, Prospectus:

- "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the Fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

55.     Each of these representations in the November 14, 2005, prospectus is false for the reasons stated in ¶¶ 80-98.

56.     November 15, 2005, Prospectus, as amended August 17, 2006:

- "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER) BONDS."

- "In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk."

- "The investment adviser's credit research department analyzes and monitors the securities that the fund owns or is considering buying."

- "The fund's investment strategy is designed to offer the potential for somewhat higher yields than a money market fund, although unlike a money market fund, its share price will fluctuate.  In exchange for seeking minimal fluctuation in share

price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the Fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

- THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund invests primarily in investment-grade bonds.  The fund offers the potential for higher yields than a money market fund.  However, unlike a money market fund, its share price will fluctuate.  The fund seeks to keep the average duration of its portfolio at one year or less.

* * *

STRATEGY

- TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE (HIGH AND  CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY  THE INVESTMENT ADVISER) BONDS.  These may include fixed-, variable- or floating-rate corporate, mortgage-backed and asset-backed debt securities, collateralized mortgage obligations and convertible and preferred securities from U.S. and foreign issuers.

- In choosing securities, the fund's manager seeks to maximize current income within the limits of the fund's credit and maturity policies.  To help maintain a high degree of share price stability and preserve investors' capital, the fund seeks to keep the average duration of its portfolio at one year or less.  Duration is a tool to measure interest rate risk.  The fund may invest in bonds with effective or final maturities of any length and may invest up to 25% of its assets in lower quality bonds (sometimes called junk bonds) that are rated at least B by at least one nationally recognized statistical rating organization (NRSRO) or are the unrated equivalent as determined by the investment adviser.

* * *

- MANAGEMENT RISK.  The fund is an actively managed mutual fund.  Any actively managed mutual fund is subject to the risk that its investment adviser will make poor security selections.  The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund, but there can be no guarantee that they will produce the desired results.  In addition, the investment adviser's maturity and duration decisions also will affect the fund's performance.  To the extent that the investment adviser  anticipates interest rate trends imprecisely, the fund could also miss yield opportunities or its share price could fall.

57.    Each of the foregoing representations is false for the reasons stated in ¶¶ 80-98.

58.    November 15, 2006, Prospectus:

- "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

* * *

- STRATEGY  TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER).  The fund may invest in bonds from diverse market sectors based on changing economic, market, industry and issuer conditions. The fund may invest in fixed, variable or floating rate bonds issued by U.S. and non-U.S. issuers including, without limitation, Treasuries and agency securities, corporate bonds, commercial and residential mortgage-backed securities, collateralized mortgage obligations, asset-backed securities, corporate loans, preferred and convertible securities.  To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less.

- The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price.  The fund is an ultra-short bond fund and is not a money market fund.  The fund has a higher risk profile than a money market fund (please see the Principal risks section) and, unlike a money market fund, its share price will fluctuate.  As an ultra-short bond fund, the fund is not subject to the maturity, credit or diversification limitations of a money market fund and may invest in financial instruments that a money market fund may not purchase.  For example, the fund may invest in bonds with effective or final maturities of any length and may invest up to 25% of its assets in below investment grade bonds (sometimes called junk bonds) that are rated at least B by at least one nationally recognized statistical rating organization (NRSRO) or are the unrated equivalent as determined by the investment adviser.  In the event a portfolio security is no longer rated at least B by at least one NRSRO or the unrated equivalent as determined by the investment adviser, the manager will promptly sell the security.

* * *

- MANAGEMENT RISK.  The fund is an actively managed mutual fund.  Any actively managed mutual fund is subject to the risk that its investment adviser will make poor security selections.  The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund, but there can be no guarantee that they will produce the desired results.  In addition, the investment adviser's maturity and duration decisions also will affect the fund's performance.  To the extent that the investment adviser anticipates interest rate trends imprecisely, the fund could also miss yield opportunities or its share price could fall.

59.    Each of the foregoing representations is false for the reasons stated in ¶¶ 80-98.

60.    November 15, 2006, Prospectus, as amended July 13, 2007:

- "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund seeks to keep the average duration of its portfolio at one year or less."

SECOND CONSOLIDATED AMENDED COMPLAINT                        - 22 -
No. 08-cv-01510 WHA
010036-12  326326 V1

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

* * *

STRATEGY

- TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH  AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED  BY THE INVESTMENT ADVISER).  The fund may invest in bonds from diverse market  sectors based on changing economic, market, industry and issuer conditions.  The fund may invest in fixed, variable or floating rate bonds issued by U.S. and non-U.S. issuers including, without limitation, Treasuries and agency securities, corporate bonds, commercial and residential mortgage-backed  securities, collateralized mortgage obligations, asset-backed securities, corporate loans, preferred and convertible securities.  To help maintain share price stability and preserve investor capital, the fund seeks to maintain an  average portfolio duration of one year or less.

- • The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price. The fund is an ultra-short bond fund and is not a money market fund. The fund has a higher risk profile than a money market fund (please see the Principal risks section) and, unlike a money market fund, its share price will fluctuate. As an ultra-short bond fund, the fund is not subject to the maturity, credit or diversification limitations of a money market fund and may invest in financial instruments that a money market fund may not purchase. For example, the fund may invest in bonds with effective or final maturities of any length and may invest up to 25% of its assets in below investment grade bonds (sometimes called junk bonds) that are rated at least B by at least one nationally recognized statistical rating organization (NRSRO) or are the unrated equivalent as determined by the investment adviser. In the event a portfolio security is no longer rated at least B by at least one NRSRO or the unrated equivalent as determined by the investment adviser, the manager will promptly sell the security.

* * *

- • MANAGEMENT RISK. The fund is an actively managed mutual fund. Any actively managed mutual fund is subject to the risk that its investment adviser will make poor security selections. The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund, but there can be no guarantee that they will produce the desired results. In addition, the investment adviser's maturity and duration decisions also will affect the fund's performance. To the extent that the investment adviser anticipates interest rate trends imprecisely, the fund could also miss yield opportunities or its share price could fall.

61. Each of these representations is false for the reasons stated in ¶¶ 80-98.

62. November 15, 2007, Prospectus:

- • "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price. The fund seeks to keep the average duration of its portfolio at one year or less."

- • "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- • "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- • "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- • "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN SHORT U.S. TREASURY:  9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable to market timing strategies than other types of fixed income or equity mutual funds."

* * *

STRATEGY

- TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER).  The fund may invest in bonds from diverse market sectors based on changing economic, market, industry and issuer conditions.  The fund may invest in fixed, variable or floating rate bonds issued by U.S. and non-U.S. issuers including, without limitation, Treasuries and agency securities, corporate bonds, commercial and residential mortgage-backed securities, collateralized mortgage obligations, asset-backed securities, corporate loans, preferred and convertible securities.  To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less.

- The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price.  The fund is an ultra-short bond fund and is not a money market fund.  The fund has a higher risk profile than a money market fund (please see the Principal risks section) and, unlike a money market fund, its share price will fluctuate.  As an ultra-short bond fund, the fund is not subject to the maturity, credit or diversification limitations of a money market fund and may invest in financial instruments that a money market fund may not purchase.  For example, the fund may invest in bonds with effective or final maturities of any length and may invest up to 25% of its assets in below investment grade bonds (sometimes called junk bonds) that are rated, at the time of investment, at least B by at least one nationally recognized statistical rating organization (NRSRO) or are the unrated equivalent as determined by the investment adviser.  If a bond is downgraded below B or the unrated equivalent, the fund may continue to hold it unless the risk of holding the bond is unacceptable when compared to the bond's total return potential.

* * *

- MANAGEMENT RISK.  The fund is an actively managed mutual fund.  Any actively managed mutual fund is subject to the risk that its investment adviser will make poor security selections.  The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund, but there can be no guarantee that they will produce the desired results.  In addition, the investment adviser's maturity and duration decisions also will affect the fund's performance.  To the extent that the investment adviser anticipates interest rate trends imprecisely, the fund could also miss yield opportunities or its share price could fall.

63.     Each of the foregoing representations is false for the reasons stated in ¶¶ 80-98.

64.     November 15, 2007, Prospectus, as amended June 13, 2008:

- "THE SCHWAB YIELDPLUS FUND® is an ultra short-term bond fund, designed to offer high current income with minimal changes in share price.  The fund seeks to keep the average duration of its portfolio at one year or less."

- "THE FUND SEEKS HIGH CURRENT INCOME WITH MINIMAL CHANGES IN SHARE PRICE."

- "TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY THE INVESTMENT ADVISER)."

- "To help maintain share price stability and preserve investor capital, the fund seeks to maintain an average portfolio duration of one year or less."

- "The fund's investment strategy is designed to offer higher yields than a money market fund while seeking minimal changes in share price."

- "The fund's investment adviser applies its own investment techniques and risk analyses in making investment decisions for the fund. . . ."

- "INVESTMENT STYLE RISK.  In exchange for seeking minimal fluctuation in share price, the fund may offer lower long-term performance than stock investments or certain other bond investments."

- The Prospectus compared the Fund's average annual total returns to the "LEHMAN SHORT U.S. TREASURY:  9-12 MONTHS*" index.

- "TRADE ACTIVITY MONITORING.  The Schwab YieldPlus Fund is an ultra-short bond fund that seeks a high degree a [sic] share price stability.  Because of its historical ability to minimize its share price fluctuations, the fund is less vulnerable

1    to market timing strategies than other types of fixed income or equity mutual
2    funds."

3                                        * * *

4    STRATEGY

5    •    TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN
          INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM QUALITY,
6         AAA TO BBB- OR THE UNRATED EQUIVALENT AS DETERMINED BY
          THE INVESTMENT ADVISER).  The fund may invest in bonds from diverse
7         market sectors based on changing economic, market, industry and issuer conditions.
          The fund may invest in fixed, variable or floating rate bonds issued by U.S. and
8         non-U.S. issuers including, without limitation, Treasuries and agency securities,
          corporate bonds, commercial and residential mortgage-backed securities,
9         collateralized mortgage obligations, asset-backed securities, corporate loans,
10        preferred and convertible securities.  To help maintain share price stability and
          preserve investor capital, the fund seeks to maintain an average portfolio duration of
11        one year or less.

12   •    The fund's investment strategy is designed to offer higher yields than a money
          market fund while seeking minimal changes in share price.  The fund is an ultra-
13        short bond fund and is not a money market fund.  The fund has a higher risk profile
          than a money market fund (please see the Principal risks section) and, unlike a
14        money market fund, its share price will fluctuate.  As an ultra-short bond fund, the
          fund is not subject to the maturity, credit or diversification limitations of a money
15        market fund and may invest in financial instruments that a money market fund may
          not purchase.  For example, the fund may invest in bonds with effective or final
16        maturities of any length and may invest up to 25% of its assets in below investment
          grade bonds (sometimes called junk bonds) that are rated, at the time of investment,
17        at least B by at least one nationally recognized statistical rating organization
          (NRSRO) or are the unrated equivalent as determined by the investment adviser.  If
18        a bond is downgraded below B or the unrated equivalent, the fund may continue to
19        hold it unless the risk of holding the bond is unacceptable when compared to the
          bond's total return potential.
20
21                                        * * *

22   •    MANAGEMENT RISK.  The fund is an actively managed mutual fund.  Any
          actively managed mutual fund is subject to the risk that its investment adviser will
23        make poor security selections.  The fund's investment adviser applies its own
          investment techniques and risk analyses in making investment decisions for the
24        fund, but there can be no guarantee that they will produce the desired results.  In
          addition, the investment adviser's maturity and duration decisions also will affect
25        the fund's performance.  To the extent that the investment adviser anticipates
          interest rate trends imprecisely, the fund could also miss yield opportunities or its
26        share price could fall.
27

28        65.    Each of these representations is false for the reasons stated in ¶¶ 80-98.

SECOND CONSOLIDATED AMENDED COMPLAINT          - 27 -
No. 08-cv-01510 WHA
010036-12  326326 V1

66.     While the SAIs issued during the relevant time period were not identical, they did contain many of the same untrue statements and were rendered misleading by the same omissions for the reasons stated in ¶¶ 80-98.  These include the following statements:

November 15, 2005, SAI, as amended February 1, 2006:

- The fund's investment objective is to seek high current income with minimal changes in share price.

November 15, 2005, SAI, as amended September 1, 2006:

- "The fund's investment objective is to seek high current income with minimal changes in share price."

- DURATION was developed as a more precise alternative to the concept of "Maturity." Traditionally, a debt obligation's maturity has been used as a proxy for the sensitivity of the security's price to changes in interest rates (which is the "interest rate risk" or "volatility" of the security).  However, maturity measures only the time until a debt obligation provides its final payment, taking no account of the pattern of the security's payments prior to maturity.  In contrast, duration incorporates a bond's yield, coupon interest payments, final maturity, call and put features and prepayment exposure into one measure.  Duration is the magnitude of the change in the price of a bond relative to a given change in market interest rates. Duration management is one of the fundamental tools used by the investment adviser. With respect to the Schwab YieldPlus Fund, Schwab Tax-Free YieldPlus Fund and Schwab California Tax-Free YieldPlus Fund TM, each seeks to keep the average duration of its overall portfolio at one year or less.  For each of these funds, there may be times when the portfolio's average duration is more than one year.

- Suitable hedging transactions may not be available in all circumstances and there can be no assurance that a fund will engage in such transactions at any given time or from time to time.  Also, such transactions may not be successful and may eliminate any chance for a fund to benefit from favorable fluctuations in relevant foreign currencies.  The Tax-Free Bond Funds do not engage in foreign currency transactions.  Forwards will be used primarily to adjust the foreign exchange exposure of a fund with a view to protecting the outlook, and a fund might be expected to enter into such contracts under the following circumstances:

- MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities.  MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

* * *

- CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries.  Concentration increases investment exposure.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment

adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets. Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities. The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

* * *

- Suitable hedging transactions may not be available in all circumstances and there can be no assurance that a fund will engage in such transactions at any given time or from time to time. Also, such transactions may not be successful and may eliminate any chance for a fund to benefit from favorable fluctuations in relevant foreign currencies. The Tax-Free Bond Funds do not engage in foreign currency transactions. Forwards will be used primarily to adjust the foreign exchange exposure of a fund with a view to protecting the outlook, and a fund might be expected to enter into such contracts under the following circumstances:

* * *

- MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities. MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

November 15, 2006, SAI:

- The fund's investment objective is to seek high current income with minimal changes in share price.

* * *

1      SCHWAB YIELDPLUS FUND®

2 •      The fund's investment objective is to seek high current income with minimal changes in share price.

3      * * *

4

5 •      CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries.  Concentration increases investment exposure.  Based on the characteristics of mortgage-backed securities, the funds have determined that mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy.  This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.  Such developments may include changes in interest rates, state or federal legislation affecting both commercial and residential mortgages and their issuers, and changes in the overall economy.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures.  A fund will limit its investments in each identified industry to less than 25% of its total assets. Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities.

18      * * *

19 •      DURATION was developed as a more precise alternative to the concept of "maturity."  Traditionally, a debt obligation's maturity has been used as a proxy for the sensitivity of the security's price to changes in interest rates (which is the "interest rate risk" or "volatility" of the security).  However, maturity measures only the time until a debt obligation provides its final payment, taking no account of the pattern of the security's payments prior to maturity.  In contrast, duration incorporates a bond's yield, coupon interest payments, final maturity, call and put features and prepayment exposure into one measure.  Duration is the magnitude of the change in the price of a bond relative to a given change in market interest rates. Duration management is one of the fundamental tools used by the investment adviser.  With respect to the Schwab YieldPlus Fund, Schwab Tax-Free YieldPlus Fund and Schwab California Tax-Free YieldPlus Fund TM, each seeks to keep the average duration of its overall portfolio at one year or less.  For each of these funds, there may be times when the portfolio's average duration is more than one year.

26      * * *

27 •      Suitable hedging transactions may not be available in all circumstances and there can be no assurance that a fund will engage in such transactions at any given time or

from time to time. Also, such transactions may not be successful and may eliminate any chance for a fund to benefit from favorable fluctuations in relevant foreign currencies. The Tax-Free Bond Funds do not engage in foreign currency transactions. Forwards will be used primarily to adjust the foreign exchange exposure of a fund with a view to protecting the outlook, and a fund might be expected to enter into such contracts under the following circumstances:

* * *

• MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities. MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

November 15, 2006, SAI, as amended February 1, 2007:

• The fund's investment objective is to seek high current income with minimal changes in share price.

* * *

• The fund's investment objective is to seek high current income with minimal changes in share price.

* * *

• CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. Based on the characteristics of mortgage-backed securities, the funds have determined that mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting both commercial and residential mortgages and their issuers, and changes in the overall economy. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics are, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets. Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities,

which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities.

\* \* \*

- DURATION was developed as a more precise alternative to the concept of "maturity." Traditionally, a debt obligation's maturity has been used as a proxy for the sensitivity of the security's price to changes in interest rates (which is the "interest rate risk" or "volatility" of the security). However, maturity measures only the time until a debt obligation provides its final payment, taking no account of the pattern of the security's payments prior to maturity. In contrast, duration incorporates a bond's yield, coupon interest payments, final maturity, call and put features and prepayment exposure into one measure. Duration is the magnitude of the change in the price of a bond relative to a given change in market interest rates. Duration management is one of the fundamental tools used by the investment adviser. With respect to the Schwab YieldPlus Fund, Schwab Tax-Free YieldPlus Fund and Schwab California Tax-Free YieldPlus Fund TM, each seeks to keep the average duration of its overall portfolio at one year or less. For each of these funds, there may be times when the portfolio's average duration is more than one year.

\* \* \*

- MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities. MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

November 15, 2006, SAI, as amended May 7, 2007:

- The fund's investment objective is to seek high current income with minimal changes in share price.

\* \* \*

- CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. Based on the characteristics of mortgage-backed securities, the funds have determined that mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting both commercial and residential mortgages and their issuers, and changes in the overall economy. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded

(or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures.  A fund will limit its investments in each identified industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities.

\* \* \*

- MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities.  MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

November 15, 2006, SAI, as amended July 25, 2007:

- The fund's investment objective is to seek high current income with minimal changes in share price.

- The fund's investment objective is to seek high current income with minimal changes in share price.

\* \* \*

- CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries.  Concentration increases investment exposure.  Based on the characteristics of mortgage-backed securities, the funds have determined that mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy.  This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.  Such developments may include changes in interest rates, state or federal legislation affecting both commercial and residential mortgages and their issuers, and changes in the overall economy.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures.  A fund will limit its investments in each identified industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar

1   projects, such as those relating to education, health care, transportation, and utilities,
    which may make them more sensitive to certain adverse economic, business or
2   political developments affecting issuers of such securities.

3                                          * * *

4   •   Suitable hedging transactions may not be available in all circumstances and there
        can be no assurance that a fund will engage in such transactions at any given time or
5       from time to time.  Also, such transactions may not be successful and may eliminate
        any chance for a fund to benefit from favorable fluctuations in relevant foreign
6       currencies.  The Tax-Free Bond Funds do not engage in foreign currency
        transactions.  Forwards will be used primarily to adjust the foreign exchange
7       exposure of a fund with a view to protecting the outlook, and a fund might be
        expected to enter into such contracts under the following circumstances:

8                                          * * *

9
10  •   MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED
        SECURITIES may be purchased by a fund.  MBS represent participations in
11      mortgage loans, and include pass-through securities, collateralized mortgage
        obligations and stripped mortgage-backed securities.  MBS may be issued or
12      guaranteed by U.S. government agencies or instrumentalities, such as the
        Government National Mortgage Association (GNMA or Ginnie Mae) and the
        Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal
13      Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

14  November 15, 2006, SAI, as amended August 16, 2007:

15  •   The fund's investment objective is to seek high current income with minimal
        changes in share price.
16
17                                         * * *

18  SCHWAB YIELDPLUS FUND®

19  •   The fund's investment objective is to seek high current income with minimal
        changes in share price.
20
                                           * * *
21  •   CONCENTRATION means that substantial amounts of assets are invested in a
        particular industry or group of industries.  Concentration increases investment
22      exposure.  Based on the characteristics of mortgage-backed securities, the funds
        have determined that mortgage-backed securities issued by private lenders and not
23      guaranteed by U.S. government agencies or instrumentalities are not part of any
        industry for purposes of a fund's concentration policy.  This means that a fund may
24      invest more than 25% of its total assets in privately-issued mortgage-backed
        securities, which may cause the fund to be more sensitive to adverse economic,
25      business or political developments that affect privately-issued mortgage-backed
        securities.  Such developments may include changes in interest rates, state or federal
26      legislation affecting both commercial and residential mortgages and their issuers,
        and changes in the overall economy.  For purposes of a fund's concentration policy,
27      the fund will determine the industry classification of asset-backed securities based
        upon the investment adviser's evaluation of the risks associated with an investment
28      in the underlying assets.  For example, asset-backed securities whose underlying

SECOND CONSOLIDATED AMENDED COMPLAINT                    - 34 -
No. 08-cv-01510 WHA
010036-12  326326 V1

1   assets share similar economic characteristics because, for example, they are funded
2   (or supported) primarily from a single or similar source or revenue stream will be
    classified in the same industry sector.  In contrast, asset-backed securities whose
3   underlying assets represent a diverse mix of industries, business sectors and/or
    revenue streams will be classified into distinct industries based on their underlying
4   credit and liquidity structures.  A fund will limit its investments in each identified
    industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds may
5   invest more than 25% of its total assets in municipal securities financing similar
    projects, such as those relating to education, health care, transportation, and utilities,
6   which may make them more sensitive to certain adverse economic, business or
    political developments affecting issuers of such securities.

7                                          * * *

8   •     Suitable hedging transactions may not be available in all circumstances and there
          can be no assurance that a fund will engage in such transactions at any given time or
9         from time to time.  Also, such transactions may not be successful and may eliminate
          any chance for a fund to benefit from favorable fluctuations in relevant foreign
10        currencies.  The Tax-Free Bond Funds do not engage in foreign currency
          transactions.  Forwards will be used primarily to adjust the foreign exchange
11        exposure of a fund with a view to protecting the outlook, and a fund might be
          expected to enter into such contracts under the following circumstances:

12                                         * * *

13
14  •     MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED
          SECURITIES may be purchased by a fund.  MBS represent participations in
          mortgage loans, and include pass-through securities, collateralized mortgage
15        obligations and stripped mortgage-backed securities.  MBS may be issued or
          guaranteed by U.S. government agencies or instrumentalities, such as the
16        Government National Mortgage Association (GNMA or Ginnie Mae) and the
          Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal
17        Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

18  November 15, 2006, SAI, as amended October 17, 2007:

19  •     The fund's investment objective is to seek high current income with minimal
          changes in share price.
20
                                           * * *
21
22  SCHWAB YIELDPLUS FUND®

23  •     The fund's investment objective is to seek high current income with minimal
          changes in share price.
24
                                           * * *
25  •     CONCENTRATION means that substantial amounts of assets are invested in a
          particular industry or group of industries. Concentration increases investment
26        exposure.  Based on the characteristics of mortgage-backed securities, the funds
          have determined that mortgage-backed securities issued by private lenders and not
27        guaranteed by U.S. government agencies or instrumentalities are not part of any
          industry for purposes of a fund's concentration policy.  This means that a fund may
28        invest more than 25% of its total assets in privately-issued mortgage-backed

securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.  Such developments may include changes in interest rates, state or federal legislation affecting both commercial and residential mortgages and their issuers, and changes in the overall economy.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures.  A fund will limit its investments in each identified industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities.

* * *

- Suitable hedging transactions may not be available in all circumstances and there can be no assurance that a fund will engage in such transactions at any given time or from time to time.  Also, such transactions may not be successful and may eliminate any chance for a fund to benefit from favorable fluctuations in relevant foreign currencies.  The Tax-Free Bond Funds do not engage in foreign currency transactions.  Forwards will be used primarily to adjust the foreign exchange exposure of a fund with a view to protecting the outlook, and a fund might be expected to enter into such contracts under the following circumstances:

* * *

- MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED SECURITIES may be purchased by a fund. MBS represent participations in mortgage loans, and include pass-through securities, collateralized mortgage obligations and stripped mortgage-backed securities.  MBS may be issued or guaranteed by U.S. government agencies or instrumentalities, such as the Government National Mortgage Association (GNMA or Ginnie Mae) and the Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

November 15, 2007, SAI:

- The fund's investment objective is to seek high current income with minimal changes in share price.

* * *

SCHWAB YIELDPLUS FUND®

- The fund's investment objective is to seek high current income with minimal changes in share price.

* * *

1

2    • CONCENTRATION means that substantial amounts of assets are invested in a
         particular industry or group of industries.  Concentration increases investment
3        exposure.  Based on the characteristics of mortgage-backed securities, the funds
         have determined that mortgage-backed securities issued by private lenders and not
4        guaranteed by U.S. government agencies or instrumentalities are not part of any
         industry for purposes of a fund's concentration policy.  This means that a fund may
5        invest more than 25% of its total assets in privately-issued mortgage-backed
         securities, which may cause the fund to be more sensitive to adverse economic,
6        business or political developments that affect privately-issued mortgage-backed
         securities.  Such developments may include changes in interest rates, state or federal
7        legislation affecting both commercial and residential mortgages and their issuers,
         and changes in the overall economy.  For purposes of a fund's concentration policy,
8        the fund will determine the industry classification of asset-backed securities based
         upon the investment adviser's evaluation of the risks associated with an investment
9        in the underlying assets.  For example, asset-backed securities whose underlying
         assets share similar economic characteristics because, for example, they are funded
10       (or supported) primarily from a single or similar source or revenue stream will be
         classified in the same industry sector.  In contrast, asset-backed securities whose
11       underlying assets represent a diverse mix of industries, business sectors and/or
         revenue streams will be classified into distinct industries based on their underlying
12       credit and liquidity structures.  A fund will limit its investments in each identified
         industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds may
13       invest more than 25% of its total assets in municipal securities financing similar
         projects, such as those relating to education, health care, transportation, and utilities,
14       which may make them more sensitive to certain adverse economic, business or
         political developments affecting issuers of such securities.

15                                              * * *

16   • Suitable hedging transactions may not be available in all circumstances and there
         can be no assurance that a fund will engage in such transactions at any given time or
17       from time to time.  Also, such transactions may not be successful and may eliminate
         any chance for a fund to benefit from favorable fluctuations in relevant foreign
18       currencies.  The Tax-Free Bond Funds do not engage in foreign currency
         transactions.  Forwards will be used primarily to adjust the foreign exchange
19       exposure of a fund with a view to protecting the outlook, and a fund might be
         expected to enter into such contracts under the following circumstances:

20                                              * * *

21

22   • MORTGAGE-BACKED SECURITIES ("MBS") and other ASSET-BACKED
         SECURITIES may be purchased by a fund.  MBS represent participations in
23       mortgage loans, and include pass-through securities, collateralized mortgage
         obligations and stripped mortgage-backed securities.  MBS may be issued or
24       guaranteed by U.S. government agencies or instrumentalities, such as the
         Government National Mortgage Association (GNMA or Ginnie Mae) and the
25       Federal National Mortgage Association (FNMA or Fannie Mae) or the Federal
         Home Loan Mortgage Corporation (FHLMC or Freddie Mac).

26

27       67.    Each of the foregoing representations in the SAIs were misleading for the reasons

     stated in ¶¶ 80-98.

28

SECOND CONSOLIDATED AMENDED COMPLAINT            - 37 -
No. 08-cv-01510 WHA
010036-12  326326 V1

68.     Semi-annually, throughout the relevant time period, Schwab Investments also issued Certified Reports to Shareholders of the Fund.  Each report discussed the performance of the Fund, its holdings and its duration.

**2.     Additional misrepresentations and/or omissions regarding liquidity.**

69.     In addition each SAI represented that the Fund "would not invest more than 15% of its net assets in illiquid securities."

70.     Each SAI defined illiquid as follows:

> **Illiquid Securities** generally are any securities that cannot be disposed of promptly and in the ordinary course of business at approximately the amount at which a fund has valued the instruments.  The liquidity of a fund's investments is monitored under the supervision and direction of the Board of Trustees. Investments currently not considered liquid include repurchase agreements not maturing within seven days and certain restricted securities.

**3.     The material misstatements and omissions in Defendants' other written selling and offering notices, circulars, advertisements, letters and communications.**

71.     Throughout the relevant time period, Defendants were also offering and selling shares of the Fund pursuant to a barrage of glossy brochures, letters and advertisements, including web pages.  These notices, circulars, advertisements, letters and communications also constitute a prospectus under the securities laws.  Defendants created and distributed these materials as part of a consistent and coordinated marketing scheme to market the Fund to investors as a higher-yielding "smart" alternative to cash, CDs and money-market funds, which offer a combination of safety and liquidity, or the ability to quickly access cash.

72.     Defendants' website was a key part of Defendants' selling efforts and a tool used by Defendants to convince investors to pour their cash portfolio allocations into the risky Fund. Representations on the website during the relevant time period made materially inaccurate for the reasons stated in ¶¶ 80-98, and by the omission of material facts, included:

    a.     "If you are looking for higher yields on your cash with only marginally higher risk, the Schwab YieldPlus Fund could be a smart alternative."

    b.     Defendants advertised the Fund as fitting into a peer group of Morningstar "ultrashort bond funds" which has only slightly more risk than a money market fund.  The

following chart was and is used by Schwab on its website to emphasize the low risk of the

Fund in comparison to a money market fund:



      c.     Defendants advertised the Fund as having a goal to preserve principal while

being "designed with your income needs in mind."

      d.     Schwab advertised the Fund as a "cash equivalent" on its website.  This

language was removed recently.  Notably, Schwab's website, http://www.schwab.com, has

multiple menus for investments on its home page.  Under each of these menus is a selection

of investments including "CDs & Money Markets."  The "Investments Products" web page

also has a link entitled "CDs & Money Markets."  Above that link, Schwab stated, "Find

smart solutions for diversification and stability of capital."  Once the investor clicked to the

"CD & Money Markets" web page, the investor is presented with three options, including

"Explore Cash Solutions" (as well as a box for the Fund stating "Earn higher yields on your

long-term cash with minimal exposure to interest rate risk.  Learn more.").  On the "Explore

Cash Solutions" link page Schwab promises "Great rates on a wide variety of cash

solutions; Earn high returns and meet both your everyday and long-term cash management

needs."  Schwab included the Fund as a choice along with two money market funds and

three CD choices, stating "Earn higher yields on your long-term cash with minimal

exposure to interest rate risk."

      e.     The "Discover a smart alternative for your cash" web page.  The link to the

Fund in the "CD & Money Market" web page, above, led to a new page for the Fund

entitled as of February 2007 "Discover a smart alternative for your cash":

1

**Discover a smart alternative for your cash**

2

Looking for higher yields on your long-term cash with minimal exposure to interest-rate risk?  The Schwab YieldPlus Fund® could

3

be a smart alternative.

4

The YieldPlus Fund offer

5

**High yields**—As you consider alternatives for your cash, this actively managed ultrashort bond fund offers a history of solid

6

returns (see chart below) and attractive 30-day SEC yields.

7

**Minimal interest-rate risk**—YieldPlus is managed to help minimize exposure to interest rate risk.  Its share price (NAV) has fluctuated by

8

no more than $0.04 (between $9.65 and $9.69) over the year ending 1/31/2007, giving it the relative stability necessary in today's market.

9

What is NAV?

10

**Best-in-class performance**—Morningstar has given YieldPlus Fund Select Shares a five-star overall rating.  And Lipper ranked the fund

11

in the top 10% for the one, three and five year periods ending 1/31/2007.

12

f.        The "Discover a smart alternative for your cash" page also touted the Fund's

13

Morningstar ratings and Comparison to its peers and the Lipper Ultrashort Bond Category:

14

**Overall Morningstar Rating™**

15

★ ★ ★ ★ ★

16

**Select Shares**

17

★ ★ ★ ★ ★

18

**Investor Shares**

19

The Overall Morningstar Rating out of 113 funds in the Ultrashort

20

Bond Category as of 1/31/2007 is derived from the weighted average of the risk-adjusted performance figures associated with a fund's

21

three-year, five-year and 10-year (if applicable) Morningstar-rated metrics.

22

23

24

25

26

27

28

SECOND CONSOLIDATED AMENDED COMPLAINT                    - 40 -
No. 08-cv-01510 WHA
010036-12  326326 V1

**Fund performance vs. category** as of 12/31/2006



■ Schwab YieldPlus Fund–Select Shares®[1] (SWYSX)

■ Schwab YieldPlus Fund Investor Shares[2] (SWYPX)

■ Lipper Ultrashort Bond Category Average[3]

     g.     The "Let us help you make the most of your cash" Web page.  As late as September 16, 2007, the "CDs & Money Markets" web page also had a link entitled: "Explore Cash Solutions."  This link leads to a page entitled "Let us help you make the most of your cash."  In turn, that page displays the Fund along with CDs as a proper place to put an investor's cash.  The page states that the Fund belongs in the Cash portfolio: "This is cash that is part of your long-term strategic asset allocation to generate income and reduce risk for a time horizon of more than one year.  Every portfolio should contain cash to reduce overall risk.  We recommend holding 5%-30% in cash, depending on your goals."

> Whether used for diversification, a major purchase or daily expenses, we want to make sure your cash – like all your investments – reaches its full potential.
>
> **How to manage your cash based on your needs**
>
> Optimizing your returns begins with allocating your cash among three cash types according to your need for liquidity and yield.  In general, the longer you can invest your money, the higher the return you can earn.

| Portfolio Cash | Short-term Savings | Daily Cash |

This is cash that is part of your long-term strategic asset allocation to generate income and reduce risk for a time horizon of more than one year. Every portfolio should contain cash to reduce overall risk. We recommend holding 5%-30% in cash, depending on your goals.

| CDs from Schwab CD OneSource™ | Time Horizon | Investment Minimum | Rate as of 09/01/2008 |
|---|---|---|---|
| 1-year CD | 12 months | $1,000 | 3.90% APY  BUY |
| 2-year CD | 2 years | $1,000 | 4.35% APY  BUY |

Pay no fees when you purchase CDs through Schwab.

| Other Longer-Term Investments | Time Horizon | Investment Minimum | Rate Information |
|---|---|---|---|
| Schwab YieldPlus Fund® | 12 months+ | $2,500 ($1,000 IRA) | View yields |
| Other fixed income products | Varies | From $1,000 | Varies |

Smart cash-investing ideas:

- Manage tax impact and your exposure to the alternative minimum tax (AMT) with a choice of two tax-free YieldPlus funds.
- Visit for our market outlook and weekly cash allocation recommendation.

      h.     The "Let us help you make the most of your cash" page continues to identify the Fund as an appropriate place to park cash.  On the left side of the page, in a blue prominent box, along with phone numbers to call, or email addresses to send email to a Schwab representative, are the following links:



**What About Cash?**
By Rande Spiegelman

"…money market funds are more attractive than they've been in a long, long time… "
Read full article.
View additional cash related articles.

**Frequently asked questions**

What is the right amount of cash to hold?
How can I get higher yields without increasing risk? What is the difference between bank and brokered CDs?
What is the difference between the two types of money funds?

**Let us help you make most of your cash.**

Call **800-880-9217** for a personalized recommendation.

j.       The "Cash FAQs" web page.  The links to the "Frequently asked questions" on the "Let us help you make the most of your cash" Web page lead to the "Cash FAQs" Webpage.  This page identifies the Fund as an appropriate place for cash with "low principal risk":

**What is the right amount of cash to hold?**

It all depends on what you need your money for.  Optimize your cash holdings based on your needs:

**Daily cash** is the cash flow you keep on hand for trading and other day-to-day expenses.  Typically this money is held in checking accounts and/or sweep services.  We suggest keeping it to a minimum, as you may be able to earn higher yields by investing in smart cash alternatives.

**Short-term savings** are for known obligations, such as property taxes, your child's wedding or college tuition.  You might cover these with cash reserves (rather than monthly income).  Emergency funds are your buffer for the unexpected.  We recommend setting aside three to six months of after-tax income.  The key here is safety and liquidity.  Purchased money funds are a convenient investment choice, providing next-day liquidity and better interest rates than sweep money funds.  Short-term CDs are a good solution for expenses coming due in the next three to 12 months, and can also be used as part of your portfolio cash allocation.

**Portfolio cash** is the "cash" slice of the investment pie.  Most asset allocation guidelines suggest anywhere from 5% to 30% of your portfolio be kept in cash products, depending on your investing style.  <u>CDs and ultrashort bond funds such as YieldPlus funds can be used as part of your portfolio cash allocation, as can the products mentioned above.</u>

**How can I get higher yields without increased risk?**

In general, the longer you invest your money, the higher the yield you can earn.  It's important to understand which risk you want to minimize to make the appropriate risk/reward trade-off.

**Principal risk** occurs when the principal fluctuates in value.  In general, as principal risk increases, yield increases.  Principal risk will be zero in CDs, checking or savings accounts which are FDIC-insured (up to $100,000 per institution).  In other words, if you invest $1,000 in a CD, you can be sure that you will receive at least $1,000 at maturity.  <u>The Schwab YieldPlus ultrashort bond fund offers good returns with low principal risk.</u>

**Liquidity risk** occurs if you need the money before the term of the investment is over.  For instance, many bank CDs have an early withdrawal penalty.  If liquidity is a concern, a purchased money fund may be a good investment since you can access the funds in one business day.

**Interest rate risk** occurs when you are invested at today's rate in a rising interest rate environment.  For instance, by locking in a CD at 3% for five years, you do not have the option of investing that same money if interest rates climb next year to 5%.  To avoid interest-rate risk, consider investing in shorter time horizon instruments like short-term CDs.  [Emphasis added.]

k.      The link to the  **"What About Cash?"** article, on the "Let us help you make the most of your cash" Web page led to the Rande Spiegelman article dated August 3, 2006, and contains a quote that indicates that the article is about "… money funds are more attractive than they've been in a long, long, time…".  The article itself defines cash to include the Fund:

**What is cash?**

In an investment context, cash usually means cash equivalents such as money market funds, Treasury bills (T-bills), short-term corporate commercial paper, and overnight government repurchase agreements.  There are also near-cash investments such as short-term certificates of deposit (CDs), <u>ultrashort bond funds</u> and stable value funds.

The article then states the principal reasons to maintain a cash position are as follows:

**Why hold cash?**

Let's look at three broad reasons for maintaining a cash position as part of your financial plan.

**Reason No. 1:  liquidity**

Apart from day-to-day expenses, which you typically pay from current cash flow, the need for liquidity generally falls into two categories:

Emergencies (health problems, you lose your job, etc.).

Known obligations coming due in the next one to three years.

For emergency funds, we recommend setting aside cash equal to three to six months of after-tax income.  The amount that's right for you depends on your job outlook and other sources of income and credit.

Once you decide how much to set aside for emergencies, including that cash in your portfolio allocation is up to you.  Your emergency cash reserve may be larger than your portfolio's targeted cash allocation, in which case you'll need to keep at least some cash outside your investment portfolio.  On the other hand, if your portfolio is big enough, you could choose to include your emergency reserve within your targeted cash allocation.  Either way, the key is safety and liquidity in case of emergency.

Unlike your emergency reserve, which you maintain "just in case," think about cash set aside to cover known obligations as money that's already spent.  Known obligations that you might pay from cash reserves (instead of current salary or other monthly income) can include quarterly estimated income taxes, property taxes, a down payment on a home, your child's wedding, college bills, a vacation, and so on.

Liquidity is extremely important here—don't invest money reserved for short-term obligations in the market.  Instead, keep it in cash or near-cash investments.

**Liquidity for retirees**

Retirees typically have special liquidity needs.  For example, the need for emergency funds may go away – if you're no longer working, there's no need to plan for the possibility of losing your job.  However, you may want to set aside enough cash to cover at least 12 months' living expenses.  Think of it as a "known obligation."

Beyond that, it's not a bad idea to keep another two to four years' worth of expenses in near-cash investments (short-term bonds, ultrashort bond funds, CDs, etc.) as part of the fixed income portion of your retirement portfolio.  That way, when a bear market comes

1   along, you could avoid having to liquidate other assets during the worst possible time, assuming the bear market doesn't last more than a few years.

2

3   **Reason No. 2: flexibility**

4   By holding a percentage of your portfolio in cash, you can take advantage of investment opportunities as they arise.  For example, a cash allocation may come in handy if you wish to slightly overweight or underweight certain asset classes in your portfolio based on your outlook for the markets.

5

6

7   We're not talking about market timing or even large, tactical shifts between stocks, bonds and cash.  The odds against being consistently right are too great to make such a huge bet.  However, by shifting your asset allocation 5% to 10% one way or the other, you may be able to add value when you're right – without derailing your long-term goals if you're wrong.

8

9

10

11   In addition, a cash allocation can provide flexibility when it's time to rebalance your portfolio and/or pay investment fees.

12   **Reason No. 3: stability**

13   Bonds have been the traditional choice for reducing a portfolio's overall risk.  Bonds tend to perform differently than stocks in the same market conditions – sometimes moving in the opposite direction.

14

15

16   Historically, however, cash is even less correlated with stocks. What's more, cash is far less volatile than bonds on average.  The big advantage of bonds, of course, is the potential for higher income. That said, in the appropriate proportion, cash can stabilize your portfolio over time.

17

18   **Where should you keep your cash?**

19

20   Whatever your reasons for holding cash, you need a good place to park it.  That does NOT include under the mattress or in a big safe. Physical cash earns no interest and can be stolen or destroyed.

21

22   The table below summarizes various ways to invest your cash, from lowest to highest generally expected yield.

23

24

25

26

27

28

**Smart ways to invest your cash**

| Investment | Liquidity | Value | Credit quality |
|---|---|---|---|
| Checking and savings accounts | Immediate | Stable | FDIC insured |
| Money market funds | Immediate (may be limits on writing checks) | Stable | Not FDIC insured |
| Position-traded money market funds | Generally available day after sale | Stable | Not FDIC insured |
| T-bills | Available at maturity | Fluctuates prior to maturity | Backed by U.S. Treasury |
| Certificates of Deposit (CDs) | Penalties for early withdrawal | Stable | FDIC insured |
| Ultra-short bond funds | Generally available day after sale | Fluctuates | Subject to bonds in portfolio (look for overall credit rating of A or better) |
| Stable value funds* | Generally available day after sale, may have short-term redemption fees | Stable | Subject to bonds in portfolio and insurance provider (look for companies rated A or better) |

**The bottom line**

Checking, savings and money market accounts are good for day-to-day expenses as well as your emergency reserve.

Shorter-term CDs and T-bills can be used as part of your strategic cash allocation and are also good for known obligations coming due in the next three to 12 months.

Longer-term CDs, ultrashort bond funds and stable value funds can be used as part of your strategic cash allocation and are good for known obligations coming due within one to three years. . . . [Emphasis added.]

l.    On a separate page, a link to the Speigelman article, Speigelman is identified as CPA, CFP®, Vice President of Financial Planning, Schwab Center for Investment Research®, and describes the article, which recommends the Fund, as identifying, "three reasons to maintain a cash position as part of your financial plan – ***and smart cash investments.***"

m.    Schwab has taken down these web pages or has altered any suggestion that their ultrashort bond fund is an appropriate place for the cash portion of an investor's portfolio.  For instance, since March of 2008, the "Discover a smart alternative for your cash" webpage no longer contains this name, and has been changed as follows:

The Schwab YieldPlus Fund® is designed with your income needs in mind. The fund's objective is to seek high current income with minimal changes in share price.... The YieldPlus Fund offers:

• Monthly Income – The fund invests in a large, well-diversified portfolio of taxable bonds and distributes its income on the last day of each month.

• Low Duration – To minimize changes in share price or NAV, the fund seeks to maintain an average portfolio duration of one-year or less. However, in volatile markets, the fund may experience a higher degree of NAV fluctuation.

• Active Portfolio Management – The fund is actively managed by a seasoned team of taxable bond portfolio managers who are supported by a team of credit and market analysts. The team use[s] a disciplined approach designed to deliver competitive total returns, which has become the foundation of managing Schwab's other fixed income funds.

**4.    The material misstatements and omissions in Defendants' oral offer and selling communications.**

73.    Defendants also undertook to market, offer and sell the Fund to investors through oral communications and representations as a safe alternative to cash or preservation of capital. As admitted in a May 2007 interview with Bloomberg TV, Defendant Matt Hastings, co-manager of YieldPlus, stated: "The investors that we are trying to capture are money fund investors or investors that are defensive on the bond market."

74.    Schwab brokers (or customer representatives) were trained and specifically taught to sell the Fund as a "cash alternative" on par with money market investments and CDs. The misstatements above were broadly disseminated by Defendants to the Schwab brokers and customer representatives or financial consultants, and to asset managers and advisors who either sold the Fund, or invested customer assets in the Fund. Defendants did not reveal the truth about the Fund to the Schwab brokers, customer representative and asset managers, who repeated or passed on the misrepresentations, or invested their clients assets in the Fund based on the misstatements and omissions identified in ¶¶ 80-98.

75.    Schwab presented the Fund to brokers as a money market alternative and encouraged brokers to comb through client lists and recommend to clients that the client shift assets from money markets to the Fund. Schwab told brokers who, in turn, told clients that the

1   Fund was a safe alternative to a money market account because the Fund had insignificantly

2   greater risk and higher yields.  Brokers were told that the Fund had no sub-prime exposure.

3   Brokers were told that this was essentially a cash equivalent.  Schwab also encouraged investments

4   in the Fund because investors could not write checks against Fund accounts.  This meant Schwab

5   had use of the cash without the additional cost to Schwab of administering a money market fund.

6   The Fund managers at Schwab issued guidelines for brokers to target a certain type of investor.

7   Specifically, anyone who had a 12-month time frame for a money market investment or a CD was

8   a target for the Fund.  Brokers were instructed to sell this as a safe harbor for investor cash when it

9   was not.  *See infra* ¶¶ 80-98.

10          76.      Schwab incentivized its customer representatives to switch Schwab customers from

11  CDs and money market accounts to the Fund by changing its compensation structure.  Schwab had

12  followed the practice of compensating its representatives or consultants on the basis of assets

13  brought into the firm.  Schwab changed the structure of the compensation plan to focus on revenue

14  produced for Schwab by each client.  Schwab created several compensation "buckets" based on

15  revenue derived from the type of asset sold.  For example, the lowest paying bucket contained

16  individual stocks and bonds.  The next bucket, which paid more revenue to the consultant than the

17  first bucket, contained so-called expense ratio-based funds like money market, YieldPlus and

18  certain other mutual funds.  The next bucket contained fee-generating investments, and the one

19  after that contained certain Schwab proprietary managed products.  This bucket-styled

20  compensation system shifted the focus from what was best for the client to what was best for the

21  financial consultant and Schwab's bottom line.  The consultants immediately had an incentive to

22  move people "up the buckets" to earn more compensation.  Loyalty and duty to clients were

23  sacrificed as Schwab representatives sought to earn more (and sale managers were constantly

24  pushing them to produce more revenue for Schwab).  Sometime in early 2007, Schwab removed

25  CDs from the expense-ratio based compensation bucket and into the individual stock bucket.  This

26  move meant that CDs would pay a consultant only 4 basis points, whereas the Fund and other

27  mutual funds would pay out 40 basis points.  Thus, at the same time that Schwab was offering the

28

1   Fund as a cash alternative investment, it provided its consultants with a greater financial incentive

2   to promote YieldPlus over CDs.

3       77.     Schwab brokers were provided a common script or theme to entice investors into

4   the Fund.  A typical sales pitch was to inform investors that the Fund was "virtually as safe as a

5   money market account, paid a higher rate of return due to the high grade short term debt."[3]  "Yield

6   Plus was very similar to a money market fund, conservative, safe and a good place for money not

7   invested in equities."[4]  Investors were told the Fund was "safe" and better than a CD.  The upside

8   for brokers was a commission that was 5 to 10 times higher than the commissions for selling a

9   money market.

10      78.     The following is an example of the common misrepresentations repeated to

11  investors:

12              Dear Mr. Schwab:

13              I and my family have been clients of your firm for many years, and
                have gone through the ups and downs of the financial markets,
14              always with proper service from Charles Schwab Inc., which was as
                good as the service from my other investments with Fidelity,
15              Vanguard and T. Rowe Price.

16              Between April and May 2007 I spoke with your representatives at
                your San Mateo office about how I could obtain a slightly better
17              yield on my Money Market holdings (SWVXX), without
                jeopardizing my principal in the account.  *I was advised to transfer*
18              *funds to your Schwab Yield Plus Select Shares (SWYSX), and was*
                *told that it was a fund with short term securities, very stable, with*
19              *minimum fluctuations, and the same advantages as your Money*
                *Market Fund, but paying a slightly better yield than your regular*
20              *Money Market Fund.*

21              I did as advised, but over the last seven months I saw a continuous
                drop in the value of my investment.  My several inquiries with your
22              representative were answered with encouragement to continue to
                hold because the fund was bound to recover.  Finally, seeing no
23              recovery of any kind, on Friday, January 25, 2008, I sold my
                SWYSX holdings, which cost me $114,018, for $105,533, at a loss
24              of $8,485 in principal.

25              I am 79 years old, and would have never switched to the SWYSX
                Fund had I not been assured by your staff that my principal was
26              secure.  Therefore, I hereby solicit your assistance in recovering my

27      _____
        [3] Brent S.

28      [4] Randy S.

SECOND CONSOLIDATED AMENDED COMPLAINT          - 50 -
No. 08-cv-01510 WHA
010036-12  326326 V1

1     above losses, and trust that you will give this matter prompt
      consideration.  [Emphasis added.]

2

3   This selling theme is reflecting in another communication:

4     I am one of those who invested in the Schwab Yield Plus Select
      Fund, SWYSX, for my IRA.  This Fund was sold to me as "similar to

5     a money market", not exactly a money market, but a short term bond
      fund that fluctuated by "only pennies".  I invested in it because I was
      looking for a cash-type investment that had a higher return than their

6     money market.  The low yield of 5.66% helped confirm that this was
      a very conservative type of fund.

7

8     This fund has since lost over 30% of its value.

9     79.     Again, the common core sales theme is evidenced by the following reports from

10  investors:

11    1.     What you were told?

12    I was a Schwab Private Client, and the SWYSX fund was one of
      several that were recommended and suggested as a fit for my

13    portfolio.  I was a risk adverse investor, as this was my IRA account
      and for retirement purposes only.  I was told this was a bond fund,
      made up of corporate obligations of high quality.  My advisor told

14    me that he himself had money in this fund.  Along the way he
      liquidated his position, said he needed the money to buy a home.[5]

15                              *  *  *

16

17    Both my mother and myself were told by a Schwab broker in
      Medford, Or. that this was a fund with good returns and that it was

18    very much like a money market fund and that we could withdraw
      from it without holding for any length of time.  We were also told the

19    fund held only the safest of investments and was overseen by a very
      experienced team of fund managers.[6]

20  **D.     The Core Misrepresentations in All Written and Oral Materials**

21    80.     The true material facts, or material facts omitted necessary to make the statements

22  made not misleading and/or omitted material facts required to be stated therein, were:

23    a.     The Fund was not an "ultra short term bond fund" designed to offer higher

24  current income "with minimal changes in share price."  Rather, the average duration of

25  investments exceeded one year from March 1, 2007, through March 2008, and the heavy

26  concentration in mortgage backed securities made this fund not a "short term" fund.  In

27  _____

    [5] Robert J.

28  [6] Debra B.

SECOND CONSOLIDATED AMENDED COMPLAINT                    - 51 -
No. 08-cv-01510 WHA
010036-12  326326 V1

1   fact, Defendants had abandoned the objectives and investment policies of the Fund in

2   pursuit of higher yields, including the objective to maintain share price stability and

3   preserve investor capital and seek minimal fluctuation in share price.

4          b.      The Fund abandoned the stated duration objective without disclosing such

5   and in fact misrepresented the actual effective duration.  The duration of the securities held

6   by the Fund had average durations greater than one year from March 1, 2007, onward.

7   Even then, those durations were susceptible to substantial and sudden change along with

8   changes in default rates, interest and prepaid option rates.  Defendants tied the short-term

9   nature of the Fund to a core representation that the average duration was one year or less.

10  This was false as indicated by the following analysis as calculated by an industry expert[7]:

**Exhibit 1. Durations of the Fund's Holdings Quarterly from February 2006 to February 2008**

|  | 2/28/2006 | 5/31/2006 | 8/31/2006 | 11/30/2006 | 2/28/2007 | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 |
|---|---|---|---|---|---|---|---|---|---|
| Modified Duration before hedging | 1.10 | 1.41 | 1.25 | 1.27 | 1.55 | 1.90 | 1.86 | 1.61 | 1.87 |
| Effective Duration before hedging | 1.13 | 1.62 | 1.41 | 1.29 | 1.65 | 2.13 | 2.50 | 2.91 | 4.19 |
| Duration of Hedging | (0.70) | (0.75) | (0.69) | (0.84) | (0.89) | (0.26) | (0.25) | (0.46) | (0.20) |
| Hedged Modified Duration | 0.40 | 0.66 | 0.56 | 0.43 | 0.66 | 1.64 | 1.61 | 1.15 | 1.67 |
| Hedged Effective Duration | 0.43 | 0.87 | 0.72 | 0.44 | 0.76 | 1.87 | 2.25 | 2.45 | 3.99 |
| Effective Duration Reported by Schwab | 0.70 | | 0.70 | | 0.40 | | 0.60 | | 1.30 |

18         c.      The holding reports sent to investors list coupon payment dates instead of

19  maturity dates.  Notwithstanding any disclosure argument that Defendants may make, this

20  switch was misleading because (i) it suggested that the investments are short term, (ii) it

21  served to mask the fact that portfolio duration was longer than represented, and (iii)

22  investors could not determine the true maturity dates from the report.  The following

23  example from just a small sample of a holding report demonstrates this:

---

[7] Determining average duration of the Fund's holdings is a complex endeavor that only sophisticated industry experts can undertake.

| Description from 5/31/08 Holding Report | Stated Maturity | True Maturity |
|---|---|---|
| WAMU COMMERCIAL MORTGAGE SECURITY Series 2007-SL2 Class A | 06/01/08 | 12/27/2049 |
| WAMU COMMERCIAL MORTGAGE SECURITY Series 2007-SL3 Class A | 06/01/08 | 3/23/2045 |
| LEHMAN XS TRUST Series 2007-5H Class 3A4 | 11/08/09 | 5/25/2037 |
| HARBORVIEW MORTGAGE LOAN TRUST Series 2006-6 Class X1 | 06/01/08 | 8/19/2036 |
| BEAR STEARNS ALT-A TRUST Series 2006-1 Class 23A1 | 06/01/08 | 2/25/2036 |
| COUNTRYWIDE ALTERNATIVE LOAN TRUST Series 2005-51 Class 3AB1 | 06/20/08 | 11/20/2035 |
| LEHMAN XS TRUST Series 2005-4 Class 2A1B | 06/25/08 | 10/25/2035 |
| BEAR STEARNS ASSET BACKED SECURITIES, INC. Series 2004-HE6 Class M1 | 06/25/08 | 8/25/2034 |

d.     The Fund's asset allocation was not well-diversified and was overly concentrated in a single risky industry or market sector, thereby increasing risk exposure on a systematic basis, as Defendants began to concentrate investments in asset-backed securities and mortgage-backed securities.  The Fund was quickly concentrating its investments into the housing market and risky housing market-exposed debt instruments – by May 2007 the Fund was concentrated in a single risky industry or market segment, with over 46.5% of Fund assets invested in the mortgage industry.  As recently as August 2006, it was only 28.9%.  Two years before that it was 11.1%.  This change in asset concentration is inconsistent with the representations regarding share price stability, safety and risk.  The following is just an illustration of the increased and undisclosed risk to the Fund by the change in asset concentration:

|  | % Net Assets | | | | |
|---|---|---|---|---|---|
|  | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 | 5/31/2008 |
| CORPORATE BONDS | 45.10% | 40.30% | 34.90% | 34.00% | 24.60% |
| ASSET-BACKED OBLIGATIONS | 10.90% | 7.00% | 7.90% | 10.00% | 23.20% |
| MORTGAGE-BACKED SECURITIES | 46.50% | 45.90% | 46.20% | 50.10% | 18.40% |
| Total ABS+MBS | 57.40% | 52.90% | 54.10% | 60.10% | 41.60% |

This change is depicted below.

1

Exhibit 2. Asset Allocation of Schwab YieldPlus Fund from May 2005 to August 2008.



This level of concentration in mortgage-backed securities is inconsistent with the represented core purpose of this Fund and with the stated representation that the Fund presented a risk of "minimal change in share price" or was "similar to" a money market fund.

e.      The ever-growing mortgage-backed security and asset-backed portion of the portfolio assumed actual and not theoretical "maturity extension risk."  MBS and ABS are bonds backed by pools of mortgage loans and assets, respectively.  They are riskier than Treasury securities due to their complex structure and multiple risk sources, including not only interest rate risk but also prepayment risk, default risk, and liquidity risk.  The increase in concentration in MBS made the Fund increasingly dependent on complex hedging mechanisms in order to maintain share price stability.  This risk was enhanced and magnified because the Fund often held a position in the "mezzanine" tranche and thus was subordinate to the senior level of priority in the event of a default.  The number of risk exposures of the Fund was increased.  The Fund's concentration in MBS exceeded 25% in May 2006.  This represents a significant incremental risk assumed by the Fund and requires hedging to conform to the investment guidelines of the Fund.

1          f.      As a result of these extended durations, as well as its aggressive venture into

2   mortgage-backed securities, the Fund was not an ultrashort term bond fund as that term is

3   commonly understood, and the Fund was not properly categorized in the ultrashort bond

4   category.  The Fund took a very aggressive approach of investing in mortgage-backed

5   securities and lower rated bonds.  While an ultrashort fund typically focuses on duration

6   and assumes an interest rate risk greater than a 90-day treasury bond, such funds do not

7   typically take on credit or liquidity risk which could substantially impact principal.  The

8   other 111 ultrashort bond funds followed by Morningstar did not take on such risk.

9   Comparing the Fund to other top-performing ultrashort bond funds (*e.g.*, Franklin

10  Adjustable U.S. Government Securities Fund - source: morningstar.com), the Fund invested

11  a significantly larger proportion of the portfolio in mortgage securities backed by non-

12  agencies.  Also, other funds have significantly lower or no allocation to asset-backed and

13  corporate sectors.  As a result, the average asset credit quality of the top-performing

14  ultrashort bond funds has been stable (AAA) through the credit crunch, while the average

15  credit quality of the Fund's assets has been lower (A – AA) during this period.  As such, the

16  Fund has had a greater exposure to credit and also illiquidity risk than other top-performing

17  ultra short bond funds.  This risk was not adequately disclosed.

18         g.      Defendants compared the Fund to the wrong comparative index in an effort

19  to attract investment:  the Lehman Brothers U.S. Short Treasury:  9-12 months.  This

20  comparison sought to assure investors that the Fund had a comparable profile equivalent to

21  a 9-12 month Treasury.  In fact, this is not the case for the reasons stated above.  The falsity

22  of the comparison to the Lehman short term fund index is further evidenced by the fact that

23  of the dozens of funds that are "ultra short," the Fund's decline is dramatically different

24  than the reaction of other ultra short funds to changes in the market.  *See* ¶ 122.

25         h.      The Fund mispriced a material potion of its assets as the assets deteriorated

26  in value and liquidity.  Furthermore, the holding reports sent to investors falsely and

27  materially misrepresented the value of securities in the Fund.  For example, here is a

28  comparison of value using a well accepted valuation technique employed by Plaintiffs'

expert for just a few of the assets publicly reported in the Fund's holding reports for the

time periods indicated, which demonstrates that Defendants mispriced and overstated the

value of these Fund assets as evidenced by just a slice of the holding reports:

**Schwab Holding Report Valuation**

| Description | Rating | 5/31/2007 | 8/31/2007 | 11/30/2007 | Chg% |
|---|---|---|---|---|---|
| FREMONT HOME LOAN TRUST Series 2003-B Class M1 | AA | 100.15 | 98.75 | 96.75 | -3.4% |
| MORGAN STANLEY ABS CAPITAL I Series 2004-HE8 Class M1 | AA+ | 100.61 | #N/A | 97.95 | -2.6% |
| NOVASTAR HOME EQUITY LOAN Series 2003-4 Class M1 | AA | 100.05 | #N/A | 96.64 | -3.4% |
| NOVASTAR HOME EQUITY LOAN Series 2003-3 Class M1 | AA+ | 100.41 | 95.95 | 94.61 | -5.8% |

**Proper Valuation by Plaintiffs' Expert**

| Description | Rating | 5/31/2007 | 8/31/2007 | 11/30/2007 | Chg% |
|---|---|---|---|---|---|
| FREMONT HOME LOAN TRUST Series 2003-B Class M1 | AA | 100.76 | 93.20 | 81.52 | -19.1% |
| MORGAN STANLEY ABS CAPITAL I Series 2004-HE8 Class M1 | AA+ | 100.50 | 95.76 | 87.63 | -12.8% |
| NOVASTAR HOME EQUITY LOAN Series 2003-4 Class M1 | AA | 100.30 | 91.46 | 78.15 | -22.1% |
| NOVASTAR HOME EQUITY LOAN Series 2003-3 Class M1 | AA+ | 100.83 | 97.01 | 82.41 | -18.3% |

Here are other examples were the Fund holding reports sent to investors falsely and

materially misrepresented the value of securities in the Fund:

**Schwab Holding Report Valuation**:

| Description | Collateral Type | Curr Rating | Orig Rating | May-07 | Aug-07 | Nov-07 | Feb-08 | Chg% |
|---|---|---|---|---|---|---|---|---|
| AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2007-A Class 13A1 | WH30 6.4 | AAA | AAA | 101.65 | 96.20 | 96.04 | 98.51 | 2.6% |
| CITIMORTGAGE ALTERNATIVE LOAN TRUST Series 2006-A7 Class 1A12 | AltA36.4 | AAA/*- | AAA | 100.26 | 100.24 | 99.33 | 101.31 | 2.0% |
| DEUTSCHE ALTERNATIVE ASSET SECURITIES, INC. Series 2005-6 Class 1A3 | AltA36.2 | AAA | AAA | 99.54 | 99.58 | 99.79 | 101.55 | 1.8% |
| JP MORGAN ALTERNATIVE LOAN TRUST Series 2006-A4 Class A1 | AltAA6.5 | AAA | AAA | 100.36 | 100.40 | 97.92 | 98.45 | 0.5% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-3XS Class 1A2 | HOMEE6.7 | AAA | AAA | 99.70 | 99.65 | 100.23 | 103.07 | 2.8% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-8XS Class A1 | HOMEE6.7 | B- | AAA | 99.66 | 99.84 | 101.05 | 102.69 | 1.6% |
| RESIDENTIAL ACCREDIT LOANS, INC. Series 2006-QS8 Class A1 | AltA36.8 | A/*- | AAA | 100.25 | 100.45 | 98.79 | 102.15 | 3.4% |
| WASHINGTON MUTUAL ALTERNATIVE MORTGAGE PASS- THROUGH CERTIFICATES Series 2007-1 Class 2A1 | AltA15 6 | AAA | AAA | 100.16 | #N/A | 100.29 | 102.88 | 2.6% |
| Citimortgage Alternative Loan Trust Series 2007-A2 Class 1A13 | AltA36.4 | AA/*- | AAA | #N/A | 99.65 | 98.67 | 100.73 | 2.1% |
| Morgan Stanley Mortgage Loan Trust Series 2007-6XS Class 1A2S | WH30 6.7 | AAA | AAA | #N/A | 99.19 | 100.10 | 101.77 | 1.7% |

**Proper Valuation by Plaintiffs' Expert:**

| Description | Collateral Type | Curr Rating | Orig Rating | May-07 | Aug-07 | Nov-07 | Feb-08 | Chg% |
|---|---|---|---|---|---|---|---|---|
| AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2007-A Class 13A1 | WH30 6.4 | AAA | AAA | 100.72 | 99.47 | 96.13 | 90.85 | -5.5% |
| CITIMORTGAGE ALTERNATIVE LOAN TRUST Series 2006-A7 Class 1A12 | AltA36.4 | AAA/*- | AAA | 100.03 | 95.82 | 91.54 | 88.12 | -3.7% |
| DEUTSCHE ALTERNATIVE ASSET SECURITIES, INC. Series 2005-6 Class 1A3 | AltA36.2 | AAA | AAA | 98.02 | 94.46 | 90.90 | 88.42 | -2.7% |
| JP MORGAN ALTERNATIVE LOAN TRUST Series 2006-A4 Class A1 | AltAA6.5 | AAA | AAA | 98.48 | 95.84 | 93.17 | 91.48 | -1.8% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-3XS Class 1A2 | HOMEE6.7 | AAA | AAA | 100.77 | 96.56 | 92.86 | 83.11 | -10.5% |
| MORGAN STANLEY MORTGAGE LOAN TRUST Series 2007-8XS Class A1 | HOMEE6.7 | B- | AAA | 101.31 | 96.55 | 92.24 | 82.44 | -10.6% |
| RESIDENTIAL ACCREDIT LOANS, INC. Series 2006-QS8 Class A1 | AltA36.8 | A/*- | AAA | 99.99 | 95.54 | 91.03 | 87.36 | -4.0% |
| WASHINGTON MUTUAL ALTERNATIVE MORTGAGE PASS- THROUGH CERTIFICATES Series 2007-1 Class 2A1 | AltA15 6 | AAA | AAA | 99.87 | 95.08 | 90.15 | 85.83 | -4.8% |
| Citimortgage Alternative Loan Trust Series 2007-A2 Class 1A13 | AltA36.4 | AA/*- | AAA | 98.94 | 94.92 | 90.88 | 87.75 | -3.4% |
| Morgan Stanley Mortgage Loan Trust Series 2007-6XS Class 1A2S | WH30 6.7 | AAA | AAA | 99.08 | 98.69 | 97.05 | 94.85 | -2.3% |

The foregoing tables demonstrate that the holding reports overstated the value of the Fund's holdings,[8] and, on information and belief, there are many more examples.  As a direct result, the Fund's NAV was overstated, and its financial statements were false.

81.     Defendants also failed to disclose the lack of risk management and internal control.  Internal controls is an important process to keep track of the performance and manage the risk of the Fund.  Internal control documents produced by Schwab indicate a lack of proper risk management.

82.     One of the tools used by Schwab, the DailyInfoForInternalUse sheets, from Feb 06 to Sep 07, has Average WAM and Average Duration, the value of which is a constant 0.5.  It is not clear what kind of duration was considered, but it is highly unlikely the measure used was a useful or appropriate measure of interest rate risk.  It did not reflect effective duration, which, as demonstrated above, was not constant and exceeded 1 beginning in March 2007.

83.     Tolerance reports reported changes in NAV, Yield, Expense Ratio (ER), and WAM.  No other risk measures were reported.

---

[8] Determining these true valuations of the Fund's holdings is a complex endeavor that only sophisticated industry experts can undertake.

84.     DailyOversight and DailyRate sheets reported NAV, div, G/L, ER, and Yield. There is a field labeled "Duration," but no numbers were reported.

85.     Daily tolerance sheets only checked daily changes and did not include accumulated total return.  The accumulated return on the YieldPlus fund (SWYPX) is much lower than that of the index.

86.     The lack of appropriate internal risk control directly impacted the risk management of the Fund.  Given the type of securities included in the Fund and the need for hedging to manage the interest rate risk, having effective risk management reports, including proper duration measurement, is critical.  The need for such control was even greater once the Fund began to invest more heavily in MBS beginning in May 2006 and as portfolio concentration in MBS remained high through February 2008.  But there was no evidence form the material reviewed by Plaintiff's expert that the Fund was employing effective risk management measures.  The lack of coherent values where values are shown and the complete lack of values where values should have been shown in reports reviewed suggest a lack of or non-use of risk management tools necessary to manage the risk of the Fund.

87.     Defendants obfuscated the truth about the price of the assets but also falsified or obscured the true nature of the securities in the Fund's portfolio by using inconsistent asset descriptions.  For instance, the following examples from the August 31, 2007, holdings report indicated that the specified securities were variable-rate, while the November 30, 2007, holdings report indicated they were not.  Yet, the same exact security was held in the Fund on both dates:

**Examples of Inconsistent Asset Description**

| Asset Category | Asset Description | Rate / Date / Footnotes / Face Amount / Value 8/31/2007 holding report | | | Rate / Date / Footnotes / Face Amount / Value 11/30/2007 holding report | | |
|---|---|---|---|---|---|---|---|
| Corporate | AGFIRST FARM CREDIT BANK | 6.59%, 12/15/07 (a)(b)(c)(d) | 25,000 | 26,253 | 6.59%, 06/29/49 (b)(c)(d) | 25,000 | 24,802 |
| Corporate | DANSKE BANK A/S | 5.91%, 06/16/14 (a)(b)(c)(d) | 24,100 | 23,487 | 5.91%, 12/29/49 (b)(c)(d) | 24,100 | 22,777 |
| Corporate | DBS CAPITAL FUNDING CORP. | 7.66%, 03/15/11 (a)(b)(c)(d) | 24,500 | 26,432 | 7.66%, 03/31/49 (b)(c)(d) | 24,500 | 26,842 |
| Corporate | NATEXIS AMBS CO., LLC | 8.44%, 06/30/08 (a)(b)(c)(d) | 53,370 | 54,589 | 8.44%, 12/29/49 (b)(c)(d) | 53,370 | 54,643 |
| Corporate | UNICREDITO ITALIANO CAPITAL TRUST II | 9.20%, 10/05/10 (a)(b)(c)(d) | 68,986 | 76,589 | 9.20%, 10/05/49 (b)(c)(d) | 68,986 | 75,421 |
| Corporate | ILFC E-CAPITAL TRUST I | 5.90%, 12/21/10 (a)(b)(c)(d) | 73,495 | 72,339 | 5.90%, 12/21/65 (b)(c)(d) | 73,495 | 73,313 |
| Corporate | OIL INSURANCE LTD. | 7.56%, 06/30/11 (a)(b)(c)(d) | 71,375 | 74,443 | 7.56%, 12/29/49 (b)(c)(d) | 71,375 | 73,500 |
| Corporate | STONEHEATH RE | 6.87%, 10/15/11 | 34,380 | 34,745 | 6.87%, 12/29/49 | 34,380 | 32,930 |
| Corporate | ZFS FINANCE USA TRUST III | 6.51%, 09/17/07 (a)(b)(c)(d) | 78,050 | 74,345 | 6.84%, 12/15/65 (b)(c)(d) | 78,050 | 75,986 |
| Corporate | CVS CAREMARK CORP. | 6.30%, 12/01/07 (a)(b)(d) | 90,000 | 87,022 | 6.30%, 06/01/37 (b)(d) | 90,000 | 88,256 |
| MBS | AMERICAN HOME MORTGAGE INVESTMENT TRUST Series 2005-3 Class 2A3 | 4.99%, 08/25/10 (a)(b)(d) | 25,000 | 24,418 | 4.99%, 09/25/35 (b)(d) | 25,000 | 23,948 |
| MBS | GSR MORTGAGE LOAN TRUST Series 2004-5 Class 3A2 | 4.70%, 09/01/07 (a)(b)(d) | 21,888 | 21,536 | 4.70%, 05/25/34 (b)(d) | 21,888 | 21,660 |

Footnotes:

(a) Variable-rate security.

(b) Callable security.

(c) Securities exempt from registration under Rule 144A of the Securities

Act of 1933. These securities may be resold in transactions exempt from

registrations, normally to qualified institutional buyers. At the period end, the value of these amounted to $1,344,330 or 16.7% of net

assets.

(d) All or a portion of this security is held as collateral for futures

contracts and short sales.

(e) Credit-enhanced security.

Footnotes:

(a) Variable-rate security.

(b) Callable security.

(c) Securities exempt from registration under Rule 144A of the Securities

Act of 1933. These securities may be resold in transactions exempt from

registrations, normally to qualified institutional buyers. At the period end, the value of these amounted to $1,812,603 or 16.9% of net

assets.

(d) All or a portion of this security is held as collateral for futures

contracts and short sales.

(e) Credit-enhanced security.

88.    Defendants did not disclose in the Prospectuses or SAIs the dramatic change in the Fund's risk profile.  More particularly, Defendants failed to disclose the following material facts:

      a.    The increased risk presented by the Fund's burgeoning MBS holdings beginning in May 2006 exceeded the Fund's stated investment guidelines as an ultra-short bond fund seeking a high degree of share price stability that would have minimal changes in share price;

      b.    The increased holdings of MBS made the Fund's stability increasingly dependent on complex hedging structures, and that the hedging transactions were necessary to maintain the Fund's duration below one year;

1     c.  The disclosures regarding hedging failed to disclose the critical and complex

2        nature of the Fund's hedging operations in light of the Fund's increased

3        concentration in MBS;[9] and

4     d.  The Fund lacked the internal controls necessary to assess duration and risk in

5        order to accomplish the fundamental objective of the Fund to be an ultra

6        short term bond Fund designed to offer high current income with minimal

7        changes in share price in light of the Fund's increased concentration in

8        MBS.

9   89.  Defendants made other misstatements of material fact:

10     a.  In light of the foregoing evidence, it was materially misleading to continue

11        to represent after May 2006 that the Fund was an ultra-short bond fund

12        seeking a high degree of share price stability that would have minimal

13        changes in share price;

14     b.  It was misleading to continue comparing the Fund to the Lehman Short U.S.

15        Treasury 9-12 months index, which was comprised only of U.S. Treasury

16        securities, for "the interest rate risk assumed by the [Fund] portfolio

17        exceeded the interest rate risk of the benchmark for a number of time

18        periods"; and

19     c.  The Prospectus misrepresented "Management Risk" by representing in each

20        Prospectus that the Fund was "actively managed" and that its use of

21        derivatives would effectively manage risk.  This was misleading in that the

22        Fund did not have the proper procedures and tools to measure and manage

23        risk.

24   90.  Indeed, Schwab did not update the Fund's risk disclosures at all.  Remaining

25 unchanged throughout the proposed Class Period were the Prospectuses' bland disclosures about

26

27

28

---

[9] The hedge disclosures were boilerplate and remained virtually the same despite the increase in MBS.  *See* previously Berman Decl., Docket No. 227, Appendix B, at 2-3, N1, N2, N3; Appendix B at 17 N1, N2; Appendix B at 22 N1, N2; Appendix B at 26 N1, N2; Appendix B at 30, N1, N2; Appendix B at 34, N1, N2; Appendix B at 38, N1, N2.

1   derivative risk and investment techniques.  These uniform boilerplate statements failed to disclose

2   the foregoing misrepresentations and omissions.  Nor did the SAIs' description of "Concentration"

3   materially change throughout the proposed Class Period.  The uniform boilerplate statements about

4   concentration did not disclose that increasing concentration posed a risk to the Fund's core

5   objective.  The descriptions of concentration thus remained unchanged despite the increase in MBS

6   and ABS during the proposed Class Period, an increase that represented a significant incremental

7   risk assumed by the Fund.

8        91.    While at one time these disclosures may have sufficiently described the Fund's

9   risks, they no longer did after the Fund ramped up its risks with heavy concentration in MBS and

10   ABS and increased dependence on complex hedging transactions.

11        92.    The written materials also made misrepresentations and omissions regarding

12   illiquidity.  The SAI's represented that the Fund would not invest more than 15% of its not assets

13   in illiquid securities.

14        93.    Liquidity is a measure of ability to sell an investment.  "Illiquidity" is measured by

15   the "spread" to Treasuries.  Treasuries are generally considered to be very liquid.  Other classes of

16   fixed income securities are not as liquid; there are not always buyers ready and willing to buy.

17   Highly rated corporate bonds are generally considered liquid because they typically have small

18   spreads to Treasuries.  With respect to CMOs and CMBs, the spread further increases.

19        94.    To identify the illiquidity of privately issued securities backed by mortgage or home

20   equity loans, Plaintiffs estimated the liquidity spread based on the theory that the total spread of a

21   credit related security consists of both the credit spread and the liquidity spread.  The liquidity

22   spread was estimated by taking the credit spread from the total spread.

23        95.    The following plot shows the liquidity spread of the NAV weighted MBS

24   (excluding agencies-related MBS) and ABS home equity loans ("HEL") portfolio (represented by

25   the thick blue line).  Also shown in the chart are liquidity spreads of a few indices including Prime

26   Fixed AAA, Alta AAA, ABS HEL Floating Rate, ABS HEL Fixed Rate indices.  Index

27   information is taken from Barclays Capital (former Lehmanlive).  For comparison purposes, the

28

1   Treasury spread, which has zero liquidity spread, and liquidity spreads of Corporate AAA index

2   and Corporate High Yield index are also plotted in the chart.



16       96.    The liquidity spreads of the portfolio were flat before 2007 and increased gradually

17  afterwards, especially after August 2007, when the liquidity spread jumped from previous periods.

18  The table below summarizes the liquidity spreads and percentage holdings of these MBS and ABS

19  HEL securities.  The percentage holdings were above 35% during all periods analyzed, and the

20  liquidity spread analysis demonstrates that.

21       97.    The Fund held more than 15% of its assets in illiquid securities from February 2007

22  afterward.  Contrary to the SAIs' statements that "in the event that a subsequent change in net

23  assets or other circumstances causes a fund to exceed its limitation, the fund will take steps to bring

24  the aggregate amount of illiquid instruments back within the limitations as soon as reasonably

25  practicable[,]" Fund assets were not brought back within the 15% limit.

| | 2/28/2006 | 5/31/2006 | 8/31/2006 | 11/30/2006 | 2/28/2007 | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 |
|---|---|---|---|---|---|---|---|---|---|
| Weighted Average Liquidity Premium (bp) | 16 | 13 | 15 | 19 | 29 | 29 | 66 | 156 | 249 |
| %NAV of MBS (excluding Agencies) and ABS HE | 42.5% | 39.8% | 35.6% | 37.9% | 41.2% | 43.5% | 45.8% | 46.0% | 48.5% |
| Treasury Spread (bp) | 3 | 3 | 2 | 0 | 2 | 2 | 5 | 8 | 12 |
| Liquidity Spread of Corp AAA(bp) | 4 | 2 | 6 | 9 | 1 | 5 | 28 | 57 | 91 |

98.     A reasonable investor would have viewed these undisclosed facts, severally and jointly, as having materially altered the total mix of information available to him or her.  Such an investor would reasonably think that the facts described herein but never disclosed would cause him or her to undertake a materially increased investment risk in connection with the Fund shares they purchased during the relevant time period because the Fund was investing in securities that were materially more risky than disclosed.  Nevertheless, Defendants did not disclose the facts highlighted in this section of the Complaint immediately above in any of the Fund Prospectus Materials which were in effect during the relevant time period.

**E.     Defendants Failed to Treat All Shareholders Equally**

99.     As soon as the mortgage crisis began to impact the Fund, rather than treating all shareholders equally, Defendants liquidated the Fund's most liquid and high quality assets, leaving the remaining shareholders, who were oblivious to the Fund's troubles or the causes of the trouble, with the lower quality illiquid bonds.

100.     In March 2007, one of the Fund's top investors and a related Schwab entity, the Schwab Charitable Funds, pulled all of its investments out of the Fund.

101.     Even as Schwab Management deflected responsibility for the Fund's losses and tried to reassure investors, other Schwab mutual funds were pulling their investments from the Fund.  A Management Letter posted on Defendants' website on April 1, 2008, stated that, as of that day, other Schwab funds had liquidated all of their holdings in the Fund, and Schwab entities no longer held any of its shares.

**F.     The Fund's Management Profited Greatly from Running the Fund**

102.     The Registration Statement disclosed that defendant Schwab Management would receive an annual fee of .64% of the YieldPlus Investor Share's average net assets, and .49% of the YieldPlus Select Share's average net assets.

103.     Defendants' unlawful conduct allowed them to gain more than $75 million in investment advisory fees during the relevant time period.  For the fiscal years ended August 31, 2004, 2005, 2006 and 2007, the Fund paid net investment advisory fees, respectively, of $7,584,000 (gross fees were reduced by $0); $14,676,000 (gross fees were reduced by $0); $19,899,000 (gross fees were reduced by $0); and $33,797,000 (gross fees were reduced by $2,000).

**G.     Defendants' Misconduct Causes Huge Losses**

104.     Due to Defendants' positive, but misleading or untrue statements, and the omissions described above, billions of dollars poured into the Fund at prices set by Defendants, averaging a NAV of approximately $9.70 per share throughout the relevant time period.

105.     On March 22, 2007, Charles Schwab announced that the Fund was awarded a Lipper Performance Achievement Certificate for 2006.  Schwab Management attributed the Fund's success to its research acumen, rather than increased – and undisclosed – risks that the Fund had assumed:

> To be No. 1, you have to do everything well and capitalize in all areas – trading, credit analysis and portfolio management – not just outperform in one aspect.  Our overall performance might receive the attention, but we're especially pleased with our risk-adjusted performance.  That is what's important to our investors.  We don't seek to hit homeruns, but we aim for a lot of singles and the occasional double.  These funds have great long-term records because of consistent out performance, little by little, every month.

106.     By May 1, 2007, the Fund's assets reached over $13 billion.  The following chart depicts the Fund's massive growth in assets throughout 2006 and 2007:

Total Assets (mil)                                                    as of 01/31/2008



107.    But Defendants' investments ultimately triggered staggering losses.

108.    The Fund's dependence for success on heavy investments in mortgage-backed securities, including those backed by subprime mortgages, tied the Fund's fate to that of the mortgage market.  The collapse of pricing within that market and the devastating impact that collapse had on the Fund illustrate the extent to which the Fund had deviated from its investment guidelines and exposed investors to high-risk instruments that proved illiquid.

109.    Specifically, in the last half or 2006 and the first quarter of 2007, industry analysts watched the housing market slow down and predicted trouble for the mortgage loans.  Even Defendants recognized the risk in the housing market.  Defendant Daifotis admitted the housing and subprime crisis threat in the April 2007 Certified Report to Shareholders:

> The housing market remains a significant headwind for the economy and recently has provided some mixed messages.  Existing home sales were up 3.0% in January as a result of mild weather during the November-December period, supporting the sentiment that the worst of the housing crisis may have passed.  However, new home sales declined in January as cold weather hit the East Coast, and housing starts and new home sales declined 14.3% and 16.6%, respectively. In addition, the recent collapse of the sub-prime mortgage market has caused many lenders to tighten their standards, which could potentially push more sub-prime borrowers into foreclosure, thereby increasing the supply of homes on the market.  In a broader perspective, increases in foreclosure and vacancy rates in the near future have the potential to weigh down on the labor market, one of the reasons the housing market has been closely followed.

110.    Jeff Mortimer, the Senior Vice President and Chief Financial Officer of Schwab Management, admitted in a June 2007 Certified Report to Shareholders of Schwab's equity funds:

1
2

     In its March 2007 statement, the Fed noted that although adjustments to the housing sector are ongoing, the economy will likely maintain its path towards a moderate pace. . . .

3
4
5
6
7
8

     The housing market continues to pose a significant headwind for the economy and recently has shown signs that the bottom may not have yet been reached.  Existing home sales, which account for roughly 85% of the market, fell 8.4% in March to a seasonally adjusted annual rate of 6.12 million units, while new home sales were at a seasonally adjusted annual rate of 858,000 units, 23.5% below March 2006.  In general, the market seems to be quite pessimistic with regards to a recovery, with even the National Association of Realtors predicting a decline in new home sales of 14.2% in 2007.  In addition, the recent sub-prime debacle has caused many lenders to tighten standards, which could pose a further drag on homes sales.

9
10

    111.    In June 2007, two Bear Stearns hedge funds that had been heavily invested in mortgage instruments collapsed.

11
12
13
14
15

    112.    On July 5, 2007, the *New York Times* published an article noting that Countrywide, the nation's largest mortgage lender, stated the day before "that more borrowers with good credit were falling behind on their loans and that the housing market might not begin recovering until 2009 because of a decline in house prices that goes beyond anything experienced in decades."  The article further explained that:

16
17
18
19

     Countrywide's stark assessment signaled a critical change in the substance and tenor of how housing executives are publicly describing the market.  Just a couple of months ago, some executives were predicting a relatively quick recovery and saying that most home loans would be fine with the exception of those made to borrowers with weak credit who stretched too far financially.

20
21
22
23

    113.    Beginning in late 2007 and accelerating through the first quarter of 2008, the Fund took massive write-downs as it marked the value of mortgage-backed investments down to their reduced market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in turn caused investors to abandon the Fund.

24
25
26
27

    114.    The NAV plummeted $3.47 to as low as $6.18 per share on August 1, 2008, or a loss of over 35% since late July.  As seen in the Morningstar charts below, the Fund performed 30.1% worse than the average "ultrashort" bond fund that Defendants misrepresented the Fund to be.  The Fund ranked in the lowest 99% of all funds in this category.

28

115.    By comparison, the Lehman Brothers Aggregate Bond Treasury Index – another benchmark to which Defendants compared the Fund – rose significantly over the last year-and-a-half.  According to a letter posted on Schwab's website on March 20, 2008, the Fund's assets had declined to approximately $2.5 billion as of March 20, 2008, from a high of over $13.0 billion as of May 30, 2007.

116.    The following Morningstar total return chart shows the precipitous drop in NAV of the Fund's shares compared to that of its peers and the Lehman Brothers Aggregate Treasury Bond Index:

**Growth of $10,000**                                                08-31-08

- Fund: Schwab YieldPlus Investor
- Category: Ultrashort Bond
- Index: LB Aggregate Bond TR



**Performance History**                                                08-31-08

|                     | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 08-08 |
|---------------------|------|------|------|------|------|------|------|-------|
| Total Return %      | 5.9  | 2.7  | 2.9  | 2.2  | 3.4  | 5.5  | -1.2 | -29.4 |
| +/- Index           | -2.6 | -7.6 | -1.2 | -2.1 | 0.9  | 1.1  | -8.2 | -31.4 |
| +/- Category        | 0.4  | -0.2 | 1.2  | 1.0  | 0.8  | 0.8  | -3.7 | -26.4 |
| % Rank in Category  | 39   | 53   | 6    | 7    | 10   | 6    | 86   | 99    |
| Fund Category       | UB   | UB   | UB   | UB   | UB   | UB   | UB   | UB    |

See fund category codes

**Trailing Total Returns**                                         through 08-29-08

|               | Total Return % | +/- LB Aggregate Bond TR | +/- USTREAS CD Sec Mkt 6M | % Rank in Cat |
|---------------|----------------|--------------------------|---------------------------|---------------|
| 1-Day         | 0.04           | 0.06                     | ---                       | 25            |
| 1-Week        | 0.09           | -0.43                    | ---                       | 36            |
| 1-Month       | 0.50           | -0.45                    | ---                       | 1             |
| 3-Month       | -0.88          | -1.67                    | ---                       | 54            |
| Year-to-date  | -29.37         | -31.37                   | ---                       | 99            |
| 1-Year        | -30.69         | -36.55                   | ---                       | 98            |
| 3-Year Annualized | -9.37      | -13.63                   | ---                       | 100           |

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 5-Year Annualized | -4.72 | -9.33 | --- | 100 |
| 10-Yr Annualized* | --- | --- | --- | --- |

*Data through 08-31-08

**Historical Quarterly Returns**

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2008 | -19.87 | -11.63 | --- | --- |
| 2007 | 1.31 | 1.11 | -1.04 | -2.57 |
| 2006 | 1.14 | 1.24 | 1.42 | 1.54 |
| 2005 | 0.71 | 0.76 | 0.90 | 0.93 |
| 2004 | 0.69 | 0.17 | 0.86 | 0.48 |
| 2003 | 0.87 | 0.76 | 0.29 | 0.95 |
| 2002 | 0.65 | 0.76 | 0.12 | 1.11 |

S&P 500 index data: S&P 500 Copyright © 2008



117.    Defendants did not disclose that the Fund's rapid decline was the result of risky investments made in violation of the Fund's investment guidelines.  Instead, in conjunction with this revaluation, Defendants have blamed the mortgage crisis.  In November 2007, Schwab, in an e-mail response to investors' queries as to the reason for the decline of the Funds' NAV, stated that the decline was due to a "wholesale downward repricing of the mortgage and asset backed sectors by Interactive Data Corp., the independent pricing agency."

118.    On March 10, 2008, Defendants issued a letter stating:  "Even though YieldPlus is a highly diversified fund, it reflects the declines we have seen in non-Treasury securities, including

- 68 -

mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations."

119.    On March 20, 2008, Schwab Management released a statement blaming "market pessimism and forced selling of bonds by institutional leveraged investors" as "two of the reasons why the fixed income market continues to suffer."  That statement also reported that between "June 29, 2007, and March 20, 2008, approximately $0.60 of the $1.91-per share decline in NAV" of the Fund represented "unrealized losses."  Schwab Management did not disclose that the Fund's precipitous decline resulted from its abandonment of the investment strategy touted in the Prospectuses.

120.    In fact, the harm to Plaintiffs and the Classes did not result from market conditions endemic to bond mutual funds in general, or to short-duration bond funds in particular.  The devastation wrought by the Fund's venture into high-risk investments did not impact the Fund's peers, which, having avoided risky mortgage-backed securities in accordance with their profile as ultrashort bond funds, continued to generate positive returns even as the market for mortgage-backed securities collapsed.  For example, whereas the Fund was ranked by Morningstar in the top 25% within the ultrashort bond fund category for 2006, for 2007, the Fund's ranking fell to the bottom 25% based on the returns of -1.04% and -1.24% for the Select and Investor Shares, respectively.

121.    Meanwhile, the Fund's peers within the Morningstar ultra short bond funds category faired much better achieving average returns of 2.57% for 2007 and -1.47% for 2008 as of March 31.

122.    A comparison of the performance the Fund with the returns of other funds in the ultrashort bond category reveals the vastly different but undisclosed risk of the Fund due to the duration and risk of its underlying assets:

| Category Name[10] | 1 Year Return |
|---|---|
| Allegiant Ultra Short Bond A LW | 4.93 |

---

[10] As of August 2008.

| Category Name[10] | 1 Year Return |
|---|---|
| Allegiant Ultra Short Bond A | 4.93 |
| Allegiant Ultra Short Bond I | 4.88 |
| Calvert Ultra-Short Floating Income A LW | 5.67 |
| Calvert Ultra-Short Floating Income A | 5.67 |
| Franklin Adjustable U.S. Govt Secs A LW | 4.55 |
| Franklin Adjustable U.S. Govt Secs A | 4.55 |
| Ridge Worth US Gov Sec Ultra-Short Bd I | 4.42 |
| PIA Short Term Securities | 4.55 |
| Franklin Adjustable U.S. Govt Secs C | 4.13 |
| Trust For Credit Unions Ultr-Sht Dur Gov | 3.92 |
| DFA One-Year Fixed-Income I | 3.71 |
| Goldman Sachs Enhanced Income Instl | 3.06 |
| Federated Gov Ultrashort Duration Instl | 3.78 |
| SM&R Primary | 3.78 |
| Evergreen Adjustable Rate Instl | 3.54 |
| Federated Gov Ultrashort Duration InSv | 3.68 |
| Goldman Sachs Enhanced Income Admin | 3.01 |
| PIMCO Short-Term Instl | 3.15 |
| Goldman Sachs Enhanced Income A LW | 2.70 |
| Goldman Sachs Enhanced Income A | 2.70 |
| Evergreen Adjustable Rate Instl Svc | 3.28 |
| Evergreen Adjustable Rate A Load Waived | 3.27 |
| Evergreen Adjustable Rate A | 3.27 |
| Federated Gov Ultrashort Duration A LW | 3.31 |
| Federated Gov Ultrashort Duration A | 3.31 |
| PIMCO Short-Term Admin | 2.90 |
| CMG Ultra Short Term Bond | 2.23 |
| RidgeWorth Ultra-Short Bond I | 3.20 |
| PIMCO Short-Term D | 2.84 |
| PIMCO Short-Term A Load Waived | 2.79 |
| PIMCO Short-Term A | 2.79 |
| PIMCO Short-Term R | 2.53 |
| Touchstone Ultra Short Dur Fixed Inc Z | 2.79 |
| PIMCO Short-Term C | 2.48 |
| Goldman Sachs Enhanced Income B | 2.04 |

| Category Name[10] | 1 Year Return |
|---|---|
| Evergreen Adjustable Rate C | 2.50 |
| Evergreen Adjustable Rate B | 2.50 |
| Permanent Portfolio Treasury Bill | 1.99 |
| Managers Short Duration Government | 3.02 |
| PIMCO Short-Term B | 2.03 |
| Payden Limited Maturity | 0.95 |
| Goldman Sachs Ultra-Short Dur Gov Ins | 1.98 |
| RidgeWorth Limited Duration I | 2.02 |
| Goldman Sachs Ultra-Short Gov A LW | 1.52 |
| Goldman Sachs Ultra-Short Dur Gov A | 1.51 |
| Goldman Sachs Ultra-Short Gov Svc | 1.46 |
| Schwab YieldPlus Investor | -30.93 |
| Schwab YieldPlus Select | -30.94 |

**H.     Schwab Continues to Deny the Truth**

123.     Schwab Management has yet to acknowledge its responsibility for directing the Fund's investments into risky, long-duration mortgage-backed instruments that caused the losses incurred by Plaintiffs and the Classes, and instead have sought to place the blame elsewhere.  For example, on March 10, 2008, Defendants stated "Even though YieldPlus is a highly diversified fund, it reflects the declines we have seen in non-treasury securities, including mortgage-backed and asset-backed securities, where reduced demand has been the primary driver of decreasing valuations."  That letter continued to tout the Fund to investors by stating "YieldPlus invests in a diversified group of securities across a broad range of sectors and industries."  Furthermore, a subsequent letter sent to investors in a March 20, 2008, letter to investors, Schwab Management stated "market pessimism and forced selling of bonds by institutional leveraged investors are two of the reasons that the fixed income market continues to suffer."  A letter posted on Schwab's website dated April 1, 2008, continued to deflect responsibility for the Fund's losses, stating "In recent weeks, market pessimism and forced selling of bonds by institutional leveraged investors are two of the reasons that the fixed income market continues to suffer."

1

## V.    CLASS ACTION ALLEGATIONS

2        124.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

3    Procedure 23(a) and (b)(3) on behalf of classes as follows:

4            a.    The Section 11 class includes:

5            All persons or entities who acquired shares of the fund traceable to a
             false and misleading registration statement for the fund and who
6            were damages thereby.

7    The class period for the Section 11 class is November 15, 2006, through March 17, 2008.

8            b.    The Section 12 class includes:

9            All persons or entities who acquired shares of the fund traceable to a
             false and misleading prospectus for the fund and who were damaged
10           thereby.

11   The class period for the Section 12 class is May 31, 2006, through March 17, 2008.

12           c.    A single state class is hereby certified consisting of those California resident

13   investors who held shares in the fund on September 1, 2006.

14           d.    A "Section 13(a) Class" consisting of all persons or entities who owned

15   shares of the Fund on September 1, 2006.

16       125.    Excluded from these Classes are Defendants, the Officers and Directors of any of

17   the Defendants, at all relevant times, members of their immediate families and their legal

18   representatives, heirs, successors or assigns and any entity in which Defendants have or had a

19   controlling interest.

20       126.    The members of the Classes are so numerous that joinder of all members is

21   impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and

22   can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if

23   not tens-of-thousands of members in the proposed Classes.  Record owners and other members of

24   the Classes may be identified from records maintained by Registrant or its transfer agent and may

25   be notified of the pendency of this action by mail, using the form of notice similar to that

26   customarily used in securities class actions.

27

28

127.    Plaintiffs' claims are typical of the claims of the members of the Classes as all members of the Classes are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

128.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

129.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

        a.    whether the 1933 Act was violated by Defendants' acts as alleged;

        b.    whether statements made by Defendants to the investing public in the Registration Statement and Prospectus misrepresented or omitted material facts;

        c.    whether the Investment Company Act of 1940 was violated;

        d.    whether the non-Fund defendants intentionally interfered with the contract between the Fund and member of the Classes;

        e.    whether the law of Massachusetts or California governs any or all state-law claims; and

        f.    whether the members of the Classes have sustained damages and, if so, what is the proper measure thereof.

130.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**VIOLATIONS OF SECTION 11 OF THE 1933 ACT**
**ON BEHALF OF THE SECURITIES CLASS**

131.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein.  This Count is brought pursuant to § 11 of the 1933 Act, 15 U.S.C. § 77k, on behalf of the Securities Class.  It is asserted against the following defendants:  Schwab Investments; Charles R. Schwab; Dilsaver; Merk; Pereira; Byerwalter; Doward; Hasler; Holmes; Smith; Stephens; and Wilsey.

132.    The Registration Statements for the Fund contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to state material facts required to be stated therein.

133.    The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

134.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

135.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated § 11 of the 1933 Act.

136.    Plaintiffs acquired Fund shares pursuant to the Registration Statements.

137.    Plaintiffs and the Class have sustained damages.  The value of the Fund shares has declined substantially subsequent to and due to Defendants' violations.

138.    At the time of their purchases of the Fund shares, Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to July 2007.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT II**

**VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT
ON BEHALF OF THE SECURITIES CLASS**

139.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if set forth fully herein.

140.    This Count II is asserted against those defendants who were participants in the distribution of the Fund's shares through subsidiaries and trust departments of subsidiaries owned or controlled by Schwab Corp. and Charles Schwab (hereinafter the "§ 12 Defendants") to the Securities Class.  More specifically, this Count is asserted against all the Defendants in Count I, plus Charles Schwab & Co., Schwab Investment Management, Daifotis and Hastings.

141.    The § 12 Defendants offered and sold a security, namely shares of the Fund's common stock, by means of a prospectus or were controlling persons of the Fund or of those who offered and sold the Fund's shares.  This prospectus contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the § 12 Defendants knew, or in the exercise of reasonable care the § 12 Defendants would have known, were false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

142.    The § 12 Defendants actively solicited the sale of the Fund's shares to serve their own financial interests.

143.    Plaintiffs did not know that the representations made in connection with the distribution to them by the § 12 Defendants regarding the matters described above were untrue and did not know the above described material facts that were not disclosed.

144.    As a result of the matters set forth herein, pursuant to § 12(a)(2) of the Securities Act, Plaintiffs and Class members are entitled to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

1       145.    Plaintiffs and putative Class members who do not opt out, hereby tender their shares

2  in the Fund.

3       146.    The § 12 Defendants are liable to Plaintiffs and Class members pursuant to

4  § 12(a)(2) of the Securities Act, as sellers of the Fund's shares.

5                      **COUNT III**

6         **VIOLATIONS OF SECTION 15 OF THE 1933 ACT**
            **AGAINST THE CONTROL GROUP DEFENDANTS ON**
7              **BEHALF OF THE SECURITIES CLASS**

8       147.    Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs

9  as if set forth fully herein on behalf of the Securities Class.

10       148.    This Count is brought pursuant to § 15 of the 1933 Act against Defendants Schwab

11  Corp., Charles Schwab & Co., Schwab Investment Management, Schwab Investments and Charles

12  R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Halser, Holmes, Smith, Stephens, and

13  Wilsey.

14       149.    Each of these Defendants was a control person of the Fund or the Defendant

15  Schwab entities by virtue of his or her position as a trustee and/or senior officer of the Fund or the

16  Defendant Schwab entities.  The Individual Defendants each had a series of direct and/or indirect

17  business and/or personal relationships with other trustees and/or officers and/or major shareholders

18  of the Defendant Schwab entities and the Fund.

19       150.    Each of the Individual Defendants was a culpable participant in the violations of

20  §§ 11 and 12 of the 1933 Act alleged in the Counts above, based on their having signed or

21  authorized the signing of the Registration Statement and having otherwise participated in the

22  process which allowed the offerings to be successfully completed, or having participated in the

23  offer or sale of the shares of the Fund.

24                       **COUNT IV**

25       **VIOLATIONS OF THE CALIFORNIA BUS. & PROF.**
       **CODE §§ 17200 *et seq.* ON BEHALF OF THE STATE-LAW CLASS**
26

27       151.    Plaintiffs incorporate by reference and re-allege the allegations contained in the

    foregoing paragraphs 6-10, 18-51, and 124-130, as if fully set forth in this paragraph.  Paragraphs
28

relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which only encompasses the Fund's violation of its fundamental no-concentration policy.

152.    This count is asserted by Plaintiffs against Schwab Management, Schwab Investments, Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, Wilsey and Hastings, on behalf of the State-Law Class only and encompasses only shares of the Fund acquired after the Fund violated its no-concentration fundamental investment policy.

153.    These Defendants engaged in "unlawful" business acts and practices in violation of the UCL by violating § 48(a) of the ICA (15 U.S.C. § 80a-47(a)), and for causing the Fund to violate § 13(a) of the ICA.  Plaintiffs reserve the right to identify additional violations of California and/or federal law by the Fund caused by these Defendants as further investigation and discovery warrants.

154.    The Fund's conduct, as described below, violated § 13(a) of the ICA in that the Fund deviated from its investment policy that was changeable only by a shareholder vote and from a policy recited in the Fund's Prospectus as a "fundamental investment policy" as detailed above.

155.    The SAIs, which formed an integral part of the Contract, listed numerous limitations on the Fund, including limitations on the Fund's ability to invest in a given industry and ability to invest in illiquid instruments.  These were specific promises that are part of the Contract. Specifically, the SAIs stated that the Fund could not:

> Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.

The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005; November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as

amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15,

2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7,

2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16,

2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

156.    As had prior SAIs, the SAI issued November 15, 2004, set forth the Fund's existing

fundamental investment policies, which could not be changed or diverged from without prior

approval from a majority of the Fund's shareholders:

INVESTMENT LIMITATIONS

> The following investment limitations are fundamental investment
> polices and restrictions and may be changed only by vote of a
> majority of a fund's outstanding voting shares.…

> THE SCHWAB YIELDPLUS FUND® … MAY NOT:…

> 2)    Concentrate investments in a particular industry or group of
>        industries, as concentration is defined under the 1940 Act, or
>        the rules or regulations there under, as such statute, rules and
>        regulations may be amended from time to time….

The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004;

November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as

amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15,

2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005;

November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as

amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15,

2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7,

2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16,

2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

157.    Following this paragraph and within the same section establishing the Fund's

fundamental investment policies, the SAI also defined the term "concentration":

> THE FOLLOWING DESCRIPTIONS OF THE 1940 ACT MAY
> ASSIST INVESTORS IN UNDERSTANDING THE ABOVE
> POLICIES AND RESTRICTIONS.…

1
2

> Concentration.  The SEC has presently defined concentration as investing 25% or more of an investment company's net assets in an industry or group of industries, with certain exceptions.

3   The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004;

4   November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as

5   amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15,

6   2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005;

7   November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as

8   amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15,

9   2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7,

10  2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16,

11  2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

12          158.    This fundamental investment policy and material Contract term thus assured

13  shareholders that the Fund would remain well diversified.  Because this policy was "fundamental,"

14  the Board of Trustees could not legitimately change the policy without first obtaining approval by a

15  majority of the Fund's shareholders.  When they changed that policy without the required

16  shareholder vote, the Contract was breached.

17          159.    In a separate section entitled "Investments, Risks and Limitations," this

18  November 15, 2004, Statement of Additional Information also purported to describe in greater

19  detail certain terms used elsewhere in the document, including the word, "concentration."  This

20  description specifically advised investors that mortgage-backed securities constituted "a particular

21  industry" and thus were subject to the Fund's no-concentration fundamental policy:

22
23
24
25

> CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure.  Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities *as a separate industry for purposes of a fund's concentration policy*…. [Emphasis added.]

26
27  The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004;

28  November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as

amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005.

160.    The SAIs also stated that the Fund could not "Invest more than 15% of its net assets in illiquid securities."  This was another material term of the Contract.  The foregoing quote appeared verbatim in SAIs issued as followed:  November 15, 2004; November 15, 2004, as amended December 10, 2004; November 15, 2004; November 15, 2004, as amended December 15, 2004; November 15, 2004, as amended February 28, 2005; November 15, 2004, as amended April 18, 2005; November 15, 2004, as amended September 16, 2005; November 15, 2005; November 15, 2005, as amended December 9, 2005; November 15, 2005, as amended February 1, 2006; November 15, 2005, as amended September 1, 2006; November 15, 2006; November 15, 2006, as amended February 1, 2007; November 15, 2006, as amended May 7, 2007; November 15, 2006, as amended July 25, 2007; November 15, 2006, as amended August 16, 2007; November 15, 2006, as amended October 17, 2007; November 15, 2007.

161.    By summer 2006, the Fund and the Trustees were violating the no-concentration fundamental policy.  And the Fund and the Trustees had not sought shareholder approval before doing so.

162.    Contrary to the Fund's investment guidelines, the Fund's assets were being shifted into longer-duration bonds, including extensive investments in high-risk mortgage-backed securities and similar investments.  Mortgage-backed securities posed a particular risk to the Fund by drastically increasing exposure to the very interest rate risk that the Fund's investment strategy purported to minimize.  While rising interest rates may cause the value of highly-rated corporate or government bonds to decrease, such rate changes generally do not increase the risk that the bonds would default.  In contrast, instruments backed by residential mortgages – and by subprime mortgages in particular – face a significantly heightened risk of default from interest rate spikes.  Focusing on mortgage-backed securities also heightened the Fund's concentration risk by eroding the diversity of its investments, in violation of its investing guidelines.

163.    By deviating from the Fund's investment guidelines into higher-risk investments, the Fund's performance initially improved markedly.  In 2005, the Fund achieved returns of 3.4%,

significantly surpassing the Lehman Brothers Aggregate Bond Index, which achieved a return of 2.4%. Furthermore, the Fund's 2005 returns outpaced the average approximate 2.5% return of the 115 other ultrashort bond funds within the Morningstar ultrashort bond fund category. In 2006, the Fund achieved returns of 5.6% and 5.5% for the Select and Investor Shares, respectively, while the Lehman Brothers Aggregate Bond Index achieved a return of 4.3%. Meanwhile, the Fund's 2006 returns beat the average approximate 4.7% return of the 115 other ultrashort bond funds within the Morningstar ultrashort bond fund category.

164.    The strikingly improved performance achieved by abandoning the Fund's conservative investment guidelines succeeded in attracting new investors to the Fund. This growth began to occur in mid-to late 2005 when investors, attracted to a fund proclaiming itself to limiting fluctuations in share price but able to generate higher returns, poured investments into the Fund. By April 30, 2005, the Fund surpassed $5.5 billion in assets to become one of the largest ultrashort term bond funds. In May 2005, Lipper and Morningstar mutual fund industry analysts named the Fund as the best performer in its class.

165.    By the fall of 2006, the Fund's annual report dated August 31, 2006, disclosed that the Fund had 28.9% of its holdings in mortgage-backed securities, exceeding the fundamental policy's 25% limit.

166.    Even then, the SAIs description of the Fund's fundamental policy remained unchanged. The SAI dated November 15, 2006, contained the same description of the Fund's no-concentration policy, as did every SAI thereafter as set forth in ¶¶ 155-160:

**INVESTMENT LIMITATIONS**

> The following investment limitations are fundamental investment polices and restrictions and may be changed only by vote of a majority of a fund's outstanding voting shares.…
>
> THE SCHWAB YIELDPLUS FUND® … *MAY NOT*:…
>
> 2)      *Concentrate investments in a particular industry or group of industries*, as concentration is defined under the 1940 Act, or the rules or regulations there under, as such statute, rules and regulations may be amended from time to time;.…

THE FOLLOWING DESCRIPTIONS OF THE 1940 ACT MAY
ASSIST INVESTORS IN UNDERSTANDING THE ABOVE
POLICIES AND RESTRICTIONS.…

Concentration.  The SEC has presently *defined concentration as
investing 25% or more* of an investment company's net assets in an
industry or group of industries, with certain exceptions.  [Emphasis
added.]

167.    Then, by fiat and without holding a shareholder vote, the SAI amended

September 1, 2006, indicated that the Fund *reversed* its conclusion that mortgage-backed securities

comprised "a particular industry."  Purporting to excuse the Fund's over-concentration in

mortgage-based securities in violation of its fundamental investment policies, the prior SAIs

description of "concentration" was revised:

> "CONCENTRATION means that substantial amounts of assets are
> invested in a particular industry or group of industries.
> Concentration increases investment exposure.  For purposes of a
> fund's concentration policy, the fund will determine the industry
> classification of asset-backed securities based upon the investment
> adviser's evaluation of the risks associated with an investment in the
> underlying assets.  For example, asset-backed securities whose
> underlying assets share similar economic characteristics because, for
> example, they are funded (or supported) primarily from a single or
> similar source or revenue stream will be classified in the same
> industry sector.  In contrast, asset-backed securities whose
> underlying assets represent a diverse mix of industries, business
> sectors and/or revenue streams will be classified into distinct
> industries based on their underlying credit and liquidity structures.  A
> fund will limit its investments in each identified industry to less than
> 25% of its total assets.…  *The funds have determined that mortgage-
> backed securities issued by private lenders do not have risk
> characteristics that are correlated to any industry and, therefore, the
> funds have determined that mortgage-backed securities issued by
> private lenders are not part of any industry for purposes of the funds'
> concentration policies.  This means that a fund may invest more than
> 25% of its total assets in privately-issued mortgage-backed
> securities, which may cause the fund to be more sensitive to adverse
> economic, business or political developments that affect privately-
> issued mortgage-backed securities.  Such developments may include
> changes in interest rates, state or federal legislation affecting
> residential mortgages and their issuers, and changes in the overall
> economy.*"  [Emphasis added.]

168.    Over time, the Fund shifted asset allocation to become highly concentrated in

mortgage-backed securities.  The August 31, 2004, Annual Report disclosed that the Fund's

holdings in mortgage-backed securities comprised 11.1% of the Fund's portfolio.  This had grown

to 28.9% by August 31, 2006, exceeding the fundamental policy's 25% limit.  From there, it would

grow to a high of 50.1% by the end of February 2008, as demonstrated in the following chart produced by an industry expert using a sophisticated, industry-accepted valuation methodology not available to the average investor:

| | % Net Assets | | | | |
|---|---|---|---|---|---|
| | 5/31/2007 | 8/31/2007 | 11/30/2007 | 2/29/2008 | 5/31/2008 |
| CORPORATE BONDS | 45.10% | 40.30% | 34.90% | 34.00% | 24.60% |
| ASSET-BACKED OBLIGATIONS | 10.90% | 7.00% | 7.90% | 10.00% | 23.20% |
| MORTGAGE-BACKED SECURITIES | 46.50% | 45.90% | 46.20% | 50.10% | 18.40% |
| Total ABS+MBS | 57.40% | 52.90% | 54.10% | 60.10% | 41.60% |

169.    At no time did the Trustees seek or obtain approval from a majority of the Fund's shareholders to deviate from the Fund's no-concentration fundamental policy.

170.    But this deviation from the Fund's investment policy was changeable pursuant to the promises in the Contract, only by a shareholder vote.

171.    The above-noted investments made in violation of the stated fundamental investment policy and in violation of the Contract caused significant losses to the Fund's shareholders, as alleged above.

172.    All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of these Defendants' businesses.  These Defendants' wrongful conduct is part of a pattern or generalized course of conduct that has been repeated in the State of California on a continuing basis.  The Defendants' conduct thus impacts the public interest.

173.    As a proximate result of the Defendants' wrongful conduct, Plaintiffs and the members of the State-Law Class have sustained substantial damages in connection with losses in the Fund's value that resulted from the Fund's deviation from its stated fundamental investment policies.

174.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unfair competition, as provided in California Business & Professions Code § 17203 and Civil Code § 3345, and for such other relief as set forth in the Prayer for Relief.

**COUNT V[11]**

**VIOLATIONS OF SECTION 13(A) OF THE INVESTMENT COMPANY ACT AGAINST DEFENDANT SCHWAB INVESTMENTS ON BEHALF OF THE SECTION 13(A) CLASS**

175.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130, and 151-174 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which only encompasses the violation of the Fund's fundamental no-concentration policy.

176.    This count is asserted by Plaintiffs against defendant Schwab Investments.

177.    Defendant Schwab Investment's conduct, as described above, deviated from the Fund's investment policy that was changeable only by a shareholder vote; and a deviation from a policy recited in the Fund's Registration Statement as a "fundamental policy" in that, as detailed above:

        (a)    Schwab Investments employed investment strategies for the Fund inconsistent with its no-concentration fundamental policy precluding investment of more than 25% of the Fund's total assets in mortgage-backed securities; and

        (b)    Schwab Investments failed to allow Fund shareholders to vote on changing this fundamental policy before causing the Fund to deviate from the policy.

178.    The above-noted investments made in violation of the stated fundamental policy caused significant losses to the Fund's shareholders, as outlined above.

179.    As described above, Plaintiffs and other members of the Section 13(a) Class suffered substantial damages in connection with losses in the Fund's value that resulted from the Fund's deviation from its stated policy.

---

[11] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

**COUNT VI**[12]

**BREACH OF CONTRACT ON BEHALF OF THE STATE-LAW PRE-BREACH CLASS**

180.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130 and 151-179 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which focuses only on the Fund's violation of its fundamental no-concentration policy.

181.    This count is asserted by Plaintiffs against defendants Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, and Wilsey on behalf of the Pre-Breach Class only and encompasses only acquisitions of shares of the Fund that took place before the Fund violated its no-concentration fundamental investment policy.

182.    The Registration Statements, Prospectuses and SAIs are part of a contract that existed between each investor on the one hand, and the Fund and Trustee Defendants on the other (hereinafter the "Contract").  As signers of the Registration Statements, the Trustee Defendants are parties to the Contract.  The Registration Statements, Prospectuses and SAIs were proffered to investors in order to induce their investments in the Fund (that is, consideration for the bargain).

183.    Each of the defendants in this Count were a party to the Contract.  Each signed the Registration Statements and/or authorized the SAIs that are part of the contractual relationship.

184.    A valid contract exists between Plaintiffs and the above named defendants, in that Plaintiffs provided consideration in return for certain promises of performance by the defendants, and the parties had a lawful object that was part of the Contract – *i.e.*, prudent investment as defined in the Registration Statement and SAIs.  Another part of the contract is the documentation provided each Plaintiff and Class member that included a written confirmation from Schwab of the number of shares purchased in the Fund, the purchase price and transaction date.  These documents taken together provide consideration and constitute the terms of the agreement.

---
[12] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

185.   Consideration was exchanged by each party to the contract.  Plaintiffs and members of the Class tendered consideration when they invested in the Fund.  Each of the Defendants received consideration by virtue of the compensation they earned, in the hundreds of thousands of dollars on a yearly basis, from the Fund.

186.   Plaintiffs and members of the Pre-Breach Class have suffered substantial damages in connection with losses in the Fund's value that resulted from the deviation from stated fundament investment policy and resulting breach of contract.

## COUNT VII[13]

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS ON BEHALF OF THE STATE LAW PRE-BREACH CLASS

187.   Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130 and 151-186 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which focuses only on the Fund's violation of its fundamental no-concentration policy.

188.   This count is asserted by Plaintiffs against defendants Schwab, Schwab Corp., Schwab Management, Schwab Investments, Daifotis and Hastings, and in the alternative against defendants Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, and Wilsey, on behalf of the Pre-Breach Class only and encompasses only acquisitions of shares of the Fund that took place before the Fund violated its no-concentration fundamental investment policy.  In other words, if the alternative defendants are not parties to the Contract as alleged in Count IV, then they are strangers to the Contract for the purposes of this Count.

189.   As alleged *supra* at ¶¶ 182-155, the Registration Statements, Prospectuses and SAIs constituted parts of a contract between each investor and Schwab, and each Defendant knew of and indeed helped author the document which formed the Contract

---

[13] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

190.    This contract was breached and Plaintiffs were damaged as alleged *supra* at ¶¶ 155-186.

191.    These defendants, by means of their control of the Fund, intentionally induced the Fund to breach the contracts entered into by the Fund with Plaintiffs and members of the Pre-Breach Class, and interfered with the contractual relationships between the Fund and members of the Pre-Breach Class for the purpose of promoting their own financial interests by inducing the Fund to concentrate assets in a particular industry or group of industries without first obtaining shareholder approval in violation of the contracts.  Those defendants knew of the Fund's contracts with Plaintiffs and members of the Pre-Breach Class, intended to induce the Fund to breach its contracts and, as a result, did injure Plaintiffs and members of the Pre-Breach Class through these actions.

## COUNT VI[14]

### VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE §§ 17200 *et seq.* ON BEHALF OF THE STATE LAW POST-BREACH CLASS

192.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130 and 151-191 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which focuses only on the Fund's violation of its fundamental no-concentration policy

193.    This count is asserted by Plaintiffs against Schwab Management, Schwab Investments, Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, Wilsey, Daifotis and Hastings on behalf of the Pre-Breach Class only and encompasses only acquisitions of shares of the Fund that took place before the Fund violated its no-concentration fundamental investment policy.

194.    The Fund engaged in "unlawful" business acts and practices in violation of the California Unfair Competition Law ("UCL") by violating § 48(a) of the ICA (15 U.S.C. 80(a)-47(a)), and § 13(a) of the ICA, 15 U.S.C. § 80a-13(a).  Plaintiffs reserve the right to identify

---

[14] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

1  additional violations of California and/or federal law committed by the Fund as further

2  investigation and discovery warrants.

3        195.    All of the wrongful conduct alleged herein occurred and continues to occur in the

4  conduct of the Fund's business.  The wrongful conduct is part of a pattern or generalized course of

5  conduct that has been repeated in the State of California on hundreds of occasions.  The conduct

6  thus impacts the public interest.

7        196.    As a proximate result of the wrongful conduct, Plaintiffs and the members of the

8  Pre-Breach Class have sustained substantial damages in connection with losses in the Fund's value

9  that resulted from the Fund's deviation from its stated fundamental investment policy.

10        197.    Plaintiffs request that this Court enter such orders or judgments as may be necessary

11  to restore to any person in interest any money that may have been acquired by means of such

12  unlawful conduct, as provided in California Business & Professions Code § 17203 and Civil Code

13  § 3345, and for such other relief as set forth in the Prayer for Relief.

14                            **COUNT VII[15]**

15    **BREACH OF CONTRACT ON BEHALF OF THE STATE LAW POST-BREACH CLASS**

16        198.    Plaintiffs incorporate by reference and re-allege the allegations contained in the

17  foregoing paragraphs 6-10, 18-51, 124-130 and 151-197 as if fully set forth in this paragraph.

18  Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus

19  Fund are not incorporated into this Count, which focuses only on the Fund's violation of its

20  fundamental no-concentration policy

21        199.    This count is asserted by Plaintiffs against Charles R. Schwab, Dilsaver, Merk,

22  Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, and Wilsey, on behalf of the Post-

23  Breach Class only and encompasses only acquisitions of shares of the Fund that took place after the

24  Fund violated its no-concentration fundamental investment policy.

25        200.    As pled above, the fundamental investment policy was a material Contract term that

26  assured shareholders that the Fund would remain well diversified.  Because this policy was

27  _____

28        [15] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

"fundamental," the Board of Trustees could not legitimately change the policy without first obtaining approval by a majority of the Fund's shareholders.

201.    At no time did the Trustees seek or obtain approval from a majority of the Fund's shareholders to deviate from the Fund's no-concentration fundamental policy.

202.    When the Trustees changed that policy without the required shareholder vote, the Contract was breached.

203.    The above-noted investments made in violation of the stated fundamental investment policy caused significant losses to the Fund's shareholders, as alleged above.

204.    Plaintiffs and members of the Post-Breach Class have suffered substantial damages in connection with losses in the Fund's value that resulted from the deviation from stated fundament investment policy and resulting breach of contract.

## COUNT VIII[16]

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL
### RELATIONS ON BEHALF OF THE STATE LAW POST-BREACH CLASS

205.    Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130 and 151-204 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which focuses only on the Fund's violation of its fundamental no-concentration policy.

206.    This count is asserted by Plaintiffs against defendants Schwab, Schwab Corp., Schwab Management, Schwab Investments, Daifotis and Hastings, and in the alternative against defendants Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, and Wilsey, and in the alternative against defendants Charles R. Schwab, Dilsaver, Merk, Pereira, Byerwalter, Doward, Hasler, Holmes, Smith, Stephens, and Wilsey, on behalf of the Post-Breach Class only and encompasses only acquisitions of shares of the Fund that took place after the Fund violated its no-concentration fundamental investment policy.  In other

---

[16] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

words, if the alternative defendants are not parties to the Contract as alleged in Count VII, then they are strangers to the Contract for the purposes of this Count.

207.     As alleged *supra* at ¶¶ 182-155, the Registration Statements, Prospectuses and SAIs and confirmation statements constituted a contract between each investor and Schwab.

208.     The contract was breached and Plaintiffs were damaged as alleged *supra* at ¶¶ 155-186.

209.     These defendants, by means of their control of the Fund, induced the Fund to breach the contracts entered into by the Fund with Plaintiffs and members of the Post-Breach Class, and interfered with the contractual relationships between the Fund and members of the Post-Breach Class for the purpose of promoting their own financial interests by inducing the Fund to concentrate assets in a particular industry or group of industries without first obtaining shareholder approval in violation of the contracts.  Those defendants knew of the Fund's contracts with Plaintiffs and members of the Post-Breach Class, intended to induce the Fund to breach its contracts and, as a result, did injure Plaintiffs and members of the Post-Breach Class through these actions.

## COUNT X[17]

### BREACH OF FIDUCIARY DUTY ON BEHALF OF STATE LAW CLASSES

210.     Plaintiffs incorporate by reference and re-allege the allegations contained in the foregoing paragraphs 6-10, 18-51, 124-130 and 151-209 as if fully set forth in this paragraph. Paragraphs relating to the misstatements and omissions made in connection with the YieldPlus Fund are not incorporated into this Count, which focuses only on unequal treatment of shareholders and deprivation of voting rights..

211.     This count is asserted against defendants Schwab Investments, Schwab Investment Management, Charles S. Schwab, Dilsaver, Merk, Pereira, Daifotis and Hastings.

212.     Schwab Investments, Schwab Investment Management, Charles S. Schwab, Dilsaver, Merk, Pereira, Daifotis and Hastings were each controlling persons of the Fund as well as

---

[17] Plaintiffs reassert this count solely to preserve their right to appeal its dismissal.

1    other funds in the Schwab family of Funds.  Each was a fiduciary to the Fund and to Class

2    members.

3         213.    Trustees in addition had promised shareholders in the SAIs that they were

4    "responsible or protecting shareholders interests" and met seven times a year to do so.  By virtue of

5    their positions and promises, each of the Defendants was obligated to treat all shareholders with

6    equal loyalty, candor and fairness.

7         214.    Other Schwab funds were managed by these same persons.  Before the public

8    investors became aware of the losses that would occur in the Fund, these other Schwab funds

9    redeemed shares they held in this Fund before the Fund's NAV dropped.  The other Schwab

10   investment funds that were managed by the same entities and persons as the Fund, with inside

11   knowledge of the truth about the Fund, thus breached their fiduciary duties and liquidated their

12   holdings in the Fund at the expense of the other Fund investors, causing Plaintiffs and the members

13   of the Pre-Breach State-Law Class and Post-Breach State-Law Class an individual injury distinct

14   from injury to the Fund itself and treated them differently from other shareholders.

15        215.    In a letter to the SEC dated January 6, 2004, in commenting on disclosure policies,

16   Schwab stated:

17              Schwab agrees with the Commission that mutual fund managers
              should not be permitted to selectively disclose their funds' portfolio
18             holdings in order to favor larger investors.  There is no reason why
              institutional or affluent investors-such as hedge funds-should have
19             access to more frequent reports on fund portfolio holdings than
              ordinary retail investors, and doing so provides those investors with
20             an unfair advantage that could encourage harmful market timing and
              other trading activity.[18]
21
22        216.    In essence, Defendants' conduct here violates the duties recognized in this letter.

23   Defendants in this Count disclosed the hidden risks of the Fund to favored investors, providing

24   such investors with an unfair advantage that was harmful to the Fund and treated other

25   shareholders unequally.

26        217.    Moreover, defendants Schwab Investments, Schwab Investment Management,

27   Charles S. Schwab, Dilsaver, Merk, Pereira, Daifotis and Hastings breached fiduciary duties by

28   _____
     [18] http://www.sec.gov/rules/proposed/s72603/charlesschwab020604.htm

SECOND CONSOLIDATED AMENDED COMPLAINT          - 91 -
No. 08-cv-01510 WHA
010036-12  326326 V1

violating the voting rights of Plaintiffs and the Pre-Breach Class by unilaterally revising the Fund's no-concentration fundamental investment policy as more particularly described above in paragraphs 181-171.  This caused Plaintiffs and the members of the Pre-Breach Class an individual injury distinct from injury to the Fund itself.

## VI.    OTHER COUNTS

218.    Solely for the purpose of preserving Plaintiffs' right to appeal the Court's February 4, 2009, Order (the "Order") dismissing the allegation against PWC, Plaintiffs reallege and incorporate by reference all claims and related allegations in Plaintiffs' Consolidated Class Action Complaint, filed October 2, 2008, against PWC.  Because Plaintiffs are asserting these claims solely to preserve their appeal rights and because Plaintiffs assert no additional claims or facts regarding PWC that were not addressed by the Order, Plaintiffs acknowledge that the Order addresses these claims and that no additional answer or response by PWC is required.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

E.    Awarding rescissionary damages; and

F.    Such equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

1     Dated:  October 26, 2009

2                                              HAGENS BERMAN SOBOL SHAPIRO LLP

3                                              Reed R. Kathrein
4                                              Peter E. Borkon
                                               715 Hearst Avenue, Suite 202
5                                              Berkeley, CA 94710
                                               Telephone: (510) 725-3000
6                                              Facsimile: (510) 725-3001
                                               reed@hbsslaw.com
7                                              peterb@hbsslaw.com

8

9                                              HAGENS BERMAN SOBOL SHAPIRO LLP

10

11                                             By _____s/ Steve W. Berman_____
12                                                    Steve W. Berman
                                               Sean R. Matt
13                                             Erin K. Flory
                                               1301 Fifth Avenue, Suite 2900
14                                             Seattle, WA 98101
                                               Telephone: (206) 623-7292
15                                             Facsimile: (206) 623-0594
                                               steve@hbsslaw.com
16                                             sean@hbsslaw.com
17                                             erin@hbsslaw.com

18                                             Attorneys for Lead Plaintiff
19                                             theYieldPlus Investor Group

20

21

22

23

24

25

26

27

28

SECOND CONSOLIDATED AMENDED COMPLAINT          - 93 -
No. 08-cv-01510 WHA
010036-12  326326 V1