DAVID B. BAYLESS (SBN 189235)
Email:  dbayless@cov.com
TAMMY ALBARRÁN (SBN 215605)
Email:  talbarran@cov.com
AILEEN WHEELER (SBN 223705)
Email:  awheeler@cov.com
PAUL WATKINS (SBN 244974)
Email:  pwatkins@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone:     415-591-6000
Facsimile:      415-591-6091

Attorneys for Defendant Kimon P. Daifotis

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | Master File No.: 08-CV-01510 WHA **CLASS ACTION** **NOTICE OF MOTION AND MOTION OF DEFENDANT KIMON P. DAIFOTIS FOR SUMMARY JUDGMENT** Date:   March 25, 2010 Time:  8:00 a.m. Dept.:  Courtroom 9 Honorable William H. Alsup |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 25, 2010, at 8:00 a.m. in the courtroom of the Honorable William H. Alsup, United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Ave., Courtroom 9, 19th Floor, San Francisco, California, or at such date and time as the Court may otherwise direct, defendant Kimon P. Daifotis ("Mr. Daifotis") will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting Mr. Daifotis summary judgment on the only cause of action remaining against him in the Second Consolidated Amended Complaint, namely Plaintiffs' claim under Section 12(a)(2) of the Securities Act of 1933.

This motion is based on this Notice; the Memorandum of Points and Authorities set forth below; the accompanying Declaration of Tammy Albarrán in Support of Kimon P. Daifotis' Motion for Summary Judgment ("Albarrán Decl.") and exhibits attached thereto ("Ex. __"); the Declaration of Kimon P. Daifotis In Support of his Motion for Summary Judgment ("Daifotis Decl."); the Request for Judicial Notice; the Appendix of Non-Published Authorities Cited in Kimon P. Daifotis' Motion for Summary Judgment; the Proposed Order; and such further argument and evidence as the Court shall permit.

**STATEMENT OF ISSUES TO BE DECIDED**

**(Local Rule 7-4)**

1.      Whether Mr. Daifotis is a statutory seller under Section 12(a)(2) when the undisputed facts show that Mr. Daifotis did not directly solicit investors' purchases of YieldPlus shares.

2.      Whether Lead Plaintiffs have standing to maintain a class action against Mr. Daifotis for violating Section 12(a)(2) when the undisputed facts demonstrate that Mr. Daifotis did not directly solicit any Lead Plaintiff's purchase of YieldPlus shares.

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ...................................................................... 2

I.      CHARLES SCHWAB CORPORATE STRUCTURE...................................... 2

II.     MR. DAIFOTIS' RELEVANT CONDUCT AT CSIM. ................................... 3

III.    MR. DAIFOTIS HAD NO PERSONAL CONTACT WITH ANY LEAD
        PLAINTIFF. ..................................................................................................... 4

LEGAL ARGUMENT...................................................................................................... 4

I.      SECTION 12 SELLERS INCLUDE ONLY THOSE WHO EITHER PASS
        TITLE TO THE BUYER OR DIRECTLY SOLICIT A SECURITIES
        TRANSACTION. ............................................................................................... 5

        A.      Under the Supreme Court Decision, *Pinter v. Dahl*, a Person is a
                Statutory Seller of a Security Under Section 12(a)(2) Only If the
                Person Sells, or Directly Solicits the Sale of, the Security.................... 5

        B.      The Solicitation of the Plaintiff-Purchaser Must Be Direct.................. 8

                1.      "Direct Solicitation" Requires Personal Contact Between
                        Plaintiffs and the Defendant. ...................................... 9

                2.      The Personal Contact Requirement is Consistent with *Pinter*
                        and Section 12's Strict Liability. .............................. 10

II.     LEGISLATIVE HISTORY AND THE BROADER STATUTORY SCHEME
        CONFIRM THAT SECTION 12 DOES NOT REACH PARTICIPANTS. ................... 11

        A.      Legislative History Confirms Congressional Intent to Exclude As
                Sellers Those Who Merely Participate in Selling Securities. .............. 11

        B.      The Broader Federal Securities Statutes Confirm That Section 12 Does
                Not Reach Mere Participants. ............................................. 13

III.    THE UNDISPUTED FACTS SHOW THAT MR. DAIFOTIS IS NOT A
        STATUTORY "SELLER" UNDER SECTION 12(A)(2). ............................. 15

        A.      Mr. Daifotis' Conduct Does Not Constitute "Solicitation." ............... 15

        B.      Mr. Daifotis Did Not Directly Solicit Any Investors' Purchases of
                YieldPlus Shares. ....................................................... 16

IV.     PLAINTIFFS LACK STANDING TO MAINTAIN THIS CLASS ACTION
        AGAINST MR. DAIFOTIS. ............................................................. 17

CONCLUSION.............................................................................................................. 19

1
2

## TABLE OF AUTHORITIES

3

Page(s)

4

**FEDERAL CASES**

5

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...................................................................................................4

6
7

*Ballay v. Legg Mason Wood Walker, Inc.,*
   925 F.2d 682 (3d Cir. 1991) ...................................................................................14

8

*Celotrex Corp. v. Catrett,*
   477 U.S. 317 (1986)...................................................................................................4

9
10

*Endo v. Albertine,*
   No. 88C1815, 1995 U.S. Dist. LEXIS 4517 (N.D. Ill. Apr. 7, 1995) ......................9

11
12

*Friedman v. Arizona World Nurseries, Ltd.,*
   730 F. Supp. 521 (S.D.N.Y. 1990) ..........................................................................8

13

*Goodworth Holdings, Inc. v. Suh,*
   239 F. Supp. 2d 947 (N.D. Cal. 2002) ....................................................................4

14
15

*Herman & McLean v. Huddleston,*
   459 U.S. 375 (1983)................................................................................................14

16
17

*In re Alliance Equip. Lease Program Sec. Litig.,*
   No. 98-CV-2150 J (NLS), 2002 WL 34451621 (S.D. Cal. Oct. 15, 2002) ..............9, 15, 16

18
19

*In re Charles Schwab Sec. Litig.,*
   257 F.R.D. 534 (N.D. Cal. 2009).............................................................................5

20

*In re Daou Sys, Inc Sec. Litig.,*
   411 F.3d 1006 (9th Cir. 2005) ........................................................................1, 8, 15

21
22

*In re Gas Reclamation Sec. Litig.,*
   733 F. Supp. 713 (S.D.N.Y. 1990) ................................................................7, 10, 16

23
24

*In re Infonet Servs. Corp. Sec. Litig.,*
   310 F. Supp. 2d 1080 (C.D. Cal. 2003) ..................................................................5

25

*In re Newbridge Networks Sec. Litig.,*
   767 F. Supp. 275 (D.D.C. 1991)..............................................................................9

26
27

*In re Royal Ahold N.V. Sec. and ERISA Litig.,*
   384 F. Supp. 2d 838 (D. Md. 2005).....................................................................2, 18

28

*In re Westinghouse Sec. Litig.,*
   90 F.3d 696 (3rd Cir. 1996)......................................................................................8

*Jackson v. First Fed. Sav. of Ark., F.A.*,
    709 F. Supp. 863 (E.D. Ark. 1988)........................................................................8

*Mabon, Nugent & Co. v. Borey*,
    No. 89 Civ. 3986, 1991 U.S. Dist. LEXIS 7832 (S.D.N.Y. June 11, 1991)............................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................4

*Moore v. Kayport Package Express, Inc.*,
    885 F.2d 531 (9th Cir. 1989) ........................................................................1

*Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ........................................................................4

*Pinter v. Dahl*,
    486 U.S. 622 (1988)........................................................................passim

*PPM Am. Inc. v. Marriott Corp.*,
    853 F. Supp. 860 (D. Md. 1994)........................................................................10

*Pullins v. Klimley*,
    No. 3:05-CV-082, 2008 WL 85871 (S.D. Ohio Jan. 7, 2008)........................................7

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ........................................................................9, 18

*Rubin v. United States*,
    449 U.S. 424 (1981)........................................................................11

*Ryder Int'l Corp. v. First Am. Nat'l Bank*,
    943 F.2d 1521 (11th Cir. 1991) ........................................................................6, 7

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y. 1996) ........................................................................9

*Sherwood Sec. Corp.*,
    No. C-86-20344-WAI, 1989 WL 108797 (N.D. Cal. July 27, 1989)........................................7

*VT Investors v. R&D Funding Corp*,
    733 F. Supp. 823 (D. N.J. 1990) ........................................................................6

**STATUTES AND RULES**

15 U.S.C. § 77k(a) ........................................................................12, 13

15 U.S.C. § 77l(a)(2) ........................................................................passim

15 U.S.C. § 78j(b)........................................................................14

Securities Act of 1933,
    Pub. L. No. 73-22, §§ 11(e), 12(2), 48 Stat. 74, 83, 84 (1933) ...............................12

Securities Exchange Act of 1934,
    Pub. L. No. 73-291, § 206(d), 48. Stat. 881, 907 (1934) .........................................12

Fed. R. Civ. P. 56.................................................................................................................4

**OTHER AUTHORITIES**

Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of
    1933: 'Participation' and the Pertinent Legislative Materials*, 15 FORDHAM URB.
    L.J. 877, 925-26 (1987) ....................................................................................11

Harold S. Bloomenthal, *Securities Law Handbook*, 52 (2007 ed.)................................13

William O. Fisher, *Parsing Pinter Four Years Later: Defining a Statutory Seller Under
    Section 12 of the Securities Act*, 21 SEC. REGULATION L.J. 46 (Spring 1993) .......10

Louis Loss, *Securities Regulation,* 1017 (2d ed. 1961) ................................................14

Patricia O'Hara, *Erosion of the Privity Requirement in Section 12(2) of the Securities
    Act of 1933: The Expanded Meaning of Seller*, 31 UCLA L. REV. 921, 996 (1984)..............14

Robert A. Prentice, *Section 12 of the 1933 Act: Establishing the Statutory Seller*, 40
    ALA. L. REV. 417, 447 (1989)...................................................................................12

Bryan M. Schneider, *Section 12 of the Securities Act of 1933: The Privity Requirement
    in the Contemporary Securities Law Perspective*, 51 TENN. L. REV. 235, 253 (1984)..........12

**INTRODUCTION**

The only remaining cause of action against Kimon P. Daifotis ("Mr. Daifotis") in this case is a federal securities law claim under Section 12(a)(2) of the Securities Act of 1933 ("Section 12(a)(2)").  By its very terms, Section 12(a)(2) sets forth both the *proper defendant* (the person who "offers or sells" the security), as well as the *proper plaintiff* (the person "purchasing [the] security from" the defendant).  15 U.S.C. § 77l(a)(2).  Here, Mr. Daifotis is <u>not</u> the proper defendant, and <u>no</u> proper plaintiff has been identified, obviating this class action.

The Section 12(a)(2) claim against Mr. Daifotis fails because he was not a statutory seller.  A statutory seller is one who either passes title to the buyer or successfully "solicits" the purchase.  *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988) (addressing liability under Section 12(a)(1)); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 536-37 (9th Cir. 1989) (adopting *Pinter*'s reasoning and analysis to Section 12(a)(2) claims).  In turn, "solicitation" requires "urg[ing]" and "persuad[ing]" the buyer to purchase, and "tout[ing]" the security in question, all of which is "directed at producing the sale."  *See Pinter*, 486 U.S. at 644, 647 (1988).  Importantly, mere *participation* in an effort to sell securities (no matter how substantial) is not actionable under Section 12(a)(2).  *Id.* at 650.

In addition, the defendant must have been "'directly involved' in the actual solicitation of a securities purchase."  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1029 (9th Cir. 2005).  Thus, the focus must be on the relationship between the parties, *not* on the defendant's *degree of involvement* in the securities transaction.  *Pinter*, 486 U.S. at 651 ("[t]he 'purchase from' requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser.").

So, here, Lead Plaintiffs must establish that Mr. Daifotis' either passed title or directly solicited purchases of YieldPlus shares.  But the undisputed material facts show that neither is the case.

Further, each Lead Plaintiff admitted under oath that he had *no* contact and certainly *no* relationship with Mr. Daifotis before purchasing YieldPlus shares.  So, even if Mr. Daifotis directly solicited some (yet unidentified) YieldPlus investor(s), given that Lead

Plaintiffs had no direct contact with Mr. Daifotis, they have no standing to maintain this class action against him. *See In re Royal Ahold N.V. Sec. and ERISA Litig.*, 384 F. Supp. 2d 838, 843 (D. Md. 2005) ("While lead plaintiff need not have standing to assert every claim, *there must ultimately be a named plaintiff with standing as to each defendant*.") (emphasis added).

Thus, Mr. Daifotis is entitled to summary judgment on the Section 12(a)(2) claim — the only remaining cause of action against him. In the alternative, the Court should dismiss this class action against Mr. Daifotis for lack of standing. Either way, Mr. Daifotis should no longer be a party to this case.[1]

## STATEMENT OF UNDISPUTED FACTS

## I.   CHARLES SCHWAB CORPORATE STRUCTURE

The Charles Schwab Corporation ("Schwab Corp.") is a holding company that engages in securities brokerage, banking and related financial services through its various subsidiaries. (*See* Plaintiffs' Second Consolidated Amended Complaint ("SCAC") ¶ 25.) Schwab Corp. is the parent company of both Charles Schwab Investment Management, Inc. ("CSIM") and Charles Schwab & Co., Inc. ("Schwab & Co."). (*Id.*)

CSIM is an SEC-registered investment advisor for the Schwab & Co. proprietary mutual funds, including YieldPlus. (Albarrán Decl., Exs. A at 5; B at 6.) CSIM oversees the asset management and administration of the YieldPlus Fund. (SCAC ¶ 27.) Mr. Daifotis was an employee of CSIM. (Albarrán Decl., Ex. C at 18, 26; Daifotis Decl. at ¶ 2.)

Schwab & Co. is a securities broker-dealer with 303 domestic branch offices as of December 31, 2006.[2] (*See* Albarrán Decl., Ex. D at 54.) These offices are staffed with experienced financial consultants ("FCs") focused on building and sustaining client relationships. (*Id.* at 52.) The FCs help retail individual investors develop an investment strategy and carry out investment and portfolio management decisions. (*Id.*)

---

[1] Mr. Daifotis also incorporates the arguments relevant to Plaintiffs' Section 12(a)(2) claims set forth in the Independent Trustees' Motion for Summary Judgment and Schwab's Motion for Summary Judgment.

[2] Plaintiffs' personal trading accounts were opened under, and trades were executed through, Schwab & Co., *not* CSIM.

## II.     MR. DAIFOTIS' RELEVANT CONDUCT AT CSIM

Throughout the Section 12 class period (May 31, 2006 to March 17, 2008), Mr. Daifotis was employed by CSIM and served as its Chief Investment Officer ("CIO") of Fixed Income.  (Albarrán Decl., Ex. C at 19, 26; Daifotis Decl. at ¶ 2.)  As CIO of Fixed Income, Mr. Daifotis' responsibilities ranged across all of the fixed income mutual funds whose investments CSIM managed.  He supervised the portfolio management teams for six taxable bond funds (one of which was YieldPlus), four municipal bond funds, 11 taxable money market funds, as well as 14 municipal money market funds.  (Albarrán Decl., Ex. C at 19, 22-25.)

Mr. Daifotis did not sign any YieldPlus prospectus filed with the Securities and Exchange Commission.  (Daifotis Decl. at ¶ 3; Albarrán Decl., Ex. C at 21.)  Mr. Daifotis occasionally reviewed sections of advertisements about YieldPlus.  (Albarrán Decl., Ex. C at 39-40, 43-44.)  He also edited and revised "white papers" about the Ultra-Short Bond Fund category.  (*Id.* at 44-47; Albarrán Decl., Ex. K.)  Mr. Daifotis occasionally reviewed Schwab YieldPlus Fund Quarterly Reviews.  (Albarrán Decl., Exs. L; C at 48-49.)  He did not review YieldPlus Fund fact sheets.  (Albarrán Decl., Exs. M; C at 41-42.) Mr. Daifotis gave media interviews.  (*Id.* at 30.)  He spoke at fixed income industry conferences.  (*Id.* at 29.)

From time to time, Mr. Daifotis communicated with Schwab & Co. FCs and Schwab Institutional[3] sales representatives about the Fund.  (*Id.* at 27.)  On one occasion, at the request of a Schwab Institutional sales representative, Mr. Daifotis met with Moneta Financial, a large independent investment adviser.  (*Id.* at 31-32.)  On another occasion, Mr. Daifotis attended a Schwab & Co. retail client dinner in Phoenix.  (*Id.* at 37-38.)

---

[3] Schwab Institutional provides custodial, trading, technology, practice management and other support services to independent investment advisors who would custody their clients' accounts with Schwab & Co.  (*See* Albarrán Decl., Ex. D at 53.)  To attract these advisers, Schwab Institutional has a dedicated sales force.  (*Id.*)

### III.   MR. DAIFOTIS HAD NO PERSONAL CONTACT WITH ANY LEAD PLAINTIFF.

Mr. Daifotis had no personal contact with any Lead Plaintiff before or after their purchases of YieldPlus shares.  Indeed, every single Lead Plaintiff, without exception, admits that he had no pre-investment contact with Mr. Daifotis.  (Albarrán Decl., Exs. F at 158; G at 161; H at 164; I at 167; J at 170.)

### LEGAL ARGUMENT

Summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotrex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Goodworth Holdings, Inc. v. Suh*, 239 F. Supp. 2d 947, 955 (N.D. Cal. 2002) (WHA).  On a motion by the party without the burden of proof at trial, the party may carry its initial burden by either of two methods.  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc*., 210 F.3d 1099, 1106 (9th Cir. 2000); *Goodworth Holdings, Inc.*, 239 F. Supp. 2d at 956.

Here, Plaintiffs must present admissible evidence that supports their Section 12(a)(2) cause of action against Mr. Daifotis.  This burden requires admissible evidence of "specific facts" to support each element of its claim.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 250, 256 (1986).  Speculation or inconclusive inferences will not defeat summary judgment.  Rather, Plaintiffs must affirmatively produce credible and admissible evidence to support their claims.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

As set forth below, Plaintiffs cannot establish a triable issue that Mr. Daifotis is a statutory "seller" of YieldPlus securities.  Thus, he cannot be liable under Section 12(a)(2).

**I.      SECTION 12 SELLERS INCLUDE ONLY THOSE WHO EITHER PASS TITLE TO THE BUYER OR DIRECTLY SOLICIT A SECURITIES TRANSACTION.**

Section 12(a)(2) creates a cause of action for a plaintiff who purchases a security from a defendant by means of a materially false prospectus or oral communication:

> Any person who--[]
>
> (2) *offers or sells* a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact …
>
> *shall be liable … to the person purchasing such security from him*…

15 U.S.C. § 77l(a)(2) (emphasis added).[4]

Section 12(a)(2) has a narrow scope both in terms of potential defendants and potential plaintiffs.  It targets only those defendants who *actually* "offer" or "sell" a security to the plaintiff.  And a statutory seller is liable *only* to those individuals he directly solicited.  15 U.S.C. § 77l(a)(2).

**A.      Under the Supreme Court Decision, *Pinter v. Dahl,* a Person is a Statutory Seller of a Security Under Section 12(a)(2) Only If the Person Sells, or Directly Solicits the Sale of, the Security.**

The Supreme Court, in *Pinter v. Dahl*, 486 U.S. 622 (1988), identified two groups of Section 12 "sellers": (1) "the owner who passed title… to the buyer for value," and, (2) "the person who successfully solicit[ed] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id*. at 642, 647;[5] *In re Charles Schwab Sec. Litig.*, 257 F.R.D. 534, 548 n.2 (N.D. Cal. 2009) ("Ninth Circuit has clarified that" *Pinter*'s "inquiry" under section 12(a)(1) "governs claims under Section

---

[4] The Court has excluded from the Section 12 class "investors who claim to have been damaged by false *oral* statements; it will be limited to prospectuses."  (*See* August 21, 2009 Order at 8, emphasis in original.)

[5] Plaintiffs' complaint does not allege that Mr. Daifotis "passed title" to any of the plaintiffs.  (*See* SCAC.)  Indeed, the SCAC alleges, and it is undisputed, that Schwab Investments is the "issuer of the shares."  (*Id.* ¶ 28.)  Thus, Plaintiffs cannot establish liability on this basis.  *See, e.g., In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1100 (C.D. Cal. 2003) (Section 12(a)(2) claim dismissed where defendants did not pass title to the security).

12(a)(2).") (citation omitted).  The Supreme Court noted that Section 12 reaches "solicitation" because that "is the stage at which an investor is most likely to be injured . . . *by being persuaded to purchase securities without full and fair information*" (emphasis added)).  *Pinter* 486 U.S. at 646-47.

But, as *Pinter* made clear, "solicitation" does not encompass all activities related to the sales transaction, and expressly rejected participant liability:

> [Section] 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale.  When Congress wished to create such liability, it had little trouble doing so.

*Pinter*, 486 U.S. at 650 & n.26; *see also*, Order re Motions to Dismiss, filed February 4, 2009, Docket No. 164 ("Feb. 4, 2009 Order"), at 14 ("In *Pinter*, the Supreme Court left little doubt that mere participation in a solicitation or sale will not suffice.") (citation omitted).  The Court also rejected a test for "seller" that imposed liability on persons whose actions were a "substantial factor" in causing a plaintiff's purchase.  *Pinter*, 486 U.S at 651, 654.

Instead, solicitation involves "urg[ing]" and "persuad[ing]" the buyer to purchase, "tout[ing]" the security in question, all of which is "directed at producing the sale" for purposes of serving his own financial interests or those of the securities owner.  *See Pinter*, 486 U.S. at 644, 647; *VT Investors v. R&D Funding Corp*, 733 F. Supp. 823, 839 (D. N.J. 1990) (dismissing complaint alleging defendants actively solicited plaintiffs' purchases by agreeing to honor contractual commitments and providing cash flow projections to plaintiffs because the alleged conduct did not constitute "solicitation" as "[t]here is no mention of urging, or persuasion, words used by the Supreme Court in *Pinter* to describe the act of solicitation.  Nor is there language directed at producing a sale.").

Importantly, however, merely providing information and responding to questions or requests for factual information does not constitute solicitation.  In *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521 (11th Cir. 1991), defendant First American (1) contacted Ryder's agent about the investment opportunity, and (2) provided factual and financial information to Ryder and Ryder's agent about the securities at issue, along with similar

1    information about other investment opportunities.  *Ryder Int'l Corp. v. First Am. Nat'l Bank*,

2    749 F. Supp. 1569, 1579 (N.D. Ala. 1990), *aff'd*, 943 F.2d 1521 (11th Cir. 1991).  But the

3    district court found "no evidence" that First American "'urged' or 'persuaded' or 'otherwise

4    influenced'" Ryder (or his agent) to purchase the securities.  *Id.*  The Eleventh Circuit affirmed

5    the district court's grant of summary judgment, finding that First American did not "actively

6    solicit[]" plaintiff's purchase because it "did not specifically recommend or 'talk Ryder into

7    buying'" the securities.  *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1532 (11th

8    Cir. 1991).

9            Other district courts have agreed.  *See Pullins v. Klimley*, No. 3:05-CV-082, 2008

10   WL 85871, at *16 (S.D. Ohio Jan. 7 2008) (granting defendant summary judgment because his

11   statements regarding the company's financial condition did not constitute "direct and active"

12   solicitation"); *Sherwood Sec. Corp.*, No. C-86-20344-WAI, 1989 WL 108797 (N.D. Cal. July

13   27, 1989) (dismissing Section 12 claims finding presentation statements to prospective investors

14   about company's receipt of working capital, its temporary cash shortage position, positive

15   financial reports, and general allegations that defendant "promoted" the sale did not constitute

16   solicitation).

17           And presentations to prospective investors or assistance in another's solicitation

18   efforts are also insufficient to constitute solicitation.  In *In re Gas Reclamation Sec. Litig.*, 733

19   F. Supp. 713 (S.D.N.Y. 1990), the court granted summary judgment against investors who

20   alleged Section 12 violations.  The evidence showed that the defendant's agent who attended a

21   sales presentation to answer questions was introduced as "the individual responsible for

22   financing."  *Id* at 724.  The court ruled that the defendant's agent's conduct was insufficient to

23   support Section 12 liability.  *Id.*  "A seller must do more than 'merely assist in another's

24   solicitation efforts.'"  *Id.* (citing *Pinter,* 486 U.S. at 651-52, n.27).  The court considered other

25   evidence of the defendant's agent's conduct during his contact with plaintiff-investors and

26   concluded that, on each occasion, the agent was merely assisting in another's solicitation efforts.

27   *In re Gas Reclamation Sec. Litig.*, 733 F. Supp at 723-24;  *see also*, *Sherwood Sec. Corp.*, 1989

28   WL 108797 at *1.

**B.      The Solicitation of the Plaintiff-Purchaser Must Be Direct.**

As explained by *Pinter*, "[d]etermining that the activity in question falls within the definition of "offer" or "sell" in Section 2(3)… is only half of the analysis." *Pinter,* 486 U.S. at 643.  Section 12's "purchase from" requirement further "narrows the field." *Id.*.  It "focuses on the defendant's relationship with the plaintiff-purchaser." *Id.* at 651.  Indeed, in soundly rejecting the "substantial factor" test employed by lower courts to determine the scope of solicitation liability, the Court reasoned the test wrongly "focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances" rather than the defendant's relationship with the plaintiff-purchaser, as required by the statute's language.  *Id.*

As this Court has noted, "Courts have extrapolated [from *Pinter*]… a requirement that the defendant be alleged to have had some 'direct' role in the solicitation of the plaintiff."  (*See* Feb. 4, 2009 Order at 14 (citing *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1029 (9th Cir. 2005) (asking whether "defendants were 'directly involved' in the actual solicitation of a securities purchase"))).  *See also, In re Westinghouse Sec. Litig.*, 90 F.3d 696, 717 n.19 (3rd Cir. 1996) (requiring "[a]n allegation of direct and active participation in the solicitation of the immediate sale"); *Friedman v. Arizona World Nurseries, Ltd.*, 730 F. Supp. 521, 542 (S.D.N.Y. 1990), *aff'd*, 927 F.2d 594 (2d Cir. 1991) (Section 12(2) claim dismissed because no evidence or allegation that any of the plaintiffs comprised the investors purportedly in contact with the defendants); *Mabon, Nugent & Co. v. Borey*, No. 89 Civ. 3986, 1991 U.S. Dist. LEXIS 7832, at *16 (S.D.N.Y. June 11, 1991) (dismissing Section 12(2) claims against moving defendants because the "only allegations with respect to direct solicitation" relate to defendants *other than* the moving defendants); and *Jackson v. First Fed. Sav. of Ark., F.A.*, 709 F. Supp. 863, 884 (E.D. Ark. 1988) (dismissing Section 12(2) claim as plaintiff failed to allege that any defendant "either sold him his shares or solicited him to buy his shares.  Even if the defendants solicited purchases or sold shares to every other buyer of First Federal's shares, if they did not solicit [plaintiff] or sell to [plaintiff], then [plaintiff] may not recover from them under Section 12(2).").

### 1. "Direct Solicitation" Requires Personal Contact Between Plaintiffs and the Defendant.

Neither the Supreme Court nor the Ninth Circuit have elucidated the precise parameters of "direct" involvement in the actual solicitation. But, in a growing number of jurisdictions, including one district court within the Ninth Circuit, the lack of any personal contact between a plaintiff and a defendant is fatal to a Section 12 claim.[6]

In *In re Alliance Equip. Lease Program Sec. Litig.*, No. 98-CV-2150 J (NLS), 2002 WL 34451621 (S.D. Cal. Oct. 15, 2002), plaintiffs argued that Defendant Royal took an "active role" in soliciting investments by virtue of its agent's (1) meeting with potential investors at a sales presentation and answering investors' questions about the securities at issue and (2) drafting solicitation materials that misrepresented the scope of insurance coverage for the investment. *Id.* at *1, *9-*11. However, because lead plaintiffs offered no evidence that they or their financial advisors attended the sales presentation, or any other similar presentation, the court concluded that any representations Royal's agent may have made at these presentations "cannot be said to have directly solicited the investments of" lead plaintiffs. *Id.* at *9. Accordingly, the court granted summary judgment in favor of defendant broker.

---

[6] *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (affirming motion to dismiss because after-market purchaser-plaintiffs lacked standing to sue defendants who signed registration statement because "[t]o count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer"); *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 582 (S.D.N.Y. 1996)(granting defendant credit rating agency's motion to dismiss for failing to allege direct and personal contact and stating the court's view that "solicitation requires direct and personal contact, or control over and direction of the person who makes the direct solicitation"); *Endo v. Albertine*, No. 88C1815, 1995 U.S. Dist. LEXIS 4517, at *7 (N.D. Ill. Apr. 7, 1995) (denying motion to reconsider 12(b)(6) dismissal of Section 12 claims stating that "[e]ven if … [a certain defendant] participated in 'road show' presentations for the purpose of soliciting institutional investors, plaintiffs have failed to state a Section 12(2) claim against [that defendant] because plaintiffs have presented no evidence indicating that [that defendant] solicited any of the plaintiffs to purchase securities… or even had any contact with these plaintiffs); *In re Newbridge Networks Sec. Litig.*, 767 F. Supp. 275, 281 (D.D.C. 1991) (dismissing Section 12(2) claim where named plaintiffs had no relationship with defendants except through intermediaries and stating "absent any allegation of direct contact of any kind between defendants and plaintiff-purchasers, the Court rules as a matter of law that defendants are not statutory sellers.").

Similarly, in *PPM Am. Inc. v. Marriott Corp.*, 853 F. Supp. 860 (D. Md. 1994), the court granted summary judgment on plaintiff's Section 12 claim because a company issuing securities typically has no direct contact with those who purchase from an underwriter, and the issuing company's public statements about the offering were not directed at any particular investor. *Id.* at 875. The court concluded that such conduct is not "the type of one-to-one exchange of information which is typical of the broker-investor relationship and which the Supreme Court has viewed as the most typical example of 'solicitation.'" *Id.* (citing *Pinter*, 486 U.S. at 646).

And in *In re Gas Reclamation*, the court granted summary judgment in favor of defendants after analyzing each plaintiff's contacts with defendant's agent prior to plaintiff's investment. The Court held that "each investor… must prove that [defendant's agent] *personally* solicited him or her" and that only investors who attended sales presentations at which defendants' agent spoke "can claim to have been solicited" by defendant. 733 F. Supp. at 723 (emphasis added).

## 2. The Personal Contact Requirement is Consistent with *Pinter* and Section 12's Strict Liability.

The requirement that a plaintiff demonstrate that he had, *at minimum*, some *personal* contact with the defendant he claims solicited his securities purchase is consistent with *Pinter* and Section 12's statutory scheme. *Pinter*'s repeated reference to "brokers" as the quintessential Section 12 solicitor/seller, as well as the Court's citation of cases in which the defendant personally communicated with plaintiff, "strongly suggests that the sort of defendant-plaintiff relationship in which *Pinter* 'solicitation' occurs is one involving personalized point-of-sale advocacy." *See* William O. Fisher, *Parsing Pinter Four Years Later: Defining a Statutory Seller Under Section 12 of the Securities Act*, 21 SEC. REGULATION L.J. 46, 57 (Spring 1993); *see also, PPM America, Inc. v. Marriott Corp.*, 853 F. Supp. 860, 873 (D. Md. 1994) (stating that the "prototype of a 'solicitor' is a broker who solicits, in return for a commission…").

In addition, as *Pinter* noted, Section 12 is a strict liability statute: plaintiffs need not prove reliance, causation, or scienter. Such a statutory scheme "demands certainty and

predictability." *Pinter*, 486 U.S. at 652 (observing that logically sound limitations to solicitation liability under the substantial factor test would be difficult to develop and that decisions by courts employing that approach are made on an ad hoc basis). "We find it particularly unlikely that Congress would have ordained *sub silentio* the imposition of strict liability on such an unpredictably defined class of defendants." *Id*. By contrast, a requirement of personal contact provides a clear and common-sense guideline for distinguishing between a defendant who directly solicited a plaintiff's actual purchase of a security and one who was merely a substantial factor in causing that purchase.

## II. LEGISLATIVE HISTORY AND THE BROADER STATUTORY SCHEME CONFIRM THAT SECTION 12 DOES NOT REACH PARTICIPANTS.

### A. Legislative History Confirms Congressional Intent to Exclude As Sellers Those Who Merely Participate in Selling Securities.

Legislative history confirms that Congress intended Section 12(a)(2) to reach only those defendants who *actually* offer or sell a security, and not those who participate — even if such participation is substantial.

First, the '33 Act drafters were aware of other statutes expressly exposing participants to liability. The absence of such express language from Section 12 shows the drafters did not intend liability to extend to participants. The blue sky laws of twelve states and the Uniform Act "expressly imposed liability" on both direct violators and those who "participated" in making violative sales. Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of 1933: 'Participation' and the Pertinent Legislative Materials*, 15 15 FORDHAM URB. L.J. 877, 925-26 (1987) (citing Unif. Sale of Sec. Act § 16(1) (1929)); *see also id.* at 926 n.292, 927 n.294. The '33 Act drafters were aware of these statutes because they "were influenced by existing blue sky laws and by the Uniform Sale of Securities Act, a model blue sky statute approved in 1929." Abrams, *supra*, at 925; *cf. Rubin v. United States*, 449 U.S. 424, 430 (1981) (interpreting "sale" in Section 2(3) of the '33 Act in light of the Uniform Sale of Securities Act). Moreover, liability "expressly grounded in participation" is found elsewhere in the '33 Act and in Section 9 of the Securities Exchange Act of 1934 (the "'34 Act"), enacted by the same Congress that enacted the '33 Act. *Id*. at 926. Accordingly, in this context, the

1   omission of express participatory liability from Section 12 is properly deemed intentional.  *Id.* at

2   926.

3                    Second, the availability of recissory relief under Section 12 demonstrates that

4   liability under that section cannot extend to participants in the sale of securities.  As originally

5   enacted, Section 11 and Section 12 both "provided for identical recissory relief."  Abrams,

6   *supra*, at 939; *see* Securities Act of 1933, Pub. L. No. 73-22, §§ 11(e), 12(2), 48 Stat. 74, 83, 84

7   (1933).  In contrast to Section 12, Section 11 expressly reaches certain participants in the offer

8   and sale of securities, *see* 15 U.S.C. § 77k(a).  The prospect of granting recissory relief against

9   these participants who did not themselves "sell"[7] the security created enough criticism that

10  Congress removed the language from Section 11 the very next year.  Abrams, *supra*, at 939; *see*

11  Securities Exchange Act of 1934, Pub. L. No. 73-291, § 206(d), 48. Stat. 881, 907 (1934).  But,

12  Congress left recissory relief in Section 12 of the Securities Act untouched.  If Congress had

13  also intended Section 12 to encompass participants, then Congress would have removed

14  recissory relief from both statutes.  Abrams, *supra*, at 939; *see also* Robert A. Prentice, *Section*

15  *12 of the 1933 Act: Establishing the Statutory Seller*, 40 ALA. L. REV. 417, 447 (1989)

16  (describing the Section 11 amendment as "very important legislative history" for purposes of

17  interpreting Section 12).

18                   Finally, there have been several attempts to amend the '33 Act to prohibit

19  participant-like conduct, such as aiding and abetting a Section 12 violation, or "caus[ing]" an

20  untrue statement to be made.  *See* Prentice, *supra*, at 463-64 (discussing a 1955 amendment

21  proposing liability for those who caused an untrue statement to be made regarding certain

22  securities); Bryan M. Schneider, *Section 12 of the Securities Act of 1933: The Privity*

23  *Requirement in the Contemporary Securities Law Perspective*, 51 TENN. L. REV. 235, 253

24  (1984) (discussing a 1959 amendment proposing aiding and abetting enforcement powers).  The

25  perceived need for these amendments confirms that Congress did not regard Section 12 as

26  _____

27  [7] At the time, "sell" was defined to include solicitation of an offer to buy.  Section 2(3), 48 Stat.

28  at 74.

reaching those who did not actually offer or sell a security, but simply participated in a sale. Importantly, all such attempts at amendment failed.

### B.     The Broader Federal Securities Statutes Confirm That Section 12 Does Not Reach Mere Participants.

The '33 Act and '34 Act also show that Congress intended Section 12(a)(2) to have a limited reach, and not include mere participants.

First, under the '33 Act, Section 12 uses the singular expression "any person who," while Section 11 uses the expressions "every person who," "every accountant, engineer, appraiser" and "every underwriter." *Compare* 15 U.S.C. § 77k(a) *with* 15 U.S.C. § 77l(a)(2). As one commentator has noted, "[t]he use of the singular rather than the plural is readily apparent to any reader familiar with the 1933 Act," and the singular was employed in discussions of Section 12 in the legislative history. Prentice, *supra*, at 445. Because Section 12 should be read alongside Section 11, the use of the singular "any person" in the former implies that it is narrower in scope. *See id.* at 445-46.

Second, where Congress desired to create a large class of participant defendants, it did so by individually enumerating members of that class. The Supreme Court observed that Section 12, unlike Section 11, made no such individual enumeration:

> Congress knew of the collateral participation concept and employed it in the Securities Act and throughout its unified program of securities regulation. . . .  Section 11 . . . lends strong support to the conclusion that Congress did not intend to extend § 12 primary liability to collateral participants in the unlawful securities sales transaction. . . . Section 11(a) explicitly enumerates the various categories of persons . . . who are subject to suit under that section, *including many who are participants in the activities leading up to the sale.  There are no similar provisions in § 12 . . . .*

*Pinter*, 486 U.S. at 650 n.26 (emphasis added).  For this reason, the *Pinter* Court stated, "we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.*; *accord* 2 Harold S. Bloomenthal, *Securities Law Handbook* 52 (2007 ed.) (same).

Third, as a leading commentator has observed, Section 11 contains "an elaborate scheme of defenses in lieu of the scienter element in common law deceit."  Louis Loss,

*Securities Regulation,* 1017 (2d ed. 1961).  If Section 12(a)(2) were interpreted to reach the participant defendants identified in Section 11, it would undermine these defenses and obviate the need to bring Section 11 actions.  Schneider, *supra,* at 257 ("As section 12(2) expands . . . , the overlap threatens to parallel section 11 . . . .  [S]uch an overlap could subvert section 11's elaborate safeguards . . . .").  A broad interpretation of Section 12(a)(2) would undermine the ability of defendants to mount effective Section 11 defenses.

Finally, Section 12(a)(2) should also be read in conjunction with Section 10(b) of the '34 Act.  *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 692 (3d Cir. 1991) ("[T]he 1933 and 1934 Acts should be construed *in pari materia*, that is, as coordinating statutes which contain some overlapping provisions") (citing *Herman & McLean v. Huddleston*, 459 U.S. 375, 390 (1983)).  The language of Section 10(b) reaches a much wider class of defendants.  *See* 15 U.S.C. § 78j(b).  However, "[c]oncomitant with this greater sweep, the claim for relief which the courts imply thereunder requires a greater showing of proof by a plaintiff[:] . . . reliance, [and] a state of mind greater than negligence."  Patricia O'Hara, *Erosion of the Privity Requirement in Section 12(2) of the Securities Act of 1933: The Expanded Meaning of Seller*, 31 UCLA L. REV. 921, 996 (1984) (internal footnotes omitted).

Thus, where Congress intended securities liability to extend to a wide class of defendants, it provided for a heightened burden of proof.  *See id.* at 995-97.  To extend liability to participatory defendants under a provision with a *low* burden of proof would "disrupt the statutory scheme."  *Id.* at 994.

*   *   *

In sum, Section 12 legislative history and the broader statutory scheme of federal securities laws leave no doubt that Congress intended Section 12 to target a very narrow range of defendants.  A broad interpretation of "solicitation" that includes assistance, support, marketing, and management would contravene every indication of how Congress intended courts to interpret Section 12.

### III. THE UNDISPUTED FACTS SHOW THAT MR. DAIFOTIS IS NOT A STATUTORY "SELLER" UNDER SECTION 12(A)(2).

Plaintiffs allege that Mr. Daifotis engaged in conduct that amounted to the solicitation of their YieldPlus share purchases. (*See* SCAC at ¶ 41). Thus, Plaintiffs must introduce admissible evidence that Mr. Daifotis' conduct meets *Pinter's* definition of "solicitation" *and* that Mr. Daifotis directly solicited each Plaintiff's actual purchase of YieldPlus shares. *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1029 (9th Cir. 2005). The undisputed facts show that Mr. Daifotis did not directly solicit investors', much less Lead Plaintiffs', purchases of YieldPlus shares.

#### A. Mr. Daifotis' Conduct Does Not Constitute "Solicitation."

There is no admissible evidence that Mr. Daifotis' conduct constitutes solicitation, as defined by *Pinter*. Mr. Daifotis did not urge or persuade any potential investors, let alone Plaintiffs, to purchases shares in the YieldPlus fund. Mr. Daifotis was not a broker, and he was not employed by Schwab's brokerage subsidiary. Rather, he was an employee of CSIM, the investment adviser to the Schwab & Co. proprietary mutual funds, and was responsible for managing the Fund's investments. He did not solicit investors to purchase YieldPlus shares. This dooms Plaintiffs' Section 12 claim.

None of the activities that Mr. Daifotis engaged in as CIO of the fixed income mutual funds constitutes solicitation. For example, in *In re Alliance Equip. Lease Program Sec. Litig.*, discussed above, plaintiffs alleged that defendant Royal drafted solicitation materials that misrepresented the scope of insurance coverage for the investment. *In re Alliance Equip. Lease Program Sec. Litig*, 2002 WL 34451621 at *1, *10. Plaintiffs there argued (as they do here in SCAC ¶ 41) that the very purpose of these written materials was to solicit investors — a point Royal's agent admitted in deposition. Nonetheless, the court concluded that, as a matter of law, such conduct could not be considered solicitation under Section 12. *Id*. at *10. "[T]he key inquiry is whether, under *Pinter*, Royal can be said to have solicited the investments of Lead Plaintiffs through these written materials. To do this, the Court must make a distinction

between professional services which may "'merely assist in another's solicitation efforts' and actual solicitation." *Id.* (internal citations omitted).

Importantly, the court noted, "[f]inding seller liability for participating in the drafting of these two documents would seem to reincarnate the very same substantial-factor test long ago rejected by the Supreme Court." *Id.*  Given the collateral involvement of Royal in the actual solicitation of lead plaintiffs' purchases (via the drafting of solicitation materials), and the lack of evidence connecting lead plaintiffs to Royal's purported solicitation conduct, the court granted Royal's motion for summary judgment.  *Id.* at 11; *see also In re Gas Reclamation Sec. Litig.*, 733 F. Supp. at 724 (granting summary judgment because defendant's agent's review of written materials ultimately used to solicit plaintiffs not solicitation).

**B.**   **Mr. Daifotis Did Not Directly Solicit Any Investors' Purchases of YieldPlus Shares.**

Plaintiffs also must present admissible evidence — not mere speculation — that Mr. Daifotis had a direct role in investors' purchases of YieldPlus shares.  But the undisputed evidence demonstrates that Mr. Daifotis had *no* relationship and *no* contact with Plaintiffs before they invested in the Fund.  In fact, when questioned under oath, not one Lead Plaintiff testified that he had any pre-investment contact with Mr. Daifotis or that Mr. Daifotis personally solicited his purchase of YieldPlus shares.

Mr. Daifotis was involved in presentations about the fixed income market generally and these presentations, at times, involved discussions or slides on specific Schwab funds, including YieldPlus.  (Albarrán Decl., Ex. C at 29.)  But not one of the Plaintiffs has testified that he or his investment advisor attended any of these presentations.  (Albarrán Decl., Exs. F at 158; G at 161; H at 164; I at 167; J at 170.)

Likewise, Mr. Daifotis met periodically with Schwab & Co. FCs and independent investment advisors about various fixed income financial products, including YieldPlus.  (Albarrán Decl., Ex. C at 27.)  The purpose of these meetings was to provide facts about the funds to enable the FCs and investment advisors to advise their clients based on each client's individual investment goals.  (Albarrán Decl., Ex. C at 28.)  But there is no allegation,

1    and none of the Plaintiffs has testified, that Plaintiffs attended any of these meetings.  (Albarrán

2    Decl., Exs. F at 158; G at 161; H at 164; I at 167; J at 170.)

3                                               *    *    *

4              In sum, no admissible evidence demonstrates that Mr. Daifotis directly solicited

5    any investor's purchases of YieldPlus shares.

6    **IV.    PLAINTIFFS LACK STANDING TO MAINTAIN THIS CLASS ACTION**
             **AGAINST MR. DAIFOTIS.**
7
             Even if the Court concludes that a genuine issue of fact exists as to whether
8
     Mr. Daifotis directly solicited some yet unidentified investors (a point Mr. Daifotis does not
9
     concede), it is undisputed that Mr. Daifotis did not directly solicit *any* Lead Plaintiff's YieldPlus
10
     purchase.
11
                    John Hill[8]
12
                    Q: Do you know whether Mr. Daifotis actively solicited sale of
13                  the YieldPlus fund shares?

14                  A: I know nothing about that.

15                  James Coffin[9]

16                  Q: Aside from signing the registration statement,[10] are you aware
                    of anything else Mr. Daifotis may have done to actively solicit the
17                  yield fund shares?

18                  A: I don't have specific knowledge . . . of his personal actions.

19                  Q: Do you have any nonspecific . . . knowledge?

20                  A: No.

21                  Robert Dickson[11]

22                  Q: One of the allegations is that Mr. Daifotis actively solicited the
                    sale of the
23   _____

24   [8] (*See* Albarrán Decl., Ex. F at 158.)

25   [9] (*See* Albarrán Decl., Ex. G at 161.)

     [10] Mr. Coffin's testimony was incorrect on this point as Mr. Daifotis is not alleged to have
26   signed the registration statement (*Compare* SCAC ¶ 41 *with* SCAC ¶¶ 31-40), and in fact did
     *not* sign the registration statement.  (*See also*, Daifotis Decl. at ¶ 3.)
27
     [11] (*See* Albarrán Decl., Ex. H at 164.)
28

YieldPlus shares . . . So I'm asking you if you know that Mr. Daifotis actively solicited the sale of those shares?

A: Personally, I was not aware of that, no, from my personal perspective, no.

Kevin O' Donnell[12]

Q: Did Mr. Daifotis personally ever offer to sell securities in the YieldPlus Fund to you?

A: No, sir.

Q: And did Mr. Daifotis personally sell any shares in the YieldPlus Fund to you?

A: No, sir.

David Mikelonis[13]

Q: So, other than what may be on the pages that you reviewed prior to purchasing shares, is there anything else that he did to solicit the sale of YieldPlus Fund shares?

A: If you put aside the prospectus I looked at, those two things, I don't have anything that I can point you to that I remember.

The Lead Plaintiffs have no Section 12 cause of action against Mr. Daifotis and thus, they lack standing to bring a class action on behalf of any individual investor who may be able to adequately assert a Section 12 claim.[14]  *See In re Royal Ahold N.V. Sec. and ERISA Litig.*, 384 F. Supp. 2d 838, 843 (D. Md. 2005) ("While lead plaintiff need not have standing to assert every claim, there must ultimately be a named plaintiff with standing as to each defendant.");  *see also*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (affirming motion to dismiss because after-market purchaser-plaintiffs lacked standing to sue defendants who signed registration statement because "[t]o count as "solicitation," the seller must, at a minimum, directly communicate with the buyer.").

---

[12] (*See* Albarrán Decl., Ex. I at 167.)

[13] (*See* Albarrán Decl., Ex. J at 170.)

[14] Mr. Daifotis testified that on a very few occasions over an eight-year period he met with certain individual investors to answer their questions about a number of Schwab & Co. products, including YieldPlus.  (Albarrán Decl., Ex. C at 32-38.)  But not one of these as-yet-unnamed investors is a Lead Plaintiff in this Section 12 action.

**CONCLUSION**

For these reasons, the Court should grant summary judgment in favor of Mr. Daifotis and against Plaintiffs on the only remaining claim against him, the cause of action based on Section 12(a)(2) of the 1933 Securities Act.  In the alternative, the Court should dismiss with prejudice the class action as to Mr. Daifotis because Lead Plaintiffs lack standing to properly assert a Section 12(a)(2) claim against him.


DATED:  February 11, 2010                          Respectfully submitted,

                                                   COVINGTON & BURLING LLP


                                                   By:  ____/s/_____
                                                        David B. Bayless
                                                        Attorneys for Defendant
                                                        KIMON P. DAIFOTIS