1  Reed R. Kathrein (139304)
   Peter E. Borkon (212596)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone:  (510) 725-3000
4  Facsimile:  (510) 725-3001
   reed@hbsslaw.com
5  peterb@hbsslaw.com

6  Steve W. Berman (*Pro Hac Vice*)
   Sean R. Matt (*Pro Hac Vice*)
7  Erin K. Flory (*Pro Hac Vice*)
   HAGENS BERMAN SOBOL SHAPIRO LLP
8  1301 Fifth Avenue, Suite 2900
   Seattle, Washington  98101
9  Telephone: (206) 623-7292
   Facsimile: (206) 623-0594
10 steve@hbsslaw.com
   sean@hbsslaw.com
11 erin@hbsslaw.com

12 *Attorneys for Lead Plaintiff YieldPlus Investor Group*

13

14            UNITED STATES DISTRICT COURT

15          NORTHERN DISTRICT OF CALIFORNIA

16             SAN FRANCISCO DIVISION

17 | IN RE SCHWAB CORP. SECURITIES | No. 08-cv-01510 WHA |
   | LITIGATION | |
18 | | |

19 | THIS DOCUMENT RELATES TO: | PLAINTIFFS' NOTICE OF MOTION |
   | | AND MOTION FOR PARTIAL |
20 | All Actions | SUMMARY JUDGMENT RE: |
   | | UCL LIABILITY; MEMORANDUM OF |
21 | | POINTS AND AUTHORITIES IN |
   | | SUPPORT THEREOF |
22 | | |

23 | | Date:        March 25, 2010 |
   | | Time:        8:00 a.m. |
24 | | Judge:       Hon. William H. Alsup |
   | | Courtroom:   Courtroom 9, 19th Floor |
25 | | |

26            **REDACTED VERSION**

27

28

PLTFS' MOT. FOR PARTIAL SUMMARY JUDGMENT RE:
UCL LIAIBILITY - 08-cv-01510 WHA

010036-12 352700 V1

1

## NOTICE OF MOTION AND MOTION

2

**TO:  ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

3          PLEASE TAKE NOTICE that pursuant to Local Rule 7-2 and FED. R. CIV. P. 56, Plaintiffs,

4     by and through counsel, hereby move the Court for an order granting partial summary judgment

5     finding as a matter of law the Schwab defendants violated § 13(a) of the ICA and the California

6     UCL.  Plaintiffs base their motion on this Notice of Motion and Motion, the Memorandum of

7     Points and Authorities in Support Thereof, the Declaration of Steve W. Berman in Support of

8     Plaintiffs' Motion For Partial Summary Judgment Re:  UCL Liability (the "Berman Decl."), and

9     such other matters as the Court may consider in deciding this motion.  A proposed form of order is

10    submitted herewith.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## STATEMENT OF ISSUES

2

3        1.      Does violating § 8(a) of the federal Investment Company Act, 15 U.S.C. § 80a-13,

4    constitute an unlawful business act or practice under California's Unfair Competition Law, CAL.

5    BUS. & PROF. CODE § 17200 *et seq.*?  *See infra* at 10.

6        2.      Section 8(a) prohibits an investment fund from departing from its existing

7    investment of concentrating or not concentrating in any particular industry without first obtaining

8    consent from a majority of its shareholders.  But if a fund initially discloses a no-concentration

9    policy and industry categories subject to that policy, but then unilaterally revises those categories

10   to exclude industries from the policy, the fund changed its concentration policy.  In light of § 8(a)'s

11   remedial purpose to protect investors and Congress's express goal to prohibit an investment fund

12   from changing its nature without investor consent, should the Court interpret § 8(a) to require a

13   fund to obtain shareholder approval before rewriting a previously disclosed industry classification?

14   *See infra* at 11-18.

15       3.      A defendants' liability to a private plaintiff under California's UCL requires both an

16   unlawful or unfair act and that the plaintiff "lost money or property as a result of" the act.  Are

17   Plaintiffs and the UCL Class's injuries here established as a matter of law where Defendants'

18   expert does not dispute that Defendants' § 13(a) violation caused the Fund's share price to

19   plummet, injuring every UCL Class member?  *See infra* at 19-20.

20

21

22

23

24

25

26

27

28

PLTFS' MOT. FOR PARTIAL SUMMARY JUDGMENT RE:        - ii -
UCL LIAIBILITY - 08-cv-01510 WHA

010036-12 352700 V1

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ......................................................................................... i

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF FACTS ................................................................................ 3

 A. Investment Concentration in a Particular Industry or Group of Industries Is an Important Investment Policy of Any Investment Fund ............................ 3

 B. The Original No-Concentration Policy ............................................................. 3

 C. The Revised No-Concentration Policy ............................................................. 5

 D. Schwab's Reasons to Reverse Its Prior Definition .......................................... 5

 E. No Shareholder Vote Was Held With Regard to This Change in Fundamental Policy ................................................................................................................ 9

 F. YieldPlus Invests Heavily in Mortgage-Backed Securities ........................... 10

III.   LEGAL STANDARDS .................................................................................... 10

IV.    ARGUMENT ................................................................................................... 10

 A. Schwab Violated the UCL as a Matter of Law by Changing a Yieldplus Fundamental Policy Without Obtaining Shareholder Approval ...................... 10

  1. Violation of a federal statute is a predicate unlawful business act under California's Unfair Competition Law ................................................. 10

  2. The ICA instructs courts to interpret § 13(a) to protect investors from the same sort of misconduct alleged here ........................................... 11

   a. The Act identifies the "evils" that Congress intended to eliminate, and directs courts to interpret it broadly to accomplish this goal ..... 11

   b. The SEC bars management discretion to revise concentration policies, including the underlying industry classifications ............... 13

   c. Schwab's authorities are inapposite ................................................. 18

 B. There Is No Disputed Factual Issue That Defendants' § 13(a) Violation Injured Plaintiffs and the ULC Class ............................................................................ 19

V.     CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abrahamson v. Fleschner,*
 568 F.2d 862 (2d Cir. 1977) ................................................................. 17

*Barnhart v. Thomas,*
 540 U.S. 20 (2003) ............................................................................... 13

*Bell v. Hood,*
 327 U.S. 678 (1946) ............................................................................. 17

*Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co.,*
 353 U.S. 30 (1957) ............................................................................... 17

*Cazares v. Pacific Shore Funding,*
 2006 U.S. Dist. LEXIS 1081 (C.D. Cal. Jan. 5, 2006) ....................... 11

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ............................................................................. 10

*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund,*
 24 Cal. 4th 800 (2001) ......................................................................... 11

*Cisneros v. U.D. Registry, Inc.,*
 39 Cal. App. 4th 548 (1995) ................................................................ 11

*Citizens for a Better Env't v. Union Oil,*
 996 F. Supp. 934 (N.D. Cal. 1997) ..................................................... 11

*Doran v. 7-Eleven, Inc.,*
 524 F.3d 1034 (9th Cir. 2008) ............................................................. 10

*EPA v. National Crushed Stone Ass'n,*
 449 U.S. 64 (1980) ............................................................................... 13

*Estate of Tucker v. Interscope Records,*
 515 F.3d 1019 (9th Cir.), *cert. denied,* ___ U.S. ___, 129 S. Ct. 174 (2008) ........................ 10

*Fogel v. Chestnutt,*
 668 F.2d 100 (2d Cir. 1981) ................................................................ 12

*Herpich v. Wallace,*
 430 F.2d 792 (5th Cir. 1970) ............................................................... 12

*In re Alliance North Am. Gov't Income Trust, Inc. Sec. Litig.*,
  1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 26, 1996) .................................. 18, 19

*J. I. Case Co. v. Borak*,
  377 U.S. 426 (1964) ........................................................................................... 17

*Karpus v. Hyperion Capital Mgmt.*,
  1996 U.S. Dist. LEXIS 17104 (S.D.N.Y. Nov. 15, 1996) ...................................... 18

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002) ........................................................................................ 11

*Krouner v. American Heritage Fund*,
  899 F. Supp. 142 (S.D.N.Y. 1995) ........................................................................ 18

*Malcom v. Payne*,
  281 F.3d 951 (9th Cir. 2002) ............................................................................... 17

*McKell v. Washington Mut., Inc.*,
  142 Cal. App. 4th 1457 (2006) ............................................................................. 11

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir.), *cert. denied*, ___ U.S. ___, 129 S. Ct. 161 (2008) ........... 20

*Milwaukee v. Illinois*,
  451 U.S. 304 (1981) ........................................................................................... 13

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
  446 U.S. 359 (1980) ........................................................................................... 17

*Nathel v. Siegal*,
  592 F. Supp. 2d 452 (S.D.N.Y. 2008) .................................................................. 20

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  609 F. Supp. 2d 938 (N.D. Cal. 2009) ................................................................... 19

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
  104 Cal. App. 4th 508 (2002) .............................................................................. 11

*People v. McKale*,
  25 Cal. 3d 626 (1979) ........................................................................................ 11

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ............................................................................ 17

*Saravia-Paguada v. Gonzales*,
  488 F.3d 1122 (9th Cir. 2007) .............................................................................. 4

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963) ........................................................................................... 17

*Sheppard v. TCW/DW Term Trust 2000,*
   938 F. Supp. 171 (S.D.N.Y. 1996) ................................................................. 18

*Sullivan v. Chase Inv. Servs. Inc.,*
   434 F. Supp. 171 (N.D. Cal. 1977) ................................................................ 17

*Swig Weiler & Arnow Mgmt. Co. v. Stahl,*
   817 F. Supp. 404 (S.D.N.Y. 1993) ................................................................ 10

*Tingley Sys. v. Healthlink, Inc.,*
   509 F. Supp. 2d 1209 (M.D. Fla. 2007) ........................................................ 10

*United States v. Union County 16.29 Acres of Land,*
   35 F. Supp. 2d 773 (D. Or. 1997) .................................................................. 10

*Webb v. Smart Document Solutions, LLC,*
   499 F.3d 1078 (9th Cir. 2007) ...................................................................... 11

*Yourman v. Giuliani,*
   229 F.3d 124 (2d Cir. 2000) .......................................................................... 14

### STATUTES

15 U.S.C. § 80a .................................................................................. 1, 11, 12, 13

CAL. BUS. & PROF. CODE § 17200 *et seq.* .............................................. 1, 11

CAL. BUS. & PROF. CODE § 17204 .................................................................. 19

### OTHER AUTHORITIES

*In the Matter of Fundamental Investors, Inc.,*
   ICA Rel. No. 3596, 1962 SEC LEXIS 493 (Dec. 27, 1962) ...................... 11

*Registration Form Used by Open-End Management Investment Companies; Guidelines,*
   1983 SEC LEXIS 1030 (SEC Aug. 12, 1983) .......................................... 13, 14

1

## I.   INTRODUCTION

2      Defendants' registration statements for their investment fund, YieldPlus (the "Fund"),

3  disclosed to potential investors that the Fund would not concentrate in any particular industry or

4  group of industries, without first obtaining shareholder approval.  Schwab also stated that it defined

5  non-agency mortgage-backed securities as a single industry, so that the Fund could not concentrate

6  its assets in those mortgage-backed securities.  But after Plaintiffs and the UCL Class members

7  purchased their shares of YieldPlus, Schwab changed its mind and chose to invest heavily in non-

8  agency mortgage-backed securities.  To excuse this mid-stream switch, Schwab simply deleted its

9  industry definition and wrote a new one – defining non-agency mortgage-backed securities as *not* a

10  single industry – without seeking shareholder approval.  The effect, however, was to rewrite the

11  Fund's no-concentration policy by allowing the Fund to concentrate in non-agency mortgage-

12  backed securities, despite its previous promise not to do so.

13      This violated § 13(a) of the Investment Company Act of 1940 ("ICA"), which bars a fund

14  from deviating from its disclosed fundamental policies without prior shareholder approval.  15

15  U.S.C. § 80a-13.  This violation of federal law also serves as a predicate "unlawful business

16  practice" under California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq*.

17  This Court should interpret § 13(a) to prohibit Defendants' conduct as a matter of law.  In passing

18  the ICA, Congress identified a number of specific "evils" endemic to the investment-company

19  industry that Congress intended to eliminate.  These "evils" included (i) selling shares in an

20  investment fund without adequately disclosing the fund's investment policies and (ii) changing the

21  character of a fund's business without fund shareholders' consent.  Congress also directed courts to

22  interpret the ICA broadly to "eliminate, or mitigate" these evils and not to frustrate the ICA's

23  remedial purposes.  *See infra* at 11-13.

24      In addition, the Securities Exchange Commission drafted guidelines for preparing a fund

25  registration statement that conforms to the ICA.  The SEC's Guide 19, entitled "*Concentration of*

26  *Investments in Particular Industries*," rejected allowing fund management, after first disclosing a

27  fund's concentration or no-concentration policy in a registration statement, any discretion to

28  change that policy absent shareholder approval.  While Guide 19 grants fund management some

1    discretion initially to define categories of industries subject to the policy, it nowhere grants

2    discretion to *later* revise those categories after disclosing them to shareholders.  It also states that if

3    a fund wishes to reserve some discretion to unilaterally change a concentration policy, the

4    registration statement must disclose the specific conditions under which the policy might change.

5    *See infra* at 13-16.

6            These sources, coupled with the familiar statutory-construction rules to provide broad and

7    flexible interpretation of remedial legislation, compel the conclusion that § 13(a) prohibits

8    Schwab's misconduct in this case.  By concentrating in non-agency mortgage-backed securities,

9    the Fund fundamentally changed its character from a diversified fund into something far riskier.

10   Section 13(a), interpreted as Congress requires to protect investors from this very "evil," prohibits

11   this change.  Indeed, if a fund can defeat § 13(a)'s prohibitions simply by unilaterally revising

12   previously disclosed industry definitions that govern a concentration policy, as Defendants insist

13   they can do, § 13(a) fails its purpose of protecting fund investors, a result this Court must reject.

14   *See infra* at 16-18.

15           Plaintiffs are thus entitled to summary judgment.  The facts are not in dispute.  The Court

16   can rule as a matter of law that Defendants violated § 13(a) by changing its industry classification

17   and concentrating Fund assets in non-agency mortgage-backed securities.  The Court can also rule

18   as a matter of law that this violation gives rise to liability under California's UCL.  Section 17204

19   requires that a UCL private plaintiff "lost money … as a result of … unfair competition."  In the

20   latter part of 2008, as the mortgage crisis exploded, the Fund's concentration in non-agency

21   mortgage-backed securities caused its share price to plummet, triggering hundreds-of-millions of

22   dollars in shareholder losses.  Defendants' expert, Christopher James, does not dispute this, and his

23   assertion that shareholders were not injured because they had notice of the violation is both

24   unfounded and immaterial.  *See infra* at 19-20.  There is, accordingly, no genuine issue of material

25   fact whether Defendants are liable under the UCL.  Plaintiffs and the UCL Class are entitled to

26   summary judgment on their UCL claim.

27

28

## II.   STATEMENT OF FACTS

**A.   Investment Concentration in a Particular Industry or Group of Industries Is an Important Investment Policy of Any Investment Fund**

Concentration risk arises from excessive exposure to the risk of particular sectors, regions, industries or products.  For example, debtors of the same industry sector or structured products of similar type share common risk exposures that increase the price co-movement and vulnerability to credit events.  Avoiding excessive risk of over-concentration is an important and necessary consideration of prudent investing.  Fong Report at 27.[1]

Concentration risk is controlled through adequate diversification by placing concentration limits on investments.  *Id.*  Throughout the Class Period, the Fund was prohibited from concentrating more than 25% of total assets in investments in a particular industry or group of industries:

> [The Fund may not]  Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.

Exhs. 2044-46 (Statements of Additional Information ("SAI") dated November 15, 2005, November 15, 2006, and November 15, 2007), Berman Decl. Exs. B-D.

**B.   The Original No-Concentration Policy**

Throughout the Class Period, the Fund identified a policy of not concentrating in any industry as a "fundamental" policy that could only be changed by shareholder vote:

> INVESTMENT LIMITATIONS
>
> The following investment limitations are fundamental investment polices and restrictions and may be changed only by vote of a majority of a fund's outstanding voting shares....
>
> THE SCHWAB YIELDPLUS FUND® ... MAY NOT:
>
> ...
>
> 2)     Concentrate investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or

---

[1] References to the "Fong Report" are to the November 27, 2009, Expert Report of H. Gifford Fong, attached as Exhibit A to the Berman Decl.

the rules or regulations there under, as such statute, rules and
regulations may be amended from time to time....

Exhs. 2044-46 (SAIs dated November 15, 2005, November 15, 2006, and November 15, 2007),

Berman Decl. Exs. B-D.

These same SAIs also defined "concentration" as follows:

THE FOLLOWING DESCRIPTIONS OF THE 1940 ACT MAY
ASSIST INVESTORS IN UNDERSTANDING THE ABOVE
POLICIES AND RESTRICTIONS....

Concentration.  The SEC has presently defined concentration as
investing 25% or more of an investment company's net assets in an
industry or group of industries, with certain exceptions.

Exhs. 2044-46 (SAIs dated November 15, 2005, November 15, 2006, and November 15, 2007),

Berman Decl. Exs. B-D.

Until September 2006, the Fund included mortgage-backed securities issued by private

lenders as an "industry."[2]  For example:

CONCENTRATION means that substantial amounts of assets are
invested in a particular industry or group of industries.
Concentration increases investment exposure. *Based on the
characteristics of mortgage-backed securities, each fund has
identified mortgage-backed securities issued by private lenders and
not guaranteed by U.S. government agencies or instrumentalities as
a separate industry for purposes of a fund's concentration policy.*
Each of the Tax-Free Bond Funds may invest more than 25% of its
total assets in municipal securities financing similar projects, such as
those relating to education, health care, transportation, and utilities,
which may make them more sensitive to certain adverse economic,
business or political developments affecting issuers of such
securities.

Exh. 2161 (SAI dated November 15, 2004, as amended September 16, 2005) (emphasis added),

Berman Decl. Ex. E.

---

[2] A "private label mortgage backed security" is a mortgage backed security issued by a private
entity such as brokerage firms, banks, and homebuilders, other than by a government agency or
government-sponsored enterprise.  An "agency mortgage backed security" is one issued or backed
by a government agency such as Ginnie Mae or a government-sponsored enterprise such as Fannie
Mae or Freddie Mac.

## C.     The Revised No-Concentration Policy

The Fund reversed course and amended the SAI on September 1, 2006, to exclude non-agency mortgage-backed securities from the 25% concentration limit:

> CONCENTRATION means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets. Each of the Tax-Free Bond Funds may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities. *The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities*, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

Exh. 2162 (SAI dated November 15, 2005, as amended September 1, 2006) (emphasis added), Berman Decl. Ex. F.

## D.     Schwab's Reasons to Reverse Its Prior Definition

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ *See* Daifotis Dep. Exh. 2194 at 2, Berman Decl. Ex. G, and Hastings Dep. Exh. 2164 at 2, Berman Decl. Ex. H ████████████

███████████████████████████████████████████████████████████

  
1 ███████████████████");[3] *see also* Daifotis Dep. Exh. 2196 (████████████

2 ███████████████████████████), Berman Decl. Ex. I; Daifotis

3 Trans. at 59 (██████████████████████████████████████████████████

4 ████████████████████████), Berman Decl. Ex. J; Wilsey SEC Trans. at

5 115 (████████████████████████████████████████████████████████

6 ██████████████████), Berman Decl. Ex. K.  At the time, Matt Hastings, the Senior Portfolio

7 Manager with day-to-day responsibility for managing the YieldPlus Fund ███████████████

8 ██████████████████████████████████████████.  SEC Hastings

9 Trans. at 87-88, Berman Decl. Ex. L.

10 ██████████████████████████████████████████████████

11 █████████████████████████ SEC Hastings Trans. at 162-63, 167, Berman Decl.

12 Ex. L. ████████████████████████████████████████ (Daifotis

13 Trans. at 79-80, Berman Decl. Ex. J; Daifotis SEC Trans. at 64, Berman Decl. Ex. M███

14 ██████████████████████████████████████████████

15 Daifotis SEC Trans. at 62-63, Berman Decl. Ex. M█████████████

16 █████████████████████████████████████████████████████████

17 ███████████████████████████████ *See* Daifotis Dep. Exh. 2197

18 (Aug. 2, 2006 Hastings e-mail) ("██████████████████████████████████"),

19 Berman Decl. Ex. N.

20 ██████████████████████████████████████████████████

21 █████████████████████████████████████████████████████████

22 ███████████████████████████████████████ Daifotis Dep.

23 Exh. 2195 (██████████████████████████████████), Berman Decl.

24 Ex. O.  But Hastings could not recall any additional research actually being done after the July 26

25

26 _____

[3] A "CMO" is a collateralized mortgage obligation, which is a type of bond having mortgage-
27 backed securities as collateral.  Non-agency CMOs are sometimes referred to as private-label
mortgage-backed securities.  Hastings Trans. at 83, Berman Decl. Ex. Z.  The two phrases are often
28 used synonymously.

1   meeting.  Hastings Trans. at 113, Berman Decl. Ex. Z.  Nor could Kevin Healey, Healy Trans. at

2   234-35, Berman Decl. Ex. P, the only other non-lawyer who had done any work on the issue.[4]

3           Nonetheless, because it was already the managers' objective to make the change, had any

4   additional "empirical research" been done, it was largely a foregone conclusion.  Indeed, in the

5   summer 2006 and preceding the investment-policy change, CSIM had hired another portfolio

6   manager, Andrew Tikofsky, who would primarily focus on purchasing mortgage-backed securities.

7   Daifotis Trans. at 53, Berman Decl. Ex. J.  And Daifotis testified that ███████████████████

8   ████████████████████████████████████ (Daifotis SEC Trans. at 57, 61,

9   Berman Decl. Ex. M█████████████████████████████████

10  ███████████████████████ (Daifotis Trans. at 52-53, Berman Decl. Ex. J; Daifotis SEC

11  Trans. at 129-31, Berman Decl. Ex. M), ████████████████████████████

12  ████████████████████ Daifotis SEC Trans. at 131, Berman Decl. Ex. M.

13  Managing Director Kevin Healey, a credit analyst responsible for reviewing the Fund's mortgage-

14  backed securities purchases, testified that Hastings proposed the change because he was hitting the

15  25 percent ceiling.  Healey Trans. at 169-70, Berman Decl. Ex. P.

16          In light of this momentum to bust through the 25% non-agency mortgage-backed securities

17  limit, it is perhaps not surprising that the information the portfolio managers consulted in deciding

18  to recommend the concentration policy change was minimal.  That information was limited to the

19  following:  (i) an observation that State Street, the Fund Accountant, and some other mutual fund

20  complexes, such as PIMCO, purportedly did not treat non-agency mortgage-backed securities as an

21  "industry;" (ii) a spreadsheet and some reports by mortgage-backed security issuers showing

22  historical returns and credit losses of non-agency mortgage-backed securities; and (iii) the opinion

23  of outside counsel, including some consideration of SEC Guide 19.[5]  See Daifotis Trans. at 61-62,

---

24          [4] Healey recommended that a lower limit (25 percent) remain on "non-prime" non-agency

25  mortgage-backed securities, but the Investment Policy Committee did not adopt this
    recommendation.  See Hastings Dep. Exh. 2168, Berman Decl. Ex. Z; Healey Trans. at 237-39,

26  Berman Decl. Ex. P.

27          [5] SEC Guide 19 provides, in part, that a "mutual fund may select its own industry
    classifications, but such classifications must be reasonable and should not be so broad that the

28  primary economic characteristics of a company in a single class are materially different."

72-73, 95-97, Berman Decl. Ex. J; Hastings Trans. at 106-07, 158-60, Berman Decl. Ex. Z.

Tellingly, Daifotis admitted that reviewing the default rates of non-agency mortgage-backed

securities was not important in determining whether they constitute an "industry" for purposes of

the concentration policy.  Daifotis Trans. at 116-17, Berman Decl. Ex. J.

      Daifotis and Hastings both testified that they were not aware of whether any research was

conducted into the Standard Industrial Classification Code list, the Global Industry Classification

Standard, or the North American Industry Classification System.  Daifotis Trans. at 87-88, Berman

Decl. Ex. J; Hastings Trans. at 150-52, Berman Decl. Ex. Z ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Daifotis

SEC Trans. at 117-22, Berman Decl. Ex. M.  Apparently, they just decided to take the risk that the

reversal would later be challenged.

      Mr. Daifotis himself did not personally conduct any research relating to the proposal.

Daifotis Trans. at 60.  Nor did he – or anyone else to his knowledge – ask the SEC whether a

shareholder vote was necessary.  Daifotis Trans. at 47-48, Berman Decl. Ex. J.  Had they done so,

they would have learned ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Daifotis Trans. at 55-56, Berman Decl. Ex. J; Daifotis SEC Trans. at

164, Berman Decl. Ex. M; Berman Decl. Ex. Q (Evergreen Ultra-Short Opportunities Fund proxy

statement).

████████████████████████████████████████████████████

████████████████████████████████████████████████ Daifotis Trans. at 84, Berman

Decl. Ex. J; Hastings Dep. Exh. 2170 (██████████████), Berman Decl. Ex. R. ████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Daifotis Trans. at 86-87, Berman

Decl. Ex. J; Daifotis Dep. Exh. 2200 (██████████████), Berman Decl. Ex. S. ████████

1   Merk Trans. at 66-69, Berman

2  Decl. Ex. T; SCH-YP0048503-24, at B-7 through B-8, Berman Decl. Ex. U.

3  **E.     No Shareholder Vote Was Held With Regard to This Change in Fundamental Policy**

4          No prior notice of this change was provided to the YieldPlus Fund shareholders, and no

5  shareholder vote was held on the issue.  Daifotis Trans. at 42-43, Berman Decl. Ex. J;[6] Hastings

6  Trans. at 72-74, Beman Decl. Ex. Z.  Several witnesses have testified to

7

8

9

10

11  Stephens SEC Trans. at 92[7], Berman Decl. Ex. V; *see also* Merk Trans. at 74 ("proxy votes are

12  very expensive"), Berman Decl. Ex. T.

13          Portfolio Manager Tikofsky testified that

14

15

16

17

18

19

20

21

22

23

24

25

26  ———

27  [6] Daifotis was present at a meeting in which the issue of whether to hold a shareholder vote was discussed.  That meeting included members of Schwab's in-house counsel team.  He recalls the contents of the discussion but refused to divulge those contents after Schwab's attorneys objected and requested that he not answer.  Daifotis Trans. at 43-46, Berman Decl. Ex. J.

28  [7] Mr. Stephens is a trustee of the YieldPlus Fund.





Tikofsky SEC Trans. at 86-87, Berman Decl. Ex. W.

**F.   YieldPlus Invests Heavily in Non-Agency Mortgage-Backed Securities**

Within months of changing the policy, the Fund's holdings of non-agency mortgage-backed securities zoomed past 25% and almost doubled.  Daifotis Trans. at 53-54, Berman Decl. Ex. J.

### III.   LEGAL STANDARDS

A summary-judgment motion may properly be used to eliminate affirmative defenses for which there is no factual dispute.  *See* Fed. R. Civ. P. 56(d); *Tingley Sys. v. Healthlink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007); *United States v. Union County 16.29 Acres of Land*, 35 F. Supp. 2d 773, 774, 779 (D. Or. 1997); *see also Swig Weiler & Arnow Mgmt. Co. v. Stahl*, 817 F. Supp. 404, 407 (S.D.N.Y. 1993).  This Court may grant summary judgment when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1047-48 (9th Cir. 2008); Fed. R. Civ. P. 56(c).  The party seeking summary judgment has the initial burden of showing that there are no genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1029 (9th Cir.), *cert. denied*, ___ U.S. ___, 129 S. Ct. 174 (2008).

### IV.   ARGUMENT

**A.   Schwab Violated the UCL as a Matter of Law by Changing a Yieldplus Fundamental Policy Without Obtaining Shareholder Approval**

**1.   Violation of a federal statute is a predicate unlawful business act under California's Unfair Competition Law**

Plaintiffs allege that Schwab's violations of federal law, including § 13(a) of the Investment Company Act ("ICA"), constitute "unlawful" business acts and practices under California's Unfair Competition Law, or "UCL."  ¶¶ 151-74.  The UCL prohibits unfair competition, which includes

1   "any unlawful, unfair or fraudulent business act or practice." CAL. BUS. & PROF. CODE § 17200.

2   Section 17200 "is a broad statute designed to remedy violations of other laws, both state and

3   federal." *Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007); *see also*

4   *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 949-50 (2002). The UCL is interpreted broadly and proscribes

5   "anything that can properly be called a business practice and that at the same time is forbidden by

6   law." *People v. McKale*, 25 Cal. 3d 626, 632 (1979). Violating virtually any state, federal or local

7   law can serve as predicate for a § 17200 action. See, for example, *Charles J. Vacanti, M.D., Inc. v.*

8   *State Comp. Ins. Fund*, 24 Cal. 4th 800, 828 n.9 (2001); *McKell v. Washington Mut., Inc.*, 142 Cal.

9   App. 4th 1457, 1474-75 (2006); *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App.

10  4th 508, 515 (2002); *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 562-64 (1995); *Cazares*

11  *v. Pacific Shore Funding*, 2006 U.S. Dist. LEXIS 1081, at *17 (C.D. Cal. Jan. 5, 2006); *Citizens*

12  *for a Better Env't v. Union Oil*, 996 F. Supp. 934, 938 (N.D. Cal. 1997). In effect, § 17200's

13  "unlawful" prong makes violating the underlying law a *per se* § 17200 violation. *Kasky*, 27 Cal.

14  4th at 949-50.

15        **2.    The ICA instructs courts to interpret § 13(a) to protect investors from the same**
           **sort of misconduct alleged here**

16

17        The predicate unlawful act underlying Plaintiffs' UCL claim is Schwab's violation of

18  § 13(a) of the Investment Company Act ("ICA"). Section 13(a) prohibits a registered investment

19  company from altering any policies concerning concentration in a particular industry "unless

20  authorized by the vote of a majority of its outstanding voting securities." 15 U.S.C. § 80a-13.

21        **a.    The Act identifies the "evils" that Congress intended to eliminate, and**
           **directs courts to interpret it broadly to accomplish this goal**

22        When Congress enacted the ICA in 1940, it included in the first section of the Act explicit

23  instructions on the Act's purpose and how courts should interpret its provisions. The ICA

24  "expressly directs, that it be interpreted to eliminate, or to mitigate, the evils which gave rise to the

25  Act, [and] not to undermine substantive and remedial provisions intended to achieve this result."[8]

26  Section 1(b) (*codified at* 15 U.S.C. § 80a-1(b)) of the ICA provides:

27  _____

28      [8] *In the Matter of Fundamental Investors, Inc.*, ICA Rel. No. 3596, 1962 SEC LEXIS 493, at
    *20 (Dec. 27, 1962); ICA § 1(b) (*codified at* 15 U.S.C. § 80a-1(b)).

1         It is hereby declared that the policy and purposes of this title, in
                accordance with which the provisions of this title shall be interpreted,

2                 are to mitigate and, so far as is feasible, to eliminate the conditions
                enumerated in this section which adversely affect the national public

3                 interest and the interest of investors.

4 Importantly, "[t]his is more than a mere exordium. It is a directive to the courts." *Fogel v.*

5 *Chestnutt*, 668 F.2d 100, 110 n.9 (2d Cir. 1981).

6         Section 1(b)'s list of "evils" includes the precise misconduct that spawned this litigation.

7 The statute declares that "the national public interest and the interest of investors are adversely

8 affected" in eight generalized situations. First among the enumerated evils that Congress intended

9 the ICA to eliminate is selling of funds shares without adequate disclosure: "when investors pur-

10 chase … securities issued by investment companies, without adequate, accurate, and explicit infor-

11 mation, fairly presented, concerning the character of such securities and the circumstances, poli-

12 cies, and financial responsibility of such companies and their management." 15 U.S.C.

13 § 80a-1(b)(1). Related to the evil of inadequate initial disclosures, Congress also identified subse-

14 quent "changes in the character of the company's business without the consent of the shareholders

15 …." *Herpich v. Wallace*, 430 F.2d 792, 815 (5th Cir. 1970) (citing 15 U.S.C. § 80a-1(b)(6)).

16 Congress enacted the ICA specifically to eliminate these (and other) abuses. *Id.*

17         Addressing the first enumerated "evil," the ICA's § 8(b), 15 U.S.C. § 80a-8, is a disclosure

18 statute that requires an investment company to file with the SEC a registration statement containing

19 specified information. It directs an investment company to disclose in its registration statement the

20 critical investment policies governing a fund, including "concentrating investments in a particular

21 industry or group of industries …." 15 U.S.C. § 80a-8(b)(1). As part of this policy disclosure, the

22 fund must detail the degree of discretion reserved to fund management to engage in the activity:

23         [I]t must state "whether the registrant reserves freedom of action to
                engage in activities of such type, and if such freedom of action is

24                 reserved, a statement briefly indicating, insofar as is practicable, the
                extent to which the registrant intends to engage therein …. [*Id.*]

25 Section 8(b) goes on to require disclosure of a fund's other fundamental policies: "all [other]

26 investment policies of the registrant … which are changeable only if authorized by shareholder

27

28

1    vote," and all policies that "the registrant deems matters of fundamental policy." 15 U.S.C. § 80a-

2    8(b)(2) & (3).

3          Section 13(a)(3), 15 U.S.C. § 80a-13(a)(3), then makes it a violation of the Act for a fund to

4    change its disclosed concentration policy or other fundamental policies unless a majority of the

5    fund's shareholders first vote to authorize the change:

6          § 80a-13.  Changes in investment policy

7          (a) No registered investment company shall, unless authorized by the
           vote of a majority of its outstanding voting securities –

8

9                ...

10         (3) deviate from its policy in respect of concentration of
           investments in any particular industry or group of industries as
           recited in its registration statement, deviate from any
11         investment policy which is changeable only if authorized by shareholder vote, or
           deviate from any policy recited in its registration statement pursuant
12         to section 8(b)(3) [15 U.S.C. § 80a-8(b)(3)]; ....

13         The ICA's explicit enumeration of (i) the "evils" that corrupt management and directors

14   have inflicted upon the national public interest and the interest of investors, coupled with (ii) the

15   ICA's express purpose of eliminating these evils by mandating disclosure and investor consent to

16   alter fundamental policies, and (iii) the congressionally mandated liberal construction, constitute a

17   frame of reference to interpret and apply § 13(a) in this case.

18              **b.     The SEC bars management discretion to revise concentration policies,
                         including the underlying industry classifications**

19         The SEC provides its primary guidance for interpreting these provisions in its *Registration*

20   *Form Used by Open-End Management Investment Companies; Guidelines*, 1983 SEC LEXIS

21   1030, at *202-04 (SEC Aug. 12, 1983) ("*Guidelines*"), which provides a revised Form N-1A, along

22   with "staff guidelines for the preparation of Form N-1A." *Id.*  Within that publication, Guide 19

23   deals with "Concentration of Investments in Particular Industries." *Id.* at *202.[9]

24

25         [9] Courts owe "great deference to the interpretation given the statute by the officers or agency
     charged with its administration." *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 83 (1980)
26   (citing *Udall v. Tallman*, 380 U.S. 1, 16 (1965)); *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)
     (concluding that "when a statute speaks clearly to the issue at hand we 'must give effect to the
27   unambiguously expressed intent ... but when the statute 'is silent or ambiguous' we must defer to a
     reasonable construction by the agency charged with its implementation"); *Milwaukee v. Illinois*,
28   451 U.S. 304, 347 (1981) ("[a]s the agency charged with enforcing and implementing the Act,

     PLTFS' MOT. FOR PARTIAL SUMMARY JUDGMENT RE:          - 13 -
     UCL LIABILITY - 08-cv-01510 WHA

1    Echoing the statute, Guide 19 explains that § 8(b)(1) requires every registered investment

2    company to include in its registration statement a recital of its policies with respect to concentra-

3    tion. It defines "concentration" as "investment ... of more than 25 percent of the value of the

4    registrant's assets in any one industry represents concentration." Importantly, the SEC warns that

5    if a fund elects a no-concentration policy, "*no further investment may be made in any given indus-*

6    *try* if, upon making the proposed investment, 25 percent or more of the value of the registrant's

7    assets would be invested in such industry." *Id.* at *202-03 (emphasis added). This rules out any

8    implication that the registrant could, in the alternative, invest further after re-defining the industry.

9    The SEC also directs that a company "propos[ing] to have a policy of concentrating in a

10   particular industry or group of industries," must identify "such industry or industries." *Id.* at *101-

11   02 (Item 4). The SEC continues that: "The Registrant may reserve freedom of action with respect

12   to [concentration], but in such case, shall express definitely, in terms of a reasonable percentage of

13   assets to be devoted to the particular activity or otherwise the maximum extent to which the Regis-

14   trant intends to engage therein." *Id.* at *115. Again, by implication, the SEC has ruled out any

15   alternative that a registrant may "reserve" such "freedom of action" by first re-defining its industry

16   classifications.

17   Despite this unequivocal elimination of management discretion to unilaterally revise a no-

18   concentration policy, Schwab claims it can sidestep its 25 percent cap on investing in a particular

19   industry simply by re-defining that industry to eliminate the problem. As justification, Schwab

20   relies on the unsettled definition of "industry" generally. ██████████████████████

21   ████████████████████████████████████████████████████████████████

22   ██████████████ Schwab Wells Br. at 21, Berman Decl. Ex. AA█████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25

26

27   EPA's interpretation of the scope and limits of that statute is entitled to considerable deference");
     *Saravia-Paguada v. Gonzales*, 488 F.3d 1122, 1128 (9th Cir. 2007); *Yourman v. Giuliani*, 229 F.3d

28   124, 130 (2d Cir. 2000).



1    ███████████████████████).[10] The SEC publication points out that ████████████

2    ███████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████ *Id.*

4    Schwab continued in its Wells brief, ██████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████████

6    ████████████████████████████████ *Id.* at 21-22 (quoting SEC Release No. IC-28807, at 73

7    n.224, 74 FR 32688 (June 30, 2009) (bracketed material in original)).

8    ███████████████████████████████████████████████████████████████████

9    ██████████ *Id.* at 22. ████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████████████

13   █████████████████████████████████ *Id.*

14       But Schwab fails to recognize that Guide 19 nowhere allows a fund, after making that

15   initial determination and disclosing it to investors in a prospectus or SAI, to later *change* its

16   definitions without shareholder approval.  Schwab points to no language – because there is none –

17   authorizing such freedom of action.

18       Indeed, the SEC explained in Guide 19 that it considered and rejected this sort of manage-

19   ment discretion.  Guide 19 grants a fund great liberty *initially* to craft its concentration/no-concen-

20   tration policy as it wishes, as long as it discloses the policy to investors.  But having done so and

21   then selling fund shares to investors based on that policy, a fund cannot then alter its policy without

22   shareholder approval.  Guide 19 strictly limits a fund's discretion to unilaterally change a

23   concentration policy:  the fund must disclose from the beginning *the specific conditions under*

24   *which it might revise the policy* in the future:

25               Freedom of action to concentrate pursuant to management's
                 investment discretion, without shareholder approval, has been

26

27   ──────────────────
         [10] This report was the result of the SEC Division of Investment Management's comprehensive
28   evaluation of the ICA, completed in 1992.  The 523-page report addressed many issues, including
     conflicts of interests and investment company governance under the ICA.

considered by the staff to be prohibited by sections 8(b)(1) and
13(a)(3) of the 1940 Act, unless the statement of investment policy
clearly indicates when and under what specific conditions any
changes between concentration and non-concentration would be
made. [*Id.* at *203-04.]

The Guide then expressly bars a fund from generally reserving discretion to revise a concentration

policy:

Statements of concentration policy pursuant to which registrants
reserve the right to concentrate in particular industries "without
limitation if deemed advisable and in the best interests of the
shareholders" are viewed as failing to comply with section 8(b)(1).
[*Id.* at *204.]

And this is as it should be. Congress created the ICA to remedy unfair practices rampant in

the investment-company industry including selling fund shares without proper disclosure of the

fund's investment policies, and unilaterally changing those policies after investors bought into a

fund. Congress intended the ICA to prohibit those practices, and called upon courts to interpret

ICA provisions to achieve this purpose. *See supra* at 11-13. The ICA does not grant fund

managers discretion to entice investors by disclosing a particular concentration (or no-

concentration) policy, while not disclosing the particular circumstances under which the policy

may change, only to unilaterally change it later, after investors bought into the fund with their hard-

earned money.

Interpreting § 13(a) and Guide 19 to grant investment companies a license to change

disclosed industry classifications at will, as Schwab insists is proper, guts §§ 8 and 13(a)'s protec-

tions. Schwab insists it is free to reverse its SAI's definition of non-agency mortgage-backed

securities as a separate industry because it did not specifically change the language of its no-

concentration policy. Schwab thus proclaimed to the SEC that ▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Schwab Wells Br. at 20 (▆▆▆▆). According to Schwab, the

policy ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆ *Id.* at 21. But without immutable definitions, any statute, policy or

provision is built on shifting sands; discretion to rewrite a rule's definitions amounts to no less than

discretion to rewrite the rule itself. And where that discretion resides with a person purportedly

bound by the rule, any binding effect of the rule is illusory.

1    Fortunately, courts reject interpretations that, like Schwab's, render a statute meaningless.

2    See, for example, *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 385 (1980);

3    *Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 34-35 (1957);

4    *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1111 (9th Cir. 2007); *Malcom v. Payne*, 281 F.3d

5    951, 960 (9th Cir. 2002).  If a fund is permitted to evade its concentration policy simply by re-

6    defining a previously adopted and disclosed industry classification to exclude a category of securi-

7    ties, without initially disclosing the particular conditions under which it can do so or without first

8    obtaining shareholder approval, the fund's concentration policy is irrelevant and § 13(a) is

9    meaningless.  YieldPlus's disclosed definition of non-agency mortgage-backed securities as a

10    separate industry should thus be read as incorporated into its no-concentration policy and

11    unalterable without shareholder approval.

12    Moreover, the freedom to act that Schwab asserts here thwarts the ICA's remedial purpose

13    and Congress's explicit mandate to interpret the ICA flexibly to protect investors.  *See supra* at 11-

14    17.  It also contradicts the Supreme Court's instruction on interpreting ICA provisions:  "[I]t is the

15    duty of the courts to be alert to provide such remedies as are necessary to make effective the con-

16    gressional purpose."  *J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964).  According to the Court,

17    Congress intended the ICA, like other securities legislation, to be construed as "'enacted for the

18    purpose of avoiding frauds,' not technically and restrictively, but *flexibly* to effectuate its remedial

19    purposes."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (footnote omit-

20    ted; emphasis added).[11]  Thus, "where federally protected rights have been invaded, it has been the

21    rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary

22    relief."  *Bell v. Hood*, 327 U.S. 678, 684 (1946).  Reversing the disclosed industry classification

23    underlying YieldPlus's concentration policy changes the Fund's investment character without

24    shareholder consent and thereby exemplifies one of the "evils" Congress sought to eliminate.

25    Reading § 13(a) to allow this is a hypertechnical interpretation that would frustrate Congressional

---

26

27

28

[11] *See also Abrahamson v. Fleschner*, 568 F.2d 862, 875 (2d Cir. 1977) (same).  Though these courts were discussing the Investment Advisors Act, Congress passed it "at the same time and for the same reasons as the Investment Company Act," *Sullivan v. Chase Inv. Servs. Inc.*, 434 F. Supp. 171, 183 (N.D. Cal. 1977), so this statement of purpose and construction applies equally to the ICA.

1    purpose and deny shareholders the remedy that Congress intended.  The Court should therefore

2    reject Schwab's interpretation and find as a matter of law that Schwab deviated from its no-

3    concentration policy by investing more than 25% of YieldPlus assets in non-agency mortgage-

4    backed securities without first obtaining shareholder approval, thereby violating § 13(a) and, as a

5    consequence, the UCL.

6              **c.      Schwab's authorities are inapposite**

7              Plaintiffs do not yet know what authorities Schwab may conjure in opposition to this

8    motion.  Schwab's Wells brief ███████████████████████████████ however, and we

9    address them here.

10             All are inapposite.  None of these cases involved violation of a provision linked to a con-

11   centration policy.  In *Krouner v. American Heritage Fund*, 899 F. Supp. 142, 148-49 (S.D.N.Y.

12   1995), the court held that plaintiff failed to state a § 13(a) claim because the complaint alleged

13   defendants deviated from investment policies that were *not* identified in the fund's Registration

14   statement or prospectus as policies changeable only by shareholder vote.  Unlike the present case,

15   plaintiff in *Krouner* did not link the allegedly violated policy to any fundamental policy.  *Id.*

16             The court in *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171, 180 (S.D.N.Y.

17   1996), found that plaintiffs failed to allege violations of fundamental "investment objectives," but

18   only claimed violations of non-fundamental strategies.  Plaintiffs relied on a paragraph that iden-

19   tified two "investment objectives" as fundamental policies and then stated that the trust "will seek

20   to" meet these objectives by employing particular strategies.  The court ruled that this language

21   sufficiently distinguished the fundamental policies from their non-fundamental strategies.  *Id.*

22             In *Karpus v. Hyperion Capital Mgmt.*, 1996 U.S. Dist. LEXIS 17104, at *12 (S.D.N.Y.

23   Nov. 15, 1996), the court found "the only reasonable interpretation of the Statement and the

24   Prospectus as a whole is that the Statement was not a fundamental 'investment objective' but rather

25   an 'investment strategy' or 'policy.'"  Defendants were therefore not bound to seek shareholder

26   approval before altering that strategy or policy.  *Id.* at *7 (applying "the 'reasonable investor'

27   standard to interpret and apply federal securities laws designed to protect the investing public such

28   as the Investment Company Act").  And in *In re Alliance North Am. Gov't Income Trust, Inc. Sec.*

PLTFS' MOT. FOR PARTIAL SUMMARY JUDGMENT RE:        - 18 -
UCL LIABILITY - 08-cv-01510 WHA

010036-12 352700 V1

*Litig.*, 1996 U.S. Dist. LEXIS 14209, at *17-18 & n.10 (S.D.N.Y. Sept. 26, 1996), there were no allegations that "the Fund ever deviated from its stated concentration of investments in 'government securities,'" but plaintiffs alleged that "the investment objective of the Fund, which could not be changed without the approval of a majority of the shareholders, included the Fund's investment policies." *Id.* The court identified the fund's investment objective and fundamental investment policies, which may not be changed without majority vote of the shareholders, and held that there were no allegations that the objective nor one of these fundamental policies had been changed. *Id. Cf., Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 948 n.6 (N.D. Cal. 2009) (distinguishing *In re Alliance North Am. Gov't Income Trust, Inc. Sec. Litig.*).

Unlike each of these cases, the present case involves Schwab's disclosure of a no-concentration policy, which explicitly required a shareholder vote to change, and a definition that governed the policy. The policy incorporated the definition, so that by reversing the definition without shareholder approval, Schwab revised the policy without shareholder approval.

There is no factual dispute that the Fund then invested assets in non-agency mortgage-backed securities in amounts that exceeded its no-concentration policy's 25% limit. There is thus no issue of material fact that by doing so, Defendants violated § 13(a) and thus the UCL.

**B.    There Is No Disputed Factual Issue That Defendants' § 13(a) Violation Injured Plaintiffs and the ULC Class**

Plaintiffs and the UCL Class seek monetary relief in the form of restitution. There is no genuine issue of fact that the Class is entitled to relief from Schwab. The UCL requires that a private plaintiff "lost money or property as a result of ... unfair competition." CAL. BUS. & PROF. CODE § 17204; Order re Motion for Class Certification (Dkt. No. 233), at 13 (citing § 17204). Plaintiffs' expert opines that Schwab's over-concentration in non-agency mortgage-backed securities caused the YieldPlus share price to plummet, injuring every UCL Class member.   Fong Report at 43-45.

Schwab does not dispute this opinion. Indeed, Schwab's expert, Christopher James, merely asserts that "[t]he shareholders of the fund were on notice of the change [to YieldPlus's no-concentration policy] and were free to redeem their shares." James Report, ¶ 80, Berman Decl. Ex.

1    X; *see also id.* at ¶¶ 82, 84.  But UCL Class members were not on notice of Schwab's unlawful

2    acts.  While investors are on notice of all disclosures in a prospectus at time of purchase, *see, e.g.,*

3    *Nathel v. Siegal*, 592 F. Supp. 2d 452, 462 (S.D.N.Y. 2008) ("[i]nformation contained in an

4    offering memorandum … may also suffice to put a party on inquiry notice of potential fraud" for

5    statute-of-limitations purposes), we know of no authority imposing a *post-purchase, continuing*

6    *obligation* on fund shareholders to monitor new prospectuses for the fund and documents

7    incorporated therein.  Aside from the current prospectus at their time of purchase, investors

8    likewise have no duty to monitor Schwab's other filings with the SEC.  *See generally Miller v.*

9    *Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir.) (investors not required to "to look beyond a given

10    document to discover what is true and what is not"), *cert. denied*, ___ U.S. ___, 129 S. Ct. 161

11    (2008).  Further, the post-purchase SAIs that James cites (James Report, ¶¶ 82, 84-85, Berman

12    Decl. Ex. X) did *not* disclose that the Fund had changed its classification of non-agency mortgage-

13    backed securities as a separate industry, *see supra* at 5, and thus failed in any event to notify

14    shareholders of the Fund's departure from its no-concentration policy.  The notice that James

15    asserts thus did not exist, and James' opinion does not create a factual dispute regarding whether

16    the UCL suffered an injury.[12]

17        There is, accordingly, no genuine issue of material fact whether Defendants are liable under

18    the UCL.  Plaintiffs and the UCL Class are entitled to partial summary judgment that Defendants

19    are liable to Plaintiffs and the UCL Class.

20                                **V.    CONCLUSION**

21        For the reasons set forth above, the Court should grant Plaintiffs' motion for partial

22    summary judgment and rule that as a matter of law the Schwab defendants violated § 13(a) of the

23    ICA and are liable to Plaintiffs and the UCL Class under the California UCL.

24

25

---

26    [12] James further asserts that, having been notified of Schwab's unlawful act, shareholders could
have sold their shares at that time without incurring a loss, *id.* at ¶ 83, which, according to James,
27    breaks any "causal link" to shareholders' injuries, *id.* at 32 (heading XVII).  Neither James nor
Schwab explain, however, how such potential notice could create an issue of fact as to the Class's
28    injuries.

1    Dated: February 11, 2010.

2                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                         Reed R. Kathrein
3                                        Peter E. Borkon
                                         715 Hearst Avenue, Suite 202
4                                        Berkeley, CA 94710
                                         Telephone: (510) 725-3000
5                                        Facsimile: (510) 725-3001
                                         reed@hbsslaw.com
6                                        peterb@hbsslaw.com

7

8

9                                        By:    s/ Steve W. Berman
                                               Steve W. Berman
10                                             Sean R. Matt
                                               Erin K. Flory
11                                             Lisa M. Hasselman
                                               Robert F. Lopez
12                                       HAGENS BERMAN SOBOL SHAPIRO, LLP
                                         1301 Fifth Avenue, Suite 2900
13                                       Seattle, WA 98101
                                         Telephone: (206) 623-7292
14                                       Facsimile: (206) 623-0594
                                         steve@hbsslaw.com
15                                       sean@hbsslaw.com
                                         erin@hbsslaw.com
16                                       lisah@hbsslaw.com
                                         robl@hbsslaw.com
17

18                                       Attorneys for Lead Plaintiffs

19

20

21

22

23

24

25

26

27

28