1   DARRYL P. RAINS (CA SBN 104802)
    EUGENE ILLOVSKY (CA SBN 117892)
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California 94304-1018
    Telephone: 650.813.5600
4   Facsimile: 650.494.0792
    Email: DRains@mofo.com
5
    CRAIG D. MARTIN (CA SBN 168195)
6   DOROTHY L. FERNANDEZ (CA SBN 184266)
    MORRISON & FOERSTER LLP
7   425 Market Street
    San Francisco, California 94105-2482
8   Telephone: 415.268.7000
    Facsimile: 415.268.7522
9
    Attorneys for defendants The Charles Schwab Corporation,
10  Charles Schwab & Co., Inc., Charles Schwab Investment
    Management, Inc., Schwab Investments, Charles R. Schwab,
11  Evelyn Dilsaver, Randall W. Merk, George Pereira, and
    Matthew Hastings
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15               SAN FRANCISCO DIVISION

16

17  IN RE CHARLES SCHWAB CORP.            Master File No. C-08-01510-WHA
    SECURITIES LITIGATION
18                                        CLASS ACTION

19                                        SCHWAB'S MOTION FOR
                                          SUMMARY JUDGMENT
20
                                          Date:       March 25, 2010
21                                        Time:       8:00 a.m.
                                          Judge:      Hon. William H. Alsup
22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT, on March 25, 2010, at 8:00 a.m., or as soon thereafter

4

as the matter may be heard, in Courtroom 9 of the United States District Court for the Northern

5

District of California, 450 Golden Gate Avenue, San Francisco, California, defendants The

6

Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Investment

7

Management, Inc., Schwab Investments, Charles R. Schwab, Evelyn Dilsaver, Randall W. Merk,

8

George Pereira, and Matthew Hastings, will, and hereby do, move, pursuant to Rule 56 of the

9

Federal Rules of Civil Procedure, for summary judgment on the claims asserted in plaintiffs'

10

Second Consolidated Amended Complaint, on the ground that, as to those claims, there is no

11

genuine issue as to any material fact.

12

The motion is based on this notice of motion, the accompanying brief in support of the

13

motion, the request for judicial notice, the supporting declaration of Dorothy L. Fernandez, and

14

such other written or oral argument as may be presented at or before the time this motion is taken

15

under submission by the Court.

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF ISSUES**
**(Local Rule 7-4)**

**Falsity**

1.      *Risk Disclosure*.  Plaintiffs contend that the fund concealed the magnitude and risk of its mortgage-backed securities holdings.  The fund disclosed its mortgage-backed securities holdings and portfolio allocation, and explained the market, credit, interest rate, and liquidity risks posed by mortgage-backed securities.  Do these disclosures defeat plaintiffs' claims?

2.      *Investment Objective and Strategy*.  The fund said its objective was to seek "high current income with minimal changes in share price."  Plaintiffs say this objective was misleading because it was inconsistent with a strategy of investing in mortgage-backed securities.  The fund disclosed that, to help meet its objective, the fund invested in mortgage-backed securities.  Does this disclosure refute plaintiffs' claim?

3.      *Historical Performance*.  Plaintiffs claim that, beginning in May 2006, the fund's "concentration" in mortgage-backed securities rendered false the fund's "minimal changes in share price" objective.  The fund enjoyed a stable price from May 2006 until late July 2007. Does the fact that the fund met its investment objective for the first 13 months of the class period defeat plaintiffs' claim?

4.      *Publicly Available Facts*.  The '33 Act does not require an issuer to disclose facts in the public domain or outside the issuer's peculiar knowledge.  YieldPlus, a mutual fund, lacked confidential information about the securities in its portfolio and the real estate market.  Is plaintiffs' claim, that the fund should have made additional disclosures about mortgage-backed securities, unsupported by law?

**Loss Causation**

5.      Is Schwab entitled to summary judgment on its loss causation defense where (1) the unique way that mutual fund prices are calculated makes it impossible for plaintiffs' alleged misrepresentations to have caused plaintiffs' losses and (2) the undisputed evidence shows that mortgage-backed securities, in particular, could not have caused plaintiffs' losses?

**California Business & Professions Code § 17200**

6.      Is Schwab entitled to summary judgment on plaintiffs' section 17200 claim when the YieldPlus fund did not violate section 13 of the Investment Company Act because it did not deviate from its fundamental concentration policy?

**Section 12 Damages**

7.      Are class members who tendered their shares upon filing the complaint on March 18, 2008, able to collect damages for declines in share price long after both their tender and the revelation of the alleged "true material facts" to the market?

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION.................................................................................i

STATEMENT OF ISSUES ...............................................................................................ii

TABLE OF AUTHORITIES............................................................................................vi

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................2

I.   SCHWAB'S STATEMENTS ABOUT MORTGAGE-BACKED SECURITIES
     WERE NOT MATERIALLY MISLEADING................................................................3

     A.   Schwab Fully Disclosed The Risks of Mortgage-Backed Securities. ....................4

     B.   Schwab Fully Disclosed Its Asset Allocation to Mortgage-Backed
          Securities. ..................................................................................................6

     C.   Schwab's Statements Concerning Minimal Changes to Share Price Were
          Not False or Misleading. ..............................................................................8

     D.   The Risks of Mortgage-Backed Securities Were Known to Investors and
          Not Within Schwab's Peculiar Knowledge. ...................................................10

II.  SCHWAB'S STATEMENTS ABOUT MORTGAGE-BACKED SECURITIES
     DID NOT CAUSE PLAINTIFFS' LOSSES................................................................10

     A.   Statements in the Fund's Registration Statements and Prospectuses Could
          Not Have Impacted the Fund's Share Price. ...................................................12

     B.   Statements About Mortgage-Backed Securities Did Not Cause Plaintiffs'
          Losses. .....................................................................................................14

III. THE FUND DID NOT DEVIATE FROM ITS CONCENTRATION POLICY OR
     VIOLATE SECTION 13(a). ....................................................................................17

     A.   The Fund Did Not Change Its Fundamental Concentration Policy in
          Violation of Section 13(a). ..........................................................................17

          1.   The Fund Never Changed Its Fundamental Concentration Policy............17

          2.   The Fund's Application of Its Policy to Non-Agency Mortgage-
               Backed Securities Was Not Part of Its Fundamental Concentration
               Policy. ............................................................................................18

          3.   Non-Agency Mortgage-Backed Securities Properly Are Not
               Included as Part of Any Industry.......................................................19

          4.   The Fund's Concentration Policy Is Limited to the Policy Explicitly
               Identified As Such in Its Prospectus.  No Shareholder Vote Was
               Needed to Change Other Aspects of the Fund's Policies.......................21

IV.  PLAINTIFFS CANNOT RECOVER FOR LOSSES OCCURRING AFTER
     THEIR COMPLAINT WAS FILED..........................................................................22

1

A.    Section 12 Does Not Permit Recovery of Damages Allegedly Suffered
After Plaintiffs Tendered Their Shares.................................................................22

2

B.    NAV Declines Following This Lawsuit Were Not Caused By the Alleged
Misrepresentations...............................................................................................24

3

CONCLUSION .............................................................................................................................25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) ................................................................................ 10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................ 3

*Bastian v. Petren Res. Corp.*,
   892 F.2d 680 (7th Cir. 1990) .............................................................................. 11

*Belodoff v. Netlist, Inc.*,
   2008 WL 2356699 (C.D. Cal. May 30, 2008) ...................................................... 8

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 2

*Clark v. Nevis Capital Mgmt., LLC*,
   2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ....................................................... 12

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................ 11, 14, 15

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ............................................................................... 11

*Goldkrantz v. Griffin*,
   1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) .................................................. 10, 23

*Hunt v. Alliance North American Government Income Trust, Inc.*,
   159 F.3d 723 (2d Cir. 1998) ............................................................................. 7, 8

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
   1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) ................................................... 8, 21

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............................................................... 24

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ............................................................................. 3

*In re Charles Schwab Corp. Sec. Litig.*,
   2009 WL 2591389 (N.D. Cal. Aug. 21, 2009) ..................................................... 8

*In re Charles Schwab Corp. Sec. Litig.*,
   257 F.R.D. 534 (N.D. Cal. 2009) .................................................................... 4, 13

*In re Fortune Sys. Sec. Litig.*,
   680 F. Supp. 1360 (N.D. Cal. 1987) .................................................................. 10

*In re Infonet Servs. Corp. Sec. Litig.*,
   310 F. Supp. 2d 1080 (C.D. Cal 2003) ................................................................. 10

*In re Keegan Mgmt. Co. Sec. Litig.*,
   794 F. Supp. 939 (N.D. Cal. 1992) ...................................................................... 16

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   568 F. Supp. 2d 349 (S.D.N.Y. 2008) .................................................................. 15

*In re Metricom Sec. Litig.*,
   2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ........................................................... 5

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ........................................................ 12

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ................................................................. 5, 7

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009) ........................................................ 14

*In re Petco Animal Supplies Inc. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 97927 (S.D. Cal. Aug. 1, 2006) ........................................... 8

*In re The Ultimate Corp. Sec. Litig.*,
   1989 WL 86961 (S.D.N.Y. July 21, 1989) ............................................................ 16

*Karpus v. Hyperion Capital Mgmt., Inc.*,
   1996 WL 668860 (S.D.N.Y. Nov. 18, 1996) ......................................................... 21

*Krouner v. Am. Heritage Fund, Inc.*,
   899 F. Supp. 142 (S.D.N.Y. 1995) ...................................................................... 21

*Landmen Partners v. Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) .................................................................. 10

*Leung v. City & County of S.F.*,
   2007 WL 4570254 (N.D. Cal. Dec. 21, 2007) ......................................................... 2

*McKowan Lowe & Co. v. Jasmine, Ltd.*,
   2005 WL 1541062 (D.N.J. June 30, 2005) ............................................................ 10

*Metz v. United Counties Bancorp*,
   61 F. Supp. 2d 364 (D.N.J. 1999) ....................................................................... 23

*Metzler v. Inv. GmbH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................. 11, 14, 25

*Morin v. Trupin*,
   747 F. Supp. 1051 (S.D.N.Y. 1990) .................................................................... 23

*Ong ex rel Ong v. Sears, Roebuck & Co.*,
   2005 WL 2284285 (N.D. Ill. Sept. 14, 2005) ........................................................ 23

*Paralyzed Veterans of Am. v. McPherson*,
    2008 WL 4183981 (N.D. Cal. Sept. 9, 2008) ............................................................................ 4

*Ray v. Citigroup Global Markets, Inc.*,
    482 F.3d 991 (7th Cir. 2007) .............................................................................................. 11, 12

*Rubke v. Capitol Bancorp Ltd.*,
    460 F. Supp. 2d 1124 (N.D. Cal. 2006) ................................................................................. 16

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................................................... 10

*Sheppard v. TCW/DW Term Trust 2000*,
    938 F. Supp. 171 (S.D.N.Y. 1996) ........................................................................................ 21

*Siemers v. Wells Fargo & Co.*,
    243 F.R.D. 369 (N.D. Cal. 2007) .......................................................................................... 13

*Varela v. S.F. City & County*,
    2007 WL 205069 (N.D. Cal. Jan. 25, 2007) ........................................................................... 3

*Verona Partners, LLC v. Tenant Capital Partners Convertible Opportunities Fund LP*,
    2006 WL 2669035 (N.D. Cal. Sept. 18, 2006) ...................................................................... 13

*Villa v. Rowe*,
    2009 WL 4823019 (N.D. Cal. Dec. 10, 2009) ......................................................................... 2

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) ................................................................................... 3

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ................................................................................................. 10

## STATUTES AND RULES

15 U.S.C.
    § 77l(a)(2) ............................................................................................................................ 2, 23
    § 77l(b) ................................................................................................................. 2, 10, 14, 25
    § 77k(e) ............................................................................................................................ 10, 14
    § 80a-8(b)(1) ........................................................................................................................... 17
    § 80a-13(a) ......................................................................................................................... 2, 17
    § 80a-22(a) ............................................................................................................................. 12

17 C.F.R.
    § 270.2a-4 ............................................................................................................................... 12
    § 270.22c-1(a) ................................................................................................................... 12, 23

Fed. R. Civ. P.
    Rule 56(b) ................................................................................................................................. 3
    Rule 56(c)(2) ............................................................................................................................ 2
    Rule 56(d)(1) ............................................................................................................................ 3

1

## OTHER AUTHORITIES

2   *Money Market Fund Reform,* Investment Co. Act Release No. 28,807,
       2009 SEC LEXIS 2186 (June 30, 2009) .............................................................. 18

3

4   *Protecting Investors:  A Half Century of Investment Company Regulation* (May 1992)
       http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf ....................... 18

5   Registration Form Used by Open-End Management Investment Companies; Guidelines,
       Investment Company Act Release No. 13436, 1983 WL 35814 (Aug. 12, 1983)........... 18, 19

6

7   *Ultra-Short Bond Funds: Know Where You're Parking Your Money,*
       http://sec.gov/investor/pubs/ultra-short_bond_funds.htm. ........................................ 4

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Schwab seeks summary judgment on four aspects of plaintiffs' claims.

The first part relates to Schwab's disclosures about mortgage-backed securities.  Plaintiffs make a host of allegations about those securities, but they all are fairly grouped into three categories:  that the individual mortgage-backed securities purchased for the fund were "riskier than represented"; that the fund's "concentration" in mortgage-backed securities made it "riskier than represented"; and that its "concentration" in those securities was "inconsistent" with the fund's objective to seek "minimal changes in share price."  (Sec. Am. Compl. [Dkt. 250] ¶¶ 1, 2, 80(d).)

But the fund's offering documents described the risks associated with the mortgage-backed securities in which the fund could invest.  They disclosed the precise percentage of the portfolio that could be — and actually was — allocated to mortgage-backed securities.  And they warned of the risks associated with a higher concentration in those securities.  In other words, the registration statement and prospectus disclosed the precise risks plaintiffs say Schwab omitted.

The second part concerns Schwab's affirmative defense of loss causation.  Plaintiffs' '33 Act claims allow Schwab to show that plaintiffs' alleged losses were not caused by the misrepresentations alleged in the complaint.  The undisputed evidence establishes this affirmative defense.  Unlike stocks or bonds, shares of mutual funds do not trade in an efficient market, and their prices do not respond to information contained in (or omitted from) the funds' registration statements or prospectuses.  Mutual funds' share prices are fixed according to a statutory formula and are based on the value of each security held in the funds' portfolios.  Statements made in mutual funds' registration statements or prospectuses cannot (with few exceptions not relevant here) affect the underlying value of the securities in funds' portfolios.  Accordingly, plaintiffs cannot, as a matter of law (under *Dura* and subsequent "loss causation" cases), show any causal connection between the allegedly misleading statements and their alleged losses.

The third part deals with plaintiffs' section 17200 claim, which alleges Schwab engaged in "unlawful" conduct in violation of section 13(a) of the Investment Company Act by "deviating" from the fund's fundamental investment policy or changing that policy without

1   majority approval from the fund's shareholders.  15 U.S.C. § 80a-13(a).  In particular, plaintiffs

2   claim Schwab Investments violated section 13(a) by allowing the fund's allocation to mortgage-

3   backed securities to exceed 25 percent.  The fund's investment limitations, however, provide only

4   that the fund will not "concentrate" more than 25 percent of its assets "in a particular industry or

5   group of industries."  The undisputed evidence shows that mortgage-backed securities are not an

6   "industry" for purposes of this policy.  Section 13(a) was, therefore, not violated, and,

7   accordingly, plaintiffs cannot prove their section 17200 claim.

8        The fourth part concerns plaintiffs' claim for damages under section 12, which provides

9   that class members who still owned shares when this suit was filed may recover the consideration

10  paid, "upon the tender" of their shares.  15 U.S.C. § 77*l*(a)(2).  The undisputed evidence shows

11  that these class members tendered their shares on March 18, 2008, when they filed the complaint.

12  The Court should therefore find their damages are cut off on that date.  In addition, these class

13  members cannot show that any losses allegedly suffered after that date could have been caused by

14  statements in the fund's prospectuses or registration statements.  15 U.S.C. § 77*l*(b).

15                                              **ARGUMENT**

16        The Court should grant summary judgment when "the pleadings, the discovery and

17  disclosure materials on file, and any affidavits show that there is no genuine issue as to any

18  material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

19  P. 56(c)(2).  The moving party "bears the initial responsibility of informing the court of the basis

20  for its motion, and identifying those portions of 'the pleadings, depositions, answers to

21  interrogatories, and admissions on file, together with affidavits, if any,' which it believes

22  demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

23  317, 323 (1986).  When the "moving party has met this burden of production, the nonmoving

24  party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts

25  showing that there is a genuine issue for trial.  *Villa v. Rowe*, 2009 WL 4823019, at *4 (N.D. Cal.

26  Dec. 10, 2009).

27        "A dispute is 'material' only if it could affect the outcome of the suit under the governing

28  law."  *Leung v. City & County of S.F.*, 2007 WL 4570254, at *1 (N.D. Cal. Dec. 21, 2007) (*citing*

1    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).)  To avoid summary judgment the

2    nonmoving party must come forward with evidence that is more than "merely colorable"; it must

3    be "significantly probative."  *Anderson*, 477 U.S. at 249–50 (citations omitted).  And, it must be

4    "sufficient evidence . . . for a jury to return a verdict" in that party's favor.  *Id*. (citation omitted).

5            The party moving for summary judgment may do so on "all or part of the claim."  Fed. R.

6    Civ. P. 56(b).  The Court may grant partial summary judgment where plaintiffs cannot show a

7    genuine issue of material fact with regard to certain alleged statements or an entitlement to

8    damages.  *See*, *e.g.*, *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118–19 (9th Cir. 1989)

9    (summary judgment granted on particular statements); *Varela v. S.F. City & County*, 2007 WL

10   205069, at *3 (N.D. Cal. Jan. 25, 2007) (summary judgment granted for defendants as to

11   plaintiff's claim for punitive damages); *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F.

12   Supp. 2d 1099, 1123 (C.D. Cal. 2001) (court can resolve part of damages claim on summary

13   judgment); *see also* Fed. R. Civ. P. 56(d)(1) (court should determine what "facts — including

14   items of damages or other relief — are not genuinely at issue").

15   **I.      SCHWAB'S STATEMENTS ABOUT MORTGAGE-BACKED SECURITIES
             WERE NOT MATERIALLY MISLEADING.**

16

17           Plaintiffs' case currently focuses on mortgage-backed securities.[1]  These securities,

18   plaintiffs claim, were inherently dangerous investments.  (Sec. Am. Compl. ¶ 80(e); Exh. U

19   (Expert Report of H. Gifford Fong) at 29–31.)  (All exhibits cited in this memorandum are

20   attached to the accompanying Fernandez declaration.)  According to plaintiffs, this made the

21   fund's offering materials misleading in three respects.  *First*, plaintiffs charge, the fund did not

22   _____

            [1]  At the hearing on class certification, plaintiffs' counsel described for the Court their key
23   falsity allegations "in a nutshell" by discussing duration:

24               Well, the two primary core representations in this fund[] related to that.  It
                was the equivalent of a short-term fund, meaning that it doesn't have risk,
25               and that the average duration was one year or less.  The duration is the
                measure of risk, the interest rate risk.  And we allege that those
26               representations were false because the duration was greater than one year.

27   (June 18, 2009, Hearing Tr. [Dkt. 222-1] at 5:13–21.)  Plaintiffs now seem largely to ignore the
     duration issue.

28

1    disclose the risks associated with mortgage-backed securities.  (Sec. Am. Compl. ¶ 80(e); Exh. U

2    at 35.)  *Second*, they claim, the fund concealed its "concentration" in mortgage-backed securities

3    and the risks associated with such a "concentrated" position.  (Sec. Am. Compl. ¶ 80(d).)  And

4    *third*, plaintiffs allege, the fund's asset allocation to mortgage-backed securities could not be

5    squared with the fund's investment objective, to "seek" to have "minimal changes in share price."

6    (*Id.* ¶ 80(a); Exh. U at 59.)

7            These three allegations are easily refuted by undisputed evidence.  The registration

8    statements and prospectuses plaintiffs say were misleading, in fact, fully disclose the information

9    plaintiffs say was missing.

10           **A.        Schwab Fully Disclosed The Risks of Mortgage-Backed Securities.**

11           Ultra-short bond funds fall between money market funds and long-term bond funds.

12   Unlike a money market fund, an ultra-short bond fund "may invest in [a] wide range of securities,

13   including corporate debt, government securities, mortgage-backed securities, and other asset-

14   backed securities."  *Ultra-Short Bond Funds:  Know Where You're Parking Your Money*,

15   http://sec.gov/investor/pubs/ultra-short_bond_funds.htm.[2]  Thus, ultra-short bond funds "typically

16   pursue strategies aimed at producing higher yields by investing in securities with higher risks."

17   *Id.*  As a result, ultra-short bond funds "tend to have higher risks than money market funds and

18   certificates of deposit (CDs)."  *Id.*  In addition, unlike a money market fund, "the net asset value

19   (NAV) of an ultra-short bond fund will fluctuate."  *Id.*

20           Schwab disclosed all these facts to its investors.  The fund's prospectuses and registration

21   statements have, at their beginning, an entire section called "strategy."  That section explains:

                 TO PURSUE ITS GOAL, THE FUND PRIMARILY INVESTS IN
22               INVESTMENT-GRADE BONDS (HIGH AND CERTAIN MEDIUM
                 QUALITY, AAA TO BBB- OR THE UNRATED EQUIVALENT AS
23               DETERMINED BY THE INVESTMENT ADVISER).  The fund may
                 invest in bonds from diverse market sectors based on changing economic,
24               market, industry and issuer conditions.  The fund may invest in fixed,

25

    _____

26           [2] The Court may take judicial notice of factual information found on a government
     website.  *See Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *5 (N.D. Cal.
27   Sept. 9, 2008); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 562 n.18 (N.D.
     Cal. 2009) (taking judicial notice of accounting concept on FASB website).

28

> variable or floating rate bonds issued by U.S. and non-U.S. issuers including, without limitation, Treasuries and agency securities, corporate bonds, commercial and residential mortgage-backed securities, collateralized mortgage obligations, asset-backed securities, corporate loans, preferred and convertible securities.

(Exh. H (Nov. 15, 2006 Reg. Stmnt.) at *2.)[3]  The section goes on to explain that the "fund may invest in bonds with effective or final maturities of any length and may invest up to 25% of its assets in below investment grade bonds (sometimes called junk bonds) . . . ."  (*Id.*)[4]  Further, it said, a decline in an investment's credit quality "could cause the fund's share price to fall."  (*Id.* at *3.)

The fund contrasted its strategy with the constraints on money market funds.  The YieldPlus prospectus, for example, explained that, "[a]s an ultra-short bond fund, the fund is not subject to the maturity, credit or diversification limitations of a money market fund."  (*Id.* at *2.)  It said the fund "may invest in financial instruments that a money market fund may not purchase," including "bonds with effective or final maturities of any length."  (*Id.*)  And Schwab repeatedly emphasized that the YieldPlus fund "is not a money market fund."  (*Id.*)

Next, the registration statement and prospectus discussed the risk characteristics of mortgage-backed securities generally.  They noted, for example, that the securities' rate of principal payments hinged on the payments received on the underlying assets, which "may be affected by a variety of economic and other factors."  (*Id.* at *21 (Statement of Additional Information); *id.* at *10 (Prospectus).)  This made their price and yield "difficult to predict with precision."  (*Id.* at *21.)

It also set out the specific types of mortgage-backed securities in which the fund could

---

[3] Schwab included disclosures similar to those discussed in Section I of this Memorandum in each challenged prospectus and registration statement.  (*See* Exhs. B, E, H, M and O.)

[4] Not only did Schwab disclose the permissible limits on the fund's credit quality, it summarized the portfolio's actual credit quality in annual and semiannual reports on file with the SEC.  (*See, e.g.*, Exh. F (Aug. 31, 2006 Annual Report) at 6; Exh. J (Feb. 29, 2009 Semiannual Report) at 6.)  Because the fund spelled out the portfolio's credit quality composition, any alleged omission concerning credit risk is immaterial as a matter of law.  *See In re Metricom Sec. Litig.*, 2004 WL 966291, at *16, 24 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 714 (9th Cir. 2006); *In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466, 479 (E.D.N.Y. 2006).

1    invest, described how they worked, and disclosed their risks.  (*Id.* at *18–22.)  Schwab reviewed

2    the structure, for example, of collateralized mortgage obligations (CMO's), noting that they are

3    collateralized by pools of mortgages.  It explained that rights to principal and interest payments

4    are typically prioritized among various series of the CMO bonds.  CMO market values, Schwab

5    said, may be "more or less sensitive to changes in prepayment and interest rates" than

6    "traditional" mortgage- and asset-backed securities.  (*Id.* at *21.)  In some cases, Schwab

7    cautioned, CMO market values "may be extremely volatile."  (*Id.*)  Schwab included similar

8    disclosures about interest rate, prepayment, liquidity, and market risks for every other type of

9    mortgage-backed securities in which the fund was permitted to invest.  (*See id.* at *3–5, *18–22.)

10          Plaintiffs cannot prove, then, that the fund's registration statement or prospectus

11   concealed the risks of investing in mortgage-backed securities.

12          **B.      Schwab Fully Disclosed Its Asset Allocation to Mortgage-Backed Securities.**

13          Plaintiffs assert that the fund's "asset allocation was not well-diversified and was overly

14   concentrated in a single risky industry or market sector, thereby increasing risk exposure on a

15   systematic basis, as Defendants began to concentrate investments in asset-backed securities and

16   mortgage-backed securities."  (Sec. Am. Compl. ¶ 80(d).)  As a result, according to plaintiffs,

17   "the Fund has had a greater exposure to credit and also illiquidity risk than other top-performing

18   ultra short funds.  This risk was not adequately disclosed."  (*Id.* ¶ 80(f).)

19          There is no evidence to support this allegation.  First, the fund disclosed its permissible

20   asset allocation to mortgage-backed securities.  Prior to September 2006, Schwab told investors

21   that it would invest up to 25 percent of the fund's assets in non-agency mortgage-backed

22   securities.  (*See*, *e.g.*, Exh. D (Nov. 15, 2005 SAI as amended July 6, 2006) at *3.)  Following the

23   fund's determination that non-agency mortgage-backed securities would not be treated as an

24   industry for concentration policy purposes, Schwab told investors:

25              Concentration increases investment exposure.  Based on the
               characteristics of mortgage-backed securities, the funds have determined
26              that mortgage-backed securities issued by private lenders and not
               guaranteed by U.S. government agencies or instrumentalities are not part
27              of any industry for purposes of a fund's concentration policy. *This means
               that a fund may invest more than 25% of its total assets in privately-
28              issued mortgage-backed securities . . . .*

1   (Exh. H at *16 (emphasis added); *see also* Exh. G (Nov. 15, 2005 SAI as amended Sept. 1, 2006)

2   at SCH-YP002098.)  Plaintiffs cannot claim that the fund concealed this "concentration."

3          Indeed, the fund's offering materials incorporated by reference its annual report's

4   financial statements disclosing the percentage of its assets in mortgage-backed holdings, as well

5   as a list of each mortgage-backed security held.[5]  So, for example, the November 15, 2006

6   offering materials included a disclosure that, as of August 31, 2006, the fund held 24.6 percent of

7   its assets in CMO securities, and a list of each such security.  (Exh. F (Aug. 31, 2006 Annual

8   Report) at 24.)[6]

9          Second, the fund fully disclosed the risks of "concentrating" in mortgage-backed

10  securities.  It warned investors that the fund's allocation to mortgage-backed securities:

11              may cause the fund to be more sensitive to adverse economic, business or
                political developments that affect privately-issued mortgage-backed
12              securities.  Such developments may include changes in interest rates, state
                or federal legislation affecting both commercial and residential mortgages
13              and their issuers, and changes in the overall economy.

14  (Exh. H at *15.)

15         The disclosure in the registration statement and prospectus of the very information

16  plaintiffs claim was omitted defeats plaintiffs' claims.  This exact point was made — about

17  mortgage-backed securities, no less — in *Hunt v. Alliance North American Government Income*

18  *Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir. 1998).  There, the court dismissed a section 11 claim

19  based on an alleged failure to disclose investments in mortgage-backed securities.  The court

20

21         [5] The prospectus incorporated the fund's Statement of Additional Information, "making it
       legally a part of the prospectus."  (Exh. O (Nov. 15, 2007 Reg. Stmnt.) at *10.)  The SAI, in turn,
22     incorporated the audited financial statements in the most recent annual report.  (*Id.* at *11.)  Those
       statements included a security-by-security list of the fund's portfolio holdings, sorted by category,
23     and a summary of the security categories by percent of portfolio assets.  (*See, e.g.*, Exh. N at 18–
       27.)

24         [6] Each quarter, the fund filed with the SEC a list of every security held by the fund,
25     organized by sector.  These were published in annual and semiannual reports, and its reports on
       Form N-Q.  These reports expressly disclosed the percentage of assets invested in mortgage-
26     backed securities.  (Exhs. C, F, I–J, L, N, P.)  These disclosures negate as a matter of law the
       materiality of any omission about the fund's mortgage-backed "concentration."  *See, e.g.*, *In re
27     N.Y. Cmty. Bancorp*, 448 F. Supp. 2d at 479 (dismissing section 11 and 12(a)(2) claims where "it
       is apparent from the quarterly reports disclosed to the public that the company was heavily
       involved in investing in mortgage-backed securities").

28

1    found that the fund had disclosed it would invest in mortgage-related securities and even had

2    provided "extensive descriptions of the mortgage-related instruments purchased" for the fund.  *Id.*

3    at 731; *see also Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *9 (C.D. Cal. May 30, 2008)

4    (where information allegedly omitted was in fact disclosed, the alleged misstatement "cannot be a

5    basis for the Section 11 claim as a matter of law").

6           **C.      Schwab's Statements Concerning Minimal Changes to Share Price Were Not
                       False or Misleading.**
7

8           Plaintiffs argue that the fund's asset allocation to mortgage-backed securities was "not

9    consistent" with the fund's investment objective, which was "designed to offer high current

10   income with minimal changes in share price."  (Sec. Am. Compl. ¶¶ 5, 88(a), 89(a).)

11          No evidence supports this charge.  The fund's investment objective, after all, "announces

12   the goal of the Fund, rather than a promise to investors.  The investment objective is not the type

13   of statement that a reasonable investor would consider important in deciding whether or not to

14   invest."  *In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, 1996 WL 551732, at *4

15   (S.D.N.Y. Sept. 27, 1996); *see also In re Charles Schwab Corp. Sec. Litig.*, 2009 WL 2591389, at

16   *4 (N.D. Cal. Aug. 21, 2009) ("plaintiffs likely face an uphill fight to prove that allegations as

17   non-specific as the ones on which plaintiffs rely were false and misleading").

18          Moreover, the fund's stable share price history proves that its strategy, including its

19   investment in mortgage-backed securities, was consistent with its "minimal changes in share price

20   objective."  *See In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 97927, at

21   *70–71 (S.D. Cal. Aug. 1, 2006) (dismissing business strategy allegations where company

22   consistently met targets) (*citing In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 n.6 (9th Cir.

23   2002) (false prediction allegations weak where company met goals)).  As the graph below

24   demonstrates, the fund enjoyed a stable share price for many years, notwithstanding interest rate

25   fluctuations.  Even after May 31, 2006, when plaintiffs claim the fund's mortgage-backed

26   securities reached improper levels, the fund continued to experience "minimal changes in share

27   price" *for more than a year.*  (Sec. Am. Compl. ¶¶ 88(a), 89(a).)  It took the greatest financial

28   crisis since the Great Depression to trigger the fund's price declines starting in late July 2007.



(Exh. Y (Historical NAV from Yahoo! Finance).)

Plaintiffs' expert, H. Gifford Fong, concedes this.  Mr. Fong concluded that the fund's mortgage-backed securities holdings remained stable until fall 2007.  (*See* Exh. U at 38–40, App. H.)  Even then, he cites only a handful of poorly performing securities, no doubt the worst he could find in the portfolio.  (*Id.*)  Plaintiffs simply cannot show that the fund's stated investment objective was "false," particularly when published in the November 15, 2006 registration statement and in any prospectus effective before July 2007.

In any event, no investor could have construed the fund's stated investment objective as a promise of immunity to price declines.  That's because the prospectuses and registration statements explicitly warned of that possibility.  They cautioned, for example, that "the fund has a higher risk profile than a money market fund . . . and, unlike a money market fund, its share price will fluctuate."  (Exh. H at *2.)  They went on to warn that the fund was subject to market risk ("the values of the securities owned by the fund rise and fall daily"), interest rate risk (falling rates "could cause the fund's share price to fall"), and credit risk (a "decline in the credit quality

1    of a portfolio investment could cause the fund's share price to fall"), and expressly warned that

2    investors could lose money on the fund ("the value of your investment in the fund will fluctuate,

3    which means that you could lose money").  (*Id.* at *3.)

4         **D.    The Risks of Mortgage-Backed Securities Were Known to Investors and Not
               Within Schwab's Peculiar Knowledge.**
5

6         Even if the fund had omitted to disclose some risk associated with holding high levels of

7    mortgage-backed securities, there can be no '33 Act liability because facts within the public

8    domain are immaterial as a matter of law.  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162–

9    63 (9th Cir. 2009); *Landmen Partners v. Blackstone Group, L.P.*, 659 F. Supp. 2d 532, 545–46

10   (S.D.N.Y. 2009) (rejecting section 11 and 12(a)(2) claims for failure to disclose effect of market

11   on real estate investments).  Information about mortgage-backed securities, of course, was

12   publicly available and widely known to the market.  The YieldPlus fund, which purchased

13   securities of other issuers, did not have firm-specific knowledge about these holdings.  This too

14   defeats plaintiffs' federal securities claims, because the '33 Act imposes no duty to disclose

15   information outside the peculiar knowledge of the issuer.  *Wielgos v. Commonwealth Edison Co.*,

16   892 F.2d 509, 517 (7th Cir. 1989); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080,

17   1097 n.14 (C.D. Cal 2003).

18   **II.   SCHWAB'S STATEMENTS ABOUT MORTGAGE-BACKED SECURITIES DID
           NOT CAUSE PLAINTIFFS' LOSSES.**
19

20        "Loss causation" is an affirmative defense to claims under sections 11 and 12 of the

21   '33 Act.  15 U.S.C. §§ 77k(e), 77*l*(b) (if defendant proves "any portion" of losses was caused by

22   anything other than the misstatement or omission, "such portion . . . shall not be recoverable").

23   The loss causation affirmative defense is a proper subject for summary judgment.  *E.g.*,

24   *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 340–43 (2d Cir. 1987) (summary judgment on

25   section 11 claim where defendants showed lack of causation); *McKowan Lowe & Co. v. Jasmine,*

26   *Ltd.*, 2005 WL 1541062, at *12 (D.N.J. June 30, 2005) (same), *aff'd*, 231 F. App'x 216 (3d Cir.

27   2007); *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1368 (N.D. Cal. 1987) (same);

28   *Goldkrantz v. Griffin*, 1999 WL 191540, at *3–7 (S.D.N.Y. Apr. 6, 1999) (summary judgment on

1    section 11 and 12 claims where defendants showed lack of causation).

2          Loss causation refers to the "causal connection between the material misrepresentation

3    and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Emergent*

4    *Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) ("causal link

5    between the alleged misconduct and the economic harm ultimately suffered by the plaintiff").

6    The purpose of the loss causation requirement is to make sure that recovery is limited to

7    "economic losses that misrepresentations actually cause" without providing "broad insurance

8    against market losses" whenever a plaintiff, with the benefit of hindsight, can point to some

9    supposed omission in a prospectus. *Dura Pharms.*, 544 U.S. at 345.  To that end, the loss

10   causation requirement separates cases where the misrepresentation was responsible for a drop in

11   the share's value from those in which market forces, changed circumstances, or the realization of

12   disclosed risks are to blame. *Id.* at 342–43 (no loss causation where lower price reflects "not the

13   earlier misrepresentation, but changed economic circumstances, changed investor expectations,

14   new industry-specific or firm-specific facts, conditions, or other events").

15         These requirements are the same whether plaintiffs complain of an affirmative

16   misstatement or an omission.  In either case, there is no loss causation unless the "truth became

17   known" and that revelation of the truth caused a loss. *Dura Pharms.*, 544 U.S. at 347; *see also*

18   *Metzler v. Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) ("the

19   complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to

20   the market and caused the resulting losses").

21         Loss causation — that the misrepresentation caused the loss — is distinct from transaction

22   causation — that the misrepresentation induced the decision to buy or sell.  *See Ray v. Citigroup*

23   *Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (argument that "a knowledgeable

24   investor would not have made the investment in question, had she known all the facts" goes only

25   to transaction causation).  Evidence that a particular representation induced an investor into

26   "entering into the transaction in which they lost money" does not show the representation was

27   "the cause of the transaction's turning out to be a losing one." *Bastian v. Petren Res. Corp.*,

28   892 F.2d 680, 684 (7th Cir. 1990).  If "the summary judgment record supports plaintiff only on

1    [transaction causation], and not on loss causation, then the defendant is entitled to prevail." *Ray*,

2    482 F.3d at 995.

3        Here, the unique way in which mutual funds' shares are priced makes it impossible for

4    plaintiffs' alleged misrepresentations to have caused plaintiffs' losses.  But that is not all.  The

5    undisputed evidence also shows that alleged misrepresentations about mortgage-backed

6    securities, in particular, could not have caused plaintiffs' losses.  Those losses were caused by

7    "other factors" apart from any alleged misrepresentation, namely the decline in the values of the

8    fund's disclosed holdings during a once-in-a-century credit crisis that affected not just mortgage-

9    backed securities, but nearly all non-government bonds.

10       **A.    Statements in the Fund's Registration Statements and Prospectuses Could**
              **Not Have Impacted the Fund's Share Price.**

11

12       Unlike the price of an individual issuer's stock, which trades in a secondary market, a

13   mutual fund's share price does not move based on information about the fund itself.  Instead, its

14   NAV is calculated using a statutory formula which aggregates the prices of each of the underlying

15   securities in the fund's portfolio:

16          [T]he value of a mutual fund share is calculated according to a statutory
            formula.  Share price is a function of "Net Asset Value," the pro-rata

17          share of assets under management, minus liabilities such as fees.

18   *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *9 (S.D.N.Y.

19   Apr. 18, 2006); *see also Clark v. Nevis Capital Mgmt., LLC*, 2005 WL 488641, at *18 (S.D.N.Y.

20   Mar. 2, 2005) ("[t]he share price of a mutual fund is determined by the value of all the underlying

21   securities it holds at a given time, and the fund price fluctuates with the price of those underlying

22   securities"); 15 U.S.C. § 80a-22(a) (SEC rules govern fund share price); 17 C.F.R. § 270.22c-1(a)

23   (fund shares priced at "current net asset value"); 17 C.F.R. § 270.2a-4 (formula for "current net

24   asset value").  (*See also* Exh. Q (Mikelonis Resp. to RFAs) No. 45 at 17.)

25       Because, outside of the NAV formula, there is no mechanism for a mutual fund's share

26   price to be affected by statements about the fund, most statements in the fund's registration

27   statements and prospectuses cannot have any impact on the fund's price.  This is surely true of

28   statements like those plaintiffs complain of here — that is, general statements about the fund's

1   investment objectives, strategies, or risks.  The only possible situations where statements can

2   impact a mutual fund's NAV, which we show are not applicable here, involve misstatements that

3   relate directly to the calculation of the fund's NAV — that is, misstatements about a fund's "pro-

4   rata share of assets under management" or about its "liabilities such as fees."

5          For instance, say the defendant misrepresents the very assets that are in the fund.  In the

6   Court's words from a prior order, suppose investors are told a fund has "low-risk government

7   bonds but in fact invested in legitimate but high-risk treasure-hunting expeditions."  *In re Charles*

8   *Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).  Because the assets —

9   government bonds versus investments in treasure hunting — are, of course, part of the "net asset

10  value" formula, there may be an argument for loss causation if the NAV subsequently drops

11  because of the treasure-hunting investments.  That is not our case, however, since it is undisputed

12  that the securities in the YieldPlus fund portfolio were disclosed repeatedly before and during the

13  class period.

14         We can draw a real example from cases in which courts allow that there may be loss

15  causation in the mutual fund context where the misstatement involves a component used in the

16  fund's statutory calculation of its NAV.  In *Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 374–

17  75 (N.D. Cal. 2007), for instance, this Court allowed that there could be loss causation where the

18  alleged misstatements directly related to fees, a component of the statutory NAV calculation.

19         Plaintiffs do not seek to prove, nor does this case involve, any claims about any

20  component of the statutory NAV calculation being misrepresented in the registration statement or

21  prospectus.  As a result, they cannot respond to our showing with any proof of a loss causation

22  "link" between allegedly misleading statements and investors' alleged losses from declines in

23  NAV.  *Verona Partners, LLC v. Tenant Capital Partners Convertible Opportunities Fund LP*,

24  2006 WL 2669035, at *14 (N.D. Cal. Sept. 18, 2006) (plaintiffs unable to prove facts "showing a

25  connection between the decline in value of the Fund and the claimed omission[s]").  Investors

26  who sold fund shares for less than their purchase price did so, not because of any statements

27  Schwab made about the fund, but because of a decline in the aggregate value of the fund's

28  hundreds of individual securities.  (*See* Exh. T (Preston Depo.) at 75:20–77:11 ("[T]he net asset

value is determined by the value of the underlying securities.  So to the extent that the value of the underlying securities changes, the net asset value changes.").)

**B.     Statements About Mortgage-Backed Securities Did Not Cause Plaintiffs' Losses.**

Plaintiffs explain their loss causation theory this way:  they say the fund's NAV declined because of "massive write-downs as [the fund] marked the value of mortgage-backed investments down to their reduced market values.  Those write-downs caused a commensurate decline in the Fund's NAV, which in turn caused investors to abandon the Fund."  (Sec. Am. Compl. ¶ 113.)  This statement, even if proven true, would not establish loss causation.

Plaintiffs cannot overcome our loss causation defense simply by proving the fund's mortgage-backed securities declined in value, and that the fund then declined in value.  They must show some misrepresentation or omission in a prospectus (in 2006) that "actually cause[d]" their economic losses.  *Dura Pharms.*, 544 U.S. at 345; *see also* 15 U.S.C. §§ 77k(e), 77l(b) (if defendant proves "any portion" of losses was caused by anything other than the misstatement or omission, "such portion . . . shall not be recoverable").

The required link between the loss and the "truth" must be direct.  *See*, *e.g.*, *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *48–49 (N.D. Cal. June 19, 2009) (summary judgment where no evidence linked price decline to previously undisclosed facts about particular product that was allegedly misrepresented as being fully functional).  And that same "truth," when disclosed, must have caused the fund's NAV decline.  *Metzler*, 540 F.3d at 1063.  Plaintiffs may not, therefore, simply argue that "the fund made misrepresentations about mortgage-backed securities, and mortgage-backed securities declined in value, therefore, the fund's misrepresentations caused the loss."  It is not enough for the alleged misrepresentation merely to be about the general subject matter (or group of securities) that leads to the loss.  *Dura Pharms.*, 544 U.S. at 342 ("[t]o touch upon a loss is not to *cause* a loss").

Plaintiffs cannot show that some hidden over-concentration in mortgage-backed securities later materialized to cause the fund's losses.  The fund's increased allocation to non-agency mortgage-backed securities was fully disclosed to investors — in its registration statement, its

prospectus, its statement of additional information, its shareholder reports, and on the Internet. The fund's holdings of mortgage-backed securities were stated in words, in numbers, in pie charts, and in complete lists of securities in the portfolio. *See* section I.B, above. And the risks of concentrating in mortgage-backed securities were also fully disclosed. *Id.* Even if this asset allocation caused a decline in the fund's NAV during the credit crisis, it would not establish loss causation, because the NAV decline would represent the materialization of *disclosed* risk. *See In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 360–65 (S.D.N.Y. 2008) (complaint dismissed where "buy" recommendation allegedly insincere but risk disclosures and accurate financial statements allowed plaintiffs to evaluate risks for themselves; "plunging asset value" was materialization of disclosed risk).

Nor do plaintiffs have any evidence that any hidden risk associated with the fund's individual mortgage-backed securities later materialized to cause the fund's losses. The market's current views about the risks of individual mortgage-backed securities were incorporated into the prices of those bonds and were not within Schwab's unique knowledge. (Exh. W (Duggan Depo.) at 80:3–84:5.) Schwab reported values for its mortgage-backed securities every quarter. And, in sharp contrast to their complaint, plaintiffs fail to offer any evidence that a single security was "mispriced" before September 1, 2007.[7] This lack of evidence of "mispricing," combined with the fund's complete disclosure of its holdings, shows that the decline in the fund's NAV was caused by the declining prices of portfolio securities as the credit crisis unfolded and the market learned new information. Showing that the value of the fund's mortgage-backed securities declined in late 2007 does not link that decline to an alleged omission in a registration statement that became effective 10 months earlier, in November 2006, especially since the fund reported

---

[7] Plaintiffs allege that Schwab's reported values for 14 securities in May, August, and November 2007, and sometimes in February 2008, differed from the "proper valuation by plaintiffs' expert." (Sec. Am. Compl. ¶ 80(h).) But their expert never opines about the "proper" valuations for a single portfolio security. (Exh. R (Dickson Resp. to Interrogs.) No. 20 at 31 ("[i]n Mr. Fong's analysis, no valuation of individual securities was involved").) Instead, Mr. Fong argues that the fund must have mispriced securities because the values of those securities later declined. (Exh. U at 47–50.) For purposes of this motion, we put the many flaws in this analysis aside. Even accepting what Mr. Fong says, he does not opine or point to any evidence that a single security was "mispriced" before September 1, 2007. (*Id.*)

1   uncontested values for its securities as of February, May, and August 2007.[8]

2   　　　In all events, the fund's investments in mortgage-backed securities did not cause

3   plaintiffs' losses.  In fact, the mortgage-backed securities in the fund's portfolio performed pretty

4   much the same as the other bonds in the portfolio.  One easy way to see this is to compare

5   plaintiffs' expert's allocation of realized losses by asset type to the allocations within the

6   portfolio.  Mr. Fong attributes 51.6 percent of the fund's losses between May 2006 and March

7   2008 to "non-agency mortgage-backed securities" (which, in Mr. Fong's chart, includes "home

8   equity loan asset-backed securities") and 48.9 percent to corporate bonds.  (Exh. U at 34, 45.)

9   That breakdown of losses is roughly proportional to the weights of those asset types within the

10  portfolio, which contained approximately 45 percent "non-agency mortgage-backed securities"

11  (using Mr. Fong's non-standard definition) and 40.3 percent corporate bonds as of August 2007.

12  (Exh. U at 34–35; Exh. N at 18, 22.)

13  　　　The fund's NAV declined because the values of its disclosed holdings dropped during a

14  once-in-a-century, unforeseen credit crisis.  No law required Schwab to predict this future market

15  disruption in advance.  *See In re Keegan Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 942 (N.D. Cal.

16  1992) (summary judgment on section 11 claims; "[n]o law requires the prospectus to

17  contain . . . information that did not exist prior to its effective date"); *In re The Ultimate Corp.*

18  *Sec. Litig.*, 1989 WL 86961, at *1 (S.D.N.Y. July 21, 1989) ("Foretelling the future is not an

19  obligation to be derived from the securities laws.").[9]

20  

21  　　　[8] The November 2007 registration statement incorporates the uncontested values as of
　　　August 31, 2007.  (Exh. O at *11; Exh. N at 18–27.)  Values of portfolio holdings after
22  September 1, 2007 were never incorporated into any challenged prospectus or registration
　　　statement.  And given that the values were correctly reported on August 31, 2007, changes after
23  that date could only have been caused by the continued unfolding of the credit crisis as the market
　　　learned new information that was not known on August 31, 2007.  (*See* Exh. V (Fong Depo.) at
24  208:20–209:6, 225:20–226:8 ("up until the middle of 2007," "default exposure in triple A-rated,
　　　nonagency mortgage-backed securities" was "[v]ery, very minimal" and "less than one percent,"
25  but a later increase in mortgage defaults contributed to the fund's NAV decline).)

26  　　　[9] No section 15 claim can survive without a viable underlying section 11 or 12 claim.
　　　*Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1134 (N.D. Cal. 2006).  Plaintiffs'
27  section 11 and 12 claims are doomed by Schwab's disclosure of the information that plaintiffs say
　　　was missing and because the alleged misrepresentations could not have caused plaintiffs' losses.
　　　Schwab is, therefore, entitled to summary judgment on the section 15 claim.

28

III.   **THE FUND DID NOT DEVIATE FROM ITS CONCENTRATION POLICY OR VIOLATE SECTION 13(a).**

In 2006, the YieldPlus fund's portfolio managers decided to allocate more of the fund's assets to mortgage-backed securities. They soon approached a concentration limit that had been put in place, years earlier, capping the fund's allocation to non-agency mortgage-backed securities at 25 percent. Over the course of nearly two months, the fund's portfolio managers, CSIM's investment policy committee, the fund's internal and outside legal counsel, and the Schwab Funds' board of trustees, considered whether the limit was appropriate and the board concluded it was not. On August 29, 2006, the trustees approved a resolution reclassifying non-agency mortgage-backed securities as not part of any industry and, therefore, not subject to the fund's 25 percent concentration limitation.

A.   **The Fund Did Not Change Its Fundamental Concentration Policy in Violation of Section 13(a).**

Plaintiffs allege the fund violated section 13(a) because it did not hold a shareholder vote when the trustees approved the reclassification of non-agency mortgage-backed securities. (*See, e.g.*, Sec. Am. Compl. ¶ 158.) But no vote was required because the fund never changed its fundamental concentration policy. It simply changed the way non-agency mortgage-backed securities are categorized under the policy.

1.   **The Fund Never Changed Its Fundamental Concentration Policy.**

Section 8(b) of the ICA obligates a mutual fund to disclose, in its registration statement, the fund's "policy" "in respect of" "concentrating investments in a particular industry or group of industries." 15 U.S.C. § 80a-8(b)(1).

Section 8(b) does not say anything about what that concentration policy must contain. It does not require any particular policy, of any particular length, or any particular detail. The contents of the policy are (with some exceptions) left up to the fund and its investors.

Section 13(a), in turn, makes it unlawful for an investment company to "deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement." 15 U.S.C. § 80a-13(a)(3). Under section 13(a), a fund

1    may change its concentration policy but "only if authorized by shareholder vote."  *Id.*

2          The YieldPlus fund complied with section 8(b) in its very first registration statement.  The

3    fund set out its concentration policy under a heading identifying "investment limitations" that

4    "may be changed only by vote of a majority of the fund's shareholders."  (Exh. A (July 21, 1999

5    Reg. Stmnt.) at *3.)  That policy stated the fund will not:

> Concentrate investments in a particular industry or group of industries, as
> concentration is defined under the 1940 Act, or the rules or regulations
> thereunder, as such statute, rules and regulations may be amended from
> time to time.

9    (*Id.*)  This concentration policy said nothing about non-agency mortgage-backed securities.  And

10   the policy never changed.  It is exactly the same today as it was in 1999.

### 2.    The Fund's Application of Its Policy to Non-Agency Mortgage-Backed Securities Was Not Part of Its Fundamental Concentration Policy.

13         The fund's concentration policy does not define the term "industry."  Thus, to apply, or

14   implement, its policy, the fund had to make determinations about which groups of securities

15   would be considered an "industry" under its concentration policy.

16         Neither the '40 Act nor any SEC regulation defines "industry."  (Exh. Q Nos. 42 & 43 at

17   16.)  In fact, the meaning of "industry," for concentration purposes, has been a continuing source

18   of debate at the SEC and among commentators.  *See Protecting Investors:  A Half Century of*

19   *Investment Company Regulation*, at 281 n.103 (May 1992), http://www.sec.gov/divisions/

20   investment/guidance/icreg50-92.pdf ("it is often difficult to fit companies into distinct industry

21   categories").  In 2009, the SEC's staff admitted, in recent proposed rulemaking on money market

22   fund reform, that the "treatment of 'concentration' [has] suffered from problems of industry

23   definition.  There is no clear standard to determine what constitutes an 'industry.'"  Money

24   Market Fund Reform, Investment Company Act Release No. 28,807, 2009 SEC LEXIS 2186, at

25   *140 n.224 (June 30, 2009).

26         The closest thing to an SEC position on the meaning of "industry" is Guide 19, entitled

27   "Concentration of Investments in Particular Industries."  Guide 19 allows a mutual fund to "select

28   its own industry classifications" so long as they are "reasonable" and disclosed in the fund's

1   statement of additional information.  Registration Form Used by Open-End Management

2   Investment Companies; Guidelines ("Guide 19"), Investment Company Act Release No. 13436,

3   1983 WL 35814 (Aug. 12, 1983).  (Exh. Q, Resp. to RFA No. 44 at 16–17.)

4        Under Guide 19, then, the fund was free to make its own determinations about what is,

5   and is not, an "industry."  That is exactly what the fund did on August 29, 2006.  That decision

6   did not change any part of the fund's fundamental concentration policy.  It merely changed the

7   way the word "industry," as used in the policy, is applied to a certain type of security.  That is

8   exactly what Guide 19 gives funds the discretion to do, and it is exactly what the fund's SAI

9   disclosed.

10       As required by Guide 19, this change in the classification of non-agency mortgage-backed

11  securities was promptly and fully disclosed to investors.  (Exh. Q, Resp. to RFA No. 32 at 13–

12  14.)  On September 1, 2006, the fund changed the language of an SAI section titled

13  "concentration" — a section that appears under a heading warning that policies in that section

14  "may be changed without shareholder approval" — to disclose that non-agency mortgage-backed

15  securities would not be considered part of any industry.  (Exh. G at SCH-YP002093, SCH-

16  YP002098.)

17              **3.      Non-Agency Mortgage-Backed Securities Properly Are Not
                          Included as Part of Any Industry.**

18

19       The fund's decision not to treat non-agency mortgage-backed securities as part of any

20  industry was clearly a reasonable one.  *See* Guide 19, 1983 WL 35814.  The commonly accepted

21  understanding of "industry" aggregates companies which produce similar products (such as the

22  automobile industry or the steel industry).  Mortgage-backed securities, by contrast, are a type of

23  security:  Mortgage-backed securities are no more an industry than "preferred stock" and

24  "convertible debentures" are industries.

25       For that reason, commercially available industry categorization schemes — like the

26  Global Industry Classification Standard (GICS) and North American Industry Classification

27  System (NAICS) codes — do not list mortgage-backed securities as part of any industry.  Indeed,

28  no standard industry classification system of which we are aware defines mortgage-backed

1    securities as an industry.

2         Many mutual fund complexes — like PIMCO and Oppenheimer — also have determined

3    that non-agency mortgage-backed securities are not part of any industry.  For example, the Pacific

4    Investment Management Company ("PIMCO"), the largest investment company manager of fixed

5    income funds, has for years taken the very same position.  PIMCO's SAIs state that, "[i]n the case

6    of privately issued mortgage-related securities, the Funds take the position that mortgage-related

7    securities do not represent interests in any particular 'industry' or group of industries."  (*See*, *e.g.*,

8    Exh. X (PIMCO Oct. 1, 2007 SAI) at 17.)

9         Plaintiffs have no evidence to counter these points.  Their expert, Mr. Fong, has strained

10   to avoid saying that mortgage-backed securities are part of any industry.  Throughout his 60-page

11   expert report, he repeatedly calls mortgage-backed securities a "sector" or "a type of security."

12        Mr. Fong explained, at his deposition, why he won't call mortgage-backed securities an

13   industry.  First, he acknowledged there is no SEC rule or regulation that prohibits treating non-

14   agency mortgage-backed securities just the way Schwab did — that is, as not part of any industry.

15   (Exh. V at 137:15–20.)  He then admitted that "[t]he SEC does not provide guidance with respect

16   of specific security types with respect of the 25 percent limit."  (*Id*. at 139:16–23.)  And he

17   acknowledged that a mutual fund must only be "reasonable" "in defining what the industry

18   groups are."  (*Id*. at 140:5–11.)

19        Then Mr. Fong got to the heart of his analysis.  He explained that, "in the fixed income

20   world, classifications of fixed income securities is — the terminology used is 'sectors.'

21   'Industries' is a terminology that arises from the equity world."  (*Id.* at 147:24–148:3.)

22              In the equity world, when you talk about industries, there are different
              ways of defining what an industry is.  In the fixed income world, that
23            becomes less important because so much is driven by interest rate change
              or the effects of interest rate change.
24

25   (*Id.* at 149:1–6.)  He concluded:  "Industry classifications were originally conceived for equities.

26   'Sectors' is the terminology that's used in the fixed income world."  "I would say that the

27   nonagency mortgage-backed securities is a specific sector of the fixed income markets."  (*Id.*

28   at 157:17–21, 158:18–24.)

1   Market participants and experts agree that the fixed income market is comprised of several

2   sectors.  The most commonly-used schemes, including the industry-leading Barclays Capital

3   indices, divide fixed income securities into familiar sectors or asset types:  treasury; municipal;

4   corporate; mortgage-backed; asset-backed; international; and high yield.  (Exh. Z (list of Barclays

5   Capital indices).)  These sectors bear no relation to any particular industry.  Some, like treasuries,

6   have nothing to do with any industry.  Others, like corporate bonds, combine securities from

7   many different industries, from defense contractors to supermarkets and everything in between.

8          **4.      The Fund's Concentration Policy Is Limited to the Policy Explicitly
               Identified As Such in Its Prospectus.  No Shareholder Vote Was
9              Needed to Change Other Aspects of the Fund's Policies.**

10   Under section 8(b), a fund's concentration policy is only the policy identified in the

11   registration statement as the fund's concentration policy.  Many court decisions have made this

12   point.  They follow the common sense view that a policy or practice not designated as

13   "fundamental" is, in fact, not fundamental, and can be changed without a shareholder vote.  This

14   exact issue arose in *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171 (S.D.N.Y. 1996).

15   In that case, the fund's "fundamental investment objectives" were (1) "to provide a high level of

16   current income," and (2) to "return $10 per share to investors on or about the termination date."

17   *Id.* at 180.  Plaintiffs argued that other statements in the same paragraph were also part of the

18   fund's fundamental policies, even though they were not specifically labeled as such.  But the

19   court disagreed:

20          [U]nder the plain language of the prospectus, the fundamental policies of
            the Trust are the two investment objectives noted above. . . .  No other
21          interpretation of the quoted text is reasonable. . . .  Only the two goals
            noted above are labelled 'investment objectives' in this paragraph and
22          elsewhere in the prospectus; therefore, only these objectives — and not
            the strategies for attaining them — are fundamental policies.
23

24   *Id.*; *accord In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, 1996 WL 551732, at *5

25   (fundamental policy was "only the single statement reflecting the Fund's goal to seek the highest

26   level of income available from a portfolio of U.S., Canadian and Mexican government

27   securities"; separate concentration limit was "distinct from the statement of the Fund's

28   'investment objective'"); *Krouner v. Am. Heritage Fund, Inc.*, 899 F. Supp. 142, 148–49

1   (S.D.N.Y. 1995) (only policies listed as "changeable only if authorized by shareholder vote" are

2   fundamental policies for section 13(a)); *Karpus v. Hyperion Capital Mgmt., Inc.*, 1996 WL

3   668860, at *4 (S.D.N.Y. Nov. 18, 1996) (prospectus explained that "policies are different from

4   [fundamental] investment objectives in that they may be changed without shareholder approval").

5         The YieldPlus fund's fundamental concentration policy, as already noted, does not refer to

6   mortgage-backed securities.  All it says is that the fund may not "[c]oncentrate investments in a

7   particular industry or group of industries."  The change made to the fund's classification of

8   mortgage-backed securities did not effect any change to this fundamental policy; the change was

9   to a separate statement, not identified as fundamental, concerning the fund's strategies for

10   attaining its objectives.  (Exh. D at *2.)  Accordingly, no shareholder vote was needed to approve

11   the fund's revised treatment of mortgage-backed securities under its concentration policy.

## IV.    PLAINTIFFS CANNOT RECOVER FOR LOSSES OCCURRING AFTER THEIR COMPLAINT WAS FILED.

14         Plaintiffs concede that, for their section 11 claim, they cannot seek to recover for any

15   losses suffered by class members who continued to hold fund shares after March 18, 2008, when

16   this lawsuit was commenced.

17         But plaintiffs contend that, under section 12, they may seek damages based on a decline in

18   the fund's shares after the filing of this lawsuit.  Plaintiffs' damages expert, Candace Preston, has

19   calculated those damages based on the fund's share price through August 31, 2009.  (Exh. S

20   (Preston Expert Report) at 4; Exh. T at 24:20–26:15, 28:22–29:15.)  In her calculations, she

21   attributes more than $340 million to alleged losses occurring after March 18, 2008.  (*Id.*)

22         Plaintiffs, however, cannot recover post-filing damages under section 12 as a matter of

23   law.  And, as a matter of undisputed fact, plaintiffs cannot prove that post-filing damages were

24   caused by any alleged misrepresentation.

### A.    Section 12 Does Not Permit Recovery of Damages Allegedly Suffered After Plaintiffs Tendered Their Shares.

27         Section 12 sets out alternative damages formulae — for investors who sold their shares

28   prior to commencing suit and those who tendered their shares upon filing suit.  As the statute

1   explains, a person "may sue . . . for damages if he no longer owns the security," or may seek

2   return of "the consideration paid for such security . . . upon the tender of such security."

3   15 U.S.C. § 77*l*(a)(2).

4        Under section 12, an investor who owns shares at the time of filing suit must "tender" his

5   or her shares.  *See*, *e.g.*, *Metz v. United Counties Bancorp*, 61 F. Supp. 2d 364, 379 (D.N.J. 1999)

6   ("plaintiff must make an explicit demand for rescission, an offer to tender, in the complaint");

7   *Morin v. Trupin*, 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990).  Plaintiffs observed this essential

8   requirement:  their complaint alleges that the class members who still owned shares on March 18,

9   2008, "hereby tender their shares in the Funds."  (Compl. [Dkt. 1] ¶ 50.)

10       The act of "tendering," of course, triggers the "upon tender" aspect of section 12's

11   damages calculation formula.  A person who "tenders" locks in his damages as the difference

12   between his purchase price and the price on the date of tender, which is often made as part of a

13   complaint asserting a section 12 claim.  *Goldkrantz v. Griffin*, 1999 WL 191540, at *6 (S.D.N.Y.

14   Apr. 6, 1999); *see also Ong ex rel Ong  v. Sears, Roebuck & Co.*, 2005 WL 2284285, at *16

15   (N.D. Ill. Sept. 14, 2005) (section 12(a)(2) claim dismissed because, on the date the section 12

16   plaintiff was added, the securities were trading above the purchase price).

17       It appears, however, that many class members who claimed to have "tendered" their

18   shares on the date their complaint was filed did not actually carry through on their pleading.

19   Although they alleged they "tendered" their shares, as section 12 requires, they did not actually

20   deliver their shares to Schwab for redemption.  Schwab, of course, would have been legally

21   obligated to immediately pay them for their shares.  An open-end mutual fund like YieldPlus,

22   must, by law, buy back any investor's shares whenever presented for redemption.  17 C.F.R.

23   § 270.22c-1(a).

24       Plaintiffs apparently seek to exploit this discrepancy between class members' allegations

25   and their conduct by seeking to recover damages allegedly suffered after class members claimed

26   to have tendered their shares.  But section 12(a)(2) does not allow sharp behavior of this kind.

27   Plaintiffs' tender of their shares, which was required by section 12, cuts off the class members'

28   recovery "upon the tender" of their shares.  Class members cannot avoid this consequence by

1    failing to follow through on what they pleaded:  an investor "cannot be allowed to delay a

2    demand for rescission while he 'watch[es] the market go up or down, thereby speculating on the

3    success or value at the total risk of the wrongdoer.'"  *In re AOL Time Warner Sec. & "ERISA"*

4    *Litig.*, 381 F. Supp. 2d 192, 247 (S.D.N.Y. 2004) (citation omitted).

5         **B.    NAV Declines Following This Lawsuit Were Not Caused By the Alleged**
              **Misrepresentations.**

6

7         There is another reason why class members who held their shares after the filing of the

8    complaint cannot recover for any subsequent decline in the share price.  Any share price decline

9    after the filing date cannot have been caused by misrepresentations in the prospectus.

10        No misrepresentation allegedly contained in Schwab's 2006 and 2007 SEC filings could

11   possibly have caused any NAV declines following March 18, 2008, when this lawsuit was filed.

12   Plaintiffs cannot credibly claim that the supposed "truth" about YieldPlus remained hidden from

13   them or the market even after they recited it in their complaint and broadcast the news of their

14   lawsuit in press releases.  The supposed "truth" was revealed no later than March 18, 2008.

15        Plaintiffs' complaint concedes as much.  On March 18, 2008, plaintiffs publicly alleged

16   several purportedly "true materials facts" that they say were previously concealed.  These

17   included:  that defendants had "abandoned the objectives of the Funds in pursuit of higher yields"

18   by "concentrat[ing] in a single risky industry or market segment — in reality over 50% of the

19   Funds assets are now invested in the mortgage industry."  (Compl. [Dkt. 1] ¶ 28.)  They claimed

20   to have discovered YieldPlus's "risk profile" was higher than stated because of these investments

21   in "highly complex and speculative mortgage-back[ed] securities."  (*Id.* ¶ 2.)  They allegedly

22   learned that the Funds' analysts "did not have any real expertise in valuing the mortgage backed

23   securities they purchased, or assessing the risk."  (*Id.* ¶ 28.)  That these "mortgaged back (sic)

24   securities in which they were investing were highly vulnerable to becoming illiquid."  (*Id.*)  And

25   that the "duration of a vast majority of the bonds" in the fund was higher than reported.  (*Id.*)

26        On plaintiffs' own account then, the "true material facts" — including that the riskiness of

27   mortgage-backed securities had been misstated and that the duration of bonds had been

28   inaccurately reported — were revealed no later than March 18, 2008.  Once this "truth" was

1  revealed, and the picture of YieldPlus "corrected" by this information, any future depreciation in

2  share value must necessarily have been "other than . . . depreciation in value resulting from . . .

3  the prospectus . . . not being true."  15 U.S.C. § 77*l*(b); *see also Metzler*, 540 F.3d at 1063.  There

4  can be no dispute that losses after March 18, 2008 are not recoverable under section 12.

5                                               **CONCLUSION**

6          The Court should grant summary judgment for Schwab on the four claims discussed in

7  this motion.

8  Dated:  February 11, 2010                    DARRYL P. RAINS
                                                 EUGENE ILLOVSKY
9                                               CRAIG D. MARTIN
                                                 DOROTHY L. FERNANDEZ
10                                              MORRISON & FOERSTER LLP

11                                              By:  /s/ Darryl P. Rains
                                                         Darryl P. Rains
12
                                                Attorneys for defendants The Charles
13                                              Schwab Corporation, Charles Schwab &
                                                 Co., Inc., Charles Schwab Investment
14                                              Management, Inc., Schwab Investments,
                                                 Charles R. Schwab, Evelyn Dilsaver,
15                                              Randall W. Merk, George Pereira, and
                                                         Matthew Hastings

16

17

18

19

20

21

22

23

24

25

26

27

28