1  Reed R. Kathrein (139304)
   Peter E. Borkon (212596)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone:  (510) 725-3000
4  Facsimile:  (510) 725-3001
   reed@hbsslaw.com
5  peterb@hbsslaw.com

6  Steve W. Berman (*Pro Hac Vice*)
   Sean R. Matt (*Pro Hac Vice*)
7  Erin K. Flory (*Pro Hac Vice*)
   Lisa M. Hasselman (*Pro Hac Vice*)
8  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
9  Seattle, Washington  98101
   Telephone: (206) 623-7292
10 Facsimile: (206) 623-0594
   steve@hbsslaw.com
11 sean@hbsslaw.com
   erin@hbsslaw.com
12 lisah@hbsslaw.com

13 *Attorneys for Lead Plaintiff YieldPlus Investor Group*

14

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18 IN RE SCHWAB CORP. SECURITIES          No. 08-cv-01510 WHA
   LITIGATION
19
                                          
20 THIS DOCUMENT RELATES TO:              PLAINTIFFS' MEMORANDUM IN
                                          OPPOSITION TO INDEPENDENT
21 All Actions                            TRUSTEES' MOTION FOR
                                          SUMMARY JUDGMENT
22
                                          Date:       March 25, 2010
23                                        Time:       8:00 a.m.
                                          Judge:      Hon. William H. Alsup
24                                        Courtroom:  Courtroom 9, 19th Floor

25
                         **[REDACTED VERSION]**
26

27

28

PLTFS' MEMO. IN OPP. TO INDEPENDENT TRUSTEES'
MOTION FOR SUMMARY JUDGMENT - 08-cv-01510 WHA
010036-12  356899 V1

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
Lisa M. Hasselman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO INDEPENDENT TRUSTEES' MOTION FOR SUMMARY JUDGMENT<br><br>Date:       March 25, 2010<br>Time:       8:00 a.m.<br>Judge:      Hon. William H. Alsup<br>Courtroom:  Courtroom 9, 19th Floor |

1

## STATEMENT OF ISSUES TO BE DECIDED

2      1.      Whether the Independent Trustees of the YieldPlus Fund, who actively oversaw the

3  Fund including its investment policies and its marketing, who had authority to receive and did

4  receive insider information on the composition and risk profile of the Fund, who reviewed and

5  signed registration statements filed with the SEC that include false and misleading statements and

6  who hired and oversaw the activities of the Defendant Investment Advisor and Distributor, actively

7  solicited the YieldPlus Fund's shares.

8      2.      Whether Plaintiffs herein submit sufficient evidence that a reasonable finder of fact

9  could find that the Independent Trustees were sellers under § 12(a)(2).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................... 1

II.     RELEVANT FACTS ................................................................................................. 3

        A.      The Trustees Urged Investors to Buy Yieldplus by Signing and Having
                Responsibility Over the Contents of the Registration Statements and By
                Participating in Marketing Efforts .............................................................. 3

        B.      The YieldPlus Trustees Have Ultimate Authority Over the YieldPlus Fund ............... 5

        C.      The Independent Trustees had Access to Insider Information on YieldPlus, but
                Did Not Reveal that Information to Investors .................................................. 9

III.    ARGUMENT ......................................................................................................... 11

        A.      The Securities Act of 1933 was Intended to Protect Investors and Ensure Proper
                Disclosure of Information From Those Who Control That Information ..................... 11

        B.      Factors Indicating Direct Solicitation Under § 12(a)(2) ...................................... 12

                1.      Urging buyers to purchase ............................................................... 14

                2.      The Seller as Puppeteer:  Authorizing or directing others' solicitation .......... 15

                3.      Assess to and control over insider information ...................................... 17

        C.      The Independent Trustee's Would Have the Court too Narrowly Define "Seller" ..... 18

        D.      A Reasonable Juror Could Find the Independent Trustees are "Sellers" ................. 18

IV.     CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Capri v. Murphy Co.,
   856 F.2d 473 (2d Cir. 1988) ................................................................ 15, 17, 19

Commins v. Johnson & Higgins, Inc.,
   1988 U.S. Dist. LEXIS 15574 (N.D. Cal. 1988) ......................................... 13, 17

Degulis v. LXR Biotechnology, Inc.,
   928 F. Supp. 1301 (S.D.N.Y. 1996) .................................................................. 14

Dorchester Investors v. Peak Int'l Ltd.,
   134 F. Supp. 2d 569 (S.D.N.Y. 2001) ................................................................ 13

Dorchester Investors v. Peak Trends Trust,
   2003 U.S. Dist. LEXIS 1446 (S.D.N.Y. Feb. 3, 2003) .................................. 13, 16

Ernst & Ernst v. Hochfelder,
   425 U.S. 185 (1976) ......................................................................................... 11

In re Alliance Equip. Lease Program Sec. Litig.,
   2002 WL 34451621 (S.D. Cal. 2002)................................................................ 18

In re Charles Schwab Corp. Sec. Litig.,
   2009 WL 2591389 (N.D. Cal. Aug. 21, 2009) ..................................................... 3

In re Charles Schwab Corp. Secs. Litig.,
   257 F.R.D. 534 (N.D. Cal. 2009) ................................................. 1, 12, 13, 14

In re Chaus Sec. Litig.,
   1990 U.S. Dist. LEXIS 15810 (S.D.N.Y. 1990) ............................................... 17

In re Gas Reclamation Inc. Sec. Litig.,
   733 F. Supp. 713 (S.D.N.Y. 1990) ................................................................... 18

In re Lehman Bros. Sec. & ERISA Litig.,
   2010 WL 337997 (S.D.N.Y. Feb. 1, 2010) .................................................. 15, 16

In re Sirrom Capital Corp. Sec. Litig.,
   84 F. Supp. 2d 933 (M.D. Tenn. 1999) ............................................................. 14

In re Vivendi Universal, S.A. Sec. Litig.,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................. 13, 14, 18

Matek v. Murat,
   862 F.2d 720 (9th Cir. 1988), overruled on other grounds, 2000 U.S. App. LEXIS
   23925 (9th Cir. Sept. 21, 2000) ................................................................. 11, 12

*Milman v. Box Hill Sys. Corp.,*
   72 F. Supp. 2d 220 (S.D.N.Y. 1999) ................................................................ 16

*Moore v. Kayport Package Exp. Inc.,*
   885 F.2d 531 (9th Cir. 1989) ....................................................................... 18

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ......................................................................*passim*

*Shain v. Duff & Phelps Credit Rating Co.,*
   915 F. Supp. 575 (S.D.N.Y. 1996) ................................................................. 16

*Suppa v. Montano,*
   1989 U.S. Dist. LEXIS 5682 (W.D. Mo. Feb. 28, 1989) .................................. 13

*Tcherepnin v. Knight,*
   389 U.S. 332 (1967) ................................................................................ 11

*Warfield v. Alaniz,*
   453 F. Supp. 2d 1118 (D. Ariz. 2006), *aff'd,* 569 F.3d 1015 (9th Cir. 2009) ......... 12

## STATUTES

15 U.S.C. § 77, *et seq.* ............................................................................... 1

# I.   INTRODUCTION

Plaintiffs oppose the Independent Trustees' Motion for Summary Judgment (Dkt. No. 377). The Trustees' motion raises the factual questions of what their role was in promoting the YieldPlus Fund ("YieldPlus" or "the Fund") and whether that role was direct enough to make them liable as sellers under § 12(a)(2). These questions, at the very least are factual questions which should generally be left to the jury. *In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009).

A reasonable juror could find that the Independent Trustees' relationship to YieldPlus investors was direct enough to qualify them as soliciting sellers under the *Pinter v. Dahl* test. Under *Pinter* and later cases interpreting it, the following factors weigh towards the Trustees being held liable as sellers:

**Urging investors to purchase YieldPlus**. The Independent Trustees signed the YieldPlus Fund's registration statements. Registration statements contain the preeminent promotional documents – the prospectus. The Trustees not only had responsibility for signing these registration statements, but also guaranteed to Charles Schwab & Company ("CS&Co."), the distributor they hired, that all statements within the registration statements were true. Some Courts have held that this signing of registration statements is sufficient on its own to confer seller liability. Here, however, no such conclusion is necessary as the Trustees took on an even more active and direct role of solicitation.

**Ultimate Authority and Control**. The Trustees had ultimate authority over the YieldPlus Fund and they acted upon that authority. The Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77 *et seq.*, was enacted in part to hold security solicitors responsible if the statements used to sell those securities were false or misleading. The Trustees, although not the legal title holders, were in positions of ultimate responsibility over the YieldPlus Fund. Despite the complex corporate structure which has been built around them, the Trustees were the ones in charge of what was being sold and told to the investors. If there were false representations in the YieldPlus offering documents then the Trustees, because of their authority, would also have the opportunity to correct such false statements or tell those they oversaw to make such corrections. Here, the

Trustees were the individuals with ultimate authority over all material decisions regarding the Fund and therefore, should be held accountable as selling solicitors.

⊙ **Control over insider information**. The Trustees role of authority also put them in charge of what information was being given to investors. They had access to and control over material information regarding the YieldPlus Fund that investors did not have. This access and control included oversight authority over YieldPlus marketing and the Trustees did review YieldPlus marketing and have the opportunity to provide input. Another purpose of the 1933 Act is to protect investors who are at the mercy of those who have insider access to information about securities. *Pinter* and other courts have recognized this control over material information to be a factor indicating who is appropriately liable as a seller. The Trustees were insiders, collecting specific information on the risk profile and liquidity of the YieldPlus Fund that they were not providing to investors and in at least one case, using such information to his personal financial advantage.[1]

The Trustees' arguments that the relationship with investors must be in person or somehow more direct are insufficient to free them from seller liability. The cases cited by the Trustees involve defendants with more remote relationships to the YieldPlus investors than their relationship with investors in this case. In many of the cited cases, the involvement of the defendants was indirect in that the defendants completely relinquished their decision making authority over the securities. In other cases cited by the Trustees, the defendants were not acting as advocates for the securities, just neutral professionals hired to do a particular job. Here, the Trustees took neither of these indirect roles. They did not give up authority over YieldPlus despite hiring an investment adviser and a distributor to daily manage the funds. They continued to play an extremely active role in the administration of the Fund and made critical decisions like the decision to remove a cap on how much mortgage-backed securities could be held within the Fund's portfolio and how the Fund should respond to the SEC when it charged that the YieldPlus Fund's marketing was

---

[1] ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Declaration of Steve W. Berman in Opposition to Independent Trustees' Motion for Summary Judgment ("Berman Decl.") Ex. 1 at *3-6 (Wilsey Dep. at 200-209).

1    misleading.  The Trustees were also not acting as neutral securities professionals being paid to do a

2    job where they were specifically told what to do and then carried out those tasks merely at the

3    behest of some other authority.  Instead, they were actively promoting the Fund as evidenced by

4    their signing of the registration statements and their retention of ultimate decision making authority

5    over the Fund including oversight and input into the Fund's marketing.

6         Once the corporate layers are peeled away, it is difficult to see how the Independent

7    Trustees could argue they were not sellers of YieldPlus.  As a reasonable juror could find that the

8    Independent Trustees were sellers, their motion for summary judgment should be denied.[2]

9                          ## II.      RELEVANT FACTS

10   **A.      The Trustees Urged Investors to Buy Yieldplus by Signing and Having Responsibility
           Over the Contents of the Registration Statements and By Participating in Marketing
11           Efforts**

12        The Trustees signed registration statements for the YieldPlus Fund and according to the

13   Distribution agreement had ultimate responsibility for the truth of their representations.  *See, i.e.*,

14   Berman Decl. Exs. 2 and 3 (November 15, 2006 and November 14, 2007 Registration Statements

15   with Trustee signatures.).  Donald Dorward acknowledged that by signing the registration

16   statements, they were ultimately responsible for its contents.  Berman Decl. Ex. 4 at *3 (Dorward

17   Dep. at 64).  Pursuant to the Distribution Agreement,



24        …

25

---

26        [2] Due to this Court's previous decision regarding the availability of restitution under California
     Business and Professions Code section 17200 with regard to Mr. Daifotis, Plaintiffs do not oppose
27   the Trustees' motion on that basis.  *See In re Charles Schwab Corp. Sec. Litig.*, 2009 WL 2591389,
     at *10-11 (N.D. Cal. Aug. 21, 2009).  Plaintiffs do press the restitution claim against the remaining
28   defendants.



Berman Decl. Ex. 5 at *2-3, 7. The Trustees were thus in a position to make changes to the registration statements if they believed such changes were necessary. *Id.*

The Trustees also urged investors to purchase YieldPlus shares by participating in the marketing efforts of both CSIM and CS&Co. Three of the Independent Trustees, Smith, Stephens and Dorward served on the Board of Trustees Marketing, Distribution and Shareholder Servicing Committee. Berman Decl. Exs. 6 at *3 and 7 at *3 (Smith Dep. at 51 and Stephens Dep. at 35). One of the committee's purposes was to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Berman Decl. Ex. 8 at *2-3 (Marketing Committee Charter). To carry out the committee's purposes, its delegated powers included:



*Id.* And the Trustees did, in fact, review samples of YieldPlus marketing. On February 7, 2008, in an email from Jennifer Hafner, President of CSIM's Product Development Group, to Daifotis and others, she states ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Berman Decl. Ex. 9 at *2. This review may have been the result of Mr. Smith's request during a January 22, 2008 telephonic board meeting, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Berman Decl. Ex. 10 at *4 (Board Minutes). Employees of CSIM also testified that the Board would "review story boards of advertisements" from the different funds and that the Trustees would provide input into the advertising. Berman Decl. Exs. 11 at *3-4 and 12 at *3 (Dilsaver Dep. at 48-49 ("Yes. We

1  would have boards up that showed the advertising") and Merk Dep. at 82 ("Q. Did the Marketing,

2  Distribution and Shareholder Servicing Committee members have any input into the messaging of

3  the Schwab Funds? A. Because you're saying 'any,' which is very broad and all encompassing, I

4  would say yes they had some impact")).

5       The Trustees were aware of the specific ways in which YieldPlus was being marketed as

6  early as August 2006. After a routine inspection by the SEC of the Schwab Funds, CSIM and

7  CS&Co, the SEC sent a letter to the Board of Trustees with multiple criticisms of YieldPlus

8  marketing. Berman Decl. Ex. 13 at *2-7 (Excerpt of 8/29/06 Board Book). The letter was

9  addressed to the Trustees and was provided as part of their board materials for the August 29, 2006

10  board meeting.[3] *Id.* The letter includes quotes from YieldPlus advertisements that the SEC

11  believed might be in violation of securities laws. *Id.* at *5-6. One of the criticisms was that ▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮ *Id.* The SEC directed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

18       The Trustees reviewed the SEC letter during their Board meeting. Berman Decl. Ex. 14 at

19  *3 (Smith Dep. at 69-72). They also reviewed a draft response. They had the opportunity to

20  comment and provide input. They also could have asked CSIM to do additional research to

21  determine whether the SEC's criticisms had any basis. The Trustees approved the response to the

22  SEC and it was sent. *Id.*

23  **B.**    **The YieldPlus Trustees Have Ultimate Authority Over the YieldPlus Fund**

24       The Board of Trustees oversees Schwab Funds and includes two interested trustees and

25  seven independent trustees. *See* Berman Decl. Ex. 15 (Plaintiff-created demonstrative chart

26

27

---

28  [3] The same meeting at which they voted to remove the 25% cap on non-agency CMOs.

entitled "Corporate Oversight of the YieldPlus Fund"[4]).  Schwab Funds includes four different

groups of funds.  One of the four groups of funds overseen by the Trustees is Schwab Investments,

a Massachusetts business trust.  The YieldPlus Fund is a "series" of the "Schwab Investments"

trust.  Berman Decl. Ex. 16.  The Schwab Investments' "Agreement and Declaration of Trust"

("Trust Agreement") describes the specific powers undertaken by the Trustees overseeing the

funds, including YieldPlus, in part,



*Id.* at *9.  The Trust Agreement provides that the Trustees ███████████████████████

███████████████████████████████████████ *Id.* at *16.  It is

indisputable that the "business" of the trust includes to profit from the sale of securities including

YieldPlus.

Pursuant to the Trustees' powers enumerated in the Trust Agreement, they hired Defendant

Charles Schwab Investment Management ("CSIM") as Investment Advisor to Schwab funds

including the YieldPlus Fund.  *See* Berman Decl. Ex. 16 at *31, 39-40 ("Investment Advisory and

Administration Agreement" and "Amended Schedule A").  CSIM's management authority as

described in the Investment Advisory Agreement was,



---

[4] Plaintiffs will provide the source documents produced by Schwab for this demonstrative upon request.

Berman Decl. Ex. 16 at *32 (emphasis added).   Thus, although CSIM was hired to run the day to

day management of the funds, the Board retained authority to direct and control those efforts.

Similarly, pursuant to a "Distribution Agreement," the Trustees hired Defendant Charles

Schwab & Co. ("CS&Co.") as "the principal underwriter" and "distributor" of Schwab funds

including the YieldPlus Fund on a day to day basis but still retained the ultimate decision making

authority over the funds' distribution.   Berman Decl. Ex. 5 at *2.   The Trustees regularly approved

amendments to both the Investment Advisory Agreement and the Distribution Agreement.   *See*,

*e.g.*, Berman Decl. Exs. 17 at *3-4 and 18 at *3-4 (6/12/06 Board Minutes and 6/5/07 Board

Minutes).

By hiring CSIM and CS&Co. to administer and market the YieldPlus Fund on a day to day

basis, the Trustees were not relinquishing their direct oversight.   Instead they remained

"extremely" active in all material aspects of the YieldPlus Fund's management.   This direct

oversight is apparent in their adopted committee structure which included the following four

committees:   Investment Oversight; Marketing, Distribution and Shareholder Servicing; Audit and

Compliance; and Governance.   The committees allowed the Board to get even more involved in the

specific details of managing the funds.   As described in a Schwab Board Orientation, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Berman Decl. Ex. 19

at *3.

The individual committee charters describe in detail the powers the Trustees retained over

the management of the YieldPlus Fund.   For example, the purpose of the Trustees' Investment

Oversight Committee was ▮▮▮▮▮▮▮▮▮▮▮▮   Berman Decl. Ex.

20 at *2 (IOC Committee Charter).   The committee's powers to effectuate that purpose included,



*Id.*

Similar broad powers were enumerated in the Audit and Compliance Committee charter. The primary purpose of that committee was ███████████████████████████████████████████████████████████████████████████████████ Berman Decl. Ex. 21 at *2 (Audit and Compliance Committee Charter). To carry out this purpose, the committee's charter enumerated multiple powers delegated from the Board including, ████████████████████████████████████████████████████████ and ████████████████████████████████████████ *Id.*

The Trustees' broad oversight over the YieldPlus Fund included decision making authority on the issues which led to the Fund's decline. One such issue, elimination of the 25% cap on non-agency collateralized mortgage obligations ("CMOs"), was presented to the Trustees, discussed and then voted upon. *See, e.g.,* Berman Decl. Exs. 22 at *3 and 23 at *5-6 (Holmes Dep. at 35-36 and Merk SEC Dep. at 66-69). The Trustees knew that the change would require the Statement of Additional Information ("SAI") disclosures to be revised. Berman Decl. Ex. 24 at *3 (Smith Dep. at 115-116). The Trustees also they knew that it would change the make up of the YieldPlus portfolio. Berman Decl. Ex. 25 at *3 (Wilsey Dep. at 115).

Schwab documents reveal that Schwab corporate officers accepted that the Board of Trustees was ultimately accountable for the YieldPlus Fund and that the Trustees could hold the officers feet to the fire if problems arose. For example, during the first major shock wave of the housing crisis – the collapse of the subprime market in March 2007 – Evelyn Dilsaver sent the following email to the portfolio managers and credit analysts with oversight over the YieldPlus Fund:



Berman Decl. Ex. 27 at *2 (3/22/07 Dilsaver email).  The Trustees exercised this power over CSIM

when they authorized the firing of Mr. Daifotis, the Fixed Income Fund's Chief Investment Officer

in June 2008 due to ███████████████████████ Berman Decl. Ex. 28 at

*3 (Wilsey Dep. at 26-28).

**C.     The Independent Trustees had Access to Insider Information on YieldPlus, but Did Not Reveal that Information to Investors**

The Trustees retention of authority over the funds provided them access to insider

information about the quality and value of YieldPlus shares.  The Trustees describe their board as

███████ active, proactively overseeing the funds including YieldPlus.  Berman Decl. Ex. 29 at

*3 (Holmes Dep. at 23).  Gerald Smith described the role of the Trustees specifically towards

YieldPlus as not paying much attention until the NAV began to drop in August 2007, but then,





5 ████████████████████████████████████ Berman Decl. Ex. 26 at *3 (CAMROC

minutes).

6 ████████████████████████████████████ *Id.*

PLTFS' MEMO. IN OPP. TO INDEPENDENT TRUSTEES'
MOTION FOR SUMMARY JUDGMENT - 08-cv-01510 WHA                    - 9 -

010036-12  356899 V1

1   Berman Decl. Ex. 30 at *3 (Smith Dep. at 153).  The weekly reports that were sent to the trustees

2   contained detailed information about the redemptions of YieldPlus shares, the pricing decisions

3   relating to securities within the Fund and risk concerns.  For example, in one report Koji Felton

4   informs the trustees ███████████████████████████████████████████

5   ████████████████████████████████████  and  ███████████████

6   ███████████████████████████████████████████████

7   ███████████████████  Berman Decl. Ex. 31 at *2 (August 31, 2007 Report).  In

8   another weekly report, Mr. Felton shared with the Trustees that ███████████████

9   ███████████████████████████████████████████████

10  ████████████████████████████  Berman Decl. Ex. 32 at *2

11  (10/23/07 report).  This information was not made available to investors.

12          In another example the receipt of insider information by the Trustees, Randall Merk sent an

13  email to the Trustees in August 2007 describing the YieldPlus Fund's volatility and the client

14  questions they were receiving.  Berman Decl. Ex. 33 at *4 ████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████  One Trustee,

17  Michael Wilsey, admitted in response that he had concerns about the funds' exposures, not just to

18  subprime but to collaterized mortgage obligations generally.  Wilsey wrote, ████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████████████████  Id.

22          In response to Mr. Wilsey's concerns, Mr. Merk emailed one of the credit analysts

23  overseeing the YieldPlus Fund, Craig Nauman, and asked him to provide an answer.  Mr. Nauman

24  provided detailed information about the composition of the YieldPlus Fund which Mr. Merk said

25  he would forward to Mr. Wilsey.  Berman Decl. Ex. 33 at *2 (8/17/07 email thread); *see also*

26  Declaration of D. Rains Pursuant to Court Order Entered February 11, 2010, Dkt. No. 420, ¶ 17

27  ("In August and September 2007, defendant Robert Holmes, a former independent trustee,

28  exchanged a series of e-mails with Greg Davis and John Loder of Ropes & Gray, as well as Koji

Felton, CSIM's Senior Vice President and Deputy General Counsel, regarding securities owned by the YieldPlus Fund.  On November 5, 2007, defendant Michael Wilsey, an independent trustee, exchanged emails with Mr. Felton and others regarding the YieldPlus Fund's investments in mortgage-related instruments").

### III.   ARGUMENT

**A.    The Securities Act of 1933 was Intended to Protect Investors and Ensure Proper Disclosure of Information From Those Who Control That Information**

Congress had "broad remedial goals" in enacting the securities laws and providing civil remedies.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 200 (1976).  In *Ernst*, the Supreme Court explained,

> [f]ederal regulation of transactions in securities emerged as part of the aftermath of the market crash in 1929.  The Securities Act of 1933 (1933 Act) 48 Stat. 74, as amended, 15 U.S.C. § 77a et seq., was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing.  See H.R. Rep. No. 85, 73d Cong., 1st Sess., 1-5 (1933).

425 U.S. at 194-95.  In order to effectuate the remedial purposes of the 1933 Act, the Court has held that it be construed broadly and flexibly.  *Pinter v. Dahl*, 486 U.S. 622, 653 (1988) (citation and internal quotations omitted); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes").  This includes a liberal interpretation of the language within the statute.  *Matek v. Murat*, 862 F.2d 720, 724 (9th Cir. 1988) (addressing whether certain partnership interests were "securities" under the act), *overruled on other grounds*, 2000 U.S. App. LEXIS 23925 (9th Cir. Sept. 21, 2000).

One of the central purposes of the 1933 Act is "to protect investors through the requirement of full disclosure by issuers of securities..." *Id.*  Or, in other words,

> [t]he Securities Act ... purpose is to:  prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation against the competition afforded by dishonest securities offered to the public through crooked promotion....

1    *Warfield v. Alaniz*, 453 F. Supp. 2d 1118 (D. Ariz. 2006), *aff'd*, 569 F.3d 1015 (9th Cir. 2009)

2    (citing *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 480 (5th Cir. 1974) (quoting Senate

3    Committee on Banking & Currency, S. Rep. No. 47, 73d Cong., 1st Sess. 1 (1933))).

4           This purpose of protecting investors pays credence to the difference between individual

5    investors' access to information regarding the securities as compared to insiders.  As further

6    explained by the Ninth Circuit,

7                [t]he securities acts protect those without inside access to information
     about an investment from overreaching or manipulation of their
8                investments by insiders or promoters.  The securities acts' disclosure
     and anti-fraud rules provide passive investors the means by which to
9                assess the quality of investment opportunities.

10   *Matek*, 862 F.2d at 724-25 (citing *SEC v. Ralston Pruina Co.*, 346 U.S. 119, 124-25, 97 L. Ed.

11   1494, 73 S. Ct. 981 (1953)); *see also, Pinter*, 486 U.S. at 646 ("brokers and other solicitors are well

12   positioned to control the flow of information").

13          The *Pinter* Court also found that Congress' intent included a deterrent purpose that "the risk

14   of [§ 12(1) civil liability's] invocation should be felt by solicitors of purchases."  *Id.*

15   **B.    Factors Indicating Direct Solicitation Under § 12(a)(2)**

16          As briefly outlined by the Trustees, under *Pinter* there are two tests to determine who

17   qualifies as a seller under § 12(a)(2).[7]  The first and less controversial test is whether a defendant

18   passed title to the security.  Here, Plaintiffs do not dispute that the corporate entity "Schwab

19   Investments" owned YieldPlus shares and passed title to class members.  But the *Pinter* Court,

20   found that there was a second, broader category of individuals who could fall within the definition

21   of seller than just those who pass title, including any "person who successfully solicits the purchase

22   motivated, at least in part by a desire to serve his own financial interests or those of the security

23   owner."[8]  *Id.* at 647.

24

25        [7] "*Pinter* addressed a claim under Section 12(a)(1), but the Ninth Circuit has clarified that the
     same inquiry governs claims under Section 12(a)(2)."  *In re Charles Schwab Corp. Sec. Litig.*, 257
26   F.R.D. at 548 n.2 (citing *Moore v. Kayport Package Exp. Inc.*, 885 F.2d 531, 535-36 (9th Cir.
     1989)).

27        [8] The Independent Trustees do not argue about the second "financial interest" prong of the
     *Pinter* solicitation test.  If they did in fact solicit, there is no question that they would have been
28   motivated by Schwab's financial interests and not those of the investors.  *See* 486 U.S. at 655 ("[A]

In applying this second, broader test, courts have looked to several factors when determining who should be held accountable as sellers. *See, e.g., Dorchester Investors v. Peak Trends Trust*, 2003 U.S. Dist. LEXIS 1446, at *6-7 (S.D.N.Y. Feb. 3, 2003) (listing factors considered in the Second Circuit). An important focus of this inquiry is the "defendant's relationship with the plaintiff-purchaser." *In re Charles Schwab Corp.*, 257 F.R.D. at 549. But that relationship need not be personal communication in order to be "direct." Although personal promotion of the security to investors is strongly indicative of seller status, it is not required. "[I]t has become well settled in [the Second] Circuit that the seller need not have 'personal' contact with the purchaser … to be held liable under § 12(a)(2)." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (citations omitted); *see also Dorchester Investors*, 2003 U.S. Dist. LEXIS 1446, at *8 (holding an officer and shareholder[9] was a seller even though he did not accompany the underwriters on the road show sales presentations, because he participated in drafting and executed a registration statement and negotiated and executed the agreement with the underwriters).

But multiple other Courts have reached the same holding. In *Commins v. Johnson & Higgins, Inc.*, the court held that the defendant companies that formed drilling programs in which the plaintiff class invested were "sellers" of unregistered securities under the *Pinter* test. 1988 U.S. Dist. LEXIS 15574 (N.D. Cal. 1988). The first prong of the *Pinter* test was met because the defendants solicited the investors' purchases by hiring 'boiler room' broker-dealers to market the programs to potential investors over the telephone. *Id.* at *1. The second prong of the test was met because the defendants had a financial interest in having the investors buy their gas interests. *Id.* at *25-26; *see also Suppa v. Montano*, 1989 U.S. Dist. LEXIS 5682 (W.D. Mo. Feb. 28, 1989) (denying motion to dismiss by two major shareholders, one of whom was chairman of the issuer's board; citing *Pinter* but finding "little difficulty determining that those who prepare and person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under § 12(a) without showing that he expects to participate in the benefits the owner enjoys."). Plaintiffs thus only address the first prong of the *Pinter* solicitation test – whether the Independent Trustees "successfully solicit[ed] purchase" of YieldPlus shares. *Id.* at 647.

[9] An earlier opinion contains the description of the individual officer and shareholder's position. *See Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 571 (S.D.N.Y. 2001).

disseminate a materially false prospectus, even though they do not actually sell the security, may be held liable as an offeror under Section 12(2)).").

### 1.    Urging buyers to purchase

To be a "direct" seller, a defendant must take on the role of the advocate for the security, and not just a neutral hired hand.  According to *Pinter*,

> [a] natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase.  For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title.

*Pinter*, 486 U.S. at 644.  As one author characterized this factor, "[t]he words, then must not be neutral, but the words of an advocate."  William O. Fisher, *Parsing Pinter Four Years Later: Defining a Statutory Seller Under Section 12 of the Securities Act*, 21 Sec. Reg. L. J. 46, 53 (attached hereto as Appendix A).

Some courts have held that the signing of a prospectus or other registration statement is alone sufficient to confer seller status onto a defendant because such documents are intended to urge buyers to purchase the security.  *See, e.g., In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 945 (M.D. Tenn. 1999) (concluding that because "[a] Prospectus itself is considered a solicitation document....  Defendants who actually signed the Registration Statements may be said to have solicited the public to purchase the stock.").

Although signing a registration has not always been considered enough in itself to confer seller status,[10] it "in itself is particularly 'significant for purposes of finding that a [person] is a seller.'"  *In re Vivendi Universal*, 381 F. Supp. 2d at 187 (quoting *In re Opus360 Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 18558, at *10 (S.D.N.Y. Oct. 2, 2002) ("the signing of a registration statement is significant for purposes of finding that a [person] is a seller")); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996) (denying motion to dismiss because "[a]lthough signing the registration statement need not constitute active solicitation, it is, at this

---

[10] *See In re Charles Schwab Corp.*, 257 F.R.D. at 549 n.3 (compiling cases reaching varying results).

1    stage of the proceedings, a sufficient allegation to permit Plaintiffs to present evidence that alone or

2    in tandem with other acts, the signatures constituted active solicitation.") (citation omitted).

3        **2.    The Seller as Puppeteer:  Authorizing or directing others' solicitation**

4        Contrary to defendants' arguments that in order for the relationship between buyer and

5    seller to be direct, there must be personal contact, multiple courts have held that a defendant who

6    hires agents to merely do his bidding cannot avoid § 12 liability.  This comports not only with the

7    remedial intent of the Act, but also with its deterrent purpose – otherwise, sellers could just hire

8    lackeys to follow their instructions and then allow them to take the blame if the their rosy

9    predictions prove false.

10       An illustrative case is *Capri v. Murphy Co.*, 856 F.2d 473 (2d Cir. 1988).  In *Capri*, the

11   court stated that it had no difficulty in finding general partners in a coal mining venture liable as

12   "sellers" under § 12(a)(2) because their material misrepresentations and omissions made to the

13   plaintiffs through their agent satisfied the *Pinter* solicitation test.  *Id.* at 478.  The court found that

14   the defendants prepared and circulated the prospectus to the plaintiffs and that the prospectus

15   omitted material facts which significantly affected the risk undertaken by the investors.  *Id.*  The

16   defendants contended that only their agent, a law firm which was in direct communication with the

17   plaintiffs, should bear the responsibility for any misrepresentations or omissions.  *Id.*  The court

18   stated that while the law firm, having promoted the deal and received compensation for its efforts,

19   would have been liable as a "seller" if it had been a named defendant, the firm's status as a "seller"

20   did not preclude the defendants from being "sellers" too.  *Id.*  Since the firm's promotional efforts

21   were preformed at the behest of the defendants, the firm provided no information to the investors

22   other than what was supplied to the defendants, and took no action in relation to the investors other

23   than that which was contemplated and authorized by the defendants, the court found that the firm's

24   promotional efforts were directly attributable to the general partner defendants, causing them to be

25   liable under § 12(a)(2) even though they had no direct communication with the plaintiffs.  *Id.*

26       Defendants' attempts to distinguish *Capri* are unconvincing.  Defendants cite *In re Lehman*

27   *Bros. Sec. & ERISA Litig.*, 2010 WL 337997, at *3-4 (S.D.N.Y. Feb. 1, 2010) for the proposition

28   that their version of "direct" contact, aka "personal communication" is necessary.  *Lehman*

PLTFS' MEMO. IN OPP. TO INDEPENDENT TRUSTEES'
MOTION FOR SUMMARY JUDGMENT - 08-cv-01510 WHA              - 15 -

1    *Brothers'* holding is not so narrow. In *Lehman Brothers*, the court addressed whether rating

2    agencies' activities in "assisting in the drafting of the Prospectus Supplements, collaborating on

3    credit enhancements, and using their models to structure particular deals to obtain the desired AAA

4    ratings transformed them into statutory sellers." *Id.* at *3. In holding that the rating agencies were

5    not statutory sellers, the court used a metaphor of architects and builders as compared to home

6    owners, finding the rating agencies role

7              …was no different than those of an architect or a builder in designing
          and constructing a house for an owner who later resells the house
8              through the sole efforts of a real estate broker. While it doubtless is
          true that the architect or builder had a lot to do with the
9              characteristics of the house-no doubt characteristics that made it an
          attractive and salable product – they cannot properly be said to have
10             participated in any legally relevant sense in its resale down the line.

11   *Id.* at *4. In the court's metaphor, although the builder and architect are not responsible, the owner

12   who is directing their efforts would be. This is in line with plaintiffs' argument that neutral

13   securities professionals hired as hired-hands to do their jobs while another pulls the strings are the

14   "collateral" participants in securities transactions that are not properly liable as sellers. This is not

15   true for those defendants who are still pulling the strings, despite being not in personal

16   communication with the sellers themselves.[11]

17       For the same reasons, "courts will look at whether the defendants 'made or participated in

18   the decision to hire' the underwriters." *Dorchester Investors*, 2003 U.S. Dist LEXIS 1446, at *7

19   (quoting *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 761 (S.D.N.Y. 2001));

20   *see also, Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999). This holding

21   recognizes that hiring someone to market and distribute securities, per a defendant's instructions,

22   should not relieve them of liability and in fact, the mere hiring of such parties is a sign that you are

23   a seller or the one pulling the strings.

24

25   _____
     [11] Defendants' reliance on *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575
     (S.D.N.Y. 1996) is also misplaced. In *Shain*, the court found that a "defendant [who] provided

26   information to two brokers who passed that information on the to the plaintiff does not give rise to
     § 12 liability." The *Shain* court does not go farther and say that there must be personal

27   communication. To the contrary, and as quoted by the Trustees Motion, the court states that sellers
     must "<u>directly or personally</u> solicit the buyer." *Id.* (emphasis added). If the court meant to adopt a
     personal communication only standard it would not also have said direct.

28

1    Similarly in *In re Chaus Sec. Litig.*, 1990 U.S. Dist. LEXIS 15810 (S.D.N.Y. 1990), the

2 court refused to dismiss § 12(2) claims brought against two individual defendants on the basis that

3 they were not sellers.  The two defendants occupied the positions of board chairman, board vice

4 chairman, president and CEO.  *Id.* at \*2.  The Court reasoned,

5           [t]he complaint charges that the Chauses authorized the actions by
            the underwriters and their promotional efforts, assisted in the
6           preparation of and signed the offering documents and worked closely
            with the underwriters in conducting sophisticated traveling
7           'information' or 'due diligence' meetings with retail and institutional
            sales personnel. [Citation omitted].  It is also alleged that the Chauses
8           received a tremendous financial gain through the public offering.
            [Citation omitted.]  As these allegations, if true, would provide a
9           basis for concluding that the Chaus defendants did successfully
            solicit sales, as defined [in Pinter], the motion to dismiss…on this
10          ground is denied.

11 *Id.* at \*26.  In other words, the Court found that the Chaus's were pulling the strings over this

12 investment and could therefore be held liable as sellers.  *See also Commins v. Johnson & Higgins,*

13 *Inc.*, 1988 U.S. Dist. LEXIS 15574 (N.D. Cal. 1988) (defendants solicited the investors' purchases by

14 hiring 'boiler room' broker-dealers to market the programs to potential investors over the telephone).

15      **3.     Assess to and control over insider information**

16      Another factor weighing towards being a seller is having access to insider information and

17 the clout to control whether and how that information is conveyed to investors.  The *Pinter* Court

18 reasoned,

19          brokers and other solicitors are well positioned to control the flow of
            information to a potential purchaser, and, in fact, such persons are the
20          participants in the selling transaction who most often disseminate
            material information to investors.  Thus, solicitation is the stage at
21          which an investor is most likely to be injured, that is by being
            persuaded to purchase securities without full and fair information.
22
23 486 U.S. at 646-47.  Thus, a characteristic of one who should be held liable as a seller, is whether

24 he has the material information necessary to determine the true quality of the investments being

25 offered and whether he has the power to provide or withhold that information from investors.  In

26 *Capri*, the court found it important in making its seller determination who decided what information

27 went to investors.  856 F.2d at 478.  The court considered that partners who provided the

28 information that a law firm then directly provided to investors were properly liable as sellers.  *Id.*

C.      **The Independent Trustee's Would Have the Court too Narrowly Define "Seller"**

The Independent Trustees' so narrowly define "seller" that under their cramped definition only the issuer and those who personally communicated with each investor could be liable under Section 12(a)(2). This narrow view is not in line with the intent of the statute or with current case law. The defendants make much of *Pinter*'s refusal to confer seller status on "participants' collateral to the offer or sale." Independent Trustees' Motion, p. 3. The examples given in *Pinter*, however, are neutral professionals, *e.g.*, attorneys and accountants, hired to do a particular job at the direction of the owner or distributor of the securities. *See* cases cited in Trustees Motion at p. 7: *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 537 (9th Cir. 1989) (lawyers and accountants participation did not rise to level of solicitation); *In re Alliance Equip. Lease Program Sec. Litig.*, 2002 WL 34451621, at *9-10 (S.D. Cal. 2002) (guarantors not liable as sellers despite communications with investors because acting almost entirely in their capacity as guarantors); and *In re Gas Reclamation Inc. Sec. Litig.*, 733 F. Supp. 713, 723 (S.D.N.Y. 1990) (insurance company agent not liable as a seller). These collateral participants were not making the critical decisions of how to market the security or how to manage the security – decisions that led investors to buy the securities at issue in those cases – instead they were just hired hands doing their jobs. They were neutral securities professionals and not financially motivated advocates. The Independent Trustees, however, were ultimately directing the marketing and management of the YieldPlus Fund. The Trustees' position may have been high, but it was not collateral or indirect.

D.      **A Reasonable Juror Could Find the Independent Trustees are "Sellers"**

Here, multiple factors weigh towards the Independent Trustees being sellers. First, the Trustees signed the registration statements. Although this may not be enough on its own to deem them a seller, it is a factor that weighs towards (not neutral or against) them being sellers under § 12(a)(2). As the court reasoned in *Vivendi*, the fact that defendants did sign the registration statements it is a factor that weighs towards their liability as a seller. *See*, 381 F. Supp. 2d at 187.

Second, the Independent Trustees participated in the marketing effort. They had a marketing committee which reviewed specific pieces of marketing for the funds and was tasked with

██████████ Berman Decl. Ex. 8 at *3.  In August 2006, the Trustees specifically reviewed the marketing of the YieldPlus Fund when presented with accusations by the SEC that YieldPlus marketing contained insufficient disclosures and improperly compared it to money market funds. The Trustees reviewed that marketing and could have taken the opportunity to research whether the SEC was correct.  Instead they merely adopted the recommended response drafted by CSIM and did nothing further.  The Independent Trustees, again, were in a position of oversight where they could have protected investors from misleading statements. *See also,* Activities cited, *supra,* pp. 4-5.

Third, the Trustee also implicated themselves as sellers by hiring agents to manage the Fund subject to their direction.[12]  Thus, the Trustees directed that CSIM and CS&Co. be hired to manage the funds and to continue to do so.  *Id.*  They did not, however, relinquish their authority to make the decisions that were critical to investors.

Fourth, the Trustees authority and active oversight of the funds put them in a direct relationship with those investors who were dependent upon them for correct information. *See, supra,* pp. 9-11.

The Trustee's role here was near identical to the role played by the defendants found to be sellers in *Capri.*  856 F.2d at 478.  As in *Capri,* the defendants prepared and circulated prospectus, hired an agent to communicate with investors, and directed the marketing efforts.  *Id.*  Each of these factors weighs towards finding the Independent Trustees were sellers.

Facts cited by defendants' motion are questionable at best and even if true, do not preclude the Trustees from being held liable as sellers.  Although the trustees declare that they never reviewed or commented on YieldPlus advertising,[13] Schwab's documents show that they as Trustees had the opportunity to do so, that they did in fact review the SEC's August 2006 letter containing excerpts of YieldPlus advertising and criticisms of it, and even if they did not review much of the advertising, they should have.  Their claimed lack of review after SEC concerns shows

---

[12] Although the Investment Advisory Agreement and Distribution Agreements are between Schwab Investments and CSIM and CS&Co. respectfully, the Trustees voted on whether to approve these contracts and continue them in effect.  *See* Berman Decl. Exs. 17 and 18.

[13] *See* Trustee Declaration of Kimberly L. Taylor in Support of the Independent Trustees' Motion for Summary Judgment, Ex. 1 (Trustee Declarations).

1    a lack of oversight, and should not free them from their role as sellers.  Compared to the variety of

2    facts patterns that courts have viewed, the Trustees are more like the officers and directors that

3    were found to be sellers even if they had hired agents to communicate directly with investors, then

4    more remote or collateral securities professionals.  Based on these factors and the intent of the

5    1933 Act, a reasonable juror could find the Trustees were sellers under § 12(a)(2).

6                    **IV.    CONCLUSION**

7         The Independent Trustee Defendants have not met, and cannot meet, the burden of

8    demonstrating that there is no genuine issue of any material fact such that they are entitled to

9    judgment as a matter of law.  The Court should deny their motion.

10        Dated:  March 4, 2010.

11                    HAGENS BERMAN SOBOL SHAPIRO LLP
   Reed R. Kathrein

12                    Peter E. Borkon
   715 Hearst Avenue, Suite 202

13                    Berkeley, CA 94710
   Telephone: (510) 725-3000

14                    Facsimile: (510) 725-3001
   reed@hbsslaw.com

15                    peterb@hbsslaw.com

16

17                    By:    _s/ Steve W. Berman_

18                         Steve W. Berman
          Sean R. Matt

19                         Erin K. Flory
          Lisa M. Hasselman

20                    HAGENS BERMAN SOBOL SHAPIRO, LLP
   1918 Eighth Avenue, Suite 3300

21                    Seattle, WA 98101
   Telephone: (206) 623-7292

22                    Facsimile: (206) 623-0594
   steve@hbsslaw.com

23                    sean@hbsslaw.com
   erin@hbsslaw.com

24                    lisah@hbsslaw.com

25                    *Attorneys for Lead Plaintiffs and the Classes*

26

27

28

# Appendix A

# Parsing *Pinter* Four Years Later: Defining a Statutory Seller Under Section 12 of the Securities Act

## William O. Fisher*

*This article reviews the development of the test articulated in Pinter v. Dahl to define a "seller" under Section 12. The author argues that (1) a "soliciting seller" under Pinter must employ personal point-of-sale persuasion and must have a commission-type interest in the sale; (2) absent Pinter-type solicitation by an issuer, securities purchasers have no Section 12 claim against issuers in firm commitment underwritings; and (3) securities professionals such as lawyers and accountants have no liability under Section 12 provided that they restrict themselves to their traditional roles. The author then reviews Pinter's implication for secondary liability, class certification, and aftermarket actions.*

Section 12 of the Securities Act of 1933 (1933 Act) creates a cause of action against any person who "offers or sells a security," without a registration statement or an adequate prospectus, or pursuant to a misleading "prospectus or oral communication."[1] By its terms, Section 12 defines the proper who "offers or sells" the security and 1 party "purchasing [the] security from'

Before June 1988, courts had develop to define the statutory "sellers" who n tion 12. These tests ran the gamut from dants to those in strict privity with the tests sweeping within Section 12's ne "substantial factor" in the sale transa

In June 1988, the Supreme Court dec Court ruled that a defendant is a "sell either (1) the "owner who passed title security, to the buyer for value", 5 or cessfully solicit[ed] the purchase, mot a desire to serve his own financial interes owner."[6]

This article reviews the developmen more than four years since the Supreme sion and examines the implications of tion 12 practice beyond the definition

## The *Pinter* Rull

*Pinter* decided the scope of subsect liability for selling securities without f ment. Subsection 12(2) creates a cause o sell securities by means of a prospectus containing materially false statements o While the Court recognized that 12(2) d sellers were "relevant to the issue pres declined to "take a position on the scop

---

[2] 15 U.S.C. § 77l.

[3] These tests are described at some length in R Tell Me the Definition of the Term 'Seller': The 12(2) of the Securities Act of 1933," 14 Del. J

[4] 486 U.S. 622 (1988).

[5] *Id.* at 642.

[6] *Id.* at 647.

---

* Mr. Fisher is a partner at Pillsbury Madison & Sutro in San Francisco and a member of the firm's Securities Litigation Group. Walter J. Robinson, Esq., head of the group, contributed valuable comments to this article and Dana Harvey, Esq., O. Antony Abdoliaki, Esq., Robert D'Arcy, Marsha Ginn, and Jean Taylor, all of Pillsbury Madison & Sutro, assisted in polishing and checking.

[1] Section 12(1) of the Securities Act of 1933 creates a cause of action against any person who "offers or sells a security" for which a required registration statement has not been filed or for which the prospectus fails to meet statutory requirements. Section 12(2) creates a cause of action against "[a]ny person who...offers or sells a security...by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l; 15 U.S.C. § 77e.

purposes of § 12(2).'" Nevertheless, virtually every subsequent 12(2) decision has applied *Pinter*'s definition in addressing a statutory seller issue in connection with claims based on an allegedly misleading prospectus or oral statement.[8]

The extension of *Pinter* to 12(2) is significant, for 12(2) is a powerful plaintiff's weapon in cases involving alleged misstatements and omissions. Unlike Section 10(b) of the Securities Exchange Act of 1934, Section 12(2) requires neither scienter nor reliance.[9] And unlike Section 11 of the 1933 Act, 12(2) does not provide defendants with the opportunity to prove lack of causation as an affirmative defense,[10] does not impose Section 11's qualified reliance requirement,[11] and is not limited to misstatements or omissions in registration statements.[12]

In considering who should be subject to Section 12, *Pinter* expressly rejected the test,[13] holding that: "There is no support in or legislative history for expansion of § beyond persons who pass title and person those who 'solicit' offers."[14]

The Court wrote that "§ 12's failure to for mere participation in unlawful sales ticipants collateral to the offer or sale." in the sales transaction, or proximate ca purchase, for the words 'offers or sell

## The Issues Raised by the [Tests]

*Pinter* itself set out two tests. A person he or she meets the requirements of ei

### *Pinter*'s First Test

The *Pinter* Court determined that a who passes title for value. While this fir seller" normally produces little contro the question of whether there are cases reality so aligns the interests of the parti with the interests of the purchaser that t test yields the wrong result.

---

7 *Id.* at 642 n.20.

8 See Ackerman v. Schwartz, 947 F.2d 841, 844-845 (7th Cir. 1991); Ryder Int'l Corp. v. First Am. Nat'l Bank, 943 F.2d 1521, 1526-1530 (11th Cir. 1991); Cyrack v. Lemon, 919 F.2d 320, 325 (5th Cir. 1990) (citing Abell v. Potomac Ins. Co., 858 F.2d 1104, 1114-1115 (5th Cir. 1988), *vacated and remanded* at 492 U.S. 914 (1989) for further consideration in light of the RICO 'pattern' ruling in H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)); Wilson v. Saintine Exploration & Drilling Corp., 872 F.2d 1124, 1126 (2d Cir. 1989); Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 535-536 (9th Cir. 1989); Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988).

9 MidAmerica Fed. S&L v. Shearson/American Exp., 886 F.2d 1249, 1256 (10th Cir. 1989) (Section 12(2) "has no requirement of justifiable reliance on the part of a purchaser"). T. Hazen, *The Law of Securities Regulation* 316 (2d ed. 1990) ("it is not necessary for the purchaser to show any type of scienter on the seller's part").

10 Section 11(e) provides that

if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion or all of such damages shall not be recoverable. 15 U.S.C. § 77(e).

11 Section 11(a) ends with a sentence stating that if the plaintiff acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

12 Section 11 applies only where a "part of the registration statement, when such part became effective," contained a materia[l]
15 U.S.C. § 77k(a).

13 486 U.S. at 648-654.
14 *Id.* at 650.
15 *Id.*
16 *Id.* at 651.

## Pinter's Second Test

The *Pinter* Court set forth a second test that contains two elements: (1) whether the defendant "solicited" the sale and (2) whether the defendant did so to further (a) his own interests or (b) the interests of the party who owned the security before the sale. A defendant must satisfy both parts of this test in order to be a "soliciting seller." The first element—solicitation—raises questions about the language the defendant used and, in particular, whether it was persuasive language employed to encourage the sale. The element of solicitation also addresses the relationship between the defendant and the plaintiff, and raises the question of whether solicitation imports a notion of personal contact with a purchaser in which the defendant recommends that the plaintiff buy a certain security.

The second element of "solicitation"—financial motive—may be supplied either by (1) a financial benefit the "seller" will himself reap from the sale or (2) a benefit to the presale owner of the security if the "soliciting seller" is working on behalf of the presale owner. The first sort of financial benefit must be to the question of how proximate the financial benefit must be to the sale. The second sort of financial motive raises the question of whether the defendant was, in fact, acting on behalf of the presale owner or, instead, acting on behalf of the buyer.

Beyond the questions raised by the terms of *Pinter*'s two tests, the decision leaves unanswered many other issues—such as whether an issuer is a statutory seller to the public in a firm commitment underwriting; when securities professionals such as lawyers and accountants are "sellers" under Section 12; the extent to which the circle of Section 12 defendants can be expanded by concepts of secondary and vicarious liability, such as aiding and abetting, conspiracy, and agency; certification of Section 12(2) classes; and the implications of the *Pinter* opinion for the application of 12(2) to aftermarket purchases.

These questions assume great importance in deciding what parties will be subjected to the burdens of securities litigation. As a practical matter, whether a defendant is a statutory "seller" may be resolved in a motion to dismiss or on an early motion for summary judgment. Those who are not sellers can therefore exit a case promptly and save large litigation costs.

## The "Passing"

The first of *Pinter*'s two alter... of the party passing title, is mech... cases. There are, however, som... reality properly displaces the fo... a "passing title" seller. Thus,... the purchaser of securities, he i... the purchaser (rather than sellin... and therefore is not a "passin... documents may show that, in the... runs from the broker to the cus... hand, should be a "passing titl... customer out of his or her own ac... a market in a security.

One clearly wrong decision hol... be liable as a seller because the o... title.[18] *Pinter* confirmed that "[t... statutory seller.[19] But when a b... is the business that passes title, r... the paperwork but who never hel... While an individual officer may...

---

[17] *Ryder Int'l Corp. v. First Am. Nat.* ... 1991) (noting that "'risk of loss' is on... ship" and that the broker's customer be... order as agent); and see *Craighead v.* ... (6th Cir. 1990) (citing *Pinter* as an analo... tion: "[b]rokers have been held liable as... were closely aligned with the title-hold... securities issuers").

[18] *Fulton Bank v. McKittrick & Bri*... 1371, at 20 (E.D. Pa. Aug. 27, 1990)... from [GFS's president] Oglebay to McE... assigned to Kidder, Peabody GFS's purp... Because Oglebay thus purported to pass... he is a 'seller' under Section 12(2)").

[19] 486 U.S. at 642.

[20] Courts have recognized that corpor... ing title" sellers, saying, for example, "... tor or executive committee member of 1... changed hands, Dolman clearly is not a... passed title. IRC [Holding Corporation]

theory, he or she should not be automatically liable simply by signing transfer papers as an authorized agent. Holding liable every person executing transaction documents makes no sense and serves no useful purpose.

## Solicitation

*Pinter*'s second alternative test has created far more controversy. This second test makes a statutory seller of any party who "solicits" the sale with the requisite financial motive.[21] But the Court offered few examples of what amounted to solicitation, instead emphasizing conduct that did not meet the test.[22]

The solicitation test is, itself, divided into two parts, and a defendant must satisfy both before he or she can be found to be a "soliciting seller." First, the defendant must employ the persuasive language of solicitation and, many decisions hold, do so in the context of a relationship in which the defendant personally encourages the plaintiff to buy. Second, the defendant must have the requisite financial motive for the sale, which can be supplied either by a benefit to the defendant or, if the defendant is working on behalf of the owner of the security, by a financial benefit to that owner.

## The Language of Solicitation

*Pinter* observed of the words constituting solicitation that:

A natural reading of the statutory language would include in the statutory seller status at least some persons who *urged the buyer to purchase.*[23]

no assertion that IRC held the stock on behalf of Dolman.'' Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1017 (2d Cir. 1989). And see Loan v. Fed. Dep. Ins. Corp., 717 F. Supp. 964, 968 (D. Mass. 1989) (''[c]learly none of the individual defendants transferred title to the securities—the bank performed that function itself'').

[21] This second test is, truly, an alternative. Thus, if a defendant is a ''passing title,'' he is a proper 12(2) party, regardless of whether he has ''solicited.'' Shapiro v. UB Fin. Corp., 964 F.2d 272, 287 (3d Cir. 1992), *cert. denied*, 113 S. Ct. 365 (1992).

[22] Justice Blackmun observed that ''[t]he person who gratuitously urges another to make a particular investment decision is not, in any meaningful sense, requesting value in exchange for his suggestion or seeking the value the titleholder will obtain in exchange for the ultimate sale.'' 486 U.S. at 647.

[23] *Id.* at 644 (emphasis added).

Thus, solicitation is the stage at which an investor may first be injured, that is, *by being persuaded to invest without full and fair information.*[24]

The words, then, must not be neutral; they must be those of an advocate.[25]

*Ryder International Corp. v. First American Corp.* is by far the most interesting subsequent decision about solicitation. In that case, Ryder invested in commercial paper. On some occasions, Ryder asked First American to ask about available commercial paper; in these instances, when paper matured that Ryder had purchased, First American contacted Ryder and asked Ryder whether it wished to otherwise employ the matured funds.

In either case, when Ryder wanted to invest, First American presented Ryder with a menu of commercial paper then available and some information on the companies issuing the paper. In the Ryder Case, then selected from that menu, after additional investigation he thought necessary.

On two occasions when Ryder requested, First American provided it day paper issued by Integrated Resources and other securities. Ryder purchased the paper through its agent, Mr. Case.

[24] *Id.* at 646-647 (emphasis added).

[25] Craighead v. E.F. Hutton & Co.., 899 F.2d 485 ... *Pinter* as an analogy in addressing a 17(a) issue, ... been held to define 'seller' not only as the party ... in the transaction, but also those parties that ... persuading or seducing the purchasers into buying. ... tine Exploration & Drilling Corp., 872 F.2d 1 ... that law firm was not a statutory seller; "[o]f cou... are exempt from the concept of a 'seller' under ... mission from an actual seller for persuading ... investment").

[26] 749 F. Supp. 1569 (N.D. Ala. 1990), *aff'd* ...

Case3:08-cv-01510-WHA Document438 Filed03/04/10 Page32 of 44

solicitation (as urged by [Ryder]), a solicitation is enough to impose Section availability and disclosure of other inv chase may "imply" that First Americ ment Ryder chose.[31]

*Ryder* offers substantial comfort to to a customer inquiry about a category the customer purchase one of a num some basic facts about each, but othe the customer's selection of a particula memo. On the other hand, a plaintiff that the broker's presentation somewh that the plaintiff ultimately selected, al that the broker "stacked the deck"?) R requires more than the circumstance the security with the best numbers.[32]

Beyond an objective determination as advocate, *Pinter* solicitation appea on the plaintiff. Thus, some languag kind of causation—not transaction ca tiff prove he or she would not have pu ment or omission and not loss causat defendant's overall presentation was a tiff's decision to purchase. Thus, *Pin* who "*successfully* solicits the purchas

---

[31] *Id.* at 1532–1533.

[32] Query whether *Ryder's* reasoning would s a selection of securities, all of which suffered and the broker urged the customer to buy at lea sion is as wide as the range of choice, perhap required. Query, too, whether *Ryder* will save with a customer and then offers a variety of su court stated that "general solicitation of busi F. Supp. at 1579, the initial contact on both apparently made by *Ryder*. And see note 36

[33] 486 U.S. at 647 (emphasis added). And se Inc., 885 F.2d 531, 538–539 (9th Cir. 1989) ( ly pleaded a 12(2) claim against stock brc

---

Integrated had borrowed money from a different division of First American than the one with which Ryder dealt. The division managing the loan had arguably negative information about Integrated. That information never reached the First American division communicating with Ryder and was never disclosed to Ryder.

Integrated Resources defaulted on the paper Ryder bought. Ryder sued First American, alleging a Section 12(2) violation. The district court granted summary judgment for First American. The Eleventh Circuit affirmed.

In holding that First American was not a "soliciting seller," the district court wrote:

There is no evidence that any agent of [First American] gave Case or any other employee of plaintiff any information concerning [Integrated Resources] paper other than the rate, yield, Standard and Poor rating, and the maturity date, along with similar information about other securities.

There is no evidence that the defendant "urged" or "persuaded" or otherwise influenced plaintiff to purchase these particular securities. Surely it cannot be intended that the mere general solicitation of business of this type constitutes "solicitation" as contemplated by *Pinter*.[27]

The court of appeals went on to observe that "the bank did not specifically recommend or 'talk Ryder into buying' Integrated paper."[28] It characterized First American's role as "only exe-cut[ing] Ryder's orders,"[29] observing that "Ryder has not shown that First American persuaded Case to purchase Integrated Paper."[30] The court concluded:

The evidence as a whole does not indicate that First American "actively" solicited Ryder for the purchase of Integrated paper. Moreover, the fact that Integrated paper had a higher yield than the other available investments should not be deemed an "implied"

---

[27] *Id.* at 1579.

[28] 943 F.2d at 1532.

[29] *Id.* at 1531.

[30] *Id.* at 1534.

one of several defendants alleged to be "soliciting sellers," or even a lone defendant, might escape liability by proving that his presentation to the plaintiff was unsuccessful and played no role in the plaintiff's decision to buy.[34] Certainly, a defendant who only acted after plaintiff purchased should have at least no primary Section 12(2) liability.[35] A few decisions even suggest that whether a defendant "solicited" a purchase may depend on whether the defendant (as opposed to the plaintiff) initiated the transaction or the stage of the prepurchase negotiations at the time the defendant spoke.[36]

## Solicitation as a Personalized Conc

*Pinter* emphasized that "§ 12 focuses township with the plaintiff-purchaser.'"[38] the Court repeatedly used the of a soliciting seller.[39] Indeed, while referred several times to brokers "an solicitors, brokers are the only specific Moreover, the Court here cited cases w sonally communicated with the plaintiff the Court was referring to brokers who

---

" 'distributed sales promotion data,' 'recommended the ... limited partnership[] interests and were a 'substantial motivating force in the sales to' them'"); Polygast Technology Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 259 (S.D.N.Y. 1992) (relying on pre-*Pinter* authority for the view that "while a Section 12(2) plaintiff need not prove the particular kinds of causation required in fraud claims, never- theless 'he must still prove that the challenged sale was effected "by means of" the communication viewed as a whole. That is to say, the communication as a whole must have been instrumental in the sale' of the securities").

[34] Then again, the Court's reference to a "successful" solicitation may mean no more than that a sale is required for there to be any 12(2) claim at all. "The purchase requirement clearly confines § 12 liability to those situations in which a sale has taken place. Thus, a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities." 486 U.S. at 544.

[35] Schenk v. Continental Coal Reserves, Ltd., [1990–1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,711, at 98,358 (N.D.N.Y. Oct. 1, 1990] (granting summary judgment to law firm that issued bills of sale for coal; "the actual sale of the securities occurred prior to the issuance of the bill of sale"); see also Craig v. First Am. Capital Resources, Inc., 740 F. Supp. 530, 534 (N.D. Ill. 1990) (no liability for postpurchase misrepresentation even if substantial factor test still applied).

[36] See McKim v. Frisco, 1991 WL 256573, at 6 (D. Mass. July 30, 1991) ("[a]lthough the initiation of the negotiations is not dispositive in the determina- tion of whether a person is a "seller" for purposes of § 12(2), it is a factor for consideration"); VT Investors v. R&D Funding Corp., 733 F. Supp. 823, 840 (D.N.J. 1990) (dismissing 12(2) claim where the complaint "does not imply con- duct in the first stage of a securities sale, rather it suggests final stage negotiation or closing transactions." Here, the "commitment to exchange warrants was made at [the buyer's] request as a concession to a buyer, a scenario diametrically opposed to that of a typical solicitation").

---

[37] 486 U.S. at 651.

[38] The Court's principal discussion of solicitation

[39] 486 U.S. at 644–645 (citing to decision the owner liable as a statutory seller"); at 644 to brokers and others who solicit securities pu quently since the passage of the Securities Act" statutory seller that includes brokers and othe securities furthers the purposes of the Securities solicitors are well positioned to control the fl

[40] In Cady v. Murphy, 113 F.2d 988 (1st Ci "[N]egotiation of the transaction out of which a ducted by Murphy and Frank Lynch, the head by means of numerous telephone conversations in March, 1937, Lynch persuaded Murphy to representing 1,700 common shares of South Am (at 989). In Whitaker v. Wall, 226 F.2d 868 646), "the Walls accompanied Wagner from No introduced to C. C. Whittaker and taken on a tour ing day, at the offices of Pay Rock Oil, Inc., in ment authorizing Wagner to procure a 1/16th w known as the Freeburg 'A 'tract" (at 869). "On Wagner urged the Walls, by letter and telephon 'B' tract, and they did so" (at 869). In Schillin 134 F.2d 875 (2d Cir. 1943) (cited at 486 U. to make the purchases by Mr. Adams, an emp who called at their home and made oral represe company, its officers, one of whom was Mr. H of purchasing the stock'" (at 877). In Boehm v Ct. 1943), aff'd, 50 N.Y.S.2d 845 (App. Div. 1 tiff alleged that "defendants, who were stockbro then the owner of 400 shares of the stock of the which in effect recommended that she sell such of the stock of the Chesapeake Corporation, an and liabilities of the latter company" (42 N.Y.

tact the plaintiff[43] In effect, if not always by the
threaten to fall into the error of the substantial fac
a defendant liable because of the degree of the
ticipation in the transaction rather than determ
the basis of the defendant's relationship with

---

tified *as having actually solicited sales from the plaintiffs* (CCH) ¶95,646 (S.D.N.Y. Nov. 20, 1990), where the in 12(2) claim'' (emphasis added); Fried Nurseries, Ltd., 730 F. Supp. 521, 542 (S.D.N.Y. 1990) (2d Cir. 1991) (12(2) claim against Arthur Andersen dis do not even know that any of the plaintiffs in this action purportedly in contact with the Andersen defendants''); Jac of Ark., F.A., 709 F. Supp. 863, 884 (E.D. Ark. 1988) (gra 12(2) claim; ''[p]laintiff Gitlin does not allege that any o sold *him* his shares or solicited *him* to buy his shares. Even purchases or sold shares to every other buyer of First Fr did not solicit Mr. Gitlin or sell to Mr. Gitlin, then Mr. from them under Section 12(2). Solicitation here clearly putting of shares on the market in the hope that they will taking any of the other steps necessary to make a public original).

43 See, e.g., Chaus Sec. Litig., [1990–1991 Transfer Bi (CCH) ¶95,646 (S.D.N.Y. Nov. 20, 1990), where the 12(2) claims brought against two individual defendants on not sellers, although the court did dismiss on statute of lia two codefendants together owned 98.9 percent of the stock b ing and occupied the posts of board chairman, board vice and CEO. The court said: ''The complaint charges that the actions by the underwriters and their promotional efforts tion of and signed the offering documents and worked close in conducting sophisticated traveling 'information' or 'due retail and institutional sales personnel. [Citation omitted the Chauses received a tremendous financial gain through th tion omitted.] As these allegations, if true, would provide that the Chaus defendants did successfully solicit sales, as motion to dismiss count one on this ground is denied.''

And see Supra v. Montano, [1989 Transfer Binder] Fe ¶94,348, at 92,307 (W.D. Mo. Feb. 28, 1989) (denyin two major shareholders, one of whom was chairman of the *Pinter* but finding ''little difficulty determining that th disseminate a materially false prospectus, even though if the security, may be held liable as an offeror under Sect

44 One reason *Pinter* rejected the substantial factor test chase from' requirement of § 12 focuses on the defendant plaintiff/purchaser. The substantial-factor test, on the othe defendant's degree of involvement in the securities trans ding circumstances.'' 486 U.S. at 651.

---

suasive presentations to customers. All this strongly suggests that the sort of defendant-plaintiff relationship in which *Pinter* ''solicitation'' occurs is one involving personalized point-of-sale advocacy.

A growing body of law confirms this interpretation by requiring that a ''soliciting seller'' have ''direct'' or ''personal'' contact with the plaintiff.[41] Emphasis on the particularity of solicitation also plays a role in multiple plaintiff or defendant litigation where courts increasingly require that plaintiffs plead, and prove, which defendant solicited which plaintiff.[42]

To be sure, there are post-*Pinter* opinions that hold or suggest that ''soliciting sellers'' include those who do not directly con-

---

41 Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 636 (3d Cir. 1989) (''although an issuer is no longer immunized from § 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus. The pur- chaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller''); Persky v. Turley, [1991–1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,483 at 92,134 (D. Ariz. Dec. 19, 1991) (''active participation, not mere preparation, must be suffi- ciently alleged to claim seller liability''), In re Newbridge Networks Sec. Litig., 767 F. Supp. 275 (D.D.C. 1991) (dismissing 12(2) claims; because there was no ''allegation of direct contact of any kind between defendants and plaintiff- purchasers, the Court rules as a matter of law that defendants are not statutory sellers'' (at 281)); VT Investors v. R&D Funding Corp., 733 F. Supp. 823, 839 (D.N.J. 1990) (dismissing 12(2) claim; '' the purchaser must demonstrate direct and active participation in the solicitation of the immediate sale''' (quoting *Craft- matic*)); Schneider v. Traweek, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,507, at 97,665–97,666 (C.D. Cal. Aug. 28, 1990) (granting motion to dismiss absent allegations defendant ''*personally* solicited any Plaintiff to purchase'' (em- phasis added); Northwestern Nat'l Ins. v. Alberts, 741 F. Supp. 424, 434 (S.D.N.Y. 1990), appeal dismissed as to some defendants and injunction vacated as to others on equitable grounds, 937 F.2d 77 (2d Cir. 1991) (also requiring that defendants have ''*personally*'' solicited sales); In re Gas Reclamation, Inc. Sec. Litig., 733 F. Supp. 713, 723 (S.D.N.Y. 1990) (same); Klein v. King, [1989–1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,002, at 95,613 (N.D. Cal. Mar. 26, 1990) (granting motion to dismiss because ''there is no allegation that either Jackson or Altos directly solicited the plaintiffs to purchase Informix stock pur- suant to the proxy statement'').

42 Mabon, Nugent & Co. v. Borey, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,030, at 90,167 (S.D.N.Y. June 11, 1991) (dismissing 12(2) counts against moving defendants because the ''only allegations with respect to direct solicitation and negotiation of the sale of IRCC securities *to Mabon* relate to defen- dants other than the moving defendants'' (emphasis added)); Morin v. Trupin, 747 F. Supp. 1051, 1063 (S.D.N.Y. 1990) (''only those defendants who are iden-

not be ''sellers,'' Accordingly, they will not dants, and the cases defining special Section defendants will not further apply. Under Pin enjoy a cleaner Section 12(2) case, albeit aga of potential defendants.

## Requisite Financial Interest for Solicitat

A ''soliciting seller'' must not only person she must also have a financial motive for the of the ''passing title'' seller who will receiv sale. ''The language and purpose of § 12(1) extends only to the person who successfully *motivated at least in part by a desire to se interests or those of the securities owner.*

Typically, a person who ''solicits the purc or received a personal financial benefit fr where he 'anticipat[es] a share of the prof brokerage commission. . . .''[51] But no pers need be shown if the defendant is seeking to monetarily. As the Court in Pinter expresse solicits the buyer's purchase in order to serve of the owner may properly be liable under ing that he expects to participate in the enjoys.''[52]

The first sort of financial interest—a bene seller'' personally—raises the question of w stake in the sale will qualify. Certainly, a the titleholder will suffice,[53] as will money

Limiting ''soliciting sellers'' to those personally persuading the plaintiff to purchase may, at first consideration, seem out of place in a time that has witnessed such expansion of securities law liability as that accomplished by the fraud on the market theory.[45] In an era of impersonal markets and in a legal arena that has traditionally focused on economic reality, the idea seems somewhat quaint. Yet, the Supreme Court's direction is clear, and it may be no happenstance that Pinter cited cases from the 1940s and 1950s while defining ''solicitation.''[46]

Caution in the expansion of Section 12 is, moreover, appropriate. Regardless of how far Section 10(b) liability may be extended by modern finance concepts focusing on the efficient market, expansion of Section 10(b) liability is held in check by its scienter element.[47] But Section 12(2) can reach a defendant without proof of scienter, reliance, or causation, constrained only by the affirmative defense of ''reasonable care.''[48] Indeed, the ''substantial factor'' test employed before Pinter acquired such a momentum that, in order to restrain it, courts began to smudge the clean lines of Section 12 by inventing new elements for a Section 12(2) claim against ''collateral'' defendants.[49] Pinter's more restrictive definition of the statutory ''sellers'' should make such judicial gymnastics unnecessary. The ''collateral'' defendants will

---

[45] Basic Inc. v. Levinson, 485 U.S. 224, 241–249 (1988).

[46] Of the cases cited by the Court in its discussion of solicitation at 486 U.S. 642–647, Cady was decided in 1940, Whittaker in 1955, Schillner in 1943, and Boehm in 1943.

[47] Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).

[48] Section 12(2) provides that an otherwise liable defendant can escape a judgment if he proves that ''he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission'' in the prospectus or oral communication. 15 U.S.C. § 771(2).

[49] The Second Circuit made this point at some length in Wilson v. Ruffa & Hanover, P.C., 844 F.2d 81 (2d Cir. 1988): ''We believe that a Section 12(2) action against nonselling collateral participants such as Ruffa & Hanover [the law firm that had prepared the offering memorandum in the case] requires proof of both loss causation and transaction causation. To hold otherwise would effectively nullify the important requirement that both these elements be proven in Section 10(b) actions, and many suits against nonsellers that would fall under Section 10(b) would succeed under Section 12(2). Section 12(2) would then supplant Section 10(b) as the 'catch-all clause to prevent manipulative devices.' . . . We recognize

that our holding renders actions against collateral partici... essentially identical to actions under the '''catch-all'... an anomalous result, however, in light of the cumulati... under the 1933 and 1934 Acts.'' Id. at 86 (citations on... Court decided Pinter, the Second Circuit reconsidere... law firm was not liable because it was not a Pinter ''se... Exploration & Drilling Corp., 872 F.2d 1124 (2d Cir...

[50] 486 U.S. at 647 (emphasis added).

[51] Id. at 654 (citations omitted).

[52] Id. at 655.

[53] 486 U.S. at 654; Martin v. EVP Second Corp., [19... Sec. L. Rep. (CCH) ¶96,115, at 90,645 (S.D.N.Y. July... to dismiss as to defendant alleged to have received an

Thus, it would be wrong to find the re[] where the defendant is simply an officer [] that might use the proceeds of a sale to c[] pay the defendant a salary, or where the c[] has loaned money to an issuer that might [] business and generate revenues to pay t[] motive may be found, however, if the p[] are immediately and critically necessary [] the next payroll payment to the executive[] payment to the bank.[59]

Turning to the second sort of financia[] that where the "soliciting" seller defendant[] of the "passing title" seller, then no pe[] to the "solicitor" need be shown.[60] Post[] by this rule.[61]

in accordance therewith, (2) enhance the value of the []  to obtain significant profits from advantageous sales; [] porarily while they attempted to correct [Keegan s'] avoid disclosing material adversities which would ha[] the stock and drive down stock prices; and (4) en[] forward." Id. at 91,482.

The court wrote: "Although the financial interest[] stock involves a profit or a commission, the atypical [] plaint are no less valid under Pinter. In Pinter issu[] commission, but the court remanded to determine wh[] ently friendly advice may have served some other typ[] 486 U.S. at 644-655. Thus, for plaintiffs to state a Sec[] only to allege that the stock sales improved defend[] did not have to allege that the sale translated into an [] dants' wealth." Id.

Flournoy v. Peyson, 701 F. Supp. 1370, 1379 & [] larly misguided in suggesting that a sufficient fina[] on the basis that the defendant was entitled to rece[] the issuer's gross income. The court wrote that it [] noted the viability of Master-Sorn, in which [the de[]

[59] In McCarthy v. Barnett Bank of Polk Coun[] (M.D. Fla. 1990), plaintiffs alleged that the issuer [] money had no real assets. Dalton v. Alston & B[] (S.D. Ill. 1990) observed that the "officers and dire[] entities may also have solicited the sale of the bo[] serve...their financial interests." The case invo[] apparently necessary to salvage an otherwise doomed [] facility on which construction had halted.

[60] See quotation in text at note 52 supra.

[61] Cook v. Goldman, Sachs & Co., 726 F. Supp

---

commission but is called by another name.[54] But courts have also found a sufficient financial interest where plaintiffs pleaded or proved that insiders sold stock on an offering and reaped large profits on that sale;[55] where a bank, in order to avoid large losses on loans outstanding to an issuer, told securities buyers that the bank had investigated the issuer and found its securities to be a safe investment;[56] and where a firm was paid a flat fee as a consultant to approach prospects for a limited partnership, suggested the investment as fit or not fit for a particular investor, and otherwise facilitated the sale.[57]

The correct approach is one that permits plaintiffs to satisfy the "personal interest" financial motive by any payment to the defendant, provided that the payment is directly related to the sale of the security. While the financial interest will not always fit exactly the Supreme Court's examples—a share of the profits of the sale or a brokerage commission—the interest should share the critical characteristics of those examples. The benefit to the defendant should be immediate; it should result directly from the sale. It is only that sort of interest that provides the motive for persuading a particular buyer to make a specific purchase.[58]

contributions to limited partnership; "Section 12 is applicable to brokers, such as IREC, who solicit the sale of securities to obtain commissions or other financial remuneration").

[54] In Chin v. Shiu, 1990 WL 70520, at 3 (N.D. Ill. May 15, 1990), the court granted plaintiff's motion for summary judgment against one defendant who receiv- ed "money at various times...as a 'thank you' after friends invested in T.M. Hesh."

[55] Chaus Sec. Litig., [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,646, at 97,998, 98,003 (S.D.N.Y. Nov. 20, 1990) (granting motion to dismiss on statute of limitations grounds but denying motion on the alternative basis that they were not "sellers," as to couple who, together, occupied positions as presi- dent, CEO, chairman, and vice chairman of the board, owned 98.9 percent of stock at time company went public and "personally received approximately $99 million after brokerage commissions, fees and other expenses");

[56] McCarthy v. Barnett Bank of Polk County, 750 F. Supp. 1119 (M.D. Fla. 1990) (denying motion to dismiss 12(2) claim).

[57] Riedel v. Acutote of Colo., 773 F. Supp. 1055, 1067 (S.D. Ohio 1991) (grant- ing partial summary judgment to plaintiffs on their 12(2) claim).

[58] Keegan Management Co. Sec. Litig., [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,275 (N.D. Cal. Sept. 10, 1991) seems far off the mark. The court there held, on a motion to dismiss, that it was sufficient for plaintiffs to allege that defendants' actions were taken "in order to (1) protect their executive positions and the substantial compensation, prestige and other benefits received

putative seller had merely given gratuitous ad[vice]
The Court considered that possibility:

> When a person who urges another to make a se[curity]
> merely to assist the buyer, not only is it unco[mmon]
> buyer "purchased" from him, but it is also str[etching]
> giving of gratuitous advice, even strongly o[r]
> "soliciting." Section 2(3) defines an offer as
> offer to buy . . . for value." The person who grat[uitously]
> to make a particular investment decision is no[t, in that]
> sense, requesting value in exchange for his
> the value the titleholder will obtain in exch[ange]
> sale.[63]

While it was, and remains, unlikely that any
of cases will be filed against friends or acqu[aintances]
gest securities purchases, the principle that
be a "soliciting seller" if he "acts merely
does have significant implications. It suggest[s]
a full examination of the relationship between
the plaintiff-purchaser is necessary in order to
the defendant is a statutory seller.

In *Cox v. Eichler*,[64] the court held that
discretionary account circumscribed by ins[truction]
clients were not Section 12(2) "sellers" to th[e]
even if they were receiving commissions, th[ey]
to benefit their buyer-clients, not to benefit a
As the court put it in granting a motion to
12(2) claim: "Plaintiffs have made no allegatio[n]
Rowell were acting in the interest of the secu[rity]
they received commissions *from the seller.*

Thus, the purpose of the financial interes[t]
determine whether the "soliciting" seller has
as the "passing title" seller:

---

[63] 486 U.S. at 647.

[64] Cox v. Eichler, 765 F. Supp. 601 (N.D. Cal. 19[...]

[65] *Id.* at 609 (emphasis added). And see 9 L. Loss and
*Regulation* 4234 (3d ed. 1992) ("when the broker repres[ents]
executes a purely unsolicited order, it is difficult to see[...]
considered one who 'sells' even within the meaning of [...]

---

There are, however, a number of decisions finding that agents of the presale owner are not "soliciting sellers" in part because they have no commission-type interest in the sale.[62] At first glance, these decisions may seem unsound. Correctly read, however, these cases do not contravene *Pinter* by implying a requirement that the owner's agent must have a personal financial stake in the sale in order to be a solicitor. Instead, these opinions simply consider the financial benefit to the agent as one of a number of factors in determining whether the agent has solicited. This can be appropriate when it is otherwise difficult to determine whether the defendant's words are intended to persuade a purchase and, as set out below, may be helpful in determining whether a securities professional has stepped out of his or her proper role and thereby lost the benefit of *Pinter's* special solicitude for lawyers and accountants.

The financial motive required for solicitation deserves one final comment. In *Pinter* itself, there was some question whether the

---

("In *Pinter*, the Court found that a person who solicits to buy or purchase in order to serve the financial interest of the owner ...may also be liable under Section 12(1), even absent a showing that he expects to participate in the benefits the owner enjoys. [Citation omitted.] In the instant case, Miller allegedly solicited Cook's purchases for the issuer]. Cook alleges Miller was acting in his capacity as an equity owner of [the issuer], as well as acting as an officer of and agent for Goldman. There are sufficient facts to state a claim for relief against Miller").

Officers and other agents of an issuer will satisfy this financial interest standard. They will not, however, be statutory "sellers" unless they also actively "solicit" in the context of a personalized contact with the buyer.

[62] Royal Am. Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1017 (2d Cir. 1989) (finding an attorney for a selling stock owner not a "seller" in part because "he did not 'earn a commission from an actual seller for persuading [the buyer] to make a particular investment'" (quoting Wilson v. Saintine Exploration Drilling Corp., 872 F.2d 1124, 1127 (2d Cir. 1989); Marshall v. Quinn-L Equities, Inc.,, 704 F. Supp. 1384, 1389 (N.D. Tex. 1988) (granting summary judgment to law firm on Section 12 claim; "[t]hat Jones Walker may have been paid lump sum payments at times for its legal services, or that they were traced to the proceeds of the offerings, is insufficient summary judgment evidence to establish that Jones Walker worked on commission"); Zupnick v. Thompson Parking Partners, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶95,388, at 96,913 (S.D.N.Y. Aug. 1, 1990) (dismissing 12(2) claim against accountant for issuer; motion under Rules 12(b) and 56; "while plaintiffs charge that Helphand received 'more than three times what it would have received had it billed solely on a time basis,' there is no assertion, let alone proof, that any of Helphand's fee constituted compensation in the form of a sales commission").

Securities Exchange Commission's suggestion that 'participate in soliciting the purchase' may t... sellers,' reasoning that Section 12 did not e... merely assist in another's solicitation efforts concern for securities professionals raises th... such professionals can be held liable as Se...

## Firm Commitment Underwritings and Re... Seller's Seller

In an offering by a firm commitment und... sells to the underwriter and is therefore not a... to the public. Nor is the issuer always a "... to the public. Nor is the issuer always a "...

Yet, in a footnote destined to be widely q... cuit wrote in *Abell v. Potomac Insurance*...

Like automobile manufacturers, issuers create... posed of independent businesses aligned for a... the product. Just as Ford and General Motors... consumers, many issuers never sell their... investors. Nonetheless, automobile manufact... sive marketing campaigns to convince the pu... ucts from dealerships readily identified wi... Consequently, one often hears that someone... from Ford." To the extent that issuers and... analogous system to distribute securities, they t... whom one buys products.[71]

Other decisions, at least in dictum, have rep... At least as to firm commitment underwritings... analogy seems quite wrong. Ford has a net... with long-term relationships with Ford, and F... advertising and printed brochures for point-o...

[70] *Id.* at 651–652 n.27.

[71] Abell v. Potomac Ins. Co., 858 F.2d 1104, 1114 n.8 *supra* for subsequent procedural history.

[72] Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 62... least one commentator has suggested that this languag... impose liability on an issuer in a firm commitment und... *Liabilities: Enforcement and Litigation Under the 1933*

---

The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and *to align him with the owner in a rescission action.*[66]

Where the defendant's financial interests are not closely aligned with those of the presale owner, then the defendant is not an appro-priate "soliciting seller."[67]

## Two Further Issues of "Seller" Definition

Dicta in the *Pinter* decision raise two special "seller" ques-tions. First, the Court observed that "§ 12(1) imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller."[68] This raises the question of whether a plaintiff can recover from an issuer in a firm commitment underwriting.

Second, the Court rejected the "substantial factor" test in part because it "might expose securities professionals, such as accoun-tants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescis-sion."[69] In that regard, the Court specifically "reject[ed] the

[66] 486 U.S. at 647 (emphasis added). And see Craighead v. E.F. Hutton & Co., 899 F.2d 485, 493 (6th Cir. 1990) (observing, in discussion of 12(2) claim, that "[b]rokers have been held liable as 'sellers' only in those cases where they were closely aligned with the title-holding parties or worked as agents of the securities issuers").

[67] In holding that there was no 12(2) claim against an investment advisor who acted as an agent for plaintiff, Poole v. Frank, [1990–1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,751 (D. Or. Oct. 31, 1990) relied in part on the fact that the defendant's compensation was based on the total market value of its client's portfolio. The court concluded: "Unlike an agent for a vendor who is paid on a commission that is based upon the quantity of interests sold, the buyer's agent in this case was paid based upon the success of plaintiffs' portfolio performance. Thus, the key to Frank's motivation was clearly more closely aligned with the interests of the plaintiffs rather than the interests of the seller of any specific security." *Id.* at 98,624.

[68] 486 U.S. at 644 n.21.

[69] *Id.*

*Abell* goes beyond *Pinter*'s personaliz "modern" gloss. But in doing so, *Abell* ei admonished against imposing liability on absent facts showing that the issuer "solici as the "seller's seller" in a firm commi not a proper Section 12(2) defendant.[76] T tion 12 defendant must satisfy one of the Court set out in *Pinter* in order to be a st tests cannot be shunted to one side by analogy.

## Solicitation and Securities Professio

The Court went out of its way in "substantial factor" test in part because impose liability on lawyers and account sions have almost uniformly taken to he cautiously in applying Section 12 to se

*Wilson v. Saintine Exploration & Dri* the first, and still remains one of the m cases following *Pinter*. The plaintiff pur The defendant law firm "had prepared memorandum and the other document offering."[78] The district court determi defendants knew that [a] statement in memorandum was false."[79]

The misrepresentation concerned a ma one for the issuer's lawyer to decide—

[75] See In re Newbridge Networks Sec. Litig., 1991) (granting motion to dismiss 12(2) claim ag and directors where plaintiff alleged that "Newbri *through its underwriters*") (emphasis in original

[76] 486 U.S. at 651.

[77] 872 F.2d 1124 (2d Cir. 1989). The Second C *Wilson* before *Pinter*, finding the law firm not liab no loss causation. *Wilson v. Ruffa & Hanover, P.* After *Pinter*, the Second Circuit reconsidered *W* firm not liable because its activities did not matt

[78] 844 F.2d at 82.

[79] *Id.* at 83.

who bear Ford's name on the signs before their buildings and, oftentimes, on the business cards of their sales representatives.

The issuer's relationship with underwriters in a firm commitment underwriting is very different. An issuer may engage in a one-time transaction with a lead underwriter for a single offering or enjoy, at most, an episodic relationship with the underwriter over a period of years, with intensive contact only during the periods immediately preceding each of a number of offerings. Moreover, the actual sales are frequently made by members of an underwriting syndicate. The members of the syndicate do not operate from offices bearing the issuer's name. The issuer does not—and indeed cannot—provide anything like the national media advertising by Ford, and, aside from the prospectus (which is not solely the issuer's product in any event), the issuer does not provide standardized brochures to syndicate members to sell a security. The notion that the issuer has a Ford-like "distribution system" extending to syndicate members seems, in truth, far from reality.

Moreover, *Pinter* employs language that is directly contrary to *Abell*'s suggestion, since it holds that, "§ 12(1) imposes liability only on the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. *Thus, a buyer cannot recover against his seller's seller.* Loss, at 1023–1024; Douglas & Bates, 43 Yale L.J. at 177."[73] The passage from Loss referenced with such approval in the Supreme Court's footnote addresses directly the proper Section 12 defendant in a firm commitment underwriting:

[I]n the case of the typical firm-commitment underwriting, *the ultimate investor can recover only from the dealer who sold to him.* But the dealer in turn can recover over against the underwriter, and the latter (with some caveat by reason of the "preliminary negotiations" clause of § 2(3)) against the issuer, and each defendant can bring in his predecessor in the chain of distribution as a third-party defendant under the Federal Rules of Civil Procedure.[74]

[73] 486 U.S. at 644 n.21 (emphasis added).

[74] L. Loss, *Fundamentals of Securities Regulation* 1024 (1988) (emphasis added). See also 9 L. Loss and J. Seligman, *Securities Regulation* 4239–4240 (3d ed. 1992).

There are many cases following *Pinter* f and accountants[85] are not statutory selle[r] factor is whether the attorney or accountant

Taking into account the broad language of § 2(2) an 12(1), we think a jury could properly decide that [t] to a solicitation." *Id.* at 1053. The Second Circuit acco court, which had dismissed the case against the law[y]

As the Second Circuit observed in *Wilson*, the Supre proved of the [Katz] rationale." 872 F.2d at 1127. Mar [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 9 June 11, 1991) ("the Supreme Court in *Pinter* spe

[84] Ackerman v. Schwartz, 947 F.2d 841 (7th Cir nion included in offering materials for tax shelter; op[p] the venture that were inaccurate; affirms summary ju[d] 12 claim but reverses on 10(b) claim); Moore v. Ka[y] 885 F.2d 531, 537 (9th Cir. 1989) (affirms district co[n] where "the investors alleged that (1) all the investors p[] the prospectuses and other promotional materials w[] and Uhrtman gave advice and counsel to the owner spectuses and other promotional materials, (3) law[y] nions and allowed these opinions to be included in v[] and (4) lawyer Spolin allowed his name to be used general counsel to CCA"; Abell v. Potomac Ins. Co. (5th Cir. 1988), see note 8 *supra* for subsequent proceed to prepare offering statement; court of appeals reve 12 claim against firm); and see In re Am Lincoln Sav. & Loan Sec. Litig., 794 F. Supp. 1424, v. Stone, McGuire & Benjamin, 786 F. Supp. 1335, v. Acutote of Colo, 773 F. Supp. 1055, 1067 (S.D. Lumber Co. v. Octagon Properties, 740 F. Supp. 15 1989); Sellin v. RX Plus, Inc., 730 F. Supp. 1289 Jaffe, Snider, Raitt & Heuer, P.C., 713 F. Supp. 101 *aff'd*, 933 F.2d 1008 (6th Cir. 1991); Marshall v. F. Supp. 1384 (N.D. Tex. 1988); Fulton Bank v. LEXIS 11371, at 20–21 (E.D. Pa. Aug. 27, 1990) against law firms that gave an opinion regarding ta ment participations).

[85] Moore v. Kayport Package Exp., Inc., 885 F

proceeded to the point of a binding contract—and was, at least as the district court saw it, a knowing misrepresentation by the attorneys on this legal question. The Second Circuit, nevertheless, found no Section 12(2) liability because the law firm had not solicited the plaintiff's purchase. The firm had sent the offering materials to the plaintiff, together with a cover letter saying that it was doing so at the request of the principal shareholder and chairman of Saintine and at the request of Saintine's president.[80] That letter was "the only direct contact between [the law firm] and [the plaintiff]."[81]

Characterizing the law firm's "participation in the sale [as] consist[ing] solely of the ministerial act of mailing a copy of the private placement memorandum to [plaintiff] at [another's] request," the Second Circuit read *Pinter* to mean that "the draconian provisions of Section 12 must not be extended to include lawyers...who have performed only their usual professional functions in preparing documents for an offering."[82]

*Wilson* thus holds that securities professionals—even those who knowingly cause false statements to appear in offering materials—are not liable under Section 12 provided that they have limited their activities to normal professional roles. Moreover, it deserves emphasis that it was in the context of discussing professional liability that the Supreme Court rejected the SEC's suggestion that persons who "merely assist in another's solicitation efforts" or who "participate in soliciting the purchase" should be liable as statutory sellers.[83]

[80] 872 F.2d at 1125.

[81] *Id.*

[82] *Id.* at 1126.

[83] 486 U.S. at 651 n.27. The Commission relied on Katz v. Amos Treat & Co., 411 F.2d 1046 (2d Cir. 1969). *Katz* reversed a judgment in favor of an attorney who was special counsel for an issuer and an attorney for a broker-underwriter. The attorney had direct contact with the buyer, who claimed that the lawyer responded to plaintiff's inquiry about the stock by saying, "I hear it is a good one and I know it is okay." *Id.* at 1052.

As the Second Circuit saw it: "To be sure there was no testimony that [the lawyer] had taken the initiative. On the other hand the evidence clearly warranted the inference that . . . [the lawyer] had not simply answered [plaintiff's] questions, but had placed [the broker-underwriter] in a position to tackle [plaintiff] for the money."

alized persuasion required for solicitation, a number of these decisions emphasize that the professional simply discharged standard professional responsibilities[86] and did not receive any commission-like compensation from the sales.[87] Conversely, where lawyers and accountants have been found to be Section 12(2) sellers, it is usually the case that they have stepped out of their professional role, to act, for example, as a business negotiator.[88]

1989) (affirming dismissal of Section 12(2) claims against accountants who, plaintiffs alleged, drafted financial documents and allowed them to be used to sell securities); Maton v. Arthur Andersen & Co., 1991 WL 131184 (N.D. Ill. July 5, 1991) (granting motion to dismiss by accounting firm that had audited financial statements for prospectus, where prospectus failed to reveal that issuer owed accountants money for prior accounting services and had given to accounting firm for most of that debt a note to be paid from proceeds of the offering); Dawe v. Main St. Management Co., 738 F. Supp. 36 (D. Mass. 1990) (granting accountants' motion to dismiss where they had "allegedly prepared an Accountants' Review Report that was incorporated in the private placement memorandum)"; H.B. Holdings Corp. v. Scovill, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,201 (S.D.N.Y. Mar. 23, 1990) (dismissing Section 12(2) claim against accountants who allegedly violated various auditing standards and accounting principles in performing an audit under stock purchase agreement; the audited numbers would then determine the price paid under the purchase agreement); Zupnick v. Thompson Parking Partners, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,388 (S.D.N.Y. Aug. 1, 1990) (dismissing Section 12(2) claim against accountants who prepared a Compilation Report included in a private placement memorandum; the report consisted of forecasts of income and sources and uses of cash based on assumptions provided by limited partnership).

[86] See Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 535 (9th Cir. 1989) ("[a]s to accountants and lawyers, [Pinter] suggests that the activities of these professionals must be directed toward producing a sale as opposed to merely providing professional services before Section 12(1) liability may be imposed"); Dawe v. Main St. Management Co., 738 F. Supp. 36, 38 (D. Mass. 1990) ("In light of Pinter . . . no cause of action under § 12(2) can be stated against Deloitte Haskins for their performance of their ordinary accounting services in connection with the private placement memorandum"); Marshall v. Quinn-L Equities, Inc., 704 F. Supp. 1384, 1389 (N.D. Tex. 1988) (attorneys' work was "nothing more than the performance of professional services"); Zupnick v. Thompson Parking Partners, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,388, at 96,913 (S.D.N.Y. Aug. 1, 1990) ("no indication that [the accounting firm] performed any services 'beyond their usual professional functions in preparing documents for an offering'").

[87] See the cases set out in note 62 supra. Compare Wilson, 872 F.2d at 1127 (warning that "it does not follow that lawyers are exempt from the concept of a 'seller' under Section 12 where they earn a commission from an actual seller for persuading their clients to make a particular investment").

[88] Braunstein v. Benjamin Berman, Inc., 1990 WL 192547 (D.N.J. Sept. 12, 1990) granted plaintiffs leave to file an amended complaint against an attorney

It deserves emphasis that changes i to throw more lawyers into atypical r within Section 12's ambit. A surpris now not only in the legal business bu An American Bar Association comm "there are upwards of sixty-five larg try that have established formal at organizations for the purpose of pr one kind or another."[89] The Appen variety of services provided by law sulting, lobbying, management co economic consulting, and investment contend that "a multidisciplinary ar and related nonlegal services may clients,"[90] the more numerous and firm's connections are with a client dant, the more difficult it will be fo argument that it played only a narro offering and therefore deserves the b consideration for "professionals."

The current recession in the legal p competition may also tempt lawyers and underwriter clients by steering

and his law firm in a case involving the sale pany. "The amended complaint alleges that negotiating the deal . . . This places [the law] And see Lee v. Spicola, [1988–1989 Transf ¶ 94,120, at 91,264 (M.D. Fla. Dec. 9, 198 summary judgment on 12(2) claim; "[w]ha neither attempted to persuade the Plaintiffs in the sale, the affidavit of Plaintiff . . . states tively participated in the stock sale and reco stock"); In re Professional Fin. Managemen 1988) (the lawyer was "an early sponsor an with financial appraisals and helped draft a prospective buyers. This undisputed evidence York criminal conviction show that the was of the Energy Brain program nationally and for purposes of § 12(2)").

[89] ABA Special Coordinating Committee the Ancillary Business Activities of Lawyers c

[90] Id.

and underwriters for securities sales. By doing so, lawyers may place themselves within the circle of Section 12 defendants.

### Pinter's Further Implications

Pinter's definition of a statutory seller affects other aspects of Section 12 practice, including secondary liability and class certification. It is even tangentially related to the question of Section 12(2)'s application to aftermarket sales.

### Secondary Liability

Pinter has had a decisive impact on secondary liability under Section 12. Post-Pinter courts have almost uniformly held that, while the "controlling person" provision of the Securities Act can be used to impose secondary liability, both aiding and abetting[91] and conspiracy[92] liability under Section 12(2) are incompatible with Pinter's logic. This row definition of possible "sellers" w if secondary liability could be routin statute's coverage.

Some decisions, however, empl expand the circle of Section 12 defe ing "principals" of "agents" who a when the "principals," by their own ing title sellers" nor "soliciting se ceed with caution in such analyses this theory of vicarious liability— theories—can expand the number and dants to a degree that deprives Pin

It is fundamental that a "principa conduct of the agent with respect to

---

[91] Ackerman v. Schwartz, 947 F.2d 841, 844–845 (7th Cir. 1991); Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 636–637 (3d Cir. 1989) (the view that there is no aiding and abetting liability under Section 12(2) "finds support in the language of § 12(2), which expressly limits liability to those who offer or sell. Moreover, it would be anomalous to recognize aider and abettor liability in light of Pinter's clear direction that § 12(2) liability does not extend to collateral participants"); Wilson at 872 F.2d 1127 ("We also agree with the SEC that aiding and abetting liability under Section 12 would be wholly 'anomalous' in light of Pinter, because such liability 'is likely as broad as, if not broader than, the ... similar tests rejected by the Pinter court.' [Citing to SEC Brief.] Pinter would indeed be unworthy of Supreme Court attention if aiding and abetting liability existed under Section 12(2) because all non-selling collateral participants insulated by Pinter would nevertheless be liable as aiders and abettors"); Schlifke v. SeaFirst Corp., 866 F.2d 935, 942 (7th Cir. 1989) (rejecting aiding and abetting theory at least where there was no showing that the defendant acted with scienter; "notions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued").

The Supreme Court, itself, expressly declined to decide in Pinter "whether civil liability for aiding and abetting is appropriate" under Section 12. 486 U.S. at 622 n. 24.

But see Drexel Burnham Lambert, Inc. v. American Bankers Ins. Co. of Fla., [1989–1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,835 at 94,532 (E.D.N.C. Nov. 8, 1989), a post-Pinter case holding that there is aiding and abetting liability under 12(2).

[92] Dalton v. Alston & Bird, 741 F. Supp. 1322, 1332 (S.D. Ill. 1990) ("in light of the Congressional intent to limit liability under Section 12 to statutory sellers, this Court will not allow the plaintiff under a conspiracy theory"); Epstein v. Haa 1185 (S.D.N.Y. 1990) ("The Court does not a member of a conspiracy should be liable of his status when an aider and abettor is no conspiracy theory would also be as broad if by the Pinter court").

[93] In Capri v. Murphy, 856 F.2d 473 (2d C a district court judgment following a bench tri dants on the Section 12(2) claim and reman enter a judgment on Section 12(2) against tw who promoted the limited partnership acted a defendants "prepared and circulated the pros "provided no information to the investors oth dants." Accordingly, the agent's "promotio to the defendants and "both are liable to pla 478. In denying a motion to dismiss by th Technology Corp. v. Uniroyal, Inc., 728 F. followed Capri. The two defendants supplied to plaintiff "through their significant particip of the placement memorandum," were princip potential bidders would be offered the oppo and ultimately decided which bidders would process. Indeed, in Schwartz v. Michaels, [ R.p.(CCH) ¶ 96,920, at 93,849 (S.D.N.Y. Capri to comment, in a part of the opinion di "[n]o direct contact between the purchaser and for section 12(2) liability."

[94] Restatement (Second) of Agency § 14

Yet there are some agents who have much leeway and operate with considerable discretion. Unless the nature of the agency is one that gives the principal effective control over the actions that constitute the ''solicitation,'' agency law should not be employed to enlarge the circle of Section 12 ''soliciting seller'' defendants.

There is the pronounced risk that courts will avoid Pinter's narrow compass by loosely stating that one defendant ''authorized'' the actions of another. Such reasoning may come too close to a ''substantial factor'' analysis,[95] thereby repeating the error of that test by ''focus[ing] on the defendant's degree of involvement in the securities transaction and its surrounding circumstances'' instead of ''focus[ing] on the defendant's relationship with the plaintiff-purchaser.''[96]

## Class Certification

Beyond the applicability of secondary and vicarious liability theories, Pinter carries implications for class action treatment of Section 12(2) claims. The requirement that a particular defendant must have passed title to or personally solicited a particular plaintiff renders class actions—especially plaintiff class actions against defendant classes of underwriters—largely inappropriate.

While one solution is to deny class treatment to Section 12(2) claims in such cases altogether,[97] the better approach is to follow the lead of those pre-Pinter cases that certified Section 12(2) claims

[95] Perhaps misplaced ''agency'' reasoning lies behind the decision in Chaus Sec. Litig., [1990-91 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,646 (S.D.N.Y. Nov. 20, 1990), discussed in note 43 supra.

Mahon, Nugent & Co. v. Borey, [1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶96,030, at 90,168 (S.D.N.Y. June 11, 1991) employed better reasoning in granting a motion to dismiss made by defendants who ''are alleged to have been 'sellers or offerors' by reason of their review, approval and authorization of the offer, solicitation, and sale of securities to Mahon by means of the several documents'' (emphasis added).

[96] 486 U.S. at 651.

[97] In re Keegan Management Co. Securities Litig., Civil No. 91-20084 SW, 91-20141 SW, slip op. at 7-9 (N.D. Cal. Sept. 16, 1991) (denying certification of defendant underwriter class).

or omission in some document common to al typically a prospectus.[98] Depending on the affirmative defense of ''reasonable care'' ma class treatment, where for example each m writing syndicate relies solely on the ''due dil by the lead underwriter.

If plaintiffs prevail in such a case, of cou class trial only the opportunity to go forwar ceeding, in which defendants would still h trial, to determine which particular membe syndicate was a ''seller'' to which particular tiff class. To avoid the disastrously uneco any contest in such a proceeding, plaintiffs would abandon efforts to show that member syndicate were ''soliciting'' sellers and wo the ''passing title'' test, hoping to turn the se into something similar to a claims process

## Section 12(2) Application to Aftermarket

Finally, Pinter is tangentially relevant to th Section 12(2) liability extends to aftermarket on an offering. The courts are divided on majority of the decisions now holding that S apply to aftermarket sales.[99]

[98] In re Seagate Technologies Sec. Litig., 115 F.R Cal. 1987); In re Computer Memories Sec. Litig., 111 F Cal. 1986); In re Activision Sec. Litig., 621 F. Supp. 1985), reconsideration on issues unrelated to Section Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 92,397 2, 1985); In re Victor Tech. Sec. Litig., 102 F.R.D. 53 aff'd on cost of notice issue, 792 F.2d 862 (9th

[99] The commentators favor extension of 12(2) to Commentary, ''The Assault on Securities Act Section 908 (1992); 9 L. Loss and J. Seligman, Securities Regu 1992); Rapp, ''The Proper Role of Securities Act Sectio Remedy for Disclosure Violations,'' 47 Bus. Law. 71( tion 12(2) of the Securities Act of 1933: A Remedy for Pu Trading,'' 20 Sec. Reg. L.J. 152 (1992). But see We Right: Securities Act Section 12(2) Applies Only to Pu

ng title test seems inapplicable to [...]
It may well be impractical to determine
of exchange sales, what seller "pa
any particular day. Moreover, even
make no sense to threaten with Sec
ing title" sellers who did nothing
exchange. If, as argued above, the
*Pinter* is restricted to personalized
Section 12(2), if applied in the aftern
be limited to actions by clients again
where there was personalized sellers
of stock are sold in face-to-face

Law. 1 (1992), and the rejoinder, Loss, "[...]
ra]," 48 Bus, Law. 47 (1992).

Ballay v. Legg Mason Wood Walker, I[...]
1991), *cert. denied,* 112 S. Ct. 79 (1991) is [...]
*Pinter* that addresses the aftermarket issue
apply to aftermarket sales. The district co
at note 4 of the Maynard article.

