Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
Lisa M. Hasselman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO KIMON P. DAIFOTIS'S MOTION FOR SUMMARY JUDGMENT<br><br>Date:       March 25, 2010<br>Time:       8:00 a.m.<br>Judge:      Hon. William H. Alsup<br>Courtroom:  Courtroom 9, 19th Floor |

**[REDACTED VERSION]**

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Defendant Kim Daifotis ("Diafotis"), the Chief Investment Officer of the YieldPlus Fund and the literal and figurative face of YieldPlus promotion, and the Schwab employee who most directly managed and marketed the Fund on a day-to-day basis, actively solicited purchases of the YieldPlus Fund's shares.

2. Whether Plaintiffs herein submit sufficient evidence that a reasonable finder of fact could find that Daifotis is a seller under § 12(a)(2).

3. Whether Plaintiffs should be awarded attorneys' fees where the evidence shows that Daifotis's position that he is not a seller lacked a reasonable basis. For example in his own self-assessment, Daifotis touted his role as a "fixed income spokesman" includes participation in media tours to promote products.

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.  RELEVANT FACTS ................................................................................................. 2

    A.   As the Chief Investment Officer, Daifotis Was the Most Senior Portfolio Manager with Authority over the Fund ............................................................. 2

    B.   Daifotis Promoted the Fund Through Many Vehicles ...................................... 5

III. ARGUMENT ............................................................................................................ 9

    A.   Active Promoters of Securities are Sellers under Section 12(a)(2) .................. 9

        1.   No personal contact is necessary. ........................................................ 10

        2.   Personal contact is not required for Plaintiffs to have standing ......... 11

    B.   Authority Over the Managing of a Security and Access to Insider Information on a Security are Factors that Weigh Towards Seller Liability ................................. 13

    C.   Daifotis Cites Scant Precedent to Support his Claim that Congress Purportedly Did Not Intend that He Be Labeled a Seller ...................................................... 13

        1.   *Pinter*'s rejection of the "participation theory" did not relieve all participants from liability ...................................................................... 13

        2.   The availability of recissory damages does not limit the scope of defendants who can be sellers to those who just transfer title ............ 14

    D.   Daifotis's Legal Argument Is Illogical ........................................................... 16

    E.   Daifotis's Factual Argument Is Almost Frivolous, and a Reasonable Juror Would Likely find Daifotis was a "Seller" .................................................... 16

IV.  CONCLUSION ...................................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re American Bank Note Holographics Inc. Secs. Litig.,*
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) .......................................................................... 10

*In re Charles Schwab  Corp. Secs. Litig.,*
    257 F.R.D. 534 (N.D. Cal. Feb. 4, 2009) .......................................................... 1, 2, 9

*Commins v. Johnson & Higgins, Inc.,*
    1988 U.S. Dist. LEXIS 15574 (N.D. Cal. 1988) ...................................................... 10, 11

*Pinter v. Dahl,*
    486 U.S. 622 (1988) ........................................................................................ *passim*

*Rosenzweig v. Azurix Corp.,*
    332 F.3d 854 (5th Cir. 2003) ............................................................................ 12

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
    384 F. Supp. 2d 838 (D. Md. 2005) ........................................................... 10, 11, 12

*In re Royal Ahold N.V. Secs. & ERISA Litig.,*
    351 F. Supp. 2d 334 (D. Md. 2004) ...................................................................... 11, 12

## STATUTES

15 U.S.C. § 77 .................................................................................................................. 15

## MISCELLANEOUS

Robert A. Prentice, *Section 12 of the 1933 Act: Establishing the Statutory Seller,* 40 ALA.
    L. REV. 417 (1989) ........................................................................................ 15

Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of 1933:*
    *"Participation" and the Pertinent Legislative Materials,* 15 FORDHAM URB. L. J.
    877 (1986-1987) ................................................................................... 13, 14, 15

# I.   INTRODUCTION

Plaintiffs oppose Kimon P. Daifotis's Motion for Summary Judgment (Dkt. No. 372).  As the Chief Investment Officer, he directly supervised all aspects of the YieldPlus Fund.  He oversaw all investment decisions, including the ones that lead to the steep decline in value of the Fund.  More than any other person, he was the face and the voice of YieldPlus promotion.  His image and advice appeared in multiple advertisements promoting the Fund, including marketing materials containing the false and misleading statements identified by Plaintiffs (also deemed "omitting prospectuses").  As an example, the image below is from the March 31, 2006 Schwab YieldPlus Fund "fact sheet."  Declaration of Steve W. Berman in opposition to Daifotis Motion for Summary Judgment ("Berman Decl.") Ex. 1 (YieldPlus Fact Sheets).  The fact sheets, which constitute omitting prospectuses, were made available to prospective investors in order to urge them to buy Fund shares.



Daifotis's image and advice were on many other sales materials that were made available to investors during the Class Period, made in-person and telephonic pitches for the Fund with advisors and investors, and went on media tours and gave many media interviews promoting the Fund.  These actions qualify him as a soliciting seller under the test set forth in *Pinter v. Dahl*, 486 U.S. 622, 647 (1988).  Daifotis's arguments that his promotional efforts and his management authority over the Fund are insufficient to meet this standard are meritless.  If Daifotis is not a seller, no one is.

As quoted in Plaintiffs' Opposition to Independent Trustees Motion for Summary Judgment, this Court previously noted "[w]hether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury...." *In re Charles Schwab*

*Corp. Secs. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. Feb. 4, 2009).  There is a genuine issue of

material fact as to whether Daifotis is a seller.  Daifotis's motion should be denied.[1]

## II.    RELEVANT FACTS

### A.    As the Chief Investment Officer, Daifotis Was the Most Senior Portfolio Manager with Authority over the Fund

Kim Daifotis wore multiple hats in his work relating to the Fund, most notably as the

"YieldPlus Bond Fund Manager."  Berman Decl. Ex. 2 (Daifotis Letter).  He was an employee of

Charles Schwab Investment Management, Inc. ("CSIM"), the entity hired by Schwab Investments

(title owner of the YieldPlus shares sold to investors) to be the investment advisor and

administrator of the YieldPlus Fund.  Berman Decl. Ex. 3 (Daifotis Dep. at 13).  His

responsibilities included oversight of the Fixed Income Portfolio Management group, which

included the Taxable Bond Portfolio Management Team that oversaw Fund investments.  *Id.* at 14.

Daifotis was also a representative of the issuer, Schwab Investments.  Berman Decl. Ex. 4 at *40.

On behalf of Schwab Investments, he signed the Amendment to the Investment Advisory

Agreement with CSIM in September 2007.  *Id.*

Daifotis regularly reported to the Board of Trustees on material issues relating to the Fund's

investment objectives and risks.  In August 2006, he presented the proposal to eliminate the 25%

limit on non-agency collateralized mortgage obligations.  Berman Decl. Ex. 5 (Daifotis CMO

Presentation).  Daifotis knew that once the cap was lifted, he and the other portfolio managers

would be able to greatly increase the percentage of mortgage-related securities held in the Fund.

Berman Decl. Exs. 3, 6, & 7 (Daifotis Dep. at 52-53, 59; Wilsey Dep. at 115; and Healey Dep. at

169-170).  He also knew that the Fund's concentration in such mortgage-backed securities was, in

part, responsible for YieldPlus's poor performance in comparison to similar funds. Daifotis admits

this in a February 2008 conference call, asking himself, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1] Plaintiffs note the significant overlap between Mr. Daifotis's motion and the motion of Independent Trustees.  Plaintiffs do not intend to duplicate argument and instead incorporate by reference herein the arguments made in opposition to the Trustees.  *See*, Plaintiffs' Memorandum in Opposition to Independent Trustees Motion for Summary Judgment ("Trustee Opposition"), filed concurrently herewith.

 Berman Decl. Ex. 8 at *25 (2/1/08 Call Transcript).  He

answers his own question:



*Id.*  This answer was provided to investors in a final advertisement.  Berman Decl. Ex. 9 (Final

FAQs).

Daifotis, along with his direct report, Matthew Hastings, were the ones called upon to

report to the Board in August 2007 about the fixed income market volatility's effect on funds,

including YieldPlus.  Berman Decl. Ex. 10 (8/27/07 Board Minutes).  Daifotis and Hastings

reported in the status of the Fund's NAV and about their direct communications with investors

regarding the Fund.  Specifically, they stated, in part,

*Id.* at *12.

Daifotis's management position made him privy to the result of internal audits of the fixed

income funds.  In July 2007, Schwab's own internal auditors issued Portfolio Management and

Trading Audit findings that found the Fund's controls to be inadequate:





Berman Decl. Ex. 11 at *10 (Audit Report).  Daifotis admitted that these findings were not shared with investors.  Berman Decl. Ex. 3 (Daifotis Dep. at 279-281).

Daifotis participated on the Investment Strategy Council ("ISC"), a high level group responsible ███████████████████████████████ and for ███████████ ███████████  Berman Decl. Ex. 12 at *4.  As a participant in the Council's discussions, Daifotis was privy to all opinions and research results of the ISC members who had "███████ ████████████████████ and drew from █████████████████████████████████ ████████████████████████████████████ ████████████████████████ *Id.* at *5.  In addition to these sources of expert information and collected information on the markets, the ISC received ████████████████████████████████████ ████████████████████████████████████ ███████████ *Id.*  Although the Council provided their conclusions on where market sectors were headed to investors, participation in the committee gave Daifotis access to a broad collection of information and expert opinions on the markets, including the housing market, to which investors were not privy and which directly affected the performance of the Fund.

Daifotis was aware of material, inside information about the Fund's condition during the decline that was not shared with investors.  For instance, the market for a substantial percentage of the Fund's assets – that is, the Fund's Alt-A non-agency mortgage-backed securities – was ███████ and ████████████ by late November 2007, leading to mark-downs:



Berman Decl. Exs. 13 and 3 (Nov. 24, 2007 e-mail from Matt Hastings) and (Daifotis Dep. at 248-54 discussing the e-mail).

In June 2008, Daifotis was asked to leave due to CSIM and the Board of Trustees' "████████████████████████████ Berman Decl. Ex. 6 (Wilsey Dep. at 26-28). Daifotis admits that the decline in the net asset value of the YieldPlus Fund "had contributed to their decision" to ask him to leave. Berman Decl. Ex. 3 (Daifotis Dep. at 31-32).

**B.  Daifotis Promoted the Fund Through Many Vehicles**

Daifotis was the primary spokesman for the Fund. Berman Decl. Ex. 14 at *3 (Daifotis 2007 Assessment). In that role, Daifotis communicated with Schwab's Financial Consultants and Registered Investment Advisors to help answer their questions about the Fund; spoke directly with certain clients about the Fund; conducted webcasts; went on branch visits; and participated in industry conferences. Berman Decl. Exs. 15-18 (examples of meeting with client prospects and discussions with clients on webcast).

Aimee Watts of SunStar, a third-party public relations firm hired by CSIM to promote Schwab's fixed income funds, including YieldPlus, testified to Daifotis's many efforts to promote the Fund. Berman Decl. Ex. 19 (Watts Dep. at 19-21). According to Ms. Watts, she "assisted Kim Daifotis and the fund achieve a positive press coverage." Her "hope" was that such coverage would help to attract clients to the fund. *Id.* (Watts Dep. at 24-26). Ms. Watts also testified to arranging multiple "media tours" for Mr. Daifotis to promote the Schwab fixed income funds, including YieldPlus. *Id.*

Mr. Daifotis appeared before investors and/or the financial media to promote the Fund and tout the company's vitality on multiple occasions, including the following:

| Date | Outlet | Description | Source |
|---|---|---|---|
| Feb. 2006 | Dow Jones (Michael Pollock); Financial Times (Richard Beales); The Wall Street Journal (Ruth Simon) | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |

| Feb. 14, 2006 | Dow Jones Newswires (Michael Pollock); Financial Times (Richard Beales); The Wall Street Journal (Ruth Simon) | Media Tour Interviews | Berman Decl. Ex. 21 (Watts Ex. 2060) and Ex. 19 (Watts Dep. at 74:13-17. "Q … do you believe that the Schwab YieldPlus Fund was a topic of this particular media tour?  A It was intended to be the topic of all his interviews.") |
| Feb. 14, 2006 | SunStar Lipper Press Briefing | Press Briefing | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Mar. 10, 2006 | MarketWatch.com | Daifotis Interview | Berman Decl. Ex. 22 (Watts Ex. 2054) |
| Mar. 21, 2006 | Kiplinger's Retirement Letter (Lynn O'Shaughnessy) | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Apr. 10, 2006 | SmartMoney (Reshma Kapadia) | Interview | *Id.* |
| Apr. 13, 2006 | Financial Planning (David Twibell) | Interview | *Id.* |
| May 10, 2006 | Bloomberg Television | Interview | *Id.* |
| May 26, 2006 | Investor's Business Daily (Paul Katzeff) | Interview | *Id.* |
| May 31, 2006 | Investor's Business Daily (Laura Mandaro) | Interview | *Id.* |
| July 10, 2006 | Kiplinger's Personal Finance | Interview | Berman Decl. Ex. 23 (Watts Ex. 2070) |
| July 13 & 14, 2006 | Dow Jones Newswires (Michael Pollock); Fortune (Jon Birger); Forbes.com video interview (Michele Steele); Reuters (Meredith Davis & Cal Mankowski); The Street.com video interview (Gregg Greenberg); Barron's (Randall Forsyth); Bloomberg News (Elizabeth Stanton); Bloomberg TV | Media Tour Interviews | Berman Decl. Exs. 24-27 (Watts Exs. 2059, 2062, 2072, 2073) and Ex. 19 (Watts Dep. at 74:13-17. "Q … do you believe that the Schwab YieldPlus Fund was a topic of this particular media tour?  A It was intended to be the topic of all his interviews.") |
| July 18, 2006 | Dow Jones Article:  "Schwab Ultra-Short Bond Draws Strong Investor Interest" by Michael Pollock | News Article the result of a prior interview. Quotes Daifotis | Berman Decl. Exs. 20 and 25 (Watts Exs. 2062, 2081) |
| Aug. 23, 2006 | Reuters (Jennifer Ablan); Forbes.com (Michele Steele); The Daily Record (Warren Boroson) | Media Tour Interviews | Berman Decl. Ex. 25 (Watts Ex. 2062) |
| Aug. 23, 2006 | MarketWatch | Print Article or Video Interview: Cash Alternative: Ultra-short bond funds | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Aug. 23 & 24, 2006 | Reuters (Jennifer Ablan); Daily Record/Gannett (Warren Boroson) Financial Planning | Media Tour Interviews | Berman Decl. Exs. 24-25 (Watts Exs. 2062, 2059) and Ex. 19 (Watts Dep. at 75:22- |

| | | | 25. Q And do you believe that the Schwab YieldPlus Fund was a topic discussed on that media tour? A I do.") |
|---|---|---|---|
| | (Don Korn); MarketWatch (Leslie Wines); The Wall Street Journal (Diana Ransom); Bloomberg TV; Forbes.com video interview | | |
| Oct. 1, 2006 | Article in Financial Planning, "It's a good year for CASH …" | Daifotis quoted | Berman Decl. Ex. 28 (Watts Ex. 2056) |
| Oct. 26, 2006 | CNBC's Squawk on the Street; MarketWatch & Crain's Chicago Business (Rachel Koning Beals); Reuters (Ben Klayman); Kiplinger's Personal Finance (Katy Marquardt); Bloomberg TV | Media Tour Interviews | Berman Decl. Exs. 24 and 29 (Watts Exs. 2064, 2059) and Ex. 19 (Watts Dep. at 77:4-6. Q Do you believe the Schwab YieldPlus Fund was a topic of the media tour? A Yes.") |
| Nov. 7, 2006 | MarketWatch radio (Chuck Jaffe) | Broadcast Interview | Berman Decl. Exs. 20 and 30 (Watts Exs. 2069, 2081) |
| Nov. 16, 2006 | Dow Jones (Michael Pollock) | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Nov. 17, 2006 | Wealth Manager Magazine (Alan Gersten) | Interview | Id. |
| Dec. 1, 2006 | Bloomberg TV | Interview | Berman Decl. Ex. 31 (Watts Ex. 2074) |
| Dec. 5, 2006 | Forbes (Matt Rand); SmartMoney (Nicole Bullock); Wealth Manager (Janice Fioravantte); MarketPulse on Bloomberg; TheStreet.com (Gregg Greenberg) | Media Tour Interviews | Berman Decl. Exs. 20 and 24 (Watts Exs. 2059, 2081) and Ex. 19 (Watts Dep. at 78:16-18. "Q Dou you believe that the Schwab YieldPlus Fund was a topic of that media tour? A. Yes.") |
| Dec. 15, 2006 | CNBC's Closing Bell | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Second half of 2006 (recap) | Interviews with BusinessWeek Online, Kiplinger's Personal Finance, Reuters, Investors Business Daily, AP, Wall Street Journal; Wealth Manager, MarketWatch, Dow Jones; Live broadcast interviews on Bloomberg TV and CNBC | Media Interviews (includes both Hasting and Daifotis) | Berman Decl. Ex. 24 (Watts Ex. 2059) and Ex. 19 (Watts Dep. at 74:13-17. "Q … do you believe that the Schwab YieldPlus Fund was a topic of this particular media tour? A It was intended to be the topic of all his interviews.") |
| Jan. 24, 2007 | Dow Jones (Michael Pollock) | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Apr. 5, 2007 | CNBC.com (Tim Middleton) | Interview | Id. |
| Apr. 17, 2007 | Forbes (Matt Rand) | Interview | Id. |
| Apr. 19, 2007 | The Wall Street Journal (Jane Kim) | Interview | Id. |
| May 2007 | Bloomberg TV | San Francisco Chronicle Article refers to Hasting quote to Bloomberg TV | Berman Decl. Ex. 32 (Watts Ex. 2058) |
| June 7, 2007 | TheStreet.com video (Aaron Task) | Broadcast Interview | Berman Decl. Exs. 30 and 33 (Watts Exs. 2069 and 2075) |

| June 7, 2007 | Dow Jones (Michael Pollock) | Meeting | Berman Decl. Ex. 20 (Watts Ex. 2081) |
|---|---|---|---|
| June 28, 2007 | Morning Star Conference | Various Interviews | Berman Decl. Ex. 34 (Watts Ex. 2078) |
| Aug. 13, 2007 | The Wall Street Journal (Shefali Anand) | Interview | Berman Decl. Ex. 20 (Watts Ex. 2081) |
| Aug. 29, 2007 | Barron's (Jack Willoughby) | Interview | *Id.* |
| Oct. 29, 2007 | Financial Advisor (Evan Simonoff) | Interview | *Id.* |
| Oct. 30, 2007 | Investor's Business Daily (Doug Rogers & Trang Ho) | Interview | *Id.* |
| Oct. 30, 2007 | Investment News (Fred Gabriel) | Interview | *Id.* |
| Oct. 30, 2007 | Dow Jones (Michael Pollock) | Interview | *Id.* |

And Daifotis admits his role as the primary spokesman for the Fund.  In his 2006 employment performance review, Defendant Evelyn Dilsaver, then President of CSIM, noted about Daifotis: ████████████████████████████████████████████████████  ████████  Berman Decl. Ex. 35 (emphasis added); *see also id.*

████████████████████████████████████████████████████

████████  In his own 2007 Self Assessment, Daifotis wrote of his fund promotional efforts:





Berman Decl. Ex. 14 at *3.  In his 2005 Self Assessment, Daifotis wrote: ████████████

████████████████████████████████████████████████████

████████████████  Berman Decl. Ex. 36 (example of the White Paper, which was produced quarterly and titled "Charles Schwab Investment Management Perspectives") (emphasis added).

Daifotis also participated in the review and approval of Fund marketing materials.  Keith Maddock, a Senior Product Manager for CSIM responsible for "marketing and product support of

Schwab...fixed income funds," including YieldPlus, testified that Daifotis would review all new

Fund marketing pieces.  Berman Decl. Ex. 37 (Maddock Dep. at 31-34, 57).  The marketing

employees routinely ran marketing pieces past Daifotis in order to ████████████████████████

███████████████  Berman Decl. Ex. 38 at *2.  Daifotis even participated in crafting

letters sent directly to Fund investors, including the following:

---

**A message from the Schwab YieldPlus Bond Fund Manager, Kim Daifotis.**

In an effort to keep you informed, we'd like to explain the recent loss in the share price, or net asset value (NAV), of the Schwab YieldPlus Bond Fund.

On November 27, there was a wholesale, downward repricing of the mortgage and asset-backed sectors by Interactive Data Corporation, an independent pricing agency. This repricing has affected all bond funds with exposure to these sectors, including YieldPlus.

Because YieldPlus is not a money market fund, the share price can fluctuate. Your decision to hold this fund should be based on your overall portfolio allocation, risk tolerance and investment timeline. This fund is most appropriate for people who plan to stay invested in the fund for at least one year.

For more information, please view the most up-to-date fund facts on the Schwab YieldPlus Fund® page at Schwab.com. Thank you for investing with Schwab.

Sincerely,

*Kim Daifotis*

Kim Daifotis
Chief Investment Officer, Fixed Income
Charles Schwab Investment Management

---

Berman Decl. Exs. 39 and 3 (Daifotis Dep. at 256-258).

## III.    ARGUMENT

### A.    Active Promoters of Securities are Sellers under Section 12(a)(2)

Under *Pinter v. Dahl*, there are two tests to determine who qualifies as a seller under §

12(a)(2).[2]  The first and less controversial test is whether a defendant passed title to the security.

Here, Plaintiffs do not dispute that the corporate entity "Schwab Investments" owned YieldPlus

---

[2] "*Pinter* addressed a claim under Section 12(a)(1), but the Ninth Circuit has clarified that the same inquiry governs claims under Section 12(a)(2)." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 548 n.2 (N.D. Cal. Feb. 4, 2009) (citing *Moore v. Kayport Package Exp. Inc.*, 885 F.2d 531, 535-36 (9th Cir. 1989)).

shares and passed title to class members.  But the *Pinter* Court found that there was a second, broader category of individuals who could fall within the definition of seller than just those who pass title, including any "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the security owner."[3]  486 U.S. at 647.

Daifotis's central argument is that he must have personally promoted the security to each and every investor who seeks to hold him liable.  That is simply not the standard required under case law or under the legislative history.  *See* Trustee Opposition, pp. 12-17.   An officer of an issuer who openly solicits investors through written and oral communications is a seller under § 12(a)(2).  *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 384 F. Supp. 2d 838, 842-843 (D. Md. 2005) (citing *American High-Income Trust v. Alliedsignal*, 329 F. Supp. 2d 534, 547 (S.D.N.Y. 2004) (finding allegations that defendants helped prepare and signed the registration statement and toured the country as part of the road show sufficient to demonstrate solicitation under § 12(a)(2))). Participation in the drafting of marketing materials is another factor that weighs towards liability as a seller.  *See In re American Bank Note Holographics Inc. Secs. Litig.*, 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000) (in a firm commitment underwriting, finding allegations that issuer actively solicited the sale of shares through participation in the preparation of the registration statement and prospectus and in road shows, with a motivation to serve its own financial interest, sufficient to show seller status).

### 1.    No personal contact is necessary.

The *Pinter* solicitation test does not require in-person contact.  In *Commins v. Johnson & Higgins, Inc.*, the Court held that defendant companies that formed drilling programs in which the plaintiff class invested were "sellers" of unregistered securities under the *Pinter* test.  1988 U.S. Dist. LEXIS 15574, at *25-26 (N.D. Cal. 1988).  The companies were soliciting sellers because

---

[3] Daifotis does not argue about the second "financial interest" prong of the *Pinter* solicitation test.  If he did in fact solicit, there is no question that he would have been motivated by Schwab's financial interests and not those of the investors.  *See Pinter*, 486 U.S. at 655 ("[A] person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under § 12(1) without showing that he expects to participate in the benefits the owner enjoys.").  Plaintiffs thus only address the first prong of the *Pinter* solicitation test – whether Daifotis "successfully solicit[ed] purchase" of YieldPlus shares.  *Id.* at 647.

they hired "boiler room" broker-dealers to market the programs to potential investors over the telephone. *Id.* at *1.  Thus, no in-person contact was required between the defendant company and the investor.  *See also*, Trustee Opposition, pp. 15-17 (argument and citing cases that no in-person contact required to be liable as a seller).

### 2. Personal contact is not required for Plaintiffs to have standing

As a matter of law, there is no requirement of personal contact between each investor and each seller for standing under § 12.  If there were such a requirement, it would have been articulated in the *Pinter* test or within the language of § 12 itself.  In analyzing the "purchase from" language, the *Pinter* court noted that some courts and commentators had found that that language necessary narrows the field of potential sellers to the owner of the security.  *Pinter*, 486 U.S. at 643-44.  But the court disagreed, instead concluding that the "purchase from" language limited the field of potential sellers to only the buyer's immediate seller ("a buyer cannot recover against his seller's seller") and requires that a purchaser actually buy the security.  *Id.*  The court did not conclude, however, that this language restricts sellers to only those that might have had personal contact with each seller.

The cases cited by Daifotis do not support his argument.  In *In re Royal Ahold*, securities were sold by an issuer through three underwriters in a firm commitment underwriting, which is an arrangement in which the underwriter purchases the securities from the original issuer and then sells them to investors.  384 F. Supp. 2d at 841.  In that context, the issuer *may* not be a seller because they no longer are passing title to the investors.  But, in focusing only on the underwriters in its discussion of *Royal Ahold*, Daifotis ignores the earlier portion of the opinion discussing the important role of the officers of the issuer.

The issuer's officers, Van der Hoeven and Meur, participated with the underwriters in "road show" conference calls with investors.[4]  *Id.* at 842-43.  For purposes of evaluating the motion to dismiss, the court found that such allegations suffice to demonstrate that Royal Ahold, Van der

---

[4] An earlier opinion describes the roles of the Royal Ahold officers.  *In re Royal Ahold N.V. Secs. & ERISA Litig.*, 351 F. Supp. 2d 334, 348 (D. Md. 2004) (Van der Hoeven served as the Chief Executive Officer of the issuer and Meurs served as Executive Vice President and Chief Financial Officer).

1  Hoeven and Meur were all sellers. *Id*. More importantly, although Meurs had direct phone contact

2  with one of the plaintiffs' agents, Van der Hoeven had only signed a form 6-K and was merely

3  involved in the planning and execution of the road show effort. These facts, coupled with Van der

4  Hoeven's responsibility as CEO of Royal Ahold, were seen as sufficient factual allegations of

5  solicitation to survive a motion to dismiss. *Id*. Thus, no personal contact between Van der Hoeven

6  and any of the plaintiffs or their agents occurred.

7       In *Royal Ahold*, the court also addressed whether two of the three involved underwriters

8  should remain in the case given that plaintiffs had alleged only "indirect" involvement of those

9  underwriters in the transaction. The court explained:

10          There was no direct personal or telephone contact between Goldman
        Sachs or Merrill Lynch and [the named plaintiff], even through an

11          agent. Rather the solicitation was indirect, consisting of advice to
        Royal Ahold on preparation of the 6-K and other marketing efforts.

12          The 6-K itself is not a document signed by the underwriters, and
        there is no indication the 6-K was distributed directly to [the lead

13          Plaintiff], although it was seen by [the Plaintiffs agent].

14  *Id*. at 843. Thus, the court's decision that plaintiffs had not sufficiently pled that the two additional

15  underwriters were sellers focused on plaintiffs' failure to allege facts under either *Pinter* test: title

16  transfer *or* solicitation. *Id*. Although the court did discuss briefly the potential to bring the

17  underwriters back into the case if a plaintiff appeared that had either purchased the security from

18  the other two underwriters or been solicited by them, the court did not hold that there had to be

19  direct contact in order for plaintiffs to have standing. *Id*. To the contrary, as shown by the court's

20  opinion regarding the CEO Van der Hoeven, no direct contact is required.

21       *Rosenzweig v. Azurix Corp.*, also cited by Daifotis, similarly does not further his "standing"

22  argument. Although *Rosenzweig* frames its decision as a lack of "standing," the court held that

23  plaintiffs failed to allege that the defendant issuer either passed title to the securities or successfully

24  solicited them. 332 F.3d 854, 870-71 (5th Cir. 2003). Without such an allegation, the defendant

25  could not be found to be a seller under *Pinter* and was dismissed. *Id*. This case says nothing about

26  whether there must be direct communication between a particular defendant and a particular

27  plaintiff under *Pinter*.

28

**B.** **Authority Over the Managing of a Security and Access to Insider Information on a Security are Factors that Weigh Towards Seller Liability**

*See* Trustee Opposition, pp. 15-17.

**C.** **Daifotis Cites Scant Precedent to Support his Claim that Congress Purportedly Did Not Intend that He be Labeled a Seller**

Daifotis's motion embraces multiple theories and arguments from commentators who criticize the Supreme Court's decision in *Pinter*.  Although Plaintiffs address these arguments below, Defendant Daifotis has not addressed why any of these commentators' theories, which contradict the holding in *Pinter* and not constitute precedent, should or could be adopted by this Court.

**1.** ***Pinter*'s rejection of the "participation theory" did not relieve all participants from liability**

Daifotis relies upon Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of 1933: "Participation" and the Pertinent Legislative Materials*, 15 FORDHAM URB. L. J. 877 (1986-1987) (attached hereto as Appendix A), in support of his motion.  Abrams's paper predates the Supreme Court's decision in *Pinter v. Dahl*, which created the test in use today and which Daifotis relies upon in his motion,[5] and Abrams takes a position contrary to the *Pinter* holding.  As he makes clear, "[i]t is this Article's thesis that section 12's two subsections impose liability on only the person who, by contract of sale or by disposition, transfers title to or other interest in the security for value." *Id.* at 878 n.7.  But as *Pinter* held approximately one year later, sellers are not necessarily just those who transfer title, but a potentially broader group of those who actively solicit a sale.  486 U.S. at 647.

Abrams discusses a line of cases preceding *Pinter* which create or adopt what he calls the "participation theory" under which courts imposed "section 12 liability not only on the transferor, but also on any person 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.'"  Abrams, 15 FORDHAM URB. L. J. at 878 (quoting *Dahl v. Pinter*, 787 F.2d 985, 990 (5th Cir.), *rehearing en banc denied*, 794 F.2d 1016 (1986), *cert.*

---

[5] Notice of Motion and Motion of Defendant Kimon P. Daifotis for Summary Judgment, Dkt. No. 372, pp. 1, 5.

1  *granted*, 481 U.S. 1012 (1987)); *see also*, Abrams' notes 57, 85-88 and accompanying text (citing

2  cases with similar holdings).  Abrams spends a large portion of his article explaining why this

3  "participation theory" is incorrect, because it purportedly does not comport with "the legislative

4  scheme and the 1933 Act's regulatory antecedents."  Abrams, 15 FORDHAM URB. L. J. at 925.

5  Although he admits that "[s]ection 12's language arguably does not preclude the interpretation that

6  in some circumstances a plaintiff might purchase a security from a person who engages in

7  mechanical activities for a transferor," he decides to throw the baby out with the bath water

8  anyway and concludes that "Congress did not intend to impose section 12 liability for

9  'participating' in a selling effort, no matter how courts might determine participation and no matter

10  what an alleged participant's motive might have been." *Id.*

11       Abrams did in fact correctly predict that *Pinter* would not adopt the participation theory.

12  The main deficiency with the participation theory, according to *Pinter*, is that "it divorces the

13  analysis of seller status from any reference to the applicable statutory language and from any

14  examination of § 12 in the context of the total statutory scheme." *Pinter*, 486 U.S. at 651.  Because

15  the test focuses on the degree of participation in the transaction, it might extend liability too far to

16  "securities professionals, such as accountants and lawyers." *Id.* As the Court reasoned, "[t]he

17  buyer does not, in any meaningful sense, 'purchas[e] the security from'" a lawyer or an accountant.

18  *Id.* (quoting 15 U.S.C. § 77l (1982)) (brackets supplied by Court).  The Court also cited the test's

19  injection of tort principles of reliance and causation  into § 12 as contrary to Congress' intent. *Id.*

20  at 652.

21       But despite *Pinter*'s rejection of the participation theory, the Court still allowed for a

22  *broader* category of individuals to be liable than just those who pass title.  As discussed throughout

23  this brief and throughout Daifotis's, those who participate in the sale might be sellers if they satisfy

24  the broader solicitation test outlined in *Pinter*.

25       **2.    The availability of recissory damages does not limit the scope of defendants who can be sellers to those who just transfer title**

26       Daifotis's argument regarding recissory relief is also inconsistent with *Pinter*.  The

27  commentators actually admit that their theories were rejected by the *Pinter* court.  The argument

28

goes as follows.  Sections 11 and 12 originally both allowed for recissory relief.  But unlike § 12, §

11 specifically identifies other participants subject to its grasp beyond those who pass title.[6]  Some

questioned whether recissory relief was appropriately granted against those that did not pass title.

As one of the commentators cited by Daifotis describes:

> Most cases involving claims for rescission as a remedy for breach of
> contract through 1933 allowed rescission from only the seller.
> [citations omitted].  The Pinter majority cited contrary cases,
> [citations omitted], but those cases are in the minority.  Had
> Congress wished to change the general rule, it probably would have
> given a clear signal.  Thus, most courts addressing the argument read
> the rescission remedy to indicate that Congress intended only one
> defendant.  [Citations omitted.]

Robert A. Prentice, *Section 12 of the 1933 Act:  Establishing the Statutory Seller*, 40 ALA. L. REV.

417, 446-47 (1989) (attached hereto as Appendix B).

   Prentice and Daifotis also reference Abrams' argument that since rescission was dropped

from Section 11 due to protests that rescission should not be allowed from the broad group that

could be held as proper defendants, the legislature's decision *not* to drop rescission as a remedy

from § 12 meant that it intended § 12's reach to be limited to entity that passed the title.  Abrams,

15 FORDHAM URB. L. J. at 939.  But *Pinter*'s holding is inconsistent with these arguments.

Congress has had over 80 years to remove recissory relief from § 11 and has had over 20 years

since *Pinter v. Dahl* to correct it if the Supreme Court got it wrong.  Congress did not.  It is more

likely, as Prentice admits, that the Supreme Court simply took what may have been a minority view

in the courts because of the remedial nature of the statute and what it considered most relevant and

came up with a different result than Prentice and Abrams.

   Nothing in Daifotis's arguments distinguishes this case from *Pinter*.  Prentice actually even

states that "[t]he Pinter majority disagreed with this line of reasoning, arguing that Congress chose

rescission for its effects as a remedy, not for its delineation of a class of defendants."  *Id.*

---

[6] The list of proper defendants under § 11 includes every person who signed the registration
statement (which includes the issuer, its principal executive officers, chief financial officer,
principal accounting officer, and a majority of its board), every person who was a director or
partner, every person consensually named as about to become a director, every accountant,
engineer, appraiser or other "expert" who has prepared part of the registration statement, and every
underwriter.  15 U.S.C. § 77k(a)(1)-(5).

1    Rescission is available under § 12, despite *Pinter*'s holding that proper defendants may include a

2    boarder category than just title holders.

3    **D.    Daifotis's Legal Argument Is Illogical**

4            Daifotis's argument is, essentially, that because he did not go to each and every investor

5    and personally urge them to purchase Fund shares, that he cannot possibly be a seller under the

6    law. As discussed above and in the Trustee Opposition at pages 12-17, this is simply not the

7    appropriate legal test. If the law required only face-to-face or phone-to-phone sales to invoke the

8    investor protections afforded by Section 12 to apply, only direct salesmen or saleswoman would be

9    liable even if, like here, they had nothing to do with crafting the prospectus messages engineered

10   and delivered by the Fund managers – those who also made the decisions about how the Fund was

11   invested.

12           Daifotis's role was that of an active and direct promoter of YieldPlus. He was not a neutral

13   professional or a collateral or indirect participant in the solicitation process. Daifotis's arguments

14   to the contrary are unconvincing.

15   **E.    Daifotis's Factual Argument Is Almost Frivolous, and a Reasonable Juror Would**
       **Likely find Daifotis was a "Seller"**

16
17           Daifotis's position of authority, access to insider information and promotional efforts make

18   him liable as a seller under the *Pinter* solicitation test. First, Daifotis was the spokesman for the

19   Fund. *See supra* at 5-8. His image was plastered across YieldPlus advertisements that were

20   distributed to investors and their agents. He was applauded for his "tireless marketing efforts" and

21   in his own self-assessment touted his promotional efforts. Berman Decl. Ex. 35 (Dep. Ex. 2210).

22   He worked with third-party marketers to promote the Fund, holding countless media interviews to

23   propagate Schwab's party line. And Daifotis had a direct relationship with investors as the face of

24   YieldPlus.

25           Second, Daifotis participated in the crafting of YieldPlus marketing pieces. *See supra* at 8-

26   9. Employees that were devoted to drafting marketing for YieldPlus turned to him for information.

27   He even wrote direct updates to investors that appeared on Schwab.com.

28

1    Third, Daifotis's authority over the day-to-day management of the Fund put him in a

2   position to direct and control other individuals who were also promoting the Fund and crafting its

3   marketing. *See supra* at 8-9. He was consulted for the material information in marketing pieces

4   relating to the Fund, and his statements were used as the basis for marketing materials.

5    Fourth, Daifotis had access to insider information about the Fund's quality and risk that was

6   not available to investors. *See supra* at 2-5. His participation in the day-to-day management of the

7   Fund made him privy to this information. When important issues arose, even the Board of Trustees

8   turned to him for insider information on the Fund. He also received expert opinions and research

9   from his participation on the Investment Strategy Council. This information included insider data

10   that he had access to and ability to withhold or present it to investors.

11    Each of the above factors weighs heavily towards finding Daifotis to be a seller – so much

12   so that the Court could sanction Daifotis for making frivolous arguments and even consider

13   granting summary judgment *against* Daifotis on this issue. But, at a minimum, genuine issues of

14   material fact exist for the jury to decide, foreclosing summary in Daifotis's favor.

15                    **IV.    CONCLUSION**

16    Daifotis has not met, and cannot meet, the burden of demonstrating that there is no genuine

17   issue of any material fact such that he is entitled to judgment as a matter of law. The Court should

18   deny his motion.

19    Dated:  March 4, 2010.

20                    HAGENS BERMAN SOBOL SHAPIRO LLP
                      Reed R. Kathrein
21                    Peter E. Borkon
                      715 Hearst Avenue, Suite 202
22                    Berkeley, CA 94710
                      Telephone: (510) 725-3000
23                    Facsimile: (510) 725-3001
                      reed@hbsslaw.com
24                    peterb@hbsslaw.com

25

26

27

28

1

2                                 By:      s/ Steve W. Berman

3                                          Steve W. Berman
                                           Sean R. Matt
4                                          Erin K. Flory
                                           Lisa M. Hasselman
5                                 HAGENS BERMAN SOBOL SHAPIRO, LLP
                                  1918 Eighth Avenue, Suite 3300
6                                 Seattle, WA  98101
                                  Telephone: (206) 623-7292
7                                 Facsimile: (206) 623-0594
                                  steve@hbsslaw.com
8                                 sean@hbsslaw.com
                                  erin@hbsslaw.com
9                                 lisah@hbsslaw.com

10
                                  *Attorneys for Lead Plaintiffs and the Classes*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28