Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
Lisa M. Hasselman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO: <br><br> All Actions | PLAINTIFFS' MEMORANDUM IN OPPOSITION TO SCHWAB'S MOTION FOR SUMMARY JUDGMENT <br><br> Date:        March 25, 2010 <br> Time:        8:00 a.m. <br> Judge:       Hon. William H. Alsup <br> Courtroom:   Courtroom 9, 19th Floor |

**REDACTED VERSION**

# STATEMENT OF ISSUES TO BE DECIDED
### (Local Rule 7-4)

## Misrepresentations About the Risk of Defendants' Aggressive YieldPlus Strategy

1.    Is there a genuine issue of material fact precluding summary judgment as to whether the Fund prospectus's general, boiler-plate disclosures of the characteristics of mortgage-backed securities, which disclosures did not reveal the actual risks presented by concentrating in these securities and in corporate bonds, trump the Fund's fundamental investment objective to pursue minimal changes in share price and other prospectus assurances that the Fund would seek a high degree of share price stability, where:

- Defendants had decided to revise the Fund's risk profile by shifting Fund investments from safe, stable and well-diversified holdings into a concentration in no-agency mortgage-backed securities and related corporate bonds;

- the prospectus's statement of the Fund's investment objective did not change;

- Defendants instead merely added a general statement that "a variety of economic and other factors" can affect mortgage-backed securities and other vague disclosures;

- Defendants also buried two statements over a 100 pages into an incorporated document that concentrating in these securities may cause the Fund to be more sensitive to external "developments that affect" the securities; and

- Plaintiffs' experts conclude that (i) these statements did not adequately disclose the material risk this change presented to the Fund's investment objectives and (ii) reasonable investors would not have understood the substantial risk the Fund was taking, would not know that Schwab was violating the terms of the prospectus, and would continue to believe, incorrectly, "that the Fund was effectively managing risk in a way that would result only in small changes to the Fund's net asset value"? *See infra* at 8-13.

2.    Is there a genuine issue of material fact as to whether lists of mortgage-backed securities appearing in the Fund's annual report constitute unambiguous notice to investors that a Fund was changing the prospectus's statement of the Fund's fundamental investment objective, where:

- listing securities in an annual report does not notify purchasers during the previous 12 months;

- investors are not required to look beyond the prospectus itself for material information

necessary to make statements in the prospectus not misleading; and

- the annual report's lists did not identify the amount of the riskier holdings or disclose their enhanced risks and the lack of internal controls necessary to manage the increased risks? *See infra* at 12 n.4.

3.    Is there a genuine issue of material fact as to whether the risks associated with the Fund's concentrated positions in non-agency mortgage-backed securities were so widely known to the market so as to make statements in the prospectus not misleading where investors were not re-quired to look beyond the prospectus for material information necessary to make statements therein not misleading; and where details of the underlying mortgage instruments and their impact on the Fund portfolio were not publicly available or understandable by the average investor? *See infra* at 15-16.

4.    Is there a genuine issue of material fact as to whether a reasonable investor would deem the Fund's stated investment objective unimportant in deciding whether or not to invest where the SEC considers the objective "a critical determinant of the potential risk and reward inherent in the shareholder's investment" and one of a fund's "most defining attributes" that should not be changed without a shareholder vote because doing so "dramatically alters the nature of the shareholder's investment, requiring in effect, a new investment decision," and where the Fund's investment objective here was so important that Schwab made it a fundamental policy that could not be altered without a shareholder vote? *See infra* at 14-15.

5.    Is there a genuine issue of material fact as to whether a reasonable investor would find the Fund's representations not misleading as to the nature of the Fund and its comparison to a conservative benchmark, where:

- a reasonable investor could conclude that comparing the Fund to a conservative benchmark implied that the Fund's performance would be similar to that benchmark;

- the SEC warned Schwab in 2006 that comparing the Fund to the benchmark was misleading because the Fund's investments in Treasuries were "minimal," the Fund could "invest a significant portion of its assets in less than investment-grade securities," and the Fund "potentially incurs greater risk";

- Plaintiffs' expert likewise concludes that the Fund's performance was not comparable

to the benchmark because its holdings had far greater risks from its investments in mortgage-backed securities, corporate bonds, and asset-backed securities; and

- even a defendant admitted that the Fund was not comparable to the benchmark? *See infra* at 3-4, 11-13.

### Negative-Causation Affirmative Defense

6.     Do Defendants sustain their heavy burden of demonstrating the absence of a material fact precluding summary judgment in favor of their affirmative defense that some supervening event(s), wholly unrelated to Defendants' misrepresentations and omissions, caused all of the Fund's NAV decline where:

- loss causation is not an element of Plaintiffs' §§ 11 and 12(a)(2) claims, and to prevail on their negative-causation defense, Defendants must prove that *none* of Plaintiffs' losses stemmed from their misrepresentations and omissions;

- on this summary-judgment motion, Defendants' burden is to prove there can be no dispute that Defendants' misrepresentations are wholly unrelated to Plaintiffs' losses; and

- Defendants ignore this Court's ruling that loss causation can arise in various ways, including by whether the subject matter of the misrepresentation later manifests in a way to cause the loss, *i.e.*, where the loss is a materialization of the concealed risk? *See infra* at 16-18.

7.     Do Defendants demonstrate (i) that no reasonable juror could believe that *any* portion of Plaintiffs' losses was caused by Defendants' alleged misrepresentations and omissions, and (ii) the required connection between Plaintiffs' losses and the events that Defendants claim caused those losses where:

- Plaintiffs submit evidence that Defendants failed to disclose the risks of the Fund's over-concentration in mortgage-backed securities and corporate bonds;

- a material issue of fact exists whether Schwab's minimal, boiler-plate disclosures relating to mortgage-backed securities can trump prospectus assurances that the Fund was engineered to offer a stable share price; and

- Plaintiffs' evidence, including the analysis of Plaintiffs' expert and admissions of Schwab's own fact witnesses, shows that the Fund's mortgage-backed securities holding caused losses? *See infra* at 18-20.

8.     Do Defendants' naked assertions that Plaintiffs and Class Members cannot credibly

deny knowledge of the misrepresentations or the reasons those statements were false or misleading, as alleged in the initial complaint filed in this consolidated action on March 18, 2008, and accompanying press releases, suffice to eliminate any genuine factual dispute that negative causation arose on that date where:

- Schwab asserts no legal basis for presuming Class Members' reliance on the March 18, 2008 complaint's purportedly corrective disclosures;

- Schwab also submits no evidence that Class Members knew of the complaint's purportedly corrective disclosures by March 18, 2008; and

- none of the Lead Plaintiffs were parties to the March 18 complaint and they specifically deny any knowledge at that time of the facts and risks concealed or misrepresented by Schwab's misstatements? *See infra* at 20.

## Rescissionary Relief Under § 12(a)(2)

9.      Does the rescissionary relief authorized by § 12(a)(2) require subtracting from Class Member's original consideration for Fund shares the market value of those shares on March 18, 2008, the filing date of the initial complaint in this consolidated action where:

- such rescissionary relief provides for recovery of the full original consideration, with adjustments only for interest, dividends and, if proven, negative causation, in exchange for returning the shares;

- the shares' market value on the suit-filing date (or any other date) is irrelevant to calculating the amount of rescissionary relief; and

- this form of relief does not allow a plaintiff to exploit changes in the shares' market value because § 12(a)(2) requires all plaintiffs who own shares on the suit date to seek rescissionary relief; damages are not available to them? *See infra* at 21-24.

## Violation of § 13(a) by deviating from a fundamental no-concentration policy

10.      The Investment Company Act ("ICA") requires an investment company to disclose whether its investment policy is to concentrate, or not concentrate, in any particular industry or group of industries.  Section 13(a) of the ICA requires an investment company to obtain shareholder approval before changing or deviating from its concentration or no-concentration policy.  Where Defendants disclosed to investors that its policy was to not concentrate in any separate industry or group of industry, and they classified non-agency mortgage-backed securities

1   as a separate industry for purposes of its no-concentration policy, can Defendants then reverse that

2   classification without shareholder approval where the ICA's remedial purpose of protecting

3   investors and Congress's express goal of prohibiting an investment company from changing its

4   concentration policy without investor consent compels interpreting the ICA to require a fund to

5   obtain shareholder approval before rewriting a previously disclosed industry classification for

6   purposes of its no-concentration policy? *See infra* at 24.

       11.     Is there a genuine issue of material fact whether Defendants' industry re-classifica-

tion was reasonable where:

- Defendants initially classified non-agency mortgage-backed securities as a separate industry;

- for the purpose of enhancing returns for its YieldPlus fund, Defendants then reversed that classification, but they did so with little supporting research; and

- Plaintiffs' expert concludes that the reclassification was not reasonable? *See infra* at 24-25.

**TABLE OF CONTENTS**

**Page**

STATEMENT OF ISSUES TO BE DECIDED ................................................................. i

I.    INTRODUCTION .......................................................................................... 1

II.   THE MISREPRESENTATIONS AND OMISSIONS ............................................ 1

    A.   The Targeted Statements ......................................................................... 1

    B.   The Fund's Over-Concentrated Risk Strategy was Inconsistent with Prospectus Assurances of Share Price Stability .................................................... 2

    C.   Comparisons to Money Funds Were Materially Misleading ........................ 3

    D.   Comparisons to the Lehman Index were Materially Misleading ................. 4

    E.   The Fund's Lack of Internal Controls and Proper Risk Management Also Made Prospectus Assurances of Share Price Stability Misleading .................... 4

        1.   The Fund lacked the tools necessary to manage its new, riskier strategy, and did not disclose this to investors ................................. 5

        2.   Other control deficiencies relating to mispricing, liquidity and duration resulted in misrepresentations and omissions of material fact ................ 5

        3.   Known resource deficiencies also made representations of share-price stability misleading ................................................................. 7

III.  ARGUMENT ............................................................................................... 8

    A.   Schwab Did Not Fully Disclose The Risks Of Its Aggressive YieldPlus Strategy ....... 8

        1.   The jury could find that Schwab's minimal, boiler-plate disclosures relating to mortgage-backed securities were insufficient to make the prospectus as a whole not misleading ........................................ 8

            a.   The Fund's big gamble ............................................................. 8

            b.   Material issues of fact exist as to whether the disclosures adequately alerted investors to the big gamble ...................... 9

        2.   The jury could find that the Fund's relative stability prior to the plunge reinforced prospectus assurances of capital preservation and concealed risks ....... 13

        3.   Schwab's other authorities are inapposite .................................... 14

    B.   Schwab Cannot Carry Its Summary-Judgment Burden to Prove Negative Causation ....... 16

        1.   Negative Causation imposes a "heavy" burden on Defendants ........... 16

2.    The Court has already rejected Schwab's narrow view of negative causation ...................................................................................... 17

3.    Schwab's evidence fails to dispel any issue of material fact relating to whether Schwab's statements about mortgage-backed securities concealed risks that materialized to cause the Class's losses .......................... 18

4.    There is a factual dispute as to whether the filing of the initial complaint here establishes negative causation as to the § 12(a)(2) claim ....................... 20

C.    Section 12 Relief Extends Beyond the Complaint-Filing Date ................................... 21

1.    § 12(a)(2) rescission does not deduct the share price on any particular day ... 21

2.    Plaintiffs are not gaming § 12(a)(2)'s rescissionary relief ............................. 23

D.    The Fund Deviated From Its Concentration Policy, And Summary Judgment Cannot Be Granted to Schwab on This Issue ................................................................ 24

1.    Schwab's argument is an attempt to evade § 13(a)'s shareholder protections ..................................................................................................... 24

2.    Schwab's revised definition also is not reasonable ....................................... 24

IV.    CONCLUSION ......................................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

<u>Page(s)</u>

C<small>ASES</small>

3

*Basic v. Levinson,*
4
    485 U.S. 224 (1988) ........................................................................................ 11

5

*Belodoff v. Netlist, Inc.,*
    2008 U.S. Dist. LEXIS 45289, 2008 WL 2356699 (C.D. Cal. May 30, 2008) ...................... 14
6

*Brown v. Brewer,*
7
    2008 U.S. Dist. LEXIS 108904 (C.D. Cal. July 14, 2008) ................................................ 12

8

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ........................................................................................ 17
9

10

*Fecht v. Price Co.,*
    70 F.3d 1078 (9th Cir. 1995) ............................................................................ 13

11

*Goldkrantz v. Griffin,*
12
    1999 U.S. Dist. LEXIS 4445 (S.D.N.Y. Apr. 5, 1999) .........................................21, 22

13

*Gray v. First Winthrop Corp.,*
    82 F.3d 877 (9th Cir. 1996) ............................................................................11, 12
14

15

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.,*
    159 F.3d 723 (2d Cir. 1998) ............................................................................ 14

16

*In re Alliance N. Am. Gov't Income Trust Inc. Sec. Litig.,*
17
    1996 U.S. Dist. LEXIS 14209 (S.D.N.Y. Sept. 27, 1996) ...................................... 14

18

*In re AOL Time Warner Sec. & "ERISA" Litig.,*
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................ 23
19

20

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009) ....................................................................8, 13

21

*In re Countrywide Fin. Corp. Derivative Litig.,*
22
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) .............................................................. 13

23

*In re Daou Sys.,*
    411 F.3d 1006 (9th Cir. 2005) .......................................................................... 17
24

25

*In re Dynegy, Inc. Sec. Litig.,*
    339 F. Supp. 2d 804 (S.D. Tex. 2004) ..............................................................16, 17

26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
27
    618 F. Supp. 2d 311 (S.D.N.Y. 2009) ..............................................................11, 12

28

*In re Fuwei Films Sec. Litig.,*
    634 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................................ 15

*In re Infonet Servs. Corp. Secs. Litig.,*
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ......................................................... 15

*In re Metricom Sec. Litig.,*
    2004 U.S. Dist. LEXIS 7834 (N.D. Cal. Apr. 29, 2004), *aff'd sub nom. Young v.*
    *Dreisbach*, 182 Fed. Appx. 714 (9th Cir. 2006) ............................................ 14

*In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.,*
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ........................................................... 14

*In re Petco Animal Supplies Inc. Sec. Litig.,*
    2006 U.S. Dist. LEXIS 97927 (S.D. Cal. Aug. 1, 2006) ............................... 13

*In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.,*
    1997 U.S. Dist. LEXIS 18485 (S.D.N.Y. Nov. 20, 1997) ......................... 10, 16

*Kaplan v. Rose,*
    49 F.3d 1363 (9th Cir. 1994) .......................................................................... 11

*Landmen Partners, Inc. v. Blackstone Group, L.P.,*
    2009 U.S. Dist. LEXIS 87001 (S.D.N.Y. Sept. 22, 2009) .............................. 15

*Merzin v. Provident Fin. Group Inc.,*
    311 F. Supp. 2d 674 (S.D. Ohio 2004) .......................................................... 22

*Miller v. Thane Int'l Inc.,*
    519 F.3d 879 (9th Cir. 2008) ...................................................................*passim*

*Ong v. Sears, Roebuck & Co.,*
    2005 U.S. Dist. LEXIS 20391 (N.D. Ill. Sept. 14, 2005) ........................... 21, 22

*Randall v. Loftsgaarden,*
    478 U.S. 647 (1986) ....................................................................................... 21

*Rubin v. MF Global, Ltd.,*
    634 F. Supp. 2d 459 (S.D.N.Y. 2009) ............................................................ 11

*Rubke v. Capitol Bancorp Ltd.,*
    551 F.3d 1156 (9th Cir. 2009) .................................................................. 15, 16

*SEC v. Yuen,*
    2006 U.S. Dist. LEXIS 33938 (C.D. Cal. Mar. 16, 2006) ............................... 11

*Siemers v. Wells Fargo & Co.,*
    2007 U.S. Dist. LEXIS 21935 (N.D. Cal. Mar. 9, 2007) ................................ 17

*Siemers v. Wells Fargo & Co.,*
    2007 U.S. Dist. LEXIS 39091 (N.D. Cal. May 17, 2007) ................................. 21, 22

*White v. Heartland High-Yield Mun. Bond Fund,*
    237 F. Supp. 2d 982 (E.D. Wis. 2002) ...................................................... 10

*Wielgos v. Commonwealth Edison Co.,*
    892 F.2d 509 (7th Cir. 1989) ................................................................. 15, 16

*Wigand v. Flo-Tek, Inc.,*
    609 F.2d 1028 (2d Cir. 1979) ............................................................... 21, 23

## STATUTES

15 U.S.C. § 77 ................................................................................ 17, 21, 22

17 C.F.R. 230.482 ................................................................................... 2

"The Fund was an accident waiting to happen."[1]

## I.     INTRODUCTION

Far from the safe and stable bond fund it was represented to be, the YieldPlus Fund ("Yield-Plus" or "Fund") was secretly morphed into a high-stakes gamble in the complex, little-understood world of non-agency mortgage-backed securities and related corporate bonds. Examining the facts against controlling precedent shows that many issues of material fact exist for the jury to decide. Schwab also misstates applicable legal principles as to its negative-causation affirmative defense and the rescissionary relief available under § 12(a)(2) of the Securities Act. Finally, Schwab perverts the language of the Investment Company Act in an effort to evade its essential limits on Schwab's discretion to change the Fund's fundamental character. Schwab's summary-judgment motion should, accordingly, be denied in its entirety.

## II.     THE MISREPRESENTATIONS AND OMISSIONS

### A.     The Targeted Statements

The statements challenged in the registration statements and prospectuses issued during the class period are identified in Exhibit A to the Berman Declaration. Schwab said the Fund was "an ultra short-term bond fund, designed to offer high current income with minimal changes in share price" and would (i) "offer higher yields than a money market fund while seeking minimal changes in share price;" (ii) "seek[] a high degree [of] share price stability;" (iii) "[b]ecause of its historical ability to minimize its share price fluctuations," be "less vulnerable to market timing strategies;" and (iv) "seek[] to maintain an average portfolio duration of one year or less" in order "[t]o help maintain share price stability and preserve investor capital." The Fund also repeatedly compared itself to the "LEHMAN U.S. SHORT TREASURY:  9-12 MONTHS."

Plaintiffs also challenge statements in the Fund's Statements of Additional Information ("SAI"), which are also identified in Exhibit A. They include similar assurances that the Fund's "investment objective is to seek high current income with minimal changes in share price;" no more than 15% of total assets would be invested in illiquid securities; and no more than 25% of total assets

---

[1] Ex. C at § 2.4.  All references to "Ex." are to exhibits attached to the Declaration of Steve W. Berman accompanying this memorandum (the "Berman Decl." or "Berman Declaration").

would be invested in a single industry.  Beginning in September 2006, the SAI falsely stated that "mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities are not part of any industry for purposes of a fund's concentration policy."

Schwab also touted the Fund's safety as a cash alternative throughout the class period in various publications constituting "omitting prospectuses" under § 12 and SEC rule 482 (17 C.F.R. 230.482).  Exhibit B identifies the challenged statements contained in all relevant omitting prospectuses.  These materials promised, *inter alia*, that the Fund was designed to offer "lower risk than a long-term bond fund with higher yield potential and slightly higher risk than a money market fund[,] limited exposure to interest rate risk and resulting share price fluctuation by maintaining an ultra-short average duration[, and] the benefits of extensive credit research and professional money management."  Others trumpeted the Fund as a safe place for cash:  (i) "Looking for a way to earn better yields on your long-term cash without taking on significantly higher risk?  The Schwab YieldPlus … can be a smarter alternative to investing in money market and long-term bond funds"; and (ii) "A smart, longer-term cash alternative.  To the Fund's portfolio managers, managing risk is just as important as managing returns.  Their goal is to generate higher yield potential over money market funds."

Contrary to the foregoing representations, the Fund was not managed in a manner that would deliver "minimal changes in share price," "a high degree of share price stability," or to "preserve investors' capital," and references to money market funds and the Lehman Short U.S. Treasury 9-12 Months Index were materially misleading.  Rather, the Fund over-concentrated assets in private-label mortgage-backed securities and the corporate bonds of financial companies and lacked critical risk management controls, including proper credit review.  The case against Schwab is thus much broader than Schwab's characterization of it being only about mortgage-backed securities.  Schwab at 3-4.

## B.   The Fund's Over-Concentrated Risk Strategy was Inconsistent with Prospectus Assurances of Share Price Stability

During a time in which Schwab had ample warnings about a severe downturn in the housing market (Berman Decl. ¶¶ 50-54), the Fund increased its mortgage-backed securities holdings from above 20% in early 2006 to above 40% by late 2007 by investing primarily in non-agency mortgage-backed issues (also called non-agency collateral mortgage obligations).  Ex. D at 21, 30.  These

securities bore greater credit risk than their "agency" counterparts, which had the backing of a government agency or a government-sponsored enterprise. *Id.* at 30. The risk was magnified by Schwab's decision to invest in the riskier "Alt-A" and subprime flavors of these securities, with holdings peaking at 61% of all mortgage-backed investments by February 2008. *Id.* at 33-34. "Alt-A" mortgage loans have less restrictive underwriting standards and are made to borrowers who were unable to provide full documentation. Subprime loans are the riskiest mortgages from borrowers with weak credit scores or no verification of income. *Id.* at 32-33, 36-41. Schwab did not adequately disclose the risk that the Fund's concentration of non-agency mortgage-backed securities presented to the objectives of the Fund, and that such concentrations violated the Fund's investment guidelines and were "an affront to the Fund's objective of price stability." *Id.* at 26, 42.

The Fund also held large positions in corporate bonds issued by companies providing financial services involving borrowing, lending and investment, exceeding the Fund's 25% industry concentra-tion limit from mid-2006 and ultimately ballooning to over 32% of assets. *Id.* at 41. The risks of these securities were highly correlated with the Fund's mortgage-backed securities holdings because both shared common risk exposures. *Id.* at 42. Thus, the "concentration in financial sector corporate bonds made the portfolio, which was already over-concentrated in mortgage-backed securities, even more vulnerable to problems in the market for residential mortgage-backed securities ... and was otherwise inappropriate for a fund marketed as a safe alternative to cash and one with minimal changes in share price. This was not adequately disclosed to investors." *Id.*

## C.   Comparisons to Money Funds Were Materially Misleading

The Fund promoted itself as a safe alternative to money-market funds. *E.g.*, Ex. B at Stmts. 1-11, 14, 17, 20. In August 2006, the SEC challenged such comparisons as "inaccurate or misleading." Ex. E. Plaintiffs' expert confirms that investors were persuaded that the Fund was similar to a money market, subject to minimal risk and was a safe alternative to a cash investment. Ex. F at 11.

████████████████████████████████████████████████████████

██████████████████████████████████, Ex. G at 171 ████████████

████████████████████████████████████████████ *Id.* at 181.

**D.     Comparisons to the Lehman Index were Materially Misleading**

Schwab compared the Fund to the "LEHMAN U.S. SHORT TREASURY: 9-12 MONTHS" index (the "Index"). *E.g.,* Ex. A at Stmt. 5; Ex. B at Stmts. 1, 11, 15, 18, 25, 27, 29, 31.  A reasonable investor could conclude that the comparison of the Fund to the Index implied that the Fund's performance would be similar to that of the Index. Ex. D at 22-23.  Yet in 2006, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████" Ex. E.  Plaintiffs' expert shares the SEC's concern given that the "Fund's performance was not comparable to the [Index] as its holdings had far greater risks such as credit and liquidity risk" resulting from its investments in mortgage-backed securities, corporate bonds, and asset-backed securities. Ex. D at 10, 22.

Even Daifotis admitted that the Index was not comparable to the Fund, testifying that "there were no short benchmarks that we felt accurately depicted what would be a reasonable benchmark for a fund similar to YieldPlus." Ex. H.  He also admitted that YieldPlus held very few Treasuries, and that many of its investments held were not held in the Index, and that he could think of *no* other similarities between the Index and the YieldPlus Fund other than duration. *Id.*; *see also* Ex. I.

**E.     The Fund's Lack of Internal Controls and Proper Risk Management Also Made Prospectus Assurances of Share Price Stability Misleading**

The Fund was ill-equipped to manage the increased risks associated with its big bets on non-agency mortgage-backed securities and the corporate bonds of financial companies.  While internal risk control is always important, the Fund's increasing exposure to mortgage-backed securities beginning in early 2006 made it critical. Ex. D at 56.  But, regrettably, "there was no evidence . . . that the Fund was employing effective risk management monitoring." *Id.*  Thus, representations that the Fund was managed to "preserve investor's capital," have "minimal changes in share price," have "a high degree of share price stability," would "minimize its share price fluctuations," was "less vulnerable to market timing strategies than other types of fixed income or equity mutual funds" and employed "extensive credit research" were misleading because there were inadequate internal controls and staffing to appropriately manage risk.

**1.   The Fund lacked the tools necessary to manage its new, riskier strategy, and did not disclose this to investors**

In July 2007, and before the YieldPlus Fund's NAV began its swoon, ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████   [Emphasis added.]

Ex. J at p. 5 of 6.  This same report also found that, ████████████████████████

████████████████████████████████████████████████████████

████████████████████, Ex. K at pp. 3 and 4 of 12, ████████████████████████

████████████████████████████████. *See, e.g.*, Ex. B at Stmt. 20.

These serious lapses in risk control were not disclosed to investors.  Ex. L; Ex. M.  Moreover, the managers were not evaluating and reporting "spread duration," a common and critical risk measurement of the price sensitivity of a security to changes in the yield spread that is especially appropriate for higher spread securities like non-agency mortgage-backed issues.  This means that Schwab "effectively misrepresented [to] investors the risk they are exposed to."  Ex. O at 7-8; Ex. P (response to Interrog. No. 25).

**2.   Other control deficiencies relating to mispricing, liquidity and duration resulted in misrepresentations and omissions of material fact**

The Fund mispriced securities and violated liquidity and duration limits.  These control deficiencies were not disclosed to investors and also made representations about share price stability false.  And Schwab made other affirmative misrepresentations on these topics.

The Fund overvalued its assets by as much as $118 million as early as February 2006, Ex. D at

55; inflated net asset values in its holding reports, providing investors with inaccurate and misleading

information; misreported losses on the magnitude of $225 million, resulting in a net asset value

inflated by at least 5 percent; and mispriced securities. *Id.* at 47-50; *see also* Ex. P (response to

Interrog. Nos. 18-20); Ex. Q. Although there were some exceptions, the Fund often failed to adjust

the price of securities even after transactions occurred at prices different from that carried on the

Fund's books. Ex. D at 50.

Schwab also made many misrepresentations relating to the liquidity of the Fund's investments.

The Fund could "not … invest more than 15% of its net assets in illiquid securities," yet "the total

percentage of net assets in illiquid securities exceeded 15% by the end of November 2007." Ex. D at

45-46. In late 2007, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████." Ex. R. In a January 2008

████████████████████████████████████████████████████████████████

██████████████████████████" Ex. T. Yet in many communications to financial consultants, invest-

ment advisors and clients beginning in June 2007 and continuing into 2008, Schwab made assurances

about Fund liquidity. *See* Ex. B at Stmts. 24, 26, 29-30. These constituted misrepresentations, and

Schwab's failure to disclose Fund illiquidity made representations about share price stability false.

In those same communications, Schwab discussed the Fund's limited subprime holdings and

once blamed the Fund's pricing service for a euphemistically downward "repricing" of mortgage-

backed securities. *See* Ex. B, Stmts. 19, 21-22, 27-28, 30. In emphasizing the Fund's limited

subprime holdings, Schwab failed to disclose that the Fund's decline resulted from heavy and risky

investments in Alt-A. And with the Fund in a freefall by January 2008, ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████ Ex. W. Defendants failed to disclose

this incredibly material fact to the YieldPlus Fund shareholders. Ex. V; *see also* Exs. X-Y.

The Fund also represented that it would seek to keep the average duration of its overall portfo-

lio at one year or less, although the SAI disclosed that "there may be times when the portfolio's aver-

PLTFS' MEMO. IN OPP. TO SCHWAB'S MOTION. FOR
SUMMARY JUDGMENT - 08-cv-01510 WHA
010036-12  356978 V1

- 6 -

age duration is more than one year." But the tool that the Fund was using to manage duration (a Treasury futures hedge) failed (Ex. D at 52) and effective duration exceeded one in March (1.19), May (1.29), and November 2007 (1.63) and February 2008 (1.51). Ex. D at 51-52; *see also* Ex. P (response to Interrog. No. 23). Even Schwab now admits that duration exceeded one during two periods. Ex. Z. Plaintiffs' expert advises that having duration over one year for multiple quarters evinces ineffective risk management, Ex. D at 53, which Schwab failed to disclose. And these calculations also demonstrate that Schwab misrepresented its duration numbers.

**3.      Known resource deficiencies also made representations of share-price stability misleading**

Control deficiencies were heightened by lack of resources that made assurances of share price stability misleading. CSIM's former President acknowledged that ███████████████████ ██████████████████. *See* Ex. AA; *see also* Ex. BB. An internal auditor testified that critical control and accounting departments were under strain, Ex. CC, and a senior operations manager admitted to "██████████████████████████████ █████████████████████████████████████████████████ ████████████" Ex. DD. This was particularly troubling given that George Pereira, CFO and Treasurer, reported to the ████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████ █████████████████████████████████. Ex. EE.

Managing Director Kevin Healey, who was responsible for doing credit analyses on the mortgage-backed and asset-backed securities purchased for the Fund, testified that the credit research department did not have sufficient resources to properly conduct credit reviews; had an 18-month backlog in 2006 for reviewing securities that had already been purchased; was simply "rubber stamping" the purchases after-the-fact; and was concerned that the Fund had "incredible exposure to real estate." Ex. FF. And Daifotis and Hastings ██████████████████████████ █████████████████████████████████████████████████ Exs. GG at 29-32; HH; II, JJ at 29-32.

III.    ARGUMENT

A.    **Schwab Did Not Fully Disclose The Risks Of Its Aggressive YieldPlus Strategy**

In arguments recycled from its denied motion to dismiss (*see* Doc. No. 115 at 11-12), Schwab says it "fully" disclosed the risks of the Fund's investments. Schwab at 4-8. Schwab cites the same prospectus and SAI material referenced in its motion to dismiss but cites very little record evidence, as if discovery never occurred in this case. Schwab's purported "disclosures" are not sufficiently specific to foreclose material issues of fact and put investors on notice, as a matter of law, that Schwab was dramatically altering the risk profile of the Fund. Schwab never disclosed to investors that it had substituted, in the words of the Court, a "treasure-hunting expedition" for an ultra-conservative strategy of preserving investors' capital. *In re: Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).

   1.    **The jury could find that Schwab's minimal, boiler-plate disclosures relating to mortgage-backed securities were insufficient to make the prospectus as a whole not misleading**

      a.    **The Fund's big gamble**

As the class period began, the Fund's non-agency mortgage-backed securities holdings were already exceeding 25%, *see* Ex. D at 29-30, 35, thereby resulting in a misrepresentation given the SAI's assurance that the Fund would not invest more than 25% of its assets in such securities. *E.g.*, Ex. A, § F, Stmt. 17. The Fund was showing non-agency mortgage-backed securities at less than 25% of total assets by sleight-of-hand, dropping its subprime holdings into the separate "asset-backed" classification even though subprime securities are, in fact, mortgage-backed instruments. Ex. D at 29-30, 35.

Fund managers had made a fateful decision. Treasury yields were low, corporate bonds were offering only incremental yields above Treasuries, and the managers had other concerns about the market for corporate bonds. Ex. KK at 79-80; Ex. LL at 62-64. In contrast ███████████ ███████████████████████████████████████████ Ex. MM at 162-63, 167. ███████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ███████ Ex. NN; Ex. OO at 57, 61; Ex. FF at 156. ██████████████████

████████████████████████████████████████████████████

██████████.[2]  *E.g.*, Ex. PP at 52-53; Ex. QQ at 129-31.  Indeed, within months of avoiding the

concentration limit (and before the next annual report was issued in August 2007 listing the Fund's

mortgage-backed securities holdings at the time), the Fund's holdings of non-agency mortgage-

backed securities zoomed past 25% and almost doubled.  Ex. PP at 53-54.

Schwab thus decided that, in order to more aggressively chase the "Plus" in "YieldPlus," it

would fundamentally change the Fund's risk profile in a gamble to increase returns by investing al-

most half of the portfolio in non-agency mortgage-backed securities.  What did Schwab disclose about

this new strategy and the risks it entailed?  *Little to nothing*.  The prospectuses hardly changed, and

there was no notice that investors had been subjected to a classic "bait-and-switch."

       **b.**     **Material issues of fact exist as to whether the disclosures adequately alerted investors to the big gamble**

Schwab's mortgage-backed securities descriptions constituted a very general, four-page

outline of what mortgage-backed securities are.  Fernandez Ex. H at *18-22.  The first page-and-a half

focused on the guarantees provided by governmental entities on agency securities, and other safety

assurances such as credit enhancements were discussed, followed by more general descriptions of

other types of mortgage-backed securities.  Discussion of risk was minimal and limited to general

statements that mortgage-backed securities "may be affected by a variety of economic and other

factors," that their price and yield were "difficult to predict with precision," and that their value was

"more or less sensitive to changes in prepayment and interest rates than is the case with traditional

MBS and ABS, and in some cases such market value may be extremely volatile."  *Id.* at *21.  Schwab

did not disclose the impacts that concentration in these investments would have on the share price

stability objective of the Fund.

In its brief, Schwab cites to a *separate* discussion of concentration added to the SAI in

September 2006 and providing that investing more than 25% of assets in privately-issued mortgage-

backed securities "may cause the fund to be more sensitive to adverse economic, business or political

---

   [2] This is the subject of Plaintiffs' claim for exceeding the concentration limit without holding a shareholder vote, which is discussed in detail *infra* at 24-25.

1    developments that affect" such securities. *Id.* at *16. This was the only material change in the dis-

2    closures that occurred after Schwab pulled the end-around the concentration limit.

3          That's it. From these simple statements, buried *116 and 130 pages* into the SAI, Schwab con-

4    tends that there can be no issue of material fact regarding whether a reasonable investor would under-

5    stand that concentrating the Fund's investments in non-agency mortgage-backed securities would jeo-

6    pardize the Fund's assurances of share price stability. Schwab is wrong. Plaintiffs' expert opines that

7    the Fund's prospectus and marketing materials did not adequately disclose the risk that this transfor-

8    mation presented to the objectives of the Fund and that such concentrations violated the Fund's invest-

9    ment guidelines and were "an affront to the Fund's objective of price stability." *Id.* at 26. Plaintiffs'

10   expert on the behavior of retail investors agrees, opining that a reasonable investor would not have

11   understood the substantial risks that the Fund was taking, would not be able to learn that Schwab

12   violated the terms of the prospectus, and would believe "that the Fund was effectively managing risk

13   in a way that would result only in small changes to the Fund's net asset value." Ex. F at 5.

14         Courts have rejected similar assertions that boiler-plate disclosures excuse otherwise

15   misleading statements. In *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 1997 U.S. Dist.

16   LEXIS 18485 (S.D.N.Y. Nov. 20, 1997), defendants relied on prospectus information about

17   mortgage-backed securities risks, including that rising interest rates may cause prepayments to occur

18   at a slower than expected rate, that prepayments can occur at any time, and that rising interest rates

19   generally decrease the value of the mortgage-backed securities. *Id.* at *17-19. But such disclosures

20   did not suffice to conclude, as a matter of law, that the *consequences* of "maturity extension risk"

21   were fully disclosed. While the disclosures, "understood together, clearly and accurately depict the

22   type of risk borne by the Fund, a reasonable investor could find both that the prospectus failed to

23   disclose the extent of the risk, and that this failure significantly altered the total mix of information

24   available." *Id.* at *19; *see also White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982,

25   986 (E.D. Wis. 2002) (boiler-plate warnings that certain securities involve greater risks and limited

26   liquidity were inadequate to support dismissal). So it is here, where Schwab's disclosures did not

27   explain – at all – the *consequences* of its concentration strategy.

28         The "cautionary language must be specific, prominent and must directly address the risk that

plaintiffs claim was not disclosed," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 322 (S.D.N.Y. 2009), and courts must examine the language *in context* to analyze whether they "accurately inform rather than mislead prospective buyers." *Miller v. Thane Int'l Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (quoting *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)); *accord SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, at *101 (C.D. Cal. Mar. 16, 2006); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 467 (S.D.N.Y. 2009). Investors are "not generally required to look beyond a given document to discover what is true and what is not." *Miller*, 519 F.3d at 887. Courts thus not only reject boiler-plate cautionary language that does not specifically address the plaintiffs' claims, they disfavor scattered disclosures that force investors to hunt-and-peck for key information.

For example, *Flag Telecom* criticized disclosures scattered in "various amendments, annexes and exhibits to the Prospectus and Registration Statement," finding that they did not suffice "as a matter of law to disclose the material facts to reasonable investors." 618 F. Supp. 2d at 324-25. This dovetails with expert opinion here that "it is not reasonable to expect an investor will study descriptions of a fund's portfolio composition or asset allocation, compare that data to the fund's stated objectives, and draw his own conclusions about the fund's risks or sources of return." Ex. RR at 4.

Schwab's cautionary language was "so generalized in nature that a reasonable jury could nonetheless find the prospectus misleading." *Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996); *see also Miller*, 519 F.3d at 887 (summary judgment should be denied if "a jury could reasonably find the document misleading despite the risks disclosed and the cautionary language employed").[3] Schwab did not tell investors that it was intending to make a concentrated bet on real estate through the increased concentrations of mortgage-backed securities *and* the bonds of financial companies and that such bets were inconsistent with stated representations that the Fund presents a risk of "minimal change in price" or "was similar to a money market fund" or the Lehman Index. Rather

---

[3] Questions as to whether a reasonable investor would consider the information important in making an investment decision – the touchstone of materiality – are usually left to the fact finder. *See, e.g., Basic v. Levinson*, 485 U.S. 224, 239-40 (1988); *Kaplan v. Rose*, 49 F.3d 1363, 1381 (9th Cir. 1994). Indeed, materiality involves "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Miller*, 519 F.3d at 885 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

1    than disclosing what impact the dramatic transformation of the Fund's risk profile would have,

2    Schwab instead chose to market and describe the Fund with the *exact same* assurances of share price

3    stability as before.  For example, the July 13, 2007 amendment to the November 15, 2006 prospectus

4    contained the same statements about "minimal changes in share price," "share price stability," and

5    "preserv[ing] investor capital" that were prominently featured in all of the preceding prospectuses

6    during the class period.  Berman Decl., ¶ 46.  Schwab made almost no change in the so-called

7    cautionary language it now cites.  The only change was to bury an extra sentence 116 pages into the

8    SAI (and not the prospectus proper) stating that mortgage-backed securities concentrations "may

9    cause the fund to be more sensitive to adverse economic, business or political developments that

10   affect" such securities.[4]

11        The jury could reasonably find the prospectus materials misleading notwithstanding the pur-

12   ported disclosures, given the buried generalities of the cautionary language, the repeated prospectus

13   material assurances that the Fund was designed to have "minimal changes in share price," "a high

14   degree of share price stability," and would "preserve investors' capital," and the continuing compari-

15   sons to the Lehman Index.  The jury could find that no reasonable investor would understand from

16   Schwab's conclusory and isolated statements that the Fund managers were embarking on a strategy

17   shift that would make the portfolio much riskier, greatly diminishing the likelihood of obtaining the

18   Fund's share price stability objective.  In other words, the jury could (and should) find that the disclo-

19   sures "were so generalized in nature" that the prospectus was nonetheless misleading, *Gray*, 82 F.3d at

20   884, and that the totality of Schwab's purported cautionary language did not directly address the risk

21   that Plaintiffs claim was not disclosed. *Flag Telecom*, 618 F. Supp. 2d at 322.  Summary judgment in

22

23        [4] Schwab also points to holdings in annual reports, Schwab at 5 n.4, but listing securities in
     August 2007 – 12 months after its last annual listing – obviously does not put investors on notice
24   during the preceding 12 months of the holdings. *Cf. Brown v. Brewer*, 2008 U.S. Dist. LEXIS
     108904, at *9 (C.D. Cal. July 14, 2008) (10Q issued long after proxy not part of the total mix of info
25   available to investors).  Further, Schwab cannot defend by reference to annual reports, semi-annual
     reports (which were not even incorporated into the prospectuses), or an obscure article on an SEC
26   website (Schwab at 4) because investors are not required to look beyond the prospectus itself. *Miller*,
     519 F.3d at 887; *Flag Telecom*, 618 F. Supp. 2d at 324.  Moreover, although Schwab listed holdings
27   in annual reports, this did not separately identify the amount of the riskier Alt-A and subprime
     holdings and did not disclose their enhanced risks and the lack of internal controls necessary to
28   manage the increased risks.

Schwab's favor is simply untenable on this record. Schwab has to demonstrate that "reasonable

minds could not disagree as to whether the *mix* of information in [the prospectus material] was mis-

leading." *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (holding that "[i]nclusion of some

cautionary language is not enough to support a determination as a matter of law that defendants'

statements were not misleading"). It cannot do so.

### 2.    The jury could find that the Fund's relative stability prior to the plunge reinforced prospectus assurances of capital preservation and concealed risks

Schwab contends that, as a matter of law, it could not have made any false or misleading state-

ments as to share price stability given that, for a time, the Fund's NAV was in fact relatively stable.

Schwab at 8-9. But the NAV only served to reinforce prospectus assurances of minimal changes in

share price and, as Mr. Fong explains, "masked the risks imbedded" in the mortgage-backed securities

concentration gamble even though that gamble provided the Fund with slightly better yield than its

competition for a time. Ex. D at 35. Those expectations were then crushed when the undisclosed,

ticking time-bomb of the risks detonated and the much more speculative nature of the Fund ultimately

revealed itself, causing massive losses. The Court has already correctly recognized that viable claims

can be based on misstatements and omissions that concealed "'the price-volatility risk (or some other

risk) that materialized and played some part in diminishing the market value of' the security," and that

loss can result from failing to disclose facts that cause injury through plaintiffs' undervaluation of the

risk. *In re: Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) (quoting *Lentell

v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005)). Indeed, misrepresentations and

omissions quite frequently conceal problems that later cause losses. *E.g., In re Countrywide Fin.

Corp. Derivative Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008) (stock price inflated by undisclosed

changes to the company's business model that relied on riskier products).

Schwab cites *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 97927 (S.D.

Cal. Aug. 1, 2006), Schwab at 8-9, but *Petco* merely held that 49 consecutive quarters of profit "signi-

ficantly weaken[ed]" scienter allegations that management knew that its statements about the defen-

dants' future prospects were false. *Id.* at *69-71. *Petco* says nothing about the later materialization of

loss resulting from misrepresentations and material omissions relating to a fund investment strategy's

1    true risks, as occurred here.

2          **3.     Schwab's other authorities are inapposite**

3          Schwab's primary legal "support" is *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159

4    F.3d 723 (2d Cir. 1998), and *Belodoff v. Netlist, Inc.*, 2008 U.S. Dist. LEXIS 45289 (C.D. Cal. May

5    30, 2008).  Schwab at 7-8.  The *Hunt* plaintiffs alleged that defendants failed to disclose that a fund

6    would invest in a certain type of mortgage-backed security, but the court found that the prospectus

7    did.  159 F.3d at 730-31.  Similarly, in *Belodoff*, the plaintiffs alleged a failure to disclose a decline in

8    demand from the defendant's largest customer, yet the prospectus did.  2008 U.S. Dist. LEXIS 45289,

9    at *24.  In contrast, Plaintiffs here do not allege that Schwab failed to disclose that the Fund would

10   invest in mortgage-backed securities but that the over-concentration strategy pursued by Schwab was

11   inconsistent with prospectus representations of share price stability and the like.

12         Schwab cites *In re Metricom Sec. Litig.*, 2004 U.S. Dist. LEXIS 7834 (N.D. Cal. Apr. 29,

13   2004), *aff'd sub nom. Young v. Dreisbach*, 182 Fed. Appx. 714 (9th Cir. 2006), Schwab at 5 n.4,

14   where the court applied Rule 9(b) to §§ 11 and 12 counts sounding in fraud and dismissed on the basis

15   that the defendants were under no obligation, at the time of the public offering, to reveal ongoing

16   negotiations.  2004 U.S. Dist. LEXIS 7834, at *68.  The dismissal had nothing to do with any pur-

17   ported disclosures.  Further, *Metricom* conflicts with the Ninth Circuit's decision in *Miller* holding

18   that investors are not required to look beyond the prospectus itself.  *See Miller*, 519 F.3d at 887.

19         *In re N.Y. Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006) (cited by

20   Schwab at 5 n.4), is distinguishable on the basis that the court ruled that a corporate officer's verbal

21   assurances that the company was risk averse amounted to "no more than inactionable puffery" in the

22   face of prospectus risk disclosures.  448 F. Supp. 2d at 479-80.  Importantly, the statements at issue

23   were not considered prospectus materials, like they are here.

24         Citing *In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, 1996 U.S. Dist. LEXIS

25   14209, at *12-13 (S.D.N.Y. Sept. 27, 1996), Schwab contends that a fund's investment objective is

26   not the type of statement that a reasonable investor would consider important in deciding whether to

27   invest.  Schwab at 8.  But the *Alliance* court's ruling that a fund's investment objective is inactionable,

28   forward-looking puffery is cavalier and contravenes the SEC, which considers the objective "a critical

1    determinant of the potential risk and reward inherent in the shareholder's investment" and one of a

2    fund's "most defining attributes" that should not be changed without a shareholder vote because doing

3    so "dramatically alters the nature of the shareholder's investment, requiring in effect, a new

4    investment decision." Ex. SS.  Indeed, the Fund's investment objective here was so important that

5    Schwab made it a fundamental policy that could not be altered without a shareholder vote.  *Fernandez*

6    *Decl. Exh. H* at *13; *see also* Ex. D at 17 ("Of critical importance is the disclosure of the fund's

7    objectives (the type of fund) and associated investment guidelines (how the objectives will be

8    achieved)").  Tellingly, although *Alliance* is 14-years old, no other court in a published opinion has

9    approved this particular aspect of its ruling.  And Schwab's argument also ignores its many

10   misrepresentations appearing outside the investment objective.

11          Schwab next argues that it cannot be held liable for failing to disclose the risks associated with

12   the Fund's concentrated positions in mortgage-backed securities because "[i]nformation about mort-

13   gage-backed securities, of course, was publicly available and widely known to the market."  Schwab

14   at 10.  As support, Schwab cites several decisions standing for the unremarkable proposition that

15   certain "extraneous" information already in the public domain need not be incorporated into disclo-

16   sures.  *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009); *Landmen Partners, Inc. v.

17   Blackstone Group, L.P.*, 2009 U.S. Dist. LEXIS 87001 (S.D.N.Y. Sept. 22, 2009); *Wielgos v.

18   Commonwealth Edison Co.*, 892 F.2d 509 (7th Cir. 1989); *In re Infonet Servs. Corp. Secs. Litig.*, 310

19   F. Supp. 2d 1080 (C.D. Cal. 2003).

20          These authorities do not help Schwab.  First, they either involved fraud on the market pre-

21   sumptions and/or failed to note the Ninth Circuit's rule that investors are not required to look beyond

22   the prospectus "to discover what is true and what is not," for "in an action that does not involve the

23   fraud on the market presumption, *that truthful information is available elsewhere does not relieve a

24   defendant from liability for misrepresentations in a given filing or statement*."  *Miller*, 519 F.3d at 887

25   & n.2 (emphasis added); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437-38

26   (S.D.N.Y. 2009) (noting the "serious limitations" on charging investors with knowledge of publicly

27   available info omitted from a prospectus).  Second, the policy rationale of excluding from offering

28   documents a flood of extraneous items that would obfuscate truly material information is not invoked

PLTFS' MEMO. IN OPP. TO SCHWAB'S MOTION. FOR          - 15 -
SUMMARY JUDGMENT - 08-cv-01510 WHA
010036-12 356978 V1

here.  So, in contrast to *Wielgos*' observation that "investors do not want to know everything that could go wrong," 892 F.3d at 517, the Class here certainly would have wanted to know that (i) Schwab was intending to morph the Fund into a concentrated real estate bet and (ii) the Fund's gambling on mortgage-backed securities and the corporate bonds of financial firms presented concentrated risks that were inconsistent with the core objectives of the Fund.  And in *Rubke*, the omitted information did not render any representation in the registration statement false or misleading, and its extraneous nature and ready public availability negated any affirmative duty to disclose.  *See* 551 F.3d at 1163.

Nor were details of the underlying mortgage instruments and their impact on the portfolio easily determined from publicly available information, let alone easily understood by the average investor.  Mortgage-backed securities are "complicated financial products" that include derivative securities valued using complicated mathematical models incorporating a host of "prepayment assumptions and other factors that involve estimates of future economic and market conditions." *TCW/DW N. Am.*, 1997 U.S. Dist. LEXIS 18485, at *9-10; *see also* Ex. D at 30-40 (discussing complexity).  "A reasonable investor would have no practical way of learning about, or comprehending, the substantial risks undertaken in the residential mortgage back[ed] securities purchased by the YieldPlus Fund.  Nor would an investor be able to learn that the fund manager had violated the conditions of his fund's prospectus." Ex. F at 5.  Indeed, Schwab employed a specialized department of credit analysts whose training and occupation were tailored to determining the quality and risks of the complex mortgage instruments in which the Fund invested.  And given that Schwab trustee Gerald Smith ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ (Ex. TT 157-58, 162-63), it is fantasy to conclude as a matter of law that the Fund's investors did.  Schwab cites no authority that individual investors should be charged with this level of specialized knowledge, because no such authority exists.

**B.    Schwab Cannot Carry Its Summary-Judgment Burden to Prove Negative Causation**

**1.    Negative Causation imposes a "heavy" burden on Defendants**

Loss causation is not an element of §§ 11 and 12, which impose strict liability and *presume* that any decline in value is caused by the alleged misrepresentations or omissions. *In re Dynegy, Inc.*

1  *Sec. Litig.*, 339 F. Supp. 2d 804, 867 (S.D. Tex. 2004). Schwab can overcome the presumption of

2  causation only by showing that some other supervening event, wholly unrelated to its misstatements,

3  caused the loss. 15 U.S.C. § 77k(e). Schwab's burden is very heavy, as discussed in detail at pp. 3-5

4  of Plaintiffs' Memorandum in Support of Mtn. for Partial Summary Judgment re Loss Causation

5  ("Mtn. re Loss Causation"), which are incorporated by this reference. Schwab says little about its

6  heavy burden, because it requires Schwab to prove something that it cannot: "that no reasonable juror

7  could believe that *any portion of [plaintiffs']* losses was caused by the defendants' alleged

8  misrepresentations in the registration statements, *i.e.*, the losses were caused by another factor." *Id.*

9  (emphasis added). *See* Mtn. re Loss Causation at 4. If Schwab cannot prove that the misstatements

10  are entirely unrelated to the losses, its negative-causation affirmative defense fails. *See id.*; *In re*

11  *Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005).

12  **2.    The Court has already rejected Schwab's narrow view of negative causation**

13  Schwab's argument is a nearly verbatim recitation of its prior negative-causation argument this

14  Court already rejected. *See* Schwab Mtn. to Dismiss, Dkt. No. 115, at 14-16; Schwab Reply to Mtn.

15  to Dismiss, Dkt. No. 145, at 7-8. As before, Schwab asserts that the Supreme Court in *Dura Pharms.,*

16  *Inc. v. Broudo*, 544 U.S. 336 (2005), required plaintiffs to establish loss causation by proof that the

17  market price of a security dropped upon public disclosure of the concealed truth. Schwab at 11. But

18  this Court recognized that *Dura* did not limit loss causation so narrowly:

> [D]efendants restrict the concept of loss causation ... too narrowly....
> Although the loss causation inquiry often hinges on the timing of
> purchases and sales in relation to the typical inflation-disclosure-
> deflation cycle, loss causation is not limited to that scenario.... Indeed,
> although *Dura* addressed that scenario, the decision explained that it
> "need not, and d[id] not, consider other proximate cause or loss-related
> questions." [Order, Dkt. No. 164, at 9-10.]

23  *Dura*'s refined test for loss causation is thus a broad concept encompassing many theories of loss.

24  *Dura* did not confine it solely to proof that the price plummeted after the truth was disclosed. While

25  that is "one way to plead loss causation," it is "not the only way." *Siemers v. Wells Fargo & Co.*,

26  2007 U.S. Dist. LEXIS 21935, at *45-46 (N.D. Cal. Mar. 9, 2007).

27  The Court also rejected Schwab's narrow view of loss causation as overtly self-serving:

28  "Defendants' narrow formulation of loss causation would effectively insulate mutual fund companies

from claims for a wide range of material misrepresentations regarding fund policies, risks and investment decisions." Order, Dkt. No. 164, at 10. The Court thus rejected Schwab's contention that the way in which mutual funds' shares are priced "makes it impossible for plaintiffs' alleged misrepresentations to have caused plaintiffs' losses" and that plaintiffs' losses "were caused by 'other factors' apart from any alleged misrepresentations." *Compare* Schwab at 12 *with* Order, Dkt. No. 164, at 9 (explaining and rejecting Schwab's argument).

The Court then articulated the applicable formulation of loss causation:

> [A] plaintiff may establish loss causation by alleging "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered;" that defendants' "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of" the security.

*Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173, 177 (2d Cir. 2005)). In other words, the loss must be caused by the materialization of the concealed risk, *id.* (quoting *In re Mutual Funds Inv. Litig.*, 568 F. Supp. 2d 349, 359 (D. Md. 2008)), that is, "where a plaintiff proves that 'it was the very facts about which the defendant lied which caused its injuries,'" *id.* (quoting *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007)).

The Court agreed that Plaintiffs' allegations met this standard:

> Here, plaintiffs certainly alleged that the *subject* of the fraudulent statements caused their losses – that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses. Similarly, if defendants misrepresented the scope of the fund's risks, and the undisclosed risks exacerbated the losses, then plaintiffs' resulting undervaluation of risks might be deemed to have caused some portion of their losses. [*Id.* at 11 (emphasis in original).]

Schwab asserts it fully disclosed the risks that later materialized to cause or exacerbate the Class's losses. Schwab at 13. To the contrary, Schwab concealed those risks. *See supra* at 8-14.

### 3. Schwab's evidence fails to dispel any issue of material fact relating to whether Schwab's statements about mortgage-backed securities concealed risks that materialized to cause the Class's losses

Schwab again argues that Plaintiffs cannot show that "some hidden over-concentration in mortgage-backed securities later materialized to cause the fund's losses" because the Fund fully disclosed its allocation to non-agency mortgage-backed securities. Schwab at 14-15. But Schwab did not fully disclose the risks of the Fund's over-concentration in mortgage-backed securities and

corporate bonds, and a material issue of fact exists regarding whether Schwab's minimal, boiler-plate disclosures relating to mortgage-backed securities can trump prospectus assurances that the Fund was engineered to offer minimal changes in share price. *See supra* at 8-14.

Schwab next contends that there is no factual dispute that the Fund's mortgage-backed securi-ties holdings did not cause any losses. Schwab at 16. To the contrary, Plaintiffs' expert ran a "realized loss attribution" that segregated the Fund's NAV decline by each security type, which showed that the Fund's losses were indeed caused by investments in non-agency mortgage-backed securities and the bonds of financial issuers. Ex. D at 44-45. "The Fund's losses are [thus] a direct result of the toxic over-concentration in the mortgage-backed securities and other finance-related investments." *Id.* at 44. Schwab argues that the proportionality of the loss to the Fund's holdings of these instruments somehow vitiates liability, Schwab at 16, and that Plaintiffs cannot "simply" argue that Schwab misrepresented the risk of mortgage-backed securities and then show that they declined in value, *id.* at 14. Yet, as the Court has already recognized, a materialization of undisclosed risks is a valid measure of causation. Order, Dkt. 164 at 11.

Second, Schwab's own fact witnesses *admitted* that investments in non-agency mortgage backed securities caused Fund losses. These witnesses include portfolio managers Daifotis, Hastings, and Tikofsky. Plaintiffs outline this evidence in detail in their Motion for Partial Summary Re: Negative Causation (filed under seal), at 6-10, which Plaintiffs incorporate by reference.

Schwab concludes its argument with its tread-worn mantra that the Fund's decline was due to a "once-in-a-century, unforeseen credit crisis." Schwab at 16. But Plaintiffs' damages expert, Candace Preston, debunked this myth. She showed that most of the ultra-short peer funds did not sustain the losses that YieldPlus did and, as a group, actually *made money* during the class period. Her analysis of the peer funds demonstrates that the losses sustained by the Fund were security-specific and did not indicate market conditions for these securities in general, as evidenced by the performance of similar ultrashort bond funds. Ex. UU at 10-15.

Other evidence, much of it from in Defendants' own files, also negates Schwab's defense that the mortgage market's problems were unprecedented and unforeseeable. For example, on September 22, 2006, ███████████████████████████████████████████████ed

1   ███████████████████████████████████████ Ex.

2   VV. In response, Stephen Ward ████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████.” *Id.* And Daifotis retained several reports from Wall

5   Street that referenced, as early as 2006 and into early 2007, the possibility of a severe market

6   downturn. One report from January 2007 went so far as to foresee "The Crash of 2009," questioning

7   "When's the Next Bank Run?" and noting risk factors such as a "Massive Housing Correction" and

8   "Drying up of Excess Liquidity." Ex.WW at 31. The "Greatest Risks" reported were "Liquidity

9   squall, as soon as 2007," and "Global housing correction," *id.* at 55, both of which, of course, came to

10  fruition. *See also* Ex. XX at 30, 33; Ex. YY at 7; Ex. ZZ.

11      **4.      There is a factual dispute as to whether the filing of the initial complaint here
                  establishes negative causation as to the § 12(a)(2) claim**

12          Schwab also insists that it is not responsible for any declines in NAV occurring after this

13  litigation was filed on March 18, 2008 because "the supposed 'truth' was revealed no later than" then.

14  Schwab at 24. But the filing of the initial complaint did not stop shareholders' losses. Assuming for

15  argument purposes only that knowledge of the disclosures in the initial complaint negates causation

16  for subsequent losses, Schwab presents no evidence – and certainly not enough to meet its burden on

17  its summary-judgment motion – that Class Members knew of the complaint and its allegations. First,

18  Schwab asserts no legal basis for presuming Class Members' reliance on the March 18, 2008

19  complaint's purportedly corrective disclosures and makes no effort to sustain its heavy burden of

20  proving beyond factual dispute that Class Members learned of them by March 18, 2008. Schwab

21  instead merely proclaims that the "supposed 'truth' about YieldPlus" did not credibly "remain

22  hidden." Schwab at 24. Nor does Schwab offer any authority that Class Members are charged as a

23  matter of law with knowledge of that complaint's allegations. None of the Lead Plaintiffs were

24  parties to the March 18 complaint, and they specifically deny any knowledge at that time of the facts

25  and risks concealed by Schwab's misstatements. *See* Complaint, Dkt. No. 1; Declarations of Coffin,

26  Dickson, Levin, Mikelonis, and O'Donnell in Opposition to Schwab's Motion for Summary

27  Judgment. The filing of the March 18 complaint thus does not establish negative causation beyond

28

1 factual dispute.

2 **C.   Section 12 Relief Extends Beyond the Complaint-Filing Date**

3       **1.   § 12(a)(2) rescission does not deduct the share price on any particular day**

4       Schwab contends that the share price on March 18, 2008 limits § 12(a)(2) *damages* for those

5 who still hold shares. Schwab at 22-24. This is wrong. Section 12 provides different relief for

6 investors (i) who sold their shares before commencing suit or (ii) who continue to hold their shares

7 upon filing suit. Schwab at 22. Investors who continue to hold may "upon the tender of such

8 security," "recover the consideration paid for such security ...." 15 U.S.C. § 771(a)(2); *Wigand v.*

9 *Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979); *Siemers v. Wells Fargo & Co.*, 2007 U.S. Dist. LEXIS

10 39091, at *11 (N.D. Cal. May 17, 2007). This recovery of consideration is subject to several

11 adjustments: "the addition of interest thereon, less the amount of any income received thereon ...," 15

12 U.S.C. § 771(a)(2); *Wigand*, 609 F.2d at 1036 n.8, plus the amount of loss that a defendant proves

13 was not caused by the alleged misrepresentations. 15 U.S.C. § 77l(b).

14       By contrast, investors who sold their shares before filing suit may recover damages. 15 U.S.C.

15 § 771(a)(2); *Randall v. Loftsgaarden*, 478 U.S. 647, 655 (1986); *Siemers*, 2007 U.S. Dist. LEXIS

16 39091, at *11. The status as of the filing date thus governs which option applies to a plaintiff. *See*

17 *Wigand*, 609 F.2d at 1035; *Ong v. Sears, Roebuck & Co.*, 2005 U.S. Dist. LEXIS 20391, at *51 (N.D.

18 Ill. Sept. 14, 2005). After filing, plaintiff has no choice of remedy. *Goldkrantz v. Griffin*, 1999 U.S.

19 Dist. LEXIS 4445, at *15 (S.D.N.Y. Apr. 5, 1999) (quoting *Wigand*).[5]

20       Schwab asserts, incorrectly, that Class Members who continue to hold shares are subject to a

21 "damages calculation formula" limiting the recovery by "the price on the date of tender." Schwab

22 misstates § 12(a)(2) rescissionary relief where plaintiff continues to hold. Consistent with the

23 statute's plain language, a plaintiff can recover the share's *full* purchase price. *See Wigand*, 609 F.2d

24 at 1036. This relief, after adjusting for dividends and interest, in exchange for returning the security

25 satisfies rescission's fundamental purpose of returning the parties to the status quo. *See id.* at 1035.

26

---

27    [5] Plaintiffs agree that those who continue to own shares at the time of filing must tender their shares. *See* Schwab at 23; *see also Wigand*, 609 F.2d at 1034. Schwab acknowledges that Plaintiffs

28 here have done so. Schwab at 23 (citing Complaint, Dkt. No.1, ¶ 50).

1    And this leaves no room for deducting the share's value on the suit date (or any other date).  The

2    share's value at any time other than the purchase date is irrelevant to the relief amount.  *Merzin v.*

3    *Provident Fin. Group Inc.*, 311 F. Supp. 2d 674, 684 (S.D. Ohio 2004).  The purchase price is thus the

4    *only* relevant factor to calculating rescissionary relief (aside from adjustments for interest, dividends

5    and possibly negative causation).

6         Schwab's argument improperly co-mingles § 11 damages and § 12(a)(2) rescission.  The § 11

7    measure of damages is generally the difference between the security's purchase price and its price

8    when the suit was brought.  *See* 15 U.S.C. § 77k(e).  But unlike § 12(a)(2), plaintiffs may retain their

9    shares under § 11, so it is appropriate to subtract the security's market value on the suit date.

10   Schwab's asserted § 12(a)(2) damages formula thus grants it a windfall:  it obtains Class Members'

11   shares without paying for them.

12        To be clear, § 12(a)(2) may require inquiry into the security's value on the date of suit, or later

13   to determine whether plaintiff has been *injured*.  If the value exceeds the rescissionary relief, courts

14   dismiss § 12(a)(2) claims because awarding rescission would cause plaintiff a loss.  *See, e.g., Merzin*,

15   311 F. Supp. 2d at 686; *Siemers*, 2007 U.S. Dist. LEXIS 39091, at *11 & *13.  But this inquiry is

16   distinct from measuring the *amount* of rescissionary relief awarded to an injured plaintiff.

17        Schwab's authority, *Ong v. Sears, Roebuck & Co.*, is consistent.  *Ong* properly characterized

18   § 12(a)(2) relief for a plaintiff that retained shares at the suit date as "the consideration paid for such

19   security with interest thereon ...."  2005 U.S. Dist. LEXIS 20391, at *45.  But the defendant was not

20   injured; the "only potential remedy – rescission" was unavailable because the notes were "currently

21   trading at a price that exceeds the purchase price."  *Id.* at *49.  The court therefore dismissed the

22   § 12(a)(2) claim for lack of injury.  *Id.*  But *Ong* did *not* rule that plaintiffs who hold shares on the suit

23   date have their rescissionary relief reduced by "the price on the date of tender ...."  *Cf.*, Schwab at 23.

24        Schwab's only other authority, *Goldkrantz v. Griffin*, 1999 U.S. Dist. LEXIS 4445, at *15, is

25   poorly reasoned and unpersuasive.  Misciting *Wigand*, the court created a damages formula for

26   § 12(a)(2) rescission, limiting recovery to the difference between the original consideration and the

27   value of the shares at the time of filing the complaint.  *Id.*  But as shown, *Wigand* ruled that a

28   prevailing § 12(a)(2) plaintiff is entitled to a full refund of consideration (with adjustments for interest

PLTFS' MEMO. IN OPP. TO SCHWAB'S MOTION. FOR          - 22 -
SUMMARY JUDGMENT - 08-cv-01510 WHA

010036-12 356978 V1

1    and dividends). *See supra* at 21. *Wigand* nowhere held that § 12(a)(2) rescission allows subtracting

2    the security's current value from its purchase price. Nor does *Goldkrantz* explain how its damages

3    formula could possibly harmonize with § 12(a)(2)'s tender requirement. Rather, *Goldkrantz* simply

4    misread *Wigand* by ignoring that, while the security's value on the suit date or later can be relevant to

5    determining whether plaintiff incurred any § 12(a)(2) injury at all, the *amount* of rescission under

6    § 12(a)(2) requires refunding the original consideration, without deducting the security's current

7    value. *Goldkrantz* is poor authority and should be rejected.

8        **2.    Plaintiffs are not gaming § 12(a)(2)'s rescissionary relief**

9           Schwab accuses Plaintiffs of attempting to game § 12(a)(2)'s relief by stalling the actual

10   tendering of their shares. But Schwab misinterprets the tender obligation. Section 12 does not require

11   Plaintiffs to physically relinquish custody of their shares to Schwab before trial. Actual tender can

12   await judgment that determines liability and the rescissionary amount. *Wigand*, 609 F.2d at 1035

13   (explaining *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269, 273 (10th Cir. 1957)). Further,

14   *Wigand* explained, the *Stadia* plaintiffs turned over custody of their stock certificates to the court.

15   This sufficed because "[d]efendants have not indicated any prejudice to them by the form of the

16   tenders.... Any question as to the rights of the defendants to delivery of the stock can be determined

17   by the trial court when it arises." *Id.* (quoting *Stadia*, 251 F.2d at 274).

18          Here, Class Members' tender satisfies *Wigand* and *Stadia* because there is no ownership docu-

19   ment to tender to Schwab and there thus will be no question of Schwab's rights to Class Members'

20   Fund shares upon Schwab's payment of rescission. YieldPlus shareholders possess no stock certifi-

21   cate or other artifact of share ownership. In exchange for payment of rescission in satisfaction of

22   judgment on the § 12(a)(2) claim, Schwab can unilaterally cancel all Class Members' shares. There is

23   thus no opportunity for Class Members who have not already sold their shares to "exploit"

24   rescissionary relief.

25          Schwab's reliance on *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192

26   (S.D.N.Y. 2004), is misplaced. The *AOL* plaintiff had stalled tendering and requesting rescission

27   under § 12(a)(2), mistakenly believing it could elect between rescission and damages at a later stage

28   of the litigation. *See id.* at 247. The court rejected this tactic, ruling, just as Plaintiff here urge, that

PLTFS' MEMO. IN OPP. TO SCHWAB'S MOTION. FOR
SUMMARY JUDGMENT - 08-cv-01510 WHA

- 23 -

the form of relief available under § 12(a)(2) is determined on the suit date, preventing a plaintiff from subsequently selecting a remedy based on the current market prices.  *See id.*; *see supra* at 21.

**D.    The Fund Deviated From Its Concentration Policy, And Summary Judgment Cannot Be Granted to Schwab on This Issue**

**1.    Schwab's argument is an attempt to evade § 13(a)'s shareholder protections**

Schwab claims that as a matter of law it can sidestep the 25% cap on investing in non-agency mortgage-backed securities set forth in the Fund's no-concentration policy simply by rewriting definitions.  But Plaintiffs have already explained that the purposes and remedial nature of the Investment Company Act compel interpreting § 13(a) to bar Schwab from reversing its disclosed classification of non-agency mortgage-backed securities as a separate industry without first obtaining shareholder approval; and that the Fund breached its no-concentration policy and Schwab violated § 13(a) and California's Unfair Competition Law by then investing more than 25% of the Fund's assets in these securities.  Plaintiffs also distinguished the authorities that Schwab previously cited to the SEC and again to this Court.  Rather than repeating its arguments here, Plaintiffs refer the Court to pp. 11-19 of their Memorandum in Support of Motion for Partial Summary Judgment Re:  UCL Liability, at 11-19 (filed under seal on February 11, 2010) ("Mtn. re UCL Liability").

**2.    Schwab's revised definition also is not reasonable**

The SEC requires that an industry classification must be reasonable.  *See* Mtn. re UCL Liability, at 15.  There is, at minimum, a factual dispute as to whether Schwab's revised definition is reasonable, and that this precludes summary judgment in Schwab's favor.

As discussed in great detail in Plaintiffs' Mtn. re UCL Liability at pp. 6-9, which are incorporated herein by this reference, Schwab revised its classification of non-agency mortgage-backed securities as a separate industry with little supporting research and rammed through the change without a shareholder vote.  Plaintiffs' expert opines that the change to the SAI purportedly permitting the Fund to exceed its prior limit of investing more than 25% of its total assets in non-agency mortgage-backed securities was *not* reasonable and was inconsistent with the Fund's fundamental investment policy that it would not "concentrate" in a particular industry.  Ex. D at 28.  Plaintiffs' expert performed correlation analyses supporting this opinion and concluded that mortgage-backed securities generally

1    are highly correlated with bonds from the corporate financial sector, and that non-agency mortgage-

2    backed securities are highly correlated with agency mortgage-backed securities. *Id.* at 42-44.

3         The correlation between the performance of non-agency mortgages and agency mortgages is

4    not surprising and easily anticipated, as Daifotis and Hastings both admitted that both types of mort-

5    gages are secured by mortgages on residential real estate. Ex. AAA at 68-69; Ex. BBB at 94. Daifotis

6    also admitted that this was an obvious risk common to both categories, and that non-agency mortgage-

7    backed securities can turn out to be a worse investment than agency mortgage-backed securities (and

8    vice-versa). Ex. AAA at 69-71; *see also* Ex. CCC at 33-34 (█████████████████████████

9    ████████████████████████████). Hastings testified that non-agency CMO and

10   agency CMO returns are "incredibly highly correlated." Ex. DDD at 160.

11        Plaintiffs' expert concludes that the high correlation confirms that high co-movement (or lack

12   of diversification) between these assets means it does not make sense from a diversification standpoint

13   to separate out any of these groupings as a separate industry or sector because concentration risks

14   would exist regardless of the grouping chosen. Ex. D at 43. Mortgage-backed securities "are all

15   subject to the same type of risk. If interest rates or the housing price[s] move or if demand for MBS

16   declines, all MBS have the same exposure – this is why they should have been considered a single

17   industry." Ex. O at 7. Notably, there were other ultra-short funds, such as the Wells Fargo Advantage

18   Ultra Short-Term Income Fund and the DFA On-Year Fixed-Income Fund, that did not exempt

19   mortgage-based securities from their concentration policies and did not lose value in late-2007 and

20   early 2008 as YieldPlus did. *Id.* The decision to exceed the 25% limit also "exposed the Fund to

21   excessive risks that were foreseeable," *id.*, was not reasonable, was not adequately disclosed, and

22   magnified the Fund's return loss. Ex. D at 43.

23        In short, this evidence shows that Schwab's industry-classification change was unreasonable.

24   There is, accordingly, a question of fact as to whether Schwab's revised definition itself violated

25   § 13(a), irrespective of whether Schwab was otherwise legally entitled to the change.

## IV.    CONCLUSION

27        For the reasons set forth above, the Court should deny Schwab's summary-judgment motion.

28

1     Dated: March 4, 2010.

2                        HAGENS BERMAN SOBOL SHAPIRO LLP

3                        Reed R. Kathrein
Peter E. Borkon

4                        715 Hearst Avenue, Suite 202
Berkeley, CA 94710

5                        Telephone: (510) 725-3000
Facsimile: (510) 725-3001

6                        reed@hbsslaw.com

7                        peterb@hbsslaw.com

8

9                        By:   <u>s/ Steve W. Berman</u>

10                             Steve W. Berman
Sean R. Matt

11                             Erin K. Flory
Lisa M. Hasselman

12                        HAGENS BERMAN SOBOL SHAPIRO, LLP

13                        1918 Eighth Avenue, Suite 3300
Seattle, WA 98101

14                        Telephone: (206) 623-7292
Facsimile: (206) 623-0594

15                        steve@hbsslaw.com
sean@hbsslaw.com

16                        erin@hbsslaw.com
lisah@hbsslaw.com

17

18                        *Attorneys for Lead Plaintiffs and the Classes*

19

20

21

22

23

24

25

26

27

28