DARRYL P. RAINS (CA SBN 104802)
EUGENE ILLOVSKY (CA SBN 117892)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
Email: DRains@mofo.com

CRAIG D. MARTIN (CA SBN 168195)
DOROTHY L. FERNANDEZ (CA SBN 184266)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for defendants The Charles Schwab Corporation,
Charles Schwab & Co., Inc., Charles Schwab Investment
Management, Inc., Schwab Investments, Charles R. Schwab,
Evelyn Dilsaver, Randall W. Merk, George Pereira, Matthew
Hastings, Mariann Byerwalter, Donald F. Dorward, William A.
Hasler, Robert G. Holmes, Gerald B. Smith, Donald R.
Stephens, and Michael W. Wilsey

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CHARLES SCHWAB CORP. SECURITIES LITIGATION | Master File No. C-08-01510-WHA <br><br> <u>CLASS ACTION</u> <br><br> SCHWAB'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE SECTION 17200; AND <br><br> SCHWAB'S NOTICE OF MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT RE SECTION 17200 <br><br> Date: March 25, 2010 <br> Time: 8:00 a.m. <br> Judge: Hon. William H. Alsup |

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE THAT, on March 25, 2010, at 8:00 a.m. or as soon thereafter

4

as the matter may be heard, in Courtroom 9 of the United States District Court for the Northern

5

District of California, 450 Golden Gate Avenue, San Francisco, California, defendants The

6

Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Investment

7

Management, Inc., Schwab Investments, Charles R. Schwab, Evelyn Dilsaver, Randall W.

8

Merk, George Pereira, Matthew Hastings, Mariann Byerwalter, Donald F. Dorward, William A.

9

Hasler, Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, and Michael W. Wilsey will,

10

and hereby do, move the Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure and

11

Local Rule 7-2, for summary judgment on the availability of restitutionary damages for

12

plaintiffs' claim for violation of California Business and Professions Code section 17200, Count

13

IV of the Second Consolidated Amended Complaint.

14

This motion is based on this notice of motion, part V of the accompanying brief in

15

support of the motion, and such other written or oral argument as may be presented at or before

16

the time this motion is taken under submission by the Court.

17

18

19

20

21

22

23

24

25

26

27

28

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

i

1

## STATEMENT OF ISSUES
### (Local Rule 7-4)

2

3

4

    1.      Should the Court deny plaintiffs' motion for summary judgment on their claim

5

under section 17200 when the YieldPlus fund did not violate section 13 of the Investment

6

Company Act because it did not deviate from its fundamental concentration policy?

7

    2.      Should the Court grant summary judgment on plaintiffs' section 17200 claim

8

where plaintiffs cannot prove that they are entitled to restitution from any of the defendants

9

because none of the defendants "wrongly obtained" money from investors when the net asset

10

value of the YieldPlus fund declined?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Schwab's: (1) Opp. to Mot. for Sum. Judg. Re § 17200 And (2) Notice of Motion &
Cross Motion for Sum. Judg. Re § 17200 — Master File No. C-08-01510-WHA
sf-2808741

ii

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION.................................................................................i

STATEMENT OF ISSUES..................................................................................................ii

TABLE OF AUTHORITIES...............................................................................................iv

INTRODUCTION ...............................................................................................................1

ARGUMENT.......................................................................................................................2

I.  THE YIELDPLUS FUND NEVER DEVIATED FROM ITS
     CONCENTRATION POLICY. ................................................................................2

        A.  The YieldPlus Fund's Concentration Policy. .............................................2

        B.  The Meaning of "Industry." .......................................................................3

        C.  Schwab Reasonably Concluded that Mortgage-Backed Securities Are Not
              Part of Any Industry. ..................................................................................5

        D.  The YieldPlus Fund Did Not Deviate From Its Concentration Policy When
              It Allocated More Than 25 Percent of Its Assets to Mortgage-Backed
              Securities. ...................................................................................................7

II.  SCHWAB'S CLASSIFICATION OF MORTGAGE-BACKED SECURITIES
      DID NOT "REWRITE" THE FUND'S CONCENTRATION POLICY.........................8

        A.  The YieldPlus Fund Never Changed Its Concentration Policy. .............8

        B.  Changes to a Separate Portion of the Fund's Registration Statement Did
              Not "In Effect" "Rewrite" the Fund's Concentration Policy. ...............9

        C.  Schwab Legally Changed Its Industry Classifications Without Shareholder
              Approval. ..................................................................................................10

        D.  Industries, and Industry Classifications, Constantly Evolve Without
              Requiring Shareholder Votes....................................................................14

        E.  Allowing Revisions to Industry Classifications Does Not Render  Section
              13(a) "Meaningless." ...............................................................................15

III.  THE INVESTMENT COMPANY ACT'S "POLICY" DOES NOT PROHIBIT
       CHANGES TO INDUSTRY CLASSIFICATIONS.....................................................16

IV.  SCHWAB'S "PURPOSES" FOR CHANGING ITS CLASSIFICATION OF
       MORTGAGE-BACKED SECURITIES ARE IRRELEVANT..................................17

V.  PLAINTIFFS CANNOT RECOVER RESTITUTION UNDER SECTION 17200.........19

        A.  Plaintiffs' Section 17200 Claim Is a Derivative Claim, Not a Class Claim...........19

        B.  Plaintiffs Cannot Obtain Restitution For Their Voting Right Claim. ..................21

        C.  Plaintiffs Cannot Seek Restitution Because No Defendant "Wrongfully
              Obtained" Their Money. .........................................................................22

CONCLUSION..................................................................................................................23

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

iii

# **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*American Iron and Steel Inst. v. OSHA,*
939 F.2d 975 (D.C. Cir. 1991) .................................................................3

*Bank of the West v. Superior Court,*
2 Cal. 4th 1254 (1992)...........................................................................22

*Batchelder v. Kawamoto,*
147 F.3d 915 (9th Cir. 1998) .................................................................20

*Baugh v. CBS, Inc.,*
828 F. Supp. 745 (N.D. Cal. 1993) ........................................................23

*Blasberg v. Oxbow Power Corp.,*
934 F. Supp. 21 (D. Mass. 1996) ...........................................................20

*Davis & Cox v. Summa Corp.,*
751 F.2d 1507 (9th Cir. 1985) ...............................................................20

*Ernst & Ernst v. Hochfelder,*
425 U.S. 185 (1976) ..............................................................................16

*Everett v. Bozic,*
No. 05 Civ. 00296 (DAB), 2006 WL 2291083 (S.D.N.Y. Aug. 3, 2006)............................20

*Forsythe v. Sun Life Fin., Inc.,*
417 F. Supp. 2d 100 (D. Mass. 2006).....................................................20

*Halebian v. Berv,*
631 F. Supp. 2d 284 (S.D.N.Y. 2007) ....................................................22

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.,*
No. 95 Civ. 0330 (LMM), 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996) ...........................12

*In re Charles Schwab Corp. Sec. Litig.,*
No. C 08-1510 WHA, 2009 WL 2591389 (N.D. Cal. Aug. 21, 2009) ................................23

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,*
No. 98 Civ. 4318 (HB), 2000 WL 10211 (S.D.N.Y. Jan. 6, 2000)....................................20

*In re J.P. Morgan Chase & Co. S'holder Litig.,*
906 A.2d 766 (Del. 2006)......................................................................22

*In re Transkaryotic Therapies, Inc.,*
954 A.2d 346 (Del. Ch. 2008)................................................................22

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

iv

*In re Worldcom, Inc.*,
   323 B.R. 844 (S.D.N.Y. Bankr. 2005) ...................................................................22

*Indiana Electrical Workers Pension Trust Fund v. Dunn*,
   No. C-06-01711 RMW, 2007 WL 1223220 (N.D. Cal. Mar. 1, 2007) ........................21

*Jackson v. Stuhlfire*,
   547 N.E.2d 1146 (Mass. App. Ct. 1990) ...............................................................20

*Karpus v. Hyperion Capital Mgmt., Inc.*,
   No. 96 Civ. 4671 (SAS), 1996 WL 668860 (S.D.N.Y. Nov. 18, 1996) .......................12

*Krouner v. American Heritage Fund, Inc.*,
   899 F. Supp. 142 (S.D.N.Y. 1995) ........................................................................12

*Lapidus v. Hecht*,
   232 F.3d 679 (9th Cir. 2000) ..........................................................................21, 22

*Lapidus v. Hecht*,
   No. C 98-3130 MMC, 2002 WL 1034042 (N.D. Cal. May 17, 2002) .........................13

*Mutchka v. Harris*,
   373 F. Supp. 2d 1021 (C.D. Cal. 2005) .................................................................20

*Patenaude v. Equitable Life Assurance Soc'y*,
   290 F.3d 1020 (9th Cir. 2002) .............................................................................16

*Phillips v. Morgan Stanley Dean Witter High Income Advantage Trust III*,
   No. 01 Civ. 8139 DC, 2002 WL 31119441 (S.D.N.Y. Sept. 25, 2002) ........................7

*Sarin v. Ochsner*,
   721 N.E.2d 932 (Mass. App. Ct. 2000) .................................................................20

*Sheppard v. TCW/DW Term Trust 2000*,
   938 F. Supp. 171 (S.D.N.Y. 1996) ........................................................................12

*Watson Labs., Inc. v. Rhone-Poulenc Rorer Inc.*,
   178 F. Supp. 2d 1099 (C.D. Cal. 2001) .................................................................23

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

v

# STATUTES & RULES

15 U.S.C.
  § 80a-1(b).............................................................................................................16
  § 80a-8(b)(1) .....................................................................................................2, 16
  § 80a-13(a)(3) .............................................................................................1, 3, 11, 17

26 U.S.C.
  § 851(3)(B)(ii) ......................................................................................................3

26 C.F.R.
  § 1.851-2(c)(2) (2009) ...........................................................................................3

*Registration Form Used by Open-End Management Investment Companies Part II,*
  63 Fed. Reg. 13916 (Mar. 23, 1998) .......................................................................11

Fed. R. of Evid.
  Rule 402 ..............................................................................................................17

Cal. Bus. & Prof. Code
  § 17203 ...............................................................................................................22

# OTHER AUTHORITIES

SEC Releases
  No. IC-167, 1941 WL 37315 (July 23, 1941)...........................................................17
  No. IC-7221, 1972 WL 125419 (June 9, 1972) ........................................................16
  No. IC-13436, 1983 WL 35814 (Aug. 12, 1983)...............................................5, 6, 15
  No. IC-28807, 2009 WL 1872302 (June 30, 2009) ....................................................4
  No. IC-29132, 2010 WL 637046 (Feb. 23, 2010) ....................................................11

SEC Form 2052 (Instructions to Form N-1A),
  http://www.sec.gov/about/forms/formn-1a.pdf ........................................................11

*Protecting Investors:  A Half Century of Investment Company Regulation* (May 1992),
  http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf.........................4

Office of Management and Budget, Standard Industry Classification Manual (1987),
  http://www.sec.gov/info/edgar/siccodes.htm............................................................4

North American Industry Classification System,
  http://www.naics.com/info.htm..................................................................................4

Global Industry Classification Standard,
  http://www.mscibarra.com/products/indices/gics/ ....................................................4

Dictionary.com,
http://dictionary.reference.com .................................................................................3

Merriam-Webster's Dictionary,
  http://www.merriam-webster.com/dictionary.............................................................3

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

vi

1   Plaintiffs' motion for summary judgment on their section 17200 claim should be denied,

2   and Schwab's motion for summary judgment on the same issues should be granted.  Schwab's

3   cross-motion for judgment on the damages portions of plaintiffs' section 17200 claim, which is

4   supported by section V of this brief, should also be granted.

5   ## INTRODUCTION

6       Section 13(a)(3) of the '40 Act says a mutual fund may not "deviate from its policy in

7   respect of concentration of investments . . . as recited in its registration statement."

8   15 U.S.C. § 80a-13(a)(3).  The YieldPlus fund's concentration policy, as recited in its

9   registration statement, says the fund "may not . . . concentrate investments in a particular

10  industry."  (Berman UCL Decl. [Dkt. No. 383], Exh. B at 37; *see also id.*, Exhs. C & D.)  The

11  registration statement defines concentration as "investing 25% or more of an investment

12  company's net assets in an industry."  (*Id.*)

13      Schwab never deviated from this policy.  Plaintiffs offer no evidence showing the

14  YieldPlus fund invested more than 25 percent of its assets in any one industry.  The fund

15  invested more than 25 percent in mortgage-backed securities, but they do not constitute an

16  industry.

17      Plaintiffs' argument seems to be that, earlier, Schwab voluntarily chose to limit its

18  holdings in non-agency mortgage-backed securities and then, in August 2006, disclosed it

19  would no longer do so.  Plaintiffs misleadingly claim that "[t]he effect" of this change "was to

20  rewrite the fund's no-concentration policy."  (Open. Br. 1.)  Not true.  The concentration policy

21  was never rewritten and it has never changed.  Plaintiffs' argument improperly grafts language

22  from a completely separate portion of the registration statement — a section dealing with

23  "investments, risks and limitations" — onto the fund's concentration policy.  Controlling case

24  law, and the plain language of the fund's registration statement, prohibit this approach.

25      Plaintiffs also argue that the '40 Act's introductory section, which references a number

26  of "evils which gave rise to the Act," requires that mortgage-backed securities be treated as an

27  industry.  But none of the specified evils has anything to do with mortgage-backed securities or

28  the meaning of the word "industry."  Plaintiffs also attack Schwab's "purposes" for changing

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

1

the classification of mortgage-backed securities, but Schwab's purposes are irrelevant to whether the fund deviated from its concentration policy.  Either the fund invested more than 25 percent of its assets in an industry, or it didn't.  Schwab's purposes are irrelevant.

Finally, plaintiffs seek a judgment that they are entitled to restitution, pursuant to section 17200, for their investment losses.  But a section 17200 claim based on a general decline in share value is a derivative, not a direct, claim.  Plaintiffs cannot pursue restitution for a decline in shareholder value.  Plaintiffs have a direct section 17200 claim regarding investors' right to vote on changes to fund policies, but restitution is not available as a remedy on this theory.  Restitution also cannot be obtained from any Schwab defendant, because none of these defendants received any benefit as a result of the fund's net asset value ("NAV") decline.  Schwab's cross-motion seeks summary judgment on plaintiffs' inability to obtain restitution pursuant to their section 17200 claim.

## ARGUMENT

### I.     THE YIELDPLUS FUND NEVER DEVIATED FROM ITS CONCENTRATION POLICY.

#### A.     The YieldPlus Fund's Concentration Policy.

Section 8(b)(1) of the '40 Act says a mutual fund must have a concentration policy, and the policy must be disclosed in the fund's registration statement:  a mutual fund's registration statement must contain "a recital of the policy of the registrant in respect of . . . concentrating investments in a particular industry" or group of industries.  15 U.S.C. § 80a-8(b)(1).

When the YieldPlus fund was formed, in 1999, it adopted a concentration policy, and it disclosed that policy in its registration statement.  The policy states:

> [The Schwab YieldPlus fund may not] concentrate investments in a
> particular industry or group of industries, as concentration is
> defined under the 1940 Act.

(Berman UCL Decl. [Dkt. No. 383], Exh. B at 37; *see also id.*, Exhs. C & D.)  This statement of the fund's concentration policy has remained unchanged since 1999.  The fund's registration statement goes on to say that, under the '40 Act, "the SEC has presently defined concentration

Schwab's:  (1) Opp. to Mot. for Sum. Judg. Re § 17200 And (2) Notice of Motion &
Cross Motion for Sum. Judg. Re § 17200 — Master File No. C-08-01510-WHA
sf-2808741

2

1    as investing 25% or more of an investment company's net assets in an industry" or group of

2    industries. (*Id.*)

3        **B.**      **The Meaning of "Industry."**

4        Section 13(a)(3) of the '40 Act provides that a mutual fund may not "deviate from its

5    policy in respect of concentration of investments in any particular industry." 15 U.S.C. § 80a-

6    13(a)(3). To prevail at trial, then, plaintiffs must prove that the YieldPlus fund deviated from its

7    concentration policy by "investing 25% or more" of its assets "in any particular industry." The

8    key word, of course, is "industry."

9        What is an industry? Commonly accepted definitions say that "industry" refers to a

10   group of companies which produce similar products (or provide similar services). Merriam-

11   Webster's Dictionary defines "industry" to mean "a department or branch of a craft, art,

12   business, or manufacture," or "a distinct group of productive or profit-making enterprises <the

13   banking industry>." Merriam-Webster.com, http://www.merriam-

14   webster.com/dictionary/industry (last visited Mar. 2, 2010). Dictionary.com says "industry"

15   means "the aggregate of manufacturing or technically productive enterprises in a particular

16   field, often named after its principal product: *the automobile industry; the steel industry.*"

17   Dictionary.com, http://dictionary.reference.com/browse/industry (last visited Mar. 2, 2010).[1]

18       Several widely-accepted categorization schemes have been developed to standardize the

19   way companies are grouped into industries. An early one — the "Standard Industry

20   Classification" system, which created "SIC codes" — is a "categorization scheme devised by

21   the Office of Management and Budget and commonly used in developing industry economic

22   profiles." *American Iron and Steel Inst. v. OSHA*, 939 F.2d 975, 985 n.6 (D.C. Cir. 1991). SIC

---

23

24        [1] The Internal Revenue Code similarly addresses mutual fund concentration by, under
certain circumstances, limiting investments in companies "in the same or similar trades or

25   businesses or related trades or businesses." 26 U.S.C. § 851(3)(B)(ii); *see* 26 C.F.R. § 1.851-
2(c)(2) (2009) ("Two or more issuers are not considered as being in the same or similar trades or
businesses merely because they are engaged in the broad field of manufacturing or of any other

26   general classification of industry, but issuers shall be construed to be engaged in the same or
similar trades or businesses if they are engaged in a distinct branch of business, trade, or

27   manufacture in which they render the same kind of service or produce or deal in the same kind
of product, and such service or products fulfill the same economic need.").

28

1  codes were last updated in 1987.  *See* Office of Management and Budget, Standard Industry

2  Classification Manual (1987), http://www.sec.gov/info/edgar/siccodes.htm.  In 1997, the U.S.

3  Census Bureau launched the North American Industry Classification System ("NAICS") as a

4  replacement for SIC codes.  The NAICS is a five level classification system which groups

5  companies by economic sector, subsector, industry group, and industry.  *See*

6  http://www.naics.com/info.htm (last visited Mar. 2, 2010).   It was last updated in 2007.  In

7  addition, Morgan Stanley and Standard & Poor's have developed the Global Industry

8  Classification Standard, or "GICS" system.  The GICS system consists of 10 sectors, 24

9  industry groups, 68 industries, and 154 sub-industries.  Various mutual funds use some or all of

10  these classification systems.  *See* http://www.mscibarra.com/products/indices/gics/ (last visited

11  Mar. 2, 2010).

12          Differences exist, of course, among the classification schemes, both as to methodology

13  and as to the proper classification of individual companies.  That is because the dividing lines

14  between industries are not always clear, the nature of large and complex corporations is not

15  always obvious, and both industries and companies evolve over time.[2]

16          Perhaps for this reason, neither the '40 Act nor any SEC regulation defines "industry."

17  Indeed, the meaning of "industry" has been a continuing source of debate at the SEC and among

18  commentators.  *See Protecting Investors:  A Half Century of Investment Company Regulation*, at

19  281 n.103 (May 1992), http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf ("it is

20  often difficult to fit companies into distinct industry categories").  Just last year, the SEC's staff

21  admitted that the "treatment of 'concentration' [has] suffer[ed] from problems of industry

22  definition.  There is no clear standard to determine what constitutes an 'industry.'"  Money

23  Market Fund Reform, SEC Release No. IC-28807, 2009 WL 1872302, at *91 n.224 (June 30,

24  2009).

25

26          [2] The SEC has offered General Electric as an example of a company that, due to its
    extensive business operations, is difficult to place in any particular industry classification.  *See*
27  *Protecting Investors:  A Half Century of Investment Company Regulation*, at 281 n.103 (May
    1992), http://www.sec.gov/divisions/investment/guidance/icreg50-92.pdf.

28

1    Instead of attempting to mandate a fixed industry classification scheme, the SEC's

2   guidance permits mutual fund companies to select their own industry classifications.

3   Registration Form Used by Open-End Management Investment Companies; Guidelines, SEC

4   Release No. IC-13436, 1983 WL 35814 (Aug. 12, 1983).  The key reference is Guide 19,

5   entitled "Concentration of Investments in Particular Industries," which was part of a larger set of

6   guidelines for the preparation of mutual fund registration statements.  Guide 19 states:

> In determining industry classifications, the staff will ordinarily use the current *Directory of Companies Filing Annual Reports with the Securities and Exchange Commission*, (the "*Directory*"), published by the Commission.  A registrant may refer to the *Directory*, or may select its own industry classifications, but such classifications must be reasonable and should not be so broad that the primary economic characteristics of the companies in a single class are materially different.  Registrants selecting their own industry classifications must be reasonable and should disclose them (a) in the prospectus in the case of a policy to concentrate, or (b) in the Statement of Additional Information in the case of a policy not to concentrate.

14   SEC Release No. IC-13436, 1983 WL 35814, at *74.[3]

15   So what is an industry?  It is an aggregation of companies offering like products or

16   services, with the precise lines between each industry classification left to the "reasonable"

17   discretion of a mutual fund, which is free to adopt a commercially available classification

18   system or select other reasonable classifications.

19   **C.    Schwab Reasonably Concluded that Mortgage-Backed Securities Are Not Part of Any Industry.**

21   On August 29, 2006, the fund's trustees voted to categorize non-agency mortgage-

22   backed securities as not part of any industry.  The decision was plainly reasonable and, as such,

23   it complied with section 13(a)(3) and applicable SEC guidance.

---

26    [3] Guide 19 is no longer in effect.  It has been supplanted by Form N-1A, as amended, which is the registration statement form for mutual funds.  Guide 19 remains the most recent SEC guidance regarding industry classification, and practitioners continue to refer to Guide 19 for guidance in the absence of more recent SEC guidance.

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION & CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

5

1    At one level, of course, mortgage-backed securities obviously are not an industry — they

2    are not companies and they do not produce like products or services.  Mortgage-backed

3    securities are, instead, a form of security.[4]  Mortgage-backed securities are no more an industry

4    than "common stock," "preferred stock," or "convertible debentures" are industries.

5    At a deeper level, the task is to look through the form of the securities to the economic

6    substance underlying them — in this case, residential mortgages — and determine if it is part of

7    the same industry.  Guide 19 acknowledges this is the correct approach for fixed income

8    securities.  It states:  "[i]t is the position of the staff [of the SEC] that investment (including

9    holdings of debt securities) of more than 25 percent of the value of the registrant's assets in any

10   one industry represents concentration."  1983 WL 35814, at *73.[5]

11   Residential mortgages are the economic substance underlying, and the source of the

12   revenue stream for, mortgage-backed securities.  They are not part of any single industry.  The

13   monies used to pay the debt service on residential mortgages do not have a single industry

14   source.  They consist of the accumulated mortgage payments of homeowners all across the

15   United States — attorneys, doctors, construction workers, automobile workers, teachers,

16   military contractors, government employees, and others.  These homeowners are not dependent

17   on the fortunes of any one industry, and their incomes (and their abilities to pay their mortgages)

18   are not tied to the success of any one industry.  Moreover, none of the commercially-available

19   industry classification schemes — like SIC codes, the NAICS codes, or the GICS system —

20   lists mortgage-backed securities as part of any industry.  Indeed, no standard industry

21   classification scheme of which we are aware defines mortgage-backed securities as an industry.

22

23   [4] Mortgage-backed securities are bonds that represent participations in pools of mortgage loans.  The mortgage payments of individual borrowers are pooled and used to pay interest and

24   principal on the bonds, and the real estate assets underlying the mortgages are pledged as security for the bonds.

25   [5] The fund's Statement of Additional Information ("SAI") says much the same thing about asset-backed securities (mortgage-backed securities are a different form of asset-backed

26   securities):  "the fund will determine the industry classification of asset-backed securities based upon . . . [whether the] underlying assets share similar economic characteristics because, for

27   example, they are funded (or supported) primarily from a single or similar source or revenue stream."  (Berman UCL Decl. [Dkt. No. 383], Exh. F at SCH-YP0002098.)

28

1       Residential mortgages also historically did not behave in a way that was correlated to

2 any industry, such as the construction industry, or building products industry, or the home

3 furnishings industry.  Their performance varied from region to geographic region — mortgages

4 on homes in inner-city Detroit behaved differently than mortgages on homes in San Francisco or

5 Fort Lauderdale.  The YieldPlus fund's portfolio managers analyzed this exact issue prior to the

6 board of trustees' decision.  They informed the trustees that:

7             CSIM has reviewed the risk characteristics of Non-Agency
            [mortgage-backed securities], and has determined that Non-Agency

8             [mortgage-backed securities] do not have risk characteristics that
            are correlated to any industry.

9

10 (Taylor Decl. Exh. A (Use of Collateralized Obligations) at SCH0009048.1513.)

11       Even plaintiffs' expert concedes that mortgage-backed securities are not an industry.  He

12 constantly referred to mortgage-backed securities as a "sector" or "a type of security" rather

13 than an industry.  He said:  "in the fixed income world, classifications of fixed income securities

14 is — the terminology used is 'sectors.'  'Industries' is a terminology that arises from the equity

15 world."  (Taylor Decl. Exh. B (Fong Depo.) at 147:24–148:3.)  "In the equity world, when you

16 talk about industries, there are different ways of defining what an industry is.  In the fixed

17 income world, that becomes less important because so much is driven by interest rate change or

18 the effects of interest rate change."  (*Id.* at 149:1–6.)

19     **D.**    **The YieldPlus Fund Did Not Deviate From Its Concentration Policy When It**
           **Allocated More Than 25 Percent of Its Assets to Mortgage-Backed Securities.**

20

21       Plaintiffs offer no evidence showing mortgage-backed securities constitute an industry.

22 There is no dispute about it.  *See Phillips v. Morgan Stanley Dean Witter High Income*

23 *Advantage Trust III*, No. 01 Civ. 8139 DC, 2002 WL 31119441, at *3–4 (S.D.N.Y. Sept. 25,

24 2002) (no valid claim where plaintiffs alleged overconcentration in a general

25 telecommunications "group of industries.")

26       Because mortgage-backed securities are not an industry, and because the '40 Act allows

27 a mutual fund to select reasonable industry classifications, the YieldPlus fund did not "deviate"

28 from its stated concentration policy when it invested more than 25 percent of its net assets in

Schwab's:  (1) Opp. to Mot. for Sum. Judg. Re § 17200 And (2) Notice of Motion &
Cross Motion for Sum. Judg. Re § 17200 — Master File No. C-08-01510-WHA
sf-2808741

7

1   mortgage-backed securities.  The Court should therefore rule that the YieldPlus fund did not

2   violate section 13(a) and did not commit an "unlawful" act within the meaning of section 17200.

3   **II.     SCHWAB'S CLASSIFICATION OF MORTGAGE-BACKED SECURITIES**
        **DID NOT "REWRITE" THE FUND'S CONCENTRATION POLICY.**

4

5          Plaintiffs concede that the fund's concentration policy, as recited in its registration

6   statement, never changed.  (*See* Open. Br. 3 (concentration policy remained the same

7   "[t]hroughout the class period").)  What plaintiffs argue, instead, is that the fund's August 2006

8   decision to classify non-agency mortgage-backed securities as not part of any industry was, "in

9   effect," a "rewrite" of the policy.  (*Id*. 1.)  They claim that the change was, "by implication," a

10  change of the fund's fundamental concentration policy and that it, therefore, required

11  shareholder approval.  (*Id*. 14.)

12         Plaintiffs' argument ignores the express language of the fund's registration statement

13  and controlling case law.

14         **A.     The YieldPlus Fund Never Changed Its Concentration Policy.**

15         The YieldPlus fund's first registration statement, dated October 1999, set out several

16  fundamental policies and limitations.  The limitations were listed under the heading "Investment

17  Limitations."  The first sentence under the heading stated:  "[t]he following investment

18  limitations are fundamental investment policies and restrictions and may be changed only by

19  vote of a majority of [the] fund's outstanding voting shares."  (Taylor Decl. Exh. C at *4.)

20         The fund's concentration policy appeared under this text.  It stated that the fund may not:

21             Concentrate investments in a particular industry or group of
               industries, as concentration is defined under the '40 Act, or the
22             rules or regulations thereunder, as such statute, rules and
               regulations may be amended from time to time.
23

24  (*Id*.)  This statement of the fund's fundamental concentration policy has never changed.  The

25  fund's current registration statement uses exactly the same language.  (Taylor Decl.

26  Exh. D at *43.)

27         A separate section of the registration statement set out information about the fund's

28  "investments, risks and limitations."  This information appeared under a sentence that stated:

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

8

The following descriptions of investment securities, risks and limitations supplement those set forth in the prospectus and **may be changed without shareholder approval** unless otherwise noted.

(Taylor Decl. Exh. C at *2 (emphasis added).)  It was in this section that, beginning in November 2001, the YieldPlus fund set out information regarding its industry classification relating to mortgage-backed securities.

Plaintiffs' argument — that changing an industry classification that was set out in the "investments, risks and limitations" section of the registration statement "in effect" rewrote the fund's fundamental concentration policy — ignores the clear difference between the fund's concentration policy and its industry classifications, and the distinction between fundamental policies and non-fundamental disclosures.  The fund's fundamental concentration policy never changed; only its industry classification of mortgage-backed securities changed.

**B.      Changes to a Separate Portion of the Fund's Registration Statement Did Not "In Effect" "Rewrite" the Fund's Concentration Policy.**

The YieldPlus fund has typically relied on the GICS classification system for purposes of implementing its concentration policy.  But, from the beginning, the fund's SAI also set out several other industry classifications chosen by Schwab.[6]  Neither the GICS industry classification system, nor the industry classifications selected by Schwab, was included in the fund's fundamental concentration policy.

When it was formed, in 1999, the fund did not classify non-agency mortgage-backed securities as an industry.  In November 2001, however, the fund disclosed a custom industry classification for non-agency mortgage-backed securities.  (Taylor Decl. Exh. E at *3.)  This industry classification was disclosed in the portion of the fund's SAI reserved for policies that were not subject to shareholder approval.  (*Id.* at *2.)  No shareholder vote was held to approve the change.

---

[6] For example, the fund's first SAI (dated July 1999) provided that, "based on the primary characteristics of non-U.S. (foreign) banks," the fund "identified each foreign country as a separate bank industry for purposes of the fund's concentration policy."  (Taylor Decl. Exh. C at *3.)

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION & CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

9

1    The industry classification for non-agency mortgage-backed securities remained in effect

2    until August 29, 2006.  On that date, the fund's board of trustees voted to eliminate the industry

3    classification for non-agency mortgage-backed securities.  (Berman UCL Decl. [Dkt. No. 383],

4    Exh. U at SCH-YP0048503–04.)  This decision did not modify one word of the fund's

5    fundamental concentration policy.  It merely changed one of the fund's self-selected industry

6    classifications — classifications that are set out in the portion of the SAI that expressly allows

7    modification without shareholder approval.  Once again, no shareholder vote was required for

8    this change.

9    The change was promptly disclosed to investors.  On September 1, 2006, the fund's SAI

10   was amended to say:

> The funds have determined that mortgage-backed securities issued
> by private lenders do not have the risk characteristics that are
> correlated to any industry and, therefore, the funds have determined
> that mortgage-backed securities issued by private lenders are not
> part of any industry for the purposes of the fund's concentration
> policies.  This means that a fund may invest more than 25% of its
> total assets in privately-issued mortgage-backed securities . . . .

15   (Berman UCL Decl. [Dkt. No. 383], Exh. F at SCH-YP0002098.)

16   **C.    Schwab Legally Changed Its Industry Classifications Without Shareholder Approval.**

18   Plaintiffs counter with an argument that finds no support in section 13(a), Guide 19, or,

19   for that matter, any law or regulation of any kind.  Plaintiffs acknowledge that Schwab had

20   discretion to select any reasonable industry classification.  (Open. Br. 1, 15.)  But, plaintiffs

21   argue, "while Guide 19 grants fund management some discretion initially to define categories of

22   industries . . . it nowhere grants discretion to *later* revise those categories after disclosing them

23   to shareholders."  (*Id.* 1–2, 15.)[7]

24

25

---

26   [7] Of course, if this argument really were true, then the YieldPlus fund should be forced
27   to utilize the industry classification scheme adopted, and disclosed, in 1999.  That scheme did
     not classify non-agency mortgage-backed securities as part of any industry.  Plaintiffs'
     argument, then, if accepted, would require dismissal of their 17200 claim.

28

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

10

1    Plaintiffs do not cite any authority for this proposition and there is none. No law, rule,

2    or SEC regulation says a fund cannot update or revise its industry classifications. On this point,

3    plaintiffs are just making it up.

4    Plaintiffs' brief also glosses over the plain distinction between a fund's concentration

5    policy and the industry classification system the fund uses to implement the policy. The SEC's

6    regulations clearly observe this distinction. Thus, the SEC requires a mutual fund to put its

7    concentration policy in the fund's prospectus if it intends to concentrate in any particular

8    industry. If a fund intends not to concentrate in any industry, the SEC requires this information

9    to be put in the fund's SAI. *See* SEC Form 2052 (Instructions to Form N-1A),

10   http://www.sec.gov/about/forms/formn-1a.pdf (last visited Mar. 2, 2010), Item 4(a), Item

11   9(b)(1), and Item 16. By contrast, the SEC currently does not require that industry

12   classifications be disclosed at all. *Id.*, Item 11.[8]

13   Similarly, the SEC has scrupulously distinguished between fundamental concentration

14   policies and industry classifications when it comes to shareholder approval. Section 13 requires

15   that any change to a fundamental concentration policy must be approved by shareholders, but it

16   imposes no such requirement for changes to industry classifications or other non-fundamental

17   policies. 15 U.S.C. § 80a-13(a)(3); *see Money Market Fund Reform*, SEC Release

18   No. IC-29132, 2010 WL 637046, *102 n.398 (Feb. 23, 2010) (allowing changes to non-

19   fundamental policies without shareholder vote where change is consistent with or more

20   restrictive than fundamental policies).

21

22

23

24   [8] Guide 19 used to require that industry classifications that differed from the categories
used by the SEC must be disclosed in the fund's SAI. Although this is no longer required, the
YieldPlus fund made this disclosure when it changed its classification of non-agency mortgage-
backed securities. But, as noted, Guide 19 has been superseded by the instructions
accompanying Form N-1A, and those instructions no longer require disclosure of industry
classifications. *Registration Form Used by Open-End Management Investment Companies
Part II*, 63 Fed. Reg. 13916, n.214 (Mar. 23, 1998) ("The Guides have not been republished
with Form N-1A, as amended. Neither the Guides nor the GCLs will apply to registration
statements prepared on the amended Form.")

28

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

11

1    The courts have also observed this distinction.  They follow the common sense view that

2    a policy or practice not designated as "fundamental" is, in fact, not fundamental, and can be

3    changed without a shareholder vote.

4    This exact issue arose in *Sheppard v. TCW/DW Term Trust 2000*, 938 F. Supp. 171

5    (S.D.N.Y. 1996).  In that case, the fund's "fundamental investment objectives" were (1) "to

6    provide a high level of current income," and (2) to "return $10 per Share . . . to shareholders on

7    or about . . . (the termination date of the Trust)."  *Id*. at 180.  Plaintiffs argued that other

8    statements in the same paragraph were also part of the fund's fundamental policies, even though

9    they were not specifically labeled as such.  But the Court disagreed, holding that the registration

10   statement drew a clear distinction between "fundamental investment objectives" and the

11   "strategies for reaching such goals:"

12           [U]nder the plain language of the prospectus, the fundamental
             policies of the Trust are the two investment objectives noted
13           above.  . . .  No other interpretation of the quoted text is
             reasonable.  . . .  Only the two goals noted above are labeled
14           'investment objectives' in this paragraph and elsewhere in the
             prospectus; therefore, only these objectives — and not the strategies
15           for attaining them — are fundamental policies.  Plaintiffs do not
             allege that defendants deviated from these two fundamental
16           policies.

17   *Id*.; *accord, In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, No. 95 Civ. 0330

18   (LMM), 1996 WL 551732, at *5 (S.D.N.Y. Sept. 27, 1996) (fundamental policy was "only the

19   single statement reflecting the Fund's goal to seek the highest level of income available from a

20   portfolio of U.S., Canadian and Mexican government securities;" separate concentration limit

21   was "distinct from the statement of the Fund's 'investment objective'"); *Krouner v. American*

22   *Heritage Fund, Inc.*, 899 F. Supp. 142, 148–49 (S.D.N.Y. 1995) (only policies listed as

23   "changeable only if authorized by shareholder vote" are fundamental policies for purposes of

24   section 13(a)); *Karpus v. Hyperion Capital Mgmt., Inc.*, No. 96 Civ. 4671 (SAS), 1996 WL

25   668860, at *4 (S.D.N.Y. Nov. 18, 1996) (prospectus explained that "policies are different from

26   [fundamental] investment objectives in that they may be changed without shareholder

27   approval").

28

Schwab's:  (1) Opp. to Mot. for Sum. Judg. Re § 17200 And (2) Notice of Motion &
Cross Motion for Sum. Judg. Re § 17200 — Master File No. C-08-01510-WHA
sf-2808741

12

1    Each of these cases observes the distinction between fundamental investment policies,

2    which can only be changed by shareholder vote, and other strategies or policies, which, because

3    they are not identified as "fundamental," may be changed without shareholder approval.

4    Plaintiffs claim these cases are "inapposite" because, in the YieldPlus fund's registration

5    statement, "[t]he policy incorporated the definition." (Open. Br. 18–19.) But a simple glance at

6    the fund's concentration policy shows this claim is not correct. The fund's concentration policy

7    contains no incorporation by reference language. And while the industry classifications set out

8    in the fund's SAI refer to the fund's concentration policy, they never say they are

9    "incorporated" into it. Quite the opposite; the fund's industry classifications appear in a portion

10   of the SAI that expressly states it is not part of any fundamental policy and can be changed

11   without a shareholder vote.

12   Plaintiffs' "incorporation" argument was earlier made, and rejected, in a case arising in

13   this district. *Lapidus v. Hecht*, No. C 98-3130 MMC, 2002 WL 1034042 (N.D. Cal. May 17,

14   2002). Plaintiffs in that case argued that a "25% concentration limitation" set out in a mutual

15   fund's prospectus "was incorporated into the fundamental restrictions set forth in the Statement

16   of Additional Information." *Id.* at *4. Judge Chesney rejected the argument and dismissed the

17   case. She noted: "there is no language in the Statement of Additional Information or August

18   2006 Prospectus purporting to incorporate a given percentage limitation into the listed

19   fundamental restrictions." *Id.* Instead, the fund's 25 percent limitation appeared in the portion

20   of the fund's SAI that expressly could "be changed by the Trustees of the Trust without

21   shareholder approval." *Id.* Judge Chesney concluded: "Because the 25% limitation is not

22   'specifically stated' in the August 1996 Prospectus, or elsewhere, to be a policy that may be

23   changed only by shareholder approval, the 25% limitation was subject to change without

24   shareholder approval." *Id.*

25   The same is true here. The YieldPlus fund's concentration policy was expressly

26   changeable only with shareholder approval; the fund's classification of mortgage-backed

27   securities was expressly changeable without shareholder approval. Accordingly, Schwab's

28

SCHWAB'S: (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

13

1    decision to amend the industry classification for non-agency mortgage-backed securities did not

2    "revise" the fund's fundamental concentration policy and did not violate section 13(a).

3         **D.      Industries, and Industry Classifications, Constantly Evolve Without
              Requiring Shareholder Votes.**

4

5         One reason for allowing mutual funds discretion in selecting industry classifications is

6    the changing nature of industries.  Industries continuously evolve; old industries change or fade

7    away; new companies and industries come into being; existing companies buy or sell divisions

8    or entire businesses.  A regulatory system that does not accommodate a rapidly changing

9    business environment would require an endless stream of successive shareholder votes in order

10   to update mutual funds' industry classifications.

11        The commercially-available classification schemes offer easy examples.  Say a mutual

12   fund chose to use SIC codes as its industry classification scheme.  The system was last updated

13   in 1987.  What is a mutual fund supposed to do?  Continue to use increasingly obsolete and

14   outmoded SIC codes?  Or adopt a new classification system?  We are not aware of any mutual

15   fund that sought shareholder approval before replacing SIC codes with an entirely different

16   classification system.

17        Another example.  The NAICS system was last updated in 2007.  That update involved a

18   substantial rejiggering of industry sectors, industries, and sub-industry categories.  Did a mutual

19   fund using the NAICS classifications in effect before 2007 need to hold a shareholder vote in

20   order to transition to NAICS's new classifications?  No fund of which we are aware held such a

21   vote.  Similarly, the GICS system made significant changes to its industry classifications in

22   2009.  No fund of which we are aware held a shareholder vote to seek approval to apply GICS's

23   new classifications.

24        A third example.  Individual companies often are moved from one industry classification

25   to another.  This is true with SIC codes, NAICS codes, and GICS codes, and it happens because

26   companies often evolve as their products ebb and flow or as their divisions are bought or sold.

27   No law or regulation says a mutual fund must hold a shareholder vote in order to approve these

28   changes.  In short, plaintiffs offer no law for the proposition that changes to industry

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

14

1  classifications, which are a regular part of life in the world of mutual funds, require shareholder

2  approval.[9]

3  ### E.  Allowing Revisions to Industry Classifications Does Not Render Section 13(a) "Meaningless."

4

5  Plaintiffs end their argument with a parade of horribles.  They say that allowing mutual

6  funds to revise their industry classifications would "gut" sections 8 and 13(a), make a fund's

7  concentration policy "irrelevant" and "meaningless," and amount "to no less than discretion to

8  rewrite the rule itself."  (Open. Br. 16–17.)

9  Not so fast.  A mutual fund's ability to revise, or update, its industry classifications is

10  always subject to the rule of reasonableness.  Any industry classification selected by a fund

11  "must be reasonable and should not be so broad that the primary economic characteristics of the

12  companies in a single class are materially different."  1983 WL 35814, at *74.

13  This restriction is adequate to prevent the abuses imagined by plaintiffs.  A mutual fund

14  may not choose any industry classification; it must choose "reasonable" classifications that are

15  not so broad as to include, in a single class, companies that are materially different.  The

16  YieldPlus fund, of course, complied with this restriction.  Its decision to classify non-agency

17  mortgage-backed securities was, as explained above, plainly reasonable, and it was promptly

18  disclosed to investors.

19  Schwab's YieldPlus fund did not invest more than 25 percent of its assets in any one

20  industry, because mortgage-backed securities are not an industry.  Schwab did not improperly

21  _____

22  [9] Plaintiffs argue that Schwab could "have learned that the SEC had required the Evergreen Ultra-Short Opportunities Fund — a fund with which YieldPlus competed — to hold a shareholder vote when it changed its concentration policy to permit the fund to invest more than 25 percent of its total assets in mortgage-backed securities."  (Open. Br. 8.)  The evidence cited by plaintiffs does not support this claim.  Indeed, Evergreen's proxy statement says nothing about whether the SEC "required" it to have a shareholder vote.  Moreover, in Evergreen's case, the fund had decided to change its fundamental concentration policy, not its industry classifications.  Shareholders were asked to approve "a revision to the Fund's fundamental investment policy."  The fund went from having a concentration policy that prohibited concentrating investments in any industry to having a fundamental concentration policy saying the fund "will normally invest more than 25% of its total assets in mortgage-backed and other mortgage-related securities."  (Berman UCL Decl. [Dkt. No. 383], Exh. Q at 7.)

23

24

25

26

27

28

Schwab's: (1) Opp. to Mot. for Sum. Judg. Re § 17200 And (2) Notice of Motion & Cross Motion for Sum. Judg. Re § 17200 — Master File No. C-08-01510-WHA
sf-2808741

15

1   change its concentration policy without a shareholder vote, because its industry classification for

2   mortgage-backed securities was expressly not part of its fundamental concentration policy.

3   Plaintiffs have thus failed to make the case that Schwab committed an "unlawful" act under

4   section 13(a).  The Court should enter judgment in Schwab's favor on plaintiffs' section 17200

5   claim.

6   **III.    THE INVESTMENT COMPANY ACT'S "POLICY" DOES NOT PROHIBIT
        CHANGES TO INDUSTRY CLASSIFICATIONS.**

7

8         Because their argument has no support in section 8, section 13(a), or SEC guidance,

9   plaintiffs resort to general policy arguments based on the '40 Act's introductory section.  A part

10   of that section says the Act's provisions should be interpreted to eliminate, or mitigate, "the

11   evils" which gave rise to the Act.  15 U.S.C. § 80a-1(b).

12         It is hard to see how this phrase helps plaintiffs' argument.  Plaintiffs claim that one of

13   the "evils" addressed by the '40 Act was "selling of funds shares without adequate disclosure,"

14   but, of course, here the YieldPlus fund's classification of non-agency mortgage-backed

15   securities was fully disclosed.  (*See* Open. Br. 12.)  Plaintiffs claim another "evil" was the

16   making of fundamental changes to the character of a fund without shareholder approval, but, as

17   explained above, Schwab's classification of non-agency mortgage-backed securities was not a

18   change to any fundamental fund policy.  (*Id.*)

19         Statutes, of course, must be given their plain meaning.  *Ernst & Ernst v. Hochfelder*,

20   425 U.S. 185, 214 (1976); *Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1025

21   (9th Cir. 2002), *overruled on other grounds by Proctor v. Vishay Intertechnology, Inc.*, 584 F.3d

22   1208, 1219 (9th Cir. 2009).  The plain language of section 8 is that a mutual fund must have a

23   policy on industry concentration, and its registration statement must contain "a recital of the

24   policy of the registrant in respect of . . . concentrating investments in a particular industry" or

25   group of industries.  15 U.S.C. § 80a-8(b)(1).  Neither Section 8 nor the SEC's registration form

26   requires any statement of industry classifications, and a mutual fund's concentration policy need

27   not address any particular classification scheme.  *See* Form N-8B-1, SEC Release No. IC-7221,

28   1972 WL 125419 (June 9, 1972) (an "acceptable response" to section 8's concentration policy

1  requirement is "Registrant will not concentrate its investments in any industry"); SEC Release

2  No. IC-167, 1941 WL 37315 (July 23, 1941) (SEC General Counsel opinion that "the required

3  statement of intention [not to concentrate] is controlling for the purposes of Section 13(a)").

4      Nothing in the introductory section of the '40 Act speaks to concentration policies or

5  industry classification.  The section says nothing about the classification of mortgage-backed

6  securities.  It says nothing about whether revisions to a fund's industry's classifications must be

7  submitted for shareholder approval.  Plaintiffs' reference to the introductory section of the

8  '40 Act provides no help for their position.

9  **IV.    SCHWAB'S "PURPOSES" FOR CHANGING ITS CLASSIFICATION OF
       MORTGAGE-BACKED SECURITIES ARE IRRELEVANT.**

10

11     Plaintiffs devote nearly five pages of their brief to the purported "purposes" behind

12  Schwab's reclassification of mortgage-backed securities.  (Open. Br. 5–10.)  These pages are all

13  irrelevant.  Plaintiffs' claim arises under the "unlawful" prong of section 17200.  That prong

14  does not have any "purpose" or "intent" component.  Section 13(a) — the underlying legal

15  provision which determines whether or not Schwab's conduct was "unlawful" — likewise has

16  no "purpose" or "intent" element.  Either the fund invested more than 25 percent of its assets in

17  an "industry" or it didn't.  Its purposes for doing so, or not doing so, are simply irrelevant.[10]

18     That said, plaintiffs' characterizations of Schwab's "purposes" are inaccurate and

19  depend on disputed facts.  Take plaintiffs' claim that the fund's portfolio managers

20  recommended the reclassification of mortgage-backed securities after conducting only

21  "minimal" research.  (Open. Br. 7.)  The evidence will actually show that the decision to

22  eliminate the separate industry classification for non-agency mortgage-backed securities was

23  based on a thorough analysis by the fund's portfolio managers as well as on various

24  presentations within the fund's advisor and to the fund's board of trustees.

25

26     [10] Because plaintiffs' arguments about "purpose" and "intent" are irrelevant, their
    evidence regarding these arguments is also irrelevant.  Schwab therefore objects to exhibits G

27  thru P, R thru W, and Y thru AA to the Berman Declaration (Dkt. No. 383) as irrelevant under
    rule 402 of the Federal Rules of Evidence.

28

1    The portfolio managers' analysis showed that non-agency mortgage-backed securities do

2    not have risk characteristics correlated to any one industry.  It also showed that mortgage-

3    backed securities with different collateral and structures produce materially different

4    performance over time.  Contemporaneous documents explain the portfolio managers'

5    investment thesis.  The fund's portfolio managers saw "fewer opportunities in corporate credit

6    given low risk premiums" and "increased event risk in the form of [leveraged buyouts], share

7    buybacks, [and] dividend increases."  (Taylor Decl. Exh. F (Dec. 31, 2006 Fact Sheet) at

8    SCH000010.)  The fund increased its investments in mortgage-backed securities partly to avoid

9    these risks.  The fund's managers also viewed mortgage-backed securities as more attractive

10   investments than corporate bonds because they had historically lower volatility, were backed by

11   collateral, had minimal credit risk (most with AAA ratings), and traded in a very liquid and deep

12   market.

13   The portfolio managers also asked State Street, the fund's external accountants, for

14   advice regarding industry practice, and State Street advised that it did not consider mortgage-

15   backed securities to be part of any industry.  The managers asked internal and outside counsel to

16   the funds for their legal opinions and advice.  And they also determined that other mutual fund

17   complexes, including the Pacific Investment Management Company ("PIMCO"), the world's

18   largest manager of fixed income funds, has for years taken the same position.  The SAI for

19   several of PIMCO's fixed income mutual funds states that, "[i]n the case of privately issued

20   mortgage-related securities, the Funds take the position that mortgage-related securities do not

21   represent interests in any particular 'industry'" or group of industries.  (Taylor Decl. Exh. E at

22   17.)

23   In addition, the portfolio managers' recommendation was reviewed and discussed at two

24   meetings of the advisor's Investment Policy Committee.  It was also considered and discussed

25   by the Investment Oversight Committee of the fund's Board of Trustees.  And it was ultimately

26   approved by the full board of trustees at its August 29, 2006, meeting.  (Berman UCL Decl.

27   [Dkt. No. 383], Exh. U at SCH-YP0048509–10.)

28

1    Plaintiffs also suggest, without citing any evidence, that Schwab decided not to hold a

2    shareholder vote because of "the very large expense associated with any shareholder vote."

3    (Open. Br. 9.)  Shareholder votes, of course, are expensive, and Schwab is careful not to hold

4    them when they are not required.  But no evidence supports the claim that, in this situation, cost

5    played any part in Schwab's decision.

6    In any event, the costs of a shareholder vote are not borne by Schwab.  In most cases,

7    they are borne by the fund.  Investors pay for shareholder votes, not Schwab.  (Taylor Decl.

8    Exh. G (Agreement and Declaration of Trust) at SCH0002059.)  Schwab therefore had no

9    financial incentive to avoid a shareholder vote — even if one had been required.

10   **V.    PLAINTIFFS CANNOT RECOVER RESTITUTION UNDER SECTION 17200.**

11   Plaintiffs end their brief with a short section on restitution.  Plaintiffs claim they are

12   entitled to summary judgment granting them "monetary relief in the form of restitution."

13   (Open. Br. 19.)

14   There are three problems with plaintiffs' request.  First, plaintiffs' request for monetary

15   damages based on a decline in the YieldPlus fund's NAV is a derivative claim, not a direct

16   claim.  Second, plaintiffs' only direct claim under section 17200 — relating to the right to vote

17   on changes to fund policy — cannot form the basis of a restitution award.  And third, restitution

18   can only be sought from one who received an improper benefit, and none of the defendants

19   benefited from the YieldPlus fund's decline.

20   Schwab therefore cross-moves for summary judgment in its favor on the ground that no

21   restitution may be awarded on plaintiffs' section 17200 claim.

22   **A.    Plaintiffs' Section 17200 Claim Is a Derivative Claim, Not a Class Claim.**

23   Plaintiffs seek "restitution" based on the decline of the fund's NAV.  (Open. Br. 19.)  That

24   is a classic derivative claim.  Plaintiffs' alleged injury derives from a decline in the value of the

25   fund's shares, not from any distinct injury to plaintiffs personally.

26

27

28

1         Massachusetts law governs whether plaintiffs' section 17200 claim is direct or

2 derivative.[11]  Under Massachusetts law, the distinction between direct and derivative claims turns

3 on whether the shareholder plaintiff alleges a direct injury in his personal capacity or alleges an

4 injury to the fund (along with a corresponding decline in the value of the fund's shares).  "[I]f the

5 wrong underlying claim results in harm to a plaintiff shareholder only because the corporate

6 entity has been injured, with the plaintiff's injury simply being his proportionate share of the

7 entity's injury, the harm to the shareholder is indirect and his cause of action is derivative."

8 *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 112 (D. Mass. 2006); *Jackson v. Stuhlfire*,

9 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1990) (a claim "alleging mismanagement or wrongdoing

10 on the part of corporate officers or directors normally states a claim of wrong to the corporation:

11 the action, therefore, is properly derivative") (citation and internal quotations omitted);

12 *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005) (under Massachusetts law, "[i]f

13 the injury merely is a reduction in the price of stock, then the suit must be derivative"); *Everett v.*

14 *Bozic*, No. 05 Civ. 00296 (DAB), 2006 WL 2291083, at *3 (S.D.N.Y. Aug. 3, 2006) ("Courts

15 analyzing Massachusetts . . . law generally have found that a reduction in share price is an

16 indirect injury, the remedy for which may be found in a derivative action.").

17         Thus, "a shareholder may bring a direct action for injuries done to him in his individual

18 capacity [only] if he has an injury which is separate and distinct from that suffered by other

19 shareholders."  *Sarin v. Ochsner*, 721 N.E.2d 932, 934–35 (Mass. App. Ct. 2000) (citation and

20 internal quotations omitted).  Allegations of an "'undifferentiated harm'" to all shareholders make

21 out a derivative claim.  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318

22 (HB), 2000 WL 10211, at *4 (S.D.N.Y. Jan. 6, 2000) (claim for decline in value of mutual fund is

23 derivative); *Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 21, 26 (D. Mass. 1996) (claims of

24 "mismanagement of funds [and] embezzlement or breach of fiduciary duty resulting in a

25

26         [11] Massachusetts law applies because the YieldPlus fund is part of a trust organized
under the laws of Massachusetts.  *See, e.g., Batchelder v. Kawamoto*, 147 F.3d 915, 920 (9th
Cir. 1998) (noting that rights of shareholders are determined by law of state of incorporation
27 under "internal affairs" doctrine); *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1527 (9th Cir.
1985) (same).

28

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

20

1    diminution of the value of the corporate stock or assets" is "held by the corporation itself, and is

2    thus derivative if brought by an investor").

3         Plaintiffs' section 17200 claim alleges that the YieldPlus fund's managers, in violation

4    of section 13(a), allocated too much of the fund's assets to investments in mortgage-backed

5    securities.  They claim this asset allocation caused a decline in the fund's NAV.  And they assert

6    that they are entitled to restitution for their losses resulting from that decline.  This is plainly a

7    derivative claim.  Plaintiffs do not assert a separate or distinct loss that is different from the loss

8    suffered by other investors.  They assert that the fund's investment decisions produced a decline

9    in the value of fund shares.

10        Plaintiffs' section 17200 claim, then, is derivative in nature, because it asserts an

11   undifferentiated harm to all shareholders resulting from a decline in the fund's NAV.  Plaintiffs

12   cannot seek any direct recovery, such as restitution, based on a derivative theory.

13       **B.    Plaintiffs Cannot Obtain Restitution for Their Voting Right Claim.**

14        Plaintiffs also claim it was "unlawful" under section 17200 for Schwab to change the

15   fund's industry classification of mortgage-backed securities without a shareholder vote.  This

16   "voting rights" claim is a direct claim.  *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000)

17   (denial of a shareholder's voting rights constitutes a "direct" injury, while a claim asserting a

18   "diminution in the value of" investors' shares as a result of violations of a fund's investment

19   policies alleges "only indirect harm to the shareholders," and must be asserted derivatively); *see*

20   *also Indiana Electrical Workers Pension Trust Fund v. Dunn*, No. C-06-01711 RMW,

21   2007 WL 1223220, at *10 (N.D. Cal. Mar. 1, 2007) ("[a]lthough plaintiffs argue that they have

22   been injured because they were not given their right to vote, the nature of their claims is

23   essentially mismanagement of corporate assets and derivative in nature").

24        But a direct claim for denial of voting rights cannot support a prayer for restitution.  The

25   *Lapidus* court specifically concluded that the plaintiffs' claim for money damages could only be

26   brought derivatively:  "the only [financial] injury to the shareholder is the indirect harm which

27   consists of the diminution in the value of his or her shares."  *Lapidus*, 232 F.3d at 683.  As a

28   result, the Ninth Circuit affirmed dismissal of the plaintiffs' damages claim, because the

1   "district court correctly determined that this claim alleged only indirect harm to the

2   shareholders." *Id*. at 684.

3        Similarly, in *Halebian v. Berv*, 631 F. Supp. 2d 284 (S.D.N.Y. 2007), a plaintiff claimed

4   his voting rights were interfered with by a false proxy solicitation. *Id*. at 288–89.  The court

5   held that his claims had to be asserted derivatively even though "plaintiff characterizes this as

6   being a case where defendants interfered with shareholders' voting rights." *Id*. at 302.

7   According to the court, the plaintiff had failed "to articulate a theory by which the alleged harm

8   to shareholders which resulted from the misleading nature of the Proxy Statement was separate

9   and independent from the harm allegedly resulting to the Fund itself." *Id*. at 303; *accord*, *In re*

10  *J.P. Morgan Chase & Co. S'holder Litig*., 906 A.2d 766, 773 (Del. 2006) (although denial of

11  voting rights was a direct claim, no damages could be recovered by shareholders, as all

12  economic harm was suffered by corporation); *In re Transkaryotic Therapies, Inc*., 954 A.2d

13  346, 362 (Del. Ch. 2008) (direct claim for denial of right to cast an informed vote dismissed

14  because no monetary damages could be awarded); *In re Worldcom, Inc.*, 323 B.R. 844, 856

15  (S.D.N.Y. Bankr. 2005) (shareholders' voting rights claims were derivative because the "Court

16  does not see how the right to vote, in this case, is differentiated from a diminution in value of

17  the shares"); *Halebian*, 631 F. Supp. 2d at 302 (voting rights claim is derivative where plaintiff

18  did not allege any injury different from an injury to the fund).

19       Plaintiffs have never explained how the alleged denial of their right to vote on fund

20  policies produced any losses compensable under section 17200.  They only claim they suffered

21  losses as a result of the fund's NAV decline.  But that alleged harm cannot be separated from

22  the derivative claim for mismanagement.  As a result, plaintiffs cannot obtain restitution as a

23  remedy for any supposed denial of their voting rights.

24  **C.     Plaintiffs Cannot Seek Restitution Because No Defendant "Wrongfully**
25  **        Obtained" Their Money.**

26       A restitution claim lies only against someone who has "wrongfully obtained" monies

27  from the plaintiff.  Cal. Bus. & Prof. Code § 17203; *see also Bank of the West v. Superior Court*,

28  2 Cal. 4th 1254, 1266 (1992) (monetary relief limited to "disgorgement of money that has been

1   wrongfully obtained"); *Watson Labs., Inc. v. Rhone-Poulenc Rorer Inc.*, 178 F. Supp. 2d 1099,

2   1122 (C.D. Cal. 2001) (restitution means "getting back" money, not "getting money"); *Baugh v.*

3   *CBS, Inc.*, 828 F. Supp. 745, 757–58 (N.D. Cal. 1993) (restitution requires that defendant have

4   taken something in value from plaintiff).

5        Plaintiffs cannot obtain restitution from any of the defendants because none of them

6   "wrongfully obtained" money from the plaintiffs.  Plaintiffs' losses occurred in the market, not

7   in transactions with the defendants.

8        The Court previously dismissed plaintiffs' section 17200 claim against Kimon Daifotis

9   on precisely this ground.  *In re Charles Schwab Corp. Sec. Litig.*, No. C 08-1510 WHA, 2009

10  WL 2591389, at *10–11 (N.D. Cal. Aug. 21, 2009).  In its order, the Court noted that "[a]n

11  order for restitution is one 'compelling a UCL defendant to return money obtained through an

12  unfair business practice to those persons in interest from whom the property was taken, that is,

13  to persons who had an ownership interest in the property or those claiming through that

14  person.'" *Id.* at *10 (*citing Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149

15  (2003)).  The Court recognized that "losses to the fund's value" is not the same as paying

16  money to a defendant.  *Id.*  The Court added that any compensation paid to Mr. Daifotis was

17  paid by his employer, not by the fund's investors.  *Id.*

18       The Court's logic and conclusions apply to the other defendants with equal force.  None

19  of the defendants obtained any benefit from investors when the fund's NAV declined.  And

20  none of the defendants received money directly from investors.  Just as plaintiffs failed to

21  identify any "money or property taken by Mr. Daifotis," they fail to identify any money or

22  property taken by any of the other defendants.  They are all entitled to summary judgment on

23  plaintiffs' section 17200 claim.

24                                  **CONCLUSION**

25       The Court has all it needs to enter summary judgment in Schwab's favor on plaintiffs'

26  section 17200 claim.  Plaintiffs have offered no evidence that the fund invested more than

27  25 percent of its assets in any one industry, because they have offered no evidence that

28  mortgage-backed securities are an industry.  Plaintiffs also have no evidence that the fund

1   changed a fundamental investment policy without a shareholder vote, because the fund's

2   industry classification of mortgage-backed securities was not part of the fund's concentration

3   policy.

4          Schwab's motion for summary judgment on plaintiffs' section 17200 claim — which

5   parallels the issues raised by plaintiffs in this motion — should therefore be granted.  This

6   motion by plaintiffs should be denied.  Schwab's cross-motion for judgment on the restitution

7   portion of plaintiffs' section 17200 claim should also be granted.

8

9   Dated:  March 4, 2010                    DARRYL P. RAINS
                                            EUGENE ILLOVSKY
10                                          CRAIG D. MARTIN
                                            DOROTHY L. FERNANDEZ
11                                          MORRISON & FOERSTER LLP

12                                          By:  /s/ Darryl P. Rains
                                                     Darryl P. Rains
13
                                            Attorneys for defendants The Charles
14                                          Schwab Corporation, Charles Schwab &
                                            Co., Inc., Charles Schwab Investment
15                                          Management, Inc., Schwab Investments,
                                            Charles R. Schwab, Evelyn Dilsaver,
16                                          Randall W. Merk, George Pereira, Matthew
                                            Hastings, Mariann Byerwalter, Donald F.
17                                          Dorward, William A. Hasler, Robert G.
                                            Holmes, Gerald B. Smith, Donald R.
18                                          Stephens, and Michael W. Wilsey

19

20

21

22

23

24

25

26

27

28

SCHWAB'S:  (1) OPP. TO MOT. FOR SUM. JUDG. RE § 17200 AND (2) NOTICE OF MOTION &
CROSS MOTION FOR SUM. JUDG. RE § 17200 — MASTER FILE NO. C-08-01510-WHA
sf-2808741

24