DARRYL P. RAINS (CA SBN 104802)
EUGENE ILLOVSKY (CA SBN 117892)
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792
Email: DRains@mofo.com

CRAIG D. MARTIN (CA SBN 168195)
DOROTHY L. FERNANDEZ (CA SBN 184266)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for defendants The Charles Schwab Corporation,
Charles Schwab & Co., Inc., Charles Schwab Investment
Management, Inc., Schwab Investments, Charles R. Schwab,
Evelyn Dilsaver, Randall W. Merk, George Pereira, Matthew
Hastings, Mariann Byerwalter, Donald F. Dorward, William A.
Hasler, Robert G. Holmes, Gerald B. Smith, Donald R.
Stephens, and Michael W. Wilsey

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE CHARLES SCHWAB CORP. SECURITIES LITIGATION | Master File No. C-08-01510-WHA |
| | CLASS ACTION |
| | SCHWAB'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE: NEGATIVE CAUSATION |
| | Date:  March 25, 2010 |
| | Time:  8:00 a.m. |
| | Judge:  Hon. William H. Alsup |

### STATEMENT OF ISSUES
### (Local Rule 7-4)

1.      Whether Schwab must show that *no* part of plaintiffs' losses was caused by the alleged misrepresentation where the statutes say that Schwab can establish its defense by showing that "any portion" of plaintiffs' loss was caused by something other than the alleged misrepresentations.

2.      Whether Schwab must "totally exclude" alleged misrepresentations as a possible cause of plaintiffs' loss where the statutes say that Schwab can establish its defense by showing that "any portion" of plaintiffs' loss was caused by something other than the alleged misrepresentations.

3.      Whether Schwab must affirmatively establish a causal connection between a specifically identified and "wholly unrelated" event and a resulting loss where the statutes say that Schwab can establish its defense by showing that any portion of plaintiffs' loss was caused by something "other than" the alleged misrepresentations and Schwab has shown that plaintiffs' losses were not caused by any of the alleged misrepresentations.

4.      Whether the Court should deny plaintiffs' motion for summary judgment where the evidence shows that all, or at least a large portion, of the fund's price decline was not caused by any of the statements challenged by plaintiffs.

5.      Whether a supposed omission about some aspect of mortgage-backed securities, in the face of extensive disclosures of the risks of those securities, makes a mutual fund an insurer for every possible thing that might go wrong with mortgage-backed securities in the next three years, or whether, consistent with Supreme Court precedent, plaintiffs instead must show a direct causative link between a price decline and an earlier misrepresentation.

1

## TABLE OF CONTENTS

2

Page

3     STATEMENT OF ISSUES ................................................................................................ i

4     TABLE OF AUTHORITIES ............................................................................................ iii

5     INTRODUCTION .......................................................................................................... 1

6     ARGUMENT .................................................................................................................. 3

7     I.      PLAINTIFFS MISSTATE THE LAW IN THREE WAYS. ............................... 3

8             A.     Plaintiffs Wrongly Claim Schwab Must Show That No Portion of
                     Investors' Losses Was Caused by Alleged Misrepresentations. ........................... 3

9             B.     Schwab Does Not Have to "Totally Exclude Alleged Misstatements and
10                   Omissions as Having Contributed to Plaintiffs' Losses." ...................................... 5

              C.     Schwab Need Not "Also Establish an Actual Causal Connection  [to an]
11                   Unrelated Event." ................................................................................................ 5

12    II.     THE EVIDENCE SHOWS THAT PART OR ALL OF PLAINTIFFS' LOSSES
              WAS NOT CAUSED BY ANY MISREPRESENTATION OR OMISSION. ................. 7

13            A.     At Least 49 Percent of Investors' Losses Were Caused by Bonds That
14                   Were Not Mortgage-Backed Securities. .............................................................. 8

              B.     Plaintiffs Admit the Fund Could Own Some Mortgage-Backed  Securities
15                   Without "Over-Concentrating." ........................................................................... 8

16            C.     A Portion of Plaintiffs' Losses Was Caused by General Market Declines. ............ 9

              D.     Changed Economic Circumstances Caused At Least Part of Investors'
17                   Losses. ................................................................................................................ 11

18            E.     NAV Declines Following This Lawsuit Were Not Caused By the Alleged
                     Misrepresentations. ............................................................................................. 11

19            F.     Any Understatement of the Fund's Duration Did Not Cause Investors
                     Losses. ................................................................................................................ 12

20    III.    PLAINTIFFS RELY ON AN ERRONEOUS THEORY OF CAUSATION AND
21            TESTIMONY THAT IS NOT RELEVANT TO LOSS CAUSATION. ......................... 13

22    CONCLUSION ............................................................................................................... 18

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) ............................................................................. 4, 6

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ................................................................................. 4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................. 3, 7

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F.Supp. 2d 662 (D. Colo. 2007) ..................................................................... 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................... 3

*Davidco Investors, LLC v. Anchor Glass Container Corp.*,
   No. 8:04cv2651T-24EAJ, 2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ................... 6

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ....................................................................................... 11, 17

*Escott v. Barchris Constr. Corp.*,
   283 F. Supp. 643 (S.D.N.Y. 1968) ......................................................................... 5

*Feit v. Leasco Data Processing Equip. Corp.*,
   332 F. Supp. 544 (E.D.N.Y. 1971) ......................................................................... 5

*Goldkrantz v. Griffin*,
   No. 97 CIV 9075 (DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999),
   *aff'd*, 201 F.3d 431 (2d Cir. 1999) ......................................................................... 7

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983) ............................................................................................... 3

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
   No. 08 Civ. 9554 (DCC), 2009 WL 3353045 (S.D.N.Y. Oct. 19, 2009) ................. 6

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ............................................................................... 5

*In re Dynegy, Inc. Sec. Litig.*,
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................................................... 4

*In re Exxon Valdez*,
   270 F.3d 1215 (9th Cir. 2001) ............................................................................... 3

*In re Keegan Mgmt. Co. Sec. Litig.*,
  794 F. Supp. 939 (N.D. Cal. 1992) ........................................................................ 16

*In re Metro. Sec. Litig.*,
  No. CV-04-25-FVS, 2010 WL 300402 (E.D. Wash. Jan. 20, 2010) ........................ 3

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................................. 4

*In re Shoretel, Inc., Sec. Litig.*,
  No. C 08-00271 CRB, 2009 WL 2588881 (N.D. Cal. Aug. 19, 2009).................... 4

*In re Ultimate Corp. Sec. Litig.*,
  No. 86 CIV. 5944 (CSH), 1989 WL 86961 (S.D.N.Y. July 31, 1989) ................... 16

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007) ............................................................... 15

*In re Williams Sec. Litig. — WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009)....................................................................... 14, 15

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994).................................................................................. 4

*McKowan Lowe & Co. v. Jasmine*,
  No. Civ. 94-5522 RBK, 2005 WL 1541062 (D.N.J. June 30, 2005),
  *aff'd*, 231 F. App'x 216 (3d Cir. 2007) .................................................................. 6

*Rebenstock v. Deloitte & Touche*,
  907 F. Supp. 1059 (E.D. Mich. 1995) .................................................................... 4

*Yu v. State Street Corp.*,
  No. 08 Civ. 8235 (RJH), 2010 U.S. Dist. LEXIS 17147 (S.D.N.Y. Feb. 25, 2010)..... 2, 17, 18

## STATUTES

15 U.S.C. § 77k(e) .................................................................................................. *passim*

15 U.S.C. § 77*l*(b) ................................................................................................. *passim*

## OTHER AUTHORITIES

Kara Scannell & Sudeep Reddy, *Greenspan Admits Errors to Hostile House Panel*,
  Wall St. J., Oct. 24, 2008 ...................................................................................... 11

Kevin F. O'Malley et al., *Federal Jury Practice & Instructions*
  § 162.74 (5th ed. 2007) .......................................................................................... 3

1

**INTRODUCTION**

2       Plaintiffs' motion for summary judgment on loss causation misstates the law in three

3   ways.

4       First, plaintiffs claim Schwab must show that "no reasonable juror could believe that any

5   portion of Plaintiffs' losses was caused by Defendants' alleged misrepresentations." (Open.

6   Br. 1, 4.) Plaintiffs have the law exactly backwards. Every case plaintiffs cite involves a

7   defendant who sought summary judgment or dismissal. The opposite standard applies to

8   plaintiffs who seek summary judgment. Plaintiffs here must prove no reasonable juror could

9   find that "any portion" of plaintiffs' losses was caused by something other than the alleged

10  misrepresentations. 15 U.S.C. §§ 77k(e), 77*l*(b).

11      Second, plaintiffs say Schwab "must *totally* exclude alleged misstatements and

12  omissions as having contributed to Plaintiffs losses." (Open. Br. 4.) Again, plaintiffs have the

13  law exactly backwards. Section 11 and section 12 do not require Schwab to "totally exclude"

14  misrepresentations as a possible cause: Schwab need only establish that all or "any portion" of

15  plaintiffs' losses was not caused by the alleged misrepresentations. 15 U.S.C. §§ 77k(e), 77*l*(b).

16      Third, plaintiffs say Schwab must not just prove that its alleged misrepresentations did

17  not cause plaintiffs' losses; they say Schwab "must also establish an actual causal connection

18  between the supposedly unrelated event they are relying on and the resulting loss." (Open. Br.

19  4.) Schwab has no such burden. Sections 11 and 12 say Schwab can establish its defense

20  simply by showing that "any portion" of plaintiffs' loss was caused by something "other than"

21  the alleged misrepresentations; it need not affirmatively prove what that something else was.

22  15 U.S.C. §§ 77k(e), 77*l*(b).

23      When the correct legal standards are applied, plaintiffs' motion on loss causation is

24  easily denied. The evidence will show that all, or at least a large portion, of plaintiffs' losses

25  was not caused by any of the statements challenged by plaintiffs. Indeed, because of the unique

26  way in which mutual fund shares are priced, none of Schwab's alleged misstatements could

27  have affected the fund's NAV or caused any loss to investors. Moreover, the evidence will

28  show that large portions of plaintiffs' losses were caused by market forces outside Schwab's

1    control during a once-in-a-century credit crisis.

2         Ultimately, it will be plaintiffs' loss causation approach that does not meet the law's

3    tests. Plaintiffs say Schwab's statements about mortgage-backed securities "caused" investors

4    losses simply because the fund's mortgage-backed securities declined in value. But saying

5    mortgage-backed securities declined does not mean Schwab's statements caused the decline. In

6    a decision that was handed down just last week, a federal judge dismissed nearly-identical

7    section 11 and section 12 claims arising from another ultra-short bond fund's investments in

8    mortgage-backed securities. *Yu v. State Street Corp.*, No. 08 Civ. 8235 (RJH), 2010 U.S. Dist.

9    LEXIS 17147, at *2-3 (S.D.N.Y. Feb. 25, 2010). That fund had remained stable for several

10   years, but dropped 34 percent during the credit crisis. *Id.* at *8. The complaint alleged that

11   fund's offering documents misled investors by describing the fund as one that invested in "high-

12   quality" securities when it invested in purportedly "risky" mortgage-backed securities — highly

13   similar to the arguments advanced by plaintiffs in this case. *Id.* Nevertheless, the court

14   dismissed those allegations at the pleading stage without leave to amend, holding:

15            In hindsight, then, it could be alleged that investments that were viewed
              by defendants — and the marketplace — to be 'high-quality . . .
16            investment grade instruments' in fact stood on shaky foundations. But
              the accuracy of offering documents must be assessed in light of
17            information available at the time they were published.

18   *Id.* *21-22, 37. Here, too, plaintiffs' claims are improperly based on hindsight. Plaintiffs'

19   expert makes a key admission on this point: she says, even if Schwab had made exactly the

20   disclosures that plaintiffs say it should have made back in 2006, the fund's price in 2006 (with

21   the supposed "truth" made known to all) would not have dropped to the price that we actually

22   saw in March 2008. That admission, by itself, shows that at least part of plaintiffs' losses is not

23   tied to any alleged misrepresentation in 2006.

24        For these reasons, plaintiffs' motion for summary judgment on loss causation should be

25   denied.

26

27

28

**ARGUMENT**

**I.    PLAINTIFFS MISSTATE THE LAW IN THREE WAYS.**

Plaintiffs begin their motion by claiming that Schwab has a "heavy burden" in establishing its loss causation defense.  (Open. Br. 1, 3-4.)  Not true.  Schwab may establish its loss causation affirmative defense by a preponderance of the evidence.[1]  15 U.S.C. §§ 77k(e), 77*l*(b); 3B Kevin F. O'Malley et al., *Federal Jury Practice & Instructions* § 162.74 (5th ed. 2007); *see generally In re Exxon Valdez*, 270 F.3d 1215, 1232 (9th Cir. 2001) ("standard of proof generally applied in federal civil cases is preponderance of evidence").

On this motion, it is plaintiffs who have a heavy burden.  As the parties seeking summary judgment, plaintiffs have the burden of showing that there are no genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**A.    Plaintiffs Wrongly Claim Schwab Must Show That No Portion of Investors' Losses Was Caused by Alleged Misrepresentations.**

Plaintiffs claim Schwab must show that "no reasonable juror could believe that any portion of Plaintiffs' losses were caused by defendants' alleged misrepresentations."  (Open. Br.  1.)  That is not the law.

The standard is the exact opposite when it is plaintiffs who seek summary judgment. Summary judgment must be denied if a reasonable juror could find that any portion of plaintiffs' losses was not caused by the alleged misrepresentations.  *See In re Metro. Sec. Litig.*, No. CV-04-25-FVS, 2010 WL 300402, at *2 (E.D. Wash. Jan. 20, 2010) (to win summary judgment on issue of negative causation, plaintiffs "must demonstrate no rational juror could find for" defendants); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (summary judgment must be denied if "a fair-minded jury could return a verdict for [the nonmoving party] on the evidence presented").

---

[1] Plaintiffs say the "affirmative defense of loss causation under § 11 is no different from the loss-causation element of a claim under § 10(b)."  (Open. Br. 4.)  It is well established that the burden of establishing loss causation under section 10(b) is by a preponderance of the evidence.  *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90 (1983).

1    Plaintiffs' error is revealed by looking at the cases they cite. Every one of them involves

2    a defendant who sought summary judgment or dismissal on the ground that a security's price

3    decline was caused by factors other than the alleged misrepresentation. Plaintiffs do not cite a

4    single case in which any court granted a plaintiff's motion for summary judgment striking a

5    defendant's affirmative defense of negative loss causation. *See, e.g., Akerman v. Oryx*

6    *Commc'ns, Inc.*, 810 F.2d 336, 340, 343 (2d Cir. 1987) (defendants' summary judgment

7    affirmed); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 233-34 (5th Cir. 2009)

8    (defendants' summary judgment reversed); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407,

9    1421-22 (9th Cir. 1994) (same; applied "touches upon a loss" standard that was later rejected by

10   Supreme Court in *Dura*); *Rebenstock v. Deloitte & Touche*, 907 F. Supp. 1059, 1066-68 (E.D.

11   Mich. 1995) (defendants' summary judgment denied; applied "touches upon a loss" standard);

12   *In re New Century*, 588 F. Supp. 2d 1206, 1238-39 (C.D. Cal. 2008) (defendants' motion to

13   dismiss denied); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 867-71 (S.D. Tex. 2004)

14   (same); *In re Shoretel, Inc., Sec. Litig.*, No. C 08-00271 CRB, 2009 WL 2588881, at *3-4 (N.D.

15   Cal. Aug. 19, 2009) (same).

16   Here, because a reasonable juror could find that all, or at least a large portion, of

17   plaintiffs' losses was caused by something other than the alleged misrepresentations, the Court

18   should deny plaintiffs' motion for summary judgment. A few examples of Schwab's evidence

19   make the point (a more-detailed discussion follows in section II). For instance, plaintiffs say

20   Schwab over-concentrated in mortgage-backed securities. But the fund never had more than

21   50 percent of its assets in mortgage-backed securities; usually it was much less. And plaintiffs'

22   own expert admits declines in the prices of non-mortgage-backed securities accounted for only

23   about half of the fund's losses. That alone, proves a large portion of plaintiffs' losses was

24   caused by something other than the alleged misrepresentations. Similarly, even if plaintiffs

25   could show that the fund's duration was higher than reported (which they can't), statements

26   about duration did not cause any losses. Having a longer duration means a fund is more

27   exposed to the risk of rising interest rates. But interest rates actually fell during the entire period

28   the NAV was declining.

**B.     Schwab Does Not Have to "Totally Exclude Alleged Misstatements and Omissions as Having Contributed to Plaintiffs' Losses."**

Next, plaintiffs say that, to avoid summary judgment, Schwab "must *totally* exclude alleged misstatements and omissions as having contributed to Plaintiffs' losses." (Open. Br. 4.) But sections 11 and 12 say the opposite. They allow Schwab to prove its affirmative defense by showing that "any portion" of plaintiffs' losses was caused by anything other than the alleged misstatement or omission. 15 U.S.C. §§ 77k(e), 77l(b); *see also Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 586 (E.D.N.Y. 1971) ("we cannot but conclude that some portion of the diminution of Leasco's price was due to market factors . . . and that, to that extent, plaintiff's damages were not 'caused' by the omissions in the registration statement"); *Escott v. Barchris Constr. Corp.*, 283 F. Supp. 643, 704 (S.D.N.Y. 1968) (decision as to whether "part of the damage sustained" "was caused by factors other than the errors and omissions of the registration statement").

The rule is the same under section 10(b) and all other securities laws that have a causation requirement. In a section 10(b) case, for example, a plaintiff might survive summary judgment by showing that a "misrepresentation is one substantial cause of the investment's decline in value," but the effect of "other contributing forces" will be an issue for the jury to decide and will "play a role in determining recoverable damages." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (*citing Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)).

Under the correct rule, plaintiffs' motion for summary judgment must be denied because a reasonable juror could find that all, or at least a large portion, of plaintiffs' losses was caused by something other than the alleged misrepresentations.

**C.     Schwab Need Not "Also Establish an Actual Causal Connection [to an] Unrelated Event."**

Plaintiffs say it is not enough for Schwab to show that the alleged misstatements could not have caused losses. They claim Schwab must also affirmatively establish a causal connection between a specifically identified and "wholly unrelated" event and the resulting loss.

1    (Open. Br. 3-4.)  Plaintiffs have no support in the statutes or case law for this argument.

2            Nothing in the text of section 11 or section 12 requires Schwab to show exactly "what

3    changed circumstances or other *Dura* factors" caused the fund's NAV decline.  (Open. Br. 5.)

4    All Schwab must show is that the NAV decline was not caused by the alleged

5    misrepresentations.  Both section 11 and section 12 say Schwab can prove its negative causation

6    defense by showing "that any portion or all of" plaintiffs' losses "represents other than" a

7    decline in the fund's NAV "resulting from" a misrepresentation in a prospectus or registration

8    statement.  15 U.S.C. §§ 77k(e), 77*l*(b).

9            Under the plain and common-sense meaning of the statutory text, a showing that

10   plaintiffs' loss could not have been caused by the alleged misrepresentations necessarily proves

11   that plaintiffs' loss was caused by something "other than" those alleged misrepresentations.  For

12   example, if a defendant had to prove that a party was from a state "other than" California

13   (perhaps to establish diversity jurisdiction), it would be enough to prove that the party was not

14   from California; it would be unnecessary to show precisely which of the other 49 states that

15   party was from.  Plaintiffs do not cite a single case that has questioned this common-sense

16   approach.

17           The cases say that "once a defendant shows that the alleged misrepresentation was not

18   the cause of the plaintiffs' losses, its burden is met" and the defendant does not need to show

19   "what other factors" caused the loss.  *See, e.g., McKowan Lowe & Co. v. Jasmine*, No. Civ. 94-

20   5522 RBK, 2005 WL 1541062, at *12 n.12 (D.N.J. June 30, 2005), *aff'd*, 231 F. App'x 216 (3d

21   Cir. 2007).  For example, courts have often found that price declines before disclosure of the

22   alleged "truth" "may not be charged to defendants," without requiring defendants to show

23   precisely what caused those price declines.  *See, e.g., Akerman*, 810 F.2d at 342; *In re Britannia*

24   *Bulk Holdings Inc. Sec. Litig.*, No. 08 Civ. 9554 (DCC), 2009 WL 3353045, at *13 (S.D.N.Y.

25   Oct. 19, 2009) (claims dismissed where defendants showed "that the allegedly misleading

26   misrepresentations did not cause the depreciation in the stock's value"); *Davidco Investors,*

27   *LLC v. Anchor Glass Container Corp.*, No. 8:04cv2651T-24EAJ, 2006 WL 547989, at *21-22

28   (M.D. Fla. Mar. 6, 2006) (same).  Likewise, when defendants show that a security's price did

1   not react to the revelation of the alleged "truth," courts have found that defendants met their

2   burden of showing that price declines were not attributable to the alleged misrepresentations.

3   *See, e.g.*, *Goldkrantz v. Griffin*, No. 97 CIV 9075 (DLC), 1999 WL 191540, at *5-7 (S.D.N.Y.

4   Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999) (unpublished table decision).  These are just

5   examples of the many different ways a defendant can show that plaintiffs' losses were caused by

6   something other than the alleged misrepresentation.

7         In any event, plaintiffs ignore the evidence that Schwab will use to prove its negative

8   causation defense.  Schwab's evidence is not limited to a showing that the alleged

9   misrepresentations could not have caused some or all of the losses.  Rather, as discussed below,

10  Schwab's evidence includes an affirmative showing that other factors caused all, or at least a

11  large portion, of plaintiffs' losses.

12  **II.   THE EVIDENCE SHOWS THAT PART OR ALL OF PLAINTIFFS' LOSSES**
13  **WAS NOT CAUSED BY ANY MISREPRESENTATION OR OMISSION.**

14        Plaintiffs' motion for summary judgment must be denied if a reasonable juror could find

15  that any portion of plaintiffs' losses was caused by something other than the alleged

16  misrepresentations.  15 U.S.C. §§ 77k(e), 77*l*(b); *Anderson*, 477 U.S. at 252 (summary judgment

17  must be denied if "a fair-minded jury could return a verdict for [nonmoving party] on the

18  evidence presented").  Schwab has plenty of evidence from which a reasonable juror could find

19  that all, or at least a large portion, of plaintiffs' losses was caused by something other than the

20  alleged misrepresentations.  This evidence comes not just from Professor James, but also from

21  other witnesses, often from plaintiffs' own experts.

22        It is not possible or helpful, in this brief, to attack every alleged misstatement plaintiffs

23  might try to prove.  They say, in an appendix to Mr. Fong's expert report, that there are 51

24  alleged misstatements, and they have suggested there are others that they will not tell us about

25  specifically.  (Berman Decl. Exh. B at 130-44; Fernandez Decl. Exh. A (O'Donnell Resp. to

26  Interrogs.) at 24 ("Plaintiffs will rely on any similar statements found in Schwab documents").)

27  Many of those are not in the complaint.  Some that are in the complaint, plaintiffs have now

28  abandoned.  When the Court pressed plaintiffs to give guidance about the allegations plaintiffs

1   plan to pursue, they mentioned four categories:  an alleged "over-concentration" in mortgage-

2   backed securities, an alleged failure to meet the fund's goal of keeping the portfolio's duration

3   at one year or less, a supposed excess of "illiquid securities," and some alleged mismanagement

4   of risk.  We address each of these claims in the examples below.  Our evidence shows that at

5   least a large portion of plaintiffs' losses was not caused by plaintiffs' alleged

6   misrepresentations.

7   **A.      At Least 49 Percent of Investors' Losses Were Caused by Bonds That
           Were Not Mortgage-Backed Securities.**

8

9        Plaintiffs' case currently focuses on mortgage-backed securities.  They say that an

10  alleged "over-concentration" in these securities made the fund riskier than disclosed.  (Sec. Am.

11  Compl. [Dkt. No. 250] ¶¶ 5, 80(d), 80(e), 80(f), 88(a), 88(b), 88(c), 88(d).)  These allegations

12  are easily refuted by undisputed evidence, as shown in Schwab's motion for summary judgment.

13  (Dkt. No. 390 at 3-10.)

14        But were the jury asked to decide whether Schwab's statements about mortgage-backed

15  securities caused plaintiffs' losses, there is ample evidence from which a reasonable juror could

16  find that large portions of plaintiffs' losses were not caused by any misrepresentation about

17  mortgage-backed securities.  Some of this evidence comes from plaintiffs' own expert, Gifford

18  Fong.  Mr. Fong concludes that corporate bonds, not mortgage-backed securities, were

19  responsible for 49 percent of the fund's losses.  (Berman Decl. Exh. B at 44-45.)  There is no

20  allegation anywhere in the complaint that Schwab made a false or misleading statement about

21  its corporate bond investments.

22        A reasonable juror could, and should, find from this evidence alone that at least 49

23  percent of plaintiffs' losses were not caused by a misrepresentation about mortgage-backed

24  securities.

25  **B.      Plaintiffs Admit the Fund Could Own Some Mortgage-Backed
           Securities Without "Over-Concentrating."**

26

27        Plaintiffs also admit that the fund could own some mortgage-backed securities without

28  "over-concentrating."  They refuse to put a number on what allocation would be permissible.

1    (Fernandez Decl. Exh. B (Dickson Resp. to Interrogs.) at 15; Fernandez Decl. Exh. C (Fong

2    Depo.) at 181:2-182:7.)  But they say they "identified peer group funds that performed

3    consistently with the stated objectives of a short term fund and which had lower concentrations

4    of MBS."  (Fernandez Decl. Exh. B at 15.)  Some of those funds had higher allocations to non-

5    agency MBS than the YieldPlus fund.  (Fernandez Decl. Exh. D (11/27/09 Ferrell Report) at

6    Exh. 23.A (AMF had as much as 62 percent in late 2007; JP Morgan had 31 percent in late

7    2006).)  And even an average of the so-called "peer group," invested around 15 percent in non-

8    agency mortgage-backed securities, according to plaintiffs' own expert.[2]  (Berman Decl. Exh. B

9    at 26.)

10          A reasonable juror could find from this evidence that allocating 15 percent (or more) of

11   the fund's portfolio to mortgage-backed securities was permissible and consistent with the

12   fund's investment objective.  Indeed, a reasonable juror could easily find that a 25 percent

13   allocation to mortgage-backed securities was permissible given the fund's consistent

14   disclosures, before September 2006, that it would invest up to 25 percent of the fund's assets in

15   non-agency mortgage-backed securities.  (Dkt. No. 390 at 6.)  And a reasonable juror could find

16   that an allocation of more than 25 percent was permissible given the fund's disclosure,

17   beginning in September 2006, that the fund "may invest more than 25% of its total assets in

18   privately-issued mortgage-backed securities."  (*Id.*)  A reasonable juror should also find that

19   losses resulting from a permissible allocation to mortgage-backed securities, and not from any

20   alleged "over-concentration," were not caused by a misrepresentation about mortgage-backed

21   securities.

22          **C.      A Portion of Plaintiffs' Losses Was Caused by General Market Declines.**

23          Plaintiffs say the fund's NAV decline was caused largely by mortgage-backed securities.

24   That assertion is not true:  in many months, other asset classes, like certain types of corporate

25          [2] In calculating their averages, Mr. Fong and Ms. Preston give equal weight to several
26   tiny funds that invested at least 80 percent of their assets in Treasuries and agency mortgage-
     backed securities and exclude the YieldPlus fund, which was by far the largest fund in the
27   category.  (Fernandez Decl. Exh. E (Preston Depo.) at 51:7-54:22; Fernandez Decl. Exh. C at
     188:17-191:8.)

28

1    bonds and asset-backed securities, performed more poorly than mortgage-backed securities.

2    One easy way to see this is to compare plaintiffs' expert's allocation of realized losses by asset

3    type to the allocations within the portfolio.  As shown in Schwab's motion for summary

4    judgment, Mr. Fong attributes losses between May 2006 and March 2008 to "non-agency

5    mortgage-backed securities" and to corporate bonds that are roughly proportional to the weights

6    of those asset types within the portfolio.  (Dkt. No. 390 at 16; Berman Decl. Exh. B at 44-45.)

7            The fund's decision to increase its allocation to mortgage-backed securities over

8    25 percent, therefore, did not contribute to the fund's losses.  Professor James will prove this

9    point.  He created a benchmark portfolio that capped mortgage-backed securities at 25 percent

10   and reallocated the remaining funds (the overage) proportionally in the other bonds actually held

11   by the fund.  The result:  the benchmark portfolio performed comparably to or worse than the

12   actual portfolio (with its higher allocation to mortgage-backed securities).[3]  (Berman Decl.

13   Exh. A at 25 & Exh. 12.)

14           Mr. Fong admits that Professor James got his analysis right; he argues only about one

15   assumption used in the analysis:  "Had the Fund not had excessive holdings of non-agency

16   MBS, the loss is difficult to determine since no one knows what they would have invested in as

17   a substitute.  If the fund was consistent in its concentration [sic] the finance sector, similar or

18   even worse results were possible."  (Fernandez Decl. Exh. F (12/18/09 Fong Report in Reply to

19   James) at 9.)  Professor James performed his analysis of what alternative investments Schwab's

20   portfolio managers would have made using objective data about the investment decisions those

21   same portfolio managers actually did make back in 2006, without the benefit of hindsight.

22   (Berman Decl. Exh. A at 25 & Exh. 12.)  Mr. Fong does a similar analysis, but, with the benefit

23   of hindsight, he speculates that the portfolio managers would have radically changed their

24   portfolio allocation, dramatically increasing Treasury holdings to match the so-called average of

25

26           [3] Professor James did a similar analysis of the securities that plaintiffs allege were
     illiquid, with the same result — a benchmark portfolios capping the allegedly illiquid securities
27   at various thresholds performed comparably to or worse than the actual portfolio.  (Berman
     Decl. Exh. A at 28.)

28

1    Mr. Fong's so-called "peer" group.  (Fernandez Decl. Exh. G (12/11/08 Fong Report in Opp. to

2    James) § 2.7.)  Even so, Mr. Fong concludes that the index he created "would have done about

3    two percent better than the [YieldPlus] fund."  (Fernandez Decl. Exh. C at 203:19-205:11.)

4    From this testimony, plaintiffs try to argue that no reasonable juror could give them any less

5    than 100 percent of their supposed damages.  A reasonable juror could, and no doubt would,

6    reject this outrageous argument.

7          A reasonable juror could find that the fund would have experienced similar losses even

8    if it had not "over-concentrated" in mortgage-backed securities.  A reasonable juror should,

9    therefore, find that at least a large portion of the fund's losses was caused by something other

10   than Schwab's statements about mortgage-backed securities.

11         **D.**    **Changed Economic Circumstances Caused At Least Part of Investors' Losses.**

12         Plaintiffs have to concede that a lot happened in late 2007 and early 2008 that could not

13   have been disclosed in a prospectus or registration statement in 2006.  To give just one example,

14   Mr. Fong admits that "up until the middle of 2007," "default exposure in triple A-rated,

15   nonagency mortgage-backed securities" was "[v]ery, very minimal" and "less than one percent,"

16   but he also says a later increase in mortgage defaults contributed to the fund's NAV decline.

17   (Fernandez Decl. Exh. C at 208:20-209:6, 225:20-226:8.)  These increased defaults were just

18   one aspect of what Alan Greenspan described as a "once-in-a-century credit tsunami" that could

19   not be anticipated by the best experts or the smartest regulators.  Kara Scannell & Sudeep

20   Reddy, *Greenspan Admits Errors to Hostile House Panel*, Wall St. J., Oct. 24, 2008, at A1.

21   Declines caused by such "changed economic circumstances" are not recoverable as damages.

22   *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).

23         A reasonable juror could, and should, find at least a large portion of the fund's losses

24   was caused by changed economic circumstances, like the dramatic and unexpected increase in

25   mortgage defaults that Mr. Fong testified about.

26         **E.**    **NAV Declines Following This Lawsuit Were Not Caused By the Alleged**
            **Misrepresentations.**

27

28         No misrepresentation allegedly contained in Schwab's 2006 and 2007 SEC filings could

1  possibly have caused any NAV declines following March 18, 2008, when this lawsuit was filed.

2  Plaintiffs cannot credibly claim that the supposed "truth" about YieldPlus remained hidden from

3  them or the market even after they recited it in their complaint and broadcast news of their

4  lawsuit in press releases.  (*See* Dkt. No. 27-4 (Mar. 18, 2008 press release on Yahoo! Finance).)

5  Such a claim does not make sense as a matter of economics.  (Fernandez Decl. Exh. H (James

6  Depo.) at 51:19-52:3, 54:4-18.)

7       On March 18, 2008, plaintiffs publicly alleged several purportedly "true materials facts"

8  they say were previously concealed.  These included:  that defendants had "abandoned the

9  objectives of the Funds in pursuit of higher yields" by "concentrat[ing] in a single risky industry

10 or market segment — in reality over 50% of the Funds assets are now invested in the mortgage

11 industry."  (Compl. [Dkt. 1] ¶ 28.)  They claimed to have discovered the fund's "risk profile"

12 was higher than stated because of these investments in "highly complex and speculative

13 mortgage back [sic] securities."  (*Id.* ¶ 2.)  They allegedly learned that the Funds' analysts "did

14 not have any real expertise in valuing the mortgage backed securities they purchased, or

15 assessing the risk."  (*Id.* ¶ 28.)  That these "mortgaged back [sic] securities in which they were

16 investing were highly vulnerable to becoming illiquid."  (*Id.*)  And that the "duration of a vast

17 majority of the bonds" in the fund was higher than reported.  (*Id.*)

18      A reasonable juror could find that, if there ever were a misrepresentation, the supposed

19 "truth" was revealed by March 18, 2008, or an earlier date.  Any losses after the "truth" was

20 revealed must obviously have been caused by something other than the market learning the

21 "truth" about any alleged misrepresentations.

22      **F.     Any Understatement of the Fund's Duration Did Not Cause Investors Losses.**

23      Plaintiffs also claim the fund's purportedly high duration increased its interest rate risk

24 and that the fund's duration was higher than Schwab reported.  (*See*, *e.g.*, Sec. Am. Compl. ¶¶ 5,

25 13, 80(b).)  Even if this were the case (which it is not), a reasonable juror could find that

26 concealed interest rate risk did not cause any part of plaintiffs' losses because interest rates

27 actually declined during the class period.

28      Bond prices tend to move in the opposite direction as interest rates, interest rate risk

1   therefore refers to the risk that the fund's value will decline if interest rates rise.  (Berman Decl.

2   Exh. A at 12; Fernandez Decl. Exh. C at 98:13-99:14.)  As Professor James shows in his report,

3   allegedly elevated interest rate risk could not have caused the fund's losses because interest

4   rates were declining.  (Berman Decl. Exh. A at 13-14; *see also* Fernandez Decl. Exh. D at 19.)

5   Plaintiffs have conceded that interest rates declined during the relevant period.  (Fernandez

6   Decl. Exh. I (Mikelonis Resp. to RFAs) Nos. 19 and 20.)  In the face of this admission, they

7   cannot possibly prove that an alleged understatement of effective duration caused any loss.[4]

8         Plaintiffs also say Schwab "had a lack of proper risk management," because, they claim,

9   there was some inadequacy in the way Schwab monitored the fund's duration.  (Sec. Am.

10   Compl. ¶¶ 81-86.)  Plaintiffs' allegations ignore the reports that the fund managers actually used

11   to monitor duration.  But even if plaintiffs' claim were true, it could not have caused any part of

12   their losses.  Plaintiffs say duration was higher than it should have been.  That claim could cause

13   losses only if interest rates went up.  Here, any mismanagement of duration could not possibly

14   have caused plaintiffs' losses, because interest rates went down.

15   **III.   PLAINTIFFS RELY ON AN ERRONEOUS THEORY OF CAUSATION AND TESTIMONY THAT IS NOT RELEVANT TO LOSS CAUSATION.**

16

17         In response to all this evidence, plaintiffs say their losses are "presumed" to be damages,

18   without any evidence from them.  While the burden initially is on Schwab to prove its

19   affirmative defense, once Schwab has presented evidence to support its position, plaintiffs must

20   offer affirmative causation evidence, if they intend to resist judgment as a matter of law.  *See*

21   *Akerman*, 810 F.2d at 343 (once defendants carry their initial burden on negative causation,

22

23       [4] Plaintiffs and their experts scrambled to reinvent their claims after it became clear that their assertions about effective duration could not be linked to any losses.  In reply reports, plaintiffs' experts raised, for the first time, the concept of "spread duration."  But spread

24   duration is a "measure of credit risk," not a measure of interest rate risk.  (Fernandez Decl. Exh. J (12/18/09 Fong Report in Reply to Ferrell) at 7.)  When Schwab said it would seek to

25   keep its duration at one year or less, Mr. Fong admits "they are referring to the effective duration."  (Fernandez Decl. Exh. C at 91:21-92:2.)  Mr. Fong also acknowledges that "effective

26   duration" is the industry standard way to measure sensitivity to changes in "nominal" interest rates (like when the Federal Reserve lowers rates) and that "nominal interest rates declined in

27   2007 and 2008."  (*Id.* at 93:2-15, 99:15-19.)

28

1  plaintiffs must come forward with evidence showing that price decline actually resulted from

2  alleged misstatement).

3       Plaintiffs apparently intend to argue that causation is established simply because the

4  fund's mortgage-backed securities declined in value.  That is what they argue in their brief.

5  (Open. Br. 6-10.)  They say Schwab "misrepresented and omitted to disclose" the risks of

6  mortgage-backed securities and that those securities caused losses.  (*Id.* at 6.)[5]  That is also what

7  their expert, Gifford Fong, says in his report.  He says:  "The Fund's large losses occurred

8  primarily because the Fund invested an excessive portion of its assets in mortgage backed

9  securities . . . ."  (Berman Decl. Exh. B at 8.)

10       But plaintiffs cannot show loss causation simply by showing the fund's mortgage-

11  backed securities declined in value.  They must show an affirmative link between a specific

12  alleged misstatement (back in 2006) and a decline in the fund's value after the truth about that

13  misstatement became known to the market.

14       A supposed omission of some possible risk related to mortgage-backed securities does

15  not establish a causal link to the eventual precipitous decline of the mortgage-backed securities

16  market years later during an unforeseen and unprecedented credit crisis.  *See In re Williams Sec.*

17  *Litig. — WCG Subclass*, 558 F.3d 1130, 1142-43 (10th Cir. 2009).  The "possibility" that

18  mortgage-backed securities could be subject to credit risk or liquidity risk[6] does not mean it was

19  "legally foreseeable destiny" that there would a complete freezing up of the mortgage markets

20  such that the fund's NAV, in March 2008, at the peak of the credit crisis, should somehow be

21  considered the fund's "true value" in 2006.  *See id.*

22  

23      [5] Plaintiffs also try to inject into the case new claims about "the corporate bonds of
financial companies," what their expert calls the "financial sector."  (Open. Br. 6.)  There are no
allegations of any misrepresentation about these bonds in the complaint.  But from the vantage

24  point of November 2009, when they filed their expert reports, plaintiffs now point to other
bonds that declined in value and seek to expand their case by somehow lumping together all

25  bonds that performed poorly.  To do it, they stretch to combine insurance companies, banks,
brokers, and more all into one "financial sector," and stretch still further to say that bonds from

26  all those different industries are somehow the same as mortgage-backed securities.

27      [6] Of course, the fund disclosed that it was subject to credit risk and liquidity risk.  These
possibilities were not hidden from investors.

28

In *Williams*, the plaintiffs argued that the company's alleged misrepresentation was that it could make money and pay off its debt. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1257 (N.D. Okla. 2007). Their expert "bootstrap[ped]" from the assumption that the company was "essentially valueless from the start" to a conclusion that any bad news about the company was a materialization of the concealed risk that the company was worthless. *Williams*, 558 F.3d at 1139. The court rejected this argument, saying: "we must again be careful not to connect each and every bit of negative information about a company to an initial misrepresentation that overstated the company's chances for success." *Id.* at 1140. The court found that the "causal connection between false statements about a company's prospects and that same company's eventual bankruptcy years later" was "too remote" to allow recovery. *Id.* at 1142. Even if bankruptcy were a "likely possibility" from the beginning of the class period, it was not the company's "legally foreseeable destiny such that its trading price at bankruptcy equaled its true value on the day the spinoff was announced." *Id.* at 1143.

*Williams* shows the problem with broad allegations like the ones plaintiffs make here. And it provides the solution. The problem is that allegations such as the company "overstated its chances for success" or the fund "understated the risks of its portfolio" are so vague that plaintiffs can argue that any bad news about the company or the portfolio that happens in the future is connected to the allegation. Crediting that theory of loss causation would "transform the securities laws into the kind of downside insurance policy that *Dura* warned against" by allowing plaintiffs to recover for changed economic circumstances that happen after the alleged misstatement. *Id.*

The solution is to require a direct causative link between a loss and an earlier misrepresentation. *Id.* at 1140 (disclosure or materialization of undisclosed risk "must at least relate back to the misrepresentation and not to some other negative information") (*citing Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)). That means plaintiffs' recoverable damages can be no more than the amount the fund's price would have

1   fallen had the supposed "truth" been told when plaintiffs say it should have been.[7]  They cannot

2   recover the amount the price would have fallen if someone had looked into a crystal ball and

3   perfectly predicted everything that would go wrong with mortgage-backed securities in the next

4   three years.  Any failure to perfectly predict the future cannot be the misrepresentation plaintiffs

5   complain of; the securities laws did not require Schwab to predict the future.  *See In re Keegan*

6   *Mgmt. Co. Sec. Litig.*, 794 F. Supp. 939, 942 (N.D. Cal. 1992) ("[n]o law requires the

7   prospectus to contain . . . information that did not exist prior to its effective date"); *In re*

8   *Ultimate Corp. Sec. Litig.*, No. 86 CIV. 5944 (CSH), 1989 WL 86961, at *1 (S.D.N.Y. July 31,

9   1989) ("Foretelling the future is not an obligation to be derived from the securities laws.").

10         Here, plaintiffs' expert admits that, even if Schwab had made exactly the disclosures

11   plaintiffs say it should have made back in 2006, the fund's price in 2006 (with the supposed

12   "truth" made known to all) would not have dropped to the price that we actually saw in March

13   2008.  (Fernandez Decl. Exh. E at 68:23-69:5.)  That admission, by itself, shows that at least

14   part of plaintiffs' losses is not tied to any alleged misrepresentation from 2006.

15         For this reason, plaintiffs' citations to deposition testimony in which various witnesses

16   say the fund's mortgage-backed securities declined in value, and therefore "caused" some

17   portion of the fund's NAV decline, miss the point.  Plaintiffs say that Kim Daifotis and Matt

18   Hastings "both testified that non-agency mortgage-backed securities caused Fund losses."

19   (Open. Br. 7-10.)  Schwab does not dispute that the prices of mortgage-backed securities and

20   most other non-government bonds fell during the credit crisis.  But plaintiffs do not point to any

21   testimony or other evidence linking those market-wide declines over which Schwab had no

22   control to a misrepresentation in 2006.  Nor could they.  As we show in Schwab's motion for

23   ———————————

24         [7]  Neither plaintiffs nor their experts offer an explanation for how any statement by
     Schwab about mortgage-backed securities could have affected the fund's NAV.  Of course, as
25   Schwab showed in its motion for summary judgment, the NAV is determined by the value of the
     underlying investments, not by Schwab's statements.  (Dkt. No. 390 at 12.)  Faced with this
26   problem, plaintiffs' experts often conflate loss causation with transaction causation.  (Fernandez
     Decl. Exh. G (12/11/09 Fong Report in Opp. to James) § 2.4 ("Had the investors known the
27   Fund was materially different from the index, they would not [sic] invest in the Fund.") and
     Exh. E at 67:21-68:15 (if alleged "truth" told in May 2006 "you would be looking at a
28   substantially different investor population").)

1   summary judgment, the fund listed every security that it owned in its quarterly reports,

2   including every Alt-A security.  (Dkt. No. 390 at 7 & n.6.)  These securities, like the other

3   bonds owned by the fund, were priced daily by a third-party pricing service.  (Fernandez Decl.

4   Exh. K (Hastings Depo.) at 298:1-19.)  In late 2007 and early 2008, economic circumstances

5   changed dramatically, and the fund's pricing service lowered the prices of Alt-A securities,

6   among others.  (Berman Decl. Exh. H at 362:10-15, 366:17-367:18.)  Losses caused by these

7   changed economic circumstances are not recoverable.  *Dura Pharms.*, 544 U.S. at 342-43.

8   Moreover, Schwab made prompt disclosures about what was happening in the market.[8]

9   (Fernandez Decl. Exh. L (Pl. Exh. 2228) and Exh. M (Daifotis Depo.) at 256:20-258:16.)

10         What plaintiffs are really trying to do is to resurrect the debunked "touches upon a loss"

11   standard — unless a loss is "wholly unrelated" to the topic of mortgage-backed securities,

12   plaintiffs say they can recover for it.  (Open. Br. 3.)  But the Supreme Court says that plaintiffs

13   can recover only for "losses that misrepresentations actually cause" and "to 'touch upon' a loss

14   is not to *cause* a loss."  *Dura Pharms.*, 544 U.S. at 344-45.  An omission about one aspect of

15   mortgage-backed securities cannot make a defendant an insurer of every possible thing that

16   might go wrong with mortgage-backed securities in the future.

17         As one court recently put it, in dismissing section 11 and section 12 claims arising from

18   another ultra-short bond fund's investments in mortgage-backed securities, "[a] backward

19   looking assessment of the infirmities of mortgage-related securities . . . cannot help plaintiffs'

20   case."  *Yu v. State Street Corp.*, 2010 U.S. Dist. LEXIS 17147, at *22.  Schwab repeatedly

21   disclosed exactly which mortgage-backed securities it owned.  And information about trends in

22   the market for mortgage-backed securities was publicly available and widely known to the

23   market.  "The law imputes knowledge of such market trends to the reasonable investor."  *Id.* at

24

25         [8] Faced with this real-time disclosure of changes in the market, plaintiffs are left to
    quibble over the wording.  They argue the fund should have said the "wholesale, downward
26   repricing" affected "Alt-A securities" instead of the broader "mortgage and asset-backed
    sectors."  Not only are Alt-A securities part of the "mortgage and asset-backed sectors," but
27   Schwab's statement more accurately captures the scope of the price changes than plaintiffs'
    after-the-fact revision.  (Fernandez Decl. Exh. M at 258:17-259:17.)

28

1   *24.  Schwab's disclosures "allowed investors to evaluate [its] investment strategy" against

2   those trends.  *Id.*  A change in the trend during an unforeseen credit crisis does not entitle

3   plaintiffs to recover their market losses from Schwab.

4          Plaintiffs' argument also shows that their claims are really about what turned out to be,

5   in hindsight, imperfect security selection given future market conditions, rather than about any

6   misrepresentation by the fund.  They point to statements that Schwab was "responsible for the

7   fund's poor recent performance" as though poor performance in early 2008 somehow proves

8   that the fund made a false statement in 2006.  (Open. Br. 10.)  It doesn't.  Not only are

9   plaintiffs' claims improperly based on hindsight (as shown by plaintiffs' unabashed citation to

10  documents that they characterize as "post-mortem"), but they are really claims of

11  mismanagement, which cannot be brought under the federal securities laws at all.  *See*

12  *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F.Supp. 2d 662, 682 (D. Colo. 2007)

13  ("federal securities laws were not intended to create a federal remedy for  . . . internal corporate

14  mismanagement") (*citing Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

## CONCLUSION

16         The Court should deny plaintiffs' motion for summary judgment on Schwab's negative

17  causation defense.

18  Dated:  March 4, 2010                     DARRYL P. RAINS
                                              EUGENE ILLOVSKY
19                                            CRAIG D. MARTIN
                                              DOROTHY L. FERNANDEZ
20                                            MORRISON & FOERSTER LLP

21

22                                            By:  /s/ Darryl P. Rains
                                                   Darryl P. Rains

23                                            Attorneys for Defendants The Charles
                                              Schwab Corporation, Charles Schwab &
24                                            Co., Inc., Charles Schwab Investment
                                              Management, Inc., Schwab Investments,
25                                            Charles R. Schwab, Evelyn Dilsaver,
                                              Randall W. Merk, George Pereira, Matthew
26                                            Hastings, Mariann Byerwalter, Donald F.
                                              Dorward, William A. Hasler, Robert G.
27                                            Holmes, Gerald B. Smith, Donald R.
                                              Stephens, and Michael W. Wilsey

28