IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:

CHARLES SCHWAB CORPORATION
SECURITIES LITIGATION.

This Document Relates
To All Cases.
_____/

No. C 08-01510 WHA

**ORDER RE 1940 ACT
SUMMARY JUDGMENT
MOTIONS**

When a mutual fund attracts investors based on a diversification policy expressly limiting investments in uninsured mortgage-backed securities or any other industry to 25 percent or less of the fund, this order holds that a shareholder vote is required before the fund may reverse field and concentrate more than 25 percent in uninsured mortgage-backed securities or in any other industry. That is, once they have gathered in the investments, the fund managers and promoters must honor the stated concentration policy and may exceed the limit only after a shareholder vote. This is required by Section 13(a) of the Investment Company Act of 1940, 15 U.S.C. 80a–13(a).

\*       \*       \*

The 1940 Act was aimed at regulating "investment companies," commonly referred to today as "mutual funds." One of the abuses that provoked the Act was a practice of attracting

investors based on an announced investment policy and then, after having investors' money in hand, radically changing the investment policy. As the Senate Report stated:

> A major problem in the case of management companies is created by the absence of any legal requirement for adherence to any announced investment policies or purposes. Such policies have often been radically changed without the knowledge or prior consent of stockholders.

Sen. Rep. No. 1775, 76th Cong., 3d Sess. at 7 (1940).

The House Report was in accord. *See* House Rep. No. 2639, 76th Cong., 3d Sess. at 9 (1940). A congressional finding in the Act's preamble stated that the national public interest and the interests of investors were adversely affected when investment companies were reorganized, become inactive or "change[d] the character of their business."

To remedy this abuse, Section 8(b) required that the registration statements set forth "the policy of the registrant in respect of" a list of activities, one of which was "concentrating investments in a particular industry or group of industries" as well as, separately, any matter deemed by the registrant to be a "fundamental policy." To prevent unilateral alteration of the concentration policy or, for that matter, any fundamental policy, Section 13(a) further stated:

> No registered investment company shall, unless authorized by a vote of a majority of its outstanding voting securities —
>
> \*          \*          \*
>
> (3) deviate from its policy with respect of concentration of investments in any particular industry or group of industries as recited in its registration statement, or deviate from any fundamental policy recited in its registration statement . . . .

In sum, the 1940 Act established that once a mutual fund registered a policy in respect of concentration of investments in an industry, it could deviate from that policy only by a majority vote of the shareholders.

\*          \*          \*

Turning to the facts at hand, the fund in question is the Schwab YieldPlus Fund. From at least November 2001 until February 2006, it had an announced diversification strategy. In 2001, it amended its registration statement to state that it would treat mortgage-backed securities issued by private lenders and not federally guaranteed as a stand-alone industry.

2

By defining uninsured mortgage-backed securities to be a stand-alone industry, the fund was enabled to invest a full quarter of the fund in such securities *in addition to* investments in whatever other industries might have comprehended such securities before the change. While this may have enlarged the manager's freedom of movement at the time, it also introduced a limitation if and when the 25-percent mark was ever reached for uninsured mortgage-backed securities. This limitation remained in place for five years. For example, the fund's statement of additional information, set forth the limitation as follows (with passages of interest in italics):

> The following descriptions of investment securities, risks and limitations supplement those set forth in the prospectus and may be changed without shareholder approval *unless otherwise noted*.
>
> \*  \*  \*
>
> **Concentration** means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. *Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities as a separate industry for purposes of a fund's concentration policy.* For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, of example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. *A fund will limit its investments in each identified industry to less than 25% of its total assets.*

Pages later, the SAI set forth another list of "investment limitations" that were changeable "only by a vote of a majority of a fund's outstanding voting shares." Without a shareholder vote, the SAI stated that the fund would not:

> 2) Concentrate investments in a particular industry or group of industries, as concentration is defined under the 1940 Act, or the rules or regulations thereunder, as such statute, rules and regulations may be amended from time to time; and
>
> \*  \*  \*

3

> *Concentration.* The SEC has presently defined concentration as investing 25% or more of an investment company's net assets in an industry or group of industries, with certain exceptions.

> \*    \*    \*

> 6) Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.

(SCH11332596 and SCH11332600).

In other words, the fund's stated concentration policy was to diversify, *i.e.*, not to concentrate more than 25 percent of the fund in uninsured mortgage-backed securities or in any other industry. Such mortgage-backed securities were specifically called out as an industry subject to the 25-percent limit.

After five years, however, and after having attracted large sums, the fund managers reversed field and repudiated the 25-percent limitation. This was stated in the SAI as of September 1, 2006, as follows:

> **Concentration** means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets.

> \*    \*    \*

> *The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies.* This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments

4

> may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

(SCHYP0002098).

Note well that this action not only abrogated the 25-percent limitation on uninsured mortgage-backed securities but even went so far as to say that such securities were not part of "any industry," thereby raising the 25-percent limit to 100 percent. Put differently, since such securities were not part of "any industry," the promoters were now claiming the authority to invest *everything* in such securities, since to do so would not concentrate in "any industry." This was a phenomenal turnabout.

This was done unilaterally by the fund managers and without any shareholder vote. No notice was sent to investors of the reversal in policy. They had no occasion to consult the registration statements, as amended, having already made their investment.

In short, for five years the registered policy in respect of concentration committed to invest no more than one fourth of the fund in uninsured mortgage-backed securities or in any other industry. The strategy was to employ diversification to guard against a precipitous decline in a single industry. Under the 1940 Act, this registered concentration policy could be reversed only by a majority vote of the shareholders. To rule otherwise would allow the very abuse that led to the 1940 Act. Therefore, Section 13 was violated by the unilateral repudiation of the concentration limitation.

\* \* \*

It is true that the industry definition was set forth in the SAI under the banner of matters that could be changed without shareholder vote "unless otherwise noted." This does not mean a shareholder vote was not required to exceed the limit. The most direct reason is that a fund promoter cannot proclaim self-serving reservations of power denied to it by the 1940 Act. This is not a disclosure question. It is a governance question. As a matter of governance, the 1940 Act insisted that reversals in concentration policy be approved by those that actually own the fund, not merely by the managers.

5

Even as a matter of disclosure, however, the SAI should not be stretched as far the defense now proposes. The stated concentration policy was to diversify and to limit investment in a single industry to one-quarter of the fund. *This was expressly stated to require shareholder approval to change.* The industry definition appeared under a long list of things that could be changed without shareholder vote "unless otherwise noted." Later in the SAI, of course, the concentration policy *was* "otherwise noted" as something requiring a shareholder vote to change. The industry definition was placed in a paragraph entitled "Concentration." It expressly referenced the fund's concentration policy. It even restated it. The industry definition would have been understood by reasonable investors to be an integral part of the concentration policy represented to be inviolate without shareholder approval. So the disclosure itself, read in the way reasonable investors would have understood it, disclosed the opposite of what the promoter now supposes.

\*     \*     \*

There is no merit in the notion that an investment policy *not* to concentrate is less regulated (or not regulated at all) under the 1940 Act. Under Section 8(b)(1), the registration statement must include "a recital of the policy of the registrant *in respect of* each of the following types of activities . . . (E) concentrating investments in a particular industry or group of industries . . . ." By this passage, therefore, the registrant must explain whatever its policy on concentration will be, even if the strategy is to diversify and thus *not* to concentrate. In turn, Section 13(a) requires a shareholder vote to deviate from a policy *in respect of* concentration of investments in any particular industry or group of industries . . . ." The Act uses the phrase "in respect of." This requires up-front disclosure of the extent to which the strategy would or would not concentrate so that investors would understand the risks and rewards, diversification usually being less risky but less rewarding than concentration.

To rule otherwise would reintroduce one of the pernicious abuses that specifically led to the 1940 Act, namely funds that drew in savings based on supposed diversification policies only to be squandered in a single industry that collapsed. The Commission study that served as the Act's foundation catalogued these abuses. For example, General Investment Company, which

6

was formed to invest in diverse public utilities instead invested nearly all of its assets in a subway in Buenos Aires, which the investment company later sold for a loss of nearly ninety percent. REPORT OF THE SECURITIES AND EXCHANGE COMMISSION ON INVESTMENT TRUSTS AND INVESTMENT COMPANIES, Pt. I, H.R. Doc. 279, 76th Cong., 1st Sess. at 497, 592–601 (1939). Similarly, Eastern Utilities Investing Corporation claimed that it would diversify its investments among the securities "of a number" of public utilities, but in reality it placed nearly all of its assets in a single company, with disastrous results. *Id*. at 624–28. Investors in the United Founders Corporation Group, which promised international diversification of assets, lost significant sums after the company concentrated in domestic securities just as the Untied States market crashed in 1929. *Id*., Pt. III at 2224–30.

Congress relied on this study when it created the Act, and the Supreme Court has referred to it when interpreting the Act. *United States v. NASD*, 422 U.S. 694, 706 (1975) (The study "as Congress has recognized, see 15 U.S.C. § 80a-1, forms the initial basis for any evaluation of the Act"). *See also* 15 U.S.C. § 80a-1(a)–(b) (making findings and declarations "upon the basis of facts disclosed by the record and reports of the Securities and Exchange Commission").

To the Senate Committee, the chief counsel of the Commission explained the phrase "in respect of" in the proposed bill, which was soon thereafter enacted. He stated (emphasis added):

> Mr. Schenker [Chief Counsel]. In the registration statement, Senator, they are required to set forth what their investment policy is going to be with regard to specific items.
>
>   If you will look on page 20, these are some of the things we consider fundamental to investment policy. Starting with line 8:
>
>     (1) a statement in respect of the policy of the registrant *in respect of* —
>
> *whether you are going to be diversified* or *nondiversified*; do you expect to issue senior securities; do you expect to engage in the underwriting business; do you expect to have concentration of investments in a particular industry or group of industries — like a chemical fund or an aviation fund; do you expect to deal in real estate and commodities, or either of them, or loans to other persons; what is your policy with respect to portfolio turnover; do you expect to have a rapid or slow turnover, and so forth? In order to give a little rubber, we say that the company should not be hamstrung by those recitals but should have some freedom of

7

> action. However, the statement of policy will indicate to all persons what general type the company is going to be. *As the company enumerates these policies in its registration statement, it will not be able to change them without a majority vote.*

Hearings on S. 3580 before a Subcommittee of the Senate Committee on Banking and Currency, Pt.4, 76th Cong., 3d Sess., at 1115–16 (1940).

It was abundantly clear in 1940 that the Act required the registration statement to state whether the fund was going to be diversified or nondiversified — either way.[1]

\*      \*      \*

It is true that the Commission's Form N-1A in 2006 divided the information required for a prospectus into two broad parts, those required for the prospectus and those required for the SAI, the former being deemed "essential" information and the latter being "useful" information. Item 4 of the former was to describe the "Investment Objectives, Principal Investment Strategies, and Related Risks," including "any policy *to concentrate* on securities of issuers in a particular industry or group of industries (*i.e.*, investing more than 25% of a Fund's net assets in a particular industry or group of industries)." Item 4 also required disclosure in the main prospectus of "any other policy specified in Item 12(c)(1) that is a principal investment strategy of the Fund." Item 12 pertained to the SAI. Item 12 required disclosure of the risks of "concentrating investments in a particular industry or group of industries" as well as "Any other policy that the Fund deems fundamental or that may not be changed without shareholder approval, including, if applicable, the Fund's investment objectives." The SAI was also required to state "whether shareholder approval [was] necessary to change any policy" set forth in Item 12(c)(1).

Although Form N-1A distinguished between "essential" information versus "useful" information in comparing the main prospectus with the SAI, the instructions for the form contemplated that fundamental strategies would be set forth in the SAI, including those requiring

---

[1] There is no caselaw on the issue and this order rests on the plain language of the Act and its legislative history. The literature is in accord. 3 Tamar Frankel, "The Regulation of Money Managers," ch XVIII, § 2 at 15 (1980); Lemke, "Regulation of Investment Companies," § 7.10[2] at 7-59 (2009); Ansberry, "Investment Company Act of 1940," 29 Geo. L.J. 614, 622 (1941); Jaretzki, "The Investment Company Act of 1940," 26 Wash. U.L.Q. 303, 317 (1941); Note, "The Investment Company Act of 1940," 50 Yale L.J. 440, 444–45 (1941); Note, "The Investment Company Act of 1940," 41 Colum. L. Rev. 269, 285–86 (1941).

8

a shareholder vote. Some of those were then to be re-duplicated under item 4 via its cross-reference to item 12 (pertaining to SAI's).

The most that can be said is that the instructions called out strategies "to concentrate" and omitted to call out (anywhere) strategies "not to concentrate." This minor circumstance cannot override the clear intent and language of the 1940 Act. And, the amicus brief of the Commission on this very motion is decidedly against any such distinction. Perhaps the Commission should consider whether to revise its form but this order will follow the 1940 Act. Whatever policy may be adopted — to diversify or to concentrate — deviations are permitted only by approval of a majority of shareholders.[2]

\* \* \*

It is true that the 1940 Act did not define "industry or group of industries." Nor has the Commission done so except to the limited guidance it once gave by referring to standard industry classifications in its now-withdrawn Guide 19. This order agrees, as said by the defense, that a promoter is free to define an industry in any reasonable way when it establishes a fund and assumes for the sake of argument that the promoter may unilaterally, even after the fund is up and running, clarify in a reasonable way a definitional line that may otherwise be vague. But once the promoter has drawn a clear line and thereafter gathers in the savings of investors, the promoter must adhere to the stated limitation unless and until changed by a stockholder vote.

Here, the promoter drew a clear line and expressly stated it would not invest more than one-fourth of the fund in uninsured mortgage-backed securities and defined those instruments as a stand-alone industry. That was clear. Having done so, the shareholders in the fund were entitled to count on that limitation unless and until changed by a vote of the shareholders.

Yes, it is true that in 2001 the promoters — without shareholder vote — decided to treat uninsured mortgage-backed securities as a stand-alone industry and placed that definition in the amended registration statement. That this was done without a shareholder vote, however, does not mean that the 2006 reversal could likewise be done without a shareholder vote. It must be

---

[2] Schwab itself was not misled by this instruction in the form and disclosed its diversification policy.

9

1  said that the 2001 change would have required a vote had it been done to exceed the 25-percent
2  limitation on what was already an identifiable industry by simply "defining" part of that industry
3  to be a stand-alone industry.  In that way, half of the entire fund could be split between the
4  "new" industry and the rest of the "old" industry.  However that might have been, and even
5  assuming that the 2001 change merely clarified an otherwise vague line, the fact is that the 2001
6  change drew a clear line around uninsured mortgage-backed securities.  Based thereon, the
7  promoters attracted many millions into the fund.  Five years passed with the limit in place.  In
8  2006, the reversal was not a mere clarification of an otherwise blurred line.  It was an entire
9  repudiation of a clear-cut definition that had become a fixture of the fund on which shareholders
10 were entitled to depend for the safety of their savings.  A vote was required.

\*          \*          \*

12 To the foregoing extent, plaintiffs' motion for summary judgment is **GRANTED** and
13 defendant's motion is **DENIED**.

15 **IT IS SO ORDERED.**

17 Dated: March 30, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE