IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:<br><br>CHARLES SCHWAB CORPORATION<br>SECURITIES LITIGATION.<br><br>This Document Relates<br>    To All Cases.<br>_____ / | No. C 08-01510 WHA<br><br>**ORDER RE DISCLOSURE AND<br>LOSS-CAUSATION MOTIONS<br>FOR SUMMARY JUDGMENT** |

       A recent order ruled on the 1940 Act governance issues. This order addresses the 1933 Act disclosure issues and the loss-causation motion.

*      *      *

       With respect to the main disclosure issue, here is the essence of the problem. The fund represented that it was diversified and that its plan was never to concentrate more than 25 percent in a single industry. In fact, however, the plan was to concentrate far more than fifty percent in the residential housing and/or commercial real-estate industry, a plan that was inadequately disclosed. This was the fundamental contradiction — or so a reasonable jury could find.

       The centerpiece of the defense is a set of three sentences included in the SAI. They stated (SCH-YP0002098):

> . . . The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private

> lenders are not part of any industry for purposes of the funds' concentration policies. *This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.* Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

Based on these three sentences, the defense contends investors would have understood that more than 25 percent could be invested in uninsured mortgage-backed securities.[1]

Before turning to the ways reasonable investors would have understood these sentences, it is necessary to place them in the actual context in which they were presented. The SAI was part of the registration statement but unlike the prospectus was available to investors only upon request. Nonetheless, this order will assume all investors must be charged with notice of the SAI and its contents.

The SAI began by stating its investment objective was "to seek high current income with minimal changes in share price." This theme was repeated several times in the registration statement. Then followed 35 pages of "Investments, Risks and Limitations." They were in alphabetical order, starting with "Auction-Rate Securities," then "Bankers' Acceptances," and so on to "Zero-Coupon, Step-Coupon, and Pay-in-Kind Securities." Each page had over forty lines of text in font size 10. Under the C's was "Concentration." It stated:

> **Concentration** means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure. For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets. For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector. In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets. Each of the Tax-Free Bond Funds

---

[1] All emphasis is added in this order.

2

> may invest more than 25% of its total assets in municipal securities financing similar projects, such as those relating to education, health care, transportation, and utilities, which may make them more sensitive to certain adverse economic, business or political developments affecting issuers of such securities. The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies. This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities. Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

SCH-YP0002098.

This is the paragraph (in the last three sentences) that defendants say put investors on adequate notice that the fund was free to concentrate more than 25 percent — indeed, *one hundred percent* — in uninsured mortgage-backed securities. There was no cross-reference to this paragraph anywhere else in the SAI or elsewhere.

Under the D's came "Diversification" (*id*. at 2102):

> **Diversification** involves investing in a wide range of securities and thereby spreading and reducing the risks of investment. Each fund is a series of an open-end investment management company.

This did not cross-reference to any 1940 Act definition or anything else.[2]

Under the M's, a paragraph was entitled "Mortgage-Backed Securities ("MBS") and Other Asset-Backed Securities" (*id*. at 2112). Note well the words "and Other." This section went on for four pages. Among other things, it said "MBS are based on different types of mortgages including those on commercial real estate and residential property." It also said "Asset-Backed Securities ('ABS') have structural characteristics similar to MBS. ABS represent direct or indirect participation in assets such as automobile loans, credit card receivables, trade

---

[2] The requirements in Section 5(b) of the 1940 Act are *minimum* requirements for a diversified fund. *See Registration Form Used by Open-End Management Investment Companies, Proposed Guidelines*, Release No. 33-6447, 1982 WL 35958, at *52 (Dec. 27, 1982). Schwab was free to impose yet more definitional requirements such as "investing in a wide range of securities and thereby spreading and reducing the risks of investment."

3

1  receivables, home equity loans (which are sometimes categorized as MBS) or other financial
2  assets. Therefore, repayment depends largely on the cash flows generated by the assets backing
3  the securities" (*id*. at 2113). There was no cross-reference to the paragraph on which the Schwab
4  defendants rely for their defense.

5  After the Z's came a new section entitled "Investment Limitations," stating (*id*. at 2128,
6  2130–31, 2134):

> The following investment limitations are fundamental investment policies and restrictions and may be changed only by vote of a majority of a fund's outstanding voting shares.
>
> \*   \*   \*
>
> The Schwab YieldPlus Fund® and Schwab GNMA Fund™ *may not*:
>
> \*   \*   \*
>
> 2) *Concentrate investments in a particular industry or group of industries*, as concentration is defined under the 1940 Act, or the rules or regulations thereunder, as such statute, rules and regulations may be amended from time to time;
>
> \*   \*   \*
>
> The following descriptions of the 1940 Act may assist investors in understanding the above policies and restrictions.
>
> \*   \*   \*
>
> **Concentration**. *The SEC has presently defined concentration as investing 25% or more of an investment company's net assets in an industry or group of industries*, with certain exceptions.
>
> \*   \*   \*
>
> 6) Purchase securities (other than securities issued or guaranteed by the U.S. government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry or group of industries.
>
> \*   \*   \*

25  In context, what would the three sentences (on which the defense relies) have
26  communicated to reasonable investors? The defense argues that they put investors on notice that
27  the fund could invest *everything* in uninsured mortgaged-backed securities. These sentences do
28  not expressly say this but it is the logical extension of the defense's construction. This would

4

1  have been an extreme interpretation, for it would have been directly at odds with the otherwise
2  clear-cut representations that the fund was diversified and would never concentrate more than
3  25 percent in a single industry or group of industries.  And it would allow the bizarre possibility
4  that by investing everything in uninsured mortgage-backed securities, the fund would be
5  invested in no industry whatsoever!  Every dollar that went into MBS would, under this
6  interpretation, fall into a black hole of finance in which the rules for industry and concentration
7  were suspended.  Although it is an extreme view, a jury might be persuaded to the defense's
8  view.

A more moderate reading of the concentration paragraph would have been that, in determining industry concentration for uninsured mortgage-backed securities, the fund would look past the *form* of the MBS obligation and would determine its *substance* by reference to the industry of the ultimate source of payment.  Immediately above the three sentences in the same paragraph, the SAI said that this would be its approach in determining the industry for asset-backed securities (*id*. at 2098):

> **Concentration** means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities *based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets*.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) *primarily from a single or similar source or revenue stream will be classified in the same industry sector*.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams *will be classified into distinct industries based on their underlying credit and liquidity structures*. A fund will limit its investments in each identified industry to less than 25% of its total assets.

Since the SAI expressly treated mortgage-backed securities as a subset of Asset-Backed Securities, as quoted above (*id*. at 2112), and said that "Asset-Backed Securities ("ABS") have structural characteristics similar to MBS" (*id*. at 2114), readers could naturally have understood the language just indented to include and to apply to mortgage-backed securities.  Readers could reasonably have understood the entire paragraph as meaning that the fund, as to MBS, would

5

look past the *form* of the obligation and determine the *substance* of the underlying industry by considering the ultimate source of payment, such as, for example, "commercial real estate" or "residential property," the ultimate source of payment being the "asset," as in "Asset-Backed" (*id*. at 2113). In this way, the larger strategies of diversification and the 25-percent limit would still, in *substance*, be honored while MBS in *form* could still exceed 25 percent.[3] For those who had been familiar with the pre-2006 paragraph in which MBS was specifically defined *to be* an industry, the reader could reasonably understand that the 2006 change merely undid the earlier definition and folded MBS back into the larger category of asset-backed securities, making the moderate construction all the more natural. A reasonable jury could reject the defense's extreme view and conclude that the more moderate construction was how investors, faced with the totality of the registration statement, would have understood the three sentences and the overall paragraph.

\* \* \*

On summary judgment, it is necessary to view the evidence in a light most favorable to the non-moving party. Aside from the last three sentences in the "concentration" definition in the SAI, the registration statement (including the SAI) left the distinct impression that the fund was diversified, that its plan was never to concentrate more than 25 percent in a single industry, and that it was designed to offer high current income with minimal changes in share price. Viewing the evidence in a light most favorable to plaintiffs, what appears to have occurred was that the fund managers found it harder and harder to generate earnings higher than conventional money market rates and, to do so, they resorted to an ever-increasing allocation of the fund to uninsured mortgage-backed securities. In 2001, the fund amended its registration statement to state that it would treat mortgage-backed securities issued by private lenders and not federally guaranteed as a stand-alone industry. By defining uninsured mortgage-backed securities to be a stand-alone industry, the fund enabled itself to invest a full quarter of the fund in such securities

---

[3] The words "industry" or "group of industries" were not defined. A reasonable jury could conclude that "residential housing" and "commercial real-estate" were industries and would have been so understood. That "mortgage-backed securities issued by private lenders" were defined *not* to be an industry or "part of any industry" did not mean that the underlying obligations were not in the residential housing or commercial real-estate industries.

6

1  *in addition to* investments in whatever other industries might also have comprehended such
2  securities before the change. While this may have enlarged the fund's freedom of movement
3  respecting MBS at the time, it also introduced a limitation if and when the 25-percent mark was
4  ever reached for uninsured mortgage-backed securities.

5   When the fund reached or exceeded the 25-percent limit in 2006, the managers reversed
6  course and tried to define away the limit by defining uninsured mortgage-backed securities *not*
7  to be part of any industry for purposes of the concentration policy. No change, however, was
8  made to the representation that the fund was diversified and would not concentrate more than
9  25 percent in "a particular industry or group of industries, as concentration is defined under the
10 1940 Act, or the rules and regulations thereunder, as such statute, rules and regulations may be
11 amended from time to time" (*id.* at 2130). In stating the diversification policy and in stating its
12 policy not to concentrate, the SAI did *not* cross-reference to its homemade not-in-any-industry
13 definition 32 pages earlier but led readers to believe that the definitions to be followed would be
14 as per the 1940 Act and "rules and regulations" thereunder. Similarly, the statements that the
15 fund was diversified did not cross-reference to its not-in-any-industry definition.

16  Viewing the record most favorably to plaintiffs, a jury could reasonably find that the
17 three sentences had a low profile compared to the much higher profile of the attractive features
18 of the fund, that the three sentences were not cross-referenced in places one might have expected
19 them to be cross-referenced in the interests of plain disclosure, that the now-claimed message
20 of the three sentences was at war with the selling points for the fund, that the three sentences
21 communicated only the moderate meaning set forth above and, overall, that a reasonable investor
22 taking ordinary care to read the entire registration statement would not have been fairly advised,
23 in the total mix of the information, that Schwab felt free to invest more than 25 percent —
24 indeed, one hundred percent — of the fund in uninsured mortgage-backed securities.

25  In short, if defendants were going to define away the problem, a jury could reasonably
26 find that they did not do so plainly enough. They should have made it clearer, a jury could
27 find, that the diversification policy and the supposed compliance with statutory and
28 regulatory definitions were, in effect, completely nullified by a plan to invest as much as

7

one hundred percent of the fund in uninsured mortgage-backed securities even if all one hundred percent were backed by residential housing. Given that a jury could reasonably make these findings, the defense's motion for summary judgment must be denied. *See Miller v. Thane Intern., Inc.*, 519 F.3d 879, 886–87 (9th Cir. 2008).

* * *

Investors were told that the non-concentration policy would be as per "rules or regulations" issued under the 1940 Act. What rules? The Schwab defendants are fond of saying that SEC guidance allowed them to define "industry" in any reasonable way. No doubt, the SEC would approve of a fund defining an industry to be, say, "aviation engines" and then stating that it would *concentrate* in that industry. When the fund has a policy of *not* to concentrate, however, such that no more than 25 percent can be invested in a single industry or group of industries, then defining a segment of the economy *not* to be in any industry at all is a remarkable proposition: *One*, it defies common sense, for all of commerce must fit in some industry sector somewhere and, *Two*, it would automatically allow one hundred percent of all the fund to be invested in the "non-industry," thus, defeating the 25-percent rule. Can it be that the SEC has ever blessed such a not-in-any-industry definition? No such authority has been submitted.

When Guide 19 was issued by the Commission in 1983, it stated (48 Fed. Reg. 37962):

> *Note:* In determining industry classifications, the staff will ordinarily use the current *Directory of Companies Filing Annual Reports with the Securities and Exchange Commission* (the "Directory") published by the Commission. A registrant may refer to the *Directory*, or may select its own industry classifications, but such classifications must be reasonable and should not be so broad that the primary economic characteristics of the companies in a single class are materially different. Registrants selecting their own industry classifications must be reasonable and should disclose them (a) in the prospectus in the case of policy to concentrate, or (b) in the Statement of Additional Information in the case of a policy not to concentrate.

8

1 True, as the defense points out, this allowed funds to select their own industry classification, if
2 "reasonable," even for a policy *not* to concentrate. *But the Commission has never, it seems,*
3 *authorized not-in-any-industry definitions in connection with a policy not to concentrate.*[4]

4 When Guide 19 was adopted in 1983, the SEC said it would be "very unlikely" that its
5 standardized industry classifications would be inadequate for funds whose policy was *not* to
6 concentrate. In the preamble summarizing public comment on the proposed rule, no one even
7 suggested the possibility that a non-concentrating fund could define a type of commerce not to
8 be in any industry at all. 48 Fed. Reg. at 37956. In short, there is no authority for the notion the
9 Schwab defendants followed affirmative SEC guidance adopting a not-in-any-industry definition
10 in connection with a policy not to concentrate.[5]

11 This point may have relevance to the 1940 Act governance issues but is also referenced
12 here under the 1933 Act disclosure issues since, in evaluating how a reasonable investor would
13 have understood the three sentences in context, a jury would be entitled to take into account
14 whether one meaning would be lawful and the other not. That is, ambiguities are generally
15 resolved in favor of a lawful meaning rather than an unlawful one. Put differently, even the
16 defense concedes that the definition would have to be "reasonable." In deciding between two
17 meanings, a jury would be entitled to reject a meaning it finds to be unreasonable.

18 \* \* \*

19 At the request of the defense, the Court has read *Yu v. State Street Corporation*,
20 2010 U.S. Dist. LEXIS 17147 (MDL No. 1945, S.D.N.Y. 2010). Although *Yu* involved a similar
21 mutual fund and involved mortgage-backed securities, the specific representations at issue there
22 were different. There was no attempt to define away the problem, as here. The devil is always
23 in the details and the details are different here from there. *See In re Evergreen Ultra Short*
24 *Opportunities Fund Sec. Litig.* 2010 U.S. Dist. LEXIS 31360 (D. Mass. 2010).

---

[4] Or, for that matter, in connection with a policy to concentrate, at least as far as the Court can determine.

[5] Guide 19 was withdrawn in 1998. 63 Fed. Reg. 13916. It is referenced here because the Schwab defendants rely on it, while acknowledging it was rescinded, as the only statement by the Commission on the subject.

9

1    Caveat: The evidence may come in differently at trial and/or the Court may evaluate
2 the evidence differently in light of the overall evidence, so this order is without prejudice to a
3 Rule 50 motion after plaintiffs' case in chief. At trial, it might be worthwhile to know how
4 customary versus unusual the MBS definition was, whether analysts or plaintiffs picked up on it,
5 and, if so, how they understood it.

                                *        *        *

7    With respect to loss causation, consider this illustration: If a mutual fund holds itself
8 out as investing only in treasury bills and based thereon raises, say, one million dollars and then
9 invests everything in the stock of a legitimate treasure-hunting company, the NAV will start out
10 at one million dollars. If and when the treasure-hunting venture sinks without trace, the NAV
11 will sink as well. Can there be any doubt that the misrepresentation led to and caused the loss
12 to investors? Can the fund promoter escape on the ground that the loss was due to the failure to
13 find the treasure? Of course not. Similarly, if a mutual fund holds itself out as investing no
14 more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a
15 single industry, there is no escape by blaming the industry rather than the promoter. The
16 materialization of the concealed risk causes the loss. *Lentell v. Merrill Lynch & Co., Inc.*, 396
17 F.3d 161, 172 (2d Cir. 2005); *see In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005);
18 *In re Evergreen*, 2010 U.S. Dist. LEXIS 31360, AT *21–22; *In re Charles Schwab Corp. Sec.
19 Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).

**IT IS SO ORDERED.**

Dated: April 8, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10