**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:                                                      No. C 08-01510 WHA

CHARLES SCHWAB CORPORATION
SECURITIES LITIGATION.

      This Document Relates                      **ORDER RE DISCLOSURE AND**
          To All Cases.                              **LOSS-CAUSATION MOTIONS**
                                                            **FOR SUMMARY JUDGMENT**

                                   /

      A recent order ruled on the 1940 Act governance issues.  This order addresses the 1933

Act disclosure issues and the loss-causation motion.

*         *         *

      With respect to the main disclosure issue, here is the essence of the problem.  The fund

represented that it was diversified and that its plan was never to concentrate more than

25 percent in a single industry.  In fact, however, the plan was to concentrate far more than

fifty percent in the residential housing and/or commercial real-estate industry, a plan that was

inadequately disclosed.  This was the fundamental contradiction — or so a reasonable jury could

find.

      The centerpiece of the defense is a set of three sentences included in the SAI.

They stated (SCH-YP0002098):

> . . . The funds have determined that mortgage-backed securities
> issued by private lenders do not have risk characteristics that are
> correlated to any industry and, therefore, the funds have
> determined that mortgage-backed securities issued by private

**United States District Court**
For the Northern District of California

1

2

3

4

5

lenders are not part of any industry for purposes of the funds' concentration policies. *This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.* Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

6   Based on these three sentences, the defense contends investors would have understood that more

7   than 25 percent could be invested in uninsured mortgage-backed securities.[1]

8          Before turning to the ways reasonable investors would have understood these sentences,

9   it is necessary to place them in the actual context in which they were presented.  The SAI was

10  part of the registration statement but unlike the prospectus was available to investors only upon

11  request.  Nonetheless, this order will assume all investors must be charged with notice of the SAI

12  and its contents.

13         The SAI began by stating its investment objective was "to seek high current income

14  with minimal changes in share price."  This theme was repeated several times in the registration

15  statement.  Then followed 35 pages of "Investments, Risks and Limitations."  They were in

16  alphabetical order, starting with "Auction-Rate Securities," then "Bankers' Acceptances," and

17  so on to "Zero-Coupon, Step-Coupon, and Pay-in-Kind Securities."  Each page had over forty

18  lines of text in font size 10.  Under the C's was "Concentration."  It stated:

19

20

21

22

23

24

25

26

27

**Concentration** means that substantial amounts of assets are invested in a particular industry or group of industries. Concentration increases investment exposure.  For purposes of a fund's concentration policy, the fund will determine the industry classification of asset-backed securities based upon the investment adviser's evaluation of the risks associated with an investment in the underlying assets.  For example, asset-backed securities whose underlying assets share similar economic characteristics because, for example, they are funded (or supported) primarily from a single or similar source or revenue stream will be classified in the same industry sector.  In contrast, asset-backed securities whose underlying assets represent a diverse mix of industries, business sectors and/or revenue streams will be classified into distinct industries based on their underlying credit and liquidity structures. A fund will limit its investments in each identified industry to less than 25% of its total assets.  Each of the Tax-Free Bond Funds

28         [1] All emphasis is added in this order.

2

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> may invest more than 25% of its total assets in municipal securities
> financing similar projects, such as those relating to education,
> health care, transportation, and utilities, which may make them
> more sensitive to certain adverse economic, business or political
> developments affecting issuers of such securities.  The funds have
> determined that mortgage-backed securities issued by private
> lenders do not have risk characteristics that are correlated to any
> industry and, therefore, the funds have determined that
> mortgage-backed securities issued by private lenders are not part
> of any industry for purposes of the funds' concentration policies.
> This means that a fund may invest more than 25% of its total assets
> in privately-issued mortgage-backed securities, which may
> cause the fund to be more sensitive to adverse economic,
> business or political developments that affect privately-issued
> mortgage-backed securities.  Such developments may include
> changes in interest rates, state or federal legislation affecting
> residential mortgages and their issuers, and changes in the overall
> economy.

SCH-YP0002098.

This is the paragraph (in the last three sentences) that defendants say put investors

on adequate notice that the fund was free to concentrate more than 25 percent — indeed,

*one hundred percent* — in uninsured mortgage-backed securities.  There was no cross-reference

to this paragraph anywhere else in the SAI or elsewhere.

Under the D's came "Diversification" (*id*. at 2102):

> **Diversification** involves investing in a wide range of securities
> and thereby spreading and reducing the risks of investment.  Each
> fund is a series of an open-end investment management company.

This did not cross-reference to any 1940 Act definition or anything else.[2]

Under the M's, a paragraph was entitled "Mortgage-Backed Securities ("MBS") and

Other Asset-Backed Securities" (*id*. at 2112).  Note well the words "and Other."  This section

went on for four pages.  Among other things, it said "MBS are based on different types of

mortgages including those on commercial real estate and residential property."  It also said

"Asset-Backed Securities ('ABS') have structural characteristics similar to MBS.  ABS represent

direct or indirect participation in assets such as automobile loans, credit card receivables, trade

---

[2] The requirements in Section 5(b) of the 1940 Act are *minimum* requirements for a diversified fund. *See Registration Form Used by Open-End Management Investment Companies, Proposed Guidelines*, Release No. 33-6447, 1982 WL 35958, at \*52 (Dec. 27, 1982).  Schwab was free to impose yet more definitional requirements such as "investing in a wide range of securities and thereby spreading and reducing the risks of investment."

3

**United States District Court**
For the Northern District of California

1    receivables, home equity loans (which are sometimes categorized as MBS) or other financial

2    assets.  Therefore, repayment depends largely on the cash flows generated by the assets backing

3    the securities" (*id.* at 2113).  There was no cross-reference to the paragraph on which the Schwab

4    defendants rely for their defense.

5        After the Z's came a new section entitled "Investment Limitations," stating (*id.* at 2128,

6    2130–31, 2134):

7            The following investment limitations are fundamental investment
             policies and restrictions and may be changed only by vote of a
8            majority of a fund's outstanding voting shares.

9                              *        *        *

10           The Schwab YieldPlus Fund® and Schwab GNMA Fund™ *may
             not*:

11                             *        *        *

12
             2) *Concentrate investments in a particular industry or group of
13           industries*, as concentration is defined under the 1940 Act, or the
             rules or regulations thereunder, as such statute, rules and
14           regulations may be amended from time to time;

15                             *        *        *

16           The following descriptions of the 1940 Act may assist investors in
             understanding the above policies and restrictions.

17                             *        *        *

18
             **Concentration**.  *The SEC has presently defined concentration as
19           investing 25% or more of an investment company's net assets in an
             industry or group of industries*, *with certain exceptions.*

20                             *        *        *

21
             6) Purchase securities (other than securities issued or guaranteed
22           by the U.S. government, its agencies or instrumentalities) if, as a
             result of such purchase, 25% or more of the value of its total assets
23           would be invested in any industry or group of industries.

24                             *        *        *

25        In context, what would the three sentences (on which the defense relies) have

26   communicated to reasonable investors?  The defense argues that they put investors on notice that

27   the fund could invest *everything* in uninsured mortgaged-backed securities.  These sentences do

28   not expressly say this but it is the logical extension of the defense's construction.  This would

4

**United States District Court**

For the Northern District of California

1   have been an extreme interpretation, for it would have been directly at odds with the otherwise

2   clear-cut representations that the fund was diversified and would never concentrate more than

3   25 percent in a single industry or group of industries.  And it would allow the bizarre possibility

4   that by investing everything in uninsured mortgage-backed securities, the fund would be

5   invested in no industry whatsoever!  Every dollar that went into MBS would, under this

6   interpretation, fall into a black hole of finance in which the rules for industry and concentration

7   were suspended.  Although it is an extreme view, a jury might be persuaded to the defense's

8   view.

9           A more moderate reading of the concentration paragraph would have been that, in

10  determining industry concentration for uninsured mortgage-backed securities, the fund would

11  look past the *form* of the MBS obligation and would determine its *substance* by reference to the

12  industry of the ultimate source of payment.  Immediately above the three sentences in the same

13  paragraph, the SAI said that this would be its approach in determining the industry for

14  asset-backed securities (*id*. at 2098):

15                  **Concentration** means that substantial amounts of assets are
                invested in a particular industry or group of industries.
16              Concentration increases investment exposure.  For purposes of a
                fund's concentration policy, the fund will determine the industry
17              classification of asset-backed securities *based upon the investment
                adviser's evaluation of the risks associated with an investment in
18              the underlying assets*.  For example, asset-backed securities whose
                underlying assets share similar economic characteristics because,
19              for example, they are funded (or supported) *primarily from a
                single or similar source or revenue stream will be classified in the
20              same industry sector*.  In contrast, asset-backed securities whose
                underlying assets represent a diverse mix of industries, business
21              sectors and/or revenue streams *will be classified into distinct
                industries based on their underlying credit and liquidity structures*.
22              A fund will limit its investments in each identified industry to less
                than 25% of its total assets.

23

24  Since the SAI expressly treated mortgage-backed securities as a subset of Asset-Backed

25  Securities, as quoted above (*id*. at 2112), and said that "Asset-Backed Securities ("ABS") have

26  structural characteristics similar to MBS" (*id*. at 2114), readers could naturally have understood

27  the language just indented to include and to apply to mortgage-backed securities.  Readers could

28  reasonably have understood the entire paragraph as meaning that the fund, as to MBS, would

5

1   look past the *form* of the obligation and determine the *substance* of the underlying industry by

2   considering the ultimate source of payment, such as, for example, "commercial real estate" or

3   "residential property," the ultimate source of payment being the "asset," as in "Asset-Backed"

4   (*id.* at 2113).  In this way, the larger strategies of diversification and the 25-percent limit would

5   still, in *substance*, be honored while MBS in *form* could still exceed 25 percent.[3]  For those who

6   had been familiar with the pre-2006 paragraph in which MBS was specifically defined *to be* an

7   industry, the reader could reasonably understand that the 2006 change merely undid the earlier

8   definition and folded MBS back into the larger category of asset-backed securities, making the

9   moderate construction all the more natural.  A reasonable jury could reject the defense's extreme

10  view and conclude that the more moderate construction was how investors, faced with the

11  totality of the registration statement, would have understood the three sentences and the overall

12  paragraph.

13                            *            *            *

14       On summary judgment, it is necessary to view the evidence in a light most favorable to

15  the non-moving party.  Aside from the last three sentences in the "concentration" definition in

16  the SAI, the registration statement (including the SAI) left the distinct impression that the fund

17  was diversified, that its plan was never to concentrate more than 25 percent in a single industry,

18  and that it was designed to offer high current income with minimal changes in share price.

19  Viewing the evidence in a light most favorable to plaintiffs, what appears to have occurred was

20  that the fund managers found it harder and harder to generate earnings higher than conventional

21  money market rates and, to do so, they resorted to an ever-increasing allocation of the fund to

22  uninsured mortgage-backed securities.  In 2001, the fund amended its registration statement to

23  state that it would treat mortgage-backed securities issued by private lenders and not federally

24  guaranteed as a stand-alone industry.  By defining uninsured mortgage-backed securities to be a

25  stand-alone industry, the fund enabled itself to invest a full quarter of the fund in such securities

26

27       [3] The words "industry" or "group of industries" were not defined.  A reasonable jury could conclude
    that "residential housing" and "commercial real-estate" were industries and would have been so understood.
    That "mortgage-backed securities issued by private lenders" were defined *not* to be an industry or "part of any
28  industry" did not mean that the underlying obligations were not in the residential housing or commercial
    real-estate industries.

United States District Court

For the Northern District of California

1   *in addition to* investments in whatever other industries might also have comprehended such

2   securities before the change.  While this may have enlarged the fund's freedom of movement

3   respecting MBS at the time, it also introduced a limitation if and when the 25-percent mark was

4   ever reached for uninsured mortgage-backed securities.

5          When the fund reached or exceeded the 25-percent limit in 2006, the managers reversed

6   course and tried to define away the limit by defining uninsured mortgage-backed securities *not*

7   to be part of any industry for purposes of the concentration policy.  No change, however, was

8   made to the representation that the fund was diversified and would not concentrate more than

9   25 percent in "a particular industry or group of industries, as concentration is defined under the

10  1940 Act, or the rules and regulations thereunder, as such statute, rules and regulations may be

11  amended from time to time" (*id.* at 2130).  In stating the diversification policy and in stating its

12  policy not to concentrate, the SAI did *not* cross-reference to its homemade not-in-any-industry

13  definition 32 pages earlier but led readers to believe that the definitions to be followed would be

14  as per the 1940 Act and "rules and regulations" thereunder.  Similarly, the statements that the

15  fund was diversified did not cross-reference to its not-in-any-industry definition.

16         Viewing the record most favorably to plaintiffs, a jury could reasonably find that the

17  three sentences had a low profile compared to the much higher profile of the attractive features

18  of the fund, that the three sentences were not cross-referenced in places one might have expected

19  them to be cross-referenced in the interests of plain disclosure, that the now-claimed message

20  of the three sentences was at war with the selling points for the fund, that the three sentences

21  communicated only the moderate meaning set forth above and, overall, that a reasonable investor

22  taking ordinary care to read the entire registration statement would not have been fairly advised,

23  in the total mix of the information, that Schwab felt free to invest more than 25 percent —

24  indeed, one hundred percent — of the fund in uninsured mortgage-backed securities.

25         In short, if defendants were going to define away the problem, a jury could reasonably

26  find that they did not do so plainly enough.  They should have made it clearer, a jury could

27  find, that the diversification policy and the supposed compliance with statutory and

28  regulatory definitions were, in effect, completely nullified by a plan to invest as much as

7

United States District Court
For the Northern District of California

1    one hundred percent of the fund in uninsured mortgage-backed securities even if all one hundred

2    percent were backed by residential housing.  Given that a jury could reasonably make these

3    findings, the defense's motion for summary judgment must be denied.  *See Miller v. Thane*

4    *Intern., Inc.*, 519 F.3d 879, 886–87 (9th Cir. 2008).

5                                    *          *          *

6            Investors were told that the non-concentration policy would be as per "rules or

7    regulations" issued under the 1940 Act.  What rules?  The Schwab defendants are fond of saying

8    that SEC guidance allowed them to define "industry" in any reasonable way.  No doubt, the

9    SEC would approve of a fund defining an industry to be, say, "aviation engines" and then stating

10   that it would *concentrate* in that industry.  When the fund has a policy of *not* to concentrate,

11   however, such that no more than 25 percent can be invested in a single industry or group of

12   industries, then defining a segment of the economy *not* to be in any industry at all is a

13   remarkable proposition:  *One*, it defies common sense, for all of commerce must fit in some

14   industry sector somewhere and, *Two*, it would automatically allow one hundred percent of all the

15   fund to be invested in the "non-industry," thus, defeating the 25-percent rule.  Can it be that the

16   SEC has ever blessed such a not-in-any-industry definition?  No such authority has been

17   submitted.

18           When Guide 19 was issued by the Commission in 1983, it stated (48 Fed. Reg. 37962):

19           *Note:*  In determining industry classifications, the staff will
             ordinarily use the current *Directory of Companies Filing Annual*
20           *Reports with the Securities and Exchange Commission* (the
             "Directory") published by the Commission.  A registrant may refer
21           to the *Directory*, or may select its own industry classifications, but
             such classifications must be reasonable and should not be so broad
22           that the primary economic characteristics of the companies in a
             single class are materially different.  Registrants selecting their
23           own industry classifications must be reasonable and should
             disclose them (a) in the prospectus in the case of policy to
24           concentrate, or (b) in the Statement of Additional Information in
             the case of a policy not to concentrate.

25

26

27

28

8

**United States District Court**
For the Northern District of California

1    True, as the defense points out, this allowed funds to select their own industry classification, if

2    "reasonable," even for a policy *not* to concentrate. *But the Commission has never, it seems,*

3    *authorized not-in-any-industry definitions in connection with a policy not to concentrate.*[4]

4         When Guide 19 was adopted in 1983, the SEC said it would be "very unlikely" that its

5    standardized industry classifications would be inadequate for funds whose policy was *not* to

6    concentrate.  In the preamble summarizing public comment on the proposed rule, no one even

7    suggested the possibility that a non-concentrating fund could define a type of commerce not to

8    be in any industry at all.  48 Fed. Reg. at 37956.  In short, there is no authority for the notion the

9    Schwab defendants followed affirmative SEC guidance adopting a not-in-any-industry definition

10   in connection with a policy not to concentrate.[5]

11        This point may have relevance to the 1940 Act governance issues but is also referenced

12   here under the 1933 Act disclosure issues since, in evaluating how a reasonable investor would

13   have understood the three sentences in context, a jury would be entitled to take into account

14   whether one meaning would be lawful and the other not.  That is, ambiguities are generally

15   resolved in favor of a lawful meaning rather than an unlawful one.  Put differently, even the

16   defense concedes that the definition would have to be "reasonable."  In deciding between two

17   meanings, a jury would be entitled to reject a meaning it finds to be unreasonable.

18                    *          *          *

19        At the request of the defense, the Court has read *Yu v. State Street Corporation*,

20   2010 U.S. Dist. LEXIS 17147 (MDL No. 1945, S.D.N.Y. 2010).  Although *Yu* involved a similar

21   mutual fund and involved mortgage-backed securities, the specific representations at issue there

22   were different.  There was no attempt to define away the problem, as here.  The devil is always

23   in the details and the details are different here from there.  *See In re Evergreen Ultra Short*

24   *Opportunities Fund Sec. Litig.* 2010 U.S. Dist. LEXIS 31360 (D. Mass. 2010).

25

26        [4] Or, for that matter, in connection with a policy to concentrate, at least as far as the Court can
     determine.

27

28        [5] Guide 19 was withdrawn in 1998.  63 Fed. Reg. 13916.  It is referenced here because the Schwab
     defendants rely on it, while acknowledging it was rescinded, as the only statement by the Commission on the
     subject.

United States District Court

For the Northern District of California

1       Caveat:  The evidence may come in differently at trial and/or the Court may evaluate

2  the evidence differently in light of the overall evidence, so this order is without prejudice to a

3  Rule 50 motion after plaintiffs' case in chief.  At trial, it might be worthwhile to know how

4  customary versus unusual the MBS definition was, whether analysts or plaintiffs picked up on it,

5  and, if so, how they understood it.

6                      *            *            *

7       With respect to loss causation, consider this illustration:  If a mutual fund holds itself

8  out as investing only in treasury bills and based thereon raises, say, one million dollars and then

9  invests everything in the stock of a legitimate treasure-hunting company, the NAV will start out

10  at one million dollars.  If and when the treasure-hunting venture sinks without trace, the NAV

11  will sink as well.  Can there be any doubt that the misrepresentation led to and caused the loss

12  to investors?  Can the fund promoter escape on the ground that the loss was due to the failure to

13  find the treasure?  Of course not.  Similarly, if a mutual fund holds itself out as investing no

14  more than 25 percent in a single industry but then, as actually planned, invests fifty percent in a

15  single industry, there is no escape by blaming the industry rather than the promoter.  The

16  materialization of the concealed risk causes the loss.  *Lentell v. Merrill Lynch & Co., Inc.*, 396

17  F.3d 161, 172 (2d Cir. 2005); *see In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005);

18  *In re Evergreen*, 2010 U.S. Dist. LEXIS 31360, AT *21–22; *In re Charles Schwab Corp. Sec.*

19  *Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).

21       **IT IS SO ORDERED.**

23  Dated:  April 8, 2010.

                                 WILLIAM ALSUP
24                                 UNITED STATES DISTRICT JUDGE