IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:

CHARLES SCHWAB CORPORATION
SECURITIES LITIGATION.

This Document Relates
    To All Cases.
_____/

No. C 08-01510 WHA

**ORDER REGARDING
SECTION 12 DAMAGES
UNDER THE 1933 ACT**

       The 1940 Act governance issues, the 1933 Act disclosure issues, and the loss-causation motion have all been addressed by prior orders. This order focuses on the measure of damages recoverable under Section 12 of the 1933 Act, as amended by the Private Securities Litigation Reform Act.

*        *        *

       As amended, Section 12 provides:

> (a) In general
>
> Any person who—
>
>    (1) offers or sells a security in violation of section 77e of this title, or
>
>    (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to

United States District Court
For the Northern District of California

> state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
>
> shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, *who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.*
>
> (b) Loss causation
>
> In an action described in subsection (a)(2) of this section, if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) of this section *represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.*

15 U.S.C. 77l (emphasis added).

The caselaw is inconsistent as to whether plaintiffs who continue to hold their shares after the filing of a complaint are "locked in" to the market value of those shares at the time the complaint was filed. *See Goldkrantz v. Griffin*, 1999 WL 191540, at * 6 (S.D.N.Y. 1999) ("With respect to those who continue to hold the shares, their 'amount recoverable' is the difference between the consideration they originally paid for the shares and the value of the shares at the time of filing the complaint, minus any income received."); *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1036 (2d Cir. 1979) ("The value of the stock itself is irrelevant insofar as relief under section 12(2) is concerned. If the consideration passing from plaintiff to defendant is money, the amount to be awarded is simple to calculate").

This order, however, finds the 1995 legislative history and wording of Section 12(b) compelling. The situation before the amendment was explained by the Supreme Court in *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (emphasis added):

> [T]he 1933 Act is intended to do more than ensure that defrauded investors will be compensated: the Act also "aim[s] . . . to prevent

2

> further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and true information before the investor."
> S.Rep. No. 47, 73d Cong., 1st Sess., 1 (1933). *See also United States v. Naftalin*, 441 U.S. 768, 775–776 (1979). We may therefore infer that Congress chose a rescissory remedy when it enacted § 12(2) in order to deter prospectus fraud and encourage full disclosure as well as to make investors whole. Indeed, by enabling the victims of prospectus fraud to demand rescission upon tender of the security, *Congress shifted the risk of an intervening decline in the value of the security to defendants, whether or not that decline was actually caused by the fraud. See* Thompson, THE MEASURE OF RECOVERY UNDER RULE 10B-5: A RESTITUTION ALTERNATIVE TO TORT DAMAGES, 37 VAND.L.REV. 349, 369 (1984) (hereinafter Thompson); Loss, at 1133. Thus, rescission adds an additional measure of deterrence as compared to a purely compensatory measure of damages.

In other words, prior to the amendment, Section 12 seemed to require defendants to bear the risk of a market decline — whether or not that decline was actually caused by the alleged misrepresentation — when the remedy of rescission was elected under Section 12.

The potential "unfairness" of this rule was noted in the Thompson law review article cited by the Supreme Court in the above passage:

> The concern that rescission will redistribute market risks that have nothing to do with the fraud has influenced courts in securities cases to adopt the restrictions on rescission developed by equity courts, particularly the requirement that plaintiffs file suits for rescission promptly after notice of the fraud. Courts show particular concern that plaintiffs not be permitted to delay a choice of the rescission remedy while speculating on the fluctuating value of the property in question.

Thompson, THE MEASURE OF RECOVERY UNDER RULE 10B-5: A RESTITUTION ALTERNATIVE TO TORT DAMAGES, 37 VAND. L. REV. 349, 369–370 (1984); *see also Loftsgaarden*, 478 U.S. at 666 (noting that "some courts have barred plaintiffs from electing rescission, or a rescissory measure of damages, where they delayed tender or suit in order to increase their expected recovery should the market decline").

Thereafter, Congress added the "loss causation" defense set forth in Section 12(b), a direct response to the concerns mentioned in the Thompson article, as well as in *Loftsgaarden*.

3

The following excerpt from the Senate Report on the 1995 amendments to Section 12 is illustrative:

> Congress adopted Section 12(2) of the 1933 Act to deter material misrepresentations and omissions in the purchase or sale of securities. Some courts have held that a plaintiff suing under Section 12(2) need not prove that the misstatement or omission caused the loss. *As a result, issuers have been put in the position of insuring shareholders and purchasers against normal market risk.* An issuer that makes a material misstatement or omission in its prospectus can be liable for losses to shareholders — even if the losses have nothing to do with the misstatement or omission.
>
> This interpretation of Section 12(2) provides an unfair windfall to shareholders who have not in any way been harmed by the misstatement or omission.
>
> \* \* \*
>
> The Committee amends Section 12(2) to clarify that *defendants may raise the absence of "loss causation" as an affirmative defense. If a defendant in a Section 12(2) action demonstrates that part or all of the decline in the value of the security was caused by factors other than the misstatement or omission alleged in the complaint, the plaintiff may not recover damages based on that portion of the decline. The defendant must bear the burden of affirmatively demonstrating the absence of loss causation.* This provision does not place any additional burden on plaintiffs to demonstrate that loss causation existed, nor does it deprive investors of Section 12(2) remedies when they have incurred losses caused by inadequate disclosure. The amendment to Section 12(2) is modeled after Section 11 of the Securities Act, which provides for a similar affirmative defense.

S. Rep. No. 104-98, 23 (1995) (emphasis added). In other words, the affirmative defense of loss causation was added by Congress to provide defendants with a mechanism to combat unfair overcompensation in the rescission remedy where the overcompensation was due to normal market risk.

\* \* \*

With respect to a mutual fund that materially misrepresents its investment strategy, this order holds that the combined effect of Sections 12(a) and (b) is that a new investment decision must be deemed made by investors once they learn or should learn, in the exercise of reasonable diligence, the fund's true investment strategy. At that time, investors have the clear choice to redeem versus to accept the actual investment strategy and remain with the fund. Any further decline in the NAV is for the account of the investors, just as any subsequent gains would be.

4

The legislative history of Section 12(b) is clear that Congress intended to subtract from recovery any losses attributable to normal market risk, which would include losses due to market declines after the truth is revealed and investors have a fair opportunity to make a new investment decision. The measure of damages is the difference between what each investor paid minus the NAV at the time investors knew or should have known the concealed information (plus the statutory adjustments for interest and income).

The burden is on mutual fund defendant(s) to prove when the investors knew or should have known the truth — with the outside defaults being the commencement of the action in the case of the named plaintiffs and the date of class notice in the case of absent class members. For example, if early on a fund sends a clarifying letter to all investors, clearly explaining everything, then investors are in a position to make a new investment decision and to remain with the fund or to redeem. The date of receipt of the clarification locks in the damage price. Likewise, if the concealed strategy is discovered and so prominently publicized in news accounts (without dispute) such that a reasonable investor would then know the true investment strategy, a new investment decision must be deemed to have occurred. That date would lock in the damages price. In contrast, if the truth begins to leak out but the mutual fund releases misleading denials, the investors should *not* necessarily be expected to believe press rumors. (If, of course, an investor redeems before the date of discovery, then damages would be measured as of redemption.)

The reason that absent class members are not held to the lawsuit commencement date is that they do not join in the lawsuit until class notice is provided. More to the point, in the absence of proof of an earlier date, they only learn about the misrepresentation via the notice and then discover the truth. The sellers and promoters may try to prove an earlier date. Perhaps it can be proven that news of the lawsuit was so pervasive that all investors surely should have known of the true facts, but this would be a matter of proof and its burden would be on the defense.

Under this holding, it is true that an investor who stays with the fund, after learning the truth and a new investment decision is made, may recover damages even if the fund price

eventually recovers to its subscription price. The new investment decision is akin to the investor selling the shares at the then NAV (and locking in the damages), and in the next moment purchasing the same number of shares at the same NAV (for the new investment). By the same token, the new investment may crater and the subsequent decline must be for the investor's account.

Although the instant case involves a mutual fund, Section 12 covers common stocks as well. In the case of a publicly traded common stock, the principle should be the same. Damages are fixed at the point investors knew or should have known of the actual concealed or misrepresented facts. At that point, they can sell on the open market or remain invested as they elect. At this point they must be deemed to have made a new investment decision. The burden is on the seller to prove the date by which investors must be deemed to have made a new investment decision based on the corrected information and thus subjected themselves to normal market risk. One difference between a publicly traded common stock and a mutual fund is, in the case of publicly traded common stock, that the correction will tend to be almost universally and instantly known. This is due to the near instantaneous effect of public information on the market price. All investors presumably follow the market price. In contrast, given that it is based on the portfolio's underlying market prices, the NAV for a mutual fund will not necessarily transmit "bad news" instantly about cover-ups in the true investment plan. So, for common stocks, it may be easier to isolate when all investors should be deemed to have known the truth and to have made a new investment decision.

To be sure, this holding introduces a slight divergence between the named plaintiffs and absent class members. This should not be fatal to class treatment under Rule 23. Before the amendment, Section 12 already recognized a dichotomy between those who sold and those who held. That distinction was not fatal to class treatment. Since the main liability issue of misrepresentation will usually predominate, this small deviation in recovery will not prevent classes from being certified, at least in the run of cases.

Counsel have expounded at length over the meaning of "tender" and when it occurs. The practical fact of Section 12(b) in litigated class actions is to deem all class members to

have made a new investment decision, *i.e.*, to have sold and re-purchased, no later than the class notice, so there will be no rescission at the end of the case, only a damage award. The tender requirement was mainly a way to make sure that those who recover under Section 12 gave back their shares if they had not already sold. One huge effect of Section 12(b) and the PSLRA is to shift the normal market risks to the investor. Once the investor is armed with corrected information, the investor must decide to stay in or to redeem and if he or she stays in the fund, then the subsequent normal market risks are for the investor's account. The date of tender is really now just a relic of the older version of Section 12.

*     *     *

Schwab's motion is therefore **DENIED**.

**IT IS SO ORDERED.**

Dated: April 14, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE