# Exhibit A

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | **EXPERT REPORT OF CANDACE L. PRESTON** |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE SCHWAB CORP. SECURITIES
LITIGATION

No. 08-cv-01510 WHA

EXPERT REPORT OF CANDACE L. PRESTON

**Assignment**

1.   I have been retained by counsel for Plaintiffs ("Counsel") in this matter to calculate the damages sustained by purchasers or holders under Federal and California state laws, respectively, of the Schwab YieldPlus Investor Fund ("Investor Fund") and the Schwab YieldPlus Fund Select Shares ("Select Fund"), (collectively the "YieldPlus Funds").  I was specifically asked to:  a) analyze the performance of each of the YieldPlus Funds during the period May 2006 through and including August 2009; and b) calculate damages under §§11 and 12(a)(2) of the Securities Act of 1933 and damages arising from alleged violations of California Business & Professions Code §17203.  In addition, I was asked to opine on the materiality of the alleged omissions and misrepresentations set forth in the offering materials.[1]  I have assumed that a trier of fact will find liability for the misrepresentations and omissions alleged in the Second Consolidated Amended Complaint dated October 26, 2009 ("SAC") and further clarified in the Order Re Motion for Class Certification dated August 21, 2009 ("Class Certification Order").  I have calculated damages as prescribed in the relevant statutes.  I have prepared and signed this written report in fulfillment of the obligations imposed by Federal Rules of Civil Procedure, Rule 26(a)(2).

---

[1] Those materials are summarized in charts.

2.    I understand that the damage periods in this matter vary depending on the nature of the claim. The damage period for the §11 claims begins November 15, 2006; [2] the damage period for the §12(a)(2) claims begins May 31, 2006; and the damage period for holders under the California State claims begins September 1, 2006.

**Qualifications**

3.    I am a founding member of Financial Markets Analysis, LLC ("FMA").  FMA is a securities analysis and valuation firm with offices in Princeton, New Jersey and San Diego, California.  FMA provides financial analysis and related consulting in mergers, acquisitions, appraisals and litigation.  I have testified at trials, arbitrations and depositions in Federal and State Courts including the Delaware Chancery Court.  I have been retained by public and private companies, individual and institutional investors, law firms, and the United States Securities and Exchange Commission.  I have been professionally active as a financial analyst for over 25 years and have earned the designation of Chartered Financial Analyst ("CFA").  I also hold B.A. from Eastern Michigan University and an M.B.A. from the University of Pennsylvania Wharton School.  Attached as Exhibits A and B are copies of my *curriculum vitae* and a list of cases for which I have provided expert testimony within the past four years.

4.    FMA's compensation for this engagement is based on the number of hours worked and our customary hourly rate plus out-of-pocket expenses.  My hourly rate is $450.  FMA employees who worked on this engagement have hourly rates ranging from $125 to $450 per hour.  Neither my opinion, nor FMA's compensation, is in any way contingent on the outcome of this case.

5.    In the course of this assignment I have reviewed the following:

    a.  The Complaint and the SAC;

    b.  The Class Certification Order;

---

[2] For purposes of calculating §11 damages, the "true value" is established as of March 17, 2008, although I have computed selling and retention damages through August 31, 2009.  Since only monthly account data have been provided, I have included all purchases for the month of November, 2006 in my damage estimates.

2

c.   Order Re Motion to Dismiss of Schwab Defendants, Independent Trustees, Pricewaterhousecoopers; Order Re Motion to Strike ("Motion to Dismiss Order");

d.   Investors' share holdings of the YieldPlus Funds by account number each month for the period April, 2006 through August, 2009 as well as the shares held as of March 17, 2008; access to which was provided by counsel for the Defendants;

e.   A list of account numbers for investors which have settled or mediated their claim and are therefore excluded from the damages considered in this report, access to which was provided by counsel for the Defendants;

f.   Investors' share holdings of the YieldPlus Funds as of August 31, 2006 by account number for those investors that reside in the state of California, access to which was provided by counsel for the Defendants;

g.   Net Asset Value ("NAV") and total return data for the YieldPlus Funds, as well as other ultrashort bond funds for the period April 2006 through August 2009 obtained from Bloomberg L.P., which I have provided electronically; [3]

h.   Certain data and information regarding ultrashort bond funds obtained from Morningstar, Inc. ("Morningstar");

i.   Certain quarterly review reports for the Select Fund as well as promotional materials provided to me by Counsel, and listed in the attached Exhibit C by bates number;

j.   News articles about the YieldPlus Funds obtained from Factiva, which I have provided electronically;

k.   Transcripts of depositions of: Robert Dickson, Robert Levin, John A. Hill, James Coffin, David Mikelonis, and Kevin M. O'Donnell;

l.   The Expert Report of H. Gifford Fong ("Fong Report"); and

m.   Charts compiling the Actionable Statements, attached as Exhibit D.

---

[3] The Securities Exchange Commission defines "ultrashort" bond funds as "mutual funds that generally invest in fixed income securities with extremely short maturities, or time periods in which they become due for payment." (http://www.sec.gov/investor/pubs/ultra-short_bond_funds.htm)

## Summary of Damages

6.  Based on the methodology I employed, which I further describe below, as well as the damage periods identified in the Class Certification Order, a summary of the damages I have calculated appears in the table below:

| | | | Select Fund (SX) | | Investor Fund (PX) | | Totals |
|---|---|---|---|---|---|---|---|
| **Section 11** (11/15/2006 - 8/31/2009) | Damages: | $ | 601,877,285 | $ | 84,905,314 | $ | 686,782,599 |
| **Section 12*** (5/30/2006 - 8/31/2009) | Damages: | $ | 858,642,675 | $ | 170,367,628 | $ | 1,029,010,303 |
| **CA State Claim** (9/1/2006 - 8/31/2009) | Damages: | $ | 133,366,205 | $ | 25,128,440 | $ | 158,494,644 |

 Section 12 damages include interest @ 10%

## Damage Methodology

7.  In order to determine the total damages, it is necessary to determine the damage per share and the number of shares damaged.  My calculations are based on monthly data (with the exception of the intra-monthly data for March 17, 2008).  The net asset value (NAV) for a mutual fund is the value of the fund's assets, based on the market value of the portfolio's securities, less the fund's liabilities. [4] The NAV per share is calculated at the end of each trading day.  An investor's return on a mutual fund is comprised of the return due to the fluctuating NAV, based on the value of assets and liabilities of the fund, as well as the income component from distributions (dividends and interest) paid by the underlying fund securities. [5] I obtained the monthly NAV's for the YieldPlus Funds from Bloomberg, L.P (Exhibit E).  Taken together, the price return and dividends reflect the "total return" to investors.  I obtained the monthly total returns for the YieldPlus Funds from Bloomberg, L.P. as well.

---

[4] Bodie, Zvi, Kane, Alex and Marcus, Alan J., Investments, McGraw-Hill Irwin, (6th, 2005), P. 108.

[5] See, for e.g., SCH0000218:  "Investors should be assessing an ultra short bond fund based on its total return, which is a combination of the change in NAV (up or down) and the interest income."

4

**§11 Damages**

8.  In calculating damages under §11, I adhered to the statutory guidelines set forth in the Securities Act of 1933, and summarized as follows[6]

    a.  If Plaintiff retains the security as of the date the suit is filed, recoverable damages are defined as the difference between the amount paid (not to exceed the offering price) and the value of the security at the time the suit was brought.

    b.  If Plaintiff sells the security before the suit is brought, recoverable damages are defined as the difference between the amount paid (not to exceed the offering price) and the price at which the security was sold.

    c.  If Plaintiff sells the security after the suit is brought, but prior to judgment, recoverable damages are defined as the lesser of: i) the difference between the amount paid (not to exceed the offering price) and the price at which the security was sold; and ii) the difference between the amount paid (not to exceed the offering price) and the value at the time the suit was brought.

Damage per Share §11

9.  I calculated the potential damage per share on a monthly basis as the difference between the NAV on the date of purchase and the NAV on the date of sale, if the shares were disposed of in the market. According to the statute, if shares were held until August 31, 2009, the damage per share is the difference between the NAV on the date of purchase and the NAV on August 31, 2009.[7,8]  However, the statute further limits the calculation of the damage per share to the difference between the purchase price and the greater of the NAV on March 17, 2008, as this is the date the suit was brought, or the NAV on August 31,

---

[6] http://www.sec.gov/about/laws/sa33.pdf, P.25.

[7] The last quoted NAV for the Investor Fund was $4.76 on August 10, 2009.  All references to the Investor Fund's August 2009 NAV and/or total return are based on the data available through that date.

[8] To the extent it is necessary, data for the Select Fund will be updated to comply with the statute.

2009.[9]  The NAVs for both the Investor Fund and Select Fund on March 17, 2008 were $7.96 per share.  For shares sold between March 17, 2008 and August 31, 2009, the damage per share is the lesser of:  a) the difference between the NAV on the date of purchase and the NAV on the date of sale; or b) the difference between the NAV on the date of purchase and the NAV on March 17, 2008.

10.  For example, the damage per share for shares of the Investor Fund purchased in January 2007 and sold in April 2008 is the lesser of:

   a.  Purchase Price ($9.69) – Sale Price ($6.58) = $3.11; or

   b.  Purchase Price ($9.69) – Price at Time of Suit ($7.96) = $1.71.

In the above example, damages are limited to $1.71 per share for §11.

11.  The YieldPlus Fund NAVs declined from $9.66 per share as of May 31, 2006 to $4.76 per share (51 percent), and $4.81 per share (50 percent), respectively, for the Investor Fund and Select Fund through August 2009.  The graph below shows the daily NAVs for the YieldPlus Funds from May 2006 through August 2009.



### §12(a)(2) Damages

12.        I calculated damages under §12(a)(2) according to guidelines set forth in The Securities Act of 1933 which states that Plaintiff can recover, "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."[10]

Damage per Share §12(a)(2)

13.        I obtained the total monthly return data using the ticker symbols SWYPX for the Investor Fund, and SWYSX for the Select Fund from Bloomberg, L.P. Based on total returns for the period May 31, 2006 through August 31, 2009, the Investor Fund and the Select Fund declined by approximately 42 percent and 41 percent, respectively, causing substantial investor losses. I calculated the damage per share under §12(a)(2) as follows:

   a.  If Plaintiff retained the security as of August 31, 2009, recoverable damages are defined as the difference between the amount paid and the value as of that date, adjusted for any income received from the date of purchase through the date of retention.

   b.  If Plaintiff sold the security prior to August 31, 2009, recoverable damages are defined as the difference between the amount paid and the price at which the security was sold, adjusted for any income received from the date of purchase through the date of sale.

14.        Unlike in the §11 damage model, §12(a)(2) damages are not limited by the value of the securities at the time the suit was brought, and the income component of the securities' returns are considered part of the value of the security. In addition, damages under the statute include the interest Plaintiffs would have earned on their investment.

15.        For example, the damage per share for shares of the Select Fund purchased in June 2007 and held through August 31, 2009 is as follows:

---

[10] http://www.sec.gov/about/laws/sa33.pdf, P.26.

7

Purchase Price ($9.67) – Value on August 31, 2009 including distributions ($5.35) = $4.32.

**California State Claim Damages**

16.     According to the Class Certification Order, under the California State laws Plaintiffs' damages are defined as an amount that would "restore any person in interest and any money that may have been acquired by means of such unlawful conduct…"[11]  It is my understanding that the California State claim damages apply to holders of YieldPlus Fund shares as of September 1, 2006, whereas the damages for §§ 11 and 12(a)(2) apply to share purchases.  I calculated the damage per share for these claims as the difference between the NAV as of August 31, 2006 and either:  i) the price at which the securities were disposed of in the market, including any income received; or ii) the price of the securities on August 31, 2009, if held, including any income received.

17.     For example, the damage per share for shares of the Select Fund held on August 31, 2006 and sold on August 31, 2008 is as follows:

     a.     Value on August 31, 2006 ($9.67) – Sale Price including distributions ($6.89) = $2.78

**Calculating the Number of Damaged Shares**

18.     Counsel for Defendants provided me with access to certain database files that, when aggregated, included all of the YieldPlus Fund shares held monthly between April 2006 and August 2009 by more than 128,000 Investor Fund accounts and 175,000 Select Fund accounts.  Due to prior agreements to settle or mediate claims, it was necessary for me to eliminate the approximately 3,000 accounts that are no longer plaintiffs in this action.  Counsel provided me with a list of settled and/or mediated accounts and I cross-referenced the account numbers for both the Investor Fund and Select Fund accounts and eliminated the share data for those accounts.

---

[11] Class Certification Order, P.13.

19.      I set up data input files for the Investor Fund and Select Fund with the account numbers and the shares held each month beginning May 2006 through August 2009.  I then employed a computer model to determine the selling and retention pattern of shares based upon the LIFO (last-in, first-out) method of inventory accounting.  The model assumes that the most recently purchased shares are the first to be sold.[12]  The program creates a matrix of shares, with purchases on the left-hand side of the spreadsheet and either the shares sold in subsequent periods, or the shares retained in subsequent periods displayed across the columns to the right.

20.      For the §11 damages, I calculated the number of shares that were purchased each month during the period November 2006 through March 17, 2008,[13] as well as the ultimate disposition date if the shares were redeemed, and/or the number of shares that were still held as of August 2009.  Similarly, for the §12(a)(2) damages, I calculated the number of shares that were purchased each month during the period June 2006 through March 17, 2008, as well as the ultimate disposition of shares, if they were sold, and the shares still held as of August 2009.

21.      The California State claim involves a sub-class of *holders* as of September 1, 2006 who were residents of the state of California.  Counsel provided me with a list of the accounts for which the mailing address was California, and the shares held by those accounts as of August 31, 2006.  I cross-referenced all the account share data and eliminated all but the California address accounts.  Using this subset of the data, and the LIFO share inventory program, I am able to estimate the disposition dates, shares sold, and the number of shares that are still held on August 31, 2009.

22.      Having determined the number of potentially damaged shares in each period, I then applied the calculated damage per share, described above, to the number of potentially damaged shares.

---

[12] An alternative method of inventory accounting involves FIFO (first-in, first-out) which assumes that the first shares purchased (or held) are the first to be sold.  I calculated damages for a subset of the Select Fund shares using the FIFO method in order to check my belief that there would be very little difference in the results.  In fact, the damages using the FIFO method on my sample confirmed that the choice of inventory accounting had minimal impact on the overall damage number.

[13] The data that I received for March, 2008 were split into holdings as of March 17, 2008 and holdings as of March 31, 2008.

For §11, damaged shares are defined as those shares that were purchased at a higher NAV than the NAV at which they were sold, or $7.96 per share; or, if shares are retained as of March 17, 2008, the shares purchased at a higher NAV than $7.96 per share.  Damaged shares for §12(a)(2) and the California State claims are defined as those shares that were purchased at a higher NAV than the total return they received through their redemption; or those shares that were purchased at a higher NAV than the total return through August 31, 2009, if still held as of that date.  For the California State claim, I valued the shares held as of August 31, 2006 at that month's ending NAV.  These calculations resulted in the aggregate damages shown in the table in ¶6 above.

**Analysis of Other Ultrashort Bond Funds**

23.      I was asked to determine whether the investor losses that resulted from the precipitous decline in the NAVs of the YieldPlus Funds were a result of general market and/or industry-wide events, or whether they were unique to the YieldPlus Funds.  In order to make such determination I obtained weekly and monthly total returns data for a group of ultrashort bond funds for the period May 2006 through August 2009.  If the poor performance of the YieldPlus Funds was caused by market and/or industry factors, then a benchmark index, consisting of similar mutual funds, would have performed in a like manner.

24.      I consulted the Morningstar website to obtain a list of other mutual funds categorized as ultrashort bond funds.[14]  Morningstar is generally regarded as the leader in the consolidation and reporting of mutual fund performance and analytics.  I constructed what I refer to as the "Peer Index."  In order to eliminate selection bias and maintain an objective measure in the Peer Index, I selected one ultrashort bond fund from each of the ultrashort bond fund families listed by Morningstar.  Generally, the performance of the funds within the fund families was very similar (as is the case with the YieldPlus

---

[14] I originally queried the Morningstar website for a list of ultrashort bond funds on July 14, 2008.  A more recent query resulted in a different universe of offerings.  My Peer Index was created based on the earlier listing, which includes mutual funds which have since ceased trading, and thus does not suffer from survivor bias.

Funds) and the differences in the funds within families had to do with fund fees and expenses.  The Peer

Index includes 30 ultrashort bond funds, a list of which is shown below.  I have electronically provided

the monthly total returns for the YieldPlus Funds, the components of the Peer Index, and the Peer Index.

<u>Table of YieldPlus Fund Peers</u>

| Security Name | Ticker | Description from Bloomberg- Name |
|---|---|---|
| AIM LIBOR ALPHA-A | EASBX | AIM LIBOR Alpha Fund |
| ALLEGIANT ULTRA SHORT BOND-A | ASDAX | Allegiant Ultra Short Bond Fund |
| AMF ULTRA SHORT FUND | AULTX | AMF Ultra Short Fund |
| BLACKROCK ENHANCED INC-BLACK | BEIPX | BlackRock Enhanced Income Portfolio |
| DREYFUS ENHANCED INCOME-INS | DHIIX | Dreyfus Enhanced Income Fund |
| CALVERT ULTRA SHORT F INC-A | CULAX | Calvert Ultra Short Floating Income Fund |
| CMG ULTRA SHORT TERM BOND FD | CMGUX | CMF Ultra Short Term Bond Fund |
| DFA DIMENSIONAL 1 YR FXD INC | DFIHX | DFA One-Year Fixed Income Portfolio |
| DREYFUS YIELD ADVANTAGE - D | DYADX | Dreyfus Yield Advantage Fund |
| EVERGREEN ADJ RATE-IS | ESARX | Evergreen Adjustable Rate Fund |
| FEDERATED ULTRA SHORT BD-IS | FULBX | Federated Ultra Short Bond Fund |
| FIDELITY AD ULTRA-SHT BD-T | FTUSX | Fidelity Advisor Ultra-Short Bond Fund |
| FRANKLIN ADJ US GOVT SEC-A | FISAX | Franklin Adjustable U.S. Government Securities Fund |
| GMO SHORT DURATION INVST-III | GMSIX | GMO Short Duration Investment Fund |
| GOLDMAN SACHS ULT-SH DU G-I | GSARX | Goldman Sachs Ultra-Short Duration Government Fund |
| IRON MARKET OPPORTUNITY FD | IRONX | Iron Market Opportunity Fund |
| JPMORGAN LTD DUR BOND-SEL | HLGFX | JPMorgan Limited Duration Bond Fund |
| LEGG MASON WA ADJ RATE-C | ARMGX | Legg Mason Western Asset Adjustable Rate Income Fund |
| MANAGERS SHORT DUR GOVT FD | MGSDX | Managers Short Duration Government Fund |
| METROPOLITAN WEST ULT SHRT-M | MWUSX | Metropolitan West Ultra Short Bond Fund |
| PAYDEN LIMITED MATURITY FUND | PYLMX | Payden Limited Maturity Fund |
| PERMANENT TREASURY BILL PORT | PRTBX | Permanent Treasury Bill Portfolio |
| PIMCO SHORT-TERM FUND-INSTL | PTSHX | PIMCO Short-Term Fund |
| PRINCIPAL ULTRA SHOR BND-J | PUSJX | Principal Ultra Short Bond Fund |
| RIDGEWORTH ULTRA ST BOND-IN | SISSX | RidgeWorth Ultra Short Bond Fund |
| SM&R PRIMARY FUND | SMRPX | SM&R Primary Fund |
| TCW SHORT TERM BND-I | TGSMX | TCW Short Term Bond Fund |
| TOUCHSTONE ULTRA SD FIXED IN | TSDOX | Touchstone Ultra Short Duration Fixed Income Fund |
| TRUST FOR CRED UNION UL S/D | TCUUX | Trust For Credit Unions- Ultra-Short Duration Government Portfolio |
| WELLS FARGO ADV U/S DUR B-Z | STGBX | Wells Fargo Advantage Ultra-Short-Duration Bond Fund |

25.      I equally weighted the monthly total returns for the 30 peers to create a benchmark for

purposes of analyzing the relative performance of the YieldPlus Funds.  The charts below show the

relative performance of the Investor Fund and the Select Fund versus the Peer Index for the period May

2006 through August 2009.



26.    For the period May 2006 through August 2009, the Investor Fund and the Select Fund declined by approximately 42 percent and 41 percent, respectively, including distributions.  The Peer Index returned a positive three percent over the same period, thus the Investor Fund and Select Fund underperformed the Peer Index by 45 percent and 44 percent, respectively.

27.    In addition to the Peer Index, I compared the performance of the YieldPlus Funds to funds cited by Schwab in its promotional literature for the YieldPlus Funds.[15]  I refer to these funds as the "Schwab Comparables."  A graph of the performance of the YieldPlus Funds, the Peer Index and the Schwab Comparables shows that the Schwab Comparables performed virtually identically to the Peer Index and far outperformed the YieldPlus Funds, as shown below.

---

[15] Attached hereto as Exhibit F is a page from the Schwab promotional literature for the YieldPlus Funds identifying the "Schwab Comparables."



28.      As shown in the graph, the YieldPlus Funds, the Peer Index and the Schwab Comparables, perform similarly until the end of October 2007.  At that point, the YieldPlus Funds visibly diverged from the benchmarks, manifesting in the losses sustained by YieldPlus investors.[16]

29.      I statistically analyzed whether the relationship between the returns of the YieldPlus Funds and the Peer Index changed in a meaningful way during the damage period.  I performed a regression analysis, which is a generally accepted method used to define the mathematical relationship between two sets of data, of the weekly returns of the Select Fund and the Peer Index.[17]  In a regression analysis, the subject set of data that you are studying is designated as the "dependent variable," and the non-subject data are designated the "independent variable."  The regression equation defines the relationship between the two and produces coefficients that can be used to "predict" the returns of the subject set of data.  In this case, the Peer Index was the independent variable.

30.      In the first regression analysis, I compared the weekly returns of the Select Fund to those of the Peer Index for the period May 26, 2006 through October 26, 2007.  The results of this analysis

---

[16] Additional demonstrative graphs that may be used at trial are attached as Exhibit G.

[17] I performed the same calculations for the Investor Fund with nearly identical results. Because the Select Fund is the larger of the two, I have limited my discussion to the results of the Select Fund analysis.

appear below.  As shown by the coefficient of determination ($R^2$), approximately 79 percent of the variation in returns to the Select Fund was explained by the variation in returns to the Peer Index.  Given the strength of this relationship, the t-statistic for the Peer Index of 16.517 indicates that the Peer Index is a meaningful predictor of the returns to the Select Fund.[18]

5/26/06 - 10/26/07

| Regression Statistics | | | Coefficients | Standard Error | t Stat |
|---|---|---|---|---|---|
| Multiple R | 0.887 | Peer Index | 1.444 | 0.087 | 16.517 |
| R Square | 0.787 | | | | |
| Adjusted R Square | 0.773 | | | | |
| Standard Error | 0.001 | | | | |
| Observations | 75 | | | | |

31.     I performed a second regression analysis of the weekly returns of the Select Fund against those of the Peer Index for the period November 2, 2007 through August 28, 2009.  The results appear below.  As you can see, the $R^2$ declined significantly to 13 percent, indicating that to a much lesser extent, the variability of returns to the Select Fund were explained by the variability of returns to the Peer Index.  The Peer Index coefficient increased from 1.444 to 2.248, indicating the Select Fund returns became much more volatile relative to the Peer Index over this period.  A greater percentage of the variability in the returns to the Select Fund was explained by factors other than the Peer Index for this later period.

11/2/07 - 8/28/09

| Regression Statistics | | | Coefficients | Standard Error | t Stat |
|---|---|---|---|---|---|
| Multiple R | 0.360 | Peer Index | 2.248 | 0.597 | 3.766 |
| R Square | 0.130 | | | | |
| Adjusted R Square | 0.119 | | | | |
| Standard Error | 0.013 | | | | |
| Observations | 96 | | | | |

32.     Using the regression equation from the first regression analysis I performed, I predicted the weekly total returns for the Select Fund for the period November 2, 2007 through August 28, 2009.  I then subtracted the actual weekly returns from the predicted weekly returns to produce the "abnormal" or residual weekly returns.  I hypothesized that the residual returns should be not meaningfully different

---

[18] A t-statistic measures the accuracy of the estimated coefficient in a regression equation.  T-statistics of two or greater generally indicate that the independent variable is a fairly accurate proxy for the dependent variable.

from zero if the returns to the Select Fund were indicative of conditions affecting all other ultrashort bond funds.  A t-statistic computed for each of the residual returns greater than 1.96 would indicate that the residual return was significantly different from zero.

33.     Of the 94 observations (i.e. 94 weekly returns), there were 45 negative residual returns for the Select Fund that were statistically significant at the 95 percent confidence level, indicated by a t-statistic of -1.96 or less.  Nearly half of the weekly returns were more than two standard deviations less than the mean return predicted by the regression equation.  Simply put, during the period November 2, 2007 through August 28, 2009, the Select Fund did not perform in line with its peers and experienced significant losses in excess of those predicted by an industry benchmark.

34.     It is my opinion that the losses sustained by investors in the YieldPlus Funds were security-specific and not indicative of conditions in the market for these securities in general, as evidenced by the performance of similar ultrashort bond funds.  As the previously undisclosed risks of investing in the YieldPlus Funds manifested, beginning in the Summer of 2007, investors began to sustain measurable monetary losses caused by security-specific factors.

**Damages Relative to the Peer Index**

35.     I was asked to determine whether adjusting the damage per share calculation to account for the performance of the Peer Index would reduce the calculated damages sustained by Plaintiffs.  In order to do this, I calculated damages on a relative basis – that is, assuming they had invested in a basket of ultrashort bond funds rather than the YieldPlus Funds, specifically.  I performed these calculations for §§11 and 12(a)(2) and for the California State claims as I described above, however, the damage per share is slightly different.  The relative damage per share for shares that were purchased prior to March 17, 2008 and sold anytime thereafter is measured as:  a) the value of the security at the time it is sold, based on the total return to the Peer Index through the date of sale, minus the actual sale price (including distributions).  If the Peer Index value on the date of sale exceeded the purchase price, then damages are zero.  If the YieldPlus Funds through the date of sale performed better than the Peer Index, then the

15

damage per share is zero.  For shares held through August 31, 2009, the relative damage per share is measured as: a) the value of the security based on the total return to the Peer Index through August 31, 2009, minus the value if invested in the YieldPlus Funds through August 31, 2009.  Just as in the damage per share calculations described above, the relative damage per share for §11 is limited to the difference between the purchase price and the value of the security as of March 17, 2008.

36.     For example, assuming that an investor purchased 100 shares of the Select Fund in February 2007 at $9.69 per share and sold those shares in May 2008 at $6.76 per share (including distributions).  Assume the value of the Peer Index in May 2008 was $9.74 per share.  The actual damage per share is:  $9.69 - $6.76 = $2.93.  The relative damage per share for this sale is:  $9.74 - $6.76 = $2.98.

37.     The table below shows that the damages relative to the Peer Index exceed the damages on an absolute basis, providing further evidence that YieldPlus Fund investors' losses were not caused by external market and/or industry factors.

|  |  | Select Fund (SX) | Investor Fund (PX) | Totals |
|---|---|---|---|---|
| Section 11 (11/15/2006 - 8/31/2009) | Damages: | $   701,507,335 | $   94,142,115 | $   795,649,450 |
| Section 12 (5/30/2006 - 8/31/2009) | Damages: | $   784,085,805 | $   143,648,637 | $   927,734,442 |
| CA State Claim (9/1/2006 - 8/31/2009) | Damages: | $   175,763,512 | $   28,871,899 | $   204,635,411 |

**Prejudgment Interest**

38.     At Counsel's request, I calculated prejudgment interest on the §11 and California State claim damages from the time the damage was incurred through November 27, 2009 at the rate of 10 percent, not compounded.  The total damages plus prejudgment interest is included in the table below.

16

|  |  |  | Totals | Prejudgment Interest Through 11/27/09 | Totals With Interest |
|---|---|---|---|---|---|
| Section 11 (11/15/2006 - 8/31/2009) | Damages: | $ | 686,782,599 | $    175,872,686 | $    862,655,286 |
| CA State Claim (9/1/2006 - 8/31/2009) | Damages: | $ | 158,494,644 | $     51,413,057 | $    209,907,701 |

**Defendants Alleged Misrepresentations and Omissions Were Material to Investors in the YieldPlus Funds**

39.     The SAC alleges that the prospectuses, offering materials, and oral representations made to potential investors in the YieldPlus Funds were materially misleading with regard to the true risk profile of the funds.  It is my opinion that information regarding the true nature of the risks of an investment in the YieldPlus Funds would have been important to investors considering making such an investment and would have "materially altered the total mix of information" in the market about these investments.

40.     My opinion on materiality is based on my knowledge and experience in addition to i) the discrepancy between the risk characteristics of the YieldPlus Funds as described in the offering literature and the funds' actual portfolio composition and performance; ii) the conclusions set forth in the Fong Report; iii) the testimony of certain individual plaintiffs; iv) documents produced in discovery in this matter as described below; and v) information summarized in a chronology of events attached as Exhibit H.

41.     Investment risk is multi-dimensional.  In evaluating a potential investment, investors want a "rate of return that compensates them for the time, the expected rate of inflation and the uncertainty of the return."[19]  These risks can be summarized, generally, as liquidity risk, interest rate risk, and default risk, respectively.  All financial assets carry some degree of risk.  Even one who holds cash bears the risks of theft and inflation, which is why most people choose to invest their money rather than keeping it under a mattress.  The risk/return trade-off continuum holds generally that the more risk in an

---

[19] Reilly, Frank K. and Brown, Keith C., Investment Analysis and Portfolio Management, Thomson South-Western, (8th, 2006), P. 7

investment, the higher the expected return.  An individual's tolerance for risk and/or need for return determines how one chooses to invest his money.

42.      Liquidity risk is the risk that the investment cannot be traded quickly enough to avoid a loss.  U.S. Treasury bills and bonds have the highest liquidity of any investment.  The market for U.S. Treasury bills and bonds has such depth and breadth that a substantial amount of liquidity exists at the prevailing market prices.

43.      Interest rate risk is the risk that prevailing market rates will change and an interest bearing asset will have to be repriced to yield the current market rate.  For example, if an investor buys a bond that pays 5 percent and the going rate for similarly rated bonds later rises to 7 percent, the bond will be repriced downward so that it yields 7 percent.  The only way to avoid interest rate risk is to invest in very short term investments.  Because short-term investments minimize interest rate risk, their yield is generally less than if investors were exposed to that risk.

44.      Default risk is the risk that the underlying issuer can walk away from its obligations. Obligations of the U.S. Treasury carry no default risk – i.e., the government can always print more money to satisfy its debts.  Therefore U.S. Treasury obligations are viewed as having the lowest default risk.

45.      Investments come with varying degrees of risk.  As shown above, the least risky investment, one that carries no risk of default and has a very short time until maturity, is a U.S. Treasury bill.  As the length of maturity on a fixed-income security becomes greater, so does the uncertainty of the expected return.  Longer-term maturity bond prices fluctuate with changes in interest rates.  The possibility of price instability leads investors to demand a higher rate of return on a longer-maturity bond than a short-term bond.  Corporate bonds are riskier still, because they carry greater risk of default by the issuer as compared to Treasuries.  Longer-term corporate debt securities carry greater risk than short-term corporate debt securities because the possibility of default risk increases and the exposure to interest rate fluctuations increases with the longer window until maturity.

46.      Money market mutual funds are relatively safe and liquid short-term investments that derive their value from holding Treasury bills, commercial paper, and other high-grade, short-term debt

instruments.[20, 21]  Generally speaking, money market funds try to maintain an NAV of $1.00 per share while paying dividends slightly greater than the yield on a U.S. Treasury Bill ("T-bill").  The YieldPlus Funds were promoted as an alternative to money market funds carrying a slightly higher yield and a slightly higher degree of risk.

> The YieldPlus Fund offers:
>  • **Increased yield potential** – Ultra-short bond funds like the Schwab YieldPlus Fund have historically delivered higher yields than money market funds when held for a year or more.
>  • **A record of stability** – With a very limited fluctuation in share price (NAV), the fund has historically had marginally higher risk than money market funds and lower risk than longer-term bonds. While NAV may fluctuate, over the past year ending 06/30/2006 it has fluctuated by only plus or minus 3 cents.
>  • **Best-in-class performance –** Morningstar has given YieldPlus a five-star overall rating and Lipper gave the fund's Select Shares some of their highest rankings for the -,3- and 5-year periods ending 07/31/2006.[22]

47.        Plaintiffs understood that the YieldPlus Funds were "a safe money market alternative which is made up of ultra short bonds. And because of that, it wasn't particularly high-interest bearing, as opposed to other funds, but was incredibly safe and had fluctuated only pennies…"[23]  In addition, potential investors were told that the fund "had little downside risk, little risk that the principal value would drop."[24]

48.        Morningstar reported on the performance of the YieldPlus Funds before and during the damage period.  In December 2006, Morningstar published the following in a research report:

> This offering has proved itself a fine ultrashort-bond fund. Its 3.33% annualized five-year return through Dec. 27, 2006 lands near the very top of the category, and it has easily outperformed its average rival since its 1999 inception, while it hasn't been any more volatile than its typical peer. Particularly important for an ultrashort-bond fund considering many investors use such

---

[20] Commercial paper is an unsecured, short-term loan issued by a corporation with high credit ratings, typically for financing accounts receivable and inventories. It is usually issued at a discount, reflecting current market interest rates.
[21] Brealey, Richard A., Myers, Stewart C., Allen, Franklin, Principles of Corporate Finance, McGraw-Hill Irwin, (9th, 2008), P.487.
[22] SCH0000086
[23] Transcript from deposition of Robert Levin, May 18, 2009, 87:2-9.

[24] Transcript from deposition of Robert Dickson, May 11, 2009, 30:14-16.

instruments for cash management, its net asset value has remained fairly steady, varying by just six cents over the past four-plus years. (Morningstar's Take, 12/28/2006)

49.     A May 2007 Morningstar report commented that the YieldPlus Funds were "extremely risk-averse offerings" that were alternatives to money market funds.  It described the funds' portfolio as "extremely diversified" which would prevent the fund from suffering large losses if one of its positions declined in value.[25, 26]

50.     However, the perceived diversification and risk averse nature of the YieldPlus Funds was a myth.  Beginning in July 2007 the NAVs of the YieldPlus Funds declined significantly causing substantial losses for investors that continued throughout the damage period.  The divergence in the performance of the funds caught investors and analysts by surprise.

> But during this summer's subprime-fueled liquidity crisis, the fund was hit harder than most of the competition. Its formerly sturdy net asset value – a desirable trait for a short-term investment – dropped as far as 30 cents from May to September. And although the fund's 1.76% loss for the months of July and August wasn't disastrous, skittish investors headed for the exit, causing management to sell holdings in an unfavorable climate. (Morningstar's Take, 11/1/2007)
> •••
> This fund's dismal performance in recent months has left many stunned. As of March 24, the fund lost 15% in 2008 alone, the worst showing by far for any fund in the ultrashort-bond category. A loss of this magnitude may not be shocking for a stock fund, or even some bond funds that take on more risk, but funds in the ultrashort-bond category are generally perceived to be reliable vehicles given the minimal interest-rate and credit risk that they court. Those who've expected a worry-free ride from this fund, though, have been sorely disappointed. (Morningstar's Take, 03/26/2008)

51.     It was internally acknowledged at Charles Schwab that investors clearly did not expect the NAVs to decline by any material amount, given that, "Typically any price movement of more than .01 will generate calls from the field."[27]

52.     The precipitous decline in the NAVs of the YieldPlus Funds was caused in part by overexposure to risky debt securities including non-agency mortgage-backed securities, inadequate risk-control procedures, and the liquidity demands of investor redemptions following sub-par performance.  It

---

[25] Morningstar measures risk as "the amount of the variation in the fund's performance with more emphasis on downward variation." (Morningstar Rating for funds, attached hereto as Exhibit I)
[26] Morningstar's Take, May 31, 2007.
[27] E-mail from Jennifer Hafner to Brian Stanfield, Ashley D'Cruz, and Tamu Dawson dated July 20, 2007.

is my opinion that had investors been aware that due to the nature of the investments in the underlying portfolio, and management's lack of risk controls, the YieldPlus Fund was not truly an ultrashort bond fund, and was exposed to much greater price volatility than the average ultrashort bond fund, they would have demanded a much greater return commensurate with the riskiness of the investment and would certainly not have considered the investment to be a money market/cash alternative.

## Conclusion

1.  Based on my analysis, the YieldPlus Funds substantially underperformed similar ultrashort bond funds during the damage periods examined in this report, causing investors to sustain measurable monetary damages.  The damages sustained by investors are reflected in the table in ¶6 and, with interest, in ¶38, above.  It is also my opinion that Defendants materially misrepresented the true nature of the risks inherent in an investment in the YieldPlus Funds.  My work in this matter is ongoing and I reserve the right to update and/or supplement my report based upon information or data that may become available through the discovery process, reports of other experts in this action, or otherwise obtained by me during the course of my analysis.  I understand from Counsel that Schwab recently produced 20 million documents, including documents produced to the SEC.  To the extent that additional relevant information becomes available to me, I will modify these calculations as appropriate.

Candace L. Preston, CFA
November 25, 2009