# Exhibit E

CORNERSTONE RESEARCH

# Securities Class Action Settlements

## 2009 Review and Analysis

*Ellen M. Ryan*

*Laura E. Simmons*









Cornerstone Research specializes in assisting attorneys with the complex business issues encountered in litigation and regulatory proceedings. Our staff and experts possess distinctive skills and experience in using economic, financial, accounting, and marketing research to analyze the issues of a case and develop effective testimony. We provide objective, state-of-the-art analysis that has earned us a reputation for excellence and effectiveness.

We maintain a close relationship with many leading faculty and industry experts throughout the country and, through them, have access to even broader networks of expertise.

Reports such as this one are purposely brief, often summarizing published works or other research by Cornerstone Research consultants and affiliated experts. The views expressed are solely those of the authors, who are responsible for the contents of this report, and do not necessarily represent the views of Cornerstone Research.

Additional information about our research in securities class action filings and settlements can be found at *http://securities.cornerstone.com*. Information regarding Cornerstone Research consulting services is available through our Boston, Los Angeles, Menlo Park, New York, San Francisco, and Washington offices as well as from *www.cornerstone.com*.



CORNERSTONE RESEARCH

## INTRODUCTION

In 2009 there were 103 court-approved securities class action settlements, involving $3.8 billion in total settlement funds. Compared with 2008, settlements approved in 2009 increased both in the number and total value of the settlements. While the increase in the number of settlements approved was relatively small (103 settlements in 2009 compared with 97 in 2008), in dollar terms, the value of cases settled in 2009 represented more than a 35 percent increase over the corresponding amount in 2008.[1] This increase can be attributed, in part, to a $925.5 million settlement that occurred in 2009, whereas the largest single settlement in 2008 was $750.0 million. The 2009 total settlement value was consistent with historical annual averages for case settlements filed since the Private Securities Litigation Reform Act (Reform Act) was passed in late 1995—excluding the unprecedented high levels of settlement values that occurred in 2005 through 2007.[2]

---

1



Figure 1

Total settlement dollars were more than 35 percent higher in 2009 than in 2008

   This report discusses these and other findings in further detail, including settlement summary statistics, a discussion of methods used to approximate damages and analyses related to alternative damage proxies, as well as an analysis of case characteristics. This report draws upon and updates information provided in our previous reports. Our research sample includes more than 1,100 securities class actions settled from 1996 through 2009. Cases in our sample are limited to those involving allegations of fraudulent inflation in the price of a corporation's common stock. These settlements are identified by RiskMetric Group's Securities Class Action Services (SCAS). In our study, the designated settlement year corresponds to the year in which the hearing to approve the settlement was held. Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[3]

CORNERSTONE RESEARCH

### CASES SETTLED IN 2009



2

The median settlement amount for cases settled in 2009 remained unchanged from 2008 at $8.0 million. While this level is lower than the $9.3 million median settlement reached in 2007, it represents a slight increase over the median of $7.4 million for all cases settled in prior years.

The average settlement rose from $28.4 million in 2008 to $37.2 million in 2009, yet remains substantially below the average of $55.4 million for settlements through 2008. As was the case in 2008, there was no single class action settlement for more than $1 billion. The lack of billion-dollar settlements in these last two years contrasts with 2005 through 2007, during which eight of the past decade's nine settlements in excess of $1 billion occurred.[4] If we exclude the top four post–Reform Act settlements from this analysis, the average settlement amount of $37.2 million in 2009 would be slightly higher than the resulting historical average of $34.4 million for cases settled from 1996 through 2008.



### SETTLEMENT SUMMARY STATISTICS
*Dollars in Millions*

|  | 2009 | Settlements Through 2008 |
|---|---|---|
| Minimum | $0.4 | $0.1 |
| Median | $8.0 | $7.4 |
| Average | $37.2 | $55.4 |
| Maximum | $925.5 | $7,696.6 |
| Total Amount | $3,829.5 | $56,728.6 |

Settlement dollars adjusted for inflation; 2009 dollar equivalent figures shown. Excluding the top four settlements detailed in Figure 1, the average and total values are $34.4 million and $35,050.4 million for all settlements through 2008.

The average settlement rose from $28.4 million in 2008 to $37.2 million in 2009

Figure 2

The greatest number of cases settled in 2009 involved firms operating in the finance sector. Despite recent pressures on the financial industry as a whole, there actually have been only a few settlements of class actions related to the "credit crisis," and instead, it was shareholder suits filed from 2003 through 2007 that comprise the 19 settlements in the finance sector. The pharmaceutical and high-technology sectors closely followed the finance sector with 16 and 15 settlements, respectively. Reflecting the prevalence of finance-sector-related settlements, more than 55 percent of the cases settled in 2009 were for issuers whose common stock traded on the New York Stock Exchange (NYSE, including NYSE Amex)—substantially higher than the historical average of approximately 30 percent for cases settled through 2008. Across all sectors represented in the sample, settlements typically occurred approximately three years after filing; however, for cases settled in the last four years (2006–2009), the average time from filing to settlement approval has increased to three and one-half to four years.

CORNERSTONE RESEARCH

Noteworthy among settlement activity in 2009 was the resolution of the consolidated Initial Public Offering Securities Litigation matter involving more than 300 issuer defendants and 55 underwriter defendants. The $586 million aggregate settlement, occurring more than eight years from initial filing, currently ranks as the thirteenth largest post–Reform Act settlement. While the settlement documents provide a proportional allocation by issuer defendant, they stress that the actions are being resolved on a global basis. Due to the global nature of this set of cases, as well as the specific element of damages related to "laddering" claims in the cases, these cases do not meet the sample selection criteria used in this analysis. The selection criteria are designed to provide a homogeneous sample of cases involving Rule 10b-5, Section 11, or Section 12(a)(2) allegations. Thus, while the settlement of this litigation is interesting, excluding this set of cases from our analysis prevents distortion for purposes of drawing inferences about current trends and implications for future securities class action settlements.

Overall, the distribution of settlement amounts in 2009 remained comparable with that observed in recent years. Almost 60 percent of post–Reform Act cases settled for less than $10 million, and more than 80 percent of post–Reform Act cases settled for less than $25 million. Settlements in excess of $100 million remain relatively infrequent, occurring in approximately 7 percent of the cases.[5]

**3**

Almost 60 percent of post–Reform Act cases have settled for less than $10 million



Figure 3

### SETTLEMENTS AND "DAMAGE ESTIMATES"



**4**

Understanding how settlements relate to the size of a case is an important component of our research. In this section we discuss two approaches to calculating a proxy for shareholder damages: one that incorporates reported trading volume and a second based on a simpler approach using the decline in market capitalization. We also discuss the implications for damages estimates of the U.S. Supreme Court decision in *Dura Pharmaceuticals v. Broudo*.

For purposes of our research, we use a highly simplified approach to estimate so-called "plaintiff-style" damages, which is based on a modified version of a calculation method historically used by plaintiffs in securities class actions.[6] We make no attempt to link these simplified calculations of shareholder losses to the allegations included in the associated court pleadings. Accordingly, we do not intend for any damages estimates presented in this report to be indicative of actual economic damages borne by shareholders. While various models and alternative calculations could be used to assess defendants' potential exposure in securities class actions, our application of a consistent method allows us to identify and examine certain trends in estimated "plaintiff-style" damages.[7]

Our analysis of settled cases shows that the dramatic decline in *average* estimated "plaintiff-style" damages observed for cases settled in 2008 reversed in 2009, with average estimated "plaintiff-style" damages returning to levels comparable with settlements from 2003 through 2005. Meanwhile, *median* estimated "plaintiff-style" damages in 2009 remained essentially unchanged from the median value in 2008.

The dramatic decline in average estimated damages in 2008 reversed itself in 2009



Figure 4

CORNERSTONE RESEARCH



5

   While a number of factors contribute to settlement outcomes, our research indicates that estimated "plaintiff-style" damages are the single most important factor in explaining settlement amounts. However, as we have described in previous reports, settlements as a *percentage* of estimated "plaintiff-style" damages generally decrease as damages increase; this is particularly true for very large cases. Accordingly, since the dramatic escalation in estimated "plaintiff-style" damages that began in 2002, we generally have observed lower median settlements relative to estimated "plaintiff-style" damages.[8] This is true for cases settled in 2009, with a median settlement of 2.3 percent of estimated "plaintiff-style" damages, versus 2.9 percent from 2002 through 2008.



Figure 5

Settlements, as a percentage of estimated damages, generally decrease as damages increase



6

Disclosure Dollar Loss (DDL) is another simplified measure of shareholder losses. As discussed in the recent report, *Securities Class Action Filings 2009: A Year in Review*, released by the Stanford Law School Securities Class Action Clearinghouse in cooperation with Cornerstone Research (*2009 Filings*), DDL is calculated as the decline in the market capitalization of the defendant firm from the trading day immediately preceding the end of the class period to the trading day immediately following the end of the class period. As in the case of estimated "plaintiff-style" damages, we do not attempt to link DDL to the allegations included in the associated court pleadings. Thus, as this measure does not isolate movements in the defendant's stock price that are related to case allegations, it is not intended to represent an estimate of damages. This measure does not capture additional stock price declines during the alleged class period that may affect certain purchasers' potential damages claims. The DDL calculation also does not apply a model of investors' share-trading behavior to estimate the number of shares damaged.[9]

In 2009 median inflation-adjusted DDL increased to approximately $140 million, representing a nearly 15 percent increase from the 2008 median DDL. Consistent with the pattern discussed earlier in this report with regard to estimated "plaintiff-style" damages, we find that settlements as a percentage of DDL generally decline as DDL increases. In keeping with this finding, the increase in median DDL was accompanied by a decrease in median settlement values as a percentage of DDL. This percentage substantially was lower (5.7 percent) in 2009 relative to the average in prior years (9.2 percent from 1996 to 2008).

Settlements as a percentage of DDL generally decline as DDL increases



Figure 6

CORNERSTONE RESEARCH

### DAMAGE ESTIMATES AND *DURA*

The landmark decision in 2005 by the U.S. Supreme Court in *Dura Pharmaceuticals v. Broudo (Dura)* that determined that plaintiffs must show a causal link between the alleged misrepresentations and the subsequent actual losses suffered by plaintiffs has had considerable influence on securities class action damage calculations. Specifically, following this decision, damages cannot be attributed to shares sold before information regarding the alleged fraud reaches the market. Since securities class actions often involve allegations of multiple misleading statements during the class period, even a rudimentary estimate of damages must incorporate an approach that precludes recovery of damages for shares both purchased and sold between alleged corrective disclosures. Accordingly, to reflect this change in methods for calculating securities class action damages, we have explored an alternative variable to our traditional estimated "plaintiff-style" damages and DDL. This variable is based on the stock-price drops on alleged corrective disclosure dates, and creates a single or tiered value line (depending on the number of disclosure dates), hereafter referred to as "multiple disclosure damages."

We have used regression analysis to test the explanatory power of multiple disclosure damages compared with our traditional estimated "plaintiff-style" damages variable and other measures of investor losses, including DDL. Interestingly, preliminary analysis on a sample of settlements from 2006 to 2009 indicates that our traditional measure of estimated "plaintiff-style" damages remains the strongest determinant of settlements through 2009. However, we find that using the multiple disclosure damages variable as a supplement to estimated "plaintiff-style" damages enhances our ability to predict settlement amounts for this sample. We plan to continue our analysis of this variable in the future.

7

**ANALYSIS OF CASE AND SETTLEMENT CHARACTERISTICS**

In addition to estimated "plaintiff-style" damages and DDL, there are a number of other important determinants of settlement outcomes. In this section we provide information regarding these factors, identified from among the more than 60 variables we collect and analyze as part of our research.

Several of the variables that we study are related to accounting allegations. In 2009 allegations related to violations of Generally Accepted Accounting Principles (GAAP) were included in more than 65 percent of settled cases. These cases continued to be resolved with larger settlement amounts than cases not involving accounting allegations. The complexity of cases with accounting allegations may also contribute to the increasing interval between filing date and settlement date that we observed in recent years.

Although outside auditors were named in less than 20 percent of post–Reform Act settlements through 2009, cases in which an outside auditor was named as a defendant settled for relatively higher percentages of estimated "plaintiff-style" damages, when compared with the broader set of all cases in which improper accounting allegations were made. Further, *2009 Filings* noted an increasing number of cases naming auditors as defendants, even while total filings declined, suggesting that auditor defendants may become an increasingly significant factor in securities class action settlements.

8

Cases with outside auditor defendants settle for higher percentages of estimated "plaintiff-style" damages



Figure 7

Approximately 45 percent of settlements in 2009 involved restatements of financial statements, compared with slightly more than 30 percent for cases prior to Sarbanes-Oxley (SOX). This contrasts with research that finds that, overall, SOX has resulted in a decrease in the frequency of financial statement restatements.[10] It is possible that improvements in corporate governance as a result of SOX may ultimately lead to a decrease in restatement-related class actions. However, it is too early to determine the impact, if any, of the passage of SOX on the dynamics of settlements.

CORNERSTONE RESEARCH

More than 20 percent of post–Reform Act settlements involve Section 11 and/or 12(a)(2) claims. Median settlement amounts and median settlements as a percentage of estimated "plaintiff-style" damages continued to be higher for these cases. In cases involving an underwriter as a named defendant, settlements as a percentage of estimated "plaintiff-style" damages were even higher.

Although there is considerable overlap between the inclusion of an underwriter as a named defendant and the presence of Section 11 and/or 12(a)(2) claims (in addition to Rule 10b-5 claims), underwriters were named in less than 15 percent of all cases. Multiple regression analyses show that, after controlling for the presence of an underwriter defendant and other factors, Section 11 and/or 12(a)(2) claims are not associated with a statistically significant increase in settlement amounts. As noted in *2009 Filings*, filings of class actions alleging Section 11 and/or 12(a)(2) claims reached historically high levels in 2008 and 2009. As a portion of these newly filed cases settle in the coming years, the importance of Section 11 and/or 12(a)(2) claims in determining settlement amounts may increase.



Figure 8

Settlements involving underwriters as defendants settle for higher amounts

Only a small number of the cases in our sample, 46 cases in total, did not involve Rule 10b-5 claims (that is, involved *only* Section 11 and/or 12(a)(2) claims). Median settlements are generally lower for these cases ($3.5 million) relative to cases involving Rule 10b-5 claims, while median settlements as a percentage of estimated "plaintiff-style" damages are higher (9.5 percent).[11]

9

CORNERSTONE RESEARCH

Institutional investors continue to actively participate in post–Reform Act class actions, often serving as lead plaintiffs. In 2009 institutions served as lead plaintiffs in nearly 65 percent of settlements—the highest proportion to date among post–Reform Act settlements. Cases involving institutional investors as lead plaintiffs are also associated with significantly higher settlements.[12] Our sample identifies both public pension plans and union funds as a subset of all institutional investors. While the frequency of union funds acting as lead plaintiffs has increased over the past few years, higher settlements are associated with cases involving public pension plans as lead plaintiffs, as opposed to union funds or other types of institutional investors.

## 10

In 2009 institutions served as lead plaintiffs in nearly 65 percent of settlements



Figure 9

Any relationship between higher settlement outcomes and participation of public pension plans as lead plaintiff may be explained by these relatively sophisticated investors choosing to participate in stronger cases. In addition, public pension plans tend to be involved in larger cases—cases in which the public pension plan may have the potential for a substantial claim against the defendants. However, a statistical analysis of settlement amounts and participation of public pension plans as lead plaintiff shows that even when controlling for estimated "plaintiff-style" damages (case size) and other factors that affect settlement amounts (such as the nature of the allegations), the presence of a public pension plan as lead plaintiff is still associated with a statistically significant increase in settlement size.[13] A list of control variables considered when testing the effect of public pension plans serving as lead plaintiffs can be found on page 16.

CORNERSTONE RESEARCH



11

The number of cases involving companion derivative actions increased in 2009 compared with 2008, but was still below the proportion for 2007 settlements. Slightly more than 45 percent of cases settled in 2009 were accompanied by a derivative action filing, compared with approximately 40 percent in 2008 and approximately 55 percent in 2007.[14] Although settlement of a derivative action does not necessarily result in a cash payment,[15] settlement amounts for class actions that are accompanied by derivative actions (whether coinciding with the settlement of the underlying class action or occurring at a different time) are significantly higher than those for cases without companion derivative actions. However, settlements as a percentage of estimated "plaintiff-style" damages for cases with accompanying derivative actions are slightly lower than for cases with no identifiable derivative action. The lower percentage of estimated "plaintiff-style" damages statistics for cases with derivative actions likely reflects larger estimated "plaintiff-style" damages for these cases. (As we have noted, settlements as a percentage of estimated "plaintiff-style" damages generally decrease as estimated "plaintiff-style" damages increase.)

Derivative actions tend to be associated with larger class actions (as measured by estimated "plaintiff-style" damages and the assets of the issuer defendant) and class actions involving accounting allegations, actions by the Securities and Exchange Commission (SEC), and public pension plans as lead plaintiffs. Using regression analysis to control for other factors that influence class action settlements, we find that cases involving derivative actions are associated with statistically significant higher settlement amounts.

Slightly more than 45 percent of cases settled in 2009 were accompanied by a derivative action filing



MEDIAN SETTLEMENTS AND DERIVATIVE ACTIONS
1996–2009
*Dollars in Millions*

**Median Settlements**

With Derivative Action

$11.8

With No Derivative Action

$5.2

N=337          N=780

**Median Settlements as a Percent of Estimated "Plaintiff-Style" Damages**

With No Derivative Action

3.6%

With Derivative Action

2.8%

N=337          N=780

Figure 10

More than 20 percent of all post–Reform Act settlements have involved a remedy of a corresponding SEC action (evidenced by the filing of a litigation release or administrative proceeding) prior to the settlement of the class action, a slightly lower percentage from the level reported in our *Securities Class Action Settlements: 2008 Review and Analysis* report. Cases that involve SEC actions are associated with significantly higher settlements, as well as higher settlements as a percentage of estimated "plaintiff-style" damages.

The widely reported increase in SEC enforcement activity in 2008 and 2009, both in terms of number of actions brought and number of defendants named, may eventually have an effect on the overall frequency of SEC actions related to shareholder suits in our sample. However, as noted in *SEC Enforcement in 2009: A Year of Changes, with More This Year,* there has been a decline in the percentage of cases where charges against defendants were settled at the time of the filing of the SEC action (it is not uncommon for official complaint filings by the SEC to occur simultaneously with settlements by newly named defendants).[16] An increase in the number of cases that the SEC pursues to the litigation stage may delay resolution substantially—possibly slowing the measurable impact of these enforcement actions on the related securities class action settlements.

**12**

Cases that involve related SEC actions are associated with significantly higher settlements



Figure 11

CORNERSTONE RESEARCH

The percentage of settlements involving non-cash components (such as common stock or warrants) has generally declined over the years following enactment of the Reform Act. A mere 1 percent of settlements in 2009 included non-cash components in the agreed-upon settlement fund. This represents the lowest percentage during the past 10 years. The percentage of the total settlement value sourced from the non-cash components included in settlement funds in 2009 was also at a 10-year low.

The inclusion of non-cash components in settlements is associated with a statistically significant increase in settlement value, even when controlling for other factors such as estimated "plaintiff-style" damages and the nature of the allegations.



13



Figure 12

Only 1 percent

of settlements

in 2009 included

non-cash components

CORNERSTONE RESEARCH



14

The presence of a highly active plaintiff law firm does not seem to significantly increase settlement outcomes

## SETTLEMENTS BY PLAINTIFF LEAD COUNSEL AND JURISDICTION

In previous years, we reported that the law firms of Coughlin Stoia Geller Rudman & Robbins (which is expected to be renamed Robbins Geller Rudman & Dowd in Spring 2010) and Milberg, as well as its predecessor firm Milberg Weiss Bershad Hynes & Lerach, were involved as lead or co-lead plaintiff counsel in approximately half of all post–Reform Act settlements.[17] While Coughlin Stoia has maintained a significant share of the securities class action settlements, the most active firms, based on the proportion of settlements for 2008 and 2009, continued to shift. Barroway Topaz Kessler Meltzer & Check maintained its position with the second highest percentage of settled cases, and for the first time, Bernstein Litowitz Berger & Grossmann moved into the number three spot in our study. Even when controlling for estimated "plaintiff-style" damages and the nature of certain allegations, the presence of one of the more active plaintiff law firms as lead or co-lead counsel is not associated with a statistically significant increase in settlement amounts.

| PLAINTIFF LAW FIRM BY PERCENTAGE OF SETTLED CASES | | |
| --- | --- | --- |
| | 2008–2009 | |
| Plaintiff Law Firm | Percent of Settled Cases | Median Settlements as a Percent of Estimated "Plaintiff-Style" Damages |
| Coughlin Stoia Geller Rudman & Robbins | 26% | 3.3% |
| Barroway Topaz Kessler Meltzer & Check | 11% | 2.9% |
| Bernstein Litowitz Berger & Grossmann | 10% | 4.2% |
| Milberg | 9% | 2.3% |
| Labaton Sucharow | 7% | 1.6% |
| Table displays those firms involved with more than 5 percent of settled cases approved during the two-year period 2008–2009. | | |

Figure 13

CORNERSTONE RESEARCH

The Ninth Circuit (primarily concentrated in the California district courts) maintained a lead in terms of the number of settled cases in 2009 with 28 settlements, followed by the Second Circuit with 22 cases settled. Generally, individual court circuits are not statistically significant in explaining settlement size; however, we do find that settlements are higher in the Second Circuit even when controlling for the effects of estimated "plaintiff-style" damages and other determinants of settlement amounts.



15

| SETTLEMENTS BY FEDERAL COURT CIRCUIT | | | | | | |
|---|---|---|---|---|---|---|
| *Dollars in Millions* | | | | | | |
| | Number of Cases | | Median Settlements | | Median Settlements as a Percentage of Estimated "Plaintiff-Style" Damages | |
| Jurisdiction | 2009 | Through 2008 | 2009 | Through 2008 | 2009 | Through 2008 |
| 1 | 6 | 64 | $3.9 | $6.0 | 2.1% | 3.2% |
| 2 | 22 | 173 | $12.5 | $8.8 | 2.1% | 3.8% |
| 3 | 17 | 94 | $5.0 | $7.0 | 2.3% | 3.6% |
| 4 | 3 | 34 | $3.2 | $7.3 | 9.7% | 2.3% |
| 5 | 6 | 84 | $4.3 | $5.6 | 2.7% | 4.9% |
| 6 | 6 | 48 | $25.0 | $13.0 | 2.5% | 2.9% |
| 7 | 3 | 49 | $30.0 | $7.5 | 5.8% | 4.0% |
| 8 | 2 | 37 | $466.4 | $8.0 | 7.7% | 3.1% |
| 9 | 28 | 248 | $7.5 | $6.5 | 2.2% | 3.2% |
| 10 | 4 | 42 | $11.3 | $7.0 | 2.2% | 2.5% |
| 11 | 3 | 105 | $14.9 | $4.3 | 6.4% | 3.8% |
| All Federal Cases | 100 | 978 | $11.3 | $7.0 | 2.5% | 3.2% |

Figure 14



Other factors being equal, settlements tend to be higher in the Second Circuit

### CORNERSTONE RESEARCH'S SETTLEMENT PREDICTION ANALYSIS

Features of securities cases that may affect settlement outcomes are often correlated, as noted in this report. Regression analysis makes it possible to examine the effects of these factors simultaneously. Accordingly, as part of our ongoing research on securities class action settlements, we applied regression analysis to study factors associated with settlement outcomes. Analysis performed on our sample of post–Reform Act cases settled through December 2009 reveals that variables that are important determinants of settlement amounts, either independently or in combination, include:[18, 19]

16

- Simplified estimated "plaintiff-style" damages
- Disclosure dollar loss (DDL)
- Most recently reported total assets of the defendant firm
- Number of entries on the lead case docket
- Indicator of whether intentional misstatements or omissions in financial statements were reported by the issuer
- Indicator of whether a corresponding SEC action against the issuer or other defendants is involved
- Indicator of whether an accountant is a named co-defendant
- Indicator of whether an underwriter is a named co-defendant
- Indicator of whether a companion derivative action is filed
- Indicator of whether a public pension plan is a lead plaintiff
- Indicator of whether non-cash components, such as common stock or warrants, make up a portion of the settlement fund
- Number of days from class end date to the class action filing date
- Indicator of whether securities other than common stock are alleged to be damaged
- Indicator of whether the issuer is financially distressed
- Indicator of whether the case was filed in the Second Circuit
- Indicator of whether estimated "plaintiff-style" damages are greater than $1 billion

Settlements are higher when estimated "plaintiff-style" damages, DDL, defendant asset size, or number of docket entries are higher. Settlements are also higher in cases involving intentional misstatements or omissions in financial statements reported by the issuer, a corresponding SEC action, an accountant named as co-defendant, an underwriter named as co-defendant, a corresponding derivative action, a public pension fund involved as lead plaintiff, a non-cash component to the settlement, or securities other than common stock alleged to be damaged. Settlements are lower if the issuer is experiencing financial distress, if there is a wide interval between class end date and filing date, or if estimated "plaintiff-style" damages exceed $1 billion.

CORNERSTONE RESEARCH

## CONCLUDING REMARKS

Overall, the challenging economic environment that continued through 2009 did not have a distinguishable effect either on the number of settled cases or on the total value of securities case settlements approved during the year. However, forecasting the impact of the economic crisis on securities case settlements continues to be difficult because of confounding factors (see our 2008 settlements report for further discussion).

For the most part, cases brought in conjunction with the 2008 stock market decline and surrounding credit-crisis issues have not yet reached settlement. Looking ahead, we anticipate that as these cases are resolved, settlements are likely to increase both in number and value. Although cases filed in 2008 (largely cases with class periods ending in 2008) are expected to increase overall settlements in the future, this will be muted to some extent by the effects from cases filed in 2009. Specifically, as discussed in *2009 Filings*, while one important measure of investor losses (DDL) reached historic highs in 2008, for cases filed in 2009, total DDL ($83 billion) was more than 60 percent lower than in 2008 and almost 40 percent lower than the annual average for the 12 years ending in December 2008.



17

## SAMPLE AND DATA SOURCES

Our database is limited to cases alleging fraudulent inflation in the price of a corporation's common stock (that is, excluding cases filed only by bondholders, preferred stockholders, etc.) and cases alleging fraudulent depression in price. Our sample is also limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations.

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, The University of Chicago's Center for Research in Security Prices (CRSP), Standard & Poor's Compustat, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, and public press.

## ENDNOTES

**18**

1   A settlement in excess of $300 million was included in the 2008 settlements in our prior study. That settlement was ultimately renegotiated due to the distressed nature of the defendant and other factors. The revised settlement, amounting to more than $125 million, is included in our 2009 sample and the original amount dropped from the 2008 sample for purposes of our current report.

2   The three largest settlements of all time—the $6.2 billion settlement in the *WorldCom* matter, the $7.2 billion settlement in the *Enron* matter, and the $3.2 billion settlement in the *Tyco International* matter—were approved between 2005 and 2007. Although the WorldCom and Enron settlements comprised a number of partial settlements, we categorize WorldCom as a 2005 settlement and Enron as a 2006 settlement.

3   Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports. For a settlement to be moved from inclusion in an earlier to a more recent year, the subsequent partial settlement must be at least half of the then-current settlement total.

4   There was one settlement in excess of $1 billion in each of the years 2000, 2005, and 2007, and six in 2006.

5   Total settlement value based on an agreed-upon amount at the time of settlement, including the disclosed value of any non-cash components. Figures do not reflect attorney fees, additional amounts that may be paid to the class from related derivative or SEC settlements, or amounts that may have been settled by opt-out investors.

6   Our simplified "plaintiff-style" model is applied to common stock only. For all cases involving Rule 10b-5 claims, damages are determined from a market-adjusted backward value line. For cases involving only Section 11 and/or 12(a)(2) claims, damages are determined from a model that caps the purchase price at the offering price. A volume reduction of 50 percent for shares traded on NASDAQ and 20 percent for shares listed on NYSE or Amex is used. Finally, no adjustments for institutions, insiders, or short sellers are made to the float.

7   Nine settlements out of the 1,127 cases in our sample were excluded from calculations involving estimated "plaintiff-style" damages for lack of available stock price data. The WorldCom settlement was also excluded from these calculations because most of the settlements in that matter related to liability associated with bond offerings (and our research does not compute damages related to securities other than common stock).

8   In 2007 we observed what we now identify as a temporary reversal of this trend—higher median settlements relative to estimated damages (see *2008 Settlements Report*).

9   DDL information is presented in Figure 6 to provide a benchmark for the convenience of readers, since the measure is simple to compute and, as stated, does not require application of a trading model.

10   For example, see "Study: SOX Helps Cut Restatements," *Compliance Week*, March 2007.

11   The median settlement as a percentage of estimated damages for cases with only Section 11 and/ or 12(a)(2) claims was lower in 2009 than for prior years' settlements. For nine of the settlements approved in 2009, claims were limited to Section 11 and/or Section 12(a)(2). The median settlement for these nine matters was $3.6 million, with a median settlement value of 8.1 percent of estimated "plaintiff-style" damages.

12   The extraordinarily high median settlement amount for public-pension-led settlements in 2006 was driven by six separate settlements in excess of $1 billion.

13   This regression analysis may not control for the potential endogeneity in the choice by public pension plans to participate in a class action.

14   Data for 2007 and 2008 are presented in prior settlements reports.

15   Derivative cases are often resolved with changes made to the issuer's corporate governance practices, accompanied by little or no cash payment; this continues to be true despite the increase in corporate controls introduced after the passage of SOX. For purposes of the analyses in this report, a derivative action—generally a case filed against officers and directors on behalf of the issuer corporation—must have allegations similar to the class action in nature and time period to be considered an accompanying action.

CORNERSTONE RESEARCH

16  Posted by Eduardo Gallardo, Gibson, Dunn & Crutcher LLP, on Monday, February 1, 2010, available at the Harvard Law School Forum on Corporate Governance and Financial Regulation (*blogs.law.harvard.edu/corpgov/*).

17  In 2004 the firm split into Milberg Weiss Bershad & Schulman (the firm has since changed its name to Milberg) and Lerach Coughlin Stoia & Robbins (since changed to Coughlin Stoia Geller Rudman & Robbins and, as noted, soon to be renamed Robbins Geller Rudman & Dowd).

18  Our settlement database includes publicly available and measurable information about settled cases. Nonpublic or non-measurable factors, such as relative case merits or the limits of available insurance, are not reflected in the model to the extent that such factors are not correlated with the variables that are accessible to us (that is, publicly available and measurable factors).

19  Due to the presence of a small number of extreme observations in the data, we apply logarithmic transformations to settlement amounts, estimated "plaintiff-style" damages, DDL, the defendant's total assets, number of days between class end date and filing date, and the number of docket entries.



19

## ABOUT THE AUTHORS

Ellen M. Ryan
M.B.A. in International Management,
American Graduate School of International Management
B.A., Saint Mary's College

Ellen Ryan is a manager in the securities practice in Cornerstone Research's Boston office. She has consulted on economic and financial issues in a wide variety of cases, including securities class action lawsuits, financial institution breach-of-contract matters, and antitrust litigation. Ms. Ryan also has supported testifying witnesses in corporate governance and breach-of-fiduciary duty matters. Prior to joining Cornerstone Research, Ms. Ryan worked for Salomon Brothers in New York and Tokyo. Currently Ms. Ryan focuses on post–Reform Act settlement research as well as general practice area business and research.

**20**

Laura E. Simmons
Ph.D., University of North Carolina at Chapel Hill
M.B.A., University of Houston
B.B.A., University of Texas at Austin

Laura Simmons is an assistant professor in the Mason School of Business at the College of William & Mary and a senior advisor at Cornerstone Research. She is a certified public accountant and has over seventeen years of experience in accounting practice and economics consulting. Her economics consulting experience has focused on damage and liability issues in securities litigation, as well as accounting issues arising in a variety of complex commercial litigation matters. She has served as a testifying expert in cases involving accounting analyses, securities case damages, and research on securities lawsuits.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. Dr. Simmons was a consultant at Cornerstone Research for over ten years, most recently as a principal. From 1986 to 1991, she was an accountant with Price Waterhouse.



**Boston**
617.927.3000

**Los Angeles**
213.553.2500

**Menlo Park**
650.853.1660

**New York**
212.605.5000

**San Francisco**
415.229.8100

**Washington**
202.912.8900

www.cornerstone.com
securities.cornerstone.com

© 2010 by Cornerstone Research, Inc.
All Rights Reserved. Cornerstone
Research is a registered service mark
of Cornerstone Research, Inc. C logo
and design is a registered trademark of
Cornerstone Research, Inc.

