Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
Lisa M. Hasselman (*Pro Hac Vice*)
Robert F. Lopez (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com
robl@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT OF FEDERAL SECURITIES CLAIMS<br><br>Date:       September 22, 2010<br>Time:      3:30 p.m.<br>Judge:     Hon. William H. Alsup<br>Courtroom:  Courtroom 9, 19th Floor |

1

## STATEMENT OF ISSUES TO BE DECIDED
### (LOCAL RULE 7-4)

2

3          1.          Should the Court grant final approval of the proposed $200,000,000 settlement of

4   the Securities Act claims?

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   CLASS NOTICE COMPLIED WITH THE COURT'S ORDER, AND CLASS MEMBERS WILL RECEIVE A CHECK WITHOUT HAVING TO COMPLETE A CLAIM FORM ................................................................................................... 2

    A.    Settlement Notice Has Reached Virtually All Absent Class Members ........................ 2

    B.    The Settlement Notice Campaign Includes an Innovative Distribution Plan that Requires Little or No Response by the Class Member ................................................. 4

III.   THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED ...................................................................................................... 5

    A.    The Settlement Has High Value and Provides Substantial Benefits to the Classes ...... 6

        1.    The recovery as a percentage of Plaintiffs' initial damages disclosure is high ....................................................................... 7

        2.    The recovery as a percentage of Plaintiffs' estimated damages adjusted for permissible mortgage-backed securities holdings exceeds 40 percent ........ 8

    B.    There Were Substantial Risks Inherent in Continued Litigation ................................. 9

        1.    The trial risks and claim vulnerabilities highlight the reasonableness of the Proposed Settlement ................................................................. 9

            a.    A unanimous verdict of 12 jurors is difficult to obtain ........................ 9

            b.    Defendants vigorously maintained that no misrepresentations were made and that the risks of investing in mortgage-backed securities were fully disclosed ................................................................. 9

            c.    Discovery did not support the initial alleged basis for falsity ............. 10

            d.    Loss causation entailed risk .............................................................. 11

            e.    This Court's inquiry about the "but for" world invoked potential causation issues ........................................................................ 11

            f.    Damages were vulnerable to findings that early statements were not misleading ................................................................................ 12

            g.    There were few "hot" documents ....................................................... 12

        2.    Defendants' pending motions presented risks ................................................. 12

            a.    Motion to strike ............................................................................... 12

            b.    *Daubert* motions .............................................................................. 13

3.  Plaintiffs' pending motions presented risks ...................................................... 14

4.  Schwab has prevailed in a substantial number of FINRA arbitrations relating to YieldPlus ........................................................................................ 14

C.  Discovery and Investigation Were Complete at the Time of Settlement .................... 16

1.  This action has a lengthy procedural history with extensive motion practice, and the parties were fully prepared for trial ....................................... 16

2.  Extensive discovery was taken ......................................................................... 18

D.  The Terms and Conditions of the Proposed Settlement are Fair and Reasonable ....... 19

E.  Class Counsel and Lead Plaintiffs Fully Support the Proposed Settlement ............... 19

F.  The Expense and Likely Duration of the Litigation in the Absence of a Settlement Are Substantial ......................................................................................... 20

G.  The Parties Bargained in Good Faith, and There Was No Collusion .......................... 20

H.  The Class Member Reactions Have Been Positive with Few Objections ................... 21

I.  The Scope of the Settlement Release of Claims is Reasonable and Bounded by the Claims Asserted in this Litigation .................................................................... 24

IV.  CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ...........................................................................5

*Create-A-Card, Inc. v. INTUIT, Inc.*,
2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22, 2009) ...............................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .........................................................................................13

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...........................................................................6

*Kakani v. Oracle Corp.*,
2007 U.S. Dist. LEXIS 47515 (N.D. Cal. 2007) ................................................25

*Klein v. O'Neil, Inc.*,
2010 U.S. Dist. LEXIS 35183 (N.D. Tex. Apr. 9, 2010) ...................................24

*Reppert v. Marvin Lumber & Cedar Co.*,
359 F.3d 53 (1st Cir. 2004) ..............................................................................24

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ............................................................................20

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982) ...............................................................................9

*In re Zoran Corp. Derivative Litig.*,
2008 U.S. Dist. LEXIS 48246 (N.D. Cal. Apr. 7, 2008) ....................................24

## OTHER AUTHORITIES

Ellen Ryan and Laura Simmons, *Securities Class Action Settlements: 2009 Review and
Analysis* (Cornerstone Research 2010) ..............................................................7

Securities Class Action Services, *The SCAS 100 for Q4 2009* (Risk Metrics Group 2010) ...........1

# I.     INTRODUCTION

Lead Plaintiffs for the Securities Classes move for final approval of the settlement of their extensively litigated claims against all Defendants on the terms and conditions set forth in the Stipulation of Settlement dated April 23, 2010, and the three Amendments thereto (collectively the "Proposed Settlement").[1]  The Proposed Settlement resolves the Securities Classes' claims against all Defendants in exchange for Defendants' payment of $200,000,000.

Lead Plaintiffs and Class Counsel strongly believe that the Proposed Settlement, which was reached on the eve of trial, is fair and reasonable and in the best interests of the Classes as a whole. In absolute terms, the Proposed Settlement represents the fourth largest securities settlement in the Ninth Circuit since the passage of the Private Securities Litigation Reform Act of 1995.[2]  On a percentage-of-damages basis, the recovery is approximately ***45.5 to 42.8 percent*** of the most likely damages award at trial under Securities Act §§ 11 and 12(a)(2), respectively.  The average estimated settlement payment is expected to be approximately $881, and the highest estimated settlement payment is expected to exceed $2,177,000.

This Proposed Settlement is an excellent recovery by any measure and is especially strong in light of the risks of proceeding to trial, risks that are highlighted by reference to the individual investor score-card in the YieldPlus arbitrations before the Financial Industry Regulatory Authority ("FINRA").  Schwab has prevailed in 41 percent of those arbitrations; in other words, investors in 41 percent of the arbitrations received ***nothing***.  And where the investors did prevail, they recovered on average only 66 percent of the damages requested (with one award as low as 10%). Accepting the Proposed Settlement now, with its innovative distribution program that requires eligible Class members to do nothing but cash a check, is far preferable to risking an uncertain jury verdict and lengthy appeal.

---

[1] These documents were previously filed with the Court in support of preliminary approval.

[2] *See* Securities Class Action Services, *The SCAS 100 for Q4 2009*, at 2-3 (Risk Metrics Group 2010) (chart).  Declaration of Steve W. Berman In Support of Plaintiffs' Motion For Final Approval of Federal and California Settlements and For Award of Attorneys Fees and Expenses ("Berman Decl."), Ex. B.

## II.   CLASS NOTICE COMPLIED WITH THE COURT'S ORDER, AND CLASS MEMBERS WILL RECEIVE A CHECK WITHOUT HAVING TO COMPLETE A CLAIM FORM

Before turning to the Fed. R. Civ. P. 23(e) factor balancing, Plaintiffs first report on the settlement notice campaign and the innovative distribution methodology.

### A.   Settlement Notice Has Reached Virtually All Absent Class Members

The settlement notice provided to the Class members was comprehensive yet easy to read. The first page-and-a-half described in summary format the eligible YieldPlus shares, the settlement fund, the enclosed Record of Fund Transactions, the reasons for settlement, the risks of not settling, the attorneys' fees and costs sought, the deadline to object, the date of the fairness hearing, and how to obtain more information.  *See* Declaration of Michael Joaquin Regarding Mailing and Emailing of Proposed Federal Settlement Notice and Publication of Summary Notice ("Joaquin Decl."), Ex. A.  The ensuing pages of the notice provided more detail in an easy-to-follow question-and-answer format.  Among other things, it explained why the Class member received the notice; the subject matter of the lawsuit; the precise boundaries of the Class definitions and who is included in the Settlement; the basis of the Settlement and the benefits provided, including a description of how the Class member's share of the Settlement will be calculated; how to obtain a payment; the lawyers representing the Classes and the amount of compensation they seek; what rights the Class member is releasing; how to object and appear at the fairness hearing; and how to obtain more information from the Settlement Administrator.  The information conveyed in the notice compares favorably to the notice approved by the Court in *Create-A-Card, Inc. v. INTUIT, Inc.*, 2009 U.S. Dist. LEXIS 93989, at *6-7 (N.D. Cal. Sept. 22, 2009).[3]

The notices that were mailed were contained in an envelope with the following legend that the Court requested be included:  "CONTAINS IMPORTANT LEGAL DOCUMENTS REGARDING THE SCHWAB SECURITIES LITIGATION SENT BY ORDER OF THE UNITED STATES DISTRICT COURT."  The envelope also contained a return envelope for the

---

[3] This is the second notice campaign in this class action.  The first was conducted in October 2009, and the Court has already found that the notice of pendency and the methods of its distribution (*i.e.*, direct mail and website publication) met due process requirements.

- 2 -

Class member's use in sending back a Transaction Dispute form if necessary (which is described in greater detail below).  Joaquin Decl., ¶ 4.

On June 25, 2010, the following steps were accomplished pursuant to the notice plan approved by the Court (Dkt. No. 805):  (i) the Settlement Administrator, Gilardi & Co., mailed notice by first class mail to all Class members identified in the database provided by Schwab; (ii) Gilardi emailed the notice to the Class members identified in the database provided by Schwab as investors who notified Schwab that they wished to receive regulatory filings by e-mail; (iii) Gilardi posted the notice to its website; and (iv) Summary Notice was published in *Investor's Business Daily*.  Joaquin Decl., ¶¶ 4-11.  Gilardi also went live that day with a website dedicated to the settlement (and to which the notice refers), which includes a case summary, a listing of important dates related to the settlement and final approval, copies of certain case documents (including the notice), and answers to frequently asked questions.  Joaquin Decl., ¶ 8.  Gilardi also maintains a call-in center, which includes both pre-recorded information relating to the settlement and answers to frequently asked questions, as well as the option to have questions answered by live operators.  Joaquin Decl., ¶ 9.

Gilardi mailed 250,399 notices.  To date, the United States Post Office (the "Post Office") returned 264 notices to Gilardi with an updated address, and these notices have been re-mailed to the new addresses.  The Post Office returned 1,352 notices with no forwarding address.  Of these, Gilardi has been able to obtain updated or alternative address information for 850, and notices have been mailed to these new addresses.  Gilardi has been unable to obtain updated addresses for 502 Class members (or about .2% of the 250,399 unique Class member accounts).  Because we are still in the early stages of the notice period, Gilardi may receive a small number of additional returned undeliverable notices.  Joaquin Decl., ¶ 5.

In addition to mailing, a total of 61,470 email notices were sent.  Joaquin Decl., ¶ 7.  The email notice contained a secure link to an electronic copy of the notice package for that Class member's account or accounts and provided the following additional information:

> This email has been sent to you by Order of the United States District Court for the Northern District of California.  You or someone in your family may have acquired Schwab YieldPlus Fund shares

1

2
between May 31, 2006, and March 17, 2008, through purchase of
such shares or a dividend reinvestment in the Fund.  You have a right
3
to know about a proposed settlement of a class action lawsuit
involving your Schwab YieldPlus Fund shares, and the links below
will provide you with copies of the Court-approved Notice of
4
Pendency and Proposed Settlement of Class Action as well as your
Record of Fund Transactions and Estimate of Settlement Payment.
5
To view the Record of Fund Transactions and Estimate of Settlement
Payment, you will be required to enter your Schwab account number
6
at the Settlement Administrator's secure website.  Please note that
these documents are also being sent to you by mail.

7   Joaquin Decl., ¶¶ 6-7.  7,647 of the emails were refused delivery by the recipient's Internet Service

8   Provider or by the recipient's own software after multiple attempts at delivery over a 72 hour

9   period.  It is common for a significant percentage of unsolicited emails from unknown senders to

10  be refused delivery.  Here, less than 13% of the emails were returned, which is a low "bounce" rate

11  for this type of email delivery.  *Id.*, ¶ 7.

12          These procedures parallel the notice procedures that this Court affirmed in *INTUIT*, 2009

13  U.S. Dist. LEXIS 93989, at *5-6 (finding notice campaign comprised of direct mail, e-mail, and

14  publication on settlement website provided the best practicable notice to the class).

15  **B.      The Settlement Notice Campaign Includes an Innovative Distribution Plan that
            Requires Little or No Response by the Class Member**
16
17          The Settlement employs an innovative recovery process that requires no action by the Class

18  members unless they believe an error exists in the YieldPlus holdings information used in the

19  calculation of their recovery amount.  Unlike a typical securities case where the defendant has little

20  or no detail of class members' purchase or sales transactions, Schwab has been able to provide

21  complete transaction data for all Class members.  Using this data, Gilardi has calculated each Class

22  member's estimated recovery and included it in a "Record of Fund Transactions" setting forth the

23  Class member's eligible YieldPlus share purchases and sales, estimated allowed loss under both

24  Sections 11 and 12 of the Securities Act, and an explanation that the Class member's recovery will

25  be the greater of the two.  Joaquin Decl., Ex. B.  The notice contains a description of how allowed

26  losses were calculated, including:

27  *Section 11*:  For shares purchased November 15, 2006 through March 17, 2008, the
    alleged damages are the difference between the Net Asset Value ("NAV") on the date
28  of purchase and the NAV on the date of sale, if the shares were disposed of in the
    market prior to March 17, 2008.  If shares were held until March 17, 2008, the amount

per share is the difference between the NAV on the date of purchase and the $7.96, which is the NAV for both the Investor Fund and the Select Fund as of that date.  If the shares were sold after the close of trading on March 17, 2008, the amounts are the lesser of (i) the difference between the purchase NAV and the sale NAV; or (ii) the difference between the purchase NAV and $7.96.

*Section 12*:  For shares purchased May 31, 2006 through March 17, 2008 and still held as of June 1, 2008, amounts are the NAV on date of purchase, plus interest earned at the Federal Treasury bill rate through June 1, 2008, less any income received through June 1, 2008, less the NAV on June 2, 2008 which was $6.32 for the Investor and $6.31 for the Select Fund.  If shares were sold prior to June 1, 2008, amounts are calculated as the difference between the NAV on date or purchase and the NAV on date of sale, plus interest earned at the Federal Treasury bill rate through the date of sale, minus any income received from the date of purchase through the date of sale. For any shares disposed of after June 1, 2008, the amounts are calculated the same way as for those shares retained as of that date.

Also included in the notice was a Schedule of Account Activity Detail listing each eligible trade for the Class member (*e.g.*, purchase, sale, dividend reinvestment).  Joaquin Decl., Ex. B. Class Members have been given time to confirm the account summary's accuracy.  If they agree with the account information provided, they need do nothing further.  Upon final approval and distribution, a check will simply be mailed to them.

If the Class member believes that there is an error in the account information provided, he or she can complete and return to Gilardi a "Transaction Dispute Form" by August 9, 2010.  This form, along with a return envelope, was included with the notice.

Thus, there is no claims process for the Classes to go through and no laborious claim form typically seen in securities litigation that requires the claimant to provide copies of their transaction records and record the transaction data on the claim form.  Further, the entire Settlement amount will be distributed, and there will be no concerns here with measuring claims rates.

### III.   THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED

Approval of a tentative class-action settlement is a matter within the sound discretion of the district court.  *E.g.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *INTUIT,* 2009 U.S. Dist. LEXIS 93989, at *7.  The "court's inquiry is whether the settlement is 'fair, adequate, and reasonable.'"  *Id.* (quoting *City of Seattle*, 955 F.2d at 1276).  "A settlement is

fair, adequate, and reasonable when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'" *Id.*

In making its Rule 23(e) inquiry, the Court does not reach any ultimate conclusions on contested issues of fact and law and "begins its analysis with a presumption that a class settlement is fair and should be approved if it is the product of arm's-length negotiations conducted by capable counsel with extensive experience in complex class action litigation." *Id.*, at *8-9 (citing 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 11:41 (4th ed. 2006)). The Court also balances several factors that typically include:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel . . . and the reaction of the class members to the proposed settlement.

*Id.*, at *8 (quoting *City of Seattle*, 955 F.2d at 1276); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). In *INTUIT*, this Court further distilled these factors to the following: (i) the value of the settlement, and the substantial benefits it provides to Class members; (ii) the risks inherent in continued litigation; (iii) the discovery and investigation completed at the time of settlement; (iv) the terms and conditions of the proposed settlement; (v) the views of class counsel; (vi) the expense and likely duration of litigation in the absence of settlement; (vii) the presence of good faith and the absence of collusion; and (viii) the reaction of the Class members. 2009 U.S. Dist. LEXIS 93989, at *9-16. Evaluation of these factors supports approval of the Proposed Settlement.

**A.     The Settlement Has High Value and Provides Substantial Benefits to the Classes**

The benefits of the Proposed Settlement to the Classes are tremendous. Gilardi has calculated each Class member's estimated settlement payment pursuant to the recovery formula contained in the Settlement Agreement and preliminarily approved by the Court. The average estimated settlement payment is expected to be approximately ***$881***, and the highest estimated settlement

payment is expected to exceed **$2,177,000**.  Joaquin Decl., ¶ 13.  These are substantial recoveries and will provide real benefits to the Class members now if the Proposed Settlement is approved.[4]

Further, the Proposed Settlement far exceeds the median for securities class actions, both in amount and as a percentage of the estimated recovery.  Almost 60% of securities class actions settled during the 14-year period after passage of the Private Securities Litigation Reform Act of 1995 settled for less than $10 million.  Ellen Ryan and Laura Simmons, *Securities Class Action Settlements:  2009 Review and Analysis* (Cornerstone Research 2010) ("Cornerstone Study"), Berman Decl., Ex. A, at 3.  Settlements exceeding $100 million are rare, comprising only about seven percent of the cases, and settlements over $250 million are rarer still, comprising less than three percent.  *Id.* (Figure 3).[5]  The present tentative $200 million settlement falls between these amounts.  Further, the median settlement for class actions asserting claims under §§ 11 or 12(a)(2) of the Securities Act, but not § 10(b) of the Exchange Act, is only $3.5 million (although the sample size is small for this group).  *Id.* at 9.

The $200 Million Proposed Settlement represents the fourth largest securities settlement in the Ninth Circuit since the passage of the Private Securities Litigation Reform Act of 1995.  Berman Decl., Ex. B at 2-3.  The median settlement as a ***percentage*** of estimated "plaintiffs-style" damages (described at Berman Decl., Ex. A at 4) is 2.5%, and only 2.2% for settlements within the Ninth Circuit.  *Id.* at 15.  The Proposed Settlement here is many multiples of this median as described more particularly below.

### 1.    The recovery as a percentage of Plaintiffs' initial damages disclosure is high

Plaintiffs' estimated damages, as disclosed to Defendants prior to trial, were $651,307,533 for §11 and $855,544,974 for §12(a)(2).  These numbers were calculated using a month-end NAV.

---

[4] Other relevant recovery statistics are:  (i) approximately 77% of the eligible class members will receive a distribution (58,833 persons – or 22.6% of the classes – made a profit during the relevant time period and will, therefore, not participate in the distribution of the settlement proceeds); (ii) 52% of the settlement proceeds are being distributed to the block of class members with losses ranging from $10,000 to $100,000 (approximately 22,172 class members), representing the largest tier of participants by value; and (iii) the largest number of participants by volume (approximately 48% or 126,602 participants) have losses ranging from $101 to $5,000.  Joaquin Decl., ¶¶ 14-16.

[5] The Cornerstone Study is limited to securities cases involving common stock only.  *Id.* at 1. We believe, nonetheless, that it provides a reasonable gauge to measure the benefits of the Proposed Settlement.

Supplemental Declaration of Candace L. Preston in Support of Settlement ("Preston Supplemental Declaration"), ¶ 2. Thus, the proposed $200 million settlement here is **35.9** and **23.4** percent of these initial damages estimates under §§ 11 and 12(a)(2), respectively. *Id.*

Defendants maintain that it is more appropriate to use an ***average*** NAV instead of a month-end NAV in calculating damages. Plaintiffs agree that this arguably yields more accurate numbers. Damages using the average NAV under §11 are approximately $525.2 million, and those under §12(a)(2) are approximately $711.2 million. This increases the percent of recoverable damages under §§ 11 and 12(a)(2) to **38.1** and **28.1** percent, respectively. *Id.*

Either way, as a percentage of estimated damages, these numbers are about 9 to 14 times greater than the national 14-year median (and about 11 to 16 times greater than the Ninth Circuit 14-year median). And these percentage recoveries are substantially higher than the settlement approved by this Court in *In re Critical Path, Inc. Secs. Litig.*, 2002 U.S. Dist. LEXIS 26399 (N.D. Cal. June 18, 2002) ($17.5 million settlement where damages alleged were $200 million, resulting in an 8.75% recovery percentage). ***However***, the recovery as a percentage of damages likely to be recovered at trial is much higher.

      **2.**      **The recovery as a percentage of Plaintiffs' estimated damages adjusted for permissible mortgage-backed securities holdings exceeds 40 percent**

Defendants argued that the prospectuses expressly authorized the Fund to invest up to 25 percent of its assets in non-agency mortgage-backed securities, and that, consequently, damages must be reduced to accommodate this permissible level of holdings. In other words, had the Fund limited non-agency mortgage-backed securities investments to 25 percent of the portfolio, there would be no actionable over-concentration claim. The Court appeared to agree in the context of the California state-law claim, asking the parties "to run calculations to ascertain how the fund would have done if the 25-percent non-guaranteed mortgage[]-back[ed] securities limitation had been honored with the excess over the 25 percent being … kept in cash …." Dkt. No. 539 (March 30, 2010 Request for Calculations). Given this ruling, it is highly likely that the Court would have adopted a similar jury instruction limiting damages recoverable under the Securities Act claims. If so, Plaintiffs estimate that damages under §§ 11 and 12(a)(2) would be reduced to $439,536,755

1   and $467,299,361, respectively.  Preston Supplemental Declaration, ¶ 5.  Under this scenario, the

2   $200 million Proposed Settlement would represent **45.5** percent and **42.8** percent, respectively, of

3   recoverable damages.  *Id.*  ***This is probably the most likely recovery scenario, given the Court's***

4   ***March 30, 2010 Request for Calculations***.

5   **B.      There Were Substantial Risks Inherent in Continued Litigation**

6           The question of whether a tentative settlement is fair, reasonable, and adequate necessarily

7   requires a judgment and evaluation by the attorneys for the parties based upon a comparison of

8   "'the terms of the compromise with the likely rewards of litigation.'"  *Weinberger v. Kendrick*, 698

9   F.2d 61, 73 (2d Cir. 1982) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer*

10  *Ferry v. Anderson*, 390 U.S. 414, 424-25 (1968)).  Here, there would be significant risk and

11  expense necessary to prosecute the claims through trial and subsequent appeals, with inherent

12  difficulties and delays that complex litigation like this entails.  *Cf.*, *INTUIT*, 2009 U.S. Dist. LEXIS

13  93989, at *11.  We summarize below some of the more specific risks.

14          **1.      The trial risks and claim vulnerabilities highlight the reasonableness of the**
            **Proposed Settlement**

15

16                  **a.      A unanimous verdict of 12 jurors is difficult to obtain**

17          A unanimous verdict from 12 jurors is necessary to prevail at trial, and it is difficult to

    obtain a unanimous verdict.  In the absence of one, Plaintiffs would be forced into a second trial,

18  with attendant delays and additional expense but without assurance of a different outcome.

19

20                  **b.      Defendants vigorously maintained that no misrepresentations were**
                    **made and that the risks of investing in mortgage-backed securities were**
                    **fully disclosed**

21

22          Defendants vigorously disputed that Plaintiffs could prove Schwab misrepresented the risk

23  of investing in mortgage-backed securities and corporate-finance bonds.  Defense expert Allen

    Ferrell would testify that Defendants and other sophisticated financial institutions viewed mort-

24  gage-backed securities as stable, low-risk investments based on both their ratings and on a decade's

25  worth of performance, and that the housing crisis was unprecedented and unforeseeable.  Report of

26  Dr. Ferrell, Exhibit A to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion in

27  Limine #1 (Dkt. No. 628-1), ¶¶ 19-24.  Even Alan Greenspan described the mortgage defaults as a

28

1    "once-in-a-century credit tsunami" that could not be anticipated by the best experts or the smartest

2    regulators.  From this, Dr. Ferrell would opine that the disclosures regarding mortgage-backed

3    securities were adequate.  *Id.* ¶¶ 67-78.  If the jury accepted Dr. Ferrell's views, only those few

4    investors who purchased late in the class periods could recover.

5            Defendants would bolster Dr. Ferrell's testimony by introducing a multitude of documents

6    they authored at the time that indicate their belief that mortgage-backed securities were not risky,

7    were highly rated and had no history of default.  Some emails suggested otherwise, but they are

8    few in number and for the most part authored by employees outside of Fund management.

9    Defendants thus characterized Plaintiffs' omission claims as based on hindsight alone.  There was a

10   material risk this argument would resonate with jurors.

11           The jury could also find that the prospectuses did not contain any false statements or

12   omissions, that risks of investing in mortgage-backed securities were fully disclosed and, in

13   particular, that the real estate market could decline, which could trigger mortgage defaults.  In

14   balancing all of the prospectus's disclosures, the jury could find in Schwab's favor.

15                    **c.        Discovery did not support the initial alleged basis for falsity**

16           Plaintiffs initially contended that a fundamental misrepresentation concerned the duration

17   of the Fund's investments, a key means of measuring financial risk.  The Fund's offering materials

18   emphasized "duration" at one year or less.  Duration is critical to the ability of the Fund to maintain

19   a level of risk consistent with the goal of "minimal exposure of interest rate risk."  Plaintiffs

20   initially alleged that Defendants misrepresented duration when they misrepresented the risk and

21   stability of the Fund.  But documents and data obtained via discovery did not support this claim for

22   most of the class periods.  It was only late in the game, when class member purchases had declined,

23   that the average duration of the Fund exceeded one year.  This would cut damages for that claim.

24           This left the focus of Plaintiffs' claims on the Fund being "riskier" than Defendants'

25   offering materials represented.  It is difficult to assess how a jury might respond to this more

26   subjective basis of falsity, especially in light of evidence that the housing crisis was unforeseeable.

27

28

### d.   Loss causation entailed risk

Defendants' theory of negative causation was that panic-driven redemptions that forced the Fund to sell assets at fire-sale prices caused the sudden drop in Fund share prices and not the materialization of any concealed risk.  Given the magnitude of the market crash that coincided with the plummet in the Fund's share price, the jury could adopt Defendants' theory.

### e.   This Court's inquiry about the "but for" world invoked potential causation issues

As noted above, the Court asked the parties to prepare testimony regarding how the Fund would have performed had its investment in mortgage-backed securities not exceeded 25%. Defendants' damages expert, Professor James, determined that the Fund would have declined just as much as it did in reality and concluded that the Fund's excess investments in mortgage-backed securities did not cause Plaintiffs' losses.  James modeled the effect on the Fund's NAV had the Fund capped mortgage-backed securities at 5% to 25%.  The analysis, reproduced below, shows the Fund would have lost the exact same amount as it did.



Defendants would use this to show that the misrepresentations regarding the risk of mortgage-backed securities did not cause Plaintiffs' losses.  To be sure, we believe that James's methodology is incorrect.  However, the Court's line of inquiry, coupled with Defendants'

response, increased the risk that a jury could find that Defendants' misrepresentations did not cause any or even a substantial portion of the Classes' losses.

### f. Damages were vulnerable to findings that early statements were not misleading

Plaintiffs faced a material risk that a jury could find that Plaintiffs proved that Defendants issued false statements only late in the class periods, as the housing market accelerated its deterioration in August 2007 and when the average duration of the Fund's portfolio exceeded one year. *See supra* at 10. Such a finding would cut substantially the Classes' damages.

### g. There were few "hot" documents

Class Counsel were surprised by the relative dearth of "hot" documents from discovery. Counsel culled only 10 to 20 "hots" from Defendants' millions of pages of documents.

### 2. Defendants' pending motions presented risks

Pending before the Court were ten motions to exclude from trial material components of Plaintiffs' liability and damages evidence. Many of these motions, if granted, had the potential to undermine Plaintiffs' chances of obtaining a favorable verdict.

### a. Motion to strike

Schwab moved to strike (Dkt. No. 487) the following:

- Advertising prospectuses because they (i) are new statements not raised in the complaint, (ii) do not qualify as prospectuses, and (iii) cannot be the basis of liability in any event because of tracing requirement;

- Claims based on over-concentration in corporate bonds of financial companies; and

- Claims and evidence predicated on "mismanagement."

If granted, this motion would deprive Plaintiffs of their ability to buttress evidence relating to the over-concentration in mortgage-backed securities with an over-concentration in corporate finance bonds. It would also prohibit the jury from considering the advertising prospectuses, which made more aggressive marketing statements than those contained in the prospectuses proper. Most importantly, Defendants sought to exclude misrepresentations positioning the Fund as a cash alternative and an alternative to money market funds.

1  The same motion, if granted, would also deprive Plaintiffs from presenting a whole host of

2 damning evidence of lack of proper risk-management controls, including evidence that the Fund

3 lacked the tools necessary to manage its new, riskier strategy, and did not disclose this to

4 investors.  The relevant evidence on this issue includes internal audit reports finding that "stress

5 tests" designed to reveal market impacts on funds with a high concentration of mortgage securities

6 were not being conducted; internal acknowledgements that critical control and accounting

7 departments were understaffed; and that mortgage-backed securities purchases were being "rubber

8 stamped" instead of being subjected to thorough and proper credit reviews.[6]

9     **b.** ***Daubert* motions**

10  Defendants moved under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), to

11 strike Plaintiffs' expert Gifford Fong (Dkt. No. 657).  This motion seeks to exclude a number of

12 Gifford Fong's central opinions, namely:  (i) the riskiness of mortgage-backed securities; (ii) that

13 mortgage-backed securities caused the Fund's losses; and (iii) that the disclosures were

14 inadequate.  Mr. Fong is an important witness, and excluding these three opinions would materially

15 harm Plaintiffs' chance of prevailing at trial.  Without his testimony, the jury will have difficulty

16 assessing the riskiness of the Fund's mortgage-backed securities investments.  And Schwab has

17 made causation a central pillar of the defense, so having Mr. Fong's causation opinions excluded

18 could terminate the case in Defendants' favor.

19  Defendants also moved under *Daubert* to strike Plaintiffs' damages expert, Candace

20 Preston (Dkt. No. 663).  This motion seeks to exclude Preston's damages opinion in total and in

21 part.  Plaintiffs cannot prove damages without Ms. Preston's testimony.

22  And Defendants moved under *Daubert* to strike Plaintiffs' expert, Paul Meyer (Dkt.

23 No. 661).  Mr. Meyer will assist the jury in putting Schwab's advertisements and disclosures into

24 context.  He would testify that investors would not understand the risk that the Fund was taking on,

25 and that they would view it as a safe alternative to cash based on Schwab's representations.  The

26

27

28

---

[6] Defendants also moved to exclude (i) statements outside the Fund's prospectuses (Dkt. No. 644), (ii) evidence of falsity based on concentration in corporate financial bonds (Dkt. No. 651), and (iii) evidence of alleged mismanagement (Dkt. No. 644).  These motions overlap substantially with the motion to strike.

1    jury may have greater difficulty understanding the nature of Defendants' misrepresentation without

2    Mr. Meyer's testimony.

3              **3.      Plaintiffs' pending motions presented risks**

4              Plaintiffs also moved to exclude certain evidence that, if presented to the jury, could cause

5    jury confusion and undermine Plaintiffs' chances of prevailing.  For instance, Plaintiffs seek to

6    exclude evidence of extra-prospectus "disclosures" and Defendants' experts' reports referring to

7    such material.  Plaintiffs urge that the jury, in evaluating the alleged misrepresentations and

8    omissions, should focus only on the information contained inside the four corners of the Fund's

9    actual prospectuses and SAIs.  If the motion is denied, there is risk that the jury will be unduly

10   swayed by extraneous material and thereby rely on that material to trump the actual prospectuses.

11             Plaintiffs also moved to exclude references to filing prospectuses and SAIs with the SEC

12   and the Financial Industry Regulatory Authority ("FINRA") or that these filings complied with

13   FINRA or SEC regulations.  This motion would remove any imprimatur of correctness that the jury

14   might assume if it is exposed to Schwab's arguments that prospectuses and advertising material

15   were filed with relevant regulatory authorities.

16             Plaintiffs moved to exclude evidence and argument that the Fund's advertising prospectuses

17   do not qualify as prospectuses – the "other side of the coin" from Schwab's motion to strike and

18   motion in limine on this issue.  Risks presented by losing this motion are presented above vis-à-vis

19   the motion to strike.  *See supra* at 12.

20             Plaintiffs also moved to exclude Defendants' expert Christopher James.  If James's

21   opinions on causation are not excluded, the jury could be unduly swayed and/or confused by his

22   poor methodology, which poses a significant risk to Plaintiffs.

23             **4.      Schwab has prevailed in a substantial number of FINRA arbitrations relating
                         to YieldPlus**

24
              The track record in the YieldPlus Fund arbitrations before FINRA provide another relevant
25
     beacon for assessing the reasonableness of the Proposed Settlement.  There have been 44
26
     individual YieldPlus investor arbitrations against Schwab relating to YieldPlus that went to verdict,
27
     and the table below summarizes those results.  In most cases, claimants brought individual causes
28

of action under state law that may be easier to prove than violations of Sections 11 and 12 of the

Securities Act.  Such claims include negligence, breach of fiduciary duty, and unsuitability.

Nonetheless, investors prevailed in only 59% (or 26) of the arbitrations.  There have been 18

outright losses.  For the victors, recoveries range from 10% to 100% of the amounts claimed, for an

average of 66%.  Berman Decl., ¶¶ 29-34, and Ex. F.  These "real world" arbitration results

illustrate the risks of proceeding to verdict against Schwab.

| Line | Case No. | Amount Claimed[7] | Amount Awarded | Percent |
|------|----------|---------------|----------------|---------|
| 1 | 08-04701 | $167,797 | $25,000 | 15% |
| 2 | 08-03250 | $72,000 | $0 | 0% |
| 3 | 08-02118 | $19,820 | $14,570 | 74% |
| 4 | 08-03052 | $101,200 | $0 | 0% |
| 5 | 07-02674 | $18,425 | $18,425 | 100% |
| 6 | 09-06614 | $22,638 | $18,955 | 84% |
| 7 | 09-06630 | $11,086 | $9,970 | 90% |
| 8 | 09-06482 | $25,000 | $15,155 | 61% |
| 9 | 09-06541 | $25,000 | $0 | 0% |
| 10 | 09-05245 | $13,023 | $9,356 | 72% |
| 11 | 09-03736 | $22,726 | $10,736 | 46% |
| 12 | 08-01764 | $115,000 | $0 | 0% |
| 13 | 09-04755 | $19,675 | $0 | 0% |
| 14 | 08-03602 | $81,000 | $37,500 | 47% |
| 15 | 09-00588 | $263,000 | $0 | 0% |
| 16 | 09-03864 | $25,000 | $0 | 0% |
| 17 | 09-02907 | $13,755 | $0 | 0% |
| 18 | 09-03230 | $20,051 | $0 | 0% |
| 19 | 09-02752 | $15,361 | $15,361 | 100% |
| 20 | 09-03491 | $23,633 | $23,633 | 100% |
| 21 | 08-02307 | $91,022 | $74,430 | 82% |
| 22 | 09-02231 | $25,000 | $5,636 | 23% |
| 23 | 09-01949 | $25,000 | $14,872 | 60% |
| 24 | 08-02552 | $147,176 | $80,000 | 54% |
| 25 | 09-02574 | $24,153 | $0 | 0% |
| 26 | 08-03215 | $179,613 | $125,729 | 70% |
| 27 | 08-02417 | $77,218 | $74,745 | 97% |
| 28 | 08-02307 | $91,022 | $74,430 | 82% |
| 29 | 09-01081 | $13,264 | $11,129 | 84% |
| 30 | 08-01325 | $190,944 | $0 | 0% |

---

[7] The amounts claimed reported here exclude claims for fees, costs, and interest.  Punitive damages requests, which not awarded in any of these arbitrations, are also excluded.

| 31 | 09-00243 | $9,178 | $8,116 | 88% |
|----|----------|--------|--------|-----|
| 32 | 08-03017 | $56,711 | $0 | 0% |
| 33 | 08-02698 | $230,515 | $100,000 | 43% |
| 34 | 09-00346 | $18,624 | $0 | 0% |
| 35 | 09-00901 | $24,488 | $0 | 0% |
| 36 | 09-00521 | $25,000 | $0 | 0% |
| 37 | 08-02408 | $115,406 | $0 | 0% |
| 38 | 09-00097 | $13,021 | $0 | 0% |
| 39 | 09-00741 | $25,000 | $17,779 | 71% |
| 40 | 09-00300 | $23,301 | $11,400 | 49% |
| 41 | 08-03213 | $18,093 | $0 | 0% |
| 42 | 08-03125 | $16,945 | $5,400 | 32% |
| 43 | 08-01888 | $42,122 | $4,145 | 10% |
| 44 | 07-03069 | $667,000 | $542,340 | 81% |

*    *    *

In view of these risks, plus the risks generally of proceeding to trial against enormously well-resourced and defended Defendants, Class Counsel believe it was in the Securities Classes' best interests to settle the Securities Act claims for an amount that discounted Plaintiffs' expert's best-case damages estimates.

**C. Discovery and Investigation Were Complete at the Time of Settlement**

The Proposed Settlement was reached on the eve of trial and after protracted motion practice and an intensive period of document and deposition discovery. There can be no question that Class Counsel "had sufficient legal and factual bases to make a thorough appraisal of the risks of continued litigation and the adequacy of the Settlement." *INTUIT*, 2009 U.S. Dist. LEXIS 93989, at *11.

**1. This action has a lengthy procedural history with extensive motion practice, and the parties were fully prepared for trial**

This matter has been intensely litigated, as even a cursory review of the 74-page Court docket sheet reveals. After the initial complaint asserting Securities violations was filed on March 13, 2008, the Court consolidated the subsequently filed actions on June 1, 2008 (Dkt. No. 50) and appointed Lead Plaintiffs on July 3, 2008 (Dkt. No. 73). At the same time, the Court consolidated the separate state-law claims that arose from Defendants' violation of § 13(a) of the Investment Company Act of 1940.

1          In November 2008, Defendants filed four motions to dismiss or strike the First

2    Consolidated Amended Complaint.  Dkt. Nos. 115, 116, 117, 123.  After extensive briefing and a

3    hearing, the Court resolved Defendants' motions on February 4, 2009 (Dkt. No. 164), and lifted the

4    stay of discovery.

5          In May 2009, Plaintiffs moved for class certification.  Dkt. No. 189.  Substantial briefing

6    ensued and, after holding a hearing, on August 21, 2009, the Court certified two federal classes and

7    a California-only class for the remaining state-law claim under California's Unfair Competition

8    Law.  Dkt. No. 233.  On September 21, 2009, the Court granted Plaintiffs' motion to approve class

9    notice.  Dkt. No. 239.  Plaintiffs then filed a motion to amend the complaint to reflect evidence

10   adduced in discovery and, after additional briefing, the Court granted the motion in part.  Dkt. No.

11   246.

12         Numerous discovery disputes erupted that generated a substantial volume of letter briefing,

13   and the Court held *nine* discovery hearings.  *See* Dkt. Nos. 198 (May 19, 2009), 258 (Oct. 30,

14   2009), 290 (Nov. 30, 2009), 314 (Dec. 23, 2009), 324 (Jan. 7, 2010), 356 (Jan. 20, 2010), 402 (Feb.

15   11, 2010), 431 (Feb. 24, 2010), 621 (Apr. 12, 2010).  Many other discovery disputes were resolved

16   without Court intervention.

17         After completing discovery and exchanging expert reports, the parties filed various

18   summary-judgment and related motions with reams of briefing and exhibits.  Each side filed three

19   summary-judgment motions or motions to strike apiece (Dkt. Nos. 372, 377, 379, 383, 384, 390),

20   which the Court largely resolved in a series of rulings issued in March and April, 2010 (Dkt. Nos.

21   538, 584, 585, 611).  Amicus filed briefing, which required responses from the parties.  *See* Dkt.

22   Nos. 510, 512, 514.

23         Many motions *in limine* and to strike experts ensued.  Defendants filed twelve (Dkt. Nos.

24   487, 644, 648, 650, 651, 653, 655, 657, 661, 663, 665, 668); Plaintiffs filed five (*see* Dkt. Nos. 627,

25   630, 634, 637, 640).  Briefing was complete on these motions.

26         The parties made all of their pretrial disclosures, including witness and exhibit lists, jury

27   instructions, jury verdict forms and associated briefs.  They lodged their Pretrial Conference

28   Statements on April 19, 2010.  Dkt. Nos. 673-81.  Trial was scheduled to begin on or around May

10, 2010. *This case was trial ready at the time the Settlement Agreement was inked on April 23, 2010*.

### 2. Extensive discovery was taken

Defendants produced over 10 million documents comprised of more than 28 million pages. Most of the production consisted of e-mails, PowerPoint presentations, memoranda, spreadsheets and other documents maintained in "native" electronic format. Class Counsel loaded Schwab's immense production into sophisticated search databases, ran innumerable searches on the databases, and reviewed hundreds-of-thousands of documents. Some of the production was in hard-copy and was reviewed page-by-page. Berman Decl., ¶ 50.

Defendants also produced a high volume of portfolio data, including monthly investor purchase and sale data, assets under management, net asset value, cash positions, net subscriptions for each trading day between July 31, 2007 and September 17, 2009, month end account balances from March 2008 to August 2009, list of accounts with California addresses, list of accounts holding shares of the Fund on June 30, 2007, daily accrued dividends per share for each day October 1999 to December 2008, and information relating to settlements and arbitrations. Berman Decl., ¶ 51.

Twenty-six depositions were taken during discovery. Plaintiffs noted and took 14 depositions, including experts, and attended others. The Schwab employees deposed include an internal auditor (Donna Schiano), a marketing director (Keith Maddock), two portfolio managers (Steve Chan and Matt Hastings), the Fund's Treasurer (George Pereira), the Fund's Chief Investment Officer (Kimon Daifotis), the former and current Presidents of Charles Schwab Investment Management (Evelyn Dilsaver and Randall Merk), a former Managing Director in the Credit Department (Kevin Healey), and a credit analyst (Janice Diamond). Plaintiffs also deposed Defendants' experts (Christopher James, Allen Ferrell, and Tsvetan Beloreshki). Berman Decl., ¶ 52.

Depositions were also taken of outside vendors such the public relations agency that the Fund managers used (Sun Star), and firms providing analytical or pricing information for the portfolio (Citigroup's YieldBook, Barclay's POINT, and IDC). Berman Decl., ¶ 53.

1    Defendants took the depositions of all six named Plaintiffs and Plaintiffs' three experts

2    (Gifford Fong, Candace Preston, and Paul Meyer).  The experts for all parties produced numerous

3    reports.  Berman Decl., ¶ 54.

4    In sum, Class Counsel and Lead Plaintiffs were well-positioned based on discovery and

5    motion practice to fully assess the merits and risks of the litigation.

6    **D.    The Terms and Conditions of the Proposed Settlement are Fair and Reasonable**

7    The Proposed Settlement provides cash compensation to Class members who incurred

8    recoverable Section 11 and 12 losses during the respective class periods.  As explained above, the

9    Class member need not submit a claim form and provide lengthy documentation supporting the

10   claim in order to participate.  The Class member need do nothing other than receive and deposit a

11   check.  Class members are receiving substantial value, and the recovery obtained under the

12   Proposed Settlement represents from ***35.9 to 45.5***  and ***23.4 to 42.8 percent*** of recoverable damages

13   under §§ 11 and 12(a)(2), respectively, depending on the weight that a jury would give to

14   Defendants' damages arguments.  Again, these percentages are way above average recoveries in

15   similar securities class actions.  The terms of the Proposed Settlement are fair and reasonable.

16   **E.    Class Counsel and Lead Plaintiffs Fully Support the Proposed Settlement**

17   Class Counsel, with the Lead Plaintiffs' close guidance, exercised their judgment based on

18   extensive knowledge of the facts of the case and the legal issues facing the Classes, as well as

19   judgments about the strengths and weaknesses of the case.  After an extensive analysis, Class

20   Counsel concluded that the terms of the Settlement Agreement are fair, just, and adequate.  *See*

21   Berman Decl., ¶ 9.

22   Class Counsel are, of course, extremely well-versed in the facts and legal issues to be tried

23   in this case, having undergone discovery, including reviewing hundreds-of-thousands of pages of

24   documents produced by the parties in this case, taking scores of depositions, and engaging in

25   extensive expert discovery.  Class Counsel's recommendation also takes into account all of the

26   Court's summary judgment and pre-trial rulings.  *Id*.

27   Courts recognize that the opinion of experienced counsel supporting the settlement is

28   entitled to considerable weight, although, of course, a district court should not simply rubber stamp

stipulated settlements.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH), § 21.633 at 321-22;

*INTUIT*, 2009 U.S. Dist. LEXIS 93989, at *12-13; *Staton v. Boeing Co.*, 327 F.3d 938, 959-60 (9th

Cir. 2003) (court assesses a class-action settlement for "actual fraud, overreaching or collusion");

*INTUIT*, 2009 U.S. Dist. LEXIS 93989, at *12-13.  Here, Class Counsel have extensive experience

in securities litigation, and believe that this Settlement is fair, reasonable, and in the best interests

of the Classes, in light of the circumstances of this litigation.

**F.      The Expense and Likely Duration of the Litigation in the Absence of a Settlement Are Substantial**

The Proposed Settlement guarantees a substantial recovery for the Class now while

obviating the need for a lengthy, complex, and uncertain trial.  *See INTUIT*, 2009 U.S. Dist. LEXIS

93989, at *13.  And if this matter went to verdict, a lengthy appeal period would certainly result.

The Ninth Circuit currently ranks the slowest among the 12 circuit courts for median time to

resolve an appeal, requiring on average nearly 18 months from filing the notice of appeal to

disposition.  Berman Decl., Ex. G (reprinted from the Federal Judicial Center judicial-caseload

profiles, available on-line at http://www.uscourts.gov/cgi-bin/cmsa2009.pl).  Settlement now,

particularly on the extremely favorable terms embodied in the Proposed Settlement, is far

preferable to risking an uncertain verdict and lengthy appeal.

**G.      The Parties Bargained in Good Faith, and There Was No Collusion**

Arm's-length negotiations conducted by competent counsel are prima facie evidence of fair

settlements.  *INTUIT*, 2009 U.S. Dist. LEXIS 93989, at *14 (citing *In re Consolidated Pinnacle*

*West Sec. Litig.*, 51 F.3d 194, 197 n.6 (9th Cir. 1995)).  Here, the Proposed Settlement is the result

of serious, informed, non-collusive negotiations conducted in good faith over many months and

was reached only after Class Counsel diligently prosecuted the claims of the Classes.  Defendants

and the Classes first participated in a mediation session before Magistrate Judge Joseph Spero in

September 2009.  Berman Decl., ¶ 59.  No agreement was reached during that mediation or in

several mediations sessions that followed with retired Magistrate Judge Edward Infante.  After a

fifth formal mediation on April 16, 2010, before Magistrate Judge Spero, the Classes and

Defendants reached final agreement as to the Securities Act claims.  Berman Decl., ¶ 61.  The

1    Lead Plaintiffs were present for all of these mediation sessions, and had their own meetings

2    without Class Counsel's presence and exercised independent judgment.  *Id*.; *see also* Declaration

3    of David Mikelonis *passim* (Dkt. No. 694).

4    **H.    The Class Member Reactions Have Been Positive with Few Objections**

5        Class member reaction is a relevant factor for the Court to consider.  "A court may

6    appropriately infer that a class action settlement is fair, adequate, and reasonable when few class

7    members object to it [and] a court can approve a class action settlement as fair, adequate, and

8    reasonable even over the objections of a significant percentage of class members."  *INTUIT*, 2009

9    U.S. Dist. LEXIS 93989, at *15-16 (citing *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178

10   (9th Cir. 1977); *City of Seattle*, 955 F.2d at 1291-96).

11       The period to object stays open until August 24.  Through July 22, Class Counsel have

12   received only eight objections from the universe of 250,399 Class members.  Berman Decl., ¶ 63,

13   Exs. H-O.  The limited number of objections strongly supports approval of the Proposed

14   Settlement.

15       One common thread running through the objections is a failure to understand the Section 11

16   and 12 statutory recovery formulas and the limitations on recoverable damages associated with the

17   Court's class period certifications.  Thomas Grady, Martin Robins, and Edward Holtgraver object

18   on the basis that their estimated recovery does not consider shares acquired before May 31, 2006.

19   Berman Decl., Exs. I, M, O.  Eileen Mostellese, on behalf of her mother Mary Higgins, objects on

20   the basis that her recovery is too small and that eligible losses do not reflect her actual losses.

21   Berman Decl., Ex. N.  But the Court's class certification order only covers YieldPlus share

22   purchases made from May 31, 2006 through March 17, 2008 for the Section 12 class and from

23   November 15, 2006 through March 17, 2008 for the Section 11 class.  Dkt. No. 233 at 15.[8]  Mr.

24   Grady, Mr. Robins, Mr. Holtgraver and Ms. Higgins accumulated most of their shares before May

25

26   _____

       [8] As the Court may recall, Plaintiffs requested certification of a nationwide class of YieldPlus
27   investors who held shares as of September 1, 2006, and would have included all shares held on that
     date no matter when purchased.  However, the Court declined to certify a nationwide "holders"
28   class and chose to certify only the California state-law class.  Dkt. No. 233 at 9-12.

31, 2006. Therefore, their eligible losses, which are predicated on share dividend reinvestments, are quite modest. Joaquin Decl., ¶¶ 18-21.

Edward Eggers's objection rests solely on the incorrect assumption that the sales proceeds on shares that he purchased prior to the start of the class period were included in the loss calculation (Berman Decl., Ex. L), but the purchase value of those same shares was not. Neither the purchase nor sales values for shares purchased before the start of the Class periods are included in the loss calculation; only buy and sell amounts on shares purchased *during* the period were. Joaquin Decl., ¶ 17.

Mr. Holtgraver also objects on the basis that he does not believe that the cash dividends he received on his YieldPlus shares should be used to reduce the loss he incurred upon selling his shares. Berman Decl., Ex. O. However, the eligible loss calculation under Section 12 tracks the statutory measure of recovery, which mandates that any income received on the investment be deducted in the loss calculation. Joaquin Decl., ¶ 17.

Other objections are to the amount of the Settlement itself, contending that it is too low. Mr. Kitchin maintains that the agreement is too "favorable to Schwab" and "completely unacceptable." Berman Decl., Ex. H. Mr. Rush objects to a "pennies on the dollar of loss" settlement and "would much prefer that counsel take a chance with a jury . . . ." Berman Decl., Ex. K. As explained above, the Proposed Settlement is far better than "pennies on the dollar," *substantially* exceeds most securities class action settlements in both absolute and percentage-of-the-recovery terms, and delivers to Class members now about 45% of their most likely recovery at trial should a jury find Schwab liable. This is far preferable to taking a chance with a jury, who could well award *nothing* to the Class, as has happened to individual YieldPlus investors in 41% of the FINRA arbitrations.

Mr. Rush also contends that the Settlement fails to account for the individual communications that occurred between he and his Schwab financial representatives. Berman Decl., Ex. K. However, Plaintiffs' Section 11 and 12 claims here are based by necessity on misrepresentations and omissions contained in written prospectus materials and not on individual Schwab brokers' oral promises or other information conveyed by the broker to the individual

investor.  Sections 11 and 12 do not apply to oral statements, which would, in any event, arguably create difficult class certification issues.

Mr. Rush also apparently believes that the attorneys here have "skim[med] the easy money" and made "backroom deals" to settle the case.  Mr. Rush does not support these contentions with any factual evidence, and he cannot; the factual record overwhelmingly rebuts his unfounded assumptions.  Defendants have fought this case every step of the way, bringing multiple dismissal motions, opposing class certification, precipitating numerous discovery battles, lodging a plethora of summary judgment and pretrial motions, and agreeing to settle only after trial was imminent. *Nothing* about this hard-fought litigation has been easy.  And the Proposed Settlement itself is not the product of any "backroom deals" but the result of months of arm's-length negotiations held through not one but two independent, objective and well-respected mediators, one a sitting Federal Magistrate Judge (Judge Spero).[9]

The Scientific Spinal Pension Plan (the "Spinal Plan") objects on the sole basis that it is not being provided a "new" opportunity to request exclusion.  Berman Decl., Ex. J.  For support, the Spinal Plan contends that it did not receive the notice of pendency and learned of the litigation "[o]nly upon receipt" of the settlement notice.  Gilardi has confirmed that a notice of pendency was indeed mailed to the Spinal Plan and was not returned as undelivered.  Joaquin Decl., ¶ 23.  In any event, the Court should reject this objection because Fed. R. Civ. P. 23 does not require that second opportunities to opt-out be provided when a certified class action settles.

Rule 23(e)(4) affords the Court *discretion* to "refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so," but it does ***not require*** the settlement to

---

[9] Mr. Rush also complains, without providing any details, that he was informed of the class action only "by chance."  It is clear that Mr. Rush was aware of the case, because he went to the Hagens Berman website and provided information through the site's submission utility.  Further, Gilardi confirms that a notice of pendency was mailed to Mr. Rush at the address found on his objection letter, and the notice was not returned as undeliverable.  Joaquin Decl., ¶ 22.  And although Mr. Rush is dissatisfied that he did not receive a reply from Class Counsel, as a matter of course we do not ordinarily respond to information that comes through the firm's website submission utility unless the person requests a response, which Mr. Rush did not.  Berman Decl., ¶ 65.

1   provide new opt-out rights.  *In re Metlife Demutualization Litig*., 689 F. Supp. 2d 297, 329

2   (E.D.N.Y. 2010); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 114 (2d Cir. 2005).  The

3   notes to the Rule indicate it was intended to apply "in a case that settles after a certification

4   decision if the earlier opportunity to elect exclusion provided with the certification notice has

5   expired by the time of the settlement notice.  A decision to remain in the class is likely to be more

6   carefully considered and is better informed when settlement terms are known."  *See* Rule 23 Notes,

7   2003 Amendments to sub. (e), para. (3).  This is not the case here, where the Proposed Settlement

8   was reached on the eve of trial and approximately six months after the notice of pendency was

9   provided.  Further, the Court has already found that the notice of pendency campaign met

10  minimum due process requirements, and there is no reason why the Classes should be provided

11  additional exclusion opportunities.  *See Reppert v. Marvin Lumber & Cedar Co*., 359 F.3d 53, 56-

12  57 (1st Cir. 2004) (if class member receives the best notice practicable and fails to opt out by the

13  deadline, he is bound by the court's actions concerning the class, including settlement and

14  judgment); *see also Klein v. O'Neil, Inc.*, 2010 U.S. Dist. LEXIS 35183, at *75-80 (N.D. Tex. Apr.

15  9, 2010)  (declining to disapprove settlement on grounds that it did not provide class members with

16  a new opportunity to request exclusion and rejecting class member request to opt-out of settlement

17  on grounds that class member constructively received notice of pendency); *Klein v. O'Neal, Inc.*,

18  2009 U.S. Dist. LEXIS 36395 *10-11 n.4  (N.D. Tex. Apr. 29, 2009) ("the mere possibility of a

19  second opt-out opportunity arising in connection with a settlement could undermine the binding

20  effect of the first opt-out deadline that applies regardless whether a class action is settled").  This

21  Court's prior orders denying the majority of motions for late exclusion agree.

22          In sum, these few objections are not well taken and provide no reason to reject this

23  tremendous settlement.

24  **I.      The Scope of the Settlement Release of Claims is Reasonable and Bounded by the
            Claims Asserted in this Litigation**

25          This Court has ruled that "[t]he released claims should only be those made in the consoli-

26  dated complaint and those closely related thereto."  *In re Zoran Corp. Derivative Litig.*, 2008 U.S.

27  Dist. LEXIS 48246, at *31 (N.D. Cal. Apr. 7, 2008).  The parties have limited the release of claims

28

1   to satisfy this standard and preserved any claims against Defendants for violating California's

2   Unfair Competition Law.  "Released Claims" are limited to claims that were or could have been

3   asserted in this litigation.  Stipulation, ¶ 1.20 (release applies to claims "asserted or that might have

4   been asserted against the Released Parties based upon, arising out of, or related in any way

5   whatsoever to any of the facts, transactions, events, occurrences, disclosurs, statements, acts,

6   omissions or failures to act which were or could have or might have been alleged in or embraced or

7   otherwise referred to or encompassed by the Class Action, or which relate to the subject matter of

8   the Class Action . . . .").  The Stipulation's definition of "Unknown Claims" at ¶ 1.27 similarly

9   bounds those claims by the Consolidated Complaint.

10          The parties agree that these definitions confine the scope of the release to claims arising

11   from purchases of YieldPlus shares during the full range of the Securities Act Class Periods (from

12   May 31, 2006 through March 17, 2008) and for claims based on holdings on September 1, 2006.

13   And unlike the class notice criticized by this Court in *Kakani v. Oracle Corp.*, 2007 U.S. Dist.

14   LEXIS 47515, at *30 (N.D. Cal. 2007), the proposed notice reproduced the release language rather

15   than merely incorporating by reference the definition from the Stipulation.  *See* Joaquin Decl., Ex.

16   A at page 8.

17                                    **IV.     CONCLUSION**

18          For the foregoing reasons, Class Counsel and Lead Plaintiffs respectfully request that the

19   grant final approval to the Proposed Settlement.

20   Dated:  July 23, 2010

21                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                          Reed R. Kathrein
22                                        Peter E. Borkon
                                          715 Hearst Avenue, Suite 202
23                                        Berkeley, CA 94710
                                          Telephone: (510) 725-3000
24                                        Facsimile: (510) 725-3001
                                          reed@hbsslaw.com
25                                        peterb@hbsslaw.com

26

27

28

By: ___s/ Steve W. Berman_____
     Steve W. Berman
     Sean R. Matt
     Erin K. Flory
     Lisa M. Hasselman
HAGENS BERMAN SOBOL SHAPIRO, LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com

*Attorneys for Lead Plaintiffs and the Classes*