Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve W. Berman (*Pro Hac Vice*)
Sean R. Matt (*Pro Hac Vice*)
Erin K. Flory (*Pro Hac Vice*)
Lisa M. Hasselman (*Pro Hac Vice*)
Robert F. Lopez (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
erin@hbsslaw.com
lisah@hbsslaw.com
robl@hbsslaw.com

*Attorneys for Lead Plaintiff YieldPlus Investor Group*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE SCHWAB CORP. SECURITIES LITIGATION | No. 08-cv-01510 WHA |
| THIS DOCUMENT RELATES TO:<br><br>All Actions | DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF FEDERAL AND CALIFORNIA SETTLEMENTS AND FOR AWARD OF ATTORNEYS FEES AND EXPENSES<br><br>Date:       September 22, 2010<br>Time:       3:30 p.m.<br>Judge:      Hon. William H. Alsup<br>Courtroom:  Courtroom 9, 19th Floor |

DECLARATION OF STEVE W. BERMAN IN SUPPORT OF
FINAL APPROVAL OF SETTLMENTS AND FEE PETITION
08-cv-01510 WHA
010036-12  382008 V1

1       I, Steve W. Berman, declare:

2       1.     I am a partner with the law firm of Hagens Berman Sobol Shapiro LLP, one of the

3 counsel representing the Plaintiffs in the above action.  I have personal knowledge of the matters

4 described in this declaration and am competent to testify.

5       2.     I submit this declaration in support of (i) Plaintiffs' Joint Motion for Final Approval

6 of Settlement of Federal Securities Claims; (ii) Plaintiffs' Joint Motion for Final Approval of

7 Settlement of California Class Claims; and (iii) Plaintiffs' Motion for Award of Attorneys' Fees

8 and Expenses.

9 **A.**      **Putting the Settlement Amounts Into Context**

10       3.     I believe that the Proposed Settlements for both the Federal Classes ($200 Million)

11 and the California Class ($35 Million) provide tremendous benefits for the Class members.  The

12 Proposed Settlements are fair, reasonable and adequate and, we believe, deserve this Court's final

13 approval.

14       4.     Our research indicates that almost 60% of securities class actions settled during the

15 14-year period after passage of the Private Securities Litigation Reform Act of 1995 settled for less

16 than $10 million.  *See* **Exhibit A** at 3 (true and correct copy of Ellen Ryan and Laura Simmons,

17 *Securities Class Action Settlements:  2009 Review and Analysis* (Cornerstone Research 2010) (the

18 "Cornerstone Study")).  Settlements exceeding $100 million are rare, comprising only about seven

19 percent of the cases, and settlements over $250 million are rarer still, comprising less than three

20 percent.  *Id.* (Figure 3).

21       5.     The Cornerstone Study is limited to securities cases involving common stock only.

22 *Id.* at 1.  We believe, nonetheless, that it provides a reasonable gauge to measure the benefits of the

23 Proposed Settlements.

24       6.     The median settlement for class actions asserting claims under §§ 11 or 12(a)(2) of

25 the Securities Act, but not § 10(b) of the Exchange Act, is only $3.5 million.  We should note,

26 however, that the sample size is small for this group.  *Id.* at 9.  This nonetheless provides a

27 barometer for the Proposed Settlements.

28

7.     The $200 Million Proposed Settlement for the Federal Classes represents the fourth largest securities settlement in the Ninth Circuit since the passage of the Private Securities Litigation Reform Act of 1995.  *See* **Exhibit B** at 2-3 (chart) (true and correct copy of Securities Class Action Services, *The SCAS 100 for Q4 2009*, at 2-3 (Risk Metrics Group 2010)).

8.     The median settlement as a ***percentage*** of estimated "plaintiffs-style" damages (described at **Exhibit A** at 4) is 2.5%, and only 2.2% for settlements within the Ninth Circuit.  *Id.* at 15.  The Proposed Settlements here are many multiples of this median.

**B.     The Trial Risks and Claim Vulnerabilities Highlight the Reasonableness of the Proposed Settlements**

9.     With the benefit of our Plaintiffs' close guidance, Hagens Berman exercised our judgment based on extensive knowledge of the facts of the case and the legal issues facing the Classes, as well as judgments about the strengths and weaknesses of the case.  After an extensive analysis, we concluded that the terms of the Settlement Agreements in both Settlements are fair, just, and adequate.  We are extremely well-versed in the facts and legal issues to be tried in this case, having undergone discovery, including reviewing hundreds-of-thousands of pages of documents produced by the parties in this case, taking scores of depositions, and engaging in extensive expert discovery.  Our recommendation also takes into account all of the Court's summary judgment and pre-trial rulings.

10.     Plaintiffs' briefs set forth in great detail the risks that informed our decision to recommend the Proposed Settlements.  I will not repeat that level of detail here but instead summarize the risks that were of material concern to us.

**1.     Risks Confronting the Federal Classes**

11.     A unanimous verdict of 12 jurors is difficult to obtain in any case, and especially so in a class action involving complex financial concepts.

12.     Defendants vigorously disputed that Plaintiffs could prove Schwab misrepresented the risk of investing in mortgage-backed securities and corporate-finance bonds.  Defense experts would testify that Defendants and other sophisticated financial institutions viewed mortgage-backed securities as stable, low-risk investments based on both their ratings and on a decade's

worth of performance, and that the housing crisis was unprecedented and unforeseeable; and that the disclosures regarding mortgage-backed securities were adequate.  Report of Dr. Ferrell, Exhibit A to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion in Limine #1 (Dkt. No. 628-1), ¶¶ 19-24, 67-78.  Defendants also produced documents indicating their belief that mortgage-backed securities were not risky, were highly rated and had no history of default.  If the jury accepted these views, only those few investors who purchased late in the class periods could recover.

13.     Discovery did not support the initial complaint's allegation that Defendants misrepresented the objective metric of duration, which left the claims to focus on more subjective notions that the Fund was represented to be less risky than it was.  It is difficult to assess how a jury might respond to this more subjective basis of falsity, especially in light of evidence that the housing crisis was unforeseeable.

14.     Defendants' theory of negative causation was that panic-driven redemptions that forced the Fund to sell assets at fire-sale prices caused the sudden drop in Fund share prices and not the materialization of any concealed risk.  Given the magnitude of the market crash that coincided with the plummet in the Fund's share price, the jury could adopt Defendants' theory.

15.     The Court asked the parties to prepare testimony regarding how the Fund would have performed had its investment in mortgage-backed securities not exceeded 25%.  Defendants' damages expert, Professor James, determined that the Fund would have declined just as much as it did in reality and concluded that the Fund's excess investments in mortgage-backed securities did not cause Plaintiffs' losses.  James modeled the effect on the Fund's NAV had the Fund capped mortgage-backed securities at 5% to 25% and concluded that the Fund would have lost the exact same amount as it did.  We believe that James's methodology is incorrect, but the jury could have relied on it to find that Defendants' misrepresentations did not cause any or even a substantial portion of the Classes' losses.

16.     Plaintiffs faced a material risk that a jury could find that Plaintiffs proved that Defendants issued false statements only late in the class periods, as the housing market accelerated

DECLARATION OF STEVE W. BERMAN IN SUPPORT OF
FINAL APPROVAL OF SETTLMENTS AND FEE PETITION
08-cv-01510 WHA
010036-12  382008 V1

-3-

its deterioration in August 2007 and when the average duration of the Fund's portfolio exceeded one year.  Such a finding would cut substantially the Classes' damages.

17.     We were surprised by the relative dearth of "hot" documents from discovery. Counsel culled only 10 to 20 "hots" from Defendants' millions of pages of documents

18.     Defendants many pre-trial motions, if granted, would result in the exclusion of important liability and damages evidence.  Examples include:  depriving Plaintiffs of their ability to buttress evidence relating to the over-concentration in mortgage-backed securities with an over-concentration in corporate finance bonds; prohibiting the jury from considering the advertising prospectuses, which made aggressive marketing statements positioning the Fund as a cash alternative and an alternative to money market funds; depriving Plaintiffs from presenting a whole host of damning evidence of lack of proper risk-management controls, including evidence that the Fund lacked the tools necessary to manage its new, riskier strategy, and did not disclose this to investors.

19.     Defendants also moved to exclude critical portions of the testimony of Plaintiffs' three experts, Gifford Fong, Candace Preston, and Paul Meyer.  Without Mr. Fong's testimony, the jury will have difficulty assessing the riskiness of the Fund's mortgage-backed securities investments.  Without Ms. Preston's testimony, Plaintiffs cannot prove damages.  And without Mr. Meyer's testimony, the jury may have greater difficulty understanding the nature of Defendants' misrepresentations.

20.     Plaintiffs also moved to exclude certain evidence that, if presented to the jury, could cause jury confusion and undermine Plaintiffs' chances of prevailing.  Plaintiffs seek to exclude (i) evidence of extra-prospectus "disclosures" and Defendants' experts' reports referring to such material; (ii) references to filing prospectuses and SAIs with the SEC and the Financial Industry Regulatory Authority ("FINRA") or that these filings complied with FINRA or SEC regulations; (iii) evidence and argument that the Fund's advertising prospectuses do not qualify as prospectuses; and (iv) the opinions of Defendants' expert Christopher James.  The denial of these motions would have made it more difficult for Plaintiffs to prevail at trial.

**2.      Risks Confronting the California Class**

21.     Although the Court had granted summary judgment on liability against Schwab and in favor of the California Class, the risks of receiving the damages requested in the bench trial remain.

22.     Defendants are still planning on mounting a loss causation challenge at the bench trial.  Defendants' theory of negative causation was that panic-driven redemptions that forced the Fund to sell assets at fire-sale prices caused the sudden drop in Fund share prices and not the materialization of any concealed risk.  Given the magnitude of the market crash that coincided with the plummet in Fund's share price, the Court could adopt Defendants' theory or, if not the Court, the Ninth Circuit.

23.     Defendants will also seek to introduce James's determination that the Fund would have declined just as much as it did had the Fund capped mortgage-backed securities at 5% to 25% of its portfolio.  Further, in his supplemental report for the UCL damages trial, Harvard Professor Allen Ferrell argued that the Fund's investors learned or could have learned about the Fund's true investment strategy well before March 31, 2008, citing a litany of purported disclosures.  *See* **Exhibit C ¶¶** 5-14 (true and correct copy of Supplemental Expert Report of Dr. Allen Ferrell Professor Ferrell).  Professor Ferrell also challenges Plaintiff's assertion that the Fund's losses were caused by exceeding the 25% concentration policy limit on the basis that the Fund's peers with higher allocations to non-agency mortgage-backed securities performed better than peers with lower non-agency mortgage-backed securities.  *Id.* at ¶¶ 17-18.  Plaintiff has viable rebuttal arguments to Ferrell, but the Court nonetheless could be persuaded by Ferrell's analysis.

24.     There is a large gulf between the damages calculations done by Plaintiff's and Defendants' experts.  In the Court's March 30, 2010 Request for Calculations for Trial (Dkt. No. 539), the Court requested the parties "to run calculations to ascertain how the fund would have done if the 25-percent non-guaranteed mortgage[]-back[ed] securities limitation had been honored with the excess over the 25 percent being:  (a) kept in cash (Calculation One), and (b) distributed pro rata among the other non-guaranteed mortgage-back[ed] securities investments (up to the limit of any other industry limitation) (Calculation Two)."

25.     James's numbers, without any prejudgment interest, are as follows:  Calculation One, $12.1 million; and Calculation Two, $5.5 million.  *See* **Exhibit D** at ¶ 8 (true and correct copy of Supplemental Expert Report of Professor Christopher M. James).  These numbers increased to $13,600,000 and $6,200,000, respectively, after James applies prejudgment interest at a "risk-free" one-year Treasury rate rather than the 7% permitted that Plaintiff believe is proper under California law.  *Id.* at ¶ 26.  Plaintiff's expert's numbers are $52,203,379 and $33,014,433, respectively.  *See* **Exhibit E** (true and correct copy of Amended Supplemental Expert Report of Candace L. Preston Regarding California State Damages).[1]  The primary difference between the experts with respect to Calculation One is that James assumes that reallocation to cash is just that – cash that sits and does not earn any type of return.  *Id.* at ¶ 11.  In contrast, Plaintiff's Calculation One includes a "risk-free" 4-week Treasury bill return.

26.     Another difference, and one that comprises the principal difference between the experts with respect to Calculation Two as well, is the manner in which James determines what constitutes an "industry" for purposes of applying the 25% limit.  Rather than using an industry "sector" approach that focuses on correlated risk, as Plaintiff's expert did, James adopted a more granular approach using Bloomberg classifications.  *See* **Exhibit D** at ¶¶ 13, 36-37.  Although we believe that Plaintiff's approach is more reasonable, there is risk that the Court would select James's methodology.

27.     Defendants' motions in limine, if granted, have the potential to undermine Plaintiff's chances of obtaining a favorable restitution verdict on the UCL claim.  Defendants moved to exclude Mr. Fong's opinion that non-agency mortgage-backed securities caused the Fund's losses (Dkt. No. 657), an opinion that was relevant to the UCL damages trial.  Mr. Fong is an important causation witness, and excluding this opinion would materially harm Plaintiff's chance of prevailing at trial.  Defendants also moved under *Daubert* to strike Plaintiffs' damages

---

[1] Attached as Exhibit P is a true and correct copy of the Report of H. Gifford Fong Re: Requested Summary Judgment Calculations, which describes the reallocations underpinning Ms. Preston's damages calculations.

expert, Candace Preston (Dkt. No. 663).  This motion seeks to exclude Preston's damages opinion in total and in part.  Plaintiff cannot prove damages without Preston's testimony

### 3. Plaintiffs still believe their case is strong

28.     We have strong counters to the foregoing defense positions, and Plaintiffs still believe in the strength of their case notwithstanding the foregoing risks.  However, trials and appeals are fraught with uncertainty, and it is impossible to predict an end result.  This point is highlighted by the track record in individual arbitrations against Schwab involving the YieldPlus Fund, as detailed below.

### 4. Schwab has prevailed in a substantial number of FINRA arbitrations relating to YieldPlus

29.     The track record in the YieldPlus Fund arbitrations before FINRA provide another relevant beacon for assessing the reasonableness of the Proposed Settlements.

30.     The arbitration results are publicly available at the following Web address: http://www.finra.org/ArbitrationMediation/FormsTools/p018127.  We examined all decisions made for claims against Schwab involving the YieldPlus Fund (using the search terms "YieldPlus" and "Yield Plus") and have compiled the statistics presented below.  We excluded any decisions that were "stipulated."

31.     There have been 44 individual YieldPlus investor arbitrations against Schwab relating to YieldPlus that went to verdict.  The table below summarizes those results.  True and correct copies of the arbitration decisions are attached at **Exhibit F**.

| Line | Case No. | Amount Claimed[2] | Amount Awarded | Percent |
|------|----------|-------------------|----------------|---------|
| 1 | 08-04701 | $167,797 | $25,000 | 15% |
| 2 | 08-03250 | $72,000 | $0 | 0% |
| 3 | 08-02118 | $19,820 | $14,570 | 74% |
| 4 | 08-03052 | $101,200 | $0 | 0% |
| 5 | 07-02674 | $18,425 | $18,425 | 100% |
| 6 | 09-06614 | $22,638 | $18,955 | 84% |
| 7 | 09-06630 | $11,086 | $9,970 | 90% |
| 8 | 09-06482 | $25,000 | $15,155 | 61% |

---

[2] The amounts claimed reported here exclude claims for fees, costs, and interest.  Punitive damages requests, which not awarded in any of these arbitrations, are also excluded.

| 9 | 09-06541 | $25,000 | $0 | 0% |
|---|---|---|---|---|
| 10 | 09-05245 | $13,023 | $9,356 | 72% |
| 11 | 09-03736 | $22,726 | $10,736 | 46% |
| 12 | 08-01764 | $115,000 | $0 | 0% |
| 13 | 09-04755 | $19,675 | $0 | 0% |
| 14 | 08-03602 | $81,000 | $37,500 | 47% |
| 15 | 09-00588 | $263,000 | $0 | 0% |
| 16 | 09-03864 | $25,000 | $0 | 0% |
| 17 | 09-02907 | $13,755 | $0 | 0% |
| 18 | 09-03230 | $20,051 | $0 | 0% |
| 19 | 09-02752 | $15,361 | $15,361 | 100% |
| 20 | 09-03491 | $23,633 | $23,633 | 100% |
| 21 | 08-02307 | $91,022 | $74,430 | 82% |
| 22 | 09-02231 | $25,000 | $5,636 | 23% |
| 23 | 09-01949 | $25,000 | $14,872 | 60% |
| 24 | 08-02552 | $147,176 | $80,000 | 54% |
| 25 | 09-02574 | $24,153 | $0 | 0% |
| 26 | 08-03215 | $179,613 | $125,729 | 70% |
| 27 | 08-02417 | $77,218 | $74,745 | 97% |
| 28 | 08-02307 | $91,022 | $74,430 | 82% |
| 29 | 09-01081 | $13,264 | $11,129 | 84% |
| 30 | 08-01325 | $190,944 | $0 | 0% |
| 31 | 09-00243 | $9,178 | $8,116 | 88% |
| 32 | 08-03017 | $56,711 | $0 | 0% |
| 33 | 08-02698 | $230,515 | $100,000 | 43% |
| 34 | 09-00346 | $18,624 | $0 | 0% |
| 35 | 09-00901 | $24,488 | $0 | 0% |
| 36 | 09-00521 | $25,000 | $0 | 0% |
| 37 | 08-02408 | $115,406 | $0 | 0% |
| 38 | 09-00097 | $13,021 | $0 | 0% |
| 39 | 09-00741 | $25,000 | $17,779 | 71% |
| 40 | 09-00300 | $23,301 | $11,400 | 49% |
| 41 | 08-03213 | $18,093 | $0 | 0% |
| 42 | 08-03125 | $16,945 | $5,400 | 32% |
| 43 | 08-01888 | $42,122 | $4,145 | 10% |
| 44 | 07-03069 | $667,000 | $542,340 | 81% |

32.    Investors prevailed in only 59% (or 26) of the arbitrations.  There have been 18 outright losses.  For the victors, recoveries range from 10% to 100% of the amounts claimed, for an average of 66%.

DECLARATION OF STEVE W. BERMAN IN SUPPORT OF
FINAL APPROVAL OF SETTLMENTS AND FEE PETITION
08-cv-01510 WHA
010036-12  382008 V1

-8-

33.     In most cases, claimants brought individual causes of action under state law that may be easier to prove than violations of Sections 11 and 12 of the Securities Act.  Such claims include negligence, breach of fiduciary duty, and unsuitability.

34.     These arbitration results illustrate the risks of proceeding to verdict against Schwab.

**C.     Discovery and Investigation Were Complete at the Time of Settlement**

35.     The Proposed Settlement was reached on the eve of trial and after protracted motion practice and an intensive period of document and deposition discovery, as chronicled below.

> **1.     This action has a lengthy procedural history with extensive motion practice, and the parties were fully prepared for trial**

36.     After the initial complaint asserting Securities violations was filed on March 13, 2008, the Court consolidated the subsequently filed actions on June 1, 2008 (Dkt. No. 50) and appointed Lead Plaintiffs on July 3, 2008 (Dkt. No. 73).  At the same time, the Court consolidated the separate state-law claims that arose from Defendants' violation of § 13(a) of the Investment Company Act of 1940.

37.     Specific to the California Class, Plaintiffs brought state-law claims for intentional interference with contractual relations, violations of CALIFORNIA BUS. & PROFS. CODE §§ 17200 *et seq*. (the "17200 Claim"), and breach of fiduciary duty.  Plaintiffs' claims for violation of section 17200 were predicated on alleged violations of sections 13(a) and 48(a) of the Investment Company Act of 1940.  Plaintiffs alleged that Defendants violated the Investment Company Act because the YieldPlus Fund deviated from its fundamental investment policy not to concentrate more than 25% of its assets in any one industry without first holding a shareholder vote.  More specifically, Plaintiffs alleged that the YieldPlus Fund should have held a shareholder vote when it redefined mortgage-backed securities as not part of an industry for purposes of its concentration policy.  Plaintiffs asserted the 17200 Claim in two counts (Counts V and VII), on behalf of two putative subclasses of YieldPlus Fund investors:  (1) a pre-breach class defined as "[a]ll persons or entities who owned shares of the Fund at any time before the Fund's investments in mortgage-backed securities exceeded 25% of its assets, and, by continuing to own those shares suffered damages as a result thereof"; and (2) a post-breach class defined as "[a]ll persons or entities who

acquired shares of the Fund at any time after the Fund's investments in mortgage-backed securities began to exceed 25% of its assets, and, by continuing to own those shares suffered damages as a result thereof."  Plaintiffs named Schwab Investment Management, Inc., Schwab Investments, Evelyn Dilsaver, Randall W. Merk, George Pereira, Mariann Byerwalter, William A. Hasler, Robert G. Holmes, Gerald B. Smith, Donald R. Stephens, Michael W. Wilsey, Kimon P. Daifotis, and Matthew Hastings as defendants in the 17200 Claim.

38.     In November 2008, Defendants filed four motions to dismiss or strike the First Consolidated Amended Complaint.  Dkt. Nos. 115, 116, 117, 123.  After extensive briefing and a hearing, the Court resolved Defendants' motions on February 4, 2009 (Dkt. No. 164), and lifted the stay of discovery.

39.     In May 2009, Plaintiffs moved for class certification.  Dkt. No. 189.  Substantial briefing ensued and, after holding a hearing, on August 21, 2009, the Court certified two federal classes.  The Court also certified a California-only class consisting of "California resident investors who held shares in the fund on September 1, 2006" but denied a nationwide class under section 17200 and dismissed Plaintiffs' section 17200 claims against Defendant Kimon P. Daifotis.  Dkt. No. 233.

40.     On September 21, 2009, the Court granted Plaintiffs' motion to approve class notice.  Dkt. No. 239.  Plaintiffs then filed a motion to amend the complaint to reflect evidence adduced in discovery and, after additional briefing, the Court granted the motion in part.  Dkt. No. 246.

41.     Numerous discovery disputes erupted that generated a substantial volume of letter briefing, and the Court held ***nine*** discovery hearings.  *See* Dkt. Nos. 198 (May 19, 2009), 258 (Oct. 30, 2009), 290 (Nov. 30, 2009), 314 (Dec. 23, 2009), 324 (Jan. 7, 2010), 356 (Jan. 20, 2010), 402 (Feb. 11, 2010), 431 (Feb. 24, 2010), 621 (Apr. 12, 2010).  Many other discovery disputes were resolved without Court intervention.

42.     After completing discovery and exchanging expert reports, the parties filed various summary-judgment and related motions with reams of briefing and exhibits.  Each side filed three summary-judgment motions or motions to strike apiece (Dkt. Nos. 372, 377, 379, 383, 384, 390),

which the Court largely resolved in a series of rulings issued in March and April, 2010 (Dkt. Nos. 538, 584, 585, 611).

43.     Plaintiffs moved for partial summary judgment on the 17200 claim and asked the Court to find, as a matter of law, that Defendants violated section 13(a) of the Investment Company Act of 1940 because the Fund should have held a shareholder vote when it redefined mortgage-backed securities as not part of an industry for purposes of its concentration policy.  Defendants moved for summary judgment on the 17200 Claim on the ground that by redefining mortgage-backed securities as not part of any industry, the YieldPlus Fund had not changed its fundamental investment policy and thus did not violate section 13(a) of the Investment Company Act of 1940. Amicus filed briefing, which required responses from the parties.  *See* Dkt. Nos. 510, 512, 514. The independent trustee defendants (Byerwalter, Hasler, Holmes, Smith, Dorward, Stephens, and Wilsey) also moved for summary judgment on the 17200 Claim on the additional ground that Plaintiffs had no basis for seeking restitution against them.

44.     On March 30, 2010, the Court issued its summary judgment order finding a violation of section 13(a) of the Investment Company Act of 1940.  The Court held that, because the Fund in 2001 had defined mortgage-backed securities to be part of an industry for purposes of its concentration policy, it could not redefine mortgage-backed securities as not part of an industry without first holding a shareholder vote (that was not held).  Dkt. No. 538.

45.     On April 8, 2010, the Court issued an order granting the independent trustee defendants' motion for summary judgment on the 17200 Claim (Dkt. No. 585), but denying all other summary judgment motions by Defendants.

46.     On May 3, 2010, the remaining individual defendants named in the 17200 Claim (Schwab, Dilsaver, Merk, Pereira, and Hastings), filed an unopposed motion for summary judgment on the ground that plaintiffs would not be able to establish that they were entitled to restitution from them.  The Court granted this motion on May 6, 2010.  Dkt. No. 750.

47.     Many motions *in limine* and to strike experts were filed.  Defendants filed twelve (Dkt. Nos. 487, 644, 648, 650, 651, 653, 655, 657, 661, 663, 665, 668); Plaintiffs filed five (*see* Dkt. Nos. 627, 630, 634, 637, 640).  Briefing was complete on these motions.

48.     The parties made all of their pretrial disclosures, including witness and exhibit lists, jury instructions, jury verdict forms and associated briefs.  They lodged their Pretrial Conference Statements on April 19, 2010.  Dkt. Nos. 673-81.  Trial was scheduled to begin on or around May 10, 2010.

49.     This case was trial ready at the time the Settlement Agreement was inked on April 23, 2010 for the Federal Claims and the settlement was reached on May 5, 2010 for the California Class.

**2.     Extensive discovery was taken**

50.     Defendants produced over 10 million documents comprised of more than 28 million pages.  Most of the production consisted of e-mails, PowerPoint presentations, memoranda, spreadsheets and other documents maintained in "native" electronic format.  Hagens Berman loaded Schwab's immense production into sophisticated search databases, ran innumerable searches on the databases, and reviewed hundreds-of-thousands of documents.  Some of the production was in hard-copy and was reviewed page-by-page.

51.     Defendants also produced a high volume of portfolio data, including monthly investor purchase and sale data, assets under management, net asset value, cash positions, net subscriptions for each trading day between July 31, 2007 and September 17, 2009, month end account balances from March 2008 to August 2009, list of accounts with California addresses, list of accounts holding shares of the Fund on June 30, 2007, daily accrued dividends per share for each day October 1999 to December 2008, and information relating to settlements and arbitrations.

52.     Twenty-six depositions were taken during discovery.  Plaintiffs noted and took 14 depositions, including experts, and attended others.  The Schwab employees deposed include an internal auditor (Donna Schiano), a marketing director (Keith Maddock), two portfolio managers (Steve Chan and Matt Hastings), the Fund's Treasurer (George Pereira), the Fund's Chief Investment Officer (Kimon Daifotis), the former and current Presidents of Charles Schwab Investment Management (Evelyn Dilsaver and Randall Merk), a former Managing Director in the Credit Department (Kevin Healey), and a credit analyst (Janice Diamond).  Plaintiffs also deposed Defendants' experts (Christopher James, Allen Ferrell, and Tsvetan Beloreshki).

53.     Depositions were also taken of outside vendors such the public relations agency that the Fund managers used (Sun Star), and firms providing analytical or pricing information for the portfolio (Citigroup's YieldBook, Barclay's POINT, and IDC).

54.     Defendants took the depositions of all six named Plaintiffs and Plaintiffs' three experts (Gifford Fong, Candace Preston, and Paul Meyer).  The experts for all parties produced numerous reports.

55.     In sum, Hagens Berman and Lead Plaintiffs were well-positioned based on discovery and motion practice to fully assess the merits and risks of the litigation.

**D.     The Expense and Likely Duration of the Litigation in the Absence of a Settlement Are Substantial**

56.     The Proposed Settlement guarantees a substantial recovery for the Class now while obviating the need for a lengthy, complex, and uncertain trial.

57.     If this matter went to verdict, a lengthy appeal period would certainly result.  The Ninth Circuit currently ranks the slowest among the 12 circuit courts for median time to resolve an appeal, requiring on average nearly 18 months from filing the notice of appeal to disposition.  *See* **Exhibit G** (true and correct copy of reprint from the Federal Judicial Center judicial-caseload profiles, available on-line at http://www.uscourts.gov/cgi-bin/cmsa2009.pl).

**E.     The Parties Bargained in Good Faith, and There Was No Collusion**

58.     The Proposed Settlement is the result of serious, informed, non-collusive negotiations conducted in good faith over many months and was reached only after Hagens Berman diligently prosecuted the claims of the Classes.  Aided by Hagens Berman, Lead Plaintiffs carefully considered the likelihood of success against Defendants, the potential total damages that could be recovered against them, as well as the uncertain outcome and risk of any trial, especially in complex actions such as this, and the difficulties and delays inherent in such litigation.

59.     Defendants and the Classes first participated in a mediation session before Magistrate Judge Joseph Spero in September 2009.  No agreement was reached during that mediation.

60.     Several mediations sessions followed with retired Magistrate Judge Edward Infante. No agreement was reached.

61.     After a fifth formal mediation on April 16, 2010, before Magistrate Judge Spero, the Federal Classes and Defendants reached final agreement as to the Securities Act claims.  *Id.*  The Lead Plaintiffs were present for all of these mediation sessions, and had their own meetings without Hagens Berman's presence and exercised independent judgment.

62.     The parties did not settle the California Class's UCL claim at the fifth session and continued to prepare for a damages bench trial on that claim scheduled to begin May 10, 2010. Mediation efforts continued under the auspices of Magistrate Judge Spero, and a settlement was reached on May 5, 2010, which was embodied in the May 14, 2010 written agreement. Throughout this process, Class Representative Bob Levin was actively involved and exercised independent judgment.

**F.     The Class Member Reactions Have Been Positive with Few Objections**

63.     The period to object stays open until August 24.  Through July 22, Hagens Berman has received only eight objections from the universe of 250,399 Class members.

64.     True and correct copies of the objections received, along with the relevant Record of Fund Transactions, are found at **Exhibits H-O** as follows:  Thomas Kitchen (**Exhibit H**); Thomas Grady (**Exhibit I**); Scientific Spinal Pension Plan (**Exhibit J**); Dale Rush (**Exhibit K**); Edward Eggers (**Exhibit L**); Martin Robins (**Exhibit M**); Eileen Montellese for Mary Higgins (**Exhibit N**); and Edward Holtgraver (**Exhibit O**).

65.     Mr. Rush complains that he was informed of the class action only "by chance."  Mr. Rush does not provide any supporting details.  We do know that Mr. Rush went to the Hagens Berman website and provided information through the site's submission utility, and he is dissatisfied that he did not receive a reply from Hagens Berman.  As a matter of course, we do not ordinarily respond to information that comes through the firm's website submission utility unless the person requests a response.  In his submission, Mr. Rush did not request a response.

1

**G.      Information Relating to Hagens Berman's Reasonable Fee Request**

2       66.      After appointing the Lead Plaintiffs, this Court instructed them to reopen their

3   search for lead counsel.  Order Appointing Lead Plaintiff (filed July 3, 2008), Dkt. No. 73, at 7-8.

4   Lead Plaintiffs did as instructed and interviewed a number of prominent securities class-action

5   firms.  This process was highly competitive and robust.  Lead Plaintiffs entered into extensive and

6   competitive fee negotiations with the final firms they considered retaining.  *See* Joint Declaration

7   of the Yieldplus Investor Group in Support of Motion for Lead Counsel (filed under seal Aug. 14,

8   2008), at 2-4.  During these negotiations, the parties wrestled back and forth over different fee

9   structures and incentives.  Finally, Lead Plaintiffs and Hagens Berman settled on a fee structure

10  that would start at 8% of any recovery of less than 10% of allowable losses, and would increase

11  incrementally for each 10% increment of allowable losses recovered.  Allowable losses were to be

12  calculated on a claims-made basis,[3] based on expert calculation of damages, and the percentage

13  claimed or recovered.  For example, if hypothetical allowable claimed damages were $1 billion and

14  the case settled for $400 million, the fee thus would be 8% of the first $99 million, 9% of the

15  second $100 million, 10% or the third $100 million and 11% or the third 100 million, or

16  $37,920,000 in total or 9.5% overall.  In addition, the fees paid under this structure would be the

17  only payment to Hagens Berman for litigation expenses; they would not be separately reimbursed.

18      67.      In this case, the recovery for the federal class claims is $200 million, which is a

19  remarkable *42.8 to 45.5%* of the most likely damages recovery.  It is also a large share of the

20  largest recoverable losses.  Based on the §§ 11 and 12 damages calculated by Plaintiffs' damage

21  expert, Candace Preston, Hagens Berman has agreed to use the § 12 damages, which yield the

22  largest lost recoverable to the Class, or $855,544,974.  The recovery is thus 23.38% of largest

23  recoverable damages.  This recoverable loss figure is higher than the corresponding figure set forth

24  in the Supplemental Declaration of Candace L. Preston In Support of Settlement (filed July 23,

25  ───────────────

26      [3] This provision was mooted by the Settlement Agreements' arrangement that did not require
    Class Members to submit any claim form.  *See* Notice of Pendency and Proposed Settlement of
27  Class Action, Exhibit A-1 to Stipulation of Settlement (filed Apr. 23, 2010), Dkt. No. 693-1, at pp.
    44-45 of 59; Notice of Proposed Settlement of California Class Action, Exhibit A-1 to Stipulation
28  of Settlement for the California Class (filed May 17, 2010), Dkt. No. 784, at p.46 of 88.  Every
    Class Member with recognized losses who did not opt out thus will share in a settlement fund.

2010), which, based on more finely tuned data, calculates § 12 damages at $711,201,192, yielding a recovery of 28.1% of damages.  If § 11 damages had been used, the recovery would have been 38.1%.

68.     Applying the retention grid to the recovery of 23.38%, the fee for the federal class settlement is 8.80% of the Settlement Fund, calculated as follows:

| Percent Increments | Dollar Increments of Total Damages | Fee Percent | Fee |
|---|---|---|---|
| 9.00% | 76,999,047.66 | 8.00% | $6,159,923.81 |
| 10.00% | 85,554,497.40 | 9.00% | $7,699,904.77 |
| Sub Total | 162,553,545.06 | | |
| 4.38% | 37,446,454.94 | 10.00% | $3,744,645.49 |
| Total Fee | 200,000,000.00 | | $17,604,474.07 |
| | Total Fee Percent | 8.80% | |

69.     The recovery for the California class claims is $35 million.  Based on Ms. Preston's calculations, the damages for those claims ranged from $33,014,433 to $ 52,203,379, depending on hypothetical alternative portfolio allocations, with an average damage of $42,608,906.  Hagens Berman, with the consent of the class representative, has agreed to use the average for those damages, or a recovery of 82.14% or the $35 million recovery.

70.     Applying the retention grid to the recovery of 82.14% of damages, the fee for the California class is 11.71% or $4,100,166.51, calculated as follows:

| Percent Increments | Dollar Increments of Total Damages | Fee Percent | Fee |
|---|---|---|---|
| 9.00% | 3,834,801.54 | 8.00% | $306,784.12 |
| 10.00% | 4,260,890.60 | 9.00% | $383,480.15 |
| 10.00% | 4,260,890.60 | 10.00% | $426,089.06 |
| 10.00% | 4,260,890.60 | 11.00% | $468,697.97 |
| 10.00% | 4,260,890.60 | 12.00% | $511,306.87 |
| 10.00% | 4,260,890.60 | 13.00% | $553,915.78 |
| 10.00% | 4,260,890.60 | 14.00% | $596,524.68 |
| 10.00% | 4,260,890.60 | 15.00% | $639,133.59 |
| Sub Total | 33,661,035.74 | | |
| 3.14% | 1,338,964.26 | 16.00% | $214,234.28 |
| Total Fee | 35,000,000.00 | | $4,100,166.51 |
| | Total Fee Percent | 11.71% | |

1

2          71.      Additionally, while Hagens Berman has incurred $2,696,365.42 in litigation

3    expenses in prosecuting the Federal and California claims, *see infra* at ¶ 79, we have agreed not to

4    seek reimbursement of those out-of-pocket expenditures from the Settlement Funds.  Hagens

5    Berman's expenses will be reimbursed from our own award of fees, thereby reducing our

6    percentages of the recoveries for fees to roughly 7.7% of the Federal Settlement Fund and 10.6% of

7    the California Settlement Fund (after dividing expenses between the funds based on the funds'

8    proportionate sizes).  Claims-administration expenses, however, can be reimbursed from the

9    Settlement Funds.

10         72.      In short, the percentages of the common funds requested by Hagens Berman as fees

11   for its efforts and reimbursement of its expenses reflect Lead Plaintiffs' best efforts to satisfy this

12   Court's request and honor their PSLRA-mandated fiduciary duty to the classes they represent.

13   They are also deeply discounted from the Ninth Circuit-sanctioned fee benchmark of 25% of the

14   common fund and other fee awards in case involving mega-fund recoveries.  Each of the six co-

15   Lead Plaintiffs thus submit declarations supporting Hagens Berman's fee request.

16         73.      Unlike other class actions where many class members must take affirmative steps to

17   share in the benefits, Class Members here need not submit any claim form or take any other

18   affirmative action to receive their shares of the Settlements.  Through Schwab's own records, the

19   Claims Administrator has all the necessary information for disseminating Class Members' pro rata

20   shares of the Settlements.

21         74.      From the outset, Hagens Berman engaged in a concerted effort to obtain the

22   maximum recovery for the Class.  Our investigation and skillful work enabled us to plead detailed

23   allegations and defend these allegations against a series of dismissal motions.  We obtained certifi-

24   cation of a national class of all federal claims and a California class for the Unfair Competition

25   Law claim.  After completing discovery and exchanging expert reports on a relevant expedited

26   schedule, the parties filed various summary-judgment and related motions, which the Court largely

27   resolved in a series of rulings issued March and April, 2010 (Dkt. Nos. 538, 584, 585, 611).

28   Among them, the Court granted summary judgment in Plaintiffs' favor on the central issue of

DECLARATION OF STEVE W. BERMAN IN SUPPORT OF          -17-
FINAL APPROVAL OF SETTLMENTS AND FEE PETITION
08-cv-01510 WHA
010036-12 382008 V1

liability under the California Class's UCL claim, which this Court had identified as "novel." These successes, coupled with the fact that Hagens Berman has demonstrated a willingness and ability to prosecute other, similarly complex cases such as this throughout trial and appeals, were undoubtedly key factors encouraging Defendants to engage in settlement discussions, and added valuable leverage in the negotiations, ultimately resulting in the recoveries for the Classes.

75.     The various Defendants were represented by Morrison Foerster LLP, and Covington Burling LLC, among the country's largest law firms and prominent fixtures of California's legal community. That Hagens Berman achieved these settlements for the Federal and California classes in the face of formidable legal opposition further evidences the quality of our work.

76.     Throughout this entire process, Hagens Berman litigated this case with efficiency. All of the work was handled by one law firm, using a small number of experienced attorneys. Only six lawyers handled the bulk of the work over the entire course of this consolidated litigation. Assignments were allocated so that work was performed expeditiously, efficiently and in an organized manner. Repetition and needless review was completely avoided.

77.     Of the eight objections that have been sent to the Court as of July 22, 2010, only two objected to the fee presently sought. One objection is based solely on the Class Member's dissatisfaction with the amount of the Federal Settlement and how his losses are calculated; the second simply objects to "paying attorneys eight times my potential remuneration …." Exhibits K and O. The Notices to the Classes also advised Class members that Hagens Berman would apply for reimbursement of Lead Plaintiffs time and expenses up to $25,000, and no Class member has to date objected to such an award.

78.     Class Counsel's lodestar is $6,290,957 and its litigation expenses are $2,696,365, for a total investment of $8,993,242. A breakdown of the lodestar by lawyer or paralegal is as follows:

| | HOURS TOTAL | HOURLY RATE | LODESTAR TOTAL |
|---|---|---|---|
| TIME | | | |
| Garcia, Adrian (PL) | 93.50 | $ 150.00 | $ 14,025.00 |

|  | HOURS TOTAL |  | HOURLY RATE |  | LODESTAR TOTAL |
|---|---|---|---|---|---|
| Miller, Brian (PL) | 356.90 | $ | 150.00 | $ | 53,535.00 |
| O'Hara, Chris (P) | 515.10 | $ | 380.00 | $ | 195,738.00 |
| Flexer, Carrie (PL) | 105.90 | $ | 150.00 | $ | 15,885.00 |
| Cox, Colleen (A) | 1,021.60 | $ | 375.00 | $ | 383,100.00 |
| Kuhlman, D (A) | 724.80 | $ | 375.00 | $ | 271,800.00 |
| Van Diest, Dawn (PL) | 12.00 | $ | 150.00 | $ | 1,800.00 |
| Flory, Erin (P) | 1,570.90 | $ | 525.00 | $ | 824,722.50 |
| Byzewski, Elaine  (P) | 25.25 | $ | 384.90 | $ | 9,718.75 |
| Lang, Jeff (A) | 10.30 | $ | 325.00 | $ | 3,347.50 |
| Friedman, Jeff  (P) | 127.00 | $ | 496.75 | $ | 63,087.50 |
| Day, Jenel (PL) | 57.50 | $ | 150.00 | $ | 8,625.00 |
| Hasselman, Lisa (A) | 1,575.25 | $ | 375.00 | $ | 590,718.75 |
| Quon, Nancy (PL) | 384.90 | $ | 150.00 | $ | 57,735.00 |
| Borkon, Peter (A) | 783.00 | $ | 425.00 | $ | 332,775.00 |
| Lopez, Rob (A) | 478.90 | $ | 350.00 | $ | 167,615.00 |
| Haegele, Rob (PL) | 1,214.20 | $ | 150.00 | $ | 182,130.00 |
| Kathrein, Reed (P) | 1,536.80 | $ | 580.31 | $ | 891,816.25 |
| Matt, Sean (P) | 2,797.40 | $ | 505.74 | $ | 1,414,767.50 |
| Berman, Steve (P) | 1,243.10 | $ | 650.00 | $ | 808,015.00 |
| Totals | 14,673.30 |  |  | $ | 6,290,956.75 |

* (P) = Partner
  (A) = Associate
  (PL) = Paralegal

79.     My firm has expended a total of $2,696,365 in unreimbursed litigation expenses in prosecuting this litigation.  They are the type of expenses typically billed by attorneys to paying clients in the marketplace and include such costs as fees paid or incurred to experts, computerized research and other services, and travel in connection with this litigation through July 22, 2010. These expenses are broken down as follows:

|  | COSTS | | HOURS TOTAL |
|---|---|---|---|
| 010 | Airfare | $ | 41,133.49 |
| 018 | Court Reporters | $ | 4,676.61 |
| 020 | Costs | $ | 14,026.01 |
| 032 | Depositions | $ | 59,995.17 |
| 033 | Document Storage | $ | 34,598.44 |
| 035 | Outside Photocopies | $ | 10,361.73 |
| 040 | Expert Fees | $1,780,027.29 |
| 050 | Federal Express | $ | 65.84 |
| 053 | Hotel | $ | 14,913.70 |
| 055 | Lexis Nexis | $ | 25,459.88 |

| COSTS | | | HOURS TOTAL |
|---|---|---|---|
| 058 | Marketing | $ | 744.90 |
| 059 | Meals | $ | 2,653.90 |
| 060 | Messenger / Process Svc | $ | 8,205.10 |
| 061 | Mediation | $ | 19,238.26 |
| 065 | On-Line Services | $ | 45,491.10 |
| 070 | Transportation | $ | 7,687.17 |
| 071 | Parking | $ | 1,249.50 |
| 072 | Pro Hac Vice | $ | 1,470.00 |
| 076 | Public Relations | $ | 13,444.56 |
| 085 | Research | $ | 276.25 |
| 092 | Telephone - Other | $ | 3,570.89 |
| 098 | UPS Charges | $ | 5,338.76 |
| 111 | Video Transcripts | $ | 1,303.00 |
| 112 | CD / VDV / Video Duplic. | $ | 104.03 |
| 115 | Witness Fee | $ | 60.00 |
| | Total Direct Costs Paid | $2,096,095.58 | |
| | | | |
| 040 | Experts - Fin. Mkts Analysis | $ | 118,150.22 |
| 040 | Experts - Gifford Fong Assoc | $ | 415,701.40 |
| | Total Direct Costs Owing | $ | 533,851.62 |
| | | | |
| 045 | FAX - Seattle | $ | 79.00 |
| 075 | Postage | $ | 331.97 |
| 077 | Internal Photocopies | $ | 66,007.25 |
| | Total Indirect Costs | $ | 66,418.22 |
| | | | |
| | Total Costs | $2,696,365.42 | |
| | | | |
| | Total Investment | $8,993,242.17 | |

80.     The litigation expenses incurred in prosecuting this case are reflected in the books and record of this firm.  These books and records are prepared from expense vouchers and check records and are in accurate record of the expenses incurred.

81.     Our work and expenses cannot be reliably segregated between the federal and California claims.  There was substantial overlap of labor on the claims.  In many instances it would have been entirely arbitrary to assign particular work or expenses to one claim or another.

82.     Hagens Berman's lodestar is reasonable.  Given the agreement with Lead Plaintiffs that capped attorneys fees at a deeply discounted percentage of the recovery, we were amply motivated to prosecute this case efficiently.  Opposing the armies of attorneys representing

1  Defendants from the prominent law firms of Morrison Foerster LLP, and Covington Burling LLC,

2  were only six Hagens Berman lawyers who performed most of the work (over one thousand hours

3  each) investigating and prosecuting the Classes' claims, supplemented by seven other lawyers who

4  devoted fewer hours (ranging from 25 to 783 hours) to specific projects over the case's two-and-a-

5  half-year span.  Typically, only one attorney appeared for the Classes at any deposition or court

6  hearing.  A similarly skeletal arrangement governed motions practice, where usually one or two

7  lawyers worked on any brief, including such major efforts as dismissal, class-certification and

8  summary-judgment briefing.  Further, only a total of 20 timekeepers worked on the case.  Aside

9  from the attorneys, only one of these timekeepers (the principal paralegal on the case) recorded

10  more than a thousand hours, and much of that was unavoidably dedicated to trial preparation late in

11  the case.  Class Counsel also strictly limited the number of depositions, noticing only 14 fact and

12  expert depositions (while Defendants noticed 12).

13        83.  The expertise and experience of lead counsel is another important factor in setting a

14  fair fee.  As demonstrated by our firm résumé, attached hereto as Exhibit Q, Hagens Berman is

15  among the most experienced and skilled practitioners in the securities litigation field, and has long

16  and successful track records in such cases.  Hagens Berman is a nationally-recognized law firm,

17  with offices in Berkley, Seattle, Boston, Chicago, Los Angeles and Phoenix.  We have been rated

18  by the *National Law Journal* in the top ten of plaintiffs' firms in the country.  The firm has

19  extensive experience litigating complex class actions asserting claims of securities, investment

20  fraud, product liability, tort, antitrust, consumer fraud, employment, environmental, and ERISA

21  cases.  Moreover, the fact that Hagens Berman has demonstrated a willingness and ability to

22  prosecute complex cases such as this was undoubtedly a factor that encouraged Defendants to

23  engage in settlement discussions, and added valuable leverage in the negotiations, ultimately

24  resulting in the recovery for the Class.

25        84.  Hagens Berman retained three experts to aid in prosecuting the Classes' claims.

26  These experts performed a substantial volume of critical work for Plaintiffs and the Classes.  The

27  three experts are H. Gifford Fong, Candace Preston, and Paul Meyer.  Mr. Fong holds a B.S.,

28  M.B.A. and J.D., and is President of Gifford Fong Associates, a firm specializing in fixed income,

derivative product and asset allocation analysis.  His areas of emphasis include independent valuation, model validation and portfolio strategy analysis.  Mr. Fong provided guidance in the preparation of Plaintiffs' complaints; prepared a report supporting class certification; prepared an omnibus expert report under Rule 26; prepared opposition reports to defense experts Ferrell, James, and Beloreshki; prepared reply rebuttal reports to the same three defense experts; and produced a report relating to Summary Judgment Calculations for the California Class.  Among other things, Mr. Fong's work focused on identifying and calculating the Fund's concentrations of mortgage-backed securities and corporate finance bonds and opining on the risks presented by those concentrations to the Fund's ability to achieve its investment objectives; compared the Fund's performance with its peer group and the Lehman Index; reviewed internal Schwab documents and opined on lack of management controls; audited the pricing for many of the Fund's mortgage investments; and reviewed and calculated liquidity measures and duration.  In the process, Mr. Fong was required to run a myriad of complex calculations using huge files of portfolio transaction data.

85.     Candace Preston holds a B.A and an M.B.A., is a Chartered Financial Analyst and is a founding member of Financial Market Analysis, a securities analysis and valuation firm.  She has testified in numerous cases relating to securities valuation and damages issues.  Ms. Preston was Plaintiffs' damages expert, and she produced several damages reports, including an omnibus expert report under Rule 26 and opposition and reply reports to defendants' experts.  She also produced supplemental reports on the eve of trial and served as Class Counsel's damages resource throughout the litigation.  Ms. Preston's work involved calculating §§ 11, 12 and UCL damages.  Her work complemented, and did not duplicate, the tasks performed by Mr. Fong.

86.     Paul Meyer is employed by Securities Litigation and Consulting Group of Fairfax, Virginia, and worked in the securities industry continuously for 26 years, 12 as a registered representative, nine as a branch office manager, and five as a regional officer.  Mr. Meyer produced a Rule 26 report, as well as a rebuttal report and a reply report to defendants' experts.  Mr. Meyer's work focused on putting into context for the jury Schwab's advertisements and disclosures.

1    I declare, under penalty of perjury of the laws of the United States, that the foregoing is

2 true and correct to the best of my knowledge.

3    Executed this 23rd day of July, 2010 in Seattle, Washington.

4                                                        /s/ Steve W. Berman
                                                         Steve W. Berman
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28