IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | No. C 08-01510 WHA |
| CHARLES SCHWAB CORPORATION SECURITIES LITIGATION. | |
| This Document Relates To All Cases. / | **ORDER GRANTING MOTIONS FOR FINAL APPROVAL OF CLASS SETTLEMENT AGREEMENTS (DKT. NOS. 837 AND 841) AND GRANTING IN PART MOTION FOR ATTORNEY'S FEES AND EXPENSES (DKT. NO. 844)** |

**INTRODUCTION**

In this certified class action involving the alleged violation of state and federal law in the management of, disclosures concerning, accounting for, and marketing and sales of the Schwab YieldPlus Fund, the parties move for final approval of their class settlement agreements. Additionally, class counsel move for an award of attorney's fees in the amount of almost twenty-two million dollars. This order finds that the settlement is fair, reasonable, adequate, and in the best interests of the classes, and therefore final approval of the class settlements is **GRANTED**. Furthermore, for the reasons stated below, class counsel's motion for attorney's fees and expenses is **GRANTED IN PART**.

**STATEMENT**

This order concludes a multi-year pre-trial litigation followed by a year of post-settlement litigation and administration. Last year, defendants The Charles Schwab Corporation, Charles Schwab & Co., Inc., Charles Schwab Investment Management, Inc., Schwab Investments, and certain individual defendants, and lead plaintiffs, on behalf of themselves and all others similarly

situated, reached two class settlement agreements for a federal securities class and a California class. This order resolves the parties' motions for final approval of the class settlement agreements (Dkt. Nos. 837 and 841), and class counsel's motion for attorney's fees and expenses (Dkt. No. 844).

The facts of this case have been set forth in prior orders, and will only be summarized briefly here. This action originated as multiple independent class actions filed by investors in Schwab's YieldPlus Fund, a short-term fixed-income mutual fund. These actions were consolidated into the present class action with six lead plaintiffs: Kevin O'Donnell, James Coffin, John Hill, David and Gretchen Mikelonis, and Robert Dickson (Dkt. No. 73). Gretchen Mikelonis thereafter withdrew as a lead plaintiff (Dkt. No. 192). Robert Levin was also named as a plaintiff in the second consolidated amended complaint (Dkt. No. 250). The class brought this action against several Schwab corporate entities, officers and employees of those entities, and trustees of Schwab Investments who signed the registration statements at issue.

When lead plaintiffs were appointed, they were encouraged to interview counsel and select the best possible counsel to advocate for the class. That order stated in relevant part:

> Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u-4(a)(3)(B)(v). Selection and approval of class counsel are important responsibilities for the lead plaintiff and the court. The selection and approval require an assessment of the strengths, weaknesses and experience of counsel as well as the financial burden — in terms of fees and costs — on the class. *Wenderhold v. Cylink Corp.*, 191 F.R.D. 600, 602–03 (N.D. Cal. 2000) (Walker, J.).
>
> Any important decision made by a fiduciary should be preceded by due diligence. A lead plaintiff is a fiduciary for the investor class. No decision by the lead plaintiff is more important than the selection of class counsel. Consequently, the lead plaintiff should precede his or her choice with due diligence. The extent of such due diligence is a matter of judgment and reasonableness based on the facts and circumstances. . . .
>
> The lead plaintiff should immediately proceed to perform their due diligence in the selection of class counsel, and to interview appropriate candidates, and through counsel, move for the appointment and approval of their selected counsel . . .

(Dkt. No. 73). Lead plaintiffs heeded the call. They conducted impressive due diligence, including sending a notice and invitation to bid to fifteen law firms, including every firm that filed a complaint or sought to appoint a lead plaintiff. They propounded an extensive

2

questionnaire, interviewed firms that responded to the notice, and independently researched each firms' qualifications. In selecting class counsel, lead plaintiffs considered "dedication of resources to this prosecution, experience and past success as trial lawyers and class counsel, passion for this case, willingness to work with the Lead Plaintiff, status of their investigation, ability to work with consultants and experts, proposed costs and fees, and demonstrated history of a willingness to try the case if necessary" (Dkt. Nos. 87 and 96). As a result, Hagens Berman was selected and appointed as class counsel (Dkt. No. 89). As discussed below, through this process lead plaintiffs negotiated a fee structure that greatly benefits the classes, and which includes that class counsel pay their own expenses and do not seek reimbursement from the settlement fund.

Thereafter, class counsel achieved the certification under FRCP 23 of three classes of plaintiffs, as follows:

<u>Federal Classes</u>
All persons or entities who acquired shares of the fund traceable to a false and misleading registration statement for the fund and who were damaged thereby during the period November 15, 2006, through March 17, 2008, inclusive (the "Section 11 Class"); and

All persons or entities who acquired shares of the fund traceable to a false and misleading prospectus for the fund and who were damaged thereby, during the period May 31, 2006, through March 17, 2008, inclusive (the "Section 12 Class").

<u>California Class</u>
All persons or entities who resided in California and held shares in the YieldPlus Fund on September 1, 2006.

(Dkt. Nos. 233 and 250). The case management scheduling order in this matter set the final pretrial conference for April 26, 2010, and the trial for May 10 (Dkt. No. 161). After discovery and summary judgment motion practice, just before trial was set to begin, the parties reached a settlement as to the federal classes only, on April 23. The final pretrial conference on April 26 became a status conference, during which the parties addressed the status of settlement and stated their intention to proceed to trial as to the Section 17200 claim on behalf of the California class. Prior to proceeding to trial, however, the parties reached a settlement agreement as to the California class on May 5.

For ease of navigation, the federal securities class settlement agreement can be found at docket number 693-1, with amendments at docket numbers 1061-1 (No. 1, signed May 5), 783

3

(No. 2, signed May 17), 788 (No. 3, signed May 17), and 947-1 (No. 4, signed November 24). The California class settlement agreement can be found at docket number 784. Orders preliminarily approved both class settlements on May 26 (Dkt. Nos. 804–05).

Several fairness hearings were held concerning the class settlement agreements. Such hearings were held on September 22 (Dkt. No. 868), December 15 (Dkt. No. 959), February 11 (Dkt. No. 1030), and March 10 (Dkt. No. 1078). A brief recitation of post-preliminary approval procedural history follows.

The original final fairness hearing was scheduled for September 22 (Dkt. Nos. 804–05). On August 31, the parties submitted a joint motion to modify the settlement because "in the course of providing class information to Class Counsel and the Settlement Administrator, Schwab inadvertently did not provide account information for approximately 1,172 accounts with allowed losses that held YieldPlus Fund shares at broker-dealer intermediaries other than Schwab" (Dkt. No. 854). A subsequent order directed that Schwab add more money to the funds for the benefit of the 1172 class members and that notice be sent to them promptly. That order set a final fairness hearing for the 1172 class members on December 15 (Dkt. No. 858).

On September 15, in anticipation of the original fairness hearing, class counsel submitted a "reply memorandum" in support of the joint motions for final approval (Dkt. No. 859). As a result of class counsel's statement therein that they intended to appeal a ruling regarding their Section 17200 claim, Schwab filed a "response," stating that the Court should not approve the settlement because plaintiffs were "threatening" to breach the settlement agreement; this issue was addressed at the originally-scheduled fairness hearing (Dkt. Nos. 864 and 868). After further briefing on the issue of whether the federal securities class settlement agreement released Section 17200 claims as to non-California residents, a memorandum opinion found that it did not (Dkt. No. 909).

Subsequently, Schwab, via new counsel, filed a "notice of withdrawal" from the joint motions for class settlement (Dkt. No. 918). But the parties then resolved the dispute and executed Amendment No. 4 to the class settlement agreement. New notice was provided to the class members to whom Amendment No. 4 pertained, and a new fairness hearing was set

4

concerning the release of Section 17200 claims by class members who received the new notice for February 11 (Dkt. Nos. 932 and 947–48).

When the fairness hearing was held on December 15 for the 1172 class members who held accounts through intermediary broker-dealers, class counsel presented the problem that a number of broker-dealers had not responded to the parties herein to convey identifying information for the individuals associated with YieldPlus shares held on their behalf by the broker-dealers, *i.e.* potential class members (Dkt. No. 959). Therefore, an order to show cause issued to those broker-dealers, and a hearing was held on January 5 (Dkt. No. 964). With much diligence, however, the parties were able to obtain the necessary information from all relevant broker-dealers, and new notice was sent to the newly-identified class members and a *new* fairness hearing scheduled for March 10 (Dkt. Nos. 1005–09).

The fairness hearing regarding the new Section 17200 release provided by Amendment No. 4 was held on February 11 (Dkt. No. 1030; *see also* Dkt. No. 1026 (update memorandum from class counsel)). The fairness hearing regarding the new intermediary account holder class members was held on March 10 (Dkt. No. 1078; *see also* Dkt. No. 1073 (update memorandum from class counsel)). A final class list is in the record (Dkt. No. 1092).

## ANALYSIS

This order will first explain why the pending settlement agreements are good for the class and are fair, reasonable, and adequate under FRCP 23(e) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (setting forth the factors to be considered when evaluating class action settlements). This order will then explain why the attorney's fees awarded herein are reasonable, and why the class representatives should receive an appropriate payment for representing the interests of absent class members.

### A.   FINAL APPROVAL OF CLASS SETTLEMENT AGREEMENTS

Under FRCP 23(e), court approval is required for any settlement agreement that will bind absent class members. When a proposed settlement agreement is presented, the court must perform two tasks: (1) direct notice in a reasonable manner to all class members who would be

5

bound by the proposal, and (2) approve the settlement only after a hearing and on finding that the terms of the agreement are fair, reasonable, and adequate. FRCP 23(e)(1)–(2).

With respect to class notice, the forms of class notice for the settlements have already been scrutinized and approved by the undersigned (Dkt. Nos. 804–05, 858, 948, and 1007). This order finds that the individualized notice sent by first-class mail to class members met the procedural requirements of FRCP 23(c)(2) (for the notice of class certification) and FRCP 23(e)(1) (for the notice of the settlement) as well as the requirements of due process.

The instant settlements — taking into account the reasonable attorney's fees and expenses discussed below — meet the requirement that the terms of the agreements are fair, reasonable, and adequate. The Ninth Circuit in *Hanlon* set forth various factors that a court must "explore[] comprehensively" and balance when making this determination:

> [T]he strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Hanlon*, 150 F.3d at 1026. These factors, however, are not exclusive, and a court must consider whether the settlement "taken as a whole" is fair to absent class members. *Ibid.*

These factors support final approval of the proposed class settlement agreements. The award of $200 million to the federal securities class and $35 million to the California class represent a substantial percentage of their requested damages. In other words, this is a good settlement for the class.

Turning first to the federal securities class settlement. *First*, the average estimated settlement payment is expected to be approximately $881, and the highest estimated settlement payment is expected to exceed $2,177,000 (Joaquin Decl. ¶ 13, Dkt. No. 840). These are substantial recoveries and will provide real benefits to class members.

*Second*, the recoveries are 35.9 and 23.4 percent, respectively, of the initial estimated damages by plaintiffs' damages expert for the Sections 11 and 12 claims. Plaintiffs' expert estimated damages, as disclosed to defendants prior to trial, at $651,307,533 for the Section 11 class and $855,544,974 for the Section 12 class. These numbers were calculated using a

6

month-end NAV (Preston Decl. ¶ 2, Dkt. No. 839). The $200 million settlement is 35.9 and 23.4 percent, respectively, of these expert-estimated damages (*ibid.*). In using an average NAV instead of a month-end NAV for calculating damages, plaintiffs' expert states estimated damages under Section 11 were $525,243,149, and those under Section 12 were $711,201,192. This increases the percent of recoverable damages under Sections 11 and 12 to 38.1 and 28.1 percent, respectively (*ibid.*).

*Third*, when calculating the recovery as a percentage of plaintiffs' estimated damages *after* adjusting for permissible mortgage-backed securities holdings, the percentage is larger. In this case, defendants argued that the prospectuses expressly authorized the fund to invest up to 25 percent of its assets in non-agency mortgage-backed securities, and that, consequently, damages must be reduced to accommodate this permissible level of holdings. If the Court had limited damages recoverable for the federal securities claims based on this theory, plaintiffs' estimated damages under Sections 11 and 12 would have been reduced to $439,536,755 and $467,299,361, respectively (Preston Decl. ¶ 5, Dkt. No. 839). In that case, the $200 million settlement represents 45.5 and 42.8 percent, respectively, of recoverable damages (*ibid.*).

*Fourth*, prosecuting these claims through trial and subsequent appeals would have involved significant risk, expense, and delay to any potential recovery. In light of the credit crisis our nation has undergone in recent years, it is unforeseeable how a jury would perceive a case that hinged in part on the level of risk that the investments at issue entailed. Other risks included proving loss causation and the falsity of the representations at issue.

*Fifth*, at the time of settlement there were a number of pending motions that — depending on the outcome — could have made it more or less difficult for plaintiffs to prove their case against Schwab at trial. These included motions concerning key items of evidence and testimony, such as *Daubert* challenges to potentially vital experts. Such motions magnified the risks involved in going to trial identified above.

*Sixth*, the class settlements were reached on the eve of trial when class counsel had completed discovery and had conducted extensive motion practice and were thus well aware of

7

the issues and attendant risks involved in going to trial as well as the adequacy of the amount of the class settlement.

*Seventh*, the terms and conditions of the class settlement agreement are fair and reasonable. The class settlement provides cash compensation to class members who incurred recoverable Section 11 and 12 losses during the respective class periods. The class members need not submit a claim form or provide lengthy documentation supporting their claim in order to participate. Class members need only deposit their check. And as discussed above, they are receiving substantial compensation in exchange for releasing their claims.

*Eighth*, counsel negotiated in good faith and there is no evidence whatsoever of collusion. Lead plaintiffs support the settlement, and there was a low percentage of class-member objectors, to be discussed below.

*Ninth*, the scope of the class settlement release of claims is reasonable and sufficiently limited. This issue was given extensive attention during the motion practice that led up to Amendment No. 4 to the class settlement agreement, after which any problem with the scope of the release being given by class members was cured with further notice to the class, including a further opportunity to opt out. The release is now fair and reasonable.

\*        \*        \*

As to the California class settlement agreement, the average estimated settlement payment is expected to be approximately $1,564, and the highest estimated settlement payment is expected to exceed $843,000 (Joaquin Decl. ¶ 13, Dkt. No. 843). The California class settlement amount of $35 million is 82.1 percent of the estimated damages by plaintiffs' damages expert. Plaintiffs' expert estimated damages of $42,608,906, which is the average of two damage approaches that a court order inquired about in anticipation of trial (Dkt. No. 539, and Preston Decl. ¶ 8, Dkt. No. 853-5).

For the California class, the risks of going to trial included loss causation concerns similar to those for the federal securities classes, as well as divergent approaches between the parties to calculating damages. Moreover, after preliminary approval of the California class settlement agreement, our court of appeals decided *Northstar Financial Advisors, Inc. v. Schwab*

*Investments*, 615 F.3d 1106 (9th Cir. 2010). *Northstar*'s holding that the Investment Company Act does not offer a private right of action under Section 13(a) presented a risk to the theory of recovery inasmuch as Section 13(a) was the predicate for plaintiffs' Section 17200 claim. The California class mitigated this risk prior to *Northstar* by agreeing to release their claims for substantial compensation. The terms and conditions of the California class settlement agreement are also fair and reasonable for the same reasons discussed above.

Finally, the low percentage of letters received from both federal securities and California class members objecting to the settlements supports the reasonableness and fairness of their terms. There are 252,729 federal securities class members and 27,282 California class members (Dkt. No. 1092). Letters from a total of forty-three class members objecting at least in part to the class settlements were received. The majority of the letters primarily objected to the settlements based on the merits of the claims against defendants and arguments that therefore the class settlement amounts are not adequate and/or this action should proceed to trial. Other concerns included the discount of dividends from class members' settlement awards, and objections to the definition and scope of the federal securities and California classes.

These letters have been considered in coming to the finding of this order that the class settlement agreements and distribution plan are fair and reasonable. The definition and scope of the classes were set by the Court, not by counsel (*see* Dkt. No. 233). And the eligible loss calculation under Section 12 tracks the statutory measure of recovery, which mandates that any income received on the investment be deducted in the loss calculation. Finally, as to the letters that argued that the plaintiffs' recovery would be greater at trial, possibly this is true. But the letters did not answer the problem that the class might lose at trial, as happened recently in a separate securities action. *See In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW (N.D. Cal. Nov. 27, 2007).

The only remaining issues are whether the amount of attorney's fees to be awarded to class counsel, which will be taken out of the common fund for the class, is fair and reasonable, and whether expenses for claims administration and compensation payments for lead plaintiffs are

9

reasonable. As explained in detail below, this order has ensured that these awards meet the Ninth Circuit's requirements under *Hanlon*.

Having considered the full scope of the class settlement agreements, this order finds that the terms of the settlements, the award of attorney's fees and expenses, the distribution plan, and the notice provided to class members of their rights under the settlements are "fair, reasonable, and adequate" under FRCP 23(e). Based upon this finding, the motions for final approval of the federal securities and California class settlements are **GRANTED**.

### B.  ATTORNEY'S FEES AND EXPENSE AWARDS

Class counsel move for an award of $21,704,640.58 in attorney's fees, $658,019 for claims-administration expenses, awards of $21,250 to $25,000 for the six lead plaintiffs, and $20,000 as reimbursement to plaintiff Labins to be paid from class counsel's own award. Each of these requests will be addressed in turn.

#### 1.  Standard of Review

As part of the analysis under *Hanlon*, a court must ensure that attorney's fees and costs awarded to class counsel are "fair, reasonable, and adequate." *See Staton v. Boeing Co.*, 327 F.3d 938, 963–64 (9th Cir. 2003). Common fund fees, as we have here, are consistent with the "American Rule" (*i.e.*, that each party pays for its own litigation expenses), and "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

Courts in the Ninth Circuit may use two different approaches to gauge the reasonableness of a requested fee award under the traditional common-fund approach. The first is the "lodestar" calculation, which — in the common-fund context — may include a "risk multiplier" to enhance the fees under certain circumstances. The Ninth Circuit, however, also allows a calculation based upon a percentage of the common fund. *See Staton*, 327 F.3d at 967–68. The benchmark percentage is 25 percent. *See Hanlon*, 150 F.3d at 1029. A court may consider "the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues

10

presented, and the risk of nonpayment" in deciding whether a multiplier or a downward adjustment is appropriate. *Ibid.*

### 2. Requested Attorney's Fees are Fair, Reasonable, and Adequate

This order finds the requested fees of $21,704,640.58 to be "fair, reasonable, and adequate" under *both* lodestar and percentage calculations. The requested amount is the total of $17,604,474.07 from the $200 million federal securities class settlement fund and $4,100,166.51 from the $35 million California class settlement fund. By percentage, the federal fee award is 8.8 percent of the federal fund, and the California fee award is 11.7 percent of the California fund. Compared to the Ninth Circuit benchmark of 25 percent, these percentage-of-fund numbers represent very clearly how fair and reasonable these awards are.

This is a direct result of lead plaintiffs' hard work and due diligence in selecting class counsel and negotiating a competitive incentive fee structure with class counsel at the beginning of this case. As reviewed above, in appointing the lead plaintiffs, a court order instructed them to reopen their search for class counsel. Accordingly, lead plaintiffs interviewed a number of law firms, engaging in a robust and competitive search process. Lead plaintiffs entered into extensive fee negotiations with the final firms they considered retaining. In the end, lead plaintiffs and Hagens Bermans settled on a fee structure that would start at 8 percent of any recovery of less than 10 percent of allowable losses, and would increase incrementally for each 10 percent increment of allowable losses recovered. In addition, the fees paid under this structure would be *the only payment to class counsel for litigation expenses*; expenses would not be separately reimbursed (*see* Berman Decl. ¶ 66, Dkt. No. 853).

The requested fee amounts have been calculated in accordance with lead plaintiffs' negotiated fee structure (*ibid.* ¶¶ 68, 70). Each of the six lead plaintiffs submit declarations supporting class counsel's fee request (Dkt. Nos. 846–51).

As for the lodestar calculation, class counsel's lodestar has continued to grow over the year of work that has been required post-settlement. Class counsel most recently submitted lodestar numbers on February 10, when class counsel's lodestar was $7,083,599 (Berman Decl. ¶ 7, Dkt. No. 1027). Their expenses, though not recoverable, totaled $2,710,112. This leaves class

11

1    counsel with a total case investment of $9,793,711.  After deducting the expenses from the
2    requested $21,704,640.58 fee award, dividing the lodestar into the net requested fee yields a
3    multiplier of 2.68 for class counsel's work.  The lodestar has undoubtedly continued to grow
4    since that time, as class counsel responded to administrative issues and prepared for the March 10
5    final fairness hearing (*see also* Dkt. No. 860 ¶ 7 (lodestar calculations as of September 15); Dkt.
6    No. 853 ¶¶ 78–79 (lodestar calculations as of July 23)).

7          This order finds that the requested fees are fair and reasonable under a lodestar approach
8    given this 2.68 multiplier, which is warranted given "the quality of the representation, the benefit
9    obtained for the class, the complexity and novelty of the issues presented, and the risk of
10   nonpayment" in this case.  *Hanlon*, 150 F.3d at 1029.  This class action litigation was lengthy and
11   complex.  There were great risks involved, as discussed above.  Class counsel did a good job
12   persistently advocating for the best interests of the class members, and obtained a very good
13   result for the class, as reviewed above.  Given the circumstances of this case, a risk multiplier of
14   2.68 yields a fair and reasonable fee award for class counsel under a lodestar calculation.  *See Van*
15   *Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("[m]ultipliers in the 3-4
16   range are common in lodestar awards for lengthy and complex class action litigation").

17         Moreover, the fact that class counsel does not seek reimbursement for $2,710,112 in
18   expenses, as stated, further demonstrates how fair and reasonable the fee award is.  Class
19   counsel's expenses will be reimbursed from its own award of fees.  When reducing counsel's
20   percentage-of-fund recoveries to take into account reimbursement of expenses (after dividing
21   expenses between the funds based on their proportionate sizes), the percentage-of-fund recoveries
22   are 7.6 percent of the federal settlement fund and 10.6 percent of the California settlement fund.
23   Again, this is well below the 25 percent benchmark.

24         Class counsel undertook the representation of the classes in this case on a contingent-fee
25   basis, and no payment has been made to date for their services or for their litigation expenses.
26   The results achieved, given the risks of litigation, the skill required, the quality of work
27   performed, the financial burden carried by class counsel, and the reaction of the classes after
28

12

settlement all demonstrate the reasonableness of the requested award. For the reasons stated, class counsel's request for $21,704,640.58 in attorney's fees is fair, reasonable, and adequate.

### 3. Expenses for Claims Administration

Again, pursuant to their agreement with lead plaintiffs, class counsel do not seek reimbursement for their expenses of $2,710,112. Claims-administration expenses, however, can be reimbursed from the settlement funds. Incurred claims-administration expenses of $488,894 for the federal class and $169,125 for the California class total $658,019 (*see* Joaquin Decls., Dkt. No. 840 ¶ 24 and Dkt. No. 843 ¶ 17). It does not appear that these numbers have been updated by counsel since the original application in July 2010. Therefore, these are the numbers that must be used. Class counsel's request for claims-administration expenses in the amount of $658,019 is **GRANTED**.

### 4. Compensation Payments for Lead Plaintiffs

Class counsel seek additional payments for the class representatives to compensate them for the significant time they spent in furtherance of representing the class.

For many decades, class actions preceded fairly and with excellent results without ever giving any type of "incentive payment" to class representatives. Incentive payments are a device introduced in recent years by lawyers. While in theory these payments compensate the representative for time and effort expended in support of the class, there is a huge risk that these payments are an incentive to entice a representative to support a marginal settlement:

> [E]xcessive payments to named class members can be an indication that the agreement was reached through fraud or collusion. Indeed, [i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of class members whose interests they are appointed to guard.

*Staton*, 327 F.3d at 975 (citations and quotation marks omitted). If the settlement alone is not good enough for the representative, it is likely not good enough for the class. In general, the undersigned is very reluctant to give a class representative more than class members. But considering both that this case did not settle until the eve of trial, and given the impressive amount of time and effort these lead plaintiffs put into working on this case, this order does find that the lead plaintiffs are entitled to additional payments, the amount of which will be discussed

13

1  below. These are not "incentive" fees. Rather, they are compensation for the many hours the
2  lead plaintiffs spent representing the class.

3  As can be seen from the lead plaintiffs' declarations submitted in support of class
4  counsel's motion for attorney's fees and other expenses, the lead plaintiffs were active in their
5  roles, working closely with counsel throughout this litigation. The lead plaintiffs devoted
6  hundreds of hours to, for example, reviewing documents relevant to the case, participating in
7  discussions of strategy, and attending hearings and mediation sessions (*see* Dkt. Nos. 846–51).

8  The lead plaintiffs request compensation for their time as follows. As a marketing
9  consultant, Robert Levin requests $21,250, based on an estimated expenditure of 170 hours
10 performing duties as a lead plaintiff and an hourly rate of $125 (Dkt. No. 846). As an attorney
11 and business consultant, Kevin O'Donnell requests $25,000, based on an estimated expenditure of
12 150 hours performing duties as a lead plaintiff and an hourly rate of $300, for a total of $45,000,
13 which he discounts to $25,000 (Dkt. No. 847). As a lead reliability engineer, John Hill requests
14 $25,000, based on an estimated expenditure of 150 hours performing duties as a lead plaintiff and
15 an hourly rate of $210, for a total of $31,500, which he discounts to $25,000 (Dkt. No. 848). As a
16 business consultant, Robert Dickson requests $25,000, based on an estimated expenditure of 300
17 hours performing duties as a lead plaintiff and an hourly rate of $250, for a total of $75,000,
18 which he discounts to $25,000 (Dkt. No. 849). As an attorney, James Coffin requests $25,000,
19 based on an estimated expenditure of 250 hours performing duties as a lead plaintiff and an
20 hourly rate of $300, for a total of $75,000, which he discounts to $25,000 (Dkt. No. 850). As an
21 attorney and business consultant, David Mikelonis requests $25,000, based on an estimated
22 expenditure of 750 hours performing duties as a lead plaintiff and an hourly rate of $300, for a
23 total of $225,000, which he discounts to $25,000 (Dkt. No. 851).

24 The lead plaintiffs' asserted hourly rates were calculated according to their estimated
25 hourly rates in their professions. Yet, this order should not promote the approach that lead
26 plaintiffs' role in this litigation was simply akin to their normal jobs, rather than a duty to further
27 the interests of class members. They took on the mantle of leadership as a service, not as a profit
28 center. Their main incentive is to recover shoulder to shoulder with the class. They have a larger

stake than most in a class recovery. This should be incentive enough. For these reasons, the requested amounts will be discounted, taking into account the amount of time spent by each of the lead plaintiffs, and considering that they are recovering from the settlement fund too. This order finds the following awards appropriate to compensate lead plaintiffs: $5,000 for Robert Levin, $6,250 for Kevin O'Donnell, $6,250 for John Hill, $7,500 for Robert Dickson, $7,500 for James Coffin, and $8,750 for David Mikelonis. Accordingly, class counsel's request for compensation payments for the lead plaintiffs is **GRANTED IN PART**.

### 5. Compensation Payment for Michael Labins

In addition to compensation payments to the lead plaintiffs, class counsel request that this order authorize the payment of $20,000 to Michael Labins, to be paid from class counsel's own award of fees. Labins' declaration states that he spent 40 hours on this matter as the initial putative class representative. As a "market-maker," Labins estimates an hourly rate of $500, for a total of $20,000 (Dkt. No. 852). Class counsel's request for a compensation payment for Labins is **DENIED**. One of the risks that a candidate for lead plaintiff takes is that he will not be selected as lead plaintiff and will have invested time without special compensation. Labins is at least a member of the class and will be compensated in that way. To allow class counsel to compensate Labins out of their own reward is to invite forms of collusion at the pre-lead plaintiff stage. Out of caution, this order shall not support such compensation, even if in this case there was no collusion.

*             *             *

Therefore, the fee and expense request filed in connection with the class settlements is **GRANTED IN PART**. This order awards class counsel attorney's fees of **$17,604,474.07** payable to class counsel from the federal settlement fund, and **$4,100,166.51** payable to class counsel from the California settlement fund. Class counsel's out-of-pocket litigation expenses of $2,710,112 are not separately recoverable.

This order awards interest on the attorney's fees payable to class counsel calculated for the same time period established by the settlement agreements and at the same rate as that earned on the settlement funds. This order approves class counsel's request to reimburse the claims

administrator for current fees and expenses related to claims administration in the amount of $488,894 from the federal settlement fund and $169,125 from the California settlement fund.

In addition, this order awards lead plaintiffs their costs and expenses directly related to the representation of the class in the following amounts: $5,000 for Robert Levin, $6,250 for Kevin O'Donnell, $6,250 for John Hill, $7,500 for Robert Dickson, $7,500 for James Coffin, and $8,750 for David Mikelonis. These reimbursement awards are to be paid from the federal settlement fund. This order disapproves compensation payment for Michael Labins from class counsel's award of fees.

This order finds that due and adequate notice was directed to all persons and entities who are class members, advising them of class counsel's intent to seek attorney's fees, claim-administration expenses, reimbursement for lead plaintiffs, and of their right to object thereto. A full and fair opportunity was accorded to all such persons and entities to be heard with respect to the fee application.

## CONCLUSION

Therefore, the parties' joint motions for final approval of the class settlement agreements are **GRANTED**, and class counsel's motion for attorney's fees and expenses is **GRANTED IN PART**. This order finds that the settlement is fair, reasonable, and adequate, and in the best interests of the class members.

Solely as to the attorney's fees awarded herein, of the total amount of fees awarded, 50 percent may be paid to counsel after the "effective date" as defined in the settlement agreements. The remaining 50 percent of attorney's fees may be paid only after counsel certifies that all class members have received and cashed their checks, no problems with the distribution have been reported for a period of 30 days, and there is nothing left to do, unless leave of Court is otherwise granted. If problems do arise and if the management of this fund so necessitates, any shortfall in funds to pay class members may be deducted from the unpaid attorney's fees.

**IT IS SO ORDERED.**

Dated: April 19, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

16